

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

SEP 2 7 2001

Michael N. Milby
Clerk of Court

|  |  |  |
|---|---|---|
| PAUL RICHARD COLELLA, | § § § § | |
| PETITIONER, | § § | |
| V. | § § | CIVIL ACTION NO. **B-01-166** |
| JANIE COCKRELL, Director,<br>Texas Department of Criminal,<br>Institutional Division, | § § § § | |
| RESPONDENT. | § § § | |

## PETITIONER'S PETITION FOR WRIT OF HABEAS CORPUS

TO THE HONORABLE JUDGE OF THE UNITED STATES DISTRICT COURT:

Petitioner Paul Richard Colella ("Petitioner"), Texas Department of Criminal Justice Inmate No. 999045, through undersigned counsel and pursuant to the United States Constitution, the laws of the United States, and 28 U.S.C. § 2254, submits this Petition for a Writ of Habeas Corpus (the "Petition") to seek release from confinement on grounds that his custody violates the United States Constitution and laws of the United States.

### I.    INTRODUCTION

1.     Paul Colella is sentenced to death. Disturbing events occurred during Petitioner's capital murder trial. The State repeatedly used false testimony to secure Mr. Colella's conviction. The false testimony concerned critical issues, any one of which would cause a rational person to say, "That fact was important to my guilty decision and my decision to sentence Mr. Colella to death." The false testimony was sponsored knowingly: the State's witnesses in Petitioner's trial had testified inconsistently, often under examination by the same prosecutor, only months earlier in the capital

1

murder trial of Petitioner's wife, Brenda Bowling Colella.

2.      The problems with Mr. Colella's case do not stop with the false testimony. Petitioner's sole appointed trial counsel, trying his first death penalty case, was not paid until almost two years after trial. Crucial leads were not investigated.  Counsel made multiple critical mistakes at every stage.

## II.      CONFINEMENT AND SENTENCE

3.      Petitioner is confined at the Polunsky Unit, Texas Department of Criminal Justice, Institutional Division, in Livingston Texas, in the custody of Janie Cockrell, Director of the Institutional Division.

4.      Petitioner is confined under a Judgment entered on September 11, 1992, by the 357th Judicial District Court of Cameron County, Texas, Hon. Rogelio Valdez, presiding.  A copy of this Judgment is Exhibit 1 in the eight volume of appendices (the "Appendices") filed simultaneously with this Petition.  The Appendices are adopted and incorporated herein for all purposes.   Further, in his state habeas proceedings, Petitioner submitted the exhibits in appendices volumes I through VII and in an earlier proceeding in federal court (described below) the Petitioner submitted many of these exhibits.  All of these exhibits are on file with this Court or will be part of the record and incorporated herein for all purposes.

## III.      PROCEDURAL BACKGROUND

### A.      Trial and Direct Appeal.

5.      A grand jury in Cameron County, Texas indicted Petitioner Paul Colella, his wife Brenda Bowling Colella, and Anthony Randall "Red" Wilson for the capital murder of Michael Lavesphere and David Ray Taylor.  *See* Appendix I, Exhibit 2 (Indictment).[1]  The trial cou

---

[1]  Hereinafter, citations to exhibits contained in the eight volumes of Appendices to this Petition will employ the citation form "App. [volume number], Exh. [exhibit number]." —itations to the trial record will employ the citation form S.F. Vol. [volume number]: [page number(s)]. Citations to the record of Brenda Bowling Colella's trial will preceded by "(BBC)," but otherwise employ the same citation form.  The referenced portions of the record of Brenda Colella's trial can be found in Appendix I, Exhibit 4.

2

appointed one attorney, Abel E. Limas of Brownsville, to represent Mr. Colella. *See* App. I, Exh. 3 (Order Appointing Attorney).

6.      Brenda Colella was tried and convicted of capital murder in late May and early June of 1992. (BBC) Vol. IX: 989. On May 26, 1992, shortly before Mrs. Colella's trial, Red Wilson entered into an immunity agreement with the State of Texas. *See* App. I, Exh. 5 (Agreement for Immunity from Prosecution for Testimony with the State of Texas, hereinafter "Immunity Agreement"). Red Wilson was given complete immunity from capital murder charges "for his truthful testimony" at Mr. Colella's trial and/or Brenda Colella's trial, *id.* at 1, and so long as the State did not gain evidence that Red Wilson had "voluntarily participated in the actual killing" of the victims. *Id.* at 2.

7.      On June 23, 1992, due to extensive pretrial publicity about Mr. Colella's case arising from Brenda Colella's earlier capital murder trial, Mr. Colella moved to transfer venue from Cameron County. *See* App. I, Exh. 6 (Motion for Change of Venue). The motion was denied at a hearing on June 26, 1992. *See* App. VI, Exh. 54 (Transcript of Pre-Trial Hearing).

8.      Mr. Colella's trial began on August 17, 1992. S.F. Vol. V: 2. After a jury was empaneled, the guilt phase began on August 24, 1992. S.F. Vol. XI: 9. On September 3, 1992, after deliberating from 11:10 a.m. to 4:30 p.m., the jury convicted Applicant of capital murder. S.F. Vol. XIX: 1560-62; *see also* App. I, Exh. 7 (Verdict on Guilt Including Charge). The sentencing phase began on September 3, 1992 at 4:55 p.m. (S.F. Vol. XX: 3) and ended on September 4, 1992. S.F. Vol. XXI: 201. After deliberating from 3:50 p.m. to 5:30 p.m., the jury answered "yes" to Special Issue No. 1 and "no" to Special Issue No. 2 submitted under Texas Code of Criminal Procedure art. 37.071 § 2(b)(1) & (e). *Id.*; *see also* App. I, Exh. 8 (Verdict on Punishment Including Charge). The jury's answers resulted in a mandatory sentence of death by lethal injection.

9.      Mr. Colella's appointed trial counsel represented him on direct appeal, again without

co-counsel. *See Colella v. State*, 915 S.W.2d 834, 836 (Tex. Crim. App. 1995); *see also* App. I, Exh. 9 (Transcript of Evidentiary Hearing, *Ex Parte Colella*, No. 92-CR-173-E, at 6 (357th Judicial Dist. of Texas, April 6, 1998)). On October 11, 1995, the Texas Court of Criminal Appeals affirmed the judgment of conviction and sentence of death. *Colella*, 915 S.W.2d at 845.

10. The Court of Criminal Appeals' opinion contained a lengthy dissent by two Judges which concluded that "the evidence in this record suggests that [Red Wilson], not appellant committed the murders." *Id.* at 859. The dissent continued:

> In conclusion, after a painstaking review of the entire record, I am convinced the non-accomplice evidence is insufficient to corroborate the accomplice witness testimony. I would reverse the judgment of the trial court and order an acquittal. Judge Learned Hand once wrote that '[o]ur procedure has always been haunted by the ghost of an innocent man convicted. It is an unreal dream.' *United States v. Garsson*, 291 F. 646, 649 (S.D.N.Y.1923). I fear, in the instant case, that unreal dream is a reality. I respectfully dissent.

*Id.* (footnote omitted).

11. On February 21, 1996, the Court of Criminal Appeals denied rehearing. Mr. Colella's counsel did not file a petition for a writ of certiorari with the United States Supreme Court.

### B. First State Habeas Proceeding

12. On July 15, 1998, the Court of Criminal Appeals dismissed Mr. Colella's Untimely Application as an abuse of the writ. *See* Ex. 13 (Order, *Ex Parte Colella*, No. 37,418-01), at 1. The *per curiam* majority noted that the Untimely Application was "untimely" and that its claims did not satisfy the provisions of art. 11.071 § 5(a). *Id.*[2]

---

[2] This provision bars consideration of an untimely application unless it "contains sufficient specific facts establishing that: (1) the current claims and issues have not been and could not have been presented previously...;[or] (2) [that] by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt; or (3) by clear and convincing evidence, but for a violation of the United States Constitution no rational juror [could have sentenced the defendant to death]." Art. 11.071 § 5 (a).

13.     Mr. Colella filed a Petition for a Writ of Certiorari to the United States Supreme Court, which was denied.

### C.     First Federal Habeas Proceeding.

14.     Mr. Colella filed a Preliminary Petition for a Writ of Habeas Corpus in the United States District Court for the Southern District of Texas, Brownsville Division, on September 9, 1998. Mr. Colella filed an Amended Petition on March 23, 1999.  On September 1, 1999, TEX. CODE CRIM. PROC. Ann. art. 11.071 § 4A(f) took effect, which permits habeas applicants whose appointed counsel, before September 1, 1999, "filed an untimely application or failed to file an application before [the relevant due date]" to the appointment of new counsel and an opportunity to file an additional habeas application. Mr. Colella was entitled to the benefit of § 4A(f).  On February 29, 2000, United States Magistrate Judge John William Black entered a Report and Recommendation recommending that Mr. Colella's pending federal petition be dismissed without prejudice to allow him to return to state court and exhaust his remedies under § 4A(f). *See* App. VI, Exh. 55 (Report and Recommendation).   In the Report, the Magistrate ordered and the State of Texas agreed that "[t]he federal habeas limitations periods is EQUITABLY TOLLED AND/OR TOLLED  in all respects to and including September 1, 1999." *Id.* at ¶ 19 B.; *see also id.* at ¶ 15.   Also, the Report provided that "[i]f Petitioner files a federal habeas petition following exhaustion of his state remedies, that petition will not be deemed "second or successive under AEDPA [the Anti-terrorism and Effective Death Penalty Act of 1996]." *Id.* at ¶ 17.  United States District Judge Hilda Tagle adopted Magistrate Black's Report and Recommendation and entered an Order dismissing Mr. Colella's federal habeas action on March 14, 2000.  *See* App. VI, Exh. 56 (Court Order).

**D.      State Habeas Proceedings Pursuant to TEX. CODE CRIM. PROC. art. 11.071 §
4A(f).**

15.      On April 20, 2000, the Court of Criminal Appeals entered an Order appointing
Andrew Hammel as counsel to represent Mr. Colella and ordered that Mr. Colella file his Original
Application on or before August 18, 2000. *See* App. VI, Exh. 57 (Order of the Court of Criminal
Appeals). On August 18, 2000, Petitioner, represented by court-appointed counsel, Mr. Hammel,
filed his Original Application for Writ of Habeas Corpus with the convicting court. On August 24,
2000, Petitioner filed an Unopposed Motion for Withdrawal and Substitution of Counsel, requesting
that Mr. Hammel be granted permission to withdraw as counsel because he was moving to
Massachusetts to pursue further legal studies, and that Mr. Raoul Schonemann be appointed in his
place. On August 30, 2000, the Court of Criminal Appeals granted Petitioner's motion. On October
13, 2000, Petitioner filed a motion for extension of time to file the amended application. On October
16, 2000, the Court of Criminal Appeals granted Petitioner's motion and ordered that "the application
is to be filed no later than 270 days after April 20, 2000, with due date being January 15, 2001."
Pursuant to Rule 4.1(b) of the Texas Rules of Appellate Procedure, Petitioner's due date was
extended to January 16, 2001.[3] In any event, on January 14, 2001, Petitioner filed his First Amended
Application with the trial court.

16.      Under Texas Code of Criminal Procedure art. 11.071 § 7(a), the State's answer to
Petitioner's state habeas application was due on May 16, 2001. The State did not file an answer on
May 16, 2001.

17.      Instead, on May 17, 2001, the State's Attorney, Cameron County Assistant District

---

[3] Rule 4.1(b) of the Texas Rules of Appellate Procedure provides that if "the act to be done is filing a document, and
if the clerk's office where the document is to be filed is closed or inaccessible during regular hours on the last day for
fiing the document, the period for filing the document extends to the end of the next day when the clerk's office is open
or inaccessible." TEX.R.APP.P. 4.1(b) (West 2000). Because the Cameron County District Clerk's office is closed on
January 15, 2001, for Martin Luther King, Jr., Day, Rule 4.1(b) extends the period for filing this Amended Application
to January 16, 2001.

Attorney, John Olson, informed the trial court by letter that he had intended to submit a "proposed order" but had not done so because his grandmother passed away on May 16, 2001, and he had been preoccupied with her illness in the days preceding her death. Mr. Olson also requested that he be given until May 21, 2001 to submit a "proposed order".

18.    On May 21, 2001, the State submitted two proposed orders to the Honorable Benjamin Euresti, Jr., Judge of the 107th Judicial District Court, Cameron County, Texas, presiding by assignment. Upon information and belief, Judge Euresti was assigned to Petitioner's case because Judge Valdez of the 347th Judicial District Court of Cameron County, the judge who had presided over Petitioner's trial, had retired. The new judge of the 347th Judicial District Court of Cameron County, Texas, the Honorable Abel Limas, was Petitioner's court-appointed trial counsel, so presumably Judge Limas recused himself.

19.    One of the State's proposed orders called for a hearing without referencing any claims. The lengthier proposed order contained rulings denying relief on the basis of so-called procedural defaults, and other defenses and affirmative defenses that the State had never pleaded in any answer as required by Section 7(a) (the "Lengthier Order"). Counsel for Petitioner received the proposed orders on May 22, 2001.

20.    On May 23, 2001, without notice to Petitioner or his counsel (at this point, Ms. Welch had been substituted for Mr. Schonemann as counsel; Mr. Powell and Ms. Karamanian appeared as pro bono counsel), the district judge to whom this case was assigned for the purpose of the article 11.071 proceeding (again, who was not the trial judge) signed the Lengthier Order without any changes whatsoever. *See* App. VIII, Exh. 68 (Order, signed May 23, 2001 and filed May 24, 2001).

21.    On May 25, 2001, not knowing that the State's proposed order has been signed, Petitioner's counsel placed in the mail, addressed to the District Clerk for filing, Applicant's

Objection to State's Failure to File an Answer and Motion to Preclude Defenses ("Objection"). *See* App. VIII, Exh. 69 (Objection). The Objection was based on the State's failure to file an answer, as required by section 7(a) of article 11.071. Petitioner objected to the Court's entry of *any* order sustaining any unpleaded procedural defense, procedural default, or other supposed defenses or affirmative defenses to the Application. Petitioner further objected to the State's failure to comply with sections 7, 8 and 9 of article 11.071.

22.     Upon learning that the district court had already entered the State's proposed order disposing of all of Petitioner's claims for relief, Petitioner filed a pleading objecting to the May 23, 2001 order, asking the district court to reconsider and vacate the order and renewing his previous, and renewing his previous request for discovery and an evidentiary hearing.[4]  Thereafter, Petitioner's counsel learned that the transcript of the article 11.071 proceedings had been forwarded to the Texas Court of Criminal Appeals ("CCA") and was informed, through the Clerk's office, that the judge was not going to reconsider his order.   Accordingly, Petitioner's counsel submitted a proposed order denying the objections, motion to reconsider and vacate, and renewed motions for evidentiary hearing and discovery which also directs the court clerk's office to prepare a supplemental transcript of the proceedings and forward it to the CCA.  Also, Petitioner filed in the CCA his Applicant's Objections to District Court's Order and Motion to Vacate and Remand. *See* App. VIII, Exh. 71.

23.     On September 19, 2001, the CCA issued an order (without an opinion) in which it denied Petitioner's relief. *See* App. VIII, Exh. 72 (Sept. 19, 2001 Order).

---

4  The pleading is titled:  Applicant's Objections to the Trial Court's Order of May 23, 2001 and all Procedures Contrary to Article 11.071; Motion to Reconsider and Vacate Entry of Order of May 23, 2001, Denying Applicant's First Amended Application for Writ of Habeas Corpus; and Renewed Motion for Evidentiary Hearing and Discovery. *See* App. VIII, Exh. 70.

## IV.   JURISDICTION AND EXHAUSTION

24.   This Court has jurisdiction pursuant to 28 U.S.C. § 2241(d) because Mr. Colella was

convicted and sentenced in the district court of Cameron County, Texas. Petitioner presented each

and every claim raised in this Petition to the Texas courts, which denied relief. This Petition is

timely under the Anti-terrorism and Effective Death Penalty Act, which enacted a one-year statute

of limitation for filing federal habeas corpus petitions challenging state sentences. *See* 28 U.S.C.

§ 2244(d)(1) ("A 1-year period of limitation shall apply to an application for a writ of habeas

corpus by a person in custody pursuant to the judgment of a state court."). The one-year period

is tolled while an inmate pursues habeas relief in the State courts. *Id.* In a Report and

Recommendation dated February 29, 2000, entered by the United States Magistrate John Black

of the United States District Court for the Southern District of Texas, Brownsville Division

(which Report and Recommendation Judge Tagle later adopted), the State of Texas agreed and the

Court found:

> The interests of justice would be served, and all federal and state policies respected, if a
> period of equitable tolling and/or tolling is held to encompass all time which otherwise
> would have been charged  against Petitioner under the federal habeas limitations period
> until September 1, 1999, the date upon which a newly-created state post conviction
> remedy, which removed prior impediments to exhaustion of Petitioner's claims, became
> available to Petitioner. The Respondent has expressly agreed to this finding, and the Court
> so relies on Respondent's agreement in entering these findings and recommendations.

*See* App. VI, Exh. 55 at ¶ 15. Accordingly, the Court ordered "[t]he federal habeas

limitations period is EQUITABLY TOLLED AND/OR TOLLED in all respects to and including

September 1, 1999." *Id.* at ¶ 19B. Mr. Colella filed his Application for Writ of Habeas Corpus

in the Texas courts on August 18, 2000 (twelve (12) days before the end of the one-year period),

9

and the Application remained pending in the Texas courts from August 18, 2000 until September 19, 2001. The pendency of Mr. Colella's habeas application in the Texas courts tolled the running of the one-year period from August 18, 2000 through September 19, 2001. The Petition in federal court is being filed on September 26, 2001, which is within the one-year period from September 1, 1999, given the tolling of the running of the statute of limitation for the period August 18, 2000 through September 19, 2001.

## V.  RELEVANT FACTS

25.     The following narrative describes the events that occurred on September 12 and 13, 1991. It is derived from the accounts given at two trials – the trial of Brenda Bowling Colella, held in late May and early June of 1992, and the trial of Paul Richard Colella, held in September of 1992.[5] Most of the witnesses who testified at Mr. Colella's trial also testified earlier at Mrs. Colella's trial. However, piecing together a coherent narrative of the events of those two days is difficult, because the testimony of the State's primary witnesses was marked by significant inconsistencies both within and between the trials. Further, many of the witnesses who testified at Petitioner's trial volunteered additional or inconsistent information under oath at Mrs. Colella's trial.

### A.     September 12, 1991.

26.     On September 12, 1991, three men – Michael Lavesphere, David Ray Taylor, and Ricky Taylor  – came to South Padre Island, Texas. Ricky Taylor and David Ray Taylor were brothers. All three were roughnecks or seismic technicians for B and W Enterprises, a seismic drilling concern. S.F. Vol. XVI: 869-74 (testimony of Delora Waldorff, co-owner of B and W Enterprises). Ricky Taylor had criminal convictions for drug dealing, drunk driving, and burglary. S.F. Vol. XVI: 954-56. He had served time in the penitentiary. *Id.*

27.     The three men came to South Padre Island for a vacation, after a work assignment

---

[5] Where appropriate, other relevant facts are also included in the Claims for Relief portion of this Petition.

had been canceled owing to bad weather. S.F. Vol. XVI: 941. Either just before or after coming to the Island, all three cashed large paychecks. *Id.* at 875; 943. Each carried hundreds of dollars. *Id.; see also* (BBC) S.F. Vol. VIII: 884 (Ricky Taylor carried around $700, David Ray Taylor carried between $500 and $700); S.F. Vol. XVI: 1041-44 (Ricky Taylor had about $500; David Taylor also had about $500; Michael Lavesphere was carrying hundreds of dollars in a roll in his front pocket). The three men drove along South Padre Island in a white pickup owned by B and W Enterprises. They had bought ice and a case of beer. S.F. Vol. XVI: 944-50. They came upon a vehicle that looked "pretty stuck" in the sand, and a "lady came up to us and asked us if we could try to help get her out." *Id.* at 950.

28.    The three men were trying, unsuccessfully, to tow the car out of the sand. *Id.* at 951. At that time, a red and white Ford Bronco approached. *Id.* None of the three men had ever seen the Bronco or its occupants before. *Id.* Four people rode in the Bronco: Anthony Randall "Outlaw Red" Wilson, the owner of the Bronco, Paul Colella, Lori Gully (Mr. Colella's sister), and Brenda Colella (Mr. Colella's wife). *Id.* at 952; *see also* S.F. Vol. XVII: 1299 (testimony of Paul Colella). Red Wilson and the Colellas were part of a community who lived on South Padre Island, either in vehicles, trailers, or tents. Red had convictions for burglary, trespass, two possessions of marijuana, two thefts and several DWIs. S.F. Vol XIII: 449-50. He survived by cruising the beach, looking for "tows" – people whose cars were stranded and who would pay for Red's help to free them. S.F. Vol. XVII: 1283, 1297; S.F. Vol. XIII: 468-75 (testimony of Red Wilson). Paul Colella would occasionally help Red for a small portion of the fee. Paul and Brenda Colella had recently married and moved to South Texas from Indiana, where they still had strong family ties.

29.    Either Paul Colella or Red Wilson approached the three men in the white pickup. S.F. Vol. XVI: 951, 953. Red, assisted by Paul, freed the car while the three men watched. *Id.* The three men in the white pickup asked Red and Paul if they wanted to "drink a beer." *Id.* at 953-54. Ricky Taylor also asked them "about where a party was going on." *Id.* at 957. Red and Paul said

11

they had something to do, but that the two groups might meet later. *Id.* at 954. Lavesphere and the Taylors returned to their white pickup and drove north on the beach, where they stopped and swam. *Id.* at 958. While driving south, at about 5:00 or 6:00 p.m. they once again encountered the red Bronco. *Id.* The two groups of people – David Ray Taylor, Ricky Taylor, and Michael Lavesphere from the white pickup, and Red Wilson, Paul Colella, Brenda Colella, and Lori Gully from the red Bronco – hung out and "partied" for about two hours. *Id.* at 1017-18. The three men drank beer and "screwdrivers" (orange juice and vodka) from a two-liter plastic bottle, and everyone passed around several marijuana cigarettes. *Id.* Brenda went to work at Pizza Hut, but returned about half an hour later, saying she wasn't needed. S.F. Vol. XIII: 492-93, 499 (testimony of Red Wilson); S.F. Vol. XVII: 1311 (testimony of Paul Colella). According to Red , at least one of the three men in the white pickup said they had come to South Padre Island "looking for girls." (BBC) S.F. Vol. VIII: 769. One of the three men (apparently Ricky Taylor) began playing with and throwing sand at Brenda Colella. S.F. Vol. XIII: 500-02. He grabbed Brenda's buttocks. S.F. Vol. XVIII: 1431-32. Brenda chased him and told him to quit throwing sand. *Id.* Eventually, Paul asked him to quit messing with his wife, which he did. S.F. Vol. XIII: 505. All the while, everyone drank alcohol and smoked marijuana. S.F. Vol. XVII: 1307; S.F. Vol. XIII: 495 (testimony of Red Wilson); S.F. Vol. XVI: 1017-18 (testimony of Ricky Taylor). Paul and Brenda Colella argued because Paul was supposed to be in Alcoholics Anonymous and should not have been drinking. S.F. Vol. XVII: 1313.[6]

 30. Shortly after the argument, Brenda returned to the campsite she shared with Paul. S.F. Vol. XIII: 506-08. Red later told police that one of the three guys in the white pickup told him that they wanted to follow Brenda to the campsite and "wait . . . at the campsite where Brenda had gone to," but that Red warned them not to go to the campsite unless they saw his Bronco there. (BBC) S.F. Vol. VIII: 770-71; *see also* App. II, Exh. 15 (Statement of Red Wilson, September 17,

---

[6] In his testimony at Mr. Colella's trial, Red Wilson declared that Brenda had told him that she didn't want Paul drinking because he "beat her up" when he got drunk. S.F. Vol. XIII: 506-07. Paul Colella adamantly denied this. S.F. Vol. XVII: 1313. In fact, Mr. Colella has never been arrested for spousal abuse, and every trial witness who testified at both

1991) (hereinafter "Red's Statement") at 2 ("They told me that they would wait for us there at the camp site, where Brenda had gone too. I told them not to go to the camp site unit [unless] they saw my truck there."). Red then denied that he warned the three men not to be alone with Brenda. (BBC) S.F. Vol. VIII: 770.

31.     Shortly after Brenda left, Paul and Red drove the beach looking for a tow. S.F. Vol. XIII: 509-11. The three men in the white pickup told Red that they would continue to "hang out." *Id.* However, according to his statement to police on September 17, 1991, Red said the three men got into the pickup and followed Red's Bronco:

> Paul and I rode in my Bronco, while the (3) men rode in their white truck. They followed behind my bronco, but kept dropping back a distance from us. I then took the excess [sic] road on the highway, where I saw the white truck continue to go north on the beach. As I drove north on the highway, I saw the white truck then back around on the beach and *they started to ride south or in the direction of the camp site.*

App. II, Exh. 15 (Red's Statement) at 2 (emphasis added). Shortly after this, Red lost sight of the three men. *Id.* The three men in the pickup then stopped at a trailer near the campsite. They were "whipping it up, partying, looking for the party, drunk." S.F. Vol. XVI: 989 (testimony of Vikki Larsen).

32.     Unable to find a tow, Red and Paul went to a public shower. Red maintains that Paul burglarized a boat while Red showered, while Paul claims that Red burglarized the boat. *Compare* S.F. Vol. XVII: 1320-22 (Paul Colella's account) *with* S.F. Vol. XIV: 523-28 (Red Wilson's account).

33.     In Mr. Colella's trial, both Paul and Red agreed that the burglary netted a tote bag containing a camera, pills, loose ammunition, and a gun. S.F. Vol. XIV: 533. Paul and Red then took turns firing the gun at cans and a road sign. S.F. Vol. XIV: 534-35; S.F. Vol. XVII: 1329. In a sworn affidavit provided to the police shortly after the incident, on September 17, 1991, Red never

_____

trials denied ever having seen Paul hit Brenda Colella.

mentioned the theft of the totebag, the contents of the totebag or shooting the gun. *See* App. II, Exh. 15 (Red's Statement). He said that he was unaware that Paul had a gun until he showed it later at the trailer. *Id.* He further said in his sworn statement that he did not know where Paul had got the gun. *Id.* According to Red's later testimony, these statements were lies. S.F. Vol. XIV: 626, 663-65.

34.     While Paul and Red were shooting, Brenda Colella, in a state of hysteria, arrived at the trailer of Albin "Jack" Dunn. Jack Dunn's trailer, which he shared with Vikki Larsen, had running water and electricity, and it was thus a gathering place for beach dwellers. S.F. Vol. XIII: 295 (testimony of Jack Dunn). Brenda's clothing was torn, there were deep scratches and bruises on her upper body, her shorts were wet, her hair was in disarray, and she was screaming and sobbing hysterically. She said that she had hitched a ride with the three men in the white pickup. They had offered her a ride to her campsite, but instead had driven behind some dunes and raped her. *See, e.g.*, S.F. Vol. XIII: 298-300 (testimony of Albin "Jack" Dunn: "Brenda came in screaming, very hysterical, her clothes tore all off her, scratches on her, and said she had been raped"; her blouse was "ripped wide open," she had scratches on her "arms and the neck, shoulders, chest"); S.F. Vol. XIV: 538-40 (testimony of Red Wilson); S.F. Vol. XVI: 973-74 (testimony of Vikki Larsen: "[S]he was crying and hysterical. . . . I brought her into the trailer. She was – her shirt was all torn. Her pants were soaking wet. She was full of sand and she had said that then that she had been raped."); *id.* at 975 ("Her pants were soak[ing] wet. Her shirt was torn. She was in total disarray."). Brenda refused to go to the hospital or report the rape to police because she had stolen and cashed a welfare check in Indiana, and believed she had warrants out for her arrest. S.F. Vol. XVII: 1343; S.F. Vol. XVI: 973.     With one exception, all the witnesses to Brenda's physical state and behavior immediately following her return to Jack Dunn's trailer on the night of September 12th believed she had been raped. Jack Dunn, for instance, unhesitatingly affirmed, "Yes, most definitely I believed she was raped." S.F. Vol. XIII: 314. Vikki Larsen also unequivocally stated that from "what [she] saw," she believed Brenda had been raped. S.F. Vol. XVI: 1001.

14

35.     Sherie Wilson, however, for unexplained reasons, claimed not to believe Brenda. Sherie lived near Jack Dunn in a bus with her husband, Sid Wilson. Sherie arrived at Jack's trailer shortly after Brenda had arrived. Sherie was an alcoholic and weekly user of marijuana who got drunk on beer and whiskey daily and often enjoyed dancing on top of the bus where she lived. S.F. Vol. XIII: 357 (admits that "other people" would say she had a drinking problem); (BBC) S.F. Vol. VI: 503-04 (describes alcohol and drug habits). Sherie confirmed that she was drunk on hard liquor on the night of September 12th. S.F. Vol. XIII: 362; *see also* S.F. Vol. XVI: 999 (Vikki Larsen: "Sherrie was very, very drunk."). Although she helped clean Brenda and witnessed Brenda's demeanor, she said that she did not believe Brenda had been raped. S.F. Vol. XIII: 352. However, she could not say why. *Id*. ("I really can't tell you [why I didn't believe her]. I don't know. I helped her bathe, I helped her get showered. I don't know, but I didn't and don't.").

36.     During Brenda Colella's trial, Sherie Wilson was quizzed about why she was the only person to witness Brenda's demeanor and physical state who disbelieved Brenda. She could not give any specific reason, although she admitted to pitying Brenda and considered her to have loose morals. (BBC) S.F. Vol. VI: 492, 499, 520 (can't remember why she disbelieved Brenda, admits that her alcoholism interferes with her memory); *id*. at 506, 519 (denies disliking Brenda, but says she "feels sorry for her" and did not want Brenda around the bus where she lived because she thought Brenda was "trouble"); S.F. Vol. XIII: 353 (Sherie Wilson considered Brenda "loose"). Sherie admitted that she had never even met the men in the white pickup, and had never seen Brenda flirting or "partying" with any of them. (BBC) S.F. Vol. VI: 517. She also admitted that Brenda's looseness was merely her "opinion," and that she didn't "know" based on specific personal knowledge that Brenda was loose. S.F. Vol. XIII: 361-62. At his own trial, Paul Colella testified that Sherie Wilson had taken a dislike to both Paul and Brenda from when she first met them. S.F. Vol. XVIII: 1349.

37.     While Brenda was being calmed, Vikki Larsen left Jack Dunn's trailer, found Paul and Red, and told them what happened. S.F. Vol. XVI: 975. When Paul entered the trailer and saw

CVisPDF - www.texiss.com

his wife's condition and heard what had happened, he was outraged and threatened to kill the men in the white pickup. S.F. Vol. XVII: 1339 (testimony of Paul Colella). All witnesses agreed that Paul believed that the three men in the white pickup had raped his wife. *See, e.g.*, S.F. Vol. XVI: 1001 (Vikki Larsen affirms there was no question Paul believed his wife). Witnesses confirm that Paul was extremely upset. *See, e.g.*, *id.* (Paul was "out of control").

38.   At this very moment, when Paul Colella was still outraged, Sherie Wilson, who was extremely drunk, called Brenda a liar in front of everyone, saying something like "you can't rape the willing." S.F. Vol. XIII: 371. Paul and Brenda were infuriated at Sherie's vulgar insults, and a fight ensued involving Paul, Brenda, and Sherie. Red remembers that the fight started when Sherie Wilson slapped Paul. S.F. Vol. XIV: 546. As Sherie Wilson recalled, all three started "brawling" and exchanged blows during the melee. (BBC) S.F. Vol. VI: 493-94.

39.   Sherie Wilson left to tell her husband, Sid Wilson, that Paul had hit her in the mouth. S.F. Vol. XIII: 354. Sid Wilson, like his wife, drank alcohol. *Id.* at 350. He had several convictions for theft and driving while intoxicated. *Id.* at 410-11. Sherie admitted that her husband's behavior could be erratic. (BBC) S.F. Vol. VI: 514 (describes husband as "kind of goofy" and concedes that he "doesn't always act reasonably"). After his wife woke him and told him that Paul had hit her, Sid charged out of his bus, wearing only his underwear, and confronted Paul. S.F. Vol. XIII: 355. Sid was intoxicated. S.F. Vol. XIII: 383-84 (testimony of Sid Wilson); S.F. Vol. XVIII: 1352 (testimony of Paul Colella). Sid Wilson chased Paul down the road, threatening him. (BBC) S.F. Vol. VII: 638. Sid was bigger than Paul. *Id.* To frighten Sid, Paul retreated and shot into the air the revolver that had earlier been stolen. However, Sid kept pursuing and threatening Paul. Paul did not point the gun at Sid. S.F. Vol. XIII: 392. Sherie admitted that it was not "logical" for an unarmed man wearing only his underwear to chase and threaten an armed man, but admitted that her husband had done so. S.F. Vol. XIII: 366.

40.   Eventually, Red Wilson picked up Sid, who was still yelling at Paul and threatening

him, and returned Sid to Jack Dunn's trailer. S.F. Vol. XIV: 555 (testimony of Red Wilson). He then dropped off Brenda and Paul at their campsite, which was some distance from Sid Wilson's bus. S.F. Vol. XIV: 557. Meanwhile, Sid Wilson returned to his bus, got into his truck, and went looking for Paul Colella. S.F. Vol. XIII: 387-88. About 5-10 minutes later, Red and the Colellas heard the distinctive sound of Sid's Suburban driving to the campsite they shared: "I can just about tell by the sound that it was Sid's Suburban being fired up, revved up, the motor, and telling us that he was upset, that he was *wanting something to go down*, such as he was going to come over more than likely." (BBC) S.F. Vol. VII: 646 (emphasis added). Sid was also firing a rifle. *Id.* at 644-45.

41.     Red and Brenda left, but Paul stayed behind, planning to hide behind some dunes "to watch what was going on whatever." (BBC) S.F. Vol. VII: 648-49. The last thing Red saw was Paul Colella running into the dunes by the campsite as the headlights from Sid Wilson's Suburban approached. *Id.* at 649. According to Paul, Sid arrived, pointed a long thin object which looked like a rifle into their tent, and, finding them absent, destroyed his camp and drove away. S.F. Vol. XVIII: 1366-68.

42.     After Sid left, the Colellas and Red Wilson met at the wrecked campsite and pondered their options. They all believed that Sid Wilson would return, and that he might harm or kill Paul or Brenda. Red advised the Colellas to pack and move:

> And I told [Paul Colella], 'Well, what are you going to do now? I'm going to leave. You are not going to be safe here. Sid may come over, and as drunk as he was, he might come over and mow you down. No telling what he would do.'

(BBC) S.F. Vol. VII: 654.

43.     As Red testified at Mr. Colella's trial:

> Paul and Brenda were in danger of Sid possibly coming back again, maybe *running over their tent with his Suburban. They were in danger*, and I felt that I would offer them "Do you want me to take you somewhere where y'all can relocate your campsite where you can be safe, away from Sid? It doesn't seem like he is going to let you get away with you shooting at him."

S.F. Vol. XIV: 566 (emphasis added).[7]

44.     Paul agreed with Red that he and Brenda were in danger, because Sid was a "brawler" with a violent temper and because Sid also made his living on the island looking for tows and would thus certainly come across the Colellas sooner or later. S.F. Vol. XVIII: 1368, 1372.   Brenda, shaken and upset, was still crying. S.F. Vol. XVIII: 1369. Paul and Brenda decided they needed to leave, so they packed and got into Red's pickup. S.F. Vol. XIV: 566 (testimony of Red Wilson).

45.     Accounts of the events immediately following differ.   Red Wilson told police on September 17, 1991: "Paul told me that he and Brenda were leaving the Island. They picked their clothes and Paul asked me for a ride into town . . . . I dropped them off at the entrance of Andie Bowie Park. That was the last I saw of them." App. II, Exh. 15 (Red Wilson's Statement) at 4.[8]  He further stated: "I would also like to state that I did not see nor did I take any person or persons out to look for the men who had raped Brenda." *Id.* After being indicted for capital murder and offered a complete dismissal of capital murder charges in return for his testimony, Red changed this account and substituted one in which he, Paul, and Brenda suddenly happened upon the white pickup. S.F. Vol. XIV: 568. According to this story, Paul asked Brenda whether the men in the pickup were the ones who had raped her.   After she confirmed they were, Paul shot them, then dumped the truck. S.F. Vol. XIV: 573-598.   Red insisted that Paul acted alone in dumping the truck containing the victims' bodies. *Id.* at 601.

**B.      September 13, 1991 and after.**

46.     According to Mr. Colella, who testified at the guilt phase of his trial, he asked Red

---

[7] Red's account of the fear of Sid Wilson displayed by Paul and Brenda Colella was echoed by Paul's testimony, and accepted as true in the initial State's Appellate Brief filed by the Cameron County District Attorney's Office in Brenda Colella's capital murder appeal: "In fact, there was evidence that the trio's decision to leave Red's camp had nothing to do with a search for the men, and everything to do with a late-night search for a new camp to avoid Sid's armed threat." App. II, Exh. 18 (State's Appellate Brief) at 20.

[8] In his statement, portions of which he later repudiated at Mr. Colella's trial, Red Wilson declared that Paul and Brenda Colella had earlier stolen his truck when he went to the restroom, and came back in it 45 minutes later. *See* App. II, Exh. 15 (Red's Statement) at 3.  The story Red told at Paul's trial and Brenda's trial is inconsistent with this assertion.

CPDF - www.fastio.com

to take Brenda and him from the campsite to his mother's trailer at Port Isabel, so that he and Brenda could leave the Island. S.F. Vol. XVIII: 1372-74. They felt unsafe anywhere on the Island or nearby because of Sid Wilson, and decided to return to Indiana, where they both had roots. *Id.* He and his wife were then driven to the bus station in Victoria, Texas, where they boarded a bus for Indianapolis, Indiana. *Id.* at 1384-85. They arrived at the Victoria bus station at approximately 5:30 a.m. on September 13, 1991, about half an hour before the station opened. *Id.* at 1384. A bus station employee, Amy Pflaum, remembered that persons matching the description of Paul and Brenda Colella were at the station before it opened on a Friday immediately after summer, most likely September 13, and that she shortly thereafter sold them tickets to Indiana. S.F. Vol. XVII: 1204-05. She remembered them because they were the only customers, because of their unusual appearance, and because they were buying tickets to Indiana, which was unusual. *Id.* She identified Paul Colella as the man to whom she had sold tickets at 6:00 a.m. that Friday in the middle of September, 1991. She further testified that Victoria, Texas is approximately 232 miles from South Padre Island; therefore the drive must have taken at least four hours. *Id.* at 1210.

47.     About mid-morning on September 13, 1991, the bodies of Michael Lavesphere and David Ray Taylor were found in a white pickup that was half-submerged in a bay approximately 3½ miles north of South Padre Island. A call at approximately 10:00 or 10:30 a.m. to the South Padre Island Police Department reported the location of the truck. (BBC) S.F. Vol. IV: 25. South Padre Island Detective Sandra Boyd was the first law enforcement agent on the scene. S.F. Vol. XI: 34. Because the crime scene was outside the city South Padre Island limits, Detective Boyd was outside her jurisdiction. *Id.* at 33-34; S.F. Vol. XII: 90-91. She waded into the water to determine whether the persons in the truck needed assistance. S.F. Vol. XI: 37-38.

48.     Detective Boyd saw David Taylor's body in the cab and Michael Lavesphere's body in the bed. S.F. Vol. XI: 38-39. Both were dead. *Id.* Detective Boyd videotaped and took still photographs of the scene. *Id.* at 40-41, 45. She noticed thick blood still "oozing" from one of the

victims. *Id.* at 60. Detective Boyd also noticed two sets of tire tracks. *Id.* at 49. One set appeared to belong to the white pickup, and followed the truck into the bay. *Id.* The other set followed the white pickup until the edge of the water, but then stopped, indicating to Detective Boyd that another vehicle had pushed the truck into the water. *Id.* at 69-70. Detective Boyd's report of the events stated the following:

> It appeared that the white truck had been pushed into the water. Just before the water line there was evidence of another vehicle. From the appearance of the ground it appeared that the other vehicle had been used to push the truck into the water as there were off-setting tire tracks and there was [sic] markings in the sand indicating the braking of the second vehicle or push vehicle where the brakes had been applied just before the water line pushing the sand to a small mound.

App. II, Exh. 16 (Detective Boyd's Supplement Report) at 2. In Brenda Colella's trial, Detective Boyd testified:

> When we discussed it, the officers [Sgt. Martinez, among others] that were there, it appear[ed] . . . that maybe there was some tracks that were not like two vehicles had parked next to each other. It appeared that the tracks, there was the tracks of the vehicle that was in the water and then offset, it appeared to be more tracks.

> Just before the water line, it appeared that when you brake on a surface or when you brake on a soft surface, when you do brake, many times your wheels stop but you will push something ahead of you, like a little path or a little . . . bitty sand dune. And it appeared to us that maybe another vehicle had pushed or been offset from the pickup vehicle that was in the water.

(BBC) S.F. Vol. IV: 65.

49.     Detective Boyd noticed a pair of boots on the shore. S.F. Vol. XI: 49. She did not pick them up, because she felt that they were evidence which should be left for later officers to collect. *Id.* at 77. Shortly after Detective Boyd arrived, Luis Martinez, a Sergeant with the Cameron County Sheriff's Office, arrived. *Id.* at 50-52. Although Detective Boyd remained at the crime scene, Sgt. Martinez took over the investigation. *Id.* at 52. Sgt. Martinez concurred that the clearly-visible second set of tire tracks indicated that a second vehicle was used to push the truck into the water. S.F. Vol. XII: 106. Sgt. Martinez concluded that the victims had been killed with a medium-

caliber gun; most likely a 9mm pistol. (BBC) S.F. Vol. IV: 115. However, Sgt. Martinez failed to collect or preserve copious crime-scene evidence. He never reviewed Detective Boyd's videotape. S.F. Vol. XII: 163-64. Not only did he not seize the boots on the shore, he did not even realize they were there. *Id.* at 163. He did not dust the truck for prints at the scene while the evidence was fresh, and he said that later attempts to dust for prints were unsuccessful. *Id.* at 201-02. No tests were done on the bumper of the white pickup to locate paint scrapings that might have identified the vehicle that pushed the truck into the bay. Pictures were taken of the second set of tire tracks, but no plaster of Paris cast was made. S.F. Vol. XII: 159. A clearly visible bloodstain in the sand was photographed, but was never picked up, and thus never analyzed. *Id.* at 156, 244.

50.     The physical evidence that could have provided clues about the identity of the killer or killers was either not collected, destroyed, or improperly preserved. No eyewitnesses were found who saw the white pickup being pushed into the water. Although the victims were killed by gunshot wounds, and the State's theory is that they were shot while in the cab of the pickup, no blood spatters were found in the cab, no spent bullets were recovered from the truck, and no shell casings were ever found at the site where the State's accomplice witness claimed the shootings occurred. S.F. Vol. XVI: 908-09 (pathologist testifies that blood spatters over the cab of the pickup would be expected from these shootings; none was found in cab); S.F. Vol. XII: 166 (only victims' personal belongings recovered from the truck); *id.* at 265-66 (no shell casings found at alleged murder scene). Nor were the bullets recovered from the victims' bodies ever sent for ballistics analysis at a crime lab. *Id.* at 243, 262-65.

51.     Brian Hunsaker, a Brownsville attorney and a local municipal judge, performed an inquest. S.F. Vol. XVII: 1163. He arrived at the scene at approximately 11:30 a.m. or noon. His duties were to observe the bodies, pronounce them dead, and determine whether an autopsy was in order. *Id.* at 1164. He filled out the inquest form (the "Inquest Form") at approximately 12:50 p.m. on September 13, 1991. *Id.* at 1173; App. II, Exh. 17 (Inquest Form). He discussed the time of

death with Officers Boyd and Martinez. They agreed that the state of the bodies indicated the victims had been dead for approximately 6 hours, and thus that they must have been killed "around daylight." S.F. Vol. XVII: 1174-75. Accordingly, Judge Hunsaker noted on the Inquest Form that the victims had been dead "approximately 6 hours." App. II, Exh. 17 (Inquest Form).

52.     The first two leads pointed to Red Wilson. The day after the crime, Sherie Wilson visited the police. (BBC) S.F. Vol. VI: 520 (Sherie Wilson's testimony). Sherie lived with her husband Sid in a converted bus on the beach, and she knew Red Wilson. (BBC) S.F. Vol. VI: 478-81. Sherie Wilson gave Cameron County Lieutenant Ernesto Flores an unfired 9mm bullet. S.F. Vol. XIII: 405. She told Lt. Flores that on the morning of September 13th, before anyone had discovered the two bodies, Red Wilson drove his Bronco over to Sid's bus. Red was cleaning out his Bronco. *Id.* at 406. According to Sherie Wilson, Red appeared "scared," and it appeared that his "conscience" was bothering him. (BBC) S.F. Vol. VI: 510-11. As she elaborated:

> He said he was cleaning out the truck and he found this bullet and that he didn't want to be involved in anything that might have happened. Actually, he said he didn't want his truck involved.

* * *

> The only thing that I could gather after the bodies were found was he was afraid his truck was involved. What I thought was maybe they were in his truck.

(BBC) S.F. Vol. VI: 512-13, 529.

53.     Red gave the bullet to Sid and Sherie Wilson. Later in the day, "word got back" to Sherie that two bodies had been found shot in a half-submerged pickup just north of city. *Id.* at 511. Sherie decided Red's suspicious behavior required action: "[I]'ve got a bullet here and Red is scared and our conscience couldn't handle it." *Id.* When asked whether Red appeared "scared because he knew something," Sherie said "Apparently." *Id.* Sherie took the bullet to Lt. Flores.

54.     Sid Wilson also stated that Red had driven to Sid's trailer the day after the crime, where Red began cleaning out the Bronco. S.F. Vol. XIII: 396, 405. While cleaning out the Bronco, Red found a 9 mm bullet, which Red gave to Sid Wilson. *Id.* Red Wilson was interviewed on

22

Monday, September 15, by Sgt. Martinez. Red's sworn affidavit, which generally tracked the above events, also contained lies and omissions. Red admitted that he did not mention the gun that he and Paul Colella had stolen. S.F. Vol. XIV: 665.

55.     The police interviewed several witnesses who told them that on September 12th, 1991, Paul Colella had threatened the lives of the two men in the truck. The statements of these witnesses are summarized in the direct appeal opinion. *See Colella v. State*, 915 S.W.2d 834, 836-38 (Tex. Crim. App. 1995) (majority's summary of facts); *id*. at 849-51 (dissent's summary). Based on this information, the police issued arrest warrants for Paul and Brenda Colella.

56.     Later, however, Detective Boyd's office received an anonymous tip that Red had been seen burying a gun underneath a trailer on South Padre Island sometime after the crime. S.F. Vol. XI: 74. In her report she wrote:

> On the morning of February 18, 1992, we received a phone call from a concerned individual who said the gun used in this offense to shoot the two victims could be found buried in the sand north of the city limits of South Padre Island. He said the gun had been buried by "Red" under his trailer that had been parked next to a red overturned  Jeep located on the Laguna or bay side off Hwy 100. The trailer that "Red" and his girlfriend lived in has been moved but the overturned vehicle is still there. He also said that "Red" had been with the two suspects when the shootings occurred. This is contrary to the statement given to Investigator Martinez by "Red" a few days after the bodies were found.

App. II, Exh. 16 (Detective Sandra Boyd's Supplement Report) at 3.

57.     The Colellas left South Padre Island early on the morning of September 13th, and had returned to Indiana. *Colella*, 915 S.W.2d at 838. Sgt. Martinez flew to Indiana to return the Colellas to Cameron County. S.F. Vol. XII: 118-19. Shortly after the Colellas were arrested, Red Wilson was indicted for the murders of Mr. Taylor and Mr. Lavesphere. *See* App. I, Exh. 2 (Indictment). On February 20, 1992, shortly after the Colellas had been brought back from Indiana, and two days after the police received the tip that Red and been seen burying the gun, Red told Sgt. Martinez that he knew where the murder weapon "*was buried at the island*". (BBC) S.F. Vol. V: 266 (emphasis

added).

58.    On May 26, 1992, Red Wilson was granted immunity by the State. One week before, on May 19, 1992, Red, in the company of Sgt. Martinez and personnel from the District Attorney's office, gave an "oral statement" concerning the events of September 12th and 13th. *Red's attorney specifically requested that this statement not be reduced to writing.* (BBC) S.F. Vol. V: 222. Sgt. Martinez and members of the DA's office interviewed Red for two full days beginning on May 19th. S.F. Vol. XII: 211-12. In this second "statement," Red maintained that Paul Colella had thrown the murder weapon into the Gulf of Mexico. *Id.* at 242. After obtaining immunity, Red admitted that his statement to the police of September 17, 1991, had major gaps, such as "it left out everything to do with the killing of the three [sic] guys" and it left out reference as to how the gun had been obtained. S.F. Vol. XIV: 626. Sergeant Martinez testified that Red's first statement did not tell all the truth. S.F. Vol. XII: 115. In his new statement (not in writing), Red Wilson stated that he knew that Paul Colella had stolen the totebag, including the gun, and he participated in shooting the gun. S.F. Vol. XIV: 527-34. He also declared that Mr. Colella had murdered Mr. Taylor and Mr. Lavesphere. *Id.* at 576-77. According to Mr. Wilson's new account, he, Paul and Brenda Colella were driving along the beach sometime during the evening of September 12th when they came across the white pickup, which either Paul or Brenda recognized as the pickup in which the three men who raped Brenda had been driving. *Id.* at 568-77. In Red's new account, Paul insisted that Red turn around and park near the truck, and then got out and shot Mr. Lavesphere and Mr. Taylor with the gun that had been stolen earlier in the day. *Id.* at 572-76.

59.    According to Red, Paul first ran to the back of the pickup truck and shot one of the men, S.F. Vol. XIV: 649, and then he ran to the driver's side and shot into the truck.[9] *Id.* at 651. Paul then got into the white truck (along with the victims' bodies) to dispose of it. *Id.* at 594-99.

---

[9]  This testimony was inconsistent with the testimony of the medical examiner, Dr. Lawrence Dahm, who testified that the victims sustained injuries consistent with having been shot from the passenger side of the pickup truck. *See Colella v. State*, 915 S.W.2d at 858  (Baird, J., dissenting) (pointing out that the physical evidence casts "serious doubt on the

CMJPDF - www.testia.com

The white pickup became stuck, and Red tried to pull it out, but Red's drive shaft then broke. *Id.* at 597-98. Eventually, Paul got the white pickup's four-wheel-drive engaged, and drove off alone while Red remained to try to repair his drive shaft. *Id.* at 598-99. Paul returned on foot after some time, having disposed of the white pickup alone. *Id.* at 600-01. Red then drove the Colellas to the Tiki Restaurant, and didn't see them again. *Id.* at 607-08.

60. Brenda Colella's capital murder trial occurred in late May and early June of 1992, a little more than two months before Mr. Colella's capital murder trial began in late-August of 1992. The State did not seek the death penalty against Brenda Colella.

61. Like Mr. Colella, Brenda Colella was charged with capital murder in connection with the deaths of Michael Lavesphere and David Ray Taylor. The State argued that Brenda had "intentionally and knowingly cause[d] the death[s]" of the victims. (BBC) S.F. Vol. IX: 953. The State, heavily stressing Ricky Taylor's disbelief of Brenda's rape allegations, argued that Brenda lied to her husband that Mr. Lavesphere, David Taylor, and Ricky Taylor had raped her and that she did so with the intent to cause her husband to shoot the victims. *Id.* at 953-55.

62. Further, according to the State, Brenda Colella acted in concert with Mr. Colella. *Id.* Thus, Brenda's guilt of capital murder depended on the jury's finding that Mr. Colella had intentionally and knowingly killed the two victims. Indeed, the indictment charged that Brenda Colella's guilt hinged on Mr. Colella having intentionally or knowingly shot the Messrs. Lavesphere and Taylor (*see Colella v. State*, 860 S.W.2d 618, 621 (Tex. App. - Corpus Christi, 1993)), and Brenda Colella's jury was so charged. *See, e.g.*, (BBC) S.F. Vol. IX: 956.

63. On June 3, 1992, a Cameron County jury found Brenda Colella guilty of capital murder in the deaths of Michael Lavesphere and David Taylor. (BBC) S.F. Vol. IX: 989. On July 2, 1992, the Hon. Rogelio Valdez sentenced Brenda Colella to life, recognizing that "where the State does not seek the death penalty the Court is obligated to assess the punishment of life." (BBC) S.F.

---

reliability" of Red's account).

Vol. X: 4.

64.     On appeal to the Thirteenth Court of Appeals in Corpus Christi, Texas, the State

conceded error in its initial brief and prayed that Brenda Colella be acquitted. *See* App. II, Exh.

(State's Appellate Brief, *Brenda Bowling Colella v. State*, No. 13-92-501-CR, at 18-19 (January 2,

1993)) ("State's Appellate Brief")).  The brief was signed by Cameron County Assistant District

Attorney John A. Olson, who did not appear before either Brenda Colella's or Paul Colella's juries.

*See id.* at 22.   The brief acknowledges that the State's theory of Brenda's liability was

unsubstantiated. It also contains  accurate characterizations of the State's evidence in Brenda's trial,

some of which were not consistent with the evidence proffered by the State at Mr. Colella's trial.

 After conceding error, the State retracted its admission and filed a new brief supporting the verdict

and life sentence. *See* App. II, Exh. 19 (State's Substitute Appellate Brief).  An assistant district

attorney who tried Brenda Colella's case and tried Applicant's case, Ms. Migdalia Lopez, signed the

State's Substitute Appellate Brief. *Id.* at 19.    The Court of Appeals rejected the State's new

argument and ordered Brenda Colella acquitted on the grounds of insufficient evidence that she

aided, abetted, or encouraged any criminal offense. *Colella*, 860 S.W.2d at 622.

65.     Brenda Colella's trial received substantial news coverage in and around Brownsville,

Texas and throughout Cameron County, Texas.   Because Brenda Colella's guilt depended on a

finding that Mr. Colella intentionally and knowingly caused the victims' deaths by inducing her

husband to kill them, the publicity associated with Brenda Colella's trial, the guilty finding, and her

life sentence focused heavily on Mr. Colella and his alleged conduct.

66.     The news coverage did not stop with Brenda Colella's life sentence.   While Mr.

Colella's jury was being selected, the *Valley Morning Star* wrote about various pending capital cases.

 In discussing Mr. Colella's case, the paper stated that Mr. Colella's wife, Brenda Bowling Colella,

"was sentenced to life in prison in July for her role in the shooting." App. II, Exh. 35 ("County Gears

Up for 5 Murder Trials," VALLEY MORNING STAR, August 1992).[10]  The story stated: "She reportedly had told her husband that three oil workers had raped her . . . . She repeated the allegations just before *her husband shot two of the men,* who were sleeping in a pickup truck on the beach, according to a third man indicted in the case." *Id.* (emphasis added).

67.    An investigator who worked on Mr. Colella's behalf contacted various television and radio stations in Brownsville in an effort to obtain their coverage of Brenda Colella's trial. *See* App. II, Exh. 36 (Affidavit of Susan L. Karamanian ("Karamanian Aff.")) at ¶2.  Those stations have refused to provide complete copies of their coverage absent a court order. *Id.*  It is clear, however, that the events received extensive television and radio coverage.  For example, when Brenda Colella and Paul Colella returned to Brownsville upon their arrest, television cameras greeted them at the airport. S.F. Vol. XVIII: 1470.

68.    The existence of news coverage did not go unmentioned in Mr. Colella's trial.  In response to a question from the prosecution about when he last saw Mr. Colella, Sid Wilson said: "It may have been on TV I seen him." S.F. Vol. XIII: 394.  Further, throughout Mr. Colella's trial, repeated references were made to the Brenda Colella trial. *See, e.g.*, *id.* at 410 (the prosecution (through Mrs. Lopez), in objecting to a question, stated in front of the jury: "Your Honor, that testimony has never come forward in the last trial."); S.F. Vol. XVI: 972 (a witness stated, "As I say, I told you at the first trial."); S.F. Vol. XIII: 394 (Red Wilson stated: "I have seen him one other time since then.  I believe it was at the last trial.  No, it wasn't at the last trial.").

69.    After Petitioner was found guilty of capital murder, the jury determined his sentence. The mitigation case consisted of brief comments from Mr. Colella's mother.  Trial counsel produced not a single expert witness concerning Mr. Colella's mental health. S.F. Vol. XXI: 126-169.  This is so even though Mr. Colella's mother testified about Paul's serious psychiatric problems as a child.

---

[10]  Postconviction counsel have been unable to confirm the precise date of this story or the page on which it was printed.

*Id.* at 128-130.

70.     At sentencing, the State sponsored the testimony of Ricky Taylor, David Taylor's brother whom Brenda Colella had accused of raping her.  Mr. Taylor testified that he wanted Mr. Colella to be hurt, but he did not say that he wanted him to receive the death penalty.  S.F. Vol. XX: 28.  In news coverage, as well, Mr. Taylor did not state that he wanted Mr. Colella to get the death penalty.  *See* App. III, Exh. 58  ("Jury Orders Lethal Injection for Colella," *Valley Morning Star News* September 5, 1992) (unable to identify page) (Ricky Taylor is quoted: "The way me and my family feels about this, there's only really one power (God) that should have the right to do that.  I believe we would have preferred to have it 'life and a day' as they have called some states.").  The story also stated:  "Despite their suffering, friends and family members of the two victims said they would have preferred that Colella not have been sentenced to death.  If the jury had given a life sentence, rather than the death penalty, there would have been no protest, said Shelli Miller and Helen Kuyava, friends of the two slain men and their families.  'We will abide by the court decision. . . . I think it hit us harder than it hit him, though.'" she said.  *Id.*

# VI.     CLAIMS FOR RELIEF

## A.     Prosecutorial Misconduct

## 1.     The prosecutor knowingly sponsored false testimony in violation of *Napue v. Illinois*, 360 U.S. 264 (1959).

### a.     Introduction:  Standard of Review.

Confidence in the justice system cannot be affirmed if any party is free, wholly without explanation, to make a fundamental change in its version of the facts between trials, and then conceal this change from the final trier of the facts.[11]

---

[11] *United States v. GAF Corp.,* 928 F.2d 1253, 1260 (2d Cir. 1991) (*citing United States v. McKeon*, 738 F.2d 26, 31 (2nd Cir. 1984)).

> In short, what the State claimed to be true in Smith's case it rejected in [accomplice] Cunningham's case, and vice versa. . . . . [The State's] successful attempt to prove beyond a reasonable doubt that the [victims] were murdered at two different times . . . deprived [Smith] of due process and rendered his trial fundamentally unfair.[12]

71.     Review of the two trials in this case reveals a pattern.  First, the State established key facts through sworn testimony – usually unequivocal and specific – in Brenda Colella's trial. If these facts undermined the State's case or pointed to Mr. Colella's innocence, the same witnesses, often under questioning from the same prosecutor, downplayed or denied them in Mr. Colella's trial.  In an attempt to conceal holes in its case, the State routinely and knowingly permitted its witnesses to give testimony that ranged from evasive to misleading to obviously perjurious.  The pattern is unmistakable and unacceptable, and requires the reversal of Mr. Colella's conviction and death sentence.

"A state denies a criminal defendant due process when it knowingly uses perjured testimony at trial or allows untrue testimony to go uncorrected." *Faulder v. Johnson*, 81 F.3d 515, 519 (5th Cir.), *cert. denied*, 519 U.S. 995 (1996) (citing *Giglio v. United States*, 405 U.S. 150 (1972)); *Napue v. Illinois*, 360 U.S. 264 (1959); *Cordova v. Collins*, 953 F.2d 167 (5th Cir. 1992), *cert. denied*, 502 U.S. 1067 (1992).  Due process is also violated when the prosecution allows the jury to be presented with a materially false impression. *See Alcorta v. Texas*, 355 U.S. 28, 31 (1957); *United States v. O'Keefe*, 128 F.3d 885, 896-98 (5th Cir. 1997), *cert. denied*, 523 U.S. 1078 (1998).  "[U]nder the Constitution, the defendant is entitled to a jury that is not laboring under a Government-sanctioned false impression of material evidence when it decides the question of guilt or innocence with all its ramifications." *United States v. Barham*, 595 F.2d 231, 242 (5th Cir. 1979), *cert. denied*, 450 U.S. 1002 (1981).

---

[12] *Smith v. Groose*, 205 F.3d 1045, 1050, 1051 (8th Cir. 2000), *cert. denied*, __ U.S.__, 121 S. Ct. 441 (2000).

72.     To obtain relief, Mr. Colella must show that (1) the testimony was actually false, (2) the state knew it was false, and (3) the testimony was material. *See Pyles v. Johnson*, 136 F.3d 986, 996 (5th Cir. 1998), *cert. denied*, 524 U.S. 933 (1998); *O'Keefe*, 128 F.3d at 893; *Faulder*, 81 F.3d at 519. It is irrelevant whether the false testimony directly concerns an essential element of the Government's proof or whether it bears only upon a witness's credibility. *O'Keefe*, 128 F.3d at 893; *Barham*, 595 F.2d at 241-42. False evidence is material "'if there is any reasonable likelihood that [it] could have affected the jury's verdict.'" *Goodwin v. Johnson*, 132 F.3d 162, 185 (5th Cir. 1997) (quoting *Westley v. Johnson*, 83 F.3d 714, 726 (5th Cir. 1996), *cert. denied*, 519 U.S. 1094 (1997)); *Moody v. Johnson*, 139 F.3d 477, 484 (5th Cir.), *cert. denied*, 525 U.S. 940 (1998).[13] Even if remaining untainted evidence might be sufficient to support a guilty verdict, a conviction must be reversed if the prejudice standard is satisfied: the jury, not judges, bears the constitutional responsibility to decide guilt or innocence. *Barham*, 595 F.2d at 242.

73.     A prosecutor has a duty to correct the false testimony of its witnesses when the false evidence first appeared. *United States v. Sanfilippo*, 564 F.2d 176, 178 (5th Cir. 1977). This is so because a prosecutor's client, the State, must ensure that justice is served:

> The [prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor – indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods

---

[13] This standard is "considerably less onerous" than the standard for relief under *Brady v. Maryland*, 373 U.S. 83 (1963). The *Brady* standard requires a showing of a reasonable probability that the result of the proceeding would have been different if the evidence in question had been disclosed to the defense. A "reasonable probability" is defined as "a probability sufficient to undermine confidence in the outcome [of the proceeding]." *See Kirkpatrick v. Whitley*, 992 F.2d 491, 497 n.30 (5th Cir. 1993).

calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger v. United States*, 295 U.S. 78, 88 (1935), *overruled on other grounds*, *Stirone v. United States*, 361 U.S. 212 (1960); *see also United States v. Murrah,* 888 F.2d 24, 27 (5th Cir. 1989) (quoting *Berger* and also stating that "[a]s representative of the government the prosecutor is compelled to seek justice, not convictions. Justice is served only when convictions are sought and secured in a manner consistent with the rules that have been crafted with great care over the centuries."). Further, prosecutors cannot capitalize on false testimony. The Fifth Circuit recently declared:

> [E]ven when the defense is aware of the falsity of the testimony, a deprivation of due process may result when the information has been provided to the defense but the government reinforces the falsehood by capitalizing on it in its closing argument, or the defense is unable to utilize the information, or when the government thereafter asks misleading questions. Thus, materiality is a method of maintaining the equal playing field between the prosecution and the defense necessary to allow the jury to perform its truth-seeking function.

*O'Keefe*, 128 F.3d at 894-95 (citations omitted). As the *O'Keefe* court observed, relief is warranted in prosecutorial perjury cases even if defense counsel knew of the perjury and failed to object to it, or took only ineffectual steps to counter it. *See also, e.g., United States ex rel. Washington v. Vincent*, 525 F.2d 262, 268 (2d Cir. 1975), *cert. denied sub nom. Bombard v. Washington*, 424 U.S. 934 (1976). ("[I]t would be inappropriate not to permit [the defendant] to challenge [on appeal] the egregious and highly damaging prosecutorial misconduct solely because he and his lawyer may have failed to utilize all available means for exploring the prosecution's highhandedness at trial.").

74. The State's witnesses testified falsely about material facts, such as the estimated time of death, the date when the bodies were first discovered, the source of tire tracks at the crime scene, and the terms of Red's Immunity Agreement. The State unquestionably knew the testimony was false – indeed, in many instances, the Assistant District Attorney who was present in the courtroom (and often directly examining the same witness) during Paul's trial had personally presented contrary

31

evidence in the Brenda Colella trial.

> **b.    The State knowingly sponsored perjured testimony from Sergeant Martinez about the material issue of the time of death of the victims.**

75.    Sergeant Luis Martinez, sergeant/investigator in the Cameron County Sheriff's Office, headed the investigation of the Colella case. S.F. Vol. XII: 88-89, 94. He testified in Brenda Colella's trial that the shooting occurred near 5:00 a.m. on the morning of September 13, 1991:

> Q.    The shooting, would you estimate, took place sometime between 12 and 2 o'clock in the morning or 1 o'clock in the morning [on Sept. 13, 1991]?
>
> A.    The bodies' rigor mortis had set on them real hard. And we estimate – this is estimating – between six to eight hours [had elapsed between when they were killed and when I saw the victims at approximately 11:30-12 noon].
>
> Q.    Or perhaps even ten?
>
> A.    *Ten would be a big number.* Postmortem takes place. The body *becomes loose then.*

(BBC) S.F. Vol. V: 247 (emphasis added).

> Q.    Now, you stated that based on your experience that the bodies had been dead for about six to eight hours; is that correct?
>
> *A.    Yes.*
>
> Q.    And how were you able to determine that?
>
> A.    Because of the conditions that the body were in. Rigor mortis had already set in, too, and they were stiff, very stiff.
>
> Q.    How can you tell that it was only six hours in contrast to 15 hours?
>
> A.    At that time, at that length of period, the body goes back to its normal stage and becomes movable or soft.
>
> Q.    So when a body has been dead for 15 hours or so, then it goes back

CRAPDF - www.fenrio.com

to more or less the way it was before, as far as flexibility of the limbs?

A.    Yes, because the body starts to deteriorate and the decomposition begins to set in.

\* \* \*

[Redirect:]

Q.    So if the body had been dead or had been dead six hours [when you saw it at 11:00 a.m.], then that would mean that they would have been shot about *5 in the morning, would that be accurate?*

*A.    More or less.*

*Q.    And if it would have been [the outside estimate of 8 hours], then that would have made [the time of shooting] about 3 in the morning?*

*A.    Yes.*

*Id.* at 306-07 (emphasis added).[14]   The above testimony, based on Sgt. Martinez's extensive experience investigating homicides, declares 3 a.m. to be the *absolute outside* estimate – the *earliest* the murders could have occurred.

76.    In response to the prosecution's question during Mr. Colella's trial, however, Sgt. Martinez testified that the murders occurred at *2:00 a.m. or 3:00 a.m*:

Q.    [Mrs. Lopez]: About what time, based on your investigation, did you

---

[14] The time of death was not an important issue in Brenda Colella's trial.  At the end of the State's case, Mrs. Colella's defense attorney recognized that the State's evidence, even if the jury believed all of it, had failed to establish Brenda's liability as a party to the offense.  (BBC) S.F. Vol. VIII: 940-943 (defense moves for a directed verdict based on deficient evidence that Brenda Colella aided and abetted any criminal offense).  In fact, the defense did not even present a case at Brenda's trial: "Your Honor, after the State has presented all of its evidence, we do not feel there is sufficient evidence, and we will not call any witnesses." (BBC) S.F. Vol. IX: 948.  Thus, the time of death never became an issue in Brenda's trial because the State never overcame its initial hurdle of proving criminal liability.

feel that the murder occurred?

A.      [Sgt. Martinez]: Around 2:00 or 3:00 in the morning.

S.F. Vol. XII: 205.  Perhaps the starkest inconsistency in the testimony relates to Sgt. Martinez's response to the prosecution's suggestion that the murders could have occurred twelve hours before Sgt. Martinez saw them (that is, midnight).  In Brenda's trial, Martinez was asked by defense counsel whether his estimate was that the murders had occurred "sometime between 12 and 2 o'clock in the morning or 1 o'clock in the morning" (around 12 hours before Sgt. Martinez saw them).  (BBC) S.F. V: 247.  Sgt. Martinez *rejected* this suggestion and *corrected* defense counsel, advising him that his estimate was that the bodies had been there for six to eight hours, and that the bodies could *not* have been dead for more than that long because they were still rigid from rigor mortis, and they would have been *loose* had they been dead much longer.  *Id.*  Indeed, Sgt. Martinez, citing the condition of the bodies, dismissed the possibility that the bodies could have been there for ten hours: "Ten would be a big number."  *Id.*  Later, under direct examination by prosecutor Migdalia Lopez, Martinez explicitly confirmed and adopted his "six to eight" hours estimate, and once again explained that the condition of the bodies left no doubt that six to eight hours was the correct estimate.  *Id.* at 306-307.

77.      In Mr. Colella's trial, Sgt. Martinez's testimony was completely different.  First, he estimated the time of death as between 2 and 3 a.m. – which amounts to the estimate of ten hours which he had explicitly rejected in Brenda's trial.  Sgt. Martinez even affirmed under oath that the bodies had been there for about "*twelve* hours" before he saw them at noon, which would make midnight the estimated time of death.  S.F. Vol. XII: 271 (emphasis added).  Sgt. Martinez's basis for this conclusion was that the bodies still displayed "rigor mortis."  S.F. Vol. XII: 271.  Thus, Sgt. Martinez testified at Brenda's trial that the bodies of the victims could not have been dead for more than eight hours *because* they still had rigor mortis which would have *dissipated* had the bodies been dead for more than eight hours, but in Mr. Colella's trial he testified that the bodies had been dead

34

for twelve hours because they *still had rigor mortis*. In Brenda's trial Sgt. Martinez *ruled out* an estimate of twelve hours because even after only ten hours a body would have become "loose." In Mr. Colella's trial, this logic is completely reversed. Sgt. Martinez estimates the bodies had been dead for twelve hours precisely *because* they were still in rigor mortis.

78.     This testimony is totally inconsistent: Sgt. Martinez could not have been telling the truth both times, and the lawyers who prosecuted Mr. Colella certainly knew this to be the case. Not only did Mr. Martinez's sworn testimony at Mr. Colella's trial conflict with his previous testimony in Brenda Colella's trial, it also conflicted with his initial impressions formed at the dump scene *and* with the estimate of Detective Boyd. The undersigned requested under the Texas Open Records Act that the Cameron County District Attorney's Office produce its documents concerning Mr. Colella's case. On March 5, 1999, Mr. Olson of that office sent certain of the files to the undersigned. *See* App. II, Exh. 36 (Karamanian Aff.) at ¶4. In its files the prosecution had an Inquest Form prepared at 12:50 p.m. on September 13, 1991 by Judge R. B. Hunsaker, a municipal judge from South Padre Island. *Id.* In the Inquest Form, Judge Hunsaker said that both victims "had been dead approximately 6 hours." *Id.* In other words, according to Judge Hunsaker, the deaths had occurred between *6:00 a.m. and 7:00 a.m.* on the morning of *September 13, 1991*.[15] Judge Hunsaker based his opinion on the observations of Sgt. Martinez and Detective Boyd: "[T]hey just, you know, looked at each other and they were talking about it and said *probably six hours, don't you think?* And since daylight – so it looked like they were *probably killed around daylight, probably six hours*." S.F. Vol. XVII: 1175-76 (emphasis added).

79.     The prosecutor who examined Sgt. Martinez in Mr. Colella's trial, Migdalia Lopez, *see* S.F. Vol. XII: 88, also examined him in the Brenda Colella trial. (BBC) S.F. Vol. IV: 84. Ms. Lopez knew that in Brenda Colella's trial, Sgt. Martinez had testified that the victims had been dead for only six to eight hours before noon on September 13, 1991, and no longer, and that they had died

---

[15] The Inquest Form was not an exhibit in Mr. Colella's trial although its substance was introduced.

around 5:00 a.m.   Ms. Lopez was aware of the Inquest Form in her files, which confirmed Sgt. Martinez's testimony from the Brenda Colella trial that the victims had been dead approximately six hours before 12:50 p.m. on September 13, 1991.   Further, she was aware of Sgt. Martinez's earlier testimony that rigor mortis could not go beyond a certain period after death, and clearly beyond ten hours the body is no longer subject to rigor mortis but instead is in postmortem.   Nevertheless, she permitted Sgt. Martinez to testify completely inconsistently in Mr. Colella's trial.   Ms. Lopez did not advise the jury that this key witness had testified completely inconsistently in a previous trial.   She did not advise the jury that he had given a completely different statement during inquest proceedings.   Nor did she solicit any testimony from him which could have explained the glaring inconsistencies in his testimony.

80.     Despite all of Sgt. Martinez's previous testimony and evidence to the contrary in the State's files, the prosecution allowed Sgt. Martinez to testify in Paul Colella's case that (1) the victims had been dead for about twelve hours when Sgt. Martinez saw them at noon; (2) the victims probably died in the very early hours of that day; and (3) rigor mortis would still be evident in the twelfth hour after death.   The prosecution introduced this testimony placing the time of death before 3:00 a.m. knowing that Mr. Colella intended to present an alibi as to his whereabouts at 5:00 a.m. to 6:00 a.m. and for the four hours before this time.   The prosecution sponsored Sgt. Martinez's testimony knowing that he had testified unequivocally in Brenda Colella's trial that the victims died not at midnight, or 1:00 a.m. or 2:00 a.m. but between 3:00 and 6:00 a.m., and that he had told Judge Hunsaker immediately after discovering the bodies that the victims were killed at 6:00 a.m.   The record decisively supports the inference that Sgt. Martinez changed his *sworn statement* – and the prosecutor allowed him to do so – to unfairly undermine Mr. Colella's alibi.

81.     The defense did partially cross-examine Sgt. Martinez concerning his change in testimony.   S.F. Vol. XVII: 1242-44.   The defense asked Sgt. Martinez to read back his own testimony from Brenda's trial in which he estimated that the victims had been dead "six to eight"

hours when he evaluated them around 11 a.m. to 12 noon on the September 13th. *Id*. After cross-examining Sgt. Martinez with that portion of the record, defense counsel then asked Sgt. Martinez to recite the crucial portion of the record quoted above (from (BBC) S.F. Vol: V: 307), in which Sgt. Martinez definitely stated that the victims were shot between 3 and 5 a.m. However, the trial judge, asserting *sua sponte* that the question had been "asked and answered," cut off defense counsel's cross-examination, and did not let defense counsel impeach Sgt. Martinez. S.F. Vol. XVII: 1245. Defense counsel protested that all he had was "eight more lines," (the relevant testimony on page 307 of the Brenda Colella trial transcript is exactly eight lines long) but the judge refused to allow him to continue. *Id*. Although Mr. Colella's trial counsel might have exploited Sgt. Martinez's testimony more fully, the opportunity or ability of the defense to point out the perjured testimony is not decisive of such a claim – the key fact is that the prosecution itself has violated elemental rules of ethical conduct by misleading the jury. *See O'Keefe* and *Vincent*, *supra*.

82.     Sgt. Martinez parried trial counsel's cross-examination with time-honored techniques: obfuscation, sudden, convenient memory lapses, and accusations that disinterested witnesses had lied. For instance, Sgt. Martinez contradicted Judge Hunsaker's specific testimony and asserted that neither he nor Sandra Boyd told Judge Hunsaker that the victims had been dead for approximately 6 hours. S.F. Vol. XVII: 1240. Sgt. Martinez – called as a witness by the defense in Mr. Colella's trial –conveniently "forgot" having testified that he thought the bodies had been dead for twelve hours during earlier questioning by the State: "I don't recall saying how long they were dead." *Id*. However, Sgt. Martinez had testified to precisely that effect – and been cross-examined on it – only *seven days previously*. *See* S.F. Vol. XII: 241-42. Finally, Sgt. Martinez testified that even though he had recently stated under oath that his conclusion was that the victims had died twelve hours before they were discovered, he "still [held]" to his testimony that they had been shot "within six to eight" hours before he touched them at about 12:30 p.m. S.F. Vol. XVII: 1245.

83.     The State improperly capitalized on the false testimony in closing: "And [defense

CUtePDF - www.tesisi.com

counsel is] telling you that this occurred at 5 in the morning. Where does Mr. Limas get that from? Where? What evidence have we heard that it happened at 5 o'clock in the morning? Where did that evidence come from?" S.F. Vol. XIX: 1552. In fact, because of the trial judge's improper limitation on Sgt. Martinez's cross-examination, the jury never heard Sgt. Martinez *specifically* repeat his own prior sworn testimony that the victims had been killed between 3 and 5 a.m. However, the prosecutor knew that (1) Sgt. Martinez *had* so testified at Brenda's trial; (2) he would have been forced to admit that fact had the trial judge not limited defense counsel's cross-examination; and (3) he had conceded that he had earlier testified in Brenda Colella's trial that the victims had been killed between 6 and 8 hours before Sgt. Martinez arrived at the crime scene, which is entirely consistent with a time of death of 5:00 a.m. Under these circumstances, it was incumbent on the prosecutor, at a minimum, to bring Sgt. Martinez's prior inconsistent sworn testimony to the court's and the jury's attention.[16] Nevertheless, the prosecutor suggested that the defense was fabricating or exaggerating evidence (*i.e.*, evidence that their lead investigator had once concluded that the victims had died when Mr. Colella was hundreds of miles away from the crime scene) which she certainly knew to be true.

84.    Sgt. Martinez's false testimony in Mr. Colella's trial about the time of death was material and highly prejudicial to Mr. Colella.[17] At trial, Mr. Colella established an alibi: at 6:00

---

[16] If the testimony of a prosecution witness creates a materially false impression and the prosecution knows the impression is false and fails to correct it, a due process violation arises. *See Miller v. Pate*, 386 U.S. 1 (1967); *Alcorta v. Texas*, 355 U.S. 28 (1957). It is of no matter that the prosecutors' failure to correct the false testimony was not a deliberate attempt to undermine the accuracy of the factfinding process. "[W]hether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor." *Giglio*, 405 U.S. 150, 154 (1972). Further, "prosecutorial participation in technically correct, yet seriously misleading, testimony which serves to conceal" impeaching facts known to the prosecution is impermissible. *Blankenship v. Estelle*, 545 F.2d 510, 513 (5th Cir. 1977), *cert. denied*, 494 U.S. 856 (1979).

[17] The conclusions of Detective Boyd and Sgt. Martinez were the only evidence of the victims' time of death from individuals who personally examined the victims at the crime scene. No pathologist or medical examiner was called to the scene to evaluate the victims. The victims' bodies were frozen for several days before being autopsied by Dr. Lawrence Dahm. Dr. Dahm testified that based on the limited information he had, he could not specifically pin down a time of death. S.F. Vol. XVIII: 1477-86.

a.m. on September 13, 1991 (or near the time of the victims' deaths according to Sgt. Martinez's testimony in the Brenda Colella trial) he and his wife were in Victoria, Texas, 232 miles from the crime scene. Amy Pflaum, a former ticket agent in the Victoria, Texas bus station, testified that at 6:00 a.m. on a Friday morning in the middle of a month shortly after the end of the summer in 1991, the Colellas purchased bus tickets to go from Victoria, Texas to Indianapolis, Indiana. S.F. Vol. XVII: 1205-07. Ms. Pflaum clearly recalled the Colellas and the events that morning because of Mr. Colella's tattoos and because the Colellas were waiting at the bus station when she arrived at about 6:00 a.m. *Id.* They appeared to have just arrived from the beach. *Id.* at 1221. While Ms. Pflaum could not recall the precise date, she did agree that September 13 (which was a Friday) is in the middle of the month. *Id.* at 1218.[18] She testified that it takes about four-and-a-half hours to travel from Brownsville, Texas to Victoria, Texas. S.F. Vol. XVII: 1210-12.

85.     Mr. Colella testified in his trial that he and Brenda Colella arrived at the bus station in Victoria between 5:00 a.m. to 5:30 a.m. on the day after Brenda Colella had been raped (or on the morning of September 13, 1991). S.F. Vol. XVIII: 1384-85.   Mr. Colella's mother and his stepfather had driven him and Brenda Colella from Port Isabel, Texas to Victoria, Texas. S.F. Vol. XVIII: 1383-84. Sgt. Martinez's false testimony thus struck directly at the core issue of the case: Mr. Colella's alibi defense. *See Ex Parte Adams*, 768 S.W.2d 281, 291 (Tex. Crim. App. 1989) (granting habeas corpus relief when State knowingly permitted key identification witness to give perjured testimony which had the effect of artificially bolstering the credibility of her identification); *Smith*, 205 F.2d at 1052 (violation of due process established when "inconsistency . . . exists at the core of the prosecution's case").

86.     The State denied Mr. Colella due process by knowingly presenting Sgt. Martinez's

---

[18] Ms. Pflaum's estimate of the date corresponds with that of the Colellas' acquaintances on the Island, who testified that the Colellas appeared to have left the Island after the night of September 12, 1991, and were not seen again until they were arrested several months later. *See, e.g.*, S.F. Vol. XIII: 310 (Jack Dunn); *id.* at 393-94 (Sid Wilson).

false testimony about the time of the victims' death. *Smith v. Groose, supra,* is on point. In *Smith,* Cunningham and another person were burglarizing a home when Smith, Lytle, and Bowman later arrived coincidentally to burglarize the same home. Sometime during the "double burglary," the homeowner was killed. Lytle, shortly after being arrested, initially told police in a videotaped statement that Bowman had stabbed the homeowner – making himself, Lytle, and Smith liable for felony murder. However, in testimony during Smith's trial, Lytle instead declared that Cunningham had already murdered the homeowner *before* he and his accomplices had arrived. *See id.* at 1048-49.

87.     At Smith's trial, the State impeached Lytle's trial testimony (blaming Cunningham) with his *earlier* statement to the police blaming his accomplice Bowman for the murder, and argued that Lytle's trial testimony was false, and that his statement implicating Bowman was accurate. *Id.* at 1048. The jury was convinced, and convicted Smith of felony murder based on the fact that he was Bowman's accomplice in felony murder when Bowman murdered the homeowner. When the State tried Cunningham, however, the State permitted Lytle to implicate Cunningham, even though the State had affirmatively attacked and disclaimed that testimony during Smith's trial. The State did not impeach Lytle with his prior inconsistent statements (which were "mentioned but not admitted"), but instead argued to the jury that Lytle told the truth when he stated that Cunningham had murdered the homeowner *before* he, Smith, or Bowman had arrived at the home. Indeed, the State even objected to the defense's attempt to admit the earlier videotaped statement to impeach Lytle. *Id.* at 1049-50.

88.     The Eighth Circuit reversed Smith's conviction. The court first described the prosecution's "unique" role in the justice system, which requires it to place the goal of seeking justice above the goal of winning convictions. *Id.* at 1049 (calling prosecutor's role "quasi-judicial" and pointing out that it "requires conduct of a prosecutor that it does not require of other participants in the criminal justice system"). Here, the court observed, the State had knowingly proffered inconsistent testimony so that it could "prove beyond a reasonable doubt that the [homeowner was]

murdered at two different times" and thereby "convict as many defendants as possible in a series of cases in which the question of timing was crucial." *Id.* at 1050-51. Aggravating the misconduct was that the very same prosecutor had tried both Smith and Cunningham. *Id.* at 1050. The court denounced the prosecutor's conduct in the harshest terms:

> The State's use of factually contradictory theories in this case constituted foul blows, error that fatally infected Smith's conviction. Even if our adversary system is in many ways, a gamble, that system is poorly served when a prosecutor, the State's own instrument of justice, stacks the deck in his favor. The State's duty to its citizens does not allow it to pursue as many convictions as possible without regard to fairness and the search for truth.

*Id.* at 1051 (quotations and citations omitted). Due process, the *Smith* court held, "prohibits prosecutors from putting forth inherently factually contradictory theories to convict multiple defendants of the same murder." *Id.* at 1053; *see also Troedel v. Wainwright*, 667 F. Supp. 1456, 1459-60 (S.D. Fla. 1986) ("[T]he inconsistent positions taken by the prosecution [ballistics expert] at Hawkins' and [co-defendant] Troedel's trials. . . [establishes that] the subject testimony was not only misleading, but also was used by the State knowing it to be misleading."), *aff'd sub nom., Troedel v. Dugger*, 828 F.2d 671, 672 (11th Cir. 1987).

89.    Mr. Colella's case is materially indistinguishable from *Smith*. Here the State solicited testimony in Mr. Colella's trial concerning a vital element of the State's case which was materially inconsistent with testimony presented at the trial of another accused accomplice. As in *Smith*, the testimony concerned the time of death of the victims, a critical factor in the State's case. As in *Smith*, the very same prosecutor sponsored two inconsistent stories of how the crime happened. Finally, as in *Smith*, the State impermissibly "reinforce[d] the falsehood by capitalizing on it in its closing argument." *O'Keefe*, 128 F.3d. at 894-95. The writ should be granted. *See Faulder*, 81 F.3d at 519.

41

c.    **The State knowingly sponsored and presented perjured testimony about the material issue of the date the victims' bodies were discovered.**

90.    In direct testimony in Mr. Colella's trial, the prosecution asked Sgt. Martinez the following leading question: "Q [Ms. Lopez]: Now, were you on duty back on *September 12, 1991?*" S.F. Vol. XII: 89 (emphasis added). He responded, "Yes, I was." *Id.* Sgt. Martinez then testified that he received a call to respond to the crime scene. S.F. Vol. XII: 89-90. A few minutes later, he was asked: "[W]ho went with you, if anybody, when you went to respond to the call on *September 12, 1991?*", to which he responded "Lt. Ernesto Flores." S.F. Vol. XII: 92 (emphasis added). On cross-examination, Sgt. Martinez was asked when he obtained certain photographs from Jack Dunn, one of the prosecution's witnesses, and he said "I believe it was September 13th, the day *after* the bodies had been discovered." S.F. Vol. XII: 165 (emphasis added).

91.    Sgt. Martinez testified only two months earlier in Brenda Colella's trial that he was "employed back on *September the 13th, 1991*" and *on September 13th, 1991* he first received a call about the bodies and went to the Island in response to the call. *See* (BBC) S.F. Vol. IV: 84-87. The same prosecutor, Ms. Migdalia Lopez, conducted Sgt. Martinez's direct examination in both Mr. Colella's trial and Brenda Colella's trial. *See* S.F. Vol. XII: 88; (BBC) S.F. Vol. IV: 84.

92.    Sgt. Martinez's testimony in Mr. Colella's case about the day when he was on duty and first saw the bodies (September 12, 1991) is false. It is undisputed that the victims were alive on the morning of September 12, 1991, and that their bodies were found on September 13, 1991.[19] In Brenda Colella's trial, Sgt. Martinez testified that he first saw the bodies on September 13, 1991.

---

[19] Eliza Longoria, an employee of Southwestern Bell, testified that phone records showed a collect call was placed from a Circle K on Port Isabel to a certain number at 10:26 P.M. on September 12, 1991. S.F. Vol. XVI: 884, 888. Ricky Taylor later testified that he placed that call while he, his brother, and Mr. Lavesphere were buying cigarettes at a Circle K and that the number shown by the phone records belonged to his girlfriend, Shelly Miller. S.F. Vol. XVI: 1026; *see also* State's Exhibit 32 (telephone records). The State sponsored all this testimony; there can be no doubt the State knew the victims were alive as late as 10:26 on the night of September 12th.

ChmPDF - www.fenho.com

(BBC) IV: 84-87. Ms. Lopez knew this, since she elicited that testimony. *Id.* Other witnesses in Brenda Colella's trial (except Detective Boyd) also testified that the bodies were found on September 13, 1991. *See, e.g.,* App. II, Exh. 18 (State's Appellate Brief) at 4 n.2 ("Although [Boyd] testified the bodies were found on this date [September 12, 1991], the other witness' testimony placed events in a corrected [sic] time frame."). The prosecution made no effort to correct this mistake, which Sgt. Martinez repeated.

93.    Sergeant Martinez was not the only witness who testified falsely for the State. The State's first witness, Detective Sandra Boyd of the South Padre Island Police Department, was asked: "Now, were you on duty back on *September 12, 1991?*" to which Detective Boyd answered "yes." S.F. Vol. XI: 33 (emphasis added). The next question was "were you a detective on that date [September 12, 1991]?" to which Detective Boyd said "yes." *Id.* She then testified that she received a phone call from a dispatcher who had been advised that a truck was partially submerged in the bay with two bodies in it. *Id.* The remainder of her testimony described the crime scene and her investigation. S.F. Vol. XI: 32-85. Similarly, when questioning Jack Dunn, the prosecution twice asked leading questions that falsely implied the relevant dates were September 11th and 12th, as opposed to September 12th and 13th:

> Q.    [Ms. Lopez]:  I would like to take you to September 11[th] going into September 12[th], that evening, the late evening of the 11[th] and early hours of the 12[th], at this time.
>
> A.    [Mr. Dunn]: Yes, ma'am.

S.F. Vol. XII: 289-90.

> Q.    [Ms. Lopez]: Now, I would like to take you back to September 11[th] and the night going into the early morning of the 12[th].
>
> A.    [Mr. Dunn]: Yes, ma'am.

S.F. Vol. XIII: 295.

43

CitaPDF - www.texiss.com

The prosecution did the same with Sid Wilson:

Q.      [Mr. Valle]: Sir, let me take you back to September 11 and September
        12, 1991.  Where did you live then?

A.      [Mr. Sid Wilson]: On the beach, South Padre Island.

*Id.* at 379.

Q.      [Mr. Valle]: Back around September 11th or September 12th of 1991,
        Vikki Larsen was staying with Jack Dunn?

A.      [Mr. Sid Wilson]: Yes, sir.

*Id.* at 381.

94.     It may be, as the State's original brief in Brenda's case asserted, that the repeated false

testimony about the date of critical events was simply a mistake.  However, the "good faith or bad

faith of the prosecution" is irrelevant in the *Brady/Napue* context.  *Brady*, 373 U.S. at 87.  Mr.

Colella need only prove that the testimony was false, that the State knew it was false, and that the

false testimony "may have had an effect on the outcome of the trial."  *Napue*, 360 U.S. at 272.  This

standard is "considerably less onerous" than the *Brady* standard, which requires an applicant to prove

that there is a reasonable likelihood that the outcome of the trial would have been different.  *Moody*

*v. Johnson*, 139 F.3d 477, 484 (5th Cir.), *cert. denied*, 119 S.Ct. 359 (1998).

95.     Unquestionably, the confusion sown by the State "may have had" an effect on Mr.

Colella's trial.  The State repeatedly proffered false testimony that the victims were found on the 12th

of September.  Mr. Colella's alibi related only to the events of the 13th of September; it is completely

irrelevant if the victims were killed on the 12th.  By repeatedly falsely suggesting that the victims had

been found on September 12, 1991, the prosecution diverted the jury's attention away from the

events of September 13, 1991, and more importantly, away from Mr. Colella's whereabouts on the

morning of September 13, 1991.  Mr. Colella's jury was probably confused by the conflicting

evidence concerning the date on which the victims' bodies were found.  Some or all jurors may have

44

rejected Mr. Colella's alibi not because they disbelieved the testimony which supported it, but because they thought that even if true, it was irrelevant.

96.     This scenario satisfies *Napue*'s "considerably less onerous" standard. The State's witnesses' testimony about finding the bodies on September 12, 1991 was obviously false, known to the prosecutor to be false, and it was highly material. *See Faulder*, 81 F.3d at 515. Mr. Colella's rights to Due Process under the Fourteenth Amendment to the United States Constitution and to a remedy by "due course of law" under Article I, Section 13 of the Texas Constitution were violated, and he must be granted a new trial.[20]

> ### d. The State knowingly sponsored perjured testimony from Sergeant Martinez about the material issue of the source of tire tracks found at the crime scene.

97.     The perjury does not stop with dates and estimated times of death. The prosecution also knowingly sponsored false testimony about critical crime scene evidence: the second set of tire tracks created by the vehicle used to push the white pickup into the water.

98.     In Brenda Colella's capital murder trial, Sgt. Martinez told Brenda Colella's jury that the tracks leading to the water's edge in State's Exhibit 40 were from Red Wilson's truck:

Q.      [Ms. Lopez]: How about State's Exhibit 40?

A.      [Sergeant Martinez]: That is a tire impression of the wet sand that depicts the tire track of the suspected vehicle that moved or pushed the white truck into the water.

Q.      [Ms. Lopez]: *Is that Red's tire track, his Bronco?*

A..     [Sergeant Martinez]: *Yes.*

(BBC) S.F. Vol. IV: 101 (emphasis added).

99.     This admission is consistent with Sgt. Martinez's general testimony only a few

---

[20] It is irrelevant whether the erroneous date was a mistake on the prosecutor's part. In the *Brady* context, it is the "character of the evidence, not the character of the prosecutor" that matters. *Gibbs v. Johnson*, 154 F.3d 253, 256 (5th Cir. 1998) (citing *United States v. Agurs*, 427 U.S. 97 (1976)), *cert. denied*, 502 U.S. 1107 (1992). Thus, even if the confused comments concerning the date were innocent mistakes (as unlikely as this seems, given the number of times

CUtePDF - www.tesisa.com

minutes earlier in Brenda Colella's trial about the tire tracks found at the scene:

> Q. Were there other tire tracks other than the tire tracks from the pickup that you saw submerged there?
>
> A. Yes.
>
> Q. Were you able to determine whose tire tracks those were?
>
> *A. Yes.*
>
> *Q. Could you tell us who you were able to determine they were from?*
>
> *A. A Bronco that belonged to another co-defendant.*
>
> *Q. And is that co-defendant Anthony Wilson?*
>
> *A. Yes.*
>
> *Q. Also known as Red?*
>
> *A. Yes.*

(BBC) S.F. Vol. IV: 96 (emphasis added).

100.    Sgt. Martinez's testimony was also consistent with Detective Boyd's Supplement Report and her testimony in the Brenda Colella trial. *See* App. II, Exh. 16.

101.    During Sgt. Martinez's testimony in Brenda Colella's trial, the prosecutor asked Sgt. Martinez to write a short description of the subject of the photograph marked as Exhibit 40 – a picture of the tire tracks which Sgt. Martinez had identified as coming from Red's Bronco – on the back of the photograph. (BBC) S.F. Vol. IV: 101. The prosecutor later mentioned this exercise:

> Q. (By Mrs. Lopez) Sergeant Martinez, I believe right before we stopped for lunch we were talking about the tire tracks; is that correct?
>
> A. Yes, ma'am.
>
> Q. And I remember that we went through and you identified all the

---

they were repeated), this error still requires reversal if the false testimony could have influenced the jury's verdict.

different tire tracks as to who you felt they belonged; is that correct? Do you remember that?

A.     Yes, ma'am.

Q.     And you wrote that [information] behind on the back of the pictures [of the tire tracks]?

A.     Yes, ma'am.

(BBC) S.F. Vol. IV: 102-03.[21]

102.     Thus, at Brenda Collela's trial, Sgt. Martinez positively identified Red's Bronco as the source of the second set of tire tracks at the crime scene on May 27, 1992. *See* (BBC) S.F. Vol. IV (cover page). The testimony was given approximately eight months after the bodies were found on September 13, 1991. When Sgt. Martinez testified, he had had at least seven months to review and analyze the physical evidence and compare the photographs of the car tires. On May 19, 1992, shortly before Brenda's trial, Sgt. Martinez *and* District Attorney's Office personnel, including Ms. Lopez herself, interviewed Red exhaustively concerning Red's version of the events of September 12-13, 1991. (BBC) S.F. Vol. V: 222. Sgt. Martinez had over one week in which to consider that account. Sgt. Martinez was so confident of his conclusion about the tire tracks that, *while under oath and in open court testifying against Brenda Colella,* he wrote on the back of the photographs a notation that the tire tracks in that picture belonged to "Red's Bronco." Indeed, based on Sgt. Martinez's trial testimony, the State unequivocally asserted in its brief on direct appeal of Brenda Colella's conviction that "Deputy Martinez concluded that Red's truck had pushed the victims' truck into the bay *because tire tracks near their truck matched Red's.*" App. II, Exh. 18 (State's Appellate Brief) at 21 n.3 (emphasis added).

---

[21] After all of this testimony establishing Red's Bronco as the source of the tire tracks, Sergeant Martinez nevertheless testified that he was unable to substantiate his theory that another vehicle was used to push the white truck into the bay. (BBC) S.F. Vol. IV: 103-04. This testimony, however, did not affect his conclusion that Red's Bronco is the source of the tire tracks in State's Exhibit 40. Further, Detective Boyd maintained that a separate vehicle pushed the white truck into the water. The State admitted on appeal that the evidence in Brenda Colella's case supported the theory that another

103.     Four days later, on June 1, 1992, Red Wilson testified that he watched Mr. Colella shoot the victims, and that Mr. Colella got into the white pickup with the victims' bodies in it and began driving and looking for a place to dump them.  (BBC) S.F. Vol. VII: 695-702.  Red Wilson stated that he and Brenda followed Mr. Colella in the Bronco.  The white pickup then became stuck.  While Red tried to pull the white pickup out of the sand, the drive shaft on Red's Bronco broke.  *Id.* at 700-701.  While Red worked on his drive shaft, Mr. Colella was able to get the white pickup unstuck.  *Id.*  Red Wilson then testified as follows:

Q.     (By Ms. Lopez) So did he finally get the white pickup going?

A.     (By Red Wilson) Yes, he did.

Q.     Where did he go?

A.     He took off north.

* * *

Q.     Do you know where he went?

A.     No, I do not.

[Red testified that he eventually repaired his drive shaft.]

Q.     How long did it take you to get it fixed?

A.     I'd say anywhere from 15 to 30 minutes.  I'm not exactly sure.

Q.     And during this time is this defendant [Brenda Colella] with you?

A.     Yes . . . .

Q.     Do you see Paul again?

A.     Yes.  *He shows back up.*

* * *

Q.     *Did he tell you where he got rid of the pickup?*

A.     He said *he* put it on the bay side somewhere.  I am not sure.  He says – I don't know if I asked him.  I really don't.  He was wet.  His pants

---

vehicle pushed the white truck into the water.  *See*  Section VI.B.

were wet, and I think that *he said something about driving it off into some water, that he had gotten rid of it. I'm not sure.*

Q.    *Did you ever go over where they had – where he had dumped the pickup, the white pickup?*

A.    *No, never did. My truck never went to where the truck was at.*

(BBC) S.F. Vol. VII: 703-05 (emphasis added). Red's testimony is especially puzzling because less than two weeks earlier, on May 19, 1992, Red had given a full, detailed, oral statement to Sgt. Luis Martinez and members of the DA's office concerning the events of September 12-13, 1991. (BBC) S.F. Vol. V: 222. Because Red's lawyer refused to allow the statement to be reduced to writing, it is unknown what, if anything, Red told Sgt. Martinez and the District Attorneys about his participation in dumping the white pickup.

104.    There are several possible scenarios, all of which cast doubt on the State's case. First, Red might have admitted during the May 19 meeting that his Bronco pushed the white pickup into the water. This would explain why Sgt. Martinez affirmed that the tire tracks in State's Exhibit 40 were Red's tire tracks during Brenda's trial. This would fit with Sgt. Martinez's pattern of basing most of his theories of how the crime was committed on Red Wilson's uncorroborated testimony. This would mean that Red lied on the witness stand in Brenda's trial, and the State knew it. Alternately, Red might have said during the May 19 statement that Mr. Colella disposed of the white pickup alone. If this were Red's story, it is difficult to imagine why Sgt. Martinez would have destroyed it by placing Red's truck at the dump scene, thereby exposing the State's star witness as a liar. Finally, it might be the case that Red told the truth in Brenda's trial and that Sgt. Martinez was lying or mistaken concerning the identity of the second set of tire tracks. If this is the case, it raises the question: *if Red Wilson did not help Mr. Colella dispose of the white pickup truck containing the bodies, who did?* Neither Mr. Colella nor Brenda had another car – Red's Bronco was their sole source of transportation. (BBC) S.F. Vol. V: 317.

105.    At Mr. Colella's trial, the prosecution elicited fundamentally and irreconcilably

CVisPDF - www.twice.com

inconsistent testimony from Sgt. Martinez about his investigation and conclusions concerning the source of the second set of tire tracks at the crime scene. On direct examination, Sgt. Martinez authenticated State's Exhibit 40, which depicted the second set of tire tracks found at the crime scene.[22] S.F. Vol. XII: 102, 105. As noted above, at Brenda Colella's trial, Sgt. Martinez testified under oath that the tracks belonged to Red Wilson, and wrote "Red's Bronco" on the back of the photograph *during his testimony*. On cross-examination in Applicant's trial, Sgt. Martinez now claimed (1) that the notation had been made shortly after the photographs had been developed just days after the crimes occurred; (2) that the notion that the tire tracks were from Red's Bronco was just a preliminary "theory" that the investigating officers were never able to confirm; and (3) that, in fact, the tire tracks did not match those of Red's Bronco:

Q.    It says "Red's Bronco."

A.    Right.

Q.    They are not from Red's Bronco?

A.    No, sir.

Q.    Why did you write that?

A.    That's a theory which we established prior to when we got to – When we got to the crime scene, we took photographs, and as we developed a theory, we had theorized the tire impressions that were found were from Red's Bronco. That's why we took these other photographs of the campsite tires.

We could never establish the theory because, as you can see on the photograph, the tire impressions are not of good quality because of the moisture in the sand; and the tire impressions on the tracks, as the ones from the campsite, do not make it the same tire.

Q.    So you made a mistake here when you put "Red's Bronco."

---

[22] State's Exhibit 40 in Mr. Colella's trial was identical to State's Exhibit 40 at Brenda Colella's trial: it depicted the second set of tire tracks found at the crime scene.

A.    No.  That's a theory we had when we developed this film.

Q.    All right.  Explain to the jury what you mean by "theory," a theory of what?

A.    When we first got to the scene, we developed a theory that the victims' truck had been pushed into the water by another vehicle. When we interviewed the witnesses there and we established that there was an alleged sexual assault that had been committed and a red Bronco had been involved, we theorized the red Bronco had been used to push the vehicle in the water.

Q.    So after you took this picture, you showed it to Red, right?

A.    No, sir.

Q.    Then how would you know to put "Red's Bronco"?  How would you know that?

A.    That was a theory that we had established.

Q.    When did you take this photograph?

A.    This is at the crime scene.

Q.    When did you take the photograph?

A.    The day we discovered the bodies.

Q.    So you discover the bodies, you take photographs, and after you interview Red, you put "Red's Bronco"?

A.    No, sir.  When we got the film back from the developers, we started to identify the impressions, and one of the theories that we had was that the red Bronco had been used.  So that's why I put down there "Red's Bronco."

Q.    And you found this out the very next day?

A.    I believe it was Monday.  The next day was Saturday, and I was not present on Saturday.

Q.    That's when you found out that Red's Bronco had been used?

A.     On Monday, yes, sir.

Q.     Now, this one, Exhibit 40, says "tire track at crime scene belonging to Red."

A.     That's the same theory I mentioned earlier, the theory that was established.

Q.     Did you show these to Red?

A.     No, sir.

Q.     Did you compare these to Red's Bronco?

A.     Yes.

Q.     And Exhibit No. 34 shows "tire track at Red's campsite."

A.     That is correct.

Q.     Did you verify that this is Red's Bronco?

A.     Yes.

Q.     And did Exhibit 34, 33 and 40 match in any way?

A.     No, sir.

S.F. Vol. XII: 149-50.

Sgt. Martinez thus testified in Mr. Colella's trial:

- when securing the crime scene his staff took the photograph marked State's Exhibit 40.  S.F. Vol. XII: 149-150.

- shortly after the photograph marked State's Exhibit 40 was developed he formulated a theory that the tire tracks in State's Exhibit 40 were caused by Red's Bronco.  *Id.*   Based on this theory, "that's why [he] put down 'Red's Bronco'" on State's Exhibit 40.  *Id.*

- to test his theory,  he then took pictures of tire tracks at Red's campsite. *Id.*

52

- he then compared the photographs of tire tracks from Red's campsite (State's Exhibits 33 and 34) with State's Exhibit 40 and was unable to confirm that the latter matched the former. *Id.*

106.    This testimony was demonstrably false and materially misleading in numerous respects.

First, Ms. Lopez knowingly and deliberately elicited false testimony from Sgt. Martinez to mislead the jury into believing that the notation on the back of State's Exhibit 40 ("Red's Bronco") was made very shortly after the murders ("the very next day") and merely reflected a preliminary "working hypothesis" which was never confirmed, when in fact Ms. Lopez knew that Sgt. Martinez had made the notation during his testimony at Brenda Colella's trial and that he had positively identified the tire tracks as belonging to Red Wilson's truck at that time.   It is indisputable that Ms. Lopez knew that Sgt. Martinez's testimony was false, because she conducted his direct examination in both trials.   Thus, she knew that Sgt. Martinez had asserted at Brenda Colella's trial that the tire tracks in State's Exhibit 40 were made by Red Wilson's Bronco, and that he had reached that conclusion by comparing the tracks found at the crime scene with tracks known to have been made by Red's Bronco.   She also knew that Sgt. Martinez, at her direction, had written on the back of photographs "Red's Bronco" and "tire track of crime scene belonging to Red" during his testimony at Brenda Colella's trial.   Accordingly, she knew that Sgt. Martinez testified falsely when in Mr. Colella's trial he stated that he did not know the source of these tire tracks and she knew that Sgt. Martinez was testifying falsely when he told Mr. Colella's jury that he wrote the phrase "tire track at crime scene belonging to Red" *shortly after the film was developed*.   In fact, he had written that phrase on Exhibit 40 at Ms. Lopez's direction in open court during Brenda Colella's trial.   (BBC) S.F. Vol. IV: 96.

107.    Sgt. Martinez's false testimony left Mr. Colella's jury with the false impression that his theory that "Red's truck pushed the white pickup into the bay" was a preliminary investigative

53

hypothesis formed before all the facts were known, then discarded as events developed. Nothing could have been further from the truth: in May of 1992, months after the crime scene investigation had been completed and months after the photographs had been developed, Sgt. Martinez testified under oath in the Brenda Colella trial that Red's Bronco made the tire tracks. This was no "theory" that the State "could never establish," as Sgt. Martinez testified: it was rather an important component of the State's case against Brenda Colella. The State did not correct these false statements; in fact, Ms. Lopez, during her direct examination, permitted Sgt. Martinez to set up the false "preliminary theory" story and to falsely deny that the tire tracks were made by Red's Bronco. S.F. Vol. XII: 105-08.

108.   The presence of Red's tire tracks at the crime scene was highly material. They place Red, the accomplice who received complete immunity so long as he testified truthfully and was not found to have participated in the killings, at the crime scene. They establish that Red was involved in disposing of the bodies.[23] The presence of Red's vehicle at the crime scene coupled with the undisputed testimony that a 9mm bullet, the type of bullet supposedly used in killing the victims, was found in Red's Bronco the day after the victims were found is further evidence that Red was involved. S.F. Vol. XII: 138-39. Further, Sgt. Martinez's testimony cripples Red's credibility, since Red adamantly denied *both at Brenda's trial and at Mr. Colella's* that he helped Mr. Colella dump the bodies, denied even knowing where Paul had dumped them. S.F. Vol. XIV: 599-601; (BBC) S.F. Vol. VII: 705. The jury was required to find that Red was telling the truth for it to even consider his testimony against Mr. Colella. Transcript Volume I[24] at 134 (guilt-innocence phase charge); App. II, Exh. 7 (Court's Charge to Jury) at 9.

109.   The testimony of Sgt. Martinez and Red Wilson at Mr. Colella's trial, taken together,

---

[23] The pathologist testified in Mr. Colella's trial that Mr. Lavesphere may not have died immediately upon being shot but 15 to 30 minutes later. S.F. Vol. XVI: 901.

[24] Hereinafter, citations to the Transcript Volume (now called the Clerk's Record) will follow the citation form "Tr. Vol. I at [page]."

CHMPDF - www.texio.com

establish an illogical set of facts. Red Wilson testified that Mr. Colella drove off in the white pickup containing the victims' bodies *alone,* and returned *alone* on foot shortly thereafter, to where Red and Brenda were waiting. S.F. Vol. XIV: 598-601. At Mr. Colella's trial, Sgt. Martinez unequivocally denied that Red's Bronco pushed the white truck into the water, but both he and Sandra Boyd conceded that another vehicle was certainly involved.

110. Given that he was driving a truck containing two dead bodies, it seems unlikely that Mr. Colella would have driven any farther than absolutely necessary. To believe the State's theory of the case, one must believe that Mr. Colella drove off in the white pickup alone in the morning hours, and encountered a helpful motorist. This helpful motorist agreed to assist Mr. Colella in shoving an expensive pickup truck full of oilfield equipment – *and two dead bodies, one of which was plainly visible in the bed of the truck* – into a bay. Obviously, the motorist would have risked damaging his front bumper, grille and headlights by directly pushing another vehicle into a sandy bog. This helpful motorist then drove off, and never mentioned his unusual encounter to anybody. Red Wilson, clearly floundering for some way to make this story plausible, actually suggested during Mr. Colella's trial that this helpful motorist might have been the "Tiger Van" man, apparently a beach dweller with an unusual van. S.F. Vol. XV: 760-62.

111. One might expect, if the State genuinely believed Red's story, the State would have thoroughly canvassed the area for the vital eyewitness and possible accessory after the fact who assisted Mr. Colella. There is no evidence of any such search. Once again, it is revealing to consider what might have happened during Red's intentionally unrecorded May 19th statement. If Red denied helping dispose of the white pickup, the authorities would have been on notice that another person was deeply involved in this crime. That other person would at the very least have been a vital witness, and could well have been an equally culpable co-defendant. It seems implausible that the authorities would not have bothered *even to search for this person* at all. Thus, if on May 19th Red did indeed deny helping to dispose of the white pickup, the authorities themselves do not seem to

55

have believed him. If he admitted helping dump the truck (which would explain Sgt. Martinez's testimony at Brenda's trial), *the prosecution knowingly allowed him to lie on the witness stand.* Both scenarios reflect an unacceptably cavalier attitude toward the truth and toward Mr. Colella's constitutional rights.

112.    Even without benefit of the transcript from the Brenda Colella trial (and Sgt. Martinez's prior testimony that the tire tracks leading to the water came from Red's truck), Judge Baird, in his dissenting opinion, concluded that *Red Wilson*, in fact, committed the murders:

> However, the physical evidence at the scene led the investigating officers to conclude the victims' pickup had been pushed into the bay by another vehicle. Appellant did not own a vehicle and Red controlled the Bronco which was appellant's only means of transportation.
>
> The evidence in this record suggests that Red, not appellant committed the murders. A more likely scenario is the following: after dropping off appellant and Brenda, Red proceeded to the beach, committed the murders, pushed the pickup in the bay and disposed of the murder weapon. This scenario is consistent with the estimated time of death, the coroner's testimony and that of Amy Pflaum, the bus station attendant.

*Colella v. State*, 915 S.W.2d 834, 859 (Tex. Crim. App. 1995).

113.    The presence of Red's tire tracks at the crime scene undermines Red's credibility and would have given him another reason to testify falsely in Mr. Colella's trial.  Mr. Colella's jury should have been told this fact, so it could have properly assessed the credibility of Red's testimony. *See Giglio*, 405 U.S. at 153-54 ("When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule [that suppression of material evidence justifies a new trial "irrespective of the good faith or bad faith of the prosecution].") (quoting *Napue*, 360 U.S. at 269).

114.    Because Red was an accomplice witness, the jury was required to find that his testimony was "true" before they could use it against Mr. Colella. *See* Tr. Vol. I at 134 (Guilt-Phase charge).  Thus, Sgt. Martinez's false testimony about the tire tracks is even more consequential.  If

Sgt. Martinez had testified as he did in Brenda Colella's trial that the tire tracks at the scene were Red's, the jury as instructed could not have found Red's account truthful and thus, could not have considered Red's testimony, at all, for any reason. Mr. Colella's acquittal would have been assured.

### e. The State knowingly sponsored perjured testimony about the weapon used in the offense.

115.    Similar to the manner in which she elicited false testimony from Sgt. Martinez about his investigation of the tire tracks at the crime scene, prosecutor Lopez elicited additional false and misleading testimony from Sgt. Martinez about the type of ammunition that was used to kill the victims.

116.    At Brenda Colella's trial, Sgt. Martinez testified that "[a]fter the autopsy was performed, we received a projectile that was removed from the body of Michael Lavesphere [which] proved my theory that a medium-sized caliber weapon was used. *They extracted a nine millimeter projectile from the victim's neck.*" (BBC) S.F. Vol. IV: 116 (emphasis added). When asked how he had reached that conclusion, he testified that is was based on "[t]he physical evidence removed from the body of Michael Lavesphere." *Id.*

117.    During Mr. Colella's trial, on cross-examination, Sgt. Martinez, without explanation, abandoned his former sworn testimony about how he identified the bullet's caliber:

Q.    You did not at a prior proceeding, sir, make a suggestion that you knew that a bullet that was found in the body of one of the suspects, upon your inspection, you having made that decision, was a nine millimeter, you didn't do that?

A.    No.

***

Q.    Now, did you, sir, visually inspect that bullet that you found to have been recovered from one of the bodies?

A.    No.

CUIxPDF - www.foxitic.com

S.F. Vol. XII: 198-99.

This testimony was material. At Brenda's trial, Sergeant Martinez actually *qualified as an expert in firearms* and rendered an expert opinion that the wound size in the victims and the "physical evidence" recovered from the body of Mr. Lavesphere led him to conclude that the bullets used to kill the victims were nine millimeter. (BBC) S.F. Vol. IV: 114-118 (citing "20 years" of experience in military and police work to justify expert status, testifying unequivocally that bullet was nine millimeter). Because the State never bothered to send the bullets used in this double homicide to a crime lab for professional analysis, S.F. Vol. XII: 243, Sgt. Martinez's was one of the jury's few sources of information about the bullets.

118.    The overall picture of the testimony in the case suggests an explanation for Sgt. Martinez's reluctant testimony. All of the witnesses testified that the gun stolen in the robbery at the marina was a revolver. S.F. Vol. XIII: 304, 316 (Jack Dunn describes gun as a revolver with a brown handle); (BBC) S.F. Vol. VII: 622 (Red Wilson testifies gun was a revolver). *Virtually all nine millimeter handguns are semiautomatics – not revolvers.* S.F. Vol. XIII: 426. Gordon Batsell, a local sporting goods store owner with extensive firearms experience, testified at Mr. Colella's trial that the spent bullet recovered from Michael Lavesphere was a nine millimeter. S.F. Vol. XIII: 421 (when the bullet was examined, its diameter and weight were determined to be "right at a [nine] millimeter"); *id.* at 423 ("It appears to be a standard nine millimeter bullet."); *id.* at 429 ("[I]t is my conclusion it is a nine millimeter bullet."). As Mr. Batsell further testified, a nine millimeter revolver is a "rare" gun, that "when we look at a nine millimeter [bullet], we *automatically think of a semiautomatic pistol"* and that it is "very unusual to find a revolver that shoots a nine millimeter cartridge." S.F. Vol. XIII: 426. Mr. Batsell observed that one manufacturer he knew of that made nine millimeter revolvers, Smith & Wesson, discontinued the gun in 1985 because it was unpopular. S.F. Vol. XIII: 426.

119.    Thus, if the weapon used to shoot the victims was a nine millimeter revolver, this

evidence points *away from* Mr. Colella's guilt, because the testimony establishes that the only gun he possessed – the gun which was stolen from the marina earlier in the day – was a revolver.[25] If the nine millimeter bullet found in the victims was fired from a nine millimeter automatic pistol, someone who owned a nine millimeter pistol – not Mr. Colella – shot the victims. To cover up this weakness, the State offered the testimony of Mr. Batsell to the effect that he had sold some nine millimeter revolvers – "very few[,] very few" – in the past, and therefore there were some in local circulation. S.F. Vol. XIII: 437. The State's theory of Mr. Colella's guilt therefore hinges on the assertion that when either he or Red stole the gun from the marina on the afternoon of September the 12th, they just happened to steal one of the rarest handguns in circulation, and that handgun was used to shoot the victims. Given the background weakness of the State's case, Sergeant Martinez's attempts to back away from his earlier assertion about the bullet's caliber loom large.

2.      **The State violated Mr. Colella's Fourteenth Amendment right to due process of law by using a theory of the case different from that it had earlier employed at Brenda Colella's trial.**

120.    Mr. Colella hereby incorporates and adopts all briefing above that sets out in the myriad inconsistencies in the State's proof in Brenda Colella's trial and Paul Colella's trial. *See* Section VI.A.1, *supra*. The prosecutor induced her witnesses to change the testimony they gave at Brenda Colella's trial and to testify to different facts at Paul Colella's trial in an attempt to counter Mr. Colella's alibi. The aspects of the witnesses' testimony concerned (1) the tire tracks found at the dump scene, (2) the date on which the offense took place, and, most crucially, (3) the time of death of the victims. The prosecution used one set of facts to convict Mrs. Colella, then – in a trial

---

[25] Max Courtney, a forensic scientist with expertise in forensic firearms examinations and crime scene reconstruction, has concluded that the ammunition recovered from the victims' bodies could not have been fired from the "revolver" seen in Mr. Colella's possession. *See* App. VII, Exh. 66 (Affidavit of Max Courtney). According to Mr. Courtney: "Revolvers designed to chamber and fire a 9–mm parabellum (Luger) cartridge are extremely rare; in fact, I have never seen one in my 31 years of examining evidence weapons. In general, the probability of a 9-mm bullet having been fired from a revolver rather than from a semiautomatic pistol is nil. Given the testimony of the State's expert that the bullet from the victim was a 9-mm bullet, it therefore would be very unlikely, in my opinion, that the bullet was fired from the weapon witnesses described as being in the hand of the defendant." *Id.* at ¶4.b.

before the same judge, with the same witnesses, for the same crime – invented another set of facts to make Mr. Colella's conviction easier – indeed, possible.

"It shall be the primary duty of all prosecuting attorneys, including any special prosecutors, not to convict, but to see that justice is done." TEX. CODE CRIM. PROC. art. 2.01. Prosecutors are "quasi-judicial officers" who occupy a role "unique in the justice system." *Smith v. Groose*, 205 F.3d 1045, 1049 (8th Cir. 2000). A consequence of a prosecutor's unique role is the obligation to "serve truth and justice first." *Thompson v. Calderon*, 120 F.3d 1045, 1058 (9th Cir. 1997) (en banc), *vacated on other grounds*, 523 U.S. 538 (1998).

121.    In this case, the prosecution switched several material facts between the trials of Mr. Colella and his wife. *See supra* Section V.A.1(a)-(e)   For instance, the prosecution permitted its chief investigating officer to testify in Mrs. Colella's trial that the victims were killed at one time, and to testify in Mr. Colella's trial that they were killed at another time. At no time did the prosecutor either (1) make this critical inconsistency known to the court or the jury; (2) correct it; or (3) proffer any explanation for the stark differences in the witness' testimony. In another instance, the prosecution permitted Sgt. Luis Martinez to deny in Mr. Colella's trial a fact – that the tire tracks found at the crime scene belonged to Red Wilson's Bronco – to which he had testified at Brenda Colella's trial. Once again, the prosecution failed to alert the trier of fact to this inconsistency, correct it, or offer any explanation for it (other than Sgt. Martinez's testimony – advanced for the first time in Mr. Colella's trial, and fundamentally inconsistent with his testimony at Brenda Colella's trial – that the identification of the tire tracks at Red's was only a preliminary hypothesis which was later rejected).

122.    The prosecution's conduct violated the Due Process Clause for several reasons. First, as the courts above have pointed out, when the prosecution proffers materially inconsistent testimony about the same criminal case in two separate trials, the prosecution is of necessity sponsoring false or misleading testimony on at least one occasion. Second, a criminal defendant being haled into

court has the fundamental bedrock right to rely on the prosecution's prior representations in open court – and the sworn testimony of its witnesses – in forming his defense. The values which have always underpinned the Due Process clause do not permit prosecutors to alter critical elements of their cases in order to respond to the differing defenses of codefendants.

3.    **The prosecution violated Mr. Colella's Fourteenth Amendment right to Due Process of Law by (1) entering into an Immunity Agreement with Red Wilson which gave him an incentive to distort and falsify his testimony; (2) knowingly sponsoring Red Wilson's false testimony in violation of the Immunity Agreement; and (3) deliberately mischaracterizing the Immunity Agreement and permitting Red Wilson to do the same.**

123.    On or about May 26, 1992, the State of Texas entered into an "Agreement for Immunity from Prosecution for Testimony" with Anthony Randall Wilson in *State of Texas vs. Anthony Randall Wilson*, Cause No. 92-CR-173-E, in the 357th Judicial District Court of Cameron County, Texas.  *See* Ex. 5 (Immunity Agreement).  Ms. Lopez, on behalf of the District Attorney of Cameron County, Texas, Anthony Randall Wilson, and Jerrold R. Davidson, Mr. Wilson's attorney, signed the Immunity Agreement.  *Id.* at 3.

124.    The Immunity Agreement recited that the offense is Capital Murder.  *Id.* at 1.  It further authorized a grant of immunity by Judge Rogelio Valdez of the 357th District Court to Anthony Randall Wilson "to secure the testimony of ANTHONY RANDALL WILSON as a witness in the trial of PAUL RICHARD COLELLA and/or BRENDA BOWLING COLELLA in Cause No. 92-CR-173-E in the 357[th] Judicial District Court of Cameron County, Texas." *Id.* All parties agreed that Mr. Wilson would be granted immunity "for *his truthful testimony* at the trial of PAUL RICHARD COLELLA and/or BRENDA BOWLING COLELLA." *Id.* at 1-2 (emphasis added).  In exchange for Mr. Wilson's truthful testimony, all charges against him in Cause No. 92-CR-173-E would be dismissed.  *Id.* at 2.  Further, the parties agreed "that should the State of Texas gain evidence that ANTHONY RANDALL WILSON voluntarily participated in the actual killing of

Michael Lavesphere and/or David Ray Taylor, then and in that event this agreement is null and void in its entirety." *Id.* Mr. Wilson agreed to comply with the terms of the Immunity Agreement and to give truthful testimony. *Id.* He also acknowledged that the Immunity Agreement would remain in continuous effect. *Id.*

125.    During Brenda Colella's trial, when the prosecution attempted to get Red Wilson to agree that the Immunity Agreement required him to testify truthfully as to the "material facts" of the case, or required him not to "lie . . . about your involvement in the case," Red refused. (BBC) S.F. Vol. VI: 541-43. Instead, he insisted that he believed the Immunity Agreement would be breached *only* if he was found to have participated in the "actual death" of the victims, but that it would remain in effect if he lied about anything else. *Id.*

126.    As Red's understanding attests, the Immunity Agreement had the unconstitutional effect of permitting Red to give perjured testimony. The *only* condition specifically described in the agreement that would terminate it is the prosecution's discovery of information that Red "voluntarily participated" in the killings of the victims. Thus, the Immunity Agreement provides a much stronger disincentive to Red testifying in such a way that links him to the crimes than it does to Red's lying on the witness stand: Red knows that if he supplies the prosecution with information linking himself to the murders, the Immunity Agreement will be null and void, and he will presumably be immediately prosecuted for capital murder, facing the prospect of execution. Yet, if he merely lies on the witness stand, the consequences are unclear. Red's understanding of the Immunity Agreement, described immediately above, is far from implausible.

127.    The Immunity Agreement therefore provides a clear incentive to Red to tailor his testimony to downplay his own involvement, *regardless of whether doing so involves misleading the jury*.

The Arizona Supreme Court recognized the fundamental due process violation created by immunity agreements which condition immunity on anything but a witness' truthful testimony. In

*State v. Fisher*, 686 P.2d 750 (Ariz. 1984), the immunity agreement conditioned immunity not only on truthful testimony but also on the "consistency" of the witness' trial testimony with her earlier statements to investigators:

> The prosecution did not condition conviction for a lesser offense on a defendant's promise to tell the truth. Instead, the prosecution conditioned conviction for a lesser offense on a defendant's promise to be consistent. By doing so, the prosecution may have overstepped the bounds of the law and its ethical responsibility to "scrupulously avoid any suggestion calculated to induce the witness to suppress or deviate from the truth, or in any degree to affect his free and untrammeled conduct when appearing at the trial or on the witness stand." A.B.A. Canons of Professional Ethics 39. We remind the prosecution that a public prosecutor's duty is to seek justice, not merely to convict and that a public prosecutor should not intentionally avoid pursuit of evidence merely because he believes it will damage his case or aid the accused. A.B.A. Model Code of Professional Responsibility, Ethical Consideration 7-13.

*Fisher*, 686 P.2d at 767 n.5. The Arizona Supreme Court later held that this agreement  and was unenforceable. *State v. Fisher*, 859 P.2d 179, 183 (Ariz. 1993). ("Agreements such as the one involved here undermine the reliability and fairness of the trial and plea bargaining processes and taint the truth-seeking foundation of the courts by placing undue pressure on witnesses to stick with one version or the facts regardless of its truthfulness.")

128.    Courts have recognized that immunity agreements that are conditional violate fundamental due process. *People v. Meza*, 116 Cal. App. 3d 988, 994, 172 Cal. Rptr. 531, 534 (1981) (improper for a plea agreement to require that "testimony must be confined to a predetermined formulation"); *People v. Medina*, 41 Cal. App.3d 438, 455, 116 Cal. Rptr. 133, 145 (1974) ("[A] defendant is denied a fair trial if the prosecution's case depends substantially upon accomplice testimony and the accomplice witness is placed, either by the prosecution or the court, under a strong compulsion to testify in a particular fashion."); *State v. Burchett*, 224 Neb. 444, 399 N.W.2d 258, 266 (1986) ("[W]here the prosecution has bargained for false or *specific* testimony, or a specific result, [that] an accomplice's testimony is so tainted as to require its preclusion." (emphasis added)); *State v. Dewitt*, 286 N.W.2d 379, 384 (Iowa 1979); *Franklin v. State*, 577 P.2d 860, 863

(Nev. 1978) ("By bargaining for specific testimony to implicate a defendant, and withholding the benefits of the bargain until after the witness has performed, the prosecution becomes committed to a theory quite possibly inconsistent with the truth and the search for the truth."); *Rex v. Robinson*, 70 D.L.R. 755, 761 (1921) (accomplice witness warned by judge that if his testimony "was not the same as he had already told the police he would be executed").

129.    Red was, for all practical purposes, subject to a "consistency" provision that violated due process. The wording of the Immunity Agreement suggests Red had disclaimed any direct participation in the killings in his previous statements to the authorities. Therefore, Red's charges would be dismissed only if his trial testimony was "consistent" with his prior denials of direct involvement. Red's incentive to tailor his testimony was enormous: If he were to violate the Immunity Agreement, he faced a potential death sentence. Further, this literal life-and-death proposition was made to Red – a man with a long criminal record for crimes of moral turpitude, and a man who had *already* admittedly lied to the police in his September 17 statement.

130.    Any doubt that the Immunity Agreement gave Red incentives to perjure himself is removed by the transcript, which reveals that Red gave perjured testimony – testimony which the prosecution had to know was untrue. As will be demonstrated below, several significant pieces of perjured testimony dealt specifically with (and downplayed) Red's level of involvement in the killings of Mr. Taylor and Mr. Lavesphere, in accordance with the Immunity Agreement's incentives. Further proving Red's assumption that the only "real" way to violate the agreement was to implicate himself, Red was spared any adverse legal consequences of his perjury. At several points during his testimony the prosecution, which had to know his testimony was misleading or untrue, should have revealed that fact to the jury, immediately rescinded the Immunity Agreement, and prosecuted Red Wilson for perjury. Of course, had the State done so, it would likely have been forced to give up their prosecution of Mr. Colella, as Red's testimony was the linchpin of its case. To preserve their opportunity to convict Mr. Colella, the prosecution decided to permit Red to lie on the witness stand

and violate the Immunity Agreement.

131.    The first instance of perjured testimony concerns the tire tracks of the second vehicle at the crime scene. Red testified unequivocally in Mr. Colella's trial that the tire tracks identified in State's Exhibit 40 (the photograph marked by Sgt. Martinez as "tire track at crime scene belonging to Red") do not belong to his truck:

> Q.    [Mr. Limas]: This is State's Exhibit No. 40. Sgt. Martinez has written "tire track at crime scene belonging to Red." Is that your tire track?
>
> A.    [Red Wilson]: No.

S.F. Vol. XV: 758. Red then discussed a mysterious man who drove a "tiger van" and attributed some tire tracks to this man's van. *Id.* at 760-66.

132.    The State knew that Red was not being truthful and it made no effort to correct his false statement. Sgt. Martinez had testified in the Brenda Colella trial that the tire tracks in Ex. 40 (Ex. 40 is the same in both cases) were caused by Red Wilson's truck. (BBC) S.F. IV: 101; *see also* Section V.A.1.d, *supra*.

133.    A second aspect of Mr. Wilson's trial testimony is false. In direct testimony in Mr. Colella's trial, Red testified that the morning after the incident he went with Paul's brother, Steve, to the scene "and we noticed there was a white vehicle into the water. That was pretty well easily seen from the side of the road. It wasn't really obstructed too much. There was a little dune in front–From the road, by the water, there was a little, small dune. And we stopped there for a minute, and then we took off and went back to the campsite." S.F. Vol. XIV: 614-15.

134.    But in cross-examination in Mr. Colella's trial, Red denied going to the scene until months later:

> Q.    [Mr. Limas]: Now, were you ever at this scene [the scene where the truck with the victims was found in the water]?
>
> A.    [Mr. Wilson]: No, I was not.

CutePDF - www.texto.com

Q.      [Mr. Limas]: You never drove over there or you never went over
        there.

A.      [Mr. Wilson]: Maybe months later I drove by or something.  I go up
        and down the beach a lot.

S.F. Vol. XV: 759.  Thus, in the course of Mr. Colella's trial, Red Wilson gave two diametrically

opposite accounts of whether he went to the scene.

135.    Red's third false statement concerns the time of the murders.  Red testified to Mr.

Colella's jury that he did not know the time of the murders.  S.F. Vol. XIV: 692.  But he told Brenda

Colella's jury he estimated it "at around 10:00, 10:30, 9:30, 10:30, 11:30, I guess." (BBC) S.F. Vol.

VII: 710.   When confronted with this inconsistency by Mr. Colella's defense attorney, Red

eventually said "I am wrong about the time.  I never knew what time it was." S.F. Vol. XV: 741.

136.    Even though Red's false testimony breached the Immunity Agreement, the State did

not notify the Court of the breach.  Instead, in front of Mr. Colella's jury, the State rehabilitated Mr.

Wilson and in the process caused him to give false testimony about the Immunity Agreement.  In

particular:

Q.      The only thing was that you came into this courtroom whenever you
        had to testify and tell the truth?

A.      Yes.

Q.      *And that the State did not find out later that you had lied as far as the
        shooting itself, is that correct?*

A.      *I remember the agreement, yes.*

Q.      *Not what you had done, but whether you had been the shooter.*

A.      *Correct.*

Q.      *And that's what it meant by your active participation?*

A.      *Correct.*

66

Q.     Not that we knew, because you had already told us what you had
       done, about driving the Bronco, about turning around, about putting
       on the lights.  You had already told us all of that, right?

A.     Yes.

S.F. Vol. XV: 832-33 (emphasis added).

137.    This exchange improperly suggested that so long as the State did not ever discover

that Red Wilson had lied about his not being the "shooter," the Immunity Agreement remained in

effect.  But the Immunity Agreement does not merely obligate Red not to lie about the shooting itself

or about not being the "shooter," as Ms. Lopez has characterized it.  In simple terms, Red Wilson

agreed to tell the truth about everything or otherwise he could be tried for capital murder.  For the

State to suggest that it meant anything less than this is misleading and "incompatible with

rudimentary demands of justice."  *Napue*, 360 U.S. at 269.  Given the overriding importance of Red

Wilson's credibility to the outcome of the case, the mischaracterization of the Immunity Agreement

clearly was harmful.  *See Ely v. Matesanz*, 983 F. Supp. 21, 43 (D. Mass. 1997) (granting writ when

state suppressed evidence concerning plea agreement and failed to "expose Gosselin's perjury,

especially before arguing to the jury that Gosselin had no reason to lie.").

**4.     The State violated Applicant's Fourteenth Amendment rights by
       knowingly presenting to the jury a false and misleading impression
       of the evidence.**

138.    As discussed above, the prosecution violates a defendant's due process rights if it

allows the jury to be laboring under a materially false impression.  *Alcorta v. Texas*, 355 U.S. 28,

31 (1957).  The State in Mr. Colella's trial created a false impression of the meaning and significance

of key portions of the case.  Upon information and belief, Applicant alleges that this was done

knowingly.  The false impressions given to Mr. Colella's jury warrant a new trial.

**a.     The State strongly suggested to the jury that Mr. Colella had committed
       a sexual assault when it knew that he had never been convicted of such
       a crime and that it had not introduced a single piece of admissible**

**evidence suggesting that he had committed sexual assault.**

139.    As discussed in Section VI.C.2(g) (punishment phase ineffective assistance of counsel claim), *infra*, during the punishment phase, the State sponsored the testimony of Monte Tosser from Terra Haute, Indiana. S.F. Vol. XXI: 96. Mr. Tosser was a probation officer at the Vigo County Detention Center. *Id.* While at Vigo he met Paul Colella. *Id.* at 97. He said he first met Paul in 1982 at the juvenile center and that he believed that "the first contact I had with him was on a child molestation charge." *Id.* at 98. This questioning drew an objection, to which the prosecutor, Ms. Lopez, advised the trial court she could establish a predicate for the offense and a conviction. *Id.* at 98-99. Shortly after the objection and the prosecution's representation to the Court that it would establish a predicate for the offense of child molestation and for a conviction, the prosecution elicited testimony from Mr. Tosser that the charge had been "reduced" to battery. *Id.* at 100-01. Apparently, that was the extent of the foundation.

140.    In closing argument, the State, through Ms. Lopez, again mischaracterized the offense, and also mischaracterized Mr. Tosser's testimony. The offense, which the State never proved as "child molestation," was now described to the jury as "a sexual assault." *Id.* at 196 ("He had a sexual assault that was reduced to a battery"). The State gave a materially false impression to Mr. Colella's jury that he had been convicted of sexual assault. This was not true, as the State knew from its own investigation of Mr. Colella. The unproven accusation that Mr. Colella was a rapist and a child molester undoubtedly tainted the jury's deliberations and affected its choice of sentence.

### b.    The State misled the jury about a 1985 burglary conviction it introduced during the punishment phase of his trial.

141.    As discussed in Section VI.C.2(f), *infra*, the State improperly suggested that Mr. Colella had threatened an elderly lady at knife point. The evidence did not establish this fact. Indeed, the records in this Application refute this. Again, the State should have investigated the

charge. It was highly prejudicial to Mr. Colella for his jury to be deliberating a sentence under the misleading impression that Mr. Colella had previously assaulted an elderly woman with a knife.

**5.     The prosecution violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose to the defense evidence in its possession which could have been used by the defense to impeach the testimony of the State's witnesses.**

142.     As described above, it is almost certain that, during Red Wilson's exhaustive May 19th interview with the entire prosecution team (during which Red to all places at which he claimed important events had taken place), Red Wilson advised those present that he had, in fact, pushed the white pickup containing the two victims into the bay where it was later found. Unfortunately, because the prosecution acceded to Red's lawyer's demand that this conversation *not* be recorded and preserved, it is impossible to point to a written record to highlight this point. However, as observed above, the conduct of the prosecution team is consistent *only* with Red having admitted this during his May 19th interview. It is inconceivable that the prosecution would have presented the testimony from Sgt. Martinez that the tire tracks at the dump scene were from Red's Bronco had Red not admitted this during his statement. If Red denied pushing the white pickup into the water, it is inconceivable that the State would have sponsored testimony by Sgt. Martinez, given shortly before Red took the stand, that he *did* do just this. By doing so, they would consciously damage the credibility of the person whose testimony was the linchpin of their case. Second, as noted above, had Red denied any role in dumping the pickup during the May 19th interview, the prosecution would have been unequivocally on notice that another person was involved, and would certainly have put some effort into locating this vital witness.

143.     The Cameron County Sheriff's Office presented the capital murder case against the Colellas and Red Wilson to the grand jury. S.F. Vol. XII: 184. Sgt. Martinez, as the chief investigating officer in this case, must have provided key testimony during the grand jury proceedings that resulted in the indictment of Mr. Colella, Brenda Colella, and Red Wilson for

capital murder on February 26, 1992. *See* Tr. Vol. I at 7-8. His testimony before the grand jury almost certainly echoed his testimony during Brenda Colella's trial – to wit, that the tire tracks from the vehicle which had pushed the white pickup truck into the water matched Red Wilson's tire tracks.

144.    The prosecution is required to disclose to the defense any evidence which tends to exculpate the accused. *Brady, supra.* Material in the State's possession which undermines the credibility of its witnesses is *Brady* material, and must be disclosed to the defense. *See Strickler v. Greene*, 527 U.S. 263, 280 (1999) (explaining that "the duty [imposed by *Brady*] encompasses impeachment evidence"); *United States v. Bagley*, 473 U.S. 667, 676 (1985) (holding that impeachment evidence "falls within the *Brady* rule"); *Giglio v. United States*, 405 U.S. 150, 154 (1972). Prior to trial, trial counsel Abel Limas filed *Brady* motions specifically requesting access to "any inconsistent statements" by state witnesses, and "any testimony of a grand jury witness inconsistent with any statement, written or oral, known to the State." Tr. Vol. I at 24, 25.

145.    Although grand jury testimony is usually confidential, it may be used to impeach a witness' trial testimony if it is inconsistent. *State v. Smith*, 671 S.W.2d 32, 36 (Tex. 1984). Thus, a defendant is entitled under *Brady* to discovery of any testimony by a grand jury witness which is inconsistent with that witness' later testimony at the defendant's trial. *See, e.g., Cook v. State*, 940 S.W.2d 623, 626-28 (Tex. Crim. App. 1996) (reversing appellant's conviction on due process grounds when prosecution, upon request, did not disclose grand jury testimony of "crucial" government witness which differed in several details from the witness' trial testimony); *United States v. Herberman*, 583 F.2d 222, 229 (5th Cir. 1978) (same).

146.    The same applies to prior inconsistent statements made by witnesses to state officers. *See, e.g., Strickler v. Greene*, 527 U.S. 263, 282 (1999) (evidence that key prosecution eyewitness had refined story over time, consistently adding new details that implicated defendant, should have been turned over to defense to permit impeachment); *Spicer v. Roxbury Corr. Inst.*, 194 F.3d 547, 557-58 (4th Cir. 1999) (prosecution should have revealed that witness who testified during trial that

he was an eyewitness to the crime had earlier told prosecutor during proffer that he wasn't an eyewitness). Sgt. Martinez possibly gave sworn grand jury testimony during which he identified the tire tracks as having come from Red Wilson's Bronco. The jury, after all, handed down an indictment that named both the Colellas *and* Red Wilson. As of February 1992, the prosecution had comparatively little evidence against Red Wilson, and no known motive linking him to the crime. The existence of Red's tire tracks at the scene was therefore one of the most powerful pieces at the disposal the State linking Red Wilson to the killings. If Sgt. Martinez testified under oath before the grand jury that indicted Mr. Colella that Red Wilson's Bronco provided the tire tracks, he could have been powerfully impeached with these sworn statements when, at Mr. Colella's trial, he completely abandoned that theory. The defense could have portrayed Sgt. Martinez as having developed a coherent theory of the crime based on physical evidence (before any deal had been struck with Red), then abandoning that theory to tailor the "facts" of the case to fit the implausible and perjured account Red Wilson gave. Sgt. Martinez may also have given sworn testimony as to the time of the victims' death which was inconsistent with his account at Mr. Colella's trial. If Red Wilson, in the presence of the entire prosecution team, admitted on May 19th that he helped push the white pickup truck into the water, that conclusively proves that the prosecution team knowingly sponsored perjured testimony.

147. As yet, it is impossible to determine whether relevant prior inconsistent statements such as these were made, because the defense was denied all discovery of grand-jury testimony during Mr. Colella's trial. Mr. Colella will shortly file motions for discovery and an evidentiary hearing. In these motions, he will request factual development necessary to resolve the issues noted above and determine the scope of the prosecution's *Brady* violations. As the foregoing discussion makes clear, factual development on these topics is highly relevant to Mr. Colella's claims, and essential to a full airing of his case in state court.

6.      **The prosecution violated *Brady v. Maryland* and *Kyles v. Whitley* by concealing material which the defense could have used to impeach the quality and integrity of the police investigation.**

148.    Under the due process clause of the Fourteenth Amendment to the United States Constitution and by the clearly established federal law of *Brady v. Maryland,* the State must disclose material information which the defense could use to impeach the witnesses and to assist in an attack on the integrity of the investigation or "the process by which the [government] gathered evidence and assembled the case." *Kyles v. Whitley*, 514 U.S. 419, 449 n. 19 (1995). Information which calls into question the thoroughness and good faith of the State's investigation is "material" under *Brady*. *Id.* at 445; *see also Orena v. United States*, 956 F. Supp. 1071, 1100 (S.D.N.Y. 1997) (citing *Kyles* and observing that attacking "the bona fides of the police is a tactic that has never lost its place in the criminal defense reasonable doubt armamentarium").

149.    Of course, because the undersigned counsel have not yet received complete discovery of the prosecution's case file, it is impossible to know the precise extent of *Kyles* information which has been withheld from the defense. However, upon information and belief, notes taken by any member of the prosecution team during Red Wilson's May 19th "oral" statement will contain material impeaching the integrity of the State's investigation. Because the State failed to preserve vital physical evidence, its case was dependent on Red Wilson's testimony. The structure of the testimony in Brenda Colella and Mr. Colella's trials strongly suggests that Red Wilson made statements in his unrecorded "oral" statement which were inconsistent with his later trial testimony (for instance, he likely admitted that his Bronco had been used to push the white truck containing the victims' bodies into the bay). Despite requests to review its case file, the prosecution has yet to turn over the notes created during their oral interview with Red Wilson. The notes are not available from Red Wilson's attorney, because that individual has died and his files on Red Wilson's representation have been destroyed. The prosecution also did not turn over transcripts of the grand

72

jury testimony in this case which, as described above, likely contain sworn testimony by law enforcement officers inconsistent with that offered at Mr. Colella's trial.

150.    Both of these sources of information could have been used by the defense to attack the integrity of the State's investigation. Armed with the inconsistent testimony in the notes and in the grand jury transcripts, the defense could have portrayed the investigation into the murders as compromised and fatally biased against Mr. Colella. Using the notes from Red Wilson's interview, the defense could have portrayed the State as willing to sponsor any testimony – even false testimony – from Red Wilson in order to bolster its case against Mr. Colella. Impeachment material from the grand jury transcripts would have permitted the defense to portray law enforcement witnesses as willing to switch their sworn testimony in order to plug holes in their case against Mr. Colella. The defense could have used this material to argue that "[p]rosecutorial and police misconduct has tainted [the case against him] from the outset" *Cook v. State*, 940 S.W.2d 623, 627 (Tex. Crim. App. 1996), and that therefore the State's case was entitled to "little confidence." *Id.* Given that the State's case was built almost exclusively on the twin pillars of Sgt. Martinez's and Red Wilson's testimony, evidence which would have allowed the defense to further attack and undermine both pillars would undoubtedly have "put the whole case in a different light," thus satisfying *Kyles*'s standard for materiality. *Kyles*, 514 U.S. at 434. Indeed, the defensive themes Mr. Colella could have established with the withheld evidence are similar to the ones described by the *Kyles* Court – that the police were "guilty of negligence" and that the State had ignored or hidden evidence tending to undermine the credibility of a key prosecution informant. *See id.* at 440-446.

**B.    Deprivation of Adequate Defense Resources.**

**1.    Trial counsel's unreasonably low compensation and the trial court's refusal to appoint co-counsel or to compensate trial counsel for investigative services prevented trial counsel from meaningfully representing his client.**

151.    Although this Petition documents many of trial counsel's inadequacies and episodes of deficient performance, trial counsel need not shoulder the entire blame for these mistakes. Trial

counsel was laboring under four crippling structural handicaps which would have hampered even the most conscientious attorney. First, he was trying his very first capital case. *See* App. VI, Exh. 62 (Affidavit of Abel Limas) at ¶3. Second, he was paid inadequately for his services, and that payment itself came late. App. V, Exh. 52 (Cameron County Auditor's Report). Third, the trial court refused to appoint co-counsel, even in the face of trial counsel's protestations that he could not adequately try the case without the assistance of another attorney. App. VI, Exh. 62 (Limas Aff.) at ¶4. Fourth, trial counsel was not compensated for the services of an investigator. App. VI, Exh. 62 (Limas Aff.) at ¶5. These structural handicaps led to dozens of critical mistakes caused by inadequate legal research and factual investigation, and often effectively prevented trial counsel from acting as an advocate for his client. The end result was a fundamentally unfair trial in which trial counsel was unprepared to challenge the prosecution's misconduct and overreaching, and unprepared to subject the state's case to the "crucible of meaningful adversarial testing" which is the hallmark of a fundamentally fair criminal trial. *United States v. Cronic*, 466 U.S. 648, 654 (1984).

> **a.    Counsel was paid an unreasonably low fee, and was not paid until almost two years after the trial.**

152.    Trial counsel was appointed to represent Mr. Colella on April 2, 1992. *See* App. I, Exh. 3 (Order Appointing Attorney). He submitted a claim for compensation consisting of three distinct components: in-court appearances, out-of-court preparation, and the preparation of the direct appeal brief. *See* App. V, Exh. 52 (Cameron County Auditor's Report). Hours are not specified for two of these three components. *Id.* If, however, one assumes that (1) the pretrial hearings, including consultation with the defendant, if any, took an average of 1.5 hours each; (2) each day spent in voir dire and trial was a full 8-hour workday; and (3) trial counsel, during direct appeal proceedings, spent 100 hours reading the trial record, researching and writing the direct appeal brief, preparing for oral argument, and preparing the Motion for Rehearing, then the following constitutes a fair estimate of the total number of hours spent by counsel in the representation:

Pretrial Hearings:    7.5 hours (5 hearings @ 1.5 hours/hearing)

| | |
|---|---|
| Trial & Voir Dire | 120 hours (15 days @ 8 hours/day) |
| Out of Court | 165 hours ("research, investigation and preparation for trial") |
| Appellate | 100 hours |
| TOTAL | 392.5 hours |

153.    Trial counsel was paid $9000.00 for the case. *See* App. V, Exh. 52 (Cameron County check to Abel Limas for Colella case).  Assuming counsel spent the number of hours in the representation calculated above, counsel was paid an hourly rate of $22.93.  Trial counsel paid his investigator, Roberto De La Paz, out of his own pocket, meaning that trial counsel knew that every additional hour of investigation he requested would further reduce his already-inadequate fee. *See* App. V, Exh. 62 (Affidavit of Abel Limas), at ¶5.  Therefore, the actual rate of compensation may have been much lower.  Moreover, the check was only issued on May 26, 1994 – almost two years after representation was complete. *See id.*

154.    Courts in death penalty cases have routinely labeled similar  fees unconscionably, unreasonably low, and have pointed to the crippling effect unreasonably low fee caps have on the quality and thoroughness of representation.  The Florida Supreme Court in *White v. Board of County Comm'rs*, 537 So.2d 1376 (Fla. 1989), considered a case in which an appointed attorney spent 134 hours representing a defendant in a death penalty case, and was denied compensation in excess of the statutory fee cap of $3500.00.  The attorney received $26.12/hour.  *Id.* at 1379.  The court observed that in light of the "increasing[] complex[ity]" of capital cases, "we are hard pressed to find any capital case in which the circumstances would not warrant an award of attorney's fees in excess of the . . . cap." *Id.* at 1378 & 1379 n.1.  The court found it impossible to ignore the "bottom line" reality that there is a "relationship between an attorney's compensation and the quality of his or her representation." *Id.* at 1380.

> It may be difficult for an attorney to disregard that he or she may not be reasonably
> compensated for the legal services provided due to the statutory fee limit.  As a

> result, there is a risk that the attorney may spend fewer hours than required representing the defendant or may prematurely accept a negotiated plea that is not in the best interests of the defendant. A spectre is then raised that the defendant received less than the adequate, effective representation to which he or she is entitled, the very injustice appointed counsel was intended to remedy.

*Id.* The court declared that henceforth *every* capital case, regardless of apparent "complexity," would be deemed to involve the "extraordinary circumstances" required to justify deviation from the fee cap: "Capital cases require an extraordinary and unusual amount of time, energy, and effort by counsel[.]" *Id.*

155.   Appointed counsel is obliged to provide competent representation regardless of the fee. However, to imagine that reasonable compensation for time, overhead, investigation, and expert assistance is irrelevant to the quality of representation denies reality. As the Kansas Supreme Court noted in striking down arbitrary fee caps for indigent criminal defense cases, the "financial burdens" created by inadequate representation "could well create a conflict of interest of the type proscribed by DR 5-101(A) of the Code of Professional Responsibility, [which provides that] "'a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests.'" *State ex. rel. Stephen v. Smith*, 747 P.2d 816, 831 (Kan. 1987); *see also* Anthony Paduano & Clive A. Stafford-Smith, *The Unconscionability of Sub-Minimum Wages Paid Appointed Counsel in Death Penalty Cases,* 43 RUTGERS L. REV. 281, 333 (1991) ("Only the hopelessly romantic deny that '[i]n our pecuniary culture the calibre of personal services rendered usually has a corresponding relationship to the compensation provided.'") (quoting *Makemsom v. Martin County*, 491 So.2d 1109, 1114-15 (Fla. 1986), *cert. denied*, 479 U.S. 1043 (1981)); *Federal Trade Comm'n v. Superior Court Trial Lawyers' Ass'n*, 493 U.S. 411, 422–23 and n.9 (1990) (assuming that public-defender boycott which resulted in raising of "unreasonably low" attorney compensation rates "has produced better legal representation for indigent defendants").

156.   Nowhere is the risk greater than in death penalty cases: "[T]here exists a vast body

of case law, especially concerning eighth amendment analysis, which emphasizes the need for greater reliability in capital cases than in non-capital. Few deny that greater care should be taken when the judicial path leads to the execution chamber." Paduano & Stafford-Smith, *supra*, at 292 (1991) (footnotes omitted); *see also id.* at 292-301 (describing complexities which distinguish death penalty case from non-capital cases, and citing numerous court decisions permitting higher fees in death penalty cases in view of the extra premium on reliability they involve); *Wilson v. State*, 574 So.2d 1338, 1338-39 (Miss. 1990) (recognizing that Mississippi's fee cap of $1000 in death penalty cases is not absolute in that counsel can be paid at least $25/hour in order to cover basic overhead); *Martinez-Macias v. Collins*, 979 F.2d 1067 (5th Cir. 1992) ("We are left with the firm conviction that Macias was denied his constitutional right to adequate counsel in a capital case in which actual innocence was a close question. The state paid defense counsel $11.84 per hour. Unfortunately, the justice system got only what it paid for."); *Cockrum v. Johnson*, 119 F.3d 297, 298 (5th Cir. 1997) (decrying the fact that trial counsel were paid, respectively, "$3,500 and $3,200" for their efforts in a capital case as part of a "perverse allocation of government resources").

      b.    **The failure to appoint co-counsel in this complex capital case ensured inadequate performance by the single appointed attorney.**

157.    In this case, one lawyer, without much more resources and time than were provided here, could not possibly have completed the necessary guilt and punishment-phase investigation to render effective assistance. This case involved three codefendants, two separate trials, and thirty-three separate witnesses. Virtually all of these witnesses had given over one thousand pages of testimony in Brenda Colella's trial, and some had given several conflicting statements to the police. Much of the State's aggravating evidence at the punishment phase was almost a decade old, and derived from incidents which occurred in another state. The evidence regularly generated complex legal and factual issues.

158.    As this Petition establishes, innumerable deficiencies in trial counsel's representation crippled Mr. Colella's ability to fairly present his case. Many of these deficiencies resulted from the

conditions under which trial counsel was forced to operate, including lack of co-counsel. For instance, trial counsel's cross-examination of key witnesses was repeatedly blunted by his inaccurate recall of their earlier testimony. *See* Section VI.C.1(g), *infra,*. Further, trial counsel failed to object to dozens of improper and prejudicial remarks, arguments, and portions of inadmissible testimony. One explanation might be that trial counsel was diverted by preparation for an upcoming cross-examination or closing, searching for documents, answering questions from his client, or any of the other small distractions that would inevitably affect a lawyer trying a case alone. Having an independent set of eyes and ears for trial counsel to complete and verify his recall may well have prevented many of these episodes. Second, many of the errors simply involved inadequate preparation, investigation and research. For instance, counsel did virtually nothing to prepare for the punishment phase, overlooked copious mitigation evidence, and built his punishment-phase strategy around legal principles that do not apply to capital cases. Counsel also failed to recognize the significance of the State's ballistics evidence, and failed to develop and implement a consistent defensive theory, although one was available. Many of these deficiencies no doubt resulted from the trial counsel's having been overwhelmed by a task too complex for one person. Whether these deficiencies were the product solely of inexcusable neglect, or whether they were provoked by the lack of adequate manpower, compensation and resources, their overall effect deprived Applicant of a meaningful adversarial testing of the State's case at guilt and at punishment.

159.    Trial counsel, both before and after trial, and in the judge's chambers, protested to the court that he needed co-counsel in order to adequately represent his client. At a pretrial hearing on a motion for continuance held on June 25, 1992, Mr. Limas advised the trial court as follows:

> This is a capital murder case where the State is seeking the death penalty. I find it very – or it's been insufficient time for me to prepare. I am a practitioner, your Honor, that does not have assistance other than my partner, Mr. De La Fuente, who is very, very busy working on civil matters.

> And additionally, I do not have within my office, your Honor, investigators to assist me in investigating almost all or all the facts in this case.

> I do not have the same assistance, your Honor, that the District Attorney's Office had. I'm sure they have been assisted by three prosecutors, as I look now, and they have their own investigators, your Honor. And I found it very, very difficult for me to at this point – I do not feel that at this point I will be doing justice to Mr. Colella based on the insufficiency of the time that I have had.

App. VI, Exh. 54 (Transcript) at 3.

160.  At a 1998 evidentiary hearing, Mr. Limas declared that "it should be a requirement that two attorneys, in my opinion" be appointed in a capital case. App. I, Exh. 9 (Transcript of Evidentiary Hearing) at 6. Although no formal motion for the appointment of co-counsel appears in the record, Mr. Limas raised the issue not only in open court, but also in chambers with the judge.

> I asked Judge Valdez in chambers for co-counsel to assist me in defending Mr. Colella. I explained to him that the case was far too complex for one attorney to handle alone, that I would not be able to provide Mr. Colella with the defense he deserved without the help of another lawyer, and that I had never tried a capital murder case before. Judge Valdez refused to appoint another lawyer. I believed that having co-counsel in death penalty cases is very important. Having a co-counsel would definitely have helped me in defending Mr. Colella.

*See* App. VI, Exh. 62 (Affidavit of Abel Limas) at ¶4.[26]  Nevertheless, the court refused trial

---

[26] Review of the record does not disclose a formal motion for the appointment either of co-counsel or an investigator. If this Court finds that Mr. Limas waived his right to the appointment of co-counsel or an investigator by failing to file a formal written motion requesting them, that failure itself constituted ineffective assistance of counsel. As his Affidavit demonstrates, Mr. Limas obviously recognized the need for co-counsel and court-compensated investigation. If he did not research and comply with the law governing such requests, this inexplicable decision clearly falls below a professional standard of reasonableness. A defense lawyer's failure to research relevant legal principles and follow proper procedures foreseeably applicable to the defense's case is *per se* deficient performance because there can be no reasonable strategic justification for a lawyer to remain ignorant of relevant law. *See, e.g., Loyd v. Whitley,* 977 F.2d 149, 158 (5th Cir. 1992) (counsel's decisions not entitled to normal deference required by *Strickland* when counsel was "unaware of the law" relevant to issue); *cf. Winn v. State,* 871 S.W.2d 756, 760-61 (Tex. App.–Corpus Christi 1993, no writ) (trial counsel ineffective for failing to seek appointment of defense forensics expert when State's case rested primarily on medical examiner's testimony and reasonably competent counsel would have foreseen importance of challenging such testimony).

The failure to properly request co-counsel or the appointment of an investigator was prejudicial. This Petition demonstrates dozens of mistakes due to inadequate investigation and preparation. *See, e.g.,* Section VI.C.1(k) (trial

counsel's request. Even though Mr. Colella was indigent and dependent on the Court for assistance, the Court also refused to compensate Mr. Limas for the services of an investigator, limiting the amount of investigation he could perform. *Id.* at ¶5.

161.    Appointing a single lawyer to represent an indigent defendant in a death penalty case – especially when the same counsel is appointed without co-counsel on appeal – is unusual and disfavored. *See, e.g.,* TEX. CODE CRIM. PROC. ANN. art. 26.052 (in "capital felony" cases, "judge *shall* appoint a second counsel to assist in the defense of the defendant, unless reasons against the appointment of two counsel are stated in the record." (emphasis added) (amended 1995)); AMERICAN BAR ASS'N, GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES Guideline 2.1 (1989) (ABA GUIDELINES) ("In cases where the death penalty is being sought, two qualified trial attorneys should be assigned to represent the defendant. In cases where the death penalty has been imposed, two qualified appellate attorneys should be assigned to represent the defendant.").

162.    The absence of co-counsel in a complex death penalty case cripples an indigent defendant's right to a fair trial, because of the extraordinary complexity of capital cases and proceedings:

> [T]he defendant is constitutionally entitled to legal assistance of sufficient quality so as to prepare an adequate defense at trial and an adequate appeal. In the context of capital litigation, this mandate is difficult to fulfill where the heavy responsibilities of representation are placed in the hands of a single attorney.

---

counsel inexplicably switched theories mid-trial because he had not done adequate pretrial investigation into defensive theories); Section VI.C.Part II.C.2(c ) (defense utterly fails to discover extensive, credible evidence of Mr. Colella's severe mental health problems, all of which was easily available to counsel at the time of trial); Section VI.C.2(b) (defense offers only two unprepared non-family punishment phase witnesses; witnesses themselves were not located by defense counsel but by defendant's mother). The impossibility of providing adequate assistance to Mr. Colella with only one lawyer is clear: the attempt to do so resulted in  substandard representation.

[C]ounsel must be an advocate for life as well as a defensive tactician. Trial counsel must: obtain the investigative resources necessary to prepare thoroughly for both the guilt and penalty phases of trial, . . . ; conduct extensive research in search of precedent helpful to the client; conduct thorough crime and life-history investigations in preparation for both phases of trial, . . . ; integrate the defense theory and strategy used during the guilt phase with the projected affirmative case for life at the penalty phase, . . .; prepare witnesses for both phases of trial; and present all reasonably available mitigating evidence helpful to the defendant for the purpose of convincing the judge or jury not to impose a sentence of death. Preparation for the penalty phase, as well as the adjudication phase, must begin immediately after counsel has been appointed to represent the defendant.

Because many of the duties of defense counsel in capital cases are definably different from those performed by counsel in criminal cases generally because there are many rapid developments in the complex body of law affecting death penalty cases, and especially because of the harsh and irrevocable nature of the potential penalty, the responsibilities of trial counsel are sufficiently onerous to require the appointment of two attorneys as trial counsel in order to ensure that the capital defendant receives the best possible representation. The appointment of co-counsel at trial is not only meant to provide lead counsel with assistance in the preparation of both trial and penalty phases of the case, but also to provide counsel with different perspectives on the issues inherent in each stage of the proceedings.

ABA GUIDELINES, Commentary to Guideline 1.2.

[A] capital case is not really just one complicated trial, but two. Bifurcated capital cases involve two trials with distinct sets of issues. Counsel's investigation cannot stop at the facts of the crime, disregarding information and witnesses that may be readily available in the local community. Rather, the entire history of the capital defendant must be investigated and presented at the time the jury considers whether the defendant will live or die. Any information concerning the accused may be critical, either to substantiate a juror's decision to impose life, or to refute an argument the prosecution might present in favor of death. This sweeping responsibility may require counsel to travel from one end of the country to the other, or even abroad, in the effort to provide effective representation. Prior convictions from other states which might be used by the prosecution must be investigated and challenged.

Anthony Paduano & Clive A. Stafford-Smith, *supra* at 297-98. The unique complexity of capital

cases has also been recognized by the courts:

The attorney must be conversant with constantly new interpretations of constitutional

81

law by not only the United States Supreme Court, but by courts of all jurisdictions, both Federal and State. Moreover, in preparation for trial, he must investigate the facts and circumstances of the alleged crime with no less vigor and thoroughness than the publicly compensated solicitor, who has at his disposal the entire array of state, county, and municipal law enforcement. Dramatic technological advances, such as the science of DNA (deoxyribonucleic acid) analysis, are employed by prosecutors, requiring defense attorneys to acquire special knowledge and retain expert witnesses.

Capital trials are bifurcated, divided into guilt and sentencing phase trials. At the commencement of the guilt phase, a more extensive and time consuming process for selection of the jury is followed: each juror, individually, must be interrogated by the attorney who, prior to trial, has searchingly researched and probed the background of every prospective juror. A psychologist is frequently employed by both the prosecution and defense to assist and advise in jury selection.

While the greater demands now made upon defense attorneys in the guilt phase are severe, it is in the sentencing phase that new and different issues, heretofore unknown, are introduced as a result of recent decisions of the United States Supreme Court. For example, in today's capital trial, the defendant is entitled to produce evidence concerning his childhood and family background in mitigation of his criminal conduct, so that the jury may impose life imprisonment as an alternative to the death sentence. In preparing this evidence the attorney must employ investigators in the course of thoroughly researching the defendant's entire life.

*Bailey v. State*, 424 S.E.2d 503, 506-07 (S.C. 1992) (holding that funding scheme in capital cases which provided for only "nominal" compensation for accused's attorney violated State's Sixth and Fourteenth Amendment duties to provide competent counsel and the basic tools of an adequate defense).

2.    **The trial court's refusal to provide reasonable compensation, investigative assistance, and co-counsel to trial counsel effectively denied Mr. Colella the assistance of trial counsel under *United States v. Cronic*, 466 U.S. 648, 654 (1984).**

163.    Because he was denied basic resources necessary to fully represent Mr. Colella, trial counsel was simply unable to provide representation to Mr. Colella at key points of the trial. Fully investigating and preparing for such a complex case within the woefully inadequate compensation limits set by the trial court was simply impossible. As a result, Mr. Colella was defended by a

lawyer who, at several identifiable points during the trial, was not equipped with the background information and legal knowledge to meaningfully represent his client. For instance, trial counsel was often unprepared to combat foreseeable attempts by the State to inject harmful, inadmissible testimony against his client (*see infra* Sections VI.C.1(i) & VI.C.1(n) failed to meaningfully prepare at all for the punishment phase of the case, *see infra* Section VI.C.2., and needlessly crippled his client's guilt-phase alibi defense by failing to investigate its validity in a timely fashion. At these points of the trial – and many others – counsel's failings were so profound that, for all intents and purposes, Mr. Colella was denied counsel altogether.

164.    The right to counsel requires more than mere "formal appointment" of an attorney. *Kimmelman v. Morrison*, 477 U.S. 365, 377 (1986). Any attorney must be capable of subjecting the case to the "crucible of meaningful adversarial testing" to fulfill his role within the system. *Cronic v. United States*, 466 U.S. 648, 656 (1984). Under *Cronic*, reversal is required without a showing of prejudice whenever the accused demonstrates either that he was denied counsel at a critical stage of the proceedings against him, or that his lawyer was subjected to such crippling state-imposed handicaps that the lawyer was effectively unable to act as counsel on the defendant's behalf. *Id*. at 659 & n.25 (citing cases).[27] Because this is such a case, Mr. Colella's conviction and death sentence must be reversed.

---

[27] *See also Perry v. Leeke*, 488 U.S. 272, 280 (1989) (recognizing that cases in which the government is accused of interfering with the right to counsel are not "subject to the kind of prejudice analysis that is appropriate in determining whether the quality of counsel's performance itself has been constitutionally ineffective"); *Satterwhite v. Texas*, 486 U.S. 249, 257 (1988) (noting that automatic reversal is required Joe Margulies, *Resource Deprivation and the Right to Counsel*, 80 J. CRIM. L. & CRIMINOLOGY 673, 688-89, 707 (1989) ("Because the system producing the conviction has broken down, there can be no presumption of legitimacy in the outcome. There can be, therefore, no requirement that a defendant demonstrate prejudice in the result.").

3.   **Trial counsel's unreasonably low compensation and the trial court's refusal to appoint co-counsel or to compensate trial counsel for investigative services denied Mr. Colella the effective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984).**

165.   Mr. Colella hereby adopts and incorporates all briefing set out above. Section VI.C.1 & 2, *supra*. If state-imposed handicaps do not effectively nullify counsel's efforts, but do damage his ability to effectively represent his client, such a claim must be analyzed under *Strickland*, which requires a showing of deficient performance by defense counsel and resulting prejudice to the client. Mr. Colella can clearly show both, as described *infra* in Parts VI.C.1(o) & C.2(k). Many of these errors of counsel – including the failure to formulate a consistent defense, the failure to rebut the prosecution's misleading characterizations of the evidence, the failure to adequately cross-examine state's witnesses, and the complete failure to perform any meaningful investigation of the defendant's background in preparation for the punishment phase of the trial – stemmed from lack of adequate time and resources (both investigative and expert) to prepare for trial.

4.   **Trial counsel's unreasonably low compensation and the trial court's refusal to appoint co-counsel or to compensate trial counsel for investigative services violated Mr. Colella's rights to reliable sentencing procedures under the Eighth Amendment.**

166.   Again, Mr. Colella hereby adopts and incorporates all briefing set out above. In a capital case, the deprivation of basic defense resources violates a defendant's rights under the Eighth Amendment, as well as the Sixth Amendment.[28] Primary responsibility for assuring that capital

---

[28]   The fact that the consequences of resource deprivation implicate values associated with the constitutional rights to counsel and to a fair trial does not mean that the Eighth Amendment inquiry is supplanted. *See, e.g., McCleskey v. Kemp*, 481 U.S. 279, 323 n.1 (Brennan, J., dissenting) (fact that a practice that makes a punishment arbitrary under the Eighth Amendment also violates another constitutional provision "does not mean . . . that the standard for determining an Eighth Amendment violation is superseded by the standard for determining a violation under [another constitutional] provision"). Indeed, the basic standards of rationality, fairness, and consistency against which the Court judges capital punishment schemes under the Eighth Amendment are rooted in values associated with the constitutional rights to due process and a fair trial, among others. The difference is that when the death penalty is involved, these constitutional values are more rigorously observed, primarily through the Court's reading of the Eighth Amendment's prohibition against cruel and unusual punishments. Thus, even if the "case-by-case" approach of *Strickland v Washington* is appropriate in determining whether resource deprivation has compromised an indigent defendant's Sixth Amendment

defendants enjoy the protections guaranteed by the Eighth Amendment rests with the attorneys assigned to represent them. Any state-created impediment to the discharge of that responsibility undermines the integrity of the entire capital punishment system. Resource deprivation distorts the entire adversarial process by preventing the defense attorney "from subjecting the state's case to the crucible of adversarial testing."

167. While the Eighth Amendment "is not limited in application to capital punishment," the Supreme Court's Eighth Amendment jurisprudence is informed by the "qualitative difference between death and any other permissible form of punishment." *Zant v. Stephens*, 462 U.S. 862, 884 (1982). This difference underlies "'a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.'" *Id.* at 884 (quoting *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976)). In the context of capital cases, the Eighth Amendment demands, above all else, procedural fairness in distinguishing "the few cases in which [the death penalty] is imposed from the many cases in which it is not." *Furman v. Georgia*, 408 U.S. 238, 313 (White, J., concurring). Beginning with *Furman* and *Gregg*, the Supreme Court has followed a process-oriented approach to its Eighth Amendment scrutiny of the administration of the death penalty which focuses on whether the capital punishment system adopted by a state is likely to produce outcomes in particular cases that are rational, fair and consistent. The Court will find an

---

rights, this does not mean that the *Strickland* test is adequate to safeguard the defendant's Eighth Amendment rights. *See* David R. Dow, *Teague and Death: The Impact of Current Retroactivity Doctrine on Capital Defendants*, 19 HASTINGS CONST. L.Q. 23, 29 (1991) ("whatever the merits of Strickland test for safeguarding the Sixth Amendment right to counsel, the Eighth Amendment value is entirely distinct").

CVisPDF - www.foxitia.com

Eighth Amendment violation if state procedures "create a substantial risk that the [death penalty] will be inflicted in an arbitrary and capricious manner." *Godfrey v. Georgia*, 446 U.S. 420, 427 (1980) (plurality opinion of Stewart, Blackmun, Powell, and Stevens, JJ); *see also Caldwell v. Mississippi*, 472 U.S. 320, 343 (1985) (O'Connor, J., concurring in part) (noting that the death sentence may not be imposed under circumstances that "creat[e] an unacceptable risk that 'the death penalty [may have been] meted out arbitrarily or capriciously' or through 'whim or mistake'") (citations omitted).

168. Resource deprivation is a primary source of arbitrariness in the first sense because it makes the socio-economic status of the defendant and the identity of his attorney among the strongest factors influencing the determination of whether a defendant is sentenced to death. *McCleskey v. Kemp*, 481 U.S. 279, 323 (1989) (Brennan, J., dissenting) (arguing that a death-sentencing system "that features a significant probability that sentencing decisions are influenced by impermissible considerations cannot be regarded as rational"). Clearly, the defendant's poverty is not a legally relevant characteristic of the defendant that should play any role in the determination of whether the defendant should die for his crime.

169. Further, a death-sentencing scheme must allow the jury to make an informed "reasoned moral response" to the defendant and the crime. *Saffle v. Parks*, 494 U.S. 484, 493 (1990); *Penry v. Lynaugh*, 492 U.S. 302, 326-28 (1989). The accuracy of this determination is affected by "the identity of the sentencer, the reliability of the information the sentencer receives, and the kind and quality of that information."[29] Each of these factors can be influenced by the underfunding of indigent defense. If an indigent's attorney lacks either the experience, expertise, or necessary expert

---

[29] Stephen Gillers, *The Quality of Mercy: Constitutional Accuracy at the Selection Stage of Capital Sentencing*, 18 U.C. DAVIS L. REV. 1037, 1043 (1985).

assistance to identify jurors who are likely to give full consideration of a sentence other than death

if the indigent is convicted of capital murder, the accuracy of the sentencing process will be affected

to the detriment of the indigent. More importantly, if a lack of resources effectively prevents the

attorney from discovering and presenting evidence relevant to a jury's sentencing decision, the

chances that the jury's sentencing decision is based on complete and reliable information diminish

considerably, creating a substantial risk that individual sentences are the product of whim or caprice.

170.    The state is ultimately responsible for the underfunding of the defense, because the

state is responsible for creating and funding indigent defense systems. An indigent person does not

have the luxury of choosing his own attorney. The poor person has an attorney assigned to him by

the state, and the state ultimately determines whether it will demand that the assigned attorney

possesses the experience and skills commensurate with the demands of capital representation;

whether it will burden the defense attorney with a caseload so excessive that it is impossible to

discharge that responsibilities associated with capital defense; and whether it will provide the money

necessary to ensure that the defense attorney can properly defend the case. By failing to adequately

fund its indigent defense systems, the state creates the conditions that foreclose the development of

a meaningful defense. In doing so, the state interferes with defense counsel's ability to subject the

prosecution's case to meaningful adversarial testing, easing the prosecution's burden of proving guilt

and the propriety of the death penalty.

171.    In this case, the trial court's failure to make basic resources available for defense of

this capital case is emblematic of a larger abdication on the part of the State of Texas to properly

fund indigent defense representation in capital cases. Unlike the majority of jurisdictions that

impose the death penalty, Texas fails to provide any funding for indigent defense representation in

capital cases, choosing instead to impose the entire fiscal burden on its 254 counties. The state exercises no oversight of the counties' administration of indigent defense and, until 1995 (after Mr. Colella's trial) provided no guidelines or standards to guide the counties' systems for appointment and compensation of counsel. The result, according to a 1993 report prepared for the State Bar of Texas, is "a lack of uniformity and a lack of control over the quality of representation provided throughout the state." The Spangenberg Group, *A Study of Representation of Capital Cases in Texas* (March 1993) at vi. One common feature among all of the counties, however, was the lack of funding and adequate defense resources; the report found that "in almost every county, the rate of compensation provided to court-appointed attorneys in capital cases is absurdly low and does not cover the cost of providing representation." *Id.* The study found that a "significant number of attorneys and judges" reported that the quality of representation in capital cases in Texas was "adversely affected" by general inadequacy of funding and compensation provided by the counties. *Id.* These findings have been reiterated by a recent report issued by Texas Appleseed, a non-profit legal advocacy organization, which undertook a comprehensive study of appointment and compensation of counsel in Texas capital cases. *See* App. VII, Exh. 67 (capital representation chapter of Appleseed Report). The study found systemic underfunding and a lack of oversight, uniformity, and guidance characterizes Texas' system of providing counsel for indigent capital defendants. *Id.*

172. These problems are manifest in Cameron County capital cases, including, but not limited to, Mr. Colella's. Our review of compensation data made available to us by the Cameron County Auditor's office and in the Cameron County District Clerk's office indicates that Cameron County makes grossly inadequate financial resources available to defense counsel in capital cases,

even relative to other Texas counties that are also chronically underfunding indigent defense. The failure of the State of Texas to monitor county administration of indigent capital defense and to assure minimally adequate levels of compensation and funding for investigation and experts is resulting in an arbitrary and capricious administration of the death penalty. Because his Eighth Amendment right to be free from arbitrary and capricious punishment has been violated, Mr. Colella's death sentence must be reversed.

**5.      The trial court's refusal to appoint co-counsel or to compensate trial counsel for investigative assistance to assist trial counsel in the enormous task of preparing for and presenting this complex capital case denied the Applicant basic tools essential to his defense in violation of *Ake v. Oklahoma*, 470 U.S. 68 (1985).**

173.    In *Ake v. Oklahoma*, 470 U.S. 68 (1985), the Supreme Court held:

> [W]hen a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.

*Ake*, 470 U.S. at 83.

174.    The Court in *Ake* emphasized the State's obligation to assure indigent defendants "a fair opportunity to present [their] defense." *Id.* at 76. This responsibility derives from the belief that "justice cannot be equal where, simply as a result of his poverty, a defendant is denied the opportunity to participate meaningfully in a judicial proceeding in which his liberty is at stake." *Id.* As the Court in *Ake* further stated.

> [M]ere access to the courthouse doors does not by itself assure a proper functioning of the adversary process, and . . . a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense.

*Id.* at 77.

175.    Governed by this ethic, courts throughout the country have identified necessary "raw

materials" in addition to the mental health expert at issue in *Ake*.  *See Terry v. Rees*, 985 F.2d 283, 284-85 (6th Cir. 1993) (independent pathologist appointed to determine the victim's cause of death); *Little v. Armontrout*, 835 F.2d 1240, 1243 (8th Cir. 1987), *cert. denied*, 487 U.S. 1210 (1988) (denial of a state-appointed hypnosis expert rendered the trial functionally unfair); *State v. Bridges*, 385 S.E.2d 337 (N.C. 1989) (fingerprint expert).  *Cf. United States v. St. John*, 851 F.2d 1096 (8th Cir. 1988) (psychological expert specializing in sexual abuse of children); *Bundy v. Wilson*, 815 F.2d 125, 130-31 (1st Cir. 1987) (trial transcript); *State v. Coker*, 412 N.W.2d 589, 592-93 (Iowa 1987) (expert on effects of intoxication);  *Rey v. State*, 897 S.W. 2d 333, 345 (Tex. Crim. App. 1995) (denial of expert pathologist "eliminate[d] a basic tool of an adequate defense and in doing so dramatically affect[ed] the accuracy of the jury's determination.");  *Cf. Bailey v. State*, 424 S.E.2d 503, 505-06 (S.C. 1992) (noting that the South Carolina statute provides for two attorneys in all capital cases in discussing *Ake's* requirement that defendants be given an adequate opportunity to present a defense).  Mr. Limas was denied co-counsel to assist in Mr. Colella's defense.  As demonstrated below, the assistance of another attorney was integral to Mr. Colella's case.

176.    The United States Supreme Court identified three factors to be weighed in deciding whether a defendant's due process rights were violated by the deprivation of a "basic tool" at trial:

1.    The private interest affected by the State action.

2.    The governmental interest that will be affected if the safeguard is to be provided.

3.    The probable value of the additional or substitute procedural safeguards that are sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided.

*Ake*, 470 U.S. at 77.  Each of these factors is considered below.

a.    **The harm to Mr. Colella's private interest caused by the denial of appointment of co-counsel strongly outweighs any governmental interest adversely affected by the provision of co-counsel and other resources.**

177.   In *Ake*, also a death penalty case, the Supreme Court devoted one short paragraph to the subject of Ake's interest:

> The private interest in the accuracy of a criminal proceeding that places an individual's life or liberty at risk is almost uniquely compelling. . . . The interest of the individual in the outcome of the State's effort to overcome the presumption of innocence is obvious and weighs heavily in our analysis.

470 U.S. at 78.  The Court contrasted the capital defendant's compelling interest in the accuracy of the proceedings with the State's economic interest. *Id.* at 78-79.  The Court concluded the State's economic interest in denying Ake the assistance of a court appointed psychiatrist was "not substantial, in light of the compelling interest of both the State and the individual in accurate dispositions." *Id.* at 79.  The Court also noted that the State's interest in prevailing at trial "is necessarily tempered by *its* interest in the fair and accurate adjudication of criminal cases." *Id.* (emphasis added).

178.   As in *Ake*, there can be no question that Mr. Colella's interest in the fairness of a proceeding in which his life is at stake – an interest which is shared by the State – outweighs the trial court's economic concerns.

**b.     The probable value of appointed co-counsel and expert and investigative resources was great.**

179.   In determining whether the assistance requested is a "basic tool," courts have considered the "probable value of the . . . assistance sought, and the risk of error in the proceeding if such assistance is not offered." *Ake*, 470 U.S. at 79.  In *Powell v. Alabama*, 287 U.S. 45, 69 (1932), the Court crystallized the importance of counsel as an expert necessary to assure the integrity of the adversarial process:

> Even the intelligent and educated layman has small and sometimes no skill in the science of law.  If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad.  He is unfamiliar with the rules of evidence.  Left without the aid of counsel, he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible.  He lacks both the skill and knowledge adequately to

> prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence.

*Id.* As the *Cronic* briefing set out in *supra* in Sections VI.B.1 & B.3 (which are adopted and incorporated by reference for the purposes of this claim) shows, Mr. Colella's case was clearly too complex to be handled competently by one attorney.

180.   Judges, lawyers, and scholars agree that at least two attorneys should be appointed to represent a defendant in any capital murder case. *See ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases*, Guideline 2.1 comment at 42 (February 1989) ("[b]ecause many of the duties of defense counsel in capital cases are definably different from those performed by counsel in criminal cases generally, because there are many rapid developments in the complex body of law affecting death penalty cases, and especially because of the harsh and irrevocable nature of the potential penalty, the responsibilities of trial counsel are sufficiently onerous to require the appointment of two attorneys as trial counsel"); *Summary of Action Taken by the House of Delegates of the A.B.A.*, A.B.A. Sec. Crim. J. 109 at 5-6 (1985) (citing in part the fact that death penalty trials are bifurcated as basis for recommending appointment of co-counsel in these cases); Herron, *Defending Life in Tennessee Death Penalty Cases*, 51 TENN. L. REV. 681, 682 (1984) ("[a] defense team, including at least two defense attorneys, should be involved [in capital cases]"); Bazelon, *The Defective Assistance of Counsel*, 42 CRIM. L. REV. 1, 33 n.16 (1973) (describing the deficiencies in representation resulting from burdens on a single attorney handling a capital case).

181.   The need for co-counsel in the case at bar was particularly compelling. Mr. Limas was solely responsible for:

- factual investigation, legal research, writing and argument of pre-trial motions;

- background investigation and examination of venire persons during individual voir dire;

CRAPDF - www.texhu.com

- factual investigation, legal research, preparation of case for guilt/innocence phase, devising a theory of defense at guilt/innocence; and

- factual investigation, legal research, and development of a mitigation theory for the punishment phase.

Mr. Limas was, as he complained to the court, overwhelmed.   In essence, he was responsible for conducting two separate jury trials: the guilt phase, and the punishment phase.  Performance of these tasks required travel not only in Texas but also extensive contact with witnesses in Indiana, where Mr. Colella and his wife had lived until just prior to 1991.  Under these circumstances, the "probable value" of co-counsel is indisputable.  Similarly, it can easily be seen that Mr. Limas required an investigator or trained mitigation expert as well as a mental health expert for the punishment phase of the trial.  As the punishment-phase claim briefed *infra* in Section II.C.2 shows, a background investigation was essential to minimally adequate representation at the punishment phase of the case.  Given that counsel knew that his client had spent most of his life in Indiana, and that his client had a history of mental health treatment obviously warranting further inquiry, the need for adequate investigative resources was obvious.

### c.    The risk of error in proceeding without co-counsel, expert and investigative resources was high.

182.    Mr. Limas predicted his inability to adequately represent Mr. Colella without the assistance of co-counsel. *See supra* Section VI.B.1(b).  The case was legally and factually complex.  One attorney could not adequately perform all the tasks required.  Had the trial court provided the legal assistance requested and required, the errors which sealed Mr. Colella's fate would not have occurred.

183.    The essential function of defense counsel is to identify the critical issues facing his client, develop a theme for the defense, and relate it succinctly to a jury. *Johnson v. Lockhart*, 921 F.2d 796, 799-800 (8th Cir. 1990); *United States v. Curry*, 663 F.2d 572, 574 (5th Cir. 1981).  The

.

process of developing logical, consistent positions on disputed facts and integrating them with the undisputed facts is central to the development of a defense theory. Because Mr. Limas was overwhelmed by his vast responsibilities, he failed to develop a defense theory in time, leading him to articulate two separate theories during voir dire and during the trial itself. This apparent "switch" needlessly crippled the credibility of Mr. Colella's alibi defense. *See infra* Section VI.C.1(k). The errors, described below, flow directly from the refusal of the trial court to appoint co-counsel.

184.    The absence of co-counsel was even more destructive during the punishment phase. More than anything else, co-counsel could have assisted Mr. Limas in the preparation and presentation of a powerful punishment phase defense. Having found Mr. Colella guilty of what the State portrayed as the callous murder of two young men, Mr. Colella's life literally depended on defense counsel's ability to present to the jury those "compassionate or mitigating factors stemming from the diverse frailties of humankind." *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976). The jury stood poised to "'make a highly subjective, unique, individualized judgment regarding the punishment that a particular person deserves.'" *Turner v. Murray*, 476 U.S. 28, 33-34 (1986) (quoting *Caldwell v. Mississippi*, 472 U.S. 320, 340 n.7 (1985)).

185.    The evidence that would have saved Mr. Colella from a death sentence was readily available to a defense team that had the appropriate legal and professional mental health assistance. With co-counsel, the defense could have developed Mr. Colella's life history and presented it as the basis for a sentence less than death. Focusing on the mitigating aspects of Mr. Colella's character and background, co-counsel could have identified appropriate experts to test and evaluate the client, and work to further sharpen a punishment phase strategy. Historically, approaches like this have been recognized as highly successful in developing compelling mitigation cases. *See Brewer v. Aiken*, 935 F.2d 850, 862 (7th Cir. 1991) (Easterbrook, J., concurring).

186.    Moreover, fully-funded and available co-counsel could have significantly undermined the case the State put forward at the punishment phase. Specifically, full investigation of the state's

94

priors would have revealed that the State's characterization of them was inaccurate. *See* Section VI. D.2 (demonstrating that State grossly exaggerated the nature of two of prior offenses introduced against the Applicant at the punishment phase in order to prejudice the jury against him), and would have revealed that the prosecutor and judge who dealt with one of those previous offenses regarded it as being linked to Mr. Colella's troubled background and mental illness, and in fact cooperated with defense counsel in order to try to assure that Mr. Colella received counseling and help for his problems in addition to punishment. *Id.*

187.    In sum, even if Mr. Colella were convicted of killing David Ray Taylor and Michael Lavesphere, the extensive expert, lay and documentary evidence available to a defense with adequate resources "ha[d] the potential to totally change the evidentiary picture by altering the causal relationship that can exist between mental illness and homicidal behavior." *Middleton v. Dugger*, 849 F.2d 491, 495 (11th Cir. 1988); *Harris v. Dugger*, 874 F.2d 756, 763-64 (11th Cir. 1988), *cert. denied*, 493 U.S. 1011 (1989). Counsel could have, therefore, harmonized the facts of the cases with a compelling defense theory. Yet, Mr. Limas presented no mental health expert, only a minuscule portion of the mitigating evidence that was available, and no theory as to why the jury should spare Mr. Colella's life. His closing argument at the punishment phase – which was a mere five pages long – was a heartfelt but entirely ineffectual plea for mercy from a solo attorney.

188.    Under the circumstances of this case, it is unnecessary to speculate about the "risk" of error arising from the denial of resources: the undersigned counsels' investigation has made it perfectly clear that the denial of resources actually led to clear error. Petitioner was denied due process and effective representation as a result of his lack of resources. This denial of resources constituted clear error, and prejudiced the defense. This Court must reverse Petitioner's conviction and sentence.

## C.    Ineffective Assistance of Counsel.

### 1.    Guilt/Innocence Phase and Voir Dire.

### a.   Introduction and standard of review.

189.   The Sixth Amendment guarantees a criminal defendant the right to effective assistance of counsel:

> [A] fair trial is one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding. The right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord defendants the ample opportunity to meet the case of the prosecution to which they are entitled.

*Strickland v. Washington*, 466 U.S. 668, 685 (1984) (internal citations and quotation marks omitted).  Ineffective assistance of counsel occurs when (1) counsel's performance was deficient, falling below an "objective standard of reasonableness," and (2) the deficient performance prejudiced the defense. *Id.* at 687; *see Bryant v. Scott*, 28 F.3d 1411, 1414-15 (5th Cir. 1994); *Vela v. Estelle*, 708 F.2d 954, 963-64 (5th Cir. 1983), *cert. denied*, 464 U.S. 1053 (1984).  Trial counsel failed to ensure that Mr. Colella's trial was a genuine adversary contest.  As there is certainly a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *Strickland*, 466 U.S. at 694, Mr. Colella is entitled to habeas relief.

190.   Deference to counsel's strategic decisions is due only when counsel has first fulfilled his duty to make "reasonable investigations" or "a reasonable decision that makes particular investigations unnecessary." *Id.* at 690-91.

> [C]ounsel's function . . . is to make the adversarial testimony process work in the particular case.  Because that testing process generally will not function properly unless defense counsel has done some investigation into the prosecution's case and into various defense strategies, . . . counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

*Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986) (internal citations and quotation marks omitted).  Although courts give great deference to *informed* strategic choices, they "closely scrutinize an attorney's preparatory activities." *Foster v. Lockhart*, 9 F.3d 722, 726 (8th Cir. 1993) (citing

*Chambers v. Armontrout*, 907 F.2d 825, 831, 835 (8th Cir.) (*en banc*), *cert. denied*, 498 U.S. 950 (1990)). "An attorney's 'strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Id.* at 726 (quoting *Strickland*, 466 U.S. at 690-91).

191.   In Mr. Colella's case, trial counsel failed to make a reasonable investigation of essential facts and points of law. He also failed to make a reasonable decision that certain investigations should not be conducted.

> **b.    Trial counsel failed to make a reasonable investigation of the case and to make adequate preparations for trial.**

> **i.    In another case involving inadequate presentation of an alibi defense, Mr. Colella's trial counsel was found to have rendered ineffective assistance of counsel – and to have given non-credible explanations for his conduct.**

192.   Before turning to the allegations and extensive documentation in support of Mr. Colella's ineffective assistance of counsel claim in this case, it is instructive to review the facts of another case, *Elifonso Lopez v. Scott*, in which Mr. Colella's sole trial lawyer was found ineffective in federal habeas proceedings for his "superficial and inadequate" presentation of his client's alibi defense. While Mr. Colella recognizes that mere proof that a defense lawyer has been found ineffective before does not prove that same lawyer's ineffectiveness here, the *Lopez* case presents an intriguing look at trial counsel's practices, and is marked by many parallels with counsel's performance in this case. Thus, in *Lopez* and as alleged in this case: (1) the client and the client's mother, early in the proceedings, informed trial counsel that the Applicant had an alibi; (2) trial counsel failed to initiate contact with family members or maintain consistent communication with them; (3) trial counsel failed to meaningfully investigate the alibi defense; and (4) trial counsel presented an alibi defense with weaknesses that could have been removed or reduced by prompt, adequate investigation. Trial counsel testified to counter the ineffective assistance allegations, but

CutePDF - www.fastio.com

his testimony was dismissed as "not credible." Federal Magistrate Judge John Black eventually concluded that trial counsel's investigation and presentation of his client's alibi defense was "superficial and inadequate," and granted the writ of habeas corpus.

193.    In 1990, Elifonso Lopez was convicted of aggravated assault upon R.L., a twelve-year-old relative, and sentenced to life. *See Lopez v. State*, 815 S.W.2d 846, 847 (Tex. App. – Corpus Christi 1991). Lopez's solo appointed trial and appeal attorney was Mr. Colella's trial counsel. *Id.* According to the indictment and the State's evidence, the offense had occurred on December 17, 1988. *Id.* at 849. An alibi defense was presented. Lopez was released from Cameron County Jail on November 22, 1988 (in time to commit the offense), but a "hold" was placed on him. *Id.* No party provided clear testimony as to whether this "hold" had been carried out. *Id.* Although there was no medical evidence of sexual assault, Mr. Lopez was convicted based on the account of R.L., and on the account of "Nikki Arias, a criminal investigator." *Id.* Ms. Arias testified that "R.L. was relatively articulate for a child his age, and *what R.L. told her happened.*" *Id.* at 898. The appellate court specifically noted that "[t]here was no objection" to this testimony. *Id.*; *see supra* Section VI.C.1c, e (describing counsel's repeated failure to object to inadmissible hearsay and bolstering testimony at the guilt and punishment phases of the trial).

194.    Mr. Lopez filed an application for a writ of habeas corpus alleging that trial counsel was prejudicially ineffective for failing to adequately investigate his alibi defense. Mr. Lopez alleged that trial counsel had never obtained critical documentation that the "hold" placed on him at his November 22, 1988 release from the Cameron County, Texas Jail had actually been carried out, and that it had resulted in his continued incarceration in TDC for a period of several months – during which the crime was alleged to have occurred in Brownsville, Texas. The state court denied the application with factual findings. Mr. Lopez then filed a habeas application including the ineffectiveness claim in the Brownsville Division of the United States District Court for the Southern District of Texas. *Lopez v. Scott*, No. CA B-93-213. Felix Recio, an Assistant Federal Public

Defender, represented Mr. Lopez.

195.    A bench trial was held on Mr. Lopez's allegations on March 8, 1995, before United

States Magistrate Judge John William Black.  *See* App. IV, Exh. 46 (Transcript of Hearing).  Mr.

Recio described what Mr. Lopez would prove concerning Mr. Limas' assistance:

> We also want to show through the records and through the testimony of witnesses
> that an attorney by the name of Abel Limas was appointed to represent Mr. Lopez,
> and that he was appointed on July the 9[th] of 1990.
>
> There was, I believe, an arraignment on July the 11[th] of 1990 in which Mr. Limas did
> not appear but sent Sergio Sierra, an attorney in his place for the arraignment.
> The evidence will also show, Judge, that there was several–at least one other
> continue–two continuances in this case. The case was originally scheduled for trial
> in late July and it ended up going to trial on September the 12[th].
>
> Through the testimony of witnesses, Judge, we will show that during this two-month
> period of July 9[th], 1990 through September the 10[th] of 1990, Mr. Limas did not meet
> or discuss this case with Mr. Lopez in any form or shape.
>
> We're going to show that during this period of time numerous attempts were made
> by the Defendant to contact Mr. Limas. Numerous attempts were made by the
> Defendant's family to contact Mr. Limas in an effort to get him to speak to Mr. Lopez
> regarding this case and regarding the evidence that Mr. Lopez wanted to discuss and
> so forth.
>
> During this two-month period of time, Your Honor, we're also going to show through
> the records that there were no motions for discovery, there was no concerted effort
> by Mr. Limas to investigate this case.
>
> We will show that on July the 10[th] of 1990, the date of the jury selection, was the first
> time that Mr. Limas met with Mr. Lopez, and only for a brief period of time.
> The trial actually commenced on September the 12[th] of 1990.  Again, through the
> court records, Judge, we will show that at that particular – on that particular day, Mr.
> Limas filed a subpoena trying to get the TDC records belonging to Mr. Lopez to be
> brought to court. And that subpoena, we understand, was served on the 13[th].  And,
> again, through documentary evidence and other testimony, we will show that the
> TDC people attempted to quash that motion because it had been served on the wrong
> people. And we believe that this is further evidence of the professional –
> unprofessional errors that were committed by Mr. Limas.
>
> The trial was over on September the 13[th], so those records were never gotten. They

CVisPDF - www.foxisx.com

were never procured for purposes of trial.

During the trial, Judge, we're going to show that certain documents were available to the defense that were crucial to the point of – crucial to the issue of the alibi defense. And we're going to show that Mr. Limas's unprofessional errors resulted in that evidence not being presented to the jury.

\* \* \*

So, what we want to show here today, Judge, is that, first, there was no communication with the Defendant, there was no investigation with this case, there are no motions, there were no subpoenas, save one, and it was incorrect. There was no hearings of any kind to determine who the witnesses might be for a suppression hearings or anything.

And we're saying that all of this adds up to the unprofessional misconduct of Mr. Abel Limas which resulted in prejudice to the Defendant. And but for those errors, the jury might well have reached a different verdict in this case. And that the verdict as it stands now is totally unreliable because of those unprofessional errors, Your Honor.

*Id.* at 6-8.

196.    Mr. Lopez first called a Custodian of Records for the Cameron County Jail, who testified that the jail had no record indicating Mr. Limas had visited Mr. Lopez in 1990. *Id.* at 14. Then a Texas Department of Corrections Inmate Records Supervisor testified that according to a "travel card" for Mr. Lopez, Mr. Lopez had been transferred to TDC from Cameron County Jail on November 22, 1988. *Id.* at 20. Teresa Lopez, Mr. Lopez's mother, then testified that she had visited Mr. Limas before trial, after she learned Limas had been appointed to represent her son. *Id.* at 27. During this visit, she told Mr. Limas that "what they were blaming him–that he was in prison on that time." *Id.* at 30. Mr. Limas told her he had not "read the file" on her son's case, and could not comment on it. *Id.* at 28-30. He advised her to talk to him "at the courthouse." *Id.* at 28. Mrs. Lopez testified that she called Mr. Limas's office repeatedly and asked Mr. Limas to call her back, even volunteering to accept a collect call, but Mr. Limas never contacted her. *Id.* at 29.

197.    Mr. Lopez testified. He was transferred from the Cameron County Jail to the TDC

on November 22, 1988, and he remained incarcerated in TDC until May 15, 1989. He was indicted in June 1990, and arraigned on July 11. *Id.* at 48-49. Sergio Sierra represented him at the arraignment as a "stand-in" for Mr. Limas. *Id.* at 48. After the arraignment, Mr. Limas did not visit or correspond with Mr. Lopez, nor did he return phone calls. *Id.* at 49-51. He eventually met Mr. Limas "about five or six minutes before going in to pick the jury" on September 10, 1990. *Id.* at 50.

198.    On September 10, 1990, the first day of trial, Mr. Lopez finally told Mr. Limas about the alibi defense. *Id.* at 51. Mr. Limas seemed confident of winning: he said he knew the child was lying and that "there was no evidence against me." *Id.* at 52. Mr. Limas never asked Mr. Lopez what witnesses to produce; but Mr. Lopez kept telling him "I was in prison on that date." *Id.* at 54. According to Mr. Lopez, Mr. Limas mentioned the alibi evidence "once or twice," and called "some parole officer I didn't even know" to establish the alibi. *Id.* at 56. Mr. Limas asserted incorrectly that Mr. Lopez could not have committed the crime because he was incarcerated from 1987 to 1989. *Id.* at 57. Mr. Lopez states that he kept trying to correct Mr. Limas and point out that he had been out on parole for several periods during that time, but Limas ignored him. *Id.* at 57-58. Mr. Limas asserted that Mr. Lopez had been released into the custody of the TDC on November 22, 1988, but he had no evidence of this. The only document was a parole certificate that Mr. Lopez gave Mr. Limas, which did not resolve the definitive issue of whether the "hold" placed on him by TDC was carried out.

199.    Mr. Recio, then read a substantial portion of Mr. Lopez's trial transcript into the record to demonstrate the accuracy of Mr. Lopez's account. *Id.* at 62-71. The reading demonstrated that Mr. Limas interrogated the parole officer about the meaning of a "jail card" in the parole officer's possession which mentioned the "hold" placed on him by TDC. However, Mr. Limas never subpoenaed anyone to testify to the authenticity of this vital record, never got it admitted into evidence, and never located information from TDC that would have proven that Mr. Lopez had been incarcerated in TDC from November 22, 1988 to May 15, 1989. *Id.* at 72. Strangely, the jail card

describing the "hold" was admitted into evidence at punishment, but Limas still failed to recognize

its significance, despite Mr. Lopez's continuing explanations. *Id.* at 72-73. Mr. Limas never

communicated any information to Mr. Lopez about his appeal. *Id.* at 74. Mr. Lopez first learned

his appeal had been denied from a state Senator whose help Mr. Lopez had requested on an unrelated

matter. *Id.* at 74-75.

200.    Abel Limas then testified concerning his strategy. On direct examination, he

confirmed that his strategy was "to show that Mr. Lopez was in prison." *Id.* at 83. He also stated

there had been some initial confusion about the date of the offense; that it may have occurred on

December 17, 1989, instead of December 17, 1988, but that the State had alleged December 17,

1988, in the indictment. *Id.* Mr. Limas confirmed that Mr. Lopez told him "close to trial date" that

if the offense had actually been committed in 1988, he was in prison. *Id.* at 84. Mr. Limas asserted

that the State was aware of the defendant's alibi for 1988, and "changed its strategy" and tried to

create confusion about when the offense had actually occurred. *Id.* at 91.

201.    On cross-examination, Mr. Limas asserted that he had destroyed his file on the Lopez

case. *Id.* at 100-101 ("I get them from the warehouse and then I burn them, I throw them, destroy

them."). He would also destroy all supporting documentation with it and all pieces of paper in his

office that referred to it. *Id.* at 102-03. Mr. Limas conceded that he had not listed any jail visits,

investigation, or motion preparation time on his request for compensation. *Id.* at 107. To explain

this fact, Mr. Limas asserted that the county did not pay for time spent out of court in 1990. *Id.* at

106. Mr. Limas claims that Mr. Lopez's mother had not told him that her son was in TDC when she

met with him, which conflicted with her testimony. *Id.* at 110. Mr. Lopez also testified that he had

consulted with Mr. Lopez ten days before the trial, on September 2, 1990, which conflicts with Mr.

Lopez's testimony that the first consultation occurred at trial itself. *Id.* at 111. Mr. Limas conceded

that he had received a copy of the indictment listing December 17, 1988, as the date of the offense

when appointed to the case, but insisted that the prosecutor, Rick Lara, had led him to believe the

102

actual date was 1989. *Id.* at 111-12. Mr. Limas asserted that, before trial, he spoke to Mr. Lopez several times on the telephone, and visited him once at jail. *Id.* at 115. This testimony conflicted with that of Mr. Lopez and of the Cameron County Jail records custodian.

202.    Mr. Limas admitted that he had not subpoenaed records from the TDC to confirm the TDC's custody of Mr. Lopez until September 12, 1990, the day before trial. *Id.* at 117. The subpoena was returned quashed on the 13th of September because it had been directed at "E.R. Cole," who was not the Custodian of Records for the TDC but rather a "custodian" – *a janitor*. *Id.* at 118. The records were thus never delivered, and no effort was made to seek a continuance or correct the subpoena. *Id.* at 118-19. Mr. Limas stated that he believed the parole officer would have the proper documentation. *Id.* However, after several evasive answers, Mr. Limas conceded that the parole officer did not have adequate documentation. *Id.* at 121. Mr. Limas then conceded that his entire defense had lasted twenty minutes. *Id.* at 125. Mr. Limas, under further cross-examination, contended that the Court of Appeals opinion was wrong in saying that he had not shown whether the "hold" on Mr. Lopez had actually been carried out, that the testimony of the parole officer Omar Sanchez had been adequate to establish the alibi, and that he did not believe the jail card showing the "hold" for TDC was relevant. *Id.* at 126-27.

203.    Mr. Lopez filed a grievance against Mr. Limas. On October 29, 1992 – just months after completing Mr. Colella's trial – Mr. Limas wrote the general counsel of the State of Texas in response to Mr. Lopez's grievance:

> [W]hen I was first appointed to represent Mr. Lopez [on the aggravated assault charge,] he advised me that Mr. Menton Murray, now the Honorable Judge Murray, was representing him on some driving while intoxicated charge, and that Judge Murray would be representing him on the aggravated assault charge. Mr. Lopez stated to me that he would not require my services. I then left the jail, and if memory serves me well, I contacted Judge Murray and he advised me that he was Mr. Lopez's attorney and would be representing him. I want to say that Mr. Lopez retained Judge Murray, but I am not sure.

*Id.* at 129. The lawyer whom Mr. Limas claims represented Mr. Lopez actually last represented Mr.

103

Lopez on a DWI charge in 1987. *Id.* After having the letter read to him, Mr. Limas said: "I know – no, no I talked to Mr. Vela for – I think it was on behalf of him, that he had–that somewhere in there somebody says he said that he gave $300 to somebody. I don't know to who. It wasn't to me." *Id.* at 129-130.

The Court Reporter then notes a pause.

After this development, there were a few more questions, and Mr. Limas left the witness stand. *Id.* at 131. When asked whether the Court wanted closing arguments, the Magistrate Judge stated: "No, I think I got the drift." *Id.* at 132. The Magistrate Judge had a few observations: "You know, I have to admit to you, I come from a background of civil trial practice where, shall I say, a bit more preparation was usually in order in trying cases, particularly one where – you know, I was dealing with people's money and not their liberty." *Id.* at 137-38.

204.    On May 11, 1995, the Magistrate Judge ruled. *See* App. IV, Exh. 47 (Magistrate Judge's Report and Recommendation, *Lopez v. Scott*, No. B-93-213 (S.D. Tex.)). The judge's conclusions were harsh:

> Petitioner testified that his trial counsel did not meet with him until September 10, 1990, the date of jury selection. Petitioner testified that defense trial counsel did not consult with him about his alibi defense other than in very general terms. Petitioner testified that defense trial counsel did not inquire with any specificity about Petitioner's jail records, dates of incarceration, names of witness who had personal knowledge of Petitioner's whereabouts on the date of the alleged offense, and did not allow Petitioner to discuss his case or the issues involved. Petitioner testified he had no idea what defense trial counsel was going to do in his defense, what evidence he would present or even if he intended to call Petitioner to testify. The Court finds the testimony of the Petitioner to be credible and was supported by the evidence presented and by the record transcripts of the trial.
>
> Defense trial counsel testified that he met with Petitioner on two occasions prior to trial. Once at the jail and once over the phone. Defense counsel could not remember the dates. When questioned about his trial folder and the existence of evidence to show that he met with Petitioner and had discussed the alibi defense prior to trial, defense trial counsel testified he had destroyed the files because the file was of no use to him. It should be noted and the Court finds that defense trial counsel was appointed to prepare Petitioner's state appeal and was also summoned to answer to

104

grievance allegations between 1990, 1992. When questioned when, where, and who actually destroyed the trial file folder, defense counsel could not remember. Defense counsel insisted he investigated the assault allegations by reading the district attorney's file and that he was aware of the alibi defense. When questioned about motions or investigations, defense trial counsel indicated none were necessary because he had read the district attorney's file. When questioned about subpoenas, defense trial counsel testified he filed none but did get a representative of the local State Parole Office to come testify on Petitioner's behalf. Defense trial counsel admitted on cross-examination that he attempted to subpoena Petitioner's prison records on September 12, 1990, the date the trial started, but he failed to properly subpoena the records for reasons he couldn't remember.

* * *

The Court heard the testimony of the defense trial counsel and found him *not to be credible*. The docket sheet entry shows trial counsel presented the case for the defense in twenty minutes. This includes opening statement, direct-examination of Omar Sanchez, cross examination by the prosecution and re-direct and recross. The trial transcript shows trial counsel failed to present the alibi defense when he presented evidence that Petitioner was incarcerated from June 1987 to May 1989, without showing the dates that Petitioner was released on parole. This failure allowed the prosecution to discredit the alibi defense. But more importantly it kept crucial credible evidence from being considered by the jury.

* * *

The lack of preparation, the failure to understand the theory of defense, the failure to present the necessary evidence for an alibi defense all point to the undeniable fact that Petitioner was denied his constitutional right to a fair trial because of ineffective assistance of counsel.

Trial counsel represented Petitioner on appeal and the appeals court did not consider counsel's failure to properly present the alibi defense nor did trial counsel point out to the appeals court that detailed failure of trial counsel to properly present the alibi defense.

In the case at bar, it is undisputed that defense counsel was appointed in July 9, 1990, and that jury selection was on September 10, 1990. This Court has already found that defense counsel:

    (a)       Did not meet with Petitioner between July 9, 1990, and September 10, 1990.

    (b)       Did not discuss the facts of the case with Petitioner

until September 10, 1990, the date of jury selection.

(c)   Did not file discovery motions.

(d)   Did not file any substantive motions or subpoenas.

(e)   Did not investigate the case.

(f)   Did not present evidence in an accurate or proper fashion pertaining to an alibi defense.

(g)   Did not consult with Petitioner on important decisions regarding the trial.

(h)   Did not keep Petitioner informed on important developments during the course of the prosecution.

Applying the stringent standards enunciated by the Supreme Court in *Strickland,* this Court finds, that because of the facts outlined above, Applicant's trial counsel's performance was deficient, fell below any objective standards of reasonableness, and did not measure up to that of a reasonably competent attorney.

*Id.* at 6-10.

205.    On June 12, 1995, the Texas Attorney General filed Objections to the Magistrate's Report and Recommendation with Brief in Support. *See* App. IV, Exh. 48. The Respondent urged the court to dismiss Lopez's statements and credit trial counsel's testimony, and also urged the court to revise its finding of prejudice based on the uncertainty of the date of the offense. *Id.* at 7-8, 10 ("Thus, the trial had become a question of not whether Lopez was in prison in 1988, but whether the offense had been committed in 1988 or 1989."). *Id.* at 10. The Respondent also urged the court to take into account that Lopez was well-served in that he had a "two-day" trial during which defense counsel "cross-examin[ed] ten witnesses." *Id.*

206.    The Respondent's objections were rejected, and the Magistrate's Report was adopted on June 16, 1995, by the Hon. Filemon Vela. Judge Vela wrote: "[t]he facts in this case show a serious error by counsel that could have been avoided through minimal effort to investigate the Defendant's alibi defense. . . . His performance clearly falls below the level of performance required by attorneys." In a newspaper article about the case published on June 18, 1995, Mr. Limas stated "I believe I will be vindicated. The Honorable Judge Vela and John Black do not have all the facts before them. [Lopez's allegation of inadequate pretrial communication is] a pure lie. There's no way

we could set up the defense if I hadn't talked to this guy." App. VI, Exh. 60 (Associated Press, *Man Jailed for Rape is Free After 5 Years: He Had an Alibi – A State Prison Cell*, HOUSTON CHRON., June 18, 1995, at A33).  However, the Fifth Circuit affirmed the District Court in an unpublished opinion, citing Mr. Limas's "superficial and inadequate" presentation of the alibi defense.  App. IV, Ex. 49 (*Lopez v. Johnson*, No. 95-40554 (5th Cir. May 15, 1996) (summary calendar)).

<div align="center">

**ii.    As in *Lopez*, trial counsel's preparation in this case
was superficial and grossly inadequate.**

</div>

207.    Once again, Mr. Colella acknowledges his burden of proving ineffective assistance and believe that this burden can be carried simply based on the facts and allegations in this Application alone.  Further, trial counsel's preparation in this case was more extensive than it was in *Lopez*.  However, this case was more complex and the stakes were greater than *Lopez*.  The undersigned counsel also recognize that trial counsel was working under significant state-imposed handicaps – to wit, the lack of co-counsel and inadequate compensation of counsel.  As trial counsel himself observed, the expectation that a single appointed counsel could adequately represent a death-sentenced inmate in a case as complex as this was unreasonable.  *See* App. I, Exh. 9 (State Habeas Evidentiary Hearing) at 6.

208.    Nevertheless, *Lopez* provides a suitable backdrop, since the Petitioner's allegations concerning Mr. Limas's method of preparing for Petitioner's trial are strikingly parallel to the ones confirmed in *Lopez*.  First, of course, is the insufficient communication.  As Mrs. Curtis maintains, both in her Affidavit and in her testimony at the state habeas evidentiary hearing, well before trial she notified Mr. Limas about potential alibi witnesses and Mr. Colella's extensive psychiatric history. *See* App. III, Exh. 39 (Curtis Aff.) at ¶26; App. I, Exh. 9 (State Habeas Hearing) at 46 (affirming that she told Mr. Limas about Mr. Colella's psychiatric history but he never followed up on it); App. I, Exh. 9 (evidentiary hearing) at 31-34 (defendant affirms that his pretrial meetings with Limas were too infrequent, that he never spoke to Mr. Limas' investigator, that he was not informed of decisions to hire experts, that he told Mr. Limas all the names of the people who treated him for

<div align="center">107</div>

mental illness and that Mr. Limas never contacted them and never explained why). In this Petition, Petitioner establishes that Mr. Limas' preparation for the punishment phase was utterly inadequate, and that this gross inadequacy prevented the jury from hearing the wealth of relevant mitigating evidence concerning the Petitioner.

209.    As he did with Mr. Lopez's mother, Mr. Limas ignored the information or made only ineffectual attempts to follow up on it. For example, although Mr. Limas agreed that obtaining all prior psychiatric records was "important" for the punishment phase, he admitted that he did not do that in this case. App. I, Exh. 9 (evidentiary hearing) at 26-27 (Limas admits not obtaining any psychiatric records, not having Mr. Colella analyzed, and presenting only the unprepared testimony of Mrs. Curtis' mother); *see also* App. III, Exh. 39 (Curtis Aff.) at ¶30 (Mrs. Curtis, not Mr. Limas, contacted witness who independently corroborated alibi). As in *Lopez*, Mr. Limas left trial and investigative decisions to the beginning of the trial, and in fact made little to no investigative effort himself. *Id.* at ¶30 (because Limas failed to investigate the bus station witness until trial, and showed no intention of ever doing so, Mrs. Curtis performed the investigation and informed Mr. Limas of the witness' availability on the day of trial); S.F. Vol. XVII: 1214 (bus station witness confirms she was contacted by *defendant's mother* on the first day of the trial). As in *Lopez*, Mr. Limas appeared confident of victory. App. III, Exh. 39 (Curtis Aff.) at ¶26. As set out above, even until the very last day of voir dire, Mr. Limas was clearly suggesting to the jurors that they would hear a case radically different from the one that, a week later, the defense presented to them. This is clear evidence that, even as of first day of the trial, Mr. Limas had not developed a defensive strategy.

210.    As in *Lopez*, Mr. Limas's presentation of Mr. Colella's alibi defense was "superficial and inadequate." First, but for Mrs. Curtis' efforts, the *jury would never have heard the vital corroborating testimony of the bus station witness, Amy Pflaum*. It is a stroke of luck that Mr. Colella's mother happened to be conscientious and concerned enough to perform the investigation

her son's lawyer failed to perform. Second, Mr. Limas failed to call as witnesses either Mr. or Mrs. Curtis to corroborate the alibi, even though (1) they were both willing to do so; (2) their account would have meshed with Mr. Colella's; and (3) Mr. Colella's frequent references to them in his own testimony almost certainly left the jury wondering why they had not testified. Mr. Limas called the decision not to proffer their testimony strategic, but failed to explain the nature of the strategy. Mr. Limas also failed to obtain the death certificates listing the victims' time of death at 6:00 a.m., App. I, Exh. 9 at 8-9, and failed to secure the admission of Judge Hunsaker's report into evidence, although he did present Judge Hunsaker's testimony. In *Lopez*, Mr. Limas also failed to secure the admission into evidence of a key document supporting the alibi, the jail card.

211. The most critical error, however, was the failure to adopt the defense of alibi as a unified, consistent defensive theme throughout the guilt phase. The jurors who heard Mr. Colella's case cannot be faulted for being puzzled and suspicious when the defense introduced an alibi defense, since throughout voir dire, Mr. Limas had never mentioned such a defense and had instead strongly suggested that provocation and mitigation would be the defense theme. Had Mr. Limas strongly advocated the alibi defense from the beginning of the trial, and had Mr. Limas timely procured all the documents and evidence supporting the defense, he could have made a much more compelling presentation – one that would have raised a reasonable doubt.

212. Finally, the State's arguments and tactics concerning the time of death during Mr. Colella's trial resemble the ones advanced by the State in Mr. Lopez's trial. In Mr. Lopez's case, the State indicted him for a crime committed in 1988, and, when presented with the possibility of a solid alibi, attempted to obfuscate the issue and undermine the alibi by muddying the issue of whether the offense occurred in 1988 or 1989. *See, e.g.*, App. IV, Exh. 48 (Respondent's Objections to Magistrate Judge's Report) at 8-10 (observing that "upon [] discovery" of the alibi, "the prosecution, caught in a quandary, was *forced to change its strategy*," and reprinting excerpt of state's closing attempting to muddy the timing issue) (emphasis supplied). In this case, the prosecution, from the

outset, repeatedly emphasized that no-one wore watches on the beach, and changed sworn testimony from a vital State witness to preemptively undermine Mr. Colella's alibi. Quite apart from whether the "strategy" of changing the settled facts of the State's case simply to neutralize an alibi is consistent with the highest principles of prosecutorial ethics, and the Applicant firmly maintains that it is not, it is irrelevant to the key issue. The question is not whether Mr. Colella could have convinced his jury to the point of metaphysical certainty that the victims were killed when he was on the road to Victoria with his parents. The question is whether, with a thorough, zealous defense, he could have raised *reasonable doubt* on this key point. The record establishes that this was possible.

<div align="center">

**c.    Counsel failed to adequately prepare by not obtaining and reading the complete transcript of Brenda Colella's trial.**

</div>

213.    Every major witness for the State in Mr. Colella's trial had testified about the same events in the Brenda Colella trial. As trial counsel has acknowledged in a sworn affidavit submitted in support of this Application, he never ordered a complete transcription of the testimony in Brenda's trial. App. VI, Exh. 62 (Affidavit of Abel Limas) at ¶7. Counsel may have attended isolated fragments of Brenda's trial (*see* App. III, Exh. 39 (Affidavit of Mary Curtis ("Curtis Aff.") at ¶27), but Ms. Curtis was not aware of anyone from trial counsel's office attending Brenda's entire trial. *Id.*

214.    The District Clerk's file contains trial counsel's motion requesting a transcript of the testimony of Red Wilson from the Brenda Colella trial. Again, there is no indication whether this motion was ever granted, and any transcript, if obtained, was not in trial counsel's file presented to the undersigned. Although trial counsel seemed aware of the testimony of Sgt. Martinez and Red Wilson from Mrs. Colella's trial, his inaccurate recall of it repeatedly allowed Red Wilson and Sgt. Martinez to slip the noose during critical cross-examination. Thus, as Mr. Colella has demonstrated extensively above, trial counsel failed to demonstrate to the jury how these witnesses changed their testimony pertaining to material facts in Mr. Colella's trial, and how they gave irreconcileably

inconsistent testimony in Brenda Colella's trial.   Further, trial counsel appeared largely unaware of Ricky Taylor's prior testimony and his first, inconsistent statement. *See* S.F. Vol. XVI: 1066.  Had he read Ricky Taylor's testimony from Mrs. Colella's trial, he would have discovered much invaluable impeachment material that could have parried the State's attempts to portray Brenda Colella's rape allegation as a lie.  A full review of the testimony in Mrs. Colella's trial would have alerted trial counsel to crucial information about the State's case, including its heavy reliance on hearsay.

> **d.**    **Due to trial counsel's grossly inadequate pre-trial preparation and investigation, counsel abruptly changed his theory of the defense after trial had already started, severely damaging the credibility of the alibi defense presented to the jury.**

215.    Due to trial counsel's failure to investigate the case prior to trial, counsel was fundamentally unprepared to present a well-investigated theory of the defense to the jury when the trial began.  In fact, during jury selection, counsel "previewed" a theory of the defense to prospective jurors that he ultimately abandoned in favor of an alibi defense.  As a result, trial counsel crippled Mr. Colella's defense by failing to select one defense and consistently pursue that theme.  Instead, trial counsel switched defensive themes midway through the guilt phase, exposing Mr. Colella's alibi defense to devastatingly effective attack.

216.    During voir dire, trial counsel did not mention the alibi defense.  As Mrs. Curtis' affidavit demonstrates, this was not a conscious tactical decision; rather, it was the product of trial counsel's failure to investigate.  Trial counsel voir-dired jurors solely on a potential defense of provocation, and sometimes damagingly implied, either by stating it or by focusing almost exclusively on punishment-phase issue, that punishment was the most important issue.  For instance, Mr. Limas advised one juror that the thrust of the defense would be that

> even though I killed two people and you know I did because they told you I did, because the indictment is telling you I killed those two people, but then I show you through the evidence, through witnesses, right, as to what happened.  And then you're going to . . . say "Well, although it's murder, although it's capital murder, because

the law says that, I'm going to find this man, that he had a reason to. And I'm going to lower that charge from voluntary manslaughter [sic] to voluntary manslaughter. Would you do that?

S.F. Vol. IX: 1096 (voir dire of Virginia Aguirre). The excerpt above is representative of the approach Mr. Limas used with all jurors – an approach which conceded Mr. Colella's guilt of the killing of the two men. *See, e.g.*, S.F. Vol. VI: 121-123 (juror Joseph Ronald Briseno; same lines of questioning); S.F. Vol. VII: 339-41 (examines seated juror Virginia McConnell on whether she would take into account the "rage" caused by provocation and emphasizes to her that the jury is sole judge as to whether "ten minutes" or "three hours" is sufficient "cool reflection" to dissipate sudden passion arising from adequate provocation); S.F. Vol. VII: 407-409 (juror Linda Ann Jordan questioned about "sudden passion" and "rage" as reason for a double homicide).

217. Trial counsel further routinely examined prospective jurors on their attitude toward a non-testifying defendant, and also consistently advised them that the defense will almost certainly be presenting little or no evidence. *See, e.g.*, S.F. Vol. VI: 100 ("Mr. Colella will not be testifying"); S.F. Vol. VII: 342-43 (voir dire about nontestifying defendant; seated juror); *id.* at 365 (nontestifying defendant); *id.* at 453 (nontestifying defendant); *id.* at 488 (prepares juror for no evidence from defense; juror seated); S.F. Vol. VIII: 602-03 (asks juror what he's think if state presented 30 witnesses but defense presents none; informs juror that "a defense attorney, proceeds in a case like this by [merely] asking questions from those people that the State brought in"); *id.* at 800 (nontestifying defendant); S.F. Vol. IX: 898-99 (no evidence from defense; juror seated); *id.* at 1024 (no evidence from defense; juror is seated and becomes foreperson); S.F. Vol. X: 1166 (nontestifying defendant). Trial counsel no doubt compounded the jury's confusion by neglecting to give an opening statement. S.F. Vol. XI: 31 (defers right to open with State); S.F. Vol. XVII: 1082-86

CutePDF - www.testia.com

(waives right to opening statement at beginning of defense case).

218.    Trial counsel had five months to prepare a defense.  At least as soon as Brenda Colella's trial was complete in late May of 1992 (and possibly sooner), trial counsel knew that the timing of the events would be crucial.  As of August 24, 1992 (the last day of jury selection), trial counsel was still preparing to proceed with, and preparing seated jurors to hear, a case in which (1) the defendant did not testify; (2) the defense would put on almost no evidence; (3) the focus of the defense at the guilt phase would be provocation and/or voluntary manslaughter – *i.e.*, that Mr. Colella had killed the victims in state of sudden passion following upon adequate cause; and (4) the punishment phase would be the most important phase of the trial.  The trial on the merits started *the very same day*: August 24, 1992, at 2:45 P.M.  *See* S.F. Vol. XI: 2.  By September 1, 1992 – one week later, during which time trial counsel spent every business day in trial as the sole court-appointed attorney – the defense had changed radically.  Mr. Colella did testify, he presented an alibi defense, not solely a voluntary manslaughter defense, and seven defense witnesses testified, not counting the recall of Red Wilson and Luis Martinez, who originally testified for the State.  *See* S.F. Vol. II (Master Index).

219.    The jurors thus heard a radically different case from the one they were prepared to hear.  The prosecution recognized this, and attacked the defense switch repeatedly in its closing:

> All this stuff during voir dire about voluntary manslaughter, where is that coming from? If he was going to take the witness stand all along and say "I wasn't even there," which is what he did at the end, then what are we doing going into voluntary manslaughter?  What is the purpose of voluntary manslaughter, if all along he's coming and saying, "I was not there, ladies and gentlemen.  I want you to believe that."

S.F. Vol. XIX: 1546.

113

And he [the defendant] sat there throughout all this time and he heard all the evidence. And he knew, he knew what his chances were on voluntary manslaughter. He knew that the State had already showed how much time had gone by, what had happened, those intervening pieces that we had talked about on voir dire. He already knew. So he had to change his story. So his story could not be voluntary manslaughter anymore. His story now was, "I wasn't there. I wasn't there." And how is the State going to get him out of that "I wasn't there"? How? And that's when he changed his story, ladies and gentlemen, because all along it was voluntary manslaughter until now.

*Id.* at 1554. This attack was no doubt devastating.

220.    It did not have to be. Both Mr. Colella and his mother prodded trial counsel to investigate the alibi defense at least as early as the completion of Brenda's trial, and likely even before that. App. I, Exh. 9 (Evidentiary Hearing) at 30-36 (Testimony of Mr. Colella); App. III, Exh. 39 (Curtis Aff.) at ¶¶ 29, 30. Trial counsel failed to do so, and Mrs. Curtis eventually performed the investigation herself "because it didn't seem as if [Mr. Limas] ever would" follow up on the leads his client and Mrs. Curtis had given him consistently. Had trial counsel performed a thorough, adequate and timely investigation into timing issues – which he admits were "crucial" to the case – he could have presented a consistent, uniform, compelling defense from *day one*. He could have examined prospective jurors extensively on the alibi defense, their attitudes toward alibis, and the interaction of an alibi defense with the "reasonable doubt" standard. He could then have presented a coherent opening argument that would have vigorously attacked the State's case and had the jurors prepared for the alibi evidence when they heard it. He could have exposed Sgt. Martinez and attacked his testimony as a mere attempt to unfairly undermine the defendant's alibi. *See* Section VI.A.1(b), *supra* (describing perjured testimony from Sgt. Martinez regarding time of death). The State would not have been able to accuse the defense of "defense-shopping."

### e.  Counsel failed to object when the prosecution improperly bolstered Red Wilson's credibility through Sergeant Martinez's testimony.

221.    Unquestionably, the credibility of the testifying accomplice, Red Wilson, was paramount. No ballistics, DNA, or fingerprint evidence linked Mr. Colella to the alleged murder or

the dump scenes.  Apart from suspect, uncorroborated accomplice testimony, no evidence linked belongings of the victims to Mr. Colella or to anyone related to him.  Apart from Red Wilson, no eyewitness testified to seeing Mr. Colella commit the crimes.  The murder weapon was never recovered, and the spent bullets were never sent for ballistics testing.  The Court of Criminal Appeals disagreed as to whether Red Wilson's testimony was adequately corroborated by the physical evidence.  Finally, Red Wilson's credibility was suspect.  First, he was a convicted felon and had acknowledged lying in his sworn written statement.  Second, he changed his story to secure a lifesaving deal.  Third, his trial testimony was riddled with inconsistencies.  *See* Section VI.A. *supra.*

222.  To preemptively bolster Red's credibility, the prosecution improperly had Sgt. Martinez recite Red's testimony, and then tell the jury that he had been able to "confirm" or "verify" it.  *See, e.g.,* S.F. Vol. XII: 123, 132-35.  At this point, Red Wilson *had not even testified*, and his credibility had not been impeached.  The following examples, all taken from the Sgt. Martinez's direct examination, are representative:

Q.  Were you able to determine later whether what [Red] told you [in his second, oral statement] was the truth?

A.  Yes.

Q.  And you told us that was based on what he himself later told you.

A.  Yes.

Q.  Were you able to go back and check his story?

MR. LIMAS:  Your Honor, objection.  She continues to lead the witness, your Honor.

MRS. LOPEZ:  Your Honor, that's 'were you able' to do that.  That's not —

THE COURT:  I will let him answer the question.  Go ahead.  Overruled.

THE WITNESS:  Yes.

115

Q.   And how were you able to go back and determine whether he was telling you the truth or not?

A.   He took me.

Q.   Where did he take you?

A.   To South Padre Island to the alleged crime scene and to where the actual murder was committed.

S.F. Vol. XII: 116-17.

Q.   In [Red Wilson's] first statement did you find out that what he had told you was accurate up to a point?

A.   Yes, ma'am, it was very accurate.

Q.   How were you able to determine the accuracy of the first statement?

A.   By the statements of the other witnesses that I had interviewed.

Q.   So did you corroborate his first statement?

A.   Yes, I did.

Q.   When we use the word "corroboration," what exactly does that mean?

A.   I am able to determine if a person or persons are saying an accurate report, because I am comparing it with the same reports that are given by other individuals that say the same thing.  That is corroboration.

Q.   Is that supporting evidence?

A.   Yes, it is.

*Id.* at 123.

Q.   Were you also able to verify the first statement that he gave?

A.   Yes.

Q.   And how did you go about verifying his first statement?  You already

told us about the second statement and how you verified that. Now how about the first statement? How did you verify what he told you?

A.     By talking to the other witnesses that were present.

Q.     And again was his first statement consistent with information you have received from other people?

A.     Very consistent, yes.

*Id.* at 132.

223.    The prosecution then had Sgt. Martinez recite, in narrative form, the most vital portion of Red's testimony – a recitation which consisted *solely* of single- and double-level hearsay:

Q.     In [Red's] oral statement, what did [Red] put into that statement that he hadn't put into his first statement?

A.     The fact that he had been in the vehicle. He had left the campsite with the defendant and Brenda Bowling to calm them down. They had gone down the gulf side, on the beach side, toward the third exit when they came upon the victims' truck that was parked, where the defendant had once again called out to Brenda and had asked her if they had done it to her and where she verified or replied, "Yes."
        He [the defendant] had gotten off the truck and had ordered Red to turn on the lights of the truck after Red told him, "Hey, let's go and call the police. We know where they are at. Let's call the police."
        The defendant had yelled out, "Fuck the cops," and he had gotten off, where he went to the bed of the truck and fired at the individuals.

*Id.* at 134. This testimony was all hearsay – Sgt. Martinez simply recites what he says Red had told him earlier. The portions in which Sgt. Martinez recites what Red had told him about what *the defendant* had allegedly said were double hearsay. However, trial counsel never lodged a hearsay objection against this rambling, highly prejudicial, profane hearsay narrative. *See also supra* Section VI.C.1.e (discussing trial counsel's failure to object to repeated instances of inadmissible hearsay). The error is compounded when the State asked Sgt. Martinez "Now, based on the information that

you received, *who was the shooter?*," to which Sgt Martinez replied "The defendant." *Id.* at 143. (emphasis added).

224.    Second, the testimony impermissibly bolstered Red Wilson's credibility by recycling his testimony from a law enforcement official. Because the State offered no evidence that Mr. Colella was the shooter except for Red Wilson's testimony – which was hearsay coming from Sgt. Martinez – this constitutes further improper bolstering.

225.    Trial counsel failed to validly object to or preserve error as to any of this testimony by Sgt. Martinez. The closest trial counsel came was when he interrupted Sgt. Martinez's bolstering narrative: "They have this witness [Red] that is going to testify as to the statements that he gave, your Honor. That would be the proper witness. It's all hearsay, and I'm going to object to that at this point." *See* S.F. Vol. XII: 135. Before a ruling, the prosecutor promised to "withdraw the question," and the defense lawyer never followed up the objection. *Id.* Because the objection was not pursued to a definitive adverse ruling, the claim of error for appellate review was waived. *Harris v. State*, 784 S.W.2d 5, 12 n.4 (Tex. Crim. App. 1989) ("The proper method of pursuing an objection to an adverse ruling is to (1) object and, if the objection is sustained, (2) request an instruction to disregard and (3) move for a mistrial." (citing *Brooks v. State*, 642 S.W.2d 791, 798 (Tex. Crim. App. 1982)). Recognizing and preserving error for appellate review is a fundamental component of effective representation. *See, e.g.*, *Vela v. Estelle*, 708 F.2d 954, 964 (5th Cir. 1983) (rules on how to preserve error for appellate review in Texas criminal cases are "the most elementary of blackletter rules of procedure"); *Gravley v. Mills*, 87 F.3d 779, 786 (6th Cir. 1996) ("These mistakes at trial were exacerbated after the trial when counsel failed to preserve any of the egregious errors committed by the prosecution for appeal.").

226.    Sgt. Martinez testified that Red Wilson told him the truth. The basis for these inadmissible testimonials to Red's character was often either not mentioned or tautological. For instance, in the excerpt above, Sgt. Martinez declared that Red spoke the truth because Red took him

118

to the spot on South Padre Island where the alleged murder occurred. S.F. Vol. XII: 117. In fact, as Sgt. Martinez admitted later, the police never located any casings showing that the murder had occurred there. S.F. Vol. XII: 266-67. In his cross-examination of Sgt. Martinez, Brenda Colella's trial counsel, faced with Martinez's bolstering tactics, forced him to admit that he had no evidence to corroborate Red's multiple stories about disposal of the murder weapon, Red's account of the gun burglary, Red's assertion that Mr. Colella stole the victims' wallet, or Red's account of the manner and location of the shooting. *See* (BBC) S.F. Vol. V: 257-58, 266-68. Thus, Brenda's trial counsel clearly established that when Sgt. Martinez announced that he had "established" a certain critical fact about the crime, what he actually meant was only that Red had told him (at one point) that it had happened a certain way. In Mr. Colella's case, trial counsel failed to prevent virtually all of this bolstering testimony by timely objection, and did a much less effective job than Brenda Colella's trial counsel of assuring the jury knew the real basis for Sgt. Martinez's conclusions.

227. Because Sergeant Martinez's testimony was improper bolstering of a vulnerable witness, it should have been objected to and excluded. "'Bolstering' may perhaps be understood a little more precisely to be any evidence the *sole* purpose of which is to convince the factfinder that a particular witness or source of evidence is worthy of credit, without substantively contributing 'to make the existence of [a] fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." *Cohn v. State*, 849 S.W.2d 817, 819-20 (Tex. Crim. App. 1993). "'Bolstering' occurs when one item of evidence is improperly used by a party to add credence or weight to some earlier unimpeached piece of evidence offered by the same party." *Pless v. State*, 576 S.W.2d 83, 84 (Tex. Crim. App. 1978). Improper bolstering, provided it is harmful, results in the reversal of a conviction. *Menefee v. State*, 614 S.W.2d 167, 168 (Tex. Crim. App. 1971) (reversing defendant's conviction when prosecutor praised honesty of witness in closing argument); *Puckett v. State*, 330 S.W.2d 465, 466 (Tex. Crim. App. 1959) (same as to improper praise of law enforcement officers).

228.   The failure to object to Sgt. Martinez's testimony was harmful.  Red Wilson had not yet testified; however, every party knew he would, and further knew that his testimony would be essential to the State's case.  *See, e.g.*, S.F. Vol. XI: 25-28 (prosecution opening heavily stresses Red's testimony).  Rather than letting Red's credibility stand or fall on its own, the prosecution used Sgt. Luis Martinez's testimony to unfairly bolster it.  It is improper for members of the prosecution team to vouch for the credibility of witness and therefore put the "prestige of the[ir] office" behind that witness.  *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999) (citing cases); *United States v. Garza*, 608 F.2d 659, 664, 666 (5th Cir. 1979) (it is "particularly egregious" error for prosecutor to "use the status and influence of the entire government investigatory apparatus to bolster the believability of his case").  Second, Sgt. Martinez vaguely conveyed  that Red's story had been "verified" or "confirmed."  Such comments from the prosecution team constitute reversible bolstering because they mislead the jury as to the extent to which the prosecution is able to independently verify the accomplice witness's testimony.  *See, e.g.*, S.F. Vol. XII:131; *compare Francis*, 170 F.3d at 551 (investigator's vague comments that he had "corroborated" accomplice testimony, without specific details of admissible evidence proving corroboration, constituted reversible improper bolstering); *cf. United States v. Arroyo-Angulo*, 580 F.2d 1137, 1150 (2d Cir.) (Friendly, J., concurring), *cert. denied*, 439 U.S. 913 (1978) (such comments "inevitably give jurors the impression that the prosecutor is carefully monitoring the testimony of the cooperating witness to make sure that the latter is not stretching the facts–something the prosecutor usually is quite unable to do. . . .")

229.   Courts have condemned the practice of permitting police officers or prosecutors to vouch for the credibility of accomplice witnesses who are testifying pursuant to an immunity agreement.  *See, e.g., United States v. Carroll*, 26 F.3d 1380, 1389 (6th Cir. 1994) (collecting cases); *see also United States v. Shaw*, 829 F.2d 714, 717 (9th Cir. 1987); *United States v. Roberts*, 618 F.2d 530, 536 (9th Cir. 1980) ("The prosecutor may not tell the jury that a government have confirmed

120

a witness's credibility before using him. He should be no more able to indicate that the government has taken steps to compel the witness to be truthful.) (citation omitted). Finally, Sgt. Martinez's description, under leading questioning, of what "supporting evidence" and "corroboration"; as well as who the "shooter" was (a question Sgt. Martinez obviously based on hearsay he had heard), impermissibly invaded the province of the jury.

230.    Reasonably effective trial counsel would have objected to Sgt. Martinez's improper bolstering and hearsay testimony. Especially when viewed in the context of the myriad other errors, the failure to object to Sgt. Martinez's improper testimony was prejudicial. This case boiled down to Red Wilson's credibility versus Mr. Colella's. In *Garza*, another case in which the jury was essentially presented with a swearing match between "the government witnesses [and] the defendant's alibi witnesses," the Fifth Circuit held that improper prosecution bolstering of a vulnerable witness was especially prejudicial because it was "expressly intended to influence [the jury's] critical credibility choice." *Garza*, 608 F.2d at 665, 666. The same situation is present here. Counsel's deficient performance allowed the prosecution to improperly bolster the otherwise-suspect testimony of the State's key witness, and thus "undermined confidence" in the outcome of the trial. *Strickland*, 466 U.S. at 694.

### f.  Counsel failed to object to inadmissible, inflammatory, bolstering testimony concerning alleged threats made to Red Wilson.

231.    Defense counsel again failed to object to the State's improper questioning of Red Wilson about alleged threats made to Red Wilson:

Q.    Have you been harassed and threatened because of coming to testify in court?

A.    Well, I don't know what you would consider that.

Q.    Did you tell me that somebody had been putting little signs saying you were – I will use the Spanish word because that's the word you used – "el dedo," the finger?

121

A.    Yes, there were two different occasions. One put one there and it said "Red, the big, fat rat," and the other one said "Wilson, the finger" in my section, on my tank, while I was out. When I would come back, it would be there hanging above my door.

* * *

Q.    Is there an inmate that has been talking to you about different things that this defendant has been saying?

A.    Yes.

Q.    And has been getting messages back to you?

A.    I don't know if you would say he was telling me or he was – if the defendant over here was sending – telling him to tell me this. I don't know for a fact he was actually doing this, but I heard conversations of such.

Q.    Were you afraid for your safety?

A.    Yes, I was. At one point a guard had come and told me that there was some writing on a wall and to watch out and to be careful and there's a guy in the tank on the other side that is supposedly writing the other co-defendant letters. It's just hearsay, but he says that —

      MR. LIMAS:          Honor, I will object to hearsay at this time.

Q.    (By Ms. Lopez:)      But does that concern you?

      THE COURT: Sustain the objection.

Q.    (By Ms. Lopez:)  Does that worry you?

A.    Yes.

Q.    Does that worry you for your safety?

A.    Yes, it does. I have gang members from the alleged bomber group in my tank and other people from different organizations that I feel I can fear from them that I am being called names. So they might take it upon themselves to come forth and do something. I don't know. I

122

> don't know what the outcome would be.  I don't know if they might
> come up and just beat me up.  I don't know what the outcome would
> be of it.  So I am very scared, yes.

S.F. Vol. XIII: 455-57.

232.    This testimony, in addition to being grossly unfair, was inadmissible.  First, leading

questions prompted it.  Mr. Wilson actually appears reluctant to even discuss the matter until the

State prompts him.  Second, the testimony is mostly single- and double-level anonymous hearsay,

as when Mr. Wilson describes the unnamed guard's description of writings and comments by

"somebody" or "an inmate."  Indeed, Mr. Wilson himself labeled the testimony hearsay.  S.F. Vol.

XIII: 456.

233.    The prosecution without any admissible proof – besmirched Mr. Colella's character

by accusing him of the obstruction or retaliation directed at a witness, a third-degree felony as

defined by TEX. PEN. CODE § 36.06. This unproven accusation manifestly and unfairly prejudiced

Mr. Colella's rights.  The prosecution, except in extremely limited circumstances, may not accuse

a defendant of offenses other than the one for which he is on trial:

> 234.    It is a fundamental principle of law that an accused is entitled to be tried on
> the accusation made in the State's pleading and not for some collateral crime or for
> being a criminal generally. . . .  The reason for this rule is that although the evidence
> has some legal relevance to the general issue of whether the accused committed the
> act charged, it is inadmissible because it is inherently prejudicial, tends to confuse
> the issues in the case, and forces the accused to defend himself against charges which
> he has not been notified would be brought against him.

*Clarke v. State*, 785 S.W.2d 860, 864 (Tex. App.–Fort Worth 1990) *aff'd*, 811 S.W.2d 99 (Tex.

Crim. App. 1991) (citations omitted).  Such evidence can only be admitted if it is "genuinely needed

to shore up the State's case" concerning a vital contested issue and there is no less prejudicial way

to establish the State's position.  *Id.* at 865.  Finally and crucially, the State's proof must show

*beyond a reasonable doubt* that the defendant actually committed the extraneous offense.  *Harrell*

*v. State*, 884 S.W.2d 154, 160-61 (Tex. Crim. App. 1994).  If the State cannot prove the defendant

CutePDF - www.foxiw.com

committed the extraneous offense, the evidence is "irrelevant and therefore inadmissible." *Id.* at 160. Therefore, before the evidence is admitted, the trial court must conduct a preliminary inquiry into whether the prosecution can satisfy its burden of proof. If not, the evidence must be excluded. *Id.*

235.    Mr. Limas, inexplicably, failed to object to this evidence. Had he done so, the trial court would have been required to determine whether the State could support its allegation of the serious felony of witness intimidation with any admissible proof. As Red Wilson's testimony clearly establishes, only hearsay backed up these assertions. Not only did the prosecution lack proof beyond a reasonable doubt of the witness-intimidation allegation – *it lacked any admissible proof at all.* "[T]he Government may [not] parade past the jury a litany of potentially prejudicial similar acts that have been established or connected to the defendant only by unsubstantiated innuendo." *Huddleston v. United States*, 485 U.S. 681, 689 (1988); *see also infra* Section VI.C.1(m) (objecting to prosecution's innuendo-based allegations of spousal abuse).

236.    The accusation of witness intimidation is even more prejudicial than the average extraneous offense.[30] Suggestions that the defendant threatened or intimidated a witness, without anything tying the threats to a relevant issue, are uniquely inflammatory and prejudicial. The "highly inflammatory nature of the remarks is obvious" because they "charge[] a separate, and a serious, criminal offense." *Hall v. United States*, 419 F.2d 582, 585 (5th Cir. 1969)(footnote omitted).  In fact, unproven suggestions of witness intimidation are so dangerous to a defendant's rights that they usually affect "the integrity of the trial itself" and must be immediately and strongly countered by a trial judge. *Id.; see also Mercer v. United States*, 724 A.2d 1176, 1184 (D.C. Ct. App. 1999) ("[A]ppeals to the passions of the jury, such as the presentation of evidence of threats against a

---

[30] Mr. Colella's jury was required to find that Mr. Colella had committed any extraneous offense beyond a reasonable doubt. However, this does not mitigate the prejudice in any way. As the *Harrell* court observed, the question of whether a defendant has committed the extraneous offense is a *preliminary* question of *admissibility*. If the State cannot prove the defendant committed the extraneous offense, the testimony is irrelevant and should never go before the jury. *See Harrell*, 884 S.W.2d at 157-59 (drawing distinction between admissibility and jury-instruction issues).  In this case, the jury was permitted to hear the irrelevant evidence. Mr. Colella was injured not only by this fact, but also because the prosecution's insinuations of a serious felony almost certainly had a lingering prejudicial effect not dissipated by

CutePDF - www.tesia.com

witness, . . . have the potential for great prejudice against the defendant.") (citing cases); *McClellan v. United States*, 706 A.2d 542, 551 (D.C. 1997) (noting that trial court observed that evidence of threats against a witness "tends to be prejudicial because it suggests the witness fears reprisal at the hands of the defendant or his associates if she testifies" although allowing the practice when used to explain prior inconsistent statements). Such evidence may be relevant to explain a witness' change of testimony or delay in testifying. *See, e.g., Mercer*, 724 A.2d at 1184. However, even if any admissible evidence had supported the allegations here – and none did – there is no hint of such a justifying circumstance. Red Wilson lied to the police, and changed his story, not because he feared the defendant (who was half a continent away in Indiana), but because he wanted to conceal *his own* participation in the killing. *See* S.F. Vol. XIV: 626-27 (asserting that he lied to the police in his initial statement because he "didn't want to be involved" and he "felt bad" that Brenda had been raped).

237.    As the excerpt of the examination reprinted above shows, trial counsel lodged one hearsay objection to Red's testimony about Mr. Colella's alleged threats, but then inexplicably failed to request a cautionary instruction or mistrial. In fact, he allowed the prosecutor to restate virtually the same question, allowing this extremely damaging testimony into evidence anyway. Lodging timely and relevant objections and preserving error for appellate review is a fundamental component of effective representation. *See, e.g., Vela v. Estelle*, 708 F.2d 954, 964 (5th Cir. 1983) (rules on how to preserve error for appellate review in Texas criminal cases are "the most elementary of blackletter rules of procedure"). There can be no conceivable justification for counsel's failure to object: "To pass over [i.e., fail to object to] the admission of prejudicial and arguably inadmissible evidence may be strategic; to pass over the admission of prejudicial and clearly inadmissible evidence, as here, has no strategic value." *Lyons v. McCotter*, 770 F.2d 529, 533-34 (5th Cir. 1985) (reversing conviction due to defense counsel's ineffectiveness in failing to exclude prejudicial testimony), *cert. denied*, 474

the instruction.

125

U.S. 1013 (1986). Failing to keep this prejudicial, inadmissible testimony from the jury clearly was deficient performance.

238. The error had a two-pronged prejudicial effect. First, it impermissibly bolstered the suspect credibility of the prosecution's star witness, by making it appear as if he were testifying at great personal risk. Second, it permitted the prosecution to get away with accusing Applicant with a serious criminal offense without offering any admissible supporting proof. Since trial counsel did not object to the majority of this testimony and the trial court did not instruct the jury to ignore it, the jury could consider the evidence probative and properly admitted for all purposes.

> **g.** **Counsel failed to object to inflammatory, inadmissible hearsay.**

239. A significant portion of the State's case against Mr. Colella consisted of hearsay testimony. The sheer number of hearsay statements – many irrelevant and clearly unfairly prejudicial – admitted without objection is disturbing. These statements are in addition to the clearly inadmissible testimony concerning spousal abuse allegations and the inadmissible hearsay bolstering by Sgt. Martinez.

240. During the State's direct examination of Sergeant Martinez, the following occurred:

Q.    Now, this defendant also wanted to speak with the DA's office, is that correct?

> MR. LIMAS:    I will object to any statements that this defendant made to Mr. Martinez in any form.

> THE COURT:    I will sustain the objection at this time until the proper predicate has been laid.

Q.    Did the other two defendants want to work out a deal with the DA's office as well?

A.    Yes.

S.F. Vol. XII: 218.

241. Once again, Mr. Limas' actions were completely inadequate. First, Mr. Limas should

have sought a motion in limine concerning any such conversations or negotiations, to prevent any mention of alleged deal negotiations before the jury. Second, Mr. Limas should have followed up on his initial objection and made sure that the prosecutor was prevented from soliciting testimony on this subject, or that the jury was instructed to disregard any such testimony. Because he did not do so, the prosecution was permitted to elicit testimony which certainly had the practical effect of alerting the jury to alleged plea negotiations between the Applicant and the District Attorney's Office.

242.   The prosecution committed misconduct in attempting to elicit hearsay testimony about plea discussions. This evidence was not introduced for impeachment, or for any other reason other than to unfairly prejudice Mr. Colella. Counsel should have immediately objected not only on hearsay grounds, but also on the ground of then-existing TEX. R. CRIM. EVID. 410(3), which provided that "evidence of the following is not admissible against the defendant who made the plea or was a participant in the plea discussions . . . (3) any statement made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty . . . ." Counsel did not object on hearsay, Rule 410(3), or any other relevant basis. A reasonably competent defense lawyer would have immediately recognized the prejudicial nature of this testimony, objected on relevant grounds, requested a limiting instruction, and asked for a mistrial. Trial counsel did none of these.

243.   Later, Sgt. Martinez testified about a statement allegedly given by Brenda Colella to an Investigator Green in Indianapolis. S.F. Vol. XII: 259-60. This testimony is all *double hearsay* - statements made by Brenda Colella to Investigator Green, then relayed to Sergeant Martinez. Counsel objected once on leading grounds but *never* on hearsay grounds. The testimony insinuated that Mrs. Colella had given an inconsistent account of the rape and hinted that she was selective in what she wished to discuss. Neither Mrs. Colella nor "Investigator Green" testified at Mr. Colella's trial. The prosecution never entered the "statement" into the record. This testimony was

CutePDF - www.texis.com

inadmissible, and was offered to unfairly prejudice Mr. Colella with unproven suggestions that his wife had something to hide. Effective counsel would have recognized the evidence's inadmissibility, lodged a hearsay objection, and excluded it.

244.    The prosecution again intentionally solicited inadmissible hearsay to unfairly prejudice Mr. Colella in its redirect examination of Sherie Wilson. In response to the prosecutor's leading questions, Sherie Wilson testified that she had "heard" that the defendant's sister had checked on Red shortly after the crime because the defendant's sister "thought this defendant had done something to Red" because the defendant had a "big roll of money and thought that maybe he had robbed Red." S.F. Vol. XIII: 377-78. Counsel once again lodged three ineffectual objections (two on the basis of leading questions, the other with no legal basis stated). Thus, what Sherie Wilson "heard" from some unnamed source (likely a self-serving statement from Red) was admitted. Once again, the State did not put the defendant's sister on the witness stand. Sherie Wilson admitted that she had not seen any of this happen, and only heard about it. *Id.* at 377. However, this damaging hearsay, which (1) came from Sherie Wilson, an alcoholic who disliked the Colellas, and which (2) in all likelihood simply recycled a fabrication by Red Wilson, was admitted. Counsel's inability to recognize and exclude this clearly inadmissible hearsay fell below a minimal standard of competence.

245.    Further, the State solicited hearsay from Red Wilson that Brenda didn't want Mr. Colella to drink because he would beat her. *Id.* at 506. Once again, trial counsel did not object. *Id.*

246.    Later, Red testified, without objection, that Mr. Colella had a teardrop tattoo on his face, which signified that he had "been in prison." S.F. Vol. XIV: 530-31. The prosecutor intentionally solicited this remark. The prosecution first established that Mr. Colella had tattoos – the only component of Red's testimony which might have been relevant (for identification purposes). It then asked Red whether the defendant had a tattoo on his face (yes), where on his face (near the eye), of what (a teardrop) and what that meant (that he had been to prison). *Id.* These questions

constitute reversible prosecutorial misconduct, and should have been objected to on numerous grounds. First, the prosecution is leading. Second, the questions make it clear that the prosecution knows exactly how Red will respond to each question, thus confirming that the prosecution carefully and intentionally put this material before the jury in a conscious attempt to prejudice Mr. Colella. Third, Red's speculative "opinion" about what the tattoo meant had no relevance to Mr. Colella's guilt or innocence. Finally, the prejudice is manifest. Doubtless, the jury immediately began imagining what Mr. Colella had been to prison for. This prosecution tactic alone devastated Mr. Colella's right to a fair trial. The defense's entire failure to object fell far below the standard of competent representation.

247.    Red later testified that the defendant's brother, Steven Watts, came to "check up on him" the day after the crime because, according to Mr. Watts, "Paul had showed up with a bunch of money . . . and they were worried that maybe he had tooken [sic] the money from me and I might have been dead." S.F. Vol. XIV: 612. Again, defense counsel failed to object. Trial counsel later objected on hearsay grounds when the prosecution asked "what else did the defendant's brother tell you?" (id. at 612) but by then the damage had been done. Once again, the prosecution did not put Mr. Watts on the witness stand. The reason emerges later: Steven Watts was called by the defense and called Red's story a fabrication. S.F. Vol. XVII: 1192-94.

248.    The prosecution then offered *double* hearsay from Red Wilson in this same context:

Q.    From what Steve *told* you that this defendant *told* his family, was it
        the truth or not?

A.    No, it wasn't.

Q.    Did he [the defendant] make up a story?

A.    Yes, he did.

Q.    That had nothing to do with what even occurred?

A.    That is correct.

Q.     It had to do with *some drug transaction that went bad* according to
       him?

A.     Yes.

S.F. Vol. XIV: 613-14 (emphasis added).

249.    In fact, Steven Watts never made any such comments to Red. S.F. Vol. XVII: 1192-
94. Further, Red was reciting *double* hearsay about what Steve told him the defendant said.
Reasonably effective counsel would have lodged a prompt and timely hearsay objection, especially
considering that the prosecution's initial question clearly telegraphed that it was intended to elicit
double hearsay. For proof that this testimony is inadmissible hearsay, one need look no further than
Brenda's trial, in which her lawyer successfully kept out these statements by a timely hearsay
objection. (BBC) S.F. Vol. VII: 715-17. Trial counsel compounded the error on cross-examination
by permitting Red to restate and elaborate on these statements. S.F. Vol. XV: 780-81. No strategic
justification would permit the jury to hear false and inadmissible accusations that an accused had
dealt drugs and lied to his family.

250.    More hearsay is admitted on S.F. Vol. XV: 855-56, this time concerning statements
Paul and Brenda made about Sid Wilson, and a statement allegedly made by Brenda to the effect that
she had seen Paul and Red while she was in the truck with the three men. Once again, no objection.
A few pages later, Red described a conversation he said he had in jail with Paul, in which Red
alleges - in a narrative that continues for a full printed page without any questioning, and which
consists exclusively of single and double hearsay - that Paul told him Brenda once scared someone
in Indiana by saying that they should watch out because her husband had "already killed some guys
over here in Texas." *Id.* at 858-60.[31] Counsel permitted the accomplice witness to present the jury
with a lengthy hearsay narrative of the defendant's purported statements which contain a *double*

---

[31] The context of Red's statement makes it clear that another man threatened to fight Paul over Brenda, and that Brenda
made the statement to try to avoid a fight by intimidating the other man. Therefore, Brenda had a motive to make Paul

*hearsay* statement from Brenda declaring Mr. Colella's guilt of the crime!

251.     In examining Ricky Taylor, the pattern repeated.  For example, Mr. Taylor admitted that, although he was *riding in the truck with Brenda Colella*, he had no reason to believe that Brenda had seen the defendant and Red pass by in a vehicle while riding with her in the pickup, but testified "I've been told since" that she did.   S.F. Vol. XVI: 1024.   Once again, defense counsel failed to object to hearsay.   Later, trial counsel permitted the victim's brother to declare, based apparently on what he's *heard* about the crime, that he believes the defendant killed the victims:

> Q.     Do you know who shot your brother and Michael Lavesphere to death?
>
> A.     Is that a personal opinion, or what?
>
> Q.     No, your personal knowledge, from personal knowledge.
>
> A.     *I believe Paul Colella shot them.*
>
> Q.     But did you see the shooting?
>
> A.     No, I didn't see any shooting.

---

seem threatening.  *Id.*

131

S.F. Vol. XVI: 1037-38 (emphasis added).  Once again, the defense failed to object as the prosecutor intentionally elicited one of the most inflammatory kinds of inadmissible information: a witness' direct opinion on the defendant's guilt or innocence.  Given that this form of misconduct has been condemned as a due process violation by dozens of courts both inside and outside of Texas, no conceivable strategic  reason existed for failing to object to it.  *See, e.g.*, *Taylor v. State*, 774 S.W.2d 31, 34 (Tex. App.–Houston [14th Dist.] 1989,  pet. ref'd) ("No witness is competent to voice an opinion as to guilt or innocence." (citing *Boyde v. State*, 513 S.W.2d 588, 590 (Tex. Crim. App.1974))); *United States v. Espinosa*, 827 F.2d 604, 612 (9th Cir. 1987) ("A witness . . . may not give a direct opinion on the defendant's guilt or innocence."); *People v. Torres*, 39 Cal. Rptr. 2d 103, 108 (Ct. App. 1995) ("A consistent line of authority in California as well as other jurisdictions holds a witness cannot express an opinion concerning the guilt or innocence of the defendant."); *United States v. Masson*, 582 F.2d 961, 963 n.5 (5th Cir. 1978) ("[A] witness' expression as to the guilt of a particular defendant would be a legal conclusion, against which we have previously cautioned courts to 'remain vigilant.'" (quoting *United States v. Milton*, 555 F.2d 1198, 1203 (5th Cir. 1977)).[32]

---

[32] Trial counsel's apparent ignorance of Texas law forbidding improper and prejudicial testimony concerning a witness' credibility and/or the defendant's guilt is not limited to this case.  In the Elifonso Lopez case, discussed extensively *infra*, Mr. Limas failed to object when a criminal investigator, testifying for the prosecution in a child sex abuse case, declared that "what [the alleged child victim in that case] told her [about the crime had] *happened*."  *Lopez v. State*, 815 S.W.2d 846, 848 (Tex. App. – Corpus Christi 1991, no writ).  Testimony that a particular child witness is telling the truth improperly invades the province of the jury even when it comes from qualified experts in the behavior of children. *Schutze v. State*, 957 S.W.2d 52, 59 (Tex. Crim. App. 1997) ("Expert testimony does not assist the jury if it constitutes 'a direct opinion on the truthfulness' of a child complainant's allegations." (quoting *Yount v. State*, 872 S.W.2d 706, 708 (Tex. Crim. App. 1993))).  In *Lopez*, the error was all the more egregious, as the witness who improperly bolstered the child's credibility was not qualified as an expert of any kind, and was in fact described by the opinion merely as a

252.    To function effectively as "counsel" contemplated by the Sixth Amendment, defense counsel must familiarize himself with the legal rules that will foreseeably govern significant portions of the trial. *See, e.g., Burley v. Cabana*, 818 F.2d 414, 417 (5th Cir. 1987) (counsel ineffective for failure to adequately investigate sentencing law applicable to client); *Martinez- Macias v. Collins*, 810 F. Supp. 782, 787 (W.D. Tex. 1991) (counsel ineffective for making significant trial decisions based on mistaken understanding of admissibility of other-crimes evidence caused by inadequate preparation), *aff'd*, 979 F.2d 1067 (5th Cir. 1992); *Vela v. Estelle*, 708 F.2d 954, 964 (5th Cir. 1983) (counsel must follow "elementary . . . blackletter rules of procedure"), *cert. denied*, 464 U.S. 1053 (1984).   Failure to exclude prejudicial inadmissible hearsay testimony constitutes ineffective assistance of counsel. *Ramirez v. State*, 987 S.W.2d 938, 946 (Tex. App. – Austin 1999, no writ) ("Counsel's failure to object to . . . obvious hearsay, or even to request an instruction limiting the jury's consideration of the statement to impeachment, was an error so serious that he was not functioning as the 'counsel' guaranteed by the United States and Texas constitutions.").

253.    Counsel cannot complain of surprise, because *every single witness cited above also testified at the trial of Brenda Colella, and the prosecution there attempted to elicit virtually the same hearsay statements as it did in Mr. Colella's trial. See, e.g.,* (BBC) S.F. Vol. IV: 109-10 (hearsay objection sustained to Sgt. Martinez's testimony about Sid and Sherie Wilson's accounts of retrieval of bullet from Red's Bronco); (BBC) S.F. Vol. IV: 128-134, 157-58 (hearsay from Sgt. Martinez regarding Brenda's statements); (BBC) S.F. Vol. IV: 204 (hearsay from Sgt, Martinez concerning Ricky Taylor's description of Brenda's statements in cab of truck); (BBC) S.F. Vol. V: 381 (prosecution elicits Vikki Larsen's hearsay description of rumors concerning spousal abuse); (BBC) S.F. Vol. VI: 410 (hearsay from Jack Dunn's testimony concerning what he heard about

---

"criminal investigator." *Lopez*, 815 S.W.2d at 848.  As will be explained more fully *infra*, Mr. Lopez's conviction was later overturned on the basis of Mr. Limas' ineffectiveness.

spousal abuse); (BBC) S.F. Vol. VI: 505-06 (hearsay from Sherie Wilson concerning spousal abuse); (BBC) S.F. Vol. VII: 715-717 (counsel lodges successful hearsay objection to Red's double-hearsay testimony heard from Steven Watts); (BBC) S.F. Vol. VII: 723-24 (Red's hearsay about Brenda's alleged statements).

254.    Brenda Colella's trial counsel, on several occasions, excluded, on hearsay grounds, testimony virtually identical to that introduced in Mr. Colella's trial.  Applicant's counsel had a resource few lawyers enjoy – a virtual road map to the State's case and the testimony it would try to introduce.  Had he adequately reviewed the testimony of Brenda's trial, he would have known that the State intended to elicit obviously inadmissible prejudicial hearsay statements.  He could have prepared a motion in limine requiring the prosecutor to approach the bench before introducing any of these statements and, by doing so, kept many harmful insinuations from the jury.  As noted *infra* in Section VI.C.1.m, Mr. Limas did begin to argue a motion in limine, but focused it solely on evidence of spousal abuse, and eventually apparently abandoned even that effort for no discernible reason.

255.    Especially in criminal cases, hearsay is prohibited because it  cannot be tested by direct cross-examination: "'The theory of the Hearsay rule is that the many possible deficiencies, suppressions, sources of error and untrustworthiness, which lie underneath the bare untested assertion of a witness, may be best brought to light and exposed by the test of Cross-examination.'" *Bruton v. United States*, 391 U.S. 123, 136 n.12 (1968) (Brennan, J., concurring) (quoting 5 WIGMORE, EVIDENCE § 1362, at 3).  Under the Confrontation Clause, when the State seeks to admit hearsay against a criminal defendant, it must "either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant" and to show that the statement bears "'adequate indicia of reliability'." *Idaho v. Wright*, 497 U.S. 805, 814-15 (1990) (quoting *Ohio v. Roberts,* 448 U.S. 56, 66 (1980)).

256.    Here, the State neither produced, nor demonstrated the unavailability of, a single non-

134

accomplice witness who (1) *saw* the defendant with a large amount of money after the crime, (2) corroborated Red's account of the robbery, (3) *saw* the defendant commit spousal abuse, (4) directly heard the defendant lie to his family, or (5) heard his wife accuse him of committing the killings or took Brenda Colella's "statement" to this effect. In fact, other trial witnesses denied many of these assertions. *See, e.g.* S.F. Vol. XVII: 1192-94 (Steven Watts denied making statements to Red); S.F. Vol. VI: 506 (Vikki Larsen rejected suggestion that Mr. Colella beat his wife). Further, Red's story of the alleged "robbery" – the only such evidence before the jury – was suspect. Red's story of whose wallet was stolen was not confirmed by Ricky Taylor. *See infra* Section VI.C.1(m). However, because trial counsel did not lodge a timely objection or a limiting instruction, the jury was legally permitted to consider the evidence for all purposes. *Hefner v. State*, 735 S.W.2d 608, 619 (Tex. App. – Dallas 1987).

257.    None of these statements bears any independent "indicia of reliability." In fact, because virtually all of them emanated either directly or indirectly from Red Wilson, they all bore indicia of extreme *unreliability*. Red Wilson was an accomplice witness, convicted felon and admitted liar who was testifying to save his own life. Red's motive to shift culpability and invent incriminating facts and statements was clear:

> As we have consistently recognized, a codefendant's confession is presumptively unreliable as to the passages detailing the defendant's conduct or culpability because those passages may well be the product of the codefendant's desire to shift or spread blame, curry favor, avenge himself, or divert attention to another.

*Lee v. Illinois*, 476 U.S. 530, 545 (1986). Hearsay contained in the self-serving testimony of a codefendant, even when corroborated (which it was not here) "poses too serious a threat to the accuracy of the verdict to be countenanced by the Sixth Amendment." *Id.* Thus, in addition to being inadmissible hearsay and inadmissible and prejudicial on other grounds (such as the hearsay concerning extraneous offense), the hearsay violated Mr. Colella's Sixth Amendment Confrontation Clause rights.

135

258.   No conceivable strategic reason could support not objecting to this testimony or to not obtaining a motion in limine on these matters. *Lyon v. McCotter*, 770 F.2d 529, 533-34 (5th Cir. 1985), *cert. denied*, 474 U.S. 1013 (1986).

259.   Nor did counsel's cross-examination help.  First, many kinds of prejudicial hearsay evidence are likely to make such a significant impression on the jury that cross-examination simply cannot undo the damage.  *See, e.g., Bruton*, 391 U.S. at 132 (prejudice from a hearsay statement "cannot be dispelled if the [maker of the statement] does not take the stand"); *Dunn v. United States*, 307 F.2d 883, 886 (5th Cir. 1962) ("It is better to follow [evidentiary] rules than to try to undo what has been done.  Otherwise stated, one 'cannot unring a bell'; 'after the thrust of the saber it is difficult to say forget the wound'; and finally, 'if you throw a skunk into the jury box, you can't instruct the jury not to smell it'.").  Second, counsel's cross-examination often did not even address the statements, and when it did, was often artlessly framed, leading to the admission of even more hearsay.  *See, e.g.*, S.F. Vol. XV: 780-81.  Counsel's performance fell well below a minimal standard of competence, and significantly harmed his client.  The State's case, heavily dependent as it was on deeply suspect accomplice testimony, was weak.  As the Cameron County District Attorney's Office itself has said, "[a]s for Red, he was a convicted felon who was a liar to boot." App. II, Exh. 18 (State's Appellate Brief) at 15.  Had counsel performed effectively, the jury would never have heard any of these comments, which are obviously and inherently prejudicial.  Counsel's performance undermines confidence in the outcome of the trial.  *Strickland*, 668 U.S. at 694.

260.   Ricky Taylor's assertion that he had "personal knowledge" that Mr. Colella shot the victims was likewise extremely prejudicial.  Countless courts have noted that a witness (or prosecutor's) declaration that he knows the defendant to be guilty poses two direct threats to due process.  First, "such comments can convey the impression that evidence not presented to the jury . . . supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury." *United States v. Young*, 470 U.S. 1,

136

18 (1985). Second, if the declaration of guilt comes from a witness whose testimony is likely to be viewed favorably by the jury, the jury may give the declaration of guilt undeserved extra credence. *See id.* at 18-19 (declaration of defendant's guilt by prosecutor likely to sway jury because prosecutor's institutional credibility "may induce the jury to trust the Government's judgment rather than its own view of the evidence"); *Espinosa*, 827 F.2d at 613 (declaration of guilt by law enforcement officers especially prejudicial because of the "'aura of special reliability and trustworthiness'" they enjoy in the eyes of the jury) (quoting *United States v. Young*, 745 F.2d 733, 76 (2d Cir. 1984)).

261.    Both of these factors were present here. First, Ricky Taylor declared that he had "personal knowledge" that Mr. Colella was guilty. The jury certainly must have speculated what that additional "personal knowledge" was. It could not have been the evidence properly placed before them at trial: the rule was invoked before opening statements, and Ricky Taylor, as an important witness subpoenaed by the prosecution, was barred from the courtroom during the testimony of other witnesses. *See* S.F. Vol. XI: 11-12 (rule invoked). However, it is common knowledge that police officers, detectives, and district attorneys routinely brief the surviving members of murder victims' families about the progress of the investigation into their loved ones' deaths. Therefore, the jury was especially likely to have speculated about the "personal knowledge" Mr. Taylor possessed. Did he hear the defendant confess? Did he hear an eyewitness account of the killings that the jury was barred from hearing by the rules of evidence? Did he view physical evidence which had been excluded from trial by a "technicality"? None of these things could have been true, but Mr. Taylor's comments tempted the jury to speculate about such topics. Second, the jury could not help but sympathize with Mr. Taylor, the grieving, innocent relative. When he declared his personal belief that Mr. Colella was guilty, the jury knew then that any verdict that did not square with Mr. Taylor's opinion would be deeply disappointing to him, and might cause fresh grief and anguish to someone who had already suffered the loss of a close relative. Thus, this improper testimony, like

137

declarations of guilt by police officers or prosecutors, gave the jury a strong incentive to base the verdict on something other than the evidence.  Mr. Taylor's declaration of Mr. Colella's guilt therefore deprived Mr. Colella of the due process guaranteed by the Fourteenth Amendment to the United States Constitution and the Due Course of Law provision of the Texas Constitution.  Trial counsel's incomprehensible failure to object to this testimony constituted deficient performance. Any notion that trial counsel's behavior was part of a strategy to hold key points in reserve for his cross-examination of Mr. Taylor is belied by the record: Mr. Taylor's cross-examination was a meandering, pointless exercise which (1) permitted Mr. Taylor to reiterate his direct examination; and (2) impeached him only on trivial points.  *See infra.*  Thus, allowing Mr. Taylor to pronounce his belief in Mr. Colella's guilt was prejudicial, especially in light of trial counsel's many other errors and the overall weakness of the State's case against Mr. Colella.

### h.  Counsel failed to get a document admitted into evidence that was critical to Mr. Colella's alibi defense.

262.   During his examination of Judge Brian Hunsaker, who authored the Inquest Report (Vol. II, Exh. 17) establishing that the victims died at 6:00 a.m. on September 13th, trial counsel asked Judge Hunsaker a series of questions designed to secure the admission of the Inquest Report. S.F. Vol. XVII: 1171-74.  However, trial counsel failed to clearly lay the foundation for the report's admission as either a business record (TEX. R. EVID. 803(6)) or a public record or document (TEX. R. EVID. 803(8)(B)), both of which were possible.  Trial counsel attempted to introduce the report:

MR. LIMAS:   I will mark this Defendant's Exhibit No. 5 and I'd like to offer this, your Honor.

MRS. LOPEZ:   Your Honor, at this time I object to the introduction of State's [sic] Exhibit No. 5.  It's hearsay.  The judge has testified as to what his testimony is and that is the best evidence.

THE COURT:   Response.

MR. LIMAS:   Your Honor, the witness has identified this as a copy as being

138

accurate and I would like to admit it for purposes —

THE COURT:          Sustain the objection.

MRS. LOPEZ:        Thank you, Judge.

S.F. Vol. XVII: 1174.  Thus counsel failed to adequately lay the foundation for the document, even though the evidence showed that Judge Hunsaker created the document based on information collected at or near the time of the incident pursuant to a duty imposed by law.

263.    Trial counsel never requested another opportunity to lay the foundation for the document's admission, and did not contest the prosecutor's misstatement of the "best evidence" doctrine, which actually provides that *the document itself*, not testimony about it, is the "best evidence" of its contents.  *See Englund v. State*, 946 S.W.2d 64, 67 (Tex. Crim. App. 1997) ("best evidence rule" provides that "when a party seeks to prove the contents of a writing, the original writing is required except as otherwise provided by the rules or by law." (citing former TEX. R. CRIM. EVID. 1002)).  It is true that Judge Hunsaker described the contents of the document. However, this document was crucial to the Applicant's alibi defense, because it established that the victims were killed at a time when, according to a disinterested witness, Paul Colella was hundreds of miles away from them.  Had counsel properly laid the foundation for this document – a routine task performed daily by trial litigators – he could have presented an enlarged version of it to the jury during his closing argument.  Just as importantly, the jurors could have reviewed it while deliberating.  Indeed, there is a note from the jurors in the District Clerk's file in which the jurors ask to review testimony.  *See* App. VI, Exh. 65 (note from jury signed by foreman).

**i.      Counsel failed to adequately cross-examine the State's witnesses.**

264.    Trial counsel repeatedly failed to adequately cross-examine critical trial witnesses. At several times, it became clear that defense counsel had not carefully read the earlier testimony of key witnesses at Brenda Colella's trial, and had not carefully listened to the witnesses' earlier testimony during Mr. Colella's trial.  Trial counsel's flawed recall of testimony permitted witnesses

139

to testify inconsistently about important points and then to escape the devastating cross-examination which should have been forthcoming.

265.   Trial counsel's cross-examination of Ricky Taylor was meandering and purposeless. First, trial counsel examined Mr. Taylor at length concerning the hotel arrangements the three men had made, a topic with no perceptible relevance. S.F. Vol. XVI: 1047-51. Trial counsel then examined Mr. Taylor concerning the trio's repeated stops at a Circle K on the Island, and a "scuffle" there. *Id.* at 1051-53. Trial counsel then essentially walked Ricky Taylor through his direct testimony, allowing him to repeat it largely without challenge. *Id.* at 1053-63.[33] Trial counsel then asked questions concerning his brother's sleeping position, and about Red's reaction to seeing Mr. Taylor the day after the murders. *Id.* at 1065-66. Following this, trial counsel impeached Mr. Taylor on relatively inconsequential topics, including the timing of certain events during the night of the 12th, whether Brenda Colella was actively hitchhiking when the trio in the white pickup truck gave her a ride, and how far Mr. Taylor slept from the white pickup. *Id.* at 1066-76. For instance, trial counsel challenged Ricky Taylor concerning whether he placed his sleeping bag fifty or one hundred feet from the white pickup when the trio bedded down for the night. Considering that Ricky Taylor set up his sleeping bag in the dark of midnight on a deserted beach after a day of partying, the jury

---

[33] This large stretch of trial counsel's cross-examination of Mr. Taylor, like his cross-examination of most other State witnesses, simply led Mr. Taylor through his direct examination. Virtually every respected authority on trial techniques warns against this practice:

> *Don't repeat the direct examination!* This may be the most commonly violated maxim of good cross-examination. Many are the lawyers whose standard approach is to have the witness "tell it again," in the invariably groundless hope that the witness' testimony will somehow fall apart during the second telling. This approach almost invariably fails.

THOMAS A. MAUET, FUNDAMENTALS OF TRIAL TECHNIQUES 215 (1992); *see also People v. Lee*, 541 N.E.2d 747, 759 (Ill. Ct. App. 1989) ("If one of the basic rules [of cross-examination] is to do no harm, another is 'don't repeat the direct examination!'"). Another manual advises that the purpose of cross-examination is to "focus attention *away* from the witness's direct testimony and onto matters that you believe are helpful" and that "your goal on cross examination is not to retell the witness's story but to establish a small number of additional or discrediting points." STEVEN LUBET, MODERN TRIAL ADVOCACY: ANALYSIS AND PRACTICE 95, 97 (2nd ed. 1997) (emphasis added). This elementary misstep risks boring the jury by rehashing testimony they just heard, dilutes any points the cross-examiner does manage to make, and reinforces the damaging content of the witness's direct testimony.

140

certainly understood his inability to recall precisely how far from the truck he set up the bag.

266.   Counsel also failed to effectively cross-examine Sgt. Martinez.   First, trial counsel failed to adequately impeach Sgt. Martinez with his prior testimony from the Brenda Colella trial. As noted above in Section VI.A.1 (perjured testimony claim), Sgt. Martinez specifically testified during Brenda's trial that the victims had been killed between 3:00 and 5:00 a.m. on the morning of September 13, 1991.   In Mr. Colella's trial, he changed his estimate without explaining why, testifying instead that the victims were killed between 2:00 and 3:00 a.m.   This testimony related to perhaps the crucial issue at Mr. Colella's trial – the time of the victims' deaths.   Trial counsel forced Sgt. Martinez to read the preliminary portion of his testimony from Brenda's trial, which would have begun to signal to the jury the inconsistencies in his testimony.   However, when trial counsel attempted to impeach Sgt. Martinez with his specific time estimate, the trial court cut him off, even though there was no objection from the State.   As was the case virtually every time trial error occurred in this case, trial counsel failed to preserve it for appellate review.   He did not object, attempt to explain the importance of the excluded cross-examination to the trial judge, make an offer of proof, or request a mistrial.   Trial counsel simply gave up, and moved on.   Partly because of this failure, Sgt. Martinez was able to deceptively indicate to the jury that his testimony about the time of the victims' deaths in Brenda's trial was not inconsistent with that in Mr. Colella's trial.

267.   Also as noted above in Section VI.A.1(d), trial counsel's ineffective cross-examination allowed Sgt. Martinez to argue falsely that his conclusion that Red's tire tracks were present at the dump scene was merely a preliminary, initial hypothesis formed in the early days of the investigation, and then discarded.   The truth, which Sgt. Martinez successfully concealed from the jury, is that the fact that Red's tire tracks were present at the crime scene was an established fact of the State's case which had remained unchanged in the eight months following discovery of the bodies, and which *Sgt. Martinez attested to under oath in an open courtroom during a capital murder trial only two months before Mr. Colella was tried*.   Reasonably careful review of Sgt.

Martinez's testimony from Brenda's trial would have alerted a reasonably prepared lawyer to this fact, and would have permitted a devastating cross-examination of Sgt. Martinez which would have significantly undermined the credibility not only of Sgt. Martinez but of Red himself. Juror Juan Esparza recalls that he felt there was barely enough evidence against Mr. Colella, and that Mr. Limas' cross-examination of these witnesses was unclear and did not clearly highlight the inconsistencies in their testimony. Juror Esparza declares:

> I don't feel that Paul's lawyer ever made it real clear that the sheriff's investigator who testified at Paul's trial had said different things during Brenda's trial about the tire tracks and the time of death. If I had known these things, I would not have voted to convict Paul, because I thought the evidence that he was the shooter was so weak.

App. VI, Exh. 63 (Affidavit of Juror Juan Esparza), at ¶4.

268.    Counsel's cross-examination of Red Wilson was equally haphazard. First, trial counsel made the same mistake he had made in earlier cross-examinations: he merely retraced the steps of the direct. In fact, trial counsel elicited *forty-one consecutive* pages of testimony from Red minutely detailing the events of September 12, 1991. *See* S.F. Vol. XV: 697-738. This tactic allowed Red to deliver his account of Paul shooting the victims again, in minute detail. *Id*. at 733-78. Counsel apparently intended to trip Red up, but the points he made were generally trivial and confusing. *See, e.g. id*. at 731-32, 735 (defense counsel disputes Red's account of which way he was facing during certain events, and how Red knew that Mr. Colella had jumped back into his truck after the shooting). Whatever minor points counsel scored against Red certainly did not justify permitting the jury to hear an unnecessary narrative repetition of testimony that described the defendant shooting the victims.

269.    Counsel requested a transcript of Red's testimony from Brenda's trial, and there is some suggestion in the record that he had it available in court when cross-examining Red. *See* S.F. Vol. XV: 816. However, counsel does not appear to have carefully read the transcript. For instance, counsel did not confront Red Wilson with his previous incriminating admission that he had written

142

letters to Pam "Bubbles" Smith in which he admitted that he knew where the murder weapon was located. *See infra* Part II.B.19(d). Trial counsel did attempt to point out to the jury that Red Wilson was romantically interested in Brenda Colella, but his inaccurate recall of Red's testimony at Brenda's trial allowed Red to escape largely undamaged. At Brenda's trial, Red testified as follows:

> Q: Now Red, did you tell Miss Lopez that you at one time had wanted Brenda to leave Paul?
>
> A: Yes.
>
> * * *
>
> Q: Isn't it true that you liked Brenda so much you tried to convince her to leave Paul for you?
>
> A: That wasn't the reason.
>
> Q: What was the reason?
>
> A: That she was getting beat up , and *I did like her and I did want her*, but that wasn't the reason.
>
> Q: But that was part of the reason; you wanted her for yourself?
>
> A: In the beginning.

S.F. Vol. VII: 749-50.

> Q: I liked Brenda and I wanted to get together with her. . . . I made a statement that I would trade my truck for her, give Paul my truck for her.

(BBC) S.F. Vol. VIII: 824. This testimony was important to the jury's assessment of Red's credibility because it indicated that Red may have had precisely the same motive to kill the victims as Mr. Colella did–to avenge the violent victimization of the object of his affections. Trial counsel obviously felt the importance of making this point, as he did bring up the subject in cross-examination. However, his attempt fell flat:

Q:      You love Brenda, don't you?

A:      No.

Q:      You have never told anyone you loved Brenda?

A:      That I love her?  No.

* * *

Q:      Did you ever tell Brenda that you wanted to go away with her?  Did you ever tell her that?

A:      Your question, no.

Q:      You never told her?

A:      That I wanted to go away with her, no.

S.F. Vol. XV: 849.  Trial counsel should obviously have used the precise language Red had used earlier during his sworn testimony in Brenda's trial.  Had Red denied saying those things, trial counsel could have forced him to acknowledge his previous testimony.  Had Red admitted them, the point of the cross-examination would have been made: that Red had romantic feelings toward Brenda which could have given him an equal motive to avenge her.  As it stood, however, the jury heard only Red's denials of counsel's poorly-framed questions, and may well have been left confused as to whether Red had a romantic interest in Brenda.

        270.    On occasion, counsel's cross-examination affirmatively hurt the defense.  For instance, the prosecution offered the testimony of local sporting goods store owner Gordon Batsell, who tested the bullets recovered from the victims' bodies and declared that they were nine-millimeter bullets.  S.F. Vol. XIII: 422.  The prosecution was obviously aware that one of the weaknesses in its case was the fact that nine-millimeter revolvers – the kind of weapon that must have been used to kill the victims if the State's case was to hold together – are rare firearms.  Therefore, the prosecution insisted that Mr. Batsell repeatedly state that there were some such guns in circulation

144

in 1991, and that he had sold some in the past (albeit "very few"). *See* S.F. Vol. XIII: 421. At this point, the defense should have realized three things: (1) the State's witnesses had definitely stated that the gun stolen by Red or Paul from the boat on the 12th of September, 1991 was the gun used in the crime; (2) State's witness Batsell had identified the bullets fired into the victims as nine-millimeter rounds; and (3) nine-millimeter revolvers are rare. These three facts, taken together, created a serious gap in the State's case—one the State was obviously concerned about. The defense had a ready argument for reasonable doubt: that, because the vast majority of revolvers are *not* nine-millimeter and are in fact .357 or .38 revolvers, the State's case can only hold together under the assumption that the gun stolen at random from the boat in the marina happened, by sheer coincidence, to be a very rare handgun.

271.   The defense should have pointed out that if the bullets found in the victims were actually fired from a nine-millimeter semiautomatic (a much more likely proposition than the State's theory), then Red Wilson was lying about the very centerpiece of his testimony, and Paul Colella did not kill the victims. Similarly, if the weapon stolen from the boats was a .357 or .38 revolver (once again, a much more likely proposition than the State's theory), then Red Wilson was lying about the centerpiece of his testimony, and Paul Colella did not kill the victims. By far the most powerful and convincing strategy for the defense would be to *highlight* the identification of the bullets as nine-millimeter, and to highlight the rarity of nine-millimeter revolvers. And indeed, trial counsel seems to have adopted this strategy during certain parts of his cross-examination of Gordon Batsell. *See* S.F. Vol. XIII: 426 (witness testifies under cross that "it is very unusual to find a revolver that shoots a nine-millimeter cartridge). However, at other points of his cross-examination of Mr. Batsell, counsel actually undermines his position by calling into question Mr. Batsell's identification of the spent round as a nine-millimeter round:

Q.   . . . You are not saying that [the bullet recovered from the victims] is a nine-millimeter], are you?

A.   We have no way without further testing to tell one hundred percent

145

that it's a nine-millimeter.

Q.   So then it is possible then that it could be a .38, a .357 -- a .380 would be too small, would it not?

A.   A .380 and a nine-millimeter are the same diameter.

Q.   Okay, sir.  So then basically it's *very difficult to say that is a nine-millimeter or that is a .357, that is a .380 or .38?  It's difficult without that further test as you say?*

A.   *Without any further testing, no.*

Q.   *And you didn't do any further testing, did you?*

A.   *No.*

S.F. Vol. XIII: 424.  Later, defense counsel again suggests that "it's very difficult to tell what that bullet really is."  *Id.* at 428.  Counsel appears not to have realized that by pursuing this line of questioning, he was actually undermining his own case.  Given the factual background known at the time of trial, any reasonably competent defense counsel would have recognized that the State's expert's assertion that the bullets were nine-millimeter was actually helpful to the defense, and that undermining or attacking that assessment would have been totally counterproductive.  Yet, that is precisely what counsel did.  Counsel's questioning indicates that he had not done the necessary research and investigation to accurately assess the strengths and weaknesses of the State's ballistics evidence, and his failure to adequately prepare led him to cross-examine Mr. Batsell in a way that was affirmatively harmful to his client.  Counsel also failed by not requesting that the court appoint his own ballistics expert to consult with him about this testimony, and to perform any further testing necessary.

272.    Counsel's inadequate cross-examination of the State's witnesses harmed the defense in many ways.  In the hands of a skilled and meticulously prepared attorney, the credibility of Sgt. Martinez and Red Wilson could have been much more devastatingly attacked than it was.  First, counsel  violated one of the most basic principles of trial advocacy by permitting the witnesses to

rehash their direct testimony on cross-examination. Counsel's attempts at impeachment were also often ineffective. Instead of being forced to admit gross inconsistencies on the witness stand, the State's witnesses were often able to obfuscate their testimony and to pretend that their differing accounts were actually consistent. Finally, counsel elicited some information on cross-examination – such as Red's additional account of Mr. Colella shooting the victims, Mr. Batsell's testimony undermining confidence in his estimate of the bullet caliber, and additional harmful hearsay from Ricky Taylor, *see supra* Section VI.C.1(e) – which affirmatively harmed the defense. Eliciting damaging evidence during cross-examination constitutes deficient performance. *Moore v. Johnson*, 194 F.3d 586, 611 (5th Cir. 1999). Counsel's errors during cross-examination, taken as a whole, left the jury with an inaccurate picture of the credibility of crucial State witnesses. These errors constituted deficient performance in violation of the Sixth Amendment to the United States Constitution. Especially in light of the weakness of the State's case, *see infra* Section VI.C.1(o), confidence in the outcome is undermined by counsel's errors, and Mr. Colella's conviction must be reversed. *See Strickland*, 466 U.S. at 694.

### j. Counsel failed to prevent the improper impeachment of Mr. Colella by the prosecution.

273. Paul Colella testified at the guilt phase. His testimony is far longer than that of any other defense witness, and is crucial in that it provides Mr. Colella's own account of the events. *See supra* (summarizing Mr. Colella's testimony). Prosecutor Migdalia Lopez cross-examined Mr. Colella for approximately 80 pages of the record. *See* S.F. Vol. XVIII: 1403-87. Once again, a familiar pattern emerges: Ms. Lopez repeatedly and intentionally subjects Mr. Colella to various different kinds of improper cross-examination, but the defense does virtually nothing to stop the prosecutor's unethical tactics. The result was a cross-examination that struck many foul blows, tarnishing Mr. Colella's reputation not by legitimate adversarial examination but by innuendo, hearsay, and insinuation.

274. First, the prosecutor repeatedly induced Mr. Colella to deliver a legal conclusion as

147

to whether he was entitled to a "voluntary manslaughter" defense. After half a page of Ms. Lopez badgering Mr. Colella to "give up" his manslaughter defense ("you're not claiming . . . voluntary manslaughter at all, are you?"), trial counsel belatedly steps in and successfully objects to this tactic because the question asked for a legal conclusion. *Id.* at 1449-50. However, trial counsel does not pursue the objection any further: he does not ask for a mistrial, or for an instruction for the jury to disregard the testimony, or to remind the jury that they are the ultimate judges of whether Mr. Colella was guilty of a lesser-included offense. Not only did Mr. Limas not stop this line of questioning until it was too late, he also failed to preserve this error for review. *See Cockrell v. State*, 933 S.W.2d 73, 88-89 (Tex. Crim. App. 1996) (to preserve error for review, counsel must pursue objection to adverse ruling). The jury could well have concluded that they were under no obligation to consider the voluntary-manslaughter defense because Mr. Colella had (improperly) been forced to disclaim it on the witness stand. There can be no doubt that the prosecutor knew that posing questions which require legal conclusions to lay witnesses was improper, because she herself successfully objected on such a basis earlier in the trial. S.F. Vol. XII: 238 (prosecution successfully objects when defense asks Sgt. Martinez what he knows about "lesser included offenses" because the witness is "not an attorney" and cannot be asked to "speculate on the law").

275.    Even more egregious were the prosecutor's repeated insinuation of facts outside the record. It is unethical for an advocate to frame a cross-examination question to imply the existence of facts outside the evidence. *See* Model Rules of Professional Conduct Rule 3.4(e) (counsel may not "allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence"); *see also* BENNETT L. GERSHMAN, PROSECUTORIAL MISCONDUCT § 9.4(a) (release #13, 1998) ("Courts have consistently condemned prosecutors' attempts to create an impression on the jury by innuendos in questions when no supporting evidence exists."). The prosecutor's improper questioning was so persistent that she was repeatedly admonished by the Court to "lay predicates" before injecting harmful information and to avoid "fishing expeditions,

148

unless you can lay the predicate under the rules." *Id.* at 1456-57, 1459, 1464-65.

276.    Nevertheless, the prosecution constantly used innuendo.  For instance, during her cross-examination, Ms. Lopez insinuated that Brenda Colella had been declared an "unfit" mother and had essentially abandoned her four-year old child, (*id.* at 1451), that Mr. Colella continued to "hit" and "beat" his wife when they relocated to Indiana (*id.* at 1453); that "somebody came and said that you had beaten her up before . . . and they were afraid you had *killed* Brenda?" (*id.* at 1454, emphasis added, defense counsel objects on same page but fails to pursue to a ruling); again insinuating that Mr. Colella "hit [his] wife" (*id.* at 1462, twice on one page); that Mr. Colella had told Sgt. Martinez and Abel Perez, when they arrested the Colellas in Indiana, that "Brenda and Red had stayed in the pickup when the killing had occurred." *Id.* at 1466.

277.    The prosecutor never offered any evidence to support her assertions that Brenda had been declared an unfit mother.  These questions (along with other questions concerning Brenda's flirting habits, *see id.* at 1431-32) besmirched Brenda's character by portraying her as an irresponsible parent and a woman of loose morals.  Even if they had been supported by admissible evidence, they were irrelevant, as (1) Brenda never testified and her credibility was thus not in question; and (2) the topics addressed are not relevant to credibility.

278.    The prosecution's misuse of Mr. Colella's alleged wife-beating has been addressed above.  As addressed below in Section VI.C.2(j), the prosecution never once offered any admissible evidence that Mr. Colella had physically abused his wife, much less a conviction for such conduct.  Its "proof" consisted of *nothing but dubious hearsay and rumors*.  Nevertheless, the defense, after failing to pursue its motion in limine on these matters and inexplicably permitting the rumors to be repeatedly mentioned in front of the jury, did not intervene while the prosecution repeatedly badgered Mr. Colella with these baseless allegations.  The prosecutor incalculably compounded the prejudice by injecting an inflammatory *anonymous* hearsay allegation that "somebody" thought Mr. Colella had killed his wife.  The prosecution never supported this accusation with any evidence –

no police report, no 911 transcript, no eyewitness testimony, nothing. To this day, no one knows who (if anyone) said this. Nevertheless, the jury heard it, and the defense failed to object.

279.    Once again, this allegation is irrelevant to Mr. Colella's credibility. Even if Mr. Colella had been convicted of spousal abuse (and, of course, no such conviction exists, and the prosecution never offered proof that would have even approximated the beyond-a-reasonable-doubt standard), such an extraneous offense would not have been appropriate impeachment evidence, because it does not involve moral turpitude and harbors the potential for devastating prejudice to the accused. *See, e.g.*, *Pierre v. State*, 2 S.W.3d 439, 443-44 (Tex. App. – Houston [1ˢᵗ Dist.] 1999) (trial court abused discretion in permitting impeachment of testifying defendant based on prior convictions for assaulting women).

280.    Because cross-examination allows lawyers to "testify" to the propositions contained in their questions, basing cross-examination questions on "baseless or knowingly false" points poses an especial danger to the adversarial process: "The witness, of course, can deny any untrue assertions, but the denials are likely to ring hollow in the face of an attorney's presumably superior persuasive skills. *Enormous damage can be done by false or groundless accusations*." Lubet, Modern Trial Advocacy, *supra*, at 147 (emphasis added). This is especially true of the prosecutor's fabricated assertion that *Mr. Colella* had told the police that "Brenda and Red had stayed in the pickup" when the victims were shot. No witness ever offered any testimony showing that Mr. Colella had made this alleged prior inconsistent statement. The prosecutor appears to have invented this statement, which attacks the heart of the defense's case by insinuating that Mr. Colella, out of his own mouth, had earlier contradicted the story he had just told the jury.

281.    On the very next page, the prosecutor questions Mr. Colella concerning statements allegedly made by Brenda to Sgt. Martinez and Abel Perez. The defense, caught unaware, hastily invoked Mr. Colella's "Fifth Amendment right of not [sic] to incriminate themselves." *Id.* at 1467.

The prosecution's unfair surprise[34] (coupled with the defense's lack of preparation) forced trial counsel to invoke Mr. Colella's "right not to incriminate" himself before the jury. This colloquy could only have telegraphed to the jury that they were being shielded from incriminating testimony. The Supreme Court has observed the extreme prejudicial impact of similar tactics which improperly force a defendant to discuss a claimed privilege in front of the jury:

> Too many, even those who should better be advised, view this privilege as a shelter for wrongdoers. They too readily assume that those who invoke it are either guilty of crime or commit perjury in claiming the privilege. . . .   [Bringing a claim of privilege to the attention of the jury] has grave constitutional overtones . . . [and] the danger that the jury made impermissible use of the testimony by implicitly equating the plea of the Fifth Amendment with guilt is, in light of contemporary history, far from negligible.

*Grunewald v. United States*, 353 U.S. 391, 421, 423, 424 (1957) (quotations omitted) (unanimously reversing defendant's conviction when prosecution revealed to jury that he had claimed Fifth Amendment privilege before grand jury); *see also Nezowy v. United States*, 723 F.2d 1120, 1124-25 (3rd Cir. 1983); *United States v. Williams*, 464 F.2d 927, 930 (8th Cir. 1972); *United States v. Glasser*, 443 F.2d 994, 1005 (2d Cir. 1971) (all pointing to grave risk of prejudice stemming from improper reference to Fifth Amendment rights). As the Supreme Court observed in language especially applicable to this case, "[t]he privilege serves to protect the innocent who otherwise might be ensnared by ambiguous circumstances." *Grunewald*, 353 U.S. at 421 (quotation omitted). The Supreme Court reversed Grunewald's conviction even though his jury received an instruction ordering them not to consider the Fifth Amendment invocation as evidence of Grunewald's guilt or innocence. *Id.* at 417 n.28. Mr. Colella's jury received no such instruction.

282.    In addition to being unfair and calculated to prejudice Mr. Colella by delivering inadmissible information to the jury, the prosecution's comments constituted impermissible

---

[34] As trial counsel pointed out, the prosecution raised this issue despite the defense's previous request for discovery of all "oral statements" of the defendants which the prosecutor intended to use. *Id.*

testimony. No independent evidence supported Ms. Lopez's insinuation that certain unspecified people were concerned that Mr. Colella had murdered his wife, or that Brenda had been declared an unfit mother. These questions were testimony by Migdalia Lopez to unsubstantiated hearsay allegations. A prosecutor may neither testify against the defendant in a criminal case either directly, by taking the stand, or indirectly, by inserting extra-record facts or accusations into her questions. *See, e.g., United States v. Johnston*, 690 F.2d 638 (7th Cir. 1982); *People v. Blue*, 724 N.E.2d 920, 939-40 (Ill. 2000) (reversing defendant's conviction in part because of prosecutor's impermissible testifying objections during examination of hostile state witness).

283.    Courts have repeatedly observed the unique opportunity for prejudice stemming from prosecutors injecting their own testimony into a defendant's trial. The *Blue* court observed that the witness-advocate rule must be enforced with special care against prosecutors because:

> (1) as an advocate for the government, the prosecutor's objectivity as a witness could never be assured; (2) the prosecutor's credibility is automatically (and unfairly) enhanced by the prestige and authority of the prosecutor's office; (3) the dual role of witness and advocate assumed by a prosecutor might confuse the jury; and (4) the rule reinforces the adage that the appearance of propriety is as vital to the operation of our system as actual propriety.

*Blue*, 724 N.E.2d at 240 (citing *Johnson*, 690 F.2d at 642-43). The jury was apprised of several pieces of completely speculative and extremely inflammatory information by the Ms. Lopez's inappropriate testimony. As the *Blue* and *Johnson* courts observe, this practice permitted the information to reach them from a source clothed with institutional authority and legitimacy, and they may have been especially likely to believe it.

284.    Ms. Lopez's conduct constituted prosecutorial misconduct of a kind that has long been recognized to violate the Due Process clause of the United States Constitution. *See Donelley v. Dechristoforo*, 416 U.S. 637 (1974) (holding that severe, sustained in-court prosecutorial misconduct which deprives the defendant of a fair trial violates the Due Process Clause of the United States Constitution). There is no question that the prosecution's conduct deprived Mr. Colella of a

fair trial. By obviously improper questioning, the prosecution linked Mr. Colella to unproven and irrelevant extraneous offenses, inserted prejudicial anonymous hearsay accusations of misconduct and bad character against Mr. Colella, accused him of damaging prior inconsistent statements without any supporting proof, and forced him to appear to invoke his Fifth Amendment privilege on the witness stand.

### k. Counsel failed to object to testimony concerning irrelevant, inflammatory alleged extraneous offenses.

285.    The prosecution alleged that Mr. Colella assaulted his wife Brenda, pulling her hair out and inflicting bruises and black eyes. No admissible testimony was offered to prove these allegations. The only testimony was hearsay, sometimes double hearsay. *See, e.g.*, S.F. Vol. XIII: 333-34 (Albin 'Jack' Dunn states that he once saw Brenda Colella with a black eye that he "believes" was inflicted by the defendant, but that he has never seen the defendant hit the victim); *id.* at 416, 419 (Sid Wilson declares that Brenda "said" Paul beat her, "[Brenda] *said* Paul [pulled her hair out once]. She *told* me and my wife that Paul did." (emphasis added)); *id.* at 506 (Red Wilson says Brenda "said" Paul would "beat her up," but admits "I have never been an eyewitness to none of it"). Trial counsel never objected to this evidence.

286.    The prosecution tried to elicit the same damaging hearsay from Vikki Larsen, but she refused:

Q.    Now, the defendant used to hit her, didn't he?

A.    I don't know.

Q.    Didn't she tell you that he used to hit her?

A.    *No, she did not.*

Q.    You never saw her with bruises before that time?

A.    *Not that I recollect. I've heard rumors, but that was all.*

153

Q.    And the rumor was that he did beat her?

A.    *Yeah, but I don't believe rumors on the beach.*

* * *

Q.    Did you know that [Brenda] had left the party because she was upset with this defendant because he had been drinking and that he beats her after she drinks?

A.    I don't know what the fight was about.  I just know that they were arguing and that she left.

Q.    And that she didn't want to be with him because when he drinks he beats her up, right?

A.    I don't know.

Q.    She didn't tell you that part?

A.    No.

Q.    Okay.

A.    *I had never seen him lay a hand on her.*

S.F. Vol. XVI: 988-90 (emphasis added).

287.    Not only is this testimony inadmissible hearsay, it also improperly attempted to besmirch Mr. Colella's reputation before the jury.  It was re-emphasized in the prosecution's closing–*without so much as an attempt to tie it to a relevant trial issue*:

> [The defendant]'s an alcoholic.  He is telling you he's gone to AA.  He drinks a lot and he wants you to believe that he never beat her when everybody else on the Island knew that he beat her, but he wants you to believe that he didn't do that at all.  That's what he wants you to believe.

S.F. Vol. XIX: 1556.

288.    Competent trial counsel would have objected to this testimony.  Trial counsel, on August 4, 1992, filed a motion in limine to exclude hearsay allegations of spousal abuse.  Tr. Vol.

154

I at 73-74. The proposed Order granting the motion is blank. *Id.* at 76. In a pretrial hearing held on August 17, 1992, trial counsel, in an apparent reference to this motion, stated: "The only thing that might be coming up would be a motion in lemine [sic] during the trial as the evidence goes, your Honor. That's the only thing that — " S.F. Vol. IV: 3. That is the sole discussion of the issue that appears in the record.[35] As the record stands now, trial counsel never followed up on his initial motion, and never requested a determination of the admissibility of the inadmissible hearsay spousal-abuse "evidence."

289.    Had defense counsel followed up on his stated intent to object to this testimony, he would have succeeded, because the evidence was irrelevant and prejudicial. The prosecution repeatedly insinuated weakly, again *solely through hearsay*, that Brenda Colella fabricated the allegation of rape when she noticed that Paul Colella had seen her riding in the pickup with the three men. *See, e.g.*, S.F. Vol. XVI: 1024, 1059 (Ricky Taylor says he's been "told since" that Brenda noticed the defendant, who was driving the opposite direction with Red, noticed her in the cab of the pickup with the three men, but later affirms that he doesn't remember ever having passed a vehicle while driving); S.F. Vol. XVI:989 (Vikki Larsen asked "Did Brenda also happen to mention that she saw Paul and Red heading in the opposite direction [while in the cab of the white pickup with the

---

[35] As demonstrated below, trial counsel failed to order the transcription of any pretrial hearings. *See infra* Section VI.C.3 (ineffectiveness of appellate counsel claim). Although some transcripts of pretrial proceedings were included in the record provided to the Applicant by the Cameron County District Clerk's Office, others were not, including the crucial pretrial change of venue hearing and, apparently, at least one other volume of pretrial motions. The undersigned counsel requested transcripts of these proceedings from the court reporter. On or about April 13, 1999, they received a copy of a transcript of a hearing held on June 26, 1992, which addressed defendant's (1) motion for continuance; (2) motion for discovery and inspection; (3) motion for excluding material; and (4) motion for change of venue. Thus, if there was an adjudication of the Motion in Limine concerning the spousal abuse hearsay, it is not present in the record as it stands now, and is not present solely due to the ineffectiveness of appellate counsel.

155

three men]?" to which Larsen answered "No."). The prosecution's theory was apparently that the alleged spousal abuse was relevant because it provided Brenda with a motive to invent the rape allegation to defuse Paul's anger at seeing her riding with three strange men.

290.    Whether Brenda Colella invented the rape allegation, however, was irrelevant. First, the defense at the guilt phase was alibi, a defense to which Petitioner's mental state was irrelevant. As to voluntary manslaughter, defendant need only have pointed to "some conduct by the deceased amounting to legally sufficient provocation under Penal Code Section 19.04(c)." *Guerra v. State*, 936 S.W.2d 46, 48 (Tex. App.–San Antonio 1996, pet ref'd). It is *irrelevant* whether that evidence is weak, impeached, or contradicted. *See, e.g., Woodfox v. State*, 742 S.W.2d 408, 409 (Tex. Crim. App. 1987) (holding that "the weight of evidence in support of a [defensive] instruction is *immaterial*") (emphasis added); *Sanders v. State*, 707 S.W.2d 78, 80 (Tex. Crim. App. 1986) (defensive instruction for which there is "some evidence" must be given "whether [the evidence supporting it] is strong, feeble, unimpeached, or contradicted, and even if the trial court is of the opinion the testimony is not entitled to belief"). Learning of the rape of a close family member is clearly legally sufficient provocation. *Flannery v. State*, 676 S.W.2d 369, 370 (Tex. Crim. App. 1984) (defendant convicted of voluntary manslaughter rather than murder when evidence is "uncontroverted" that his daughter had just told defendant that the victim had raped her). "Thus the proposition at issue was his state of mind after hearing of the rape *not the nature of or occurrence of the rape*.") (emphasis in original and citing *Jones v. State*, 51 Tex. Crier 472, 101 S.W. 993, 995 (1907)).

291.    The rape allegation might have been relevant if it were so clearly, utterly implausible that no reasonable person could have believed it. In that case, a jury could reasonably disbelieve the basis for the defendant's state-of-mind defense. However, this is not such a case. Brenda arrived at Jack Dunn's trailer hysterical, with her clothing torn and scratches and bruises on her body, and told everyone who saw her that night that she had been raped. Several people besides Mr. Colella

were convinced that Brenda had been raped. S.F. Vol. XVI: 1001 (Vikki Larsen); S.F. Vol. XIII: 342 (Jack Dunn believes Brenda was raped, she could not have been putting on a show). Thus, the only relevant question is whether the defendant, Mr. Colella, *actually believed* her. As to this point, the evidence is uncontroverted: Mr. Colella certainly believed his wife. *See, e.g.*, S.F. Vol. XVI: 1001 (Vikki Larsen declares that Paul believed Brenda had been raped). Even the State admits that this is so. *See* App. II, Exh. 19 (State's Substitute Appellate Brief) at 15 (State declares that Brenda's allegation was the sole cause of Mr. Colella's action in killing the victims).

292.    Linda Ann Jordan, a juror at Mr. Colella's 1992 capital murder trial, has amply illustrated the prejudice stemming from the admission of this irrelevant testimony. Juror Jordan recalls that the jurors dismissed Red's credibility, and "looked more to other evidence" to try to determine whether Mr. Colella was guilty or not. App. VI, Exh. 64 (Affidavit of Linda Ann Jordan) at ¶3. She declares that "the testimony about Paul's violent behavior towards Brenda was important in our decision about guilt, because it made it seem more likely that he was a hotheaded type of person who could have killed the guys because they messed with his woman." *Id*. at 3. Because the evidence about Brenda's fabricating the rape was deeply prejudicial and irrelevant, no reasonably competent defense attorney would have permitted its introduction.

### I.    Trial counsel's presentation of Mr. Colella's alibi defense was "superficial and inadequate."

293.    Mary Curtis, Mr. Colella's mother, attended every day of Brenda Colella's trial, and took notes. App. III, Exh. 39 (Curtis Aff.) at ¶27. Abel Limas only appeared briefly at Brenda's trial, for periods of 15 minutes or less. *Id*. Ms. Curtis was not aware of any representative from Limas's office sitting through the entire trial. *Id*. ("If there was another person from Mr. Limas' office at the trial, I was not aware of that.").

294.    At Brenda Colella's trial, Mrs. Curtis heard Sergeant Luis Martinez testify that (1) the two victims died at about 5:00 a.m. and (2) they could not have died before 3:00 a.m. due to rigor mortis. Mrs. Curtis informed Mr. Colella's trial counsel that approximately 1:00 to 5:30 a.m. on

CutePDF - www.fastio.com

September 13th she was helping to drive her son Paul from South Padre Island to the Victoria, Texas bus station and thus that her son had an alibi for that time. App. III, Exh. 39 (Curtis Aff.) at ¶29.

She asked trial counsel to contact the personnel at the bus station in Victoria, advising trial counsel that they would be able to corroborate that Paul and Brenda had arrived in Victoria before the bus station had opened at 6:00 a.m. on September 13, 1991. *Id.* Trial counsel advised Mrs. Curtis that he would "look into" the possibility of corroborating the alibi with witnesses at the bus station, but appears never to have done so. *Id.*

295.    Mrs. Curtis, finally becoming aware that *trial counsel was not going to pursue this vital line of inquiry*, went to the bus station. *Id.* at ¶30. Mrs. Curtis located Amy Pflaum, who indeed confirmed that Paul and Brenda Colella were at the Victoria bus station at 6:00 a.m. on or about Friday, September 13, 1991 – nearly the same time the victims were killed, according to (1) their official Cameron County death certificates; (2) the testimony of Luis Martinez at Brenda Colella's trial; and (3) the report of Municipal Court Judge Brian Hunsaker. *See* S.F. Vol. XVII: 1204-15; *supra* Section VI.A1.b (discussing time-of-death evidence more fully). Victoria, Texas is 232 miles from South Padre Island, Texas. S.F. Vol. XVII: 1210. Ms. Pflaum independently confirmed Mrs. Curtis' account, noting that she had been contacted by Mrs. Curtis approximately two weeks before her testimony, near the beginning of the trial.

296.    Trial counsel conceded that the alibi, which related to the time of death of the victims, was a crucial issue:

> Q.    Mr. Limas, you agree that the time of the events were a crucial issue at trial, correct?
>
> A.    That was the main issue, yes, on the alibi.
>
> Q.    An alibi was the main issue?
>
> A.    Yes.

App. I, Exh. 9 (Evidentiary Hearing) at 26. Nevertheless, trial counsel never pursued an obvious

investigative lead presented to him long before trial. The task of investigating supporting evidence for the alibi fell to *the client's mother* – who lacked any legal or investigative training.

297.    Trial counsel also failed to obtain the death certificates of the two victims, which also confirmed that the State's official position was that the victims had died at 6:00 a.m. on September 13, 1991. *See* App. II, Exh. 38 (Death Certificates) at 1-2. Finally, Mr. Limas failed to proffer the testimony of Mary Curtis and Lester Curtis, who drove Mr. Colella to the bus station in Victoria, Texas and who helped to pay his bus fare. S.F. Vol. XVIII: 1384-85. Mrs. Curtis and Lester Curtis figured prominently in Mr. Colella's account, *see id.*, and the jury no doubt wondered why their testimony was not presented. Both of them were willing to testify. App. III, Exh. 39 (Curtis Aff.) at ¶¶ 29, 33. Their testimony would have corroborated Mr. Colella's account and refuted the shadowy evidence of a purported robbery by confirming that Paul and Brenda lacked money for a bus ticket.

### m.   Trial counsel failed to object to improper, inflammatory and misleading elements of the prosecution's guilt-phase closing argument.

A prosecutor's argument is likely to have significant persuasive force with the jury. Accordingly, the scope of the argument must be consistent with the evidence and marked by the fairness that should characterize all of the prosecutor's conduct. Prosecutorial conduct in argument is a matter of special concern because of the possibility that the jury will give special weight to the prosecutor's arguments, not only because of the prestige associated with the prosecutor's office, but also because of the fact-finding facilities presumably available to the office.[36]

ABA PROSECUTION FUNCTION STANDARD 3-5.8 (commentary).

298.    The prosecution's closing argument contained improper attacks on counsel, improper references to the victims and their families, and misleading characterizations of the evidence. On virtually every page, the prosecutor obviously oversteps the bounds of permissible advocacy and delivers arguments that have been denounced time and again by courts as inimical to a defendant's

---

[36] ABA PROSECUTION FUNCTION STANDARD 3-5.8 (commentary).

right to a fair trial. The cumulative prejudicial impact was overwhelming. However, trial counsel failed to object to a *single one* of these arguments.

299.    Trial counsel's previous ineffective performance had allowed the prosecutor to exploit two themes. First, trial counsel's unexplained switch in tactics allowed the prosecutor to argue that the defense was "defense-shopping." In fact, this scornful attack on Applicant's "new-found" alibi defense was one of the *main prosecution themes* at closing argument: it was referred to at least three separate times. S.F. Vol. XIX: 1546, 1554, 1555. Second, trial counsel's inexplicable failure to object to repeated inadmissible hearsay allowed the evidence to be introduced without limitation, thus allowing the prosecution to repeatedly refer to the rumors, and hearsay statements that constituted such a prominent part of its case. *See supra* Section VI.C.1(e) (describing counsel's failure to object to hearsay, bolstering, and inadmissible extraneous offense evidence). This hearsay "evidence" constituted the primary basis for the prosecution's consistent closing theme that the defendant was a "user" who lied to and manipulated his own family and now wanted to "use" the criminal justice system to get off. S.F. Vol. XIX: 1549-50, 1559. It also permitted the prosecutor to argue, in its guilt-phase closing, minutes before the jury began deliberations, that "everybody else on the Island knew that [the defendant] beat" his wife, although the prosecution had never introduced admissible testimony to this effect. *Id.* at 1556. Counsel's previous ineffectiveness thus had lingering prejudicial effects that went beyond the original scope of the error.

300.    Indeed, trial counsel's failure to object to the prosecution's reference to wife-beating allegations during its closing argument was an independent instance of ineffective assistance of counsel. Even assuming evidence of an extraneous offense is properly admitted at trial (and it was not in this case), the prosecution may refer to that evidence during closing only in reference to the specific purpose for which the evidence was introduced. Mentioning the extraneous offense outside of that context amounts to "encourag[ing] the jury to try, convict, or punish a defendant additionally for collateral crimes that have become apparent through introduction of the facts and circumstances

immediately surrounding the offense charged." *Clarke v. State*, 785 S.W.2d 860, 874 (Tex. App. – Fort Worth 1990), *aff'd*, 811 S.W.2d 99 (Tex. Crim. App. 1991) (citing *Lomas v. State*, 707 S.W.2d 566, 569 (Tex. Crim. App. 1986)). Such argument is "serious and prejudicial error" and generally requires reversal. *Lomas*, 707 S.W.2d at 569 (quoting *Brown v. State*, 530 S.W.2d 118, 120 (Tex. Crim. App. 1975)).

301. Here, the prosecution's reference to Mr. Colella's wife-beating was an inappropriate attempt to comment on Mr. Colella's credibility. The prosecution urged the jury to disbelieve Mr. Colella's denial of the charge that he beat his wife (a subject which should never have been broached but for counsel's inexplicable failure to object) not because others had seen him do so, or because he had ever been convicted of (or even arrested for) such conduct, but rather merely because there were inadmissible rumors and gossip to that effect. The prosecution could have had no other reason to mention this evidence than to draw the jury's attention to the spousal abuse rumors directly before they retired to consider his guilt. This line argument violated Mr. Colella's right to Due Process of Law guaranteed by the Fourteenth Amendment to the United States Constitution and constituted reversible error under *Lomas* and *Brown*. Indeed, the error is even clearer here than in those cases, because there the argument occurred during the punishment phase of the trial, in which the prosecution has more latitude to argue to the jury a "complete understanding" of the circumstances surrounding the crime. *Lomas*, 707 S.W.2d at 569. "[G]reater restrictions generally have been placed upon the admissibility of extraneous offenses at guilt/innocence than at punishment." *Harrell v. State*, 884 S.W.2d 154, 161 n.13 (Tex. Crim. App. 1994). Trial counsel, having failed to exclude mention of the spousal-abuse gossip, was obliged at least to ensure that the State did not illegitimately capitalize on the earlier admission of this evidence during closing. Because he could have done so but inexplicably took no action, his conduct fell below the standard of reasonable competence guaranteed by the Sixth Amendment to the United States Constitution.

302. During its guilt-phase closing, the prosecution referred to seated jurors by name. S.F.

161

Vol. XIX: 1519 (addresses foreman by name); *id.* at 1522 (addresses *every single juror* by name). This was improper and should have been objected to. *See Ramos v. State*, 298 S.W. 431, 432 (Tex. Crim. App. 1927).

303.    The prosecution also improperly referred to the victims and the victims' family members and declared that the victims' families (who were likely in the courtroom) "appreciate" your jury service. S.F. Vol. XIX: 1518. The prosecution urged the jury, when they were deliberating, to "consider the Constitutional rights of David Ray Taylor and Michael Lavesphere, the Constitutional right that was taken away from them, the Constitutional right that we all have of life, liberty and the pursuit of happiness." *Id.* at 1520-21. The prosecution also asserted that the victims were asleep when they were murdered, *see id.* at 1523 ("David Ray Taylor and Michael Lavesphere never had a chance to explain themselves, never given an opportunity. The cattle when they are brought into a slaughtering pin have more of a fighting chance. At least they get to see their execution. David Ray Taylor and Michael Lavesphere never had that chance."), but at other points argued precisely the opposite: that the victims were awake and attempting to shield themselves with their hands when it suited other purposes. *See* S.F. Vol. XV: 898 (pathologist testifies that powder stippling on hands indicates victim trying to defend self when shot). Immediately before the jury retired, the prosecution said: "I cannot do anything to bring back Michael Lavesphere and David Taylor. There's nothing I can do. As much as I would like to do that, I can't. All I can do is make sure that this defendant pays for what he did and *hopefully their spirit will be put to rest.*" *Id.* at 1559 (emphasis added).

304.    To be permissible, jury argument must fall within one of the following four general areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; or (4) plea for law enforcement. *Darden v. State*, 629 S.W.2d 46, 52 (Tex. Crim. App. 1982); *Alejandro v. State*, 493 S.W.2d 230, 231-32 (Tex. Crim. App. 1973). The prosecution's pointed references to the presence of the victims' families, its reference to the

defendant's "slaughter" of the (now) sleeping victims, and its assertion that the victims' spirits would not be put to rest "until the defendant pays for what he did" did not fall within any of those categories. These arguments impermissibly asked the jury to render a verdict on grounds other than the evidence, and should have been objected to.

305.    The prosecution also improperly used the authority of its office to vouch for the credibility of its witnesses. During her closing, prosecutor Migdalia Lopez stated:

> Anybody can come and criticize me for the way I conducted myself in the courtroom or who I called on the witness stand and didn't call on the witness stand.
>
> * * *
>
> Yes, anybody can come and criticize. Anybody can come and criticize me for the way I conducted this trial, but I did it based on my experience. I did it based on my knowledge of the case, based on having tried another case, all that I brought into this courtroom with me in making decisions, just like the Sheriff's office does.
>
> * * *
>
> [Anybody can second-guess decisions law enforcement officers may make in the heat of an investigation,] [b]ut when you're there and you are under pressure, and you have to make decisions, then you have to use your experience. You have to do the best job you feel you can do. That's what happened.
>
> And that's what these officers have to do and they do it every single day. Not only in this case, in many cases they have to come and do that. But every time [they testify] the defense attorneys, I don't care what case, will attack them. And they know that. They know they cannot win.
>
> They are damned if they do and they're damned if they don't, because a defense attorney will come and attack them every single time, ladies and gentlemen.

*Id.* at 1548-50 (emphasis added). Thus the prosecution impermissibly used the authority of its office to confer credibility on the evidence by asking the jury to trust her "knowledge" and "experience."

306.    The prosecution also cited to facts not in evidence and improperly hinted that her

163

experience as the prosecutor in Brenda Colella's trial helped her bolster her case.[37] The credibility of the prosecution's witnesses must stand or fall on its own and on the strength of the State's case. A prosecutor may not "increase the apparent probative force of his evidence by virtue of his personal influence, his presumably superior knowledge of the facts and background of the case, and the influence of his official position." *United States v. Morris*, 568 F.2d 396, 401 (5th Cir. 1979); *see also Floyd v. Meachum*, 907 F.2d 347, 354 (2d Cir. 1990) (reversing applicant's convictions owing to remarks which invited jury to "pass on [the prosecutor's] integrity and professional ethics" because they "invited the jury to view its verdict as a vindication of the prosecutor's integrity rather than as an assessment of guilt or innocence based upon the evidence presented at trial").

307.    The prosecution also improperly vouched for the credibility of its law enforcement witnesses by painting them as reluctant but worthy individuals who routinely demonstrated courage by testifying even though they knew they "cannot win" and that they will be "attack[ed]" by defense counsel.    This argument exceeded the scope of the evidence by inviting the jury to speculate concerning the officers' treatment in other cases and how that treatment might bear on their credibility.  A prosecutor may not vouch for the credibility of its law enforcement witnesses by praising their motives or character.  *See, e.g.*, *United States v. Garza*, 608 F.2d 659, 664 (5th Cir. 1979) (prosecution committed reversible error by "personally vouching for his witness' motives and general integrity" by asserting that DEA agent was doing an "unpleasant job" but that his motives were "pure as the driven snow" and that he "wants to make this world a better place"); *Hall v. United States*, 419 F.2d 582, 587 (5th Cir. 1969) (reversing conviction based on prosecutor's "blatantly improper" voucher for credibility of FBI witness). Because it is never proper, such impermissible vouching is not invited by proper defense argument attacking the officer's credibility or by pointing to inconsistencies in his testimony. *Garza*, 608 F.2d at 662.  Such arguments are especially likely

---

[37] This argument was especially misleading, as the prosecutor, Migdalia Lopez, significantly changed the case she presented to Brenda Colella's jury when she presented it to Mr. Colella's jury.

to warrant reversal when witness credibility is the central issue at trial and the government's comments "were expressly intended to influence this critical credibility choice." *Id.* at 666 ("It is impossible to imagine this strategy did not have substantial influence on the jury.").

308. The prosecution immediately compounded the error through a series of arguments that attacked and insulted defense counsel:

> You got [sic] to remember what Mr. Limas said. He has a duty, and that is correct. He has a duty, and his duty is *to get his guy off.* That's his duty. That's his job.

> And he will come in here and he will tell you *whatever he feels he can* because he has to try to use you. He has to try to use you to believe his way, just like his client.

S.F. Vol. XIX: 1550 (emphasis added). A defense attorney's duty is not to "get his guy off," it is to defend his client's constitutional rights by challenging the State's case. It is improper for the prosecution to attack a defense attorney for proper defense advocacy, or to imply that a defense attorney's job frustrates justice or is in some other way illegitimate. Such arguments are known by the phrase "striking at [or attacking] defendant over the shoulders of his counsel" and are considered improper attempts to unfairly prejudice the defendant. *See, e.g., Gomez v. State*, 704 S.W.2d 770, 772 (Tex. Crim. App. 1985) (improper to argue that "appellant's attorney would do anything to get his client 'off the hook' because that was what he was paid to do"); *Bell v. State*, 614 S.W.2d 122, 123 (reversing based on argument that "[the defense attorney's] duty is to see that his client gets off even if it means putting on witnesses who are lying."). The *Bell* court observed that:

> The effect of this argument was to instruct the jury that only prosecuting attorneys seek to uphold truth and justice whereas defense counsel have a license to use any means to mislead the jury. By his argument the prosecutor was striking at the appellant over the shoulders of his defense counsel in an attempt to prejudice the jury against the appellant. The argument was improper and the trial court's instruction to disregard was not sufficient to have removed the prejudice it created.

*Id.* (citations omitted). Such arguments unfairly exploit common public misperceptions about the role of defense counsel in a criminal trial:

> [T]he general public does not understand the concept that defense attorneys are under
> an ethical obligation to represent the accused regardless of their personal opinion of
> their client. . . . 'This general misunderstanding by the public serves to contribute to
> the prejudicial effect of an argument by a prosecutor which strikes at a member of the
> bar for representing a person accused of crime.'

*Hughes v. State*, 878 S.W.2d 142, 159-160 (Tex. Crim. App. 1992) (Baird, J., dissenting) (quoting *Boyde v. State*, 513 S.W.2d 588, 592 (Tex. Crim. App. 1972)). Such arguments are so prejudicial that they may require reversal of a conviction even when the judge sustains defense counsel's objection and instructs the jury to disregard the remark. *Orona v. State*, 791 S.W.2d 125, 129 (Tex. Crim. App. 1990) (citing cases).

309.    Here, the prosecution clearly implied that trial counsel, in cross-examining Sgt. Martinez, was improperly "attack[ing]" a person who was just trying to do his job. "It is the *duty* of defense counsel to challenge the evidence. An attack on the police investigation does not invite a personal attack on the character of defense counsel. Texas courts have looked with special disfavor on this type of argument." *See, e.g., Byas v. State*, 906 S.W.2d 86, 87 (Tex. App. – Fort Worth 1995) (emphasis added, citations omitted) (reversing conviction based on above argument and prosecution's reference to defense attorney as "slick"). Further, the prosecution declared that trial counsel's motive was simply to "get his guy off," a phrase singled out as improper in cases cited above. Finally, and most egregiously, the prosecution clearly accused defense counsel of "us[ing]" the jury, and hinted, by advising them that the defense attorney will say "whatever he feels he can," that defense counsel might not be above lying to the jury or fabricating evidence. This reference not only insulted defense counsel but also improperly attacked the defendant by implying that he was using his lawyer's assistance solely to manipulate and exploit the jury. The prosecution compounded this error by suggesting that Mr. Colella's testimony was coached. S.F. Vol. XIX: 1546 (repeating twice phrase "He [Mr. Colella] was ready for m[y cross-examination]."). These argument were all improper and harmful and should have been objected to.

310.    The prosecution also argued outside the record on several instances. First, the

prosecution implied that the defense had "changed its story" from a voluntary manslaughter defense to alibi midway through trial, when the defendant suddenly "knew what his chances were on voluntary manslaughter . . . [and realized] he had to change his story. So his story could not be voluntary manslaughter anymore." *Id.* at 1554. The prosecution, obviously, had no insight into the defense's private strategic thinking, and thus had no basis for asserting that the defense changed the story *because* the defendant suddenly realized the voluntary manslaughter defense "wouldn't fly." This argument telegraphed to the jury that there was some deceitful, improper motive for the apparent change in defensive strategy – something the prosecution had no proof of, and which was in fact not true. As demonstrated by this Petition, Mr. Colella notified his counsel of his alibi *months before trial*. Not only did this argument go beyond the evidence, it also attacked Mr. Colella for exercising his constitutional right to be present at his trial and testify on his own behalf.

311.    The State violates Due Process when it misleads the jury concerning the defense's strategy. For instance, in *Davis v. Zant*, 36 F.3d 1538 (11th Cir. 1994), the prosecution knew that a codefendant had confessed to the crime for which the defendant was on trial some months before the trial. 36 F.3d. at 1546. The defense strategy had always been to shift the blame to this codefendant. *Id.* Nevertheless, the prosecution argued that the "blame-shifting" strategy had been "thought up" by the defendant as a desperate last-minute ploy by a defendant who was confronted with an unusually strong prosecution case. Indeed, the prosecution argument in *Davis* was very similar to that used here. The prosecution asked the jury to take note that the defense had not initially objected to the prosecution's characterizations of the crime during the state's opening. *Id.* at 1547. The prosecutor then, while insulting defense counsel in a manner similar to the way in which defense counsel was insulted in this case, stressed the "last-minute change" theory:

> When you're a defense lawyer and you've got a man that is guilty and you've got to
> get him off and you ain't got the truth on you're side and you're doing the best you
> can sometimes the best policy is to wait and see what the State has and see if there
> are any weak spots in it.

\* \* \*

> I submit to you that there was a good possibility of a mistaken identification issue
> being the defense in this case but when [the defense] heard the testimony they
> decided that [the defendant] was just too distinctive and everybody could identify
> him over here so they were going to have to [admit that he was] down here in
> Georgia. What is next? Well, we got him going to the [murder scene] with some
> pretty good iron clad witnesses. *The only thing left is we're going to have to make
> the* [co-defendant] *do it and that's the one they use.*

*Id.* at 1547-48 (quoting closing).

312.   The *Davis* court found that these arguments to be highly prejudicial. They unfairly

undermined the defendant's credibility, and "the whole defense hinged upon the jury's credibility

determination." *Id.* at 1550. The court continued:

> In light of all the circumstances–including *inter alia* the fact that the misconduct
> consisted of intentional misrepresentations which were both highly misleading to the
> jury and prejudicial to Davis, the fact that the misrepresentations were calculated to
> undermine the crux of the defense, the fact that the misconduct was pervasive, and
> the fact that there was a substantial conflict in the relevant evidence [weakening the
> State's case] we conclude that the prosecutorial misconduct in this case rendered the
> trial fundamentally unfair.

*Id.* at 1551.

313.   The same factors are relevant here. First, the prosecution's "defense-switch"

comments were repeated three times in the closing, and constituted a major theme. Second, these

improper comments were only one instance of a much broader pattern of prosecutorial misconduct

tainting not only the closing but the entire trial. Third, these misleading comments were knowingly

placed before the jury. The prosecution knew it had no factual basis for the insinuation that the

purported defense "switch" in the theory of the case was occasioned by the unanticipated strength

of the state's case, because the prosecution could only have obtained such information by becoming

privy to the defense's strategic reasoning. Finally, the weakness of the State's case (caused by the

same sorts of "substantial conflict[s]" in the evidence noted by the *Davis* court) applies here as well.

314.   The prosecution also implied that the defendant "learn[ed] a lot of things at the

CHMPDF - www.heslia.com

penitentiary," S.F. Vol. XIX: 1553-54, without explaining what those things were or what relevance they had to his guilt. Finally, the prosecution asserted that Mr. Colella had suspiciously become unable to "remember" certain facts when, in reality, Mr. Colella clearly remembered and testified in detail to the events of September 12-13, 1991. *See id.* at 1558-59 ("Then where [the defendant's story] deviates and where it stops is that he is taken to Port Isabel and he is stopped there. And when Red goes on with his story as to what happened, as to how he killed these two people, that he *does not remember* and that did not happen.").

315.   The prosecution also insulted the Petitioner and the prosecutors improperly asserted their opinions concerning his character. First, the prosecution repeatedly referred to Mr. Colella as a "user." S.F. Vol. XIX: 1545, 1550, 1555-57. The prosecution accused the defendant of "using" his own sister, his mother, his stepfather, his wife, and Red, and then insinuated that the defendant now wanted to "use" the jury to get off. S.F. Vol. XIX: 1545. The prosecution also referred to the defendant as a "liar." S.F. Vol. XIX: 1553, 1554, 1555, 1557 (calls defendant "good liar"; defendant had motive to "come here and lie"; defendant took stand knowing he was "going to lie"). However, the prosecution could point to no element of Mr. Colella's testimony that was contradicted by non-accomplice evidence, and even admitted that most of Mr. Colella's testimony was corroborated. *Id.* at 1553 ("If you're going to be a good liar, stick to the truth as much as possible."); *id.* at 1558 ("He deviates just a little [from the known facts], just *enough for you to believe him.* He just deviates a little."). The prosecutor's assertion that the defendant's testimony was corroborated actually *detracted* from his credibility turned the constitutional burden of proof on its head: it urged the jury to convict the defendant precisely *because* his story is reliable enough to raise a reasonable doubt.

316.   Of course, a prosecutor may argue that the defendant's testimony is not entitled to credence. However, the prosecution is not entitled to attempt to prejudice the jury by insulting the defendant, or by equating alleged the defendant's falsehoods with guilt. *See, e.g.*, *Ruiz v. State*, 743 So.2d 1, 5-6 (Fla. 1999) (reversing conviction when state "demean[ed] and ridicul[ed]" the defendant

by calling him "Pinocchio" and invited jury to "convict Ruiz of first-degree murder because he is a liar"); *Floyd*, 907 F.2d at 355 (reversing conviction when prosecutor referred to defendant as "liar" over forty times and "erroneously equated [the defendant's] alleged lies with proof of guilt beyond a reasonable doubt"). Comments such as this "distort the burden of proof by suggesting incorrectly what the jury must find in order to reach a certain verdict." *Id.* (citations omitted).

317. The prosecution's insulting references to Mr. Colella as a "user" were the prosecutor's own personal opinion. *See* S.F. Vol. XIX: 1545 ("And *I've* been here and *I've* looked at the defendant. And you know what the word that comes to *my* mind to describe this person? He is a user.") (emphasis added). The only apparent basis in the evidence for this insult was Mr. Colella's occasional dependence on others for transportation and lodging.[38] The prosecution's argument violated Mr. Colella's right to Due Course of Law under the Texas Constitution and his right to due process under the Fourteenth Amendment to the United States Constitution by improperly injecting the prosecution's personal opinion into the jury's deliberations and by unfairly tainting the defendant in the eyes of the jury:

> This type of shorthand characterization of an accused [in that case, calling the defendant a "hoodlum"], not based on evidence, is especially likely to stick in the minds of the jury and influence its deliberations. Out of the usual welter of grey facts it starkly rises – succinct, pithy, colorful, and expressed in a sharp break with the decorum which the citizen expects from the representative of his government.

*Hall v. United States*, 419 F.2d 582, 587 (5th Cir. 1969). In a very similar case, the Eighth Circuit found that the prosecution's guilt-phase closing argument that the defendants were "bad people" violated Due Process because it was "likely to inflame bias in the jury and to result in a verdict based on something other than the evidence." *United States v. Cannon*, 88 F.3d 1495, 1502-03 (8th Cir. 1996). To compound the harm, the prosecution tied the "user" characterization directly to the jury's

---

[38] For instance, the prosecution stressed that Mr. Colella lived in a house in Indiana which was owned by his mother, and that his sister occasionally helped him out with food stamps. S.F. Vol. XIX: 1556. Mr. Colella did not trick, manipulate, or threaten his family into helping him–their help was the kind of routine favors family members and friends often perform for one another. Thus, in addition to improperly urging the jury to convict the defendant based on

task, asserting that the defendant's use of legal representation and decision to testify were nothing more than a continuation of his manipulation, and that a "not guilty" verdict would indicate that the jury had been "taken in" by the defendant's tactics.

318.   These improper arguments were deeply prejudicial.  Many courts have recognized that improper bolstering of law enforcement witnesses and improper attacks on the defendant's integrity and credibility are especially likely to violate due process when, as here, they occur in a trial in which witness credibility is the central issue.  The Supreme Court of New Jersey recently condemned such tactics in *State v. Frost*, 727 A.2d 1 (N.J. 1999).  In *Frost,* the prosecution improperly vouched for the credibility of its law enforcement witnesses, mischaracterized the evidence, dismissed defense counsel's argument as "lawyer talk" and accused defense counsel of hoping that the jurors had a "bad taste in [their] mouths towards officers."  *Id.* at 4-6.  The lower court found the remarks improper but harmless, citing the purported "overwhelming" evidence of the defendants' guilt.  The Supreme Court, noting that the case boiled down to a swearing match between police officers and the defendants, disagreed:

> Credibility was the critical issue in the case.  All of the prosecutor's improper remarks related to the credibility of the officers' testimony.  The State's entire case rested on the testimony of the officers.  When a jury must choose which of two opposing versions to credit, *it simply cannot be said that the evidence is overwhelming.*
>
> * * *
>
> The critical issue was credibility, and the prosecutor improperly impugned the credibility of the defendants' version of the facts, thereby interfering with the jury's right to make the credibility determination.  Consequently, we are satisfied that the prosecutor's misconduct had the clear capacity to have led to an unjust verdict.

---

irrelevant character traits, the prosecution's characterization of Mr. Colella as a "user" had no basis in the evidence.

*Id.* at 6, 7 (citations omitted) (emphasis added).[39]  Other courts agree that improper prosecution argument is especially likely to prejudice a defendant when the physical evidence is missing or equivocal and the case presents a stark conflict between two conflicting but plausible accounts.  *See, e.g.*, *Floyd*, 907 F.2d at 356 (improper remarks prejudicial when physical evidence was equivocal and when state's key witness had equal opportunity with defendant to commit the crime and had been evasive in prior statements to the authorities); *Ruiz*, 743 So.2d at 1, 7 (improper comment harmful when case was "a bitterly contested swearing match between competing witnesses, including eyewitnesses on both sides, where a defendant's life hangs in the balance").

319.  Finally, the prosecution misled the jury concerning its witnesses statements.  First, the prosecution referred to defense counsel's cross-examination of Red Wilson in which defense counsel pointed out that Red's recollection of the time the shootings occurred had suspiciously become more precise between Brenda's trial and Paul's trial.  S.F. Vol. XIV: 693.  The prosecution implied that defense counsel had no basis for asserting that Red had once given an extremely wide range of possible times for the shooting – as early as 9:30 or as late as 11:30: "He's telling you he brought Red here and Red put all these times here.  Who put those times there?  Red didn't, Mr. Limas did.  Mr. Limas was the one that put the times.  Red told you the last time he testified he had said it was about midnight, but he couldn't be certain."  S.F. Vol. XIX: 1547.  In fact, Red did *not* testify at the previous trial that the shootings occurred at "12:00," he testified that they were *long over* by that time.  (BBC) S.F. Vol. VII: 708-10 (defendant had already shot victims, disposed of bodies, and thrown gun in the water by 12:00 midnight).  When asked by the prosecution in Brenda's trial when the shootings happened, Red said "I estimate at around 10:00, 10:30; 9:30, 10:30, 11:30." *Id.* at 710. Red is the source of that range of times (all of which before 10:30 are impossible, since the victims placed a phone call at 10:34).  The defense failed to object to this inaccurate characterization of the record – which was refuted by sworn testimony given in the previous trial.

---

[39] The Supreme Court approved the appellate courts's referring the prosecutor who made the closing remarks to the

320.   The prosecution also misleadingly suggested that defense counsel had no evidence suggesting that the victims had been shot at 5:00 a.m.: "And he's telling you that this occurred at 5:00 in the morning. Where does Mr. Limas get that from? Where? What evidence have we heard that it happened at 5 o'clock in the morning? Where did that evidence come from?" S.F. Vol. XIX: 1552. The prosecution's statement that there was no evidence for (and that the defense had no basis for) stating that the crime may have occurred at 5 o'clock a.m. was false. Sgt. Martinez, the State's key law enforcement witness, testified under oath in Brenda Colella's trial that the victims were shot no earlier than 3:00 a.m. and that it was entirely possible that they had been shot at "5 in the morning." (BBC) S.F. Vol. IV: 307.

321.   A prosecutor may not make statements which the prosecutor knows to be false, regardless of whether the information contradicting those statements has been admitted into evidence. In *Davis, supra*, for instance, the prosecutor knew that, almost six months previously, a co-defendant had actually confessed to the crime for which the defendant was on trial. *Davis*, 36 F.3d 1538, 1549. The co-defendant's confession, however, had been ruled inadmissible by the judge. *Id.* at 1543-44. Nevertheless, the prosecution told the jury that it was "not true" that the codefendant had confessed and, in his closing, asserted that the defense theme (which shifted the blame to the codefendant) had been invented on the eve of trial and was not credible. *Id.* at 1546-48. The reviewing court conceded that the prosecution was entitled to object to the admission of the confession, but not to "make intentional misrepresentations to the jury." *Id.* at 1549. The prosecutor "intentionally painted for the jury a distorted picture of the realities of the case in order to secure a conviction." *Id.* Because these misstatements "were extremely misleading to the jury and prejudicial to the accused," they violated the Fourteenth Amendment and required reversal of the defendant's conviction. *Id.*

322.   Similar comments were declared unconstitutional in *Paxton v. Ward*, 199 F. 3d 1197

Attorney General for discipline, and that the prosecutor had been issued a letter of reprimand. *Id.* at 7.

(10th Cir. 1999). In *Paxton*, the defendant had been suspected of killing his wife. However, after passing a polygraph test, the prosecution dismissed the charges. *Id.* at 1212. In a later trial, a different prosecutor introduced evidence about the previous killing as aggravating evidence during the punishment phase of Paxton's capital trial. *Id.* To counter the prosecution's suggestion that Paxton had committed the killing, the defense asked to be allowed to introduce the results of the polygraph, and the fact that Paxton's successful performance on the test was the prosecution's reason for dismissing the charges against him. Both requests were denied by the trial judge. *Id.*

323. During his closing argument, Paxton's prosecutor asserted that Paxton had "the same opportunity to put evidence on that witness stand about that killing that we did" but that he had not offered any. The prosecutor also declared that "we don't know" why the charges were dismissed and speculated that the real reason for the dismissal of charges against Paxton was the fact that a key witness "wouldn't talk about it." *Id.* The *Paxton* court strongly attacked the prosecutor's arguments, calling them "mendacious" and "deceitful[]." *Id.* at 1216. The court labeled them "material misrepresentations designed to mislead the jury." *Id.* The court granted relief on the basis that the prosecutor's remarks impinged on specific fair-trial guarantees. *Id.* at 1218.

324. The same is true of the prosecutor's comments noted above. Red Wilson and Sgt. Martinez's estimates of when various events occurred was critical. The jury's verdict depended on whether they believed Mr. Colella's independently corroborated alibi, and the prosecutor's remarks had the effect of "covering up" inconsistencies which she knew were substantiated by sworn testimony which she herself had elicited. Trial counsel's failure to object to these obvious and prejudicial misleading statements fell below reasonable standards for the performance of counsel.

325. On virtually page after page of the record, the prosecution violated a clearly-established norm of proper argument, depriving Mr. Colella of a fundamentally fair trial. Trial counsel failed to object to the majority of these remarks. A defense attorney's failure to object to improper, prejudicial prosecution argument constitutes ineffective assistance of counsel. *Boyington*

*v. State*, 738 S.W.2d 704, 709-10 (Tex. App.–Houston [14th Dist.] 1985).  Mr. Colella's Sixth Amendment rights were violated, and his conviction must be reversed.

### n. Trial counsel's failure to object as the prosecution unlawfully tainted the entire jury against his client and his case during voir dire proceedings constituted ineffective assistance of counsel.

326.    The prosecution repeatedly and improperly attempted to commit jurors to reach a particular result given a set of facts. Attorneys are prohibited from attempting to commit prospective jurors to a certain verdict or outcome based upon a particular set of facts.  *See, e.g., White v. State*, 629 S.W.2d 701, 706 (Tex. Crim. App. 1981) (improper voir dire when "[t]he appellant asked the venire member if he would be unable to consider the penalty of confinement for life if it were proved that the defendant went into a store, 'attempted to rob it or robbed it,' aimed a pistol at a woman's head at short range and shot her, killing her instantly, and if the woman's husband testified to that."), *cert. denied*, 456 U.S. 938 (1982); *Williams v. State*, 481 S.W.2d 119, 121-22 (Tex. Crim. App. 1972).

327.    Nevertheless, the prosecution did so consistently, repeatedly describing aspects of a hypothetical crime similar to the one it intended to prove against Mr. Colella, and asking jurors how these facts would affect their verdict.  *See, e.g.*, S.F. Vol. VI: 258, 281-83; S.F. Vol. VII: 325-27, 374-81, 396-98, 540.  The defense should have objected but almost never did so.  Mr. Colella was harmed because, as the Court of Criminal Appeals reasoned in the above cases, a juror who has promised to render a certain verdict based on a particular set of facts will not have an open mind, and may be reluctant to violate a "perceived" promise to a party by not voting the way he or she said she promised in voir dire.  *See, e.g., Allridge v. State*, 762 S.W.2d 146, 164 (Tex. Crim. App. 1988) (juror forced to endorse a certain finding based on certain facts "would thereby practically be pledged to a particular finding in advance of hearing the testimony") (quoting 23 Tex. Jur. 3d, Criminal Law § 2668, pp. 308-09).  Because the prosecution's lengthy, detailed accounts of the crimes often closely tracked the details of the instant case, and required jurors to state their reactions to the facts, and

because this improper voir dire was used against most seated jurors, Mr. Colella was harmed by counsel's inexcusable failure to limit the prosecution only to proper methods of voir dire.

328.    Further, the prosecution repeatedly attempted to bias jurors against the imposition of a voluntary manslaughter conviction for the killing of two people because the maximum penalty for voluntary manslaughter, 20 years, was "too cheap" a price for two human lives. *See, e.g.*, S.F. Vol. VI: 275 (taints seated juror with suggestion that 20 years sentence will always be too light for someone who killed people); S.F. Vol. VII: 403 (same); S.F. Vol. VIII: 611, 665, 710 (same, non-seated juror); S.F. Vol. IX: 913 (tells seated juror that 20 year sentence for voluntary manslaughter of two victims would mean victims' lives were "coming awfully cheap.").  Besides tainting the jury against a voluntary manslaughter verdict, this questioning improperly invited the jurors to consider the punishment as they debated what crime the Applicant might be guilty of, and also, from the leading, suggestive form of the question, clearly injected the prosecutor's personal opinion of the proper verdict into voir dire proceedings.  *See Williams v. State*, 712 S.W.2d 835, 837 (Tex. App.–Corpus Christi 1986) (prosecution's comments during voir dire concerning his personal opinion that probation was "not an appropriate punishment" for the crime charged were "irrelevant and inappropriate"), *rev'd on other grounds in unpublished opinion, opinion after remand at* 736 S.W.2d 906 (Tex. App. – Corpus Christi 1987); *Smith v. State*, 626 S.W.2d 843, 844 (Tex. App. – Corpus Christi 1981) (prosecutor should not refer to punishment during voir dire except to ascertain whether jurors will be able to consider full range of punishment).  Counsel's inexcusable failure to object permitted the empanelment of jurors who were biased from the outset against a voluntary manslaughter verdict.  In *Williams*, the court found the error harmless because (1) the remarks were objected to, and a curative instruction was promptly delivered by the trial court; and (2) the jurors actually returned a sentence of probation, despite the prosecutor's urgings.  Neither circumstance is present here.

329.    Trial counsel also permitted the State to improperly bolster its case by advising many

CutePDF - www.fasiss.com

jurors that the only reason the State offered immunity to Red Wilson was because if it did not do so, "all three [codefendants] would walk." *See, e.g.*, S.F. Vol. VII: 432-33; S.F. Vol. VIII: 637 (implies that deal was cut only so that victims' families could receive justice); *id.* at 639 (trial counsel objects here, but is overruled); *id.* at 717 (asserts that they picked least culpable codefendant to cut deal with); *id.* at 826 (if we didn't cut deal, all defendants would walk); *id.* at 855-56 (we owe it to victims' families to cut deals so people who kill their loved ones will be punished; objection overruled); *id.* at 922 (seated juror; how would victims' families feel if we didn't cut deal?). These sections of voir dire, and the many others like them, went far beyond legitimately probing a jurors' attitudes towards accomplice-witness testimony and crossed the line into impermissible bolstering. The prosecution was permitted to state that (1) it knows it cut the deal with the least culpable codefendant; and (2) only cut the deal to help the victims' families. All such improper comments should have been objected to.

330.    These comments invited prospective jurors to rely on the integrity and diligence of the State's attorneys and investigators, effectively telling them: "Trust us, we already know that Paul Colella is guilty and that Red Wilson is the least culpable coparticipant." Prosecution comments which seek to invoke the authority of the prosecutor's office and position have been condemned by courts:

> The statement "we try to prosecute only the guilty" is not defensible. . . .  This statement takes guilt as a pre-determined fact. The remark is, at the least, an effort to lead the jury to believe that the whole governmental establishment had already determined appellant to be guilty on evidence not before them. Or, arguably, it may be construed to mean that as a pretrial administrative matter the defendant has been guilty as charged else he would not have been prosecuted, and that the administrative level determination is either binding on the jury or highly persuasive to it. Appellant's trial was held and the jury impaneled to pass on his guilt or innocence, and he was clothed in the presumption of innocence. The prosecutor may neither dispense with the presumption of innocence nor denigrate the function of the trial nor sit as a thirteenth juror.

\* \* \*

177

'It is fair to say that the average jury, in a greater or less degree, has confidence that [the obligations of "integrity, fairness and impartiality"], which so plainly rest on the prosecuting attorney, will be faithfully observed.   Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.'

*Hall v. United States*, 419 F.2d 582, 587-88 (5ᵗʰ Cir. 1969) (citations omitted).[40]   The comments about seeking "justice" for the victims' families also warned the jury that they would be disappointing bereaved relatives if they disagreed with the prosecution's assessment that Mr. Colella was the most guilty codefendant and that Red Wilson was the least. The defense occasionally objected to this practice, *see* S.F. Vol. IX: 978-81, demonstrating that defense counsel knew it was improper.  However, trial counsel inexplicably allowed the vast majority of such comments to pass without objection.

**n.  The weakness of the State's case requires a finding that any of the errors described above, and especially all of them taken into account cumulatively, undermine confidence in the outcome of Mr. Colella's trial and require guilt-phase relief.**

331.    Most of the claims of error presented in this Petition are subject to harmless error analysis. Mr. Colella's claims that the prosecution suppressed exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) and that he received the ineffective assistance of counsel at the voir dire, guilt, punishment and appellate phases of his trial in violation of *Strickland v. Wainwright*, 466 U.S. 668 (1984), are subject to the same standard of review: the error is harmful if there is a reasonable probability that the outcome of the proceeding would have been different had the error not occurred.  A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial.  *See, e.g., Johnson v. Scott*, 68 F.3d 106, 109 (5ᵗʰ Cir. 1995) (describing

---

[40] Also startling is the defense's failure to object when the prosecution declared during voir dire: "We didn't go and kill Michael Lavesphere or David Ray Taylor. *This person did, okay?*" S.F. Vol. VIII: 588 (emphasis added). Although this error was harmless because the juror was removed on Fifth Amendment grounds, the defense's failure to object to this outrageously prejudicial comment is incomprehensible.

standard and observing that it applies both to *Brady* and to *Strickland* claims). Mr. Colella need not prove that the outcome of his case would certainly have been different absent the *Brady* and *Strickland* errors; those standards focus instead on whether the trial was fundamentally fair and reliable. *Lockhart v. Fretwell*, 506 U.S. 364, 368 (1993). Mr. Colella's claim that his conviction was tainted by the prosecution's knowing sponsorship of perjured testimony is subject to a more lenient standard of review than *Strickland* and *Brady* errors: it must result in the reversal of his conviction if there is "there is any reasonable likelihood that [the false evidence] could have affected the jury's verdict." *Goodwin v. Johnson*, 132 F.3d 162, 185 (5th Cir. 1997) (quoting *Westley v. Johnson*, 83 F.3d 714, 726 (5th Cir.1996), *cert. denied*, 117 S. Ct. 773 (1997)).

331(a).   An analysis of whether constitutional error harmed the defendant must take into account the overall strength of the prosecution's case. *Delaware v. Van Arsdall*, 475 U.S. 673, 683 (1986). "A verdict that is only weakly supported by the record is more likely to have been affected by an attorney's errors than one with strong record support." *Johnson*, 68 F.3d at 109 n.3. (citing *Strickland*, 466 U.S. at 696).

332.   When, as here, the case rests primarily on the testimony of witnesses, relevant factors include "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, [and] the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points." *Id.* The fact that important elements of the State's case required implausible or unlikely assumptions also plays a part in the analysis. *See, e.g., Kyles v. Whitley*, 514 U.S. 419, 452 n.21 (1995) (fact that State's case "depended on a facially implausible notion" helped establish materiality of *Brady* evidence); *Johnson v. Baldwin*, 114 F.3d 835, 838 (9th Cir. 1997) (ineffective assistance likely to be prejudicial when State's evidence was "extremely weak" and when "physical evidence utterly failed to support [the victim's] account"); *Guerra v. Johnson*, 90 F.3d 1075, 1076-77 (5th Cir. 1996) (granting *Brady* relief and noting, at beginning of opinion, that State's theory at trial involved unlikely assumption that a person would knowingly

"take and keep a weapon just used to kill a policeman . . . [when] it is common knowledge that anyone who kills a law enforcement officer will be quickly, vigorously, and aggressively pursued"). Because *Brady* and *Strickland* harm analyses are not "sufficiency of the evidence" tests, harm may be present despite the existence of some untainted evidence against the defendant if the effect of the constitutional error was to change the picture of the case. *Id.* at 1078-80.

The case against Mr. Colella suffered from all of the defects noted above.

### i. Red Wilson's credibility was seriously compromised, and his testimony on key points was questionable or untruthful.

333.    The State's case was overwhelmingly dependent on Red Wilson's testimony. No physical evidence whatsoever – no ballistics evidence, fingerprints, DNA, or hair or fiber comparison — linked Mr. Colella to the crime. Indeed, the only physical evidence preserved by the State from the dump scene pointed to Red Wilson. Aside from Red Wilson, no eyewitness testimony linked Mr. Colella to the actual shooting. Aside from Red Wilson's testimony, no evidence tended to show that Mr. Colella robbed the victims. Aside from Red Wilson's testimony, no evidence linked Mr. Colella to the dumping of the bodies.

334.    Red Wilson's credibility was negligible. First, he was an accomplice witness. An accomplice witness' testimony is corrupt and inherently suspect: "The underlying premise behind the accomplice witness rule is the idea that an accomplice witness is a 'discredited witness' and that 'the testimony of an accomplice witness is to be carefully scrutinized not only because of any interest he or she might have, but because her or his testimony is evidence from a corrupt source.'" *Beathard v. State*, 767 S.W.2d 423, 429 (Tex. Crim. App. 1989) (citations omitted). Article 38.14 of the Texas Code of Criminal Procedure enacts special safeguards in accomplice-witness cases, requiring jurors first to determine that the accomplice witness's testimony is truthful, then to determine that it is corroborated by other testimony. Should the accomplice witness's testimony fail either test, the jury may not consider it. Mr. Colella's jury was charged in accordance with art. 38.14 as follows:

CRAPDF - www.texis.com

The witness, Anthony R. Wilson, is an accomplice, if an offense was committed, and you cannot convict the defendant upon his testimony unless you first believe that his testimony is true and shows that the defendant is guilty as charged, and then you cannot convict the defendant upon said testimony unless you further believe that there is other testimony in the case, outside of the evidence of the said Anthony R. Wilson tending to connect the defendant with the offense committed, if you find that an offense was committed, and the corroboration is not sufficient if it merely shows the commission of the offense, but it must tend to connect the defendant with its commission, and then from all of the evidence you must believe beyond a reasonable doubt that the defendant is guilty of the offense charged against him.

Tr. Vol. I at 134.

335.    The State has acknowledged Red's questionable credibility, and its extensive dependence on his testimony.   The Cameron County District Attorney's Office, in an Appellate Brief filed in Brenda Colella's case, *itself* described Red Wilson as a "convicted felon and a liar to boot," and conceded that Red had given an account of the crime to police which was "not altogether true." App. II, Exh. 18 (State's Appellate Brief), at 8, 15.  Further, the brief admits that many key points of Red's testimony were completely uncorroborated:

> "[T]here was no evidence to corroborate Red's testimony that Paul asked Appellant [Brenda Colella] whether 'they' were the ones who 'did it,' or that she answered 'Yes,' or evidence to corroborate [Red's] testimony that she was concerned he not leave Paul and even helped push his truck after it broke down pulling the victims' truck."

*Id.* at 20-21; *see also id.* at 15 ("Where was the evidence to corroborate Red's testimony that [Brenda] said 'yes' when Paul asked her 'Did they rape you?'").

336.    Without Red's testimony, the evidence would only establish that Mr. Colella threatened the victims' lives, possessed a weapon before the crime, and left the State on the morning of the offense. Mr. Colella's own testimony established a credible, independent reason for leaving the State–Sid Wilson's repeated drunken threats to kill Mr. Colella and his wife.  Sid Wilson *admitted* that he had gone looking for Mr. Colella with a rifle, and Red, who was there to witness Sid Wilson's demeanor, believed that Sid was in a homicidal rage that he might "mow down" the Colellas or drive over them in his Suburban.  According to Mr. Colella, Sid Wilson pointed what

CRxPDF - www.lexile.com

was very likely a loaded rifle into the tent in which Sid thought the Colellas were sleeping. Even the State does not dispute that the Colellas were genuinely afraid of "Sid's armed threat." App. II, Exh. 18 (State's Appellate Brief) at 20. There is a genuine question whether the weapon seen in Mr. Colella's possession on the day before the crime could even have been the murder weapon. Thus, if Red's testimony were stricken, the only undisputed evidence linking Mr. Colella to the crime would have been his threats to harm the men who had just raped his wife. Unquestionably, this would not have been enough to prove beyond a reasonable doubt that Mr. Colella shot the victims.

337.    The State tried to prove that the victims had been robbed after they were shot, but offered only conflicting, uncorroborated testimony from Red Wilson to this effect. It should be remembered that (1) the victims were carrying hundreds of dollars in their pockets when they arrived on South Padre Island; (2) one of the victims, Mr. Lavesphere, was carrying this large amount of cash in a clearly-visible roll in his front pocket, which he likely displayed when paying for beer and food; and (3) the victims, who were unarmed, were smoking marijuana and drinking beer and hard liquor to the point of extreme intoxication, all while driving around in a company pickup filled with expensive oilfield tools. The victims would have made a tempting target for an armed robber, especially as they became more and more intoxicated and incapacitated.

338.    The only evidence the State was able to proffer that *robbery* of the hundreds of dollars they were openly displaying was *not* the motive for the victims' deaths were Mr. Colella's threats and Red's testimony. Mr. Colella never bragged about killing the victims, or even admitted to participating in the crime in any way. The crime scene and the evidence were completely consistent with a robbery-murder.

339.    Red Wilson admitted during Paul's trial that he had bought a used car for $200 shortly after the crime. S.F. Vol. XV: 840. Red, who lived out of his pickup, testified that he paid for the car using a couple hundred dollars he had saved from mechanic work and towing. *Id.* During Brenda's trial, Red maintained that he kept "around $300 or so" in his glove compartment, and that

"[e]verybody was aware of it." However, no other trial witness at Brenda's trial or Mr. Colella's trial confirmed Red's account of his glove-compartment savings account. Red also testified that his Bronco's windshield had been shattered in a towing accident some time ago, and that this made it difficult and illegal to drive the Bronco. (BBC) S.F. Vol. VI: 568-69. Red's fear of being ticketed or arrested for driving in a vehicle without a windshield significantly hampered his mobility, restricting him from driving in town. Nevertheless, apparently for months, Red did not use his "savings"–which he says were kept in the Bronco itself–to repair its windshield. However, after the two victims were found dead, with hundreds of dollars missing from their pockets, Red bought another vehicle.

<div style="margin-left:2em">

**ii.    To convict Mr. Colella, the State had to persuade the jury to believe several unlikely assertions crucial to its theory of guilt or to the credibility of its witnesses.**

</div>

340.    There were weaknesses in the State's firearms evidence. The State presented testimony from two firearms experts – Sgt. Luis Martinez and Mr. Gordon Batsell – that the projectile retrieved from Mr. Lavesphere's body was almost certainly an expended nine-millimeter slug. However, the evidence is also conclusive that the weapon stolen by either Red or Mr. Colella on the afternoon of the day before the shootings was the only weapon ever seen in Mr. Colella's possession by any trial witness, and the weapon Red swore was used to commit the offense was a revolver. Every witness who saw the gun long enough to identify it unanimously concluded that it was a revolver. Nine millimeter revolvers are very rare guns, according even to the State's own expert. *See* also App. VII, Exh. 66 (Courtney Aff.). Thus, the State's theory of the case required jurors to believe that in the burglary either Red or Mr. Colella committed on the 12th, they happened, by pure coincidence, to steal a very rare firearm.

341.    The murder weapon was never recovered. When and how the gun was disposed of was unclear. A citizen told authorities that he or she had seen *Red* burying the murder weapon

shortly after the crime. Sergeant Martinez testified that he had attempted to locate the weapon, but had not been able to do so. Red initially stated that he had seen Mr. Colella "bury" the weapon. He then changed his story, stating instead that Mr. Colella had thrown the weapon into the Gulf of Mexico.

342. The inconsistent testimony of Red Wilson and Sgt. Martinez concerning the tire tracks found at the crime scene further undermined the prosecution's case. The time of death was another crucial weakness. Mr. Colella presented an alibi defense which was corroborated by a neutral, independent observer.

<div align="center">

**iii.**     **The inadequate and incomplete work done by the State's investigating officers left the case against Mr. Colella especially vulnerable to attack.**

</div>

343. Experienced commentators have uniformly noted the importance of collecting and preserving any and all evidence present at a crime scene:

> The crime scene is the place from which most physical evidence associated with the crime will be obtained. It provides the investigating officer with a starting point, a beginning of the investigation to determine the identities of the suspect and victim and to piece together the circumstances of what happened during the crime. Physical evidence found at the crime scene can be the key to the solution of the crime. The fist officer's most important task at the scene is to prevent the destruction or the diminished utility of potential evidence that may lead to the apprehension of the criminal and the solution of the crime.

Barry A.J. Fisher, Techniques of Crime Scene Investigation 26 (5th ed. 1993). Fisher observes that "the first officer's actions or inactions may well affect the future course of the investigation." *Id*. Murders and serious assaults, he observes, require "in-depth investigation." *Id*.

344. Sgt. Luis Martinez, the lead investigating officer, failed to collect vital information. Although he claimed to have participated in "hundreds" of murder investigations, S.F. Vol. XII: 164, he failed to collect a pair of boots at the crime scene which had obvious potential as evidence, failed to preserve the critical second set of tire tracks found at the crime scene, failed to preserve blood evidence which could have yielded clues to the identity of a suspect or witness, and failed to review

<div align="center">184</div>

a videotape of the crime scene.

### iv.    The testimony of various trial witnesses was plagued with unexplained inconsistencies.

345.    The State's case against Mr. Colella consisted almost exclusively of witness testimony.  As one reads the transcripts of Paul Colella's and Brenda Colella's trials, a startling number of inconsistencies emerge.  Witnesses who testified to certain facts at Brenda Colella's trial completely change their stories by Paul's trial.  Two witnesses' descriptions of the same event are sometimes exactly opposed.  One witness will admit a fact, then deny it, then admit it again in a slightly changed form.  Sgt. Martinez, seeking to evade cross-examination or to draw attention away from gaps in the state's evidence, repeatedly abandons, modifies, or obfuscates his conclusions concerning essential elements of the State's case (such as the time of death, the type of murder weapon used, and the nature of the tire tracks found at the dump scene).  When evaluating the prejudice flowing from the constitutional error in Mr. Colella's trial, it should be kept in mind that his conviction was built not on the solid rock of thorough investigation and damning physical evidence, but on the shifting sands of the testimony described below.  In addition to the inconsistent sworn testimony he gave in Brenda and Paul's trials about the tire tracks at the dump scene and the time of death of the victims, he contradicted himself several times in Mr. Colella's trial itself.  For instance, he testified under direct examination that the weapon used in the offense came from the "general area of the trailer park [on the south side of the Sea Ranch]," described that area, and even introduced photographs of it.  S.F. Vol. 12: 129-130.  Yet, under cross-examination, he declared that no one ever told him the weapon came from a trailer park, and that he had never gone to the trailer park to look for the weapon.  *Id.* at 173-74.

346.    At one point during his testimony, Sgt. Martinez testified that he had no knowledge that the pathologist's office had ever turned any bullets recovered from the victims' bodies over to the Sheriff's Office evidence custodian Jerry Ramirez.  *Id.* at 140.  Shortly afterward, however,

185

Martinez was asked whether any bullets were found in the victims' bodies, and replied "Yes, sir." *Id*. at 199. He went on:

Q.      And do you know, sir, who came into possession of that bullet?

A.      Jerry Ramirez, the evidence custodian.

Q.      And do you know who provided that bullet to Jerry Ramirez?

A.      The pathologist from the Valley Baptist Medical Center in Harlingen where the autopsies were conducted.

*Id*.  In attempting to explain his decision not to make plaster impressions of tire tracks found at the campsite of Red Wilson and the Colellas, Sgt. Martinez first declared he didn't make casts because it would have been *impossible* to make casts from tire tracks in wet sand.  S.F. Vol. XII: 159 ("The conditions of the tire impressions or the soil itself there made it of virtually no use with the plaster of Paris.").  However, after being confronted with the fact that it is indeed possible to make such casts, Sgt. Martinez changed his story: "Q.  So you're testifying that you did have the means how to lift the tire track print, but you just did not feel a need for it? / A. Yes, sir."  S.F. Vol. XVII: 1260.

347.    The overall pattern is of Sgt. Martinez giving two completely different versions of events, and using implausible, nit-picking semantic arguments to argue that they weren't really different at all. A typical example has Sgt. Martinez struggling to conceal the damning fact that Red Wilson switched his story about what happened to the murder weapon.  During Brenda Colella's trial, Sgt. Martinez affirmed that Red, while being questioned on February 20, 1992, had told him where the murder weapon was *buried* on South Padre Island:

Q:      . . . You see in your report where you state that Red said he knew where the murder weapon was buried on the island?

A:      That he basically knew where the murder weapon was at, buried on the island.

Q:      In your own words, "That he knew where murder weapon was buried on the Island."

186

A:    That he basically knew where the murder weapon was at, buried on the Island.[41]

(BBC) S.F. Vol. V: 261.  Later in Brenda's trial, under cross-examination concerning the level of his involvement with the crime, Red caused a problem for the prosecution by lying on the witness stand about his admission to Sgt. Martinez:

Q:    Red, did you tell Officer Martinez that you knew where the murder weapon was buried on the island?

A:    No.

(BBC) S.F. Vol. VIII: 813.  Red likely testified this way because, just one week before, he had changed his story about what had happened to the murder weapon and told police that Mr. Colella had thrown the gun into the Gulf of Mexico.

348.    At Petitioner's trial, Sgt. Martinez must have realized that Red's false testimony at Brenda's trial and his changed stories regarding the location of the murder weapon would harm the State's case. Sgt. Martinez gave false and misleading testimony concerning Red's statements:

Q.    The detection of a weapon in the Gulf of Mexico, Mr. Martinez, was a hope of finding a weapon to this crime, right?

A.    Yes, sir.

---

[41] Indeed, Red testified during Brenda's trial that he had actually encouraged Mr. Colella to bury the gun, so that Red could later locate it when he went to the police. (BBC) S.F. Vol. VIII: 821.  Red also admitted at Brenda's trial that he had written letters to his then-girlfriend from jail in which he told his girlfriend that he knew where the murder weapon was. (BBC) S.F. Vol. VIII :813-14, 846.  Especially when coupled with the anonymous tip from the person who saw Red burying the gun, the incriminating statements in the letters to Pam Smith further undermine Red's credibility, and case grave doubt on the truth of his later account of having seen Mr. Colella throw the murder weapon into the Gulf of Mexico. Mr. Colella's trial counsel, who did not obtain a complete transcript of the testimony in the Brenda Colella trial, does not seem to have realized the value of this admission to impeachment of Mr. Wilson.

187

Q.     And your direction to the Gulf of Mexico was because of Red Wilson's statement to you, right?

A.     The interview, yes.

Q.     And you are saying that he *never* told you that there was a gun buried anywhere else, right?

A.     *That's correct.*

S.F. Vol. XII: 242.

Q.     Now, the weapon was never found, is that right?

A.     That is correct.

Q.     And *no one*, other than the tip [from an anonymous informant who claimed to have seen Red burying the murder weapon] told you that a weapon was buried somewhere, right?

A.     *That is correct.*

Q.     And you still hold to that story?

A.     Yes, sir.

S.F. Vol. XII: 248 (emphasis added).  Shortly after this exchange, Sgt. Martinez was confronted with his earlier report, demonstrated that Red had indeed at one point told him where the murder weapon was "buried on the Island." *Id.* Sgt. Martinez asserted that the word "bury" meant to throw in the water. *See* S.F. Vol. XII: 265 ("Q. When you were saying 'buried,' were you saying buried under the water? / A. Yes.").[42]

349.     Sgt. Martinez and Red Wilson could not get their stories straight at other points as well.  For instance, they differed on whether Red took Sgt. Martinez over to his campsite during his May "oral" statement (which is incorrectly assumed to have occurred in April in the excerpts below):

---

[42] Webster's Encyclopedic Unabridged Dictionary defines the verb "bury" as meaning "[t]o put in the ground and cover with earth."

188

Q:    Now, when [Red] took you over there in April, he took you to the campsite, right?

A:    *Yes.*

\* \* \*

Q:    And then seven months [after the crime] you go back to the campsite with Red Wilson, is that right?

A:    *That's correct.*

\* \* \*

Q:    Was he under arrest at that time?

A:    He was in custody at the county jail.

Q:    For this murder, right?

A:    Yes, sir.

S.F. Vol. XII: 169-71 (emphasis added).

    350.    Red Wilson, however, denied ever taking Sgt. Martinez to any campsite during the

May statement:

Q:    And you took [Sgt. Martinez] to whose campsite?

A:    I took him to no one's.

\* \* \*

Q:    So if Sgt. Martinez testified to that fact, that you took him to a campsite, would he be lying?

A:    If he testified that I took me to a campsite –

Q:    Let's simplify it.  You never took him to your campsite?

A:    To my campsite?

Q:      Right.

A:      No.

*  *  *

Q:      You never took them to Paul's campsite, did you?

A:      Not on that day [when he was being interviewed for his second, "oral"
        statement], no.

S.F. Vol. XIV: 657-58.  Red says the only time he escorted Sgt. Martinez to any campsite was when

he took Sgt. Martinez to Paul and Brenda's campsite in *mid-September*.  Red adamantly denies

accompanying Sgt. Martinez to any campsite during the second statement.

351.    Red Wilson also admitted that, while in jail, he had written letters describing where

the murder weapon was buried to Pam "Bubbles" Smith, his then-girlfriend.  (BBC) S.F. Vol. VIII:

813-14, 846 (affirming that he told Pam Smith "where the gun was at").  However, Sgt. Martinez

contradicted Red by testifying that he visited Pam Smith, inspected the letters sent to her by Red,

and determined that Red never mentioned the murder weapon in any of them.  (BBC) S.F. Vol. V:

235-36 (letters said "[n]othing about the gun").[43]

352.    However, Sgt. Martinez was not the only witness to give questionable or inconsistent

testimony.  During both Paul Colella and Brenda Colella's trial, Red Wilson testified that Mr. Colella

stole a wallet from one of the victims; and that Mr. Colella looked at an ID in the wallet and stated

that it belonged to Ricky Taylor, the "hippie" guy who had earlier been playing Frisbee with Red

Wilson.  (BBC) S.F. Vol. VII: 706; S.F. Vol. XIV: 603-04.  Ricky Taylor, however, never

---

[43] Each of these incidents is yet a further examples of false or misleading testimony knowingly sponsored by the
prosecution in violation of *Napue v. Illinois*, 360 U.S. 264 (1959), and of the overall pattern of police and prosecutorial
misconduct which tainted the entire trial.  The falsehoods and inconsistencies in Sgt. Martinez's testimony could clearly
have had an effect on the jury's verdict (and are thus prejudicial and warrant reversal of Mr. Colella's conviction), as they
tended to unfairly negate or undermine genuine weaknesses in the State's case — including Red's credibility, the nature
of the tire tracks found at the dump scene, and the characteristics of the bullets recovered from the victims' bodies.  As
the testimony about the letter shows, Sgt. Martinez was even willing to try to bolster Red's credibility by denying

190

mentioned having had his wallet stolen on the night of the crime at all, and instead testifies that the stolen money was missing from his *brother's* billfold and from the loose cash roll Mr. Lavesphere (who did not have a billfold) carried in his front pocket. (BBC) S.F. Vol. VIII: 884; S.F. Vol. XVI: 1042-44.

353.    The list of inconsistencies and omissions could go on for several more pages. The overall picture is of a case fraught with unanswered questions and unresolved conflicts in the testimony. Juror Esparza is to this day still "concerned" about the weakness of the evidence against the Applicant. App. VI, Exh. 63 (Affidavit of juror Juan Esparza) at ¶3. Against this backdrop, even one serious constitutional error would warrant reversal of Mr. Colella's capital murder conviction. Mr. Colella's case is tainted by multiple serious errors.

## 2.    Ineffective Assistance of Counsel – Punishment Phase.

### a.    The Legal Standard.

354.    During the punishment phase of a death penalty case, a defense attorney must gather significant evidence about his client's background to "present [the client] to the jury as a human being," ensuring that the defense has fulfilled its unique role in the "adversary process that our system counts on to produce just results." *Kubat v. Thieret*, 867 F.2d 351, 368 (7th Cir.), *cert. denied sub nom. Kubat v. Greer*, 493 U.S. 874 (1989) (citation omitted). Defense counsel must thoroughly investigate his client's background, childhood, and mental health history to ensure that the jury, which is to decide life or death, has a full picture of all mitigating characteristics. *See, e.g., Hendricks v. Calderon*, 70 F.3d 1032, 1044 (9th Cir. 1996) ("'The Constitution prohibits imposition of the death penalty without adequate consideration of factors which might evoke mercy'.") (quoting *Deutscher v. Whitley*, 884 F.2d 1152, 1161 (9th Cir. 1989)); *Eddmonds v. Peters*, 93 F.3d 1307, 1319 (7th Cir. 1996) ("Counsel *must* make a significant effort, based on reasonable investigation and logical argument, to mitigate his client's punishment.") (quotation marks omitted) (emphasis added);

---

incriminating details to which Red had already admitted under oath.

*Hill v. Lockhart*, 28 F.3d 832, 845 (8th Cir. 1994) ("Given the severity of the potential sentence and the reality that the life of [the defendant] was at stake, we believe that it was the duty of [his] lawyers to collect as much information as possible about Mr. Hill for use at the penalty phase of his state court trial.") (quotation marks omitted) (citation omitted).

355.    The failure to collect and present relevant mitigating evidence, without a sufficient supporting reason, is ineffective assistance of counsel. *See, e.g., Williams v. Taylor*, 120 S. Ct. 1495, 1514-15 (2000) (holding defense attorney in capital case ineffective for neglecting to undertake "a thorough investigation of the defendant's background" in preparation for sentencing); *Hall v. Washington*, 106 F.3d 742, 749 (7th Cir. 1996) (granting federal habeas corpus relief under the Antiterrorism and Effective Death Penalty Act when counsel overlooked significant mitigating testimony concerning Applicant's background and character, pointing to particular importance of thorough representation at sentencing phase of death penalty proceeding); *Glenn v. Tate*, 71 F.3d 1204, 1208-11 (6th Cir. 1996) (finding deficient performance and prejudice when the jury was not presented with extensive mitigating evidence of defendant's neurological problems and susceptibility to influence); *Emerson v. Gramley*, 91 F.3d 898, 906-07 (7th Cir. 1996) (granting punishment phase relief when habeas counsel compiled "moving narrative" of defendant's "bleak, so deprived, [and] harrowing" upbringing, no evidence of which had been presented to the jury); *Loyd v. Whitley*, 977 F.2d 149, 159-160 (5th Cir. 1992) (finding *Strickland* prejudice and granting punishment phase relief because the defense inexcusably overlooked copious evidence of defendant's mental illness).

356.    Because of the United States Constitution's premium on heightened reliability in death sentencing proceedings, ineffectiveness in the punishment phase is unusually likely to result in reversal. *See, e.g., Moore v. Johnson*, 185 F.3d 244 (5th Cir. 1999) (affirming District Court's finding of ineffectiveness based on counsel's failure to investigate, develop or present mitigating evidence); *Williamson v. Ward*, 110 F.3d 1508, 1514 (10th Cir. 1997) (prefacing discussion of counsel's effectiveness in death penalty case by noting that "we are mindful of the Supreme Court's

observation that '[o]ur duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case'" (quoting *Burger v. Kemp*, 483 U.S. 776, 785 (1987)); *Hendricks*, 70 F.3d at 1044 (observing that "the law's sensitivity to failures in the [death] penalty phase" is a given); *Magill v. Dugger*, 824 F.2d 879 (11th Cir. 1987) ("The jury's weighing of aggravating and mitigating circumstances is always a delicate process, and it is difficult to predict with certainty the effect which constitutional errors had upon that weighing process.").

357.   Mr. Colella should not have been convicted of capital murder.   He maintains his innocence.  No punishment phase should have occurred.  Nevertheless, counsel in a capital case must prepare for the punishment phase of any death penalty trial, regardless of the prospects of acquittal at the guilt/innocence phase. *See, e.g., Clabourne v. Lewis*, 64 F.3d 1373, 1387 (9th Cir. 1995) (finding counsel deficient for failing to present available mitigating evidence on ground that once client had been convicted, nothing would "have saved him from the death penalty"); *Blake v. Kemp*, 758 F.2d 523, 533 (11th Cir.) (finding trial counsel deficient because he "made no preparations whatsoever for the penalty phase of Blake's trial because he believed that Blake would be found not guilty by reason of insanity"), *cert. denied*, 474 U.S. 998 (1985); *cf Kubat v. Thieret*, 867 F.2d 351, 369 (7th Cir.) ("Counsel may not treat the sentencing phase as nothing more than a mere postscript to the trial."), *cert. denied*, 493 U.S. 874 (1989).  For purposes of this section, *solely for convenience and for the purposes of this argument*, the correctness of the jury's guilt verdict will be assumed.  No statement in this portion of the Application is an admission, either express or implied, that Paul Colella is criminally or otherwise liable for the deaths of Mr. Lavesphere or Mr. Taylor.

358.   This case is not an extremely aggravated offense.   Without minimizing the seriousness of the deaths, it is essential to consider the context.  According to the State, Mr. Colella did not lay in wait and ambush the victims.  He did not take out a contract.  He did not casually eliminate them to get rid of witnesses to a crime.  He did not pick the victims at random in a predatory manner, or slowly torture them.  Throughout Brenda and Paul Colella's trials, every single

piece of evidence establishes one central fact, which the State has never disputed and which the State has, in fact endorsed.

*Assuming Mr. Colella killed the victims, he did so for one reason: he genuinely believed that, hours before, they had gang-raped his wife.*[44]

359.    The State did not seek the death penalty against Mrs. Colella.  The State cut a deal with the other participant, Red Wilson, in which he completely escaped from capital murder charges. In fact, the State did not think that the circumstances of *this* crime warranted punishment of Mr. Colella by lethal injection: originally it chose not to seek the death penalty, and only chose to do so after it found that Mr. Colella had a criminal record.  S.F. Vol. II: 5.

**b.  The punishment phase case presented by trial counsel was woefully deficient.**

---

[44] In its Substitute Appellate Brief, the State maintained that Brenda's allegation of rape was the sole cause of Mr. Colella's actions. *See* App. II, Exh. 19 (State's Substitute Appellate Brief) at 17-18 (asserting that "Paul would not have killed the men but for [Brenda's alleged] lie that they had raped her" and that "Appellant knew that but for her lie Paul would not have killed the men").

"A defense lawyer in any death case who doesn't count on getting to the penalty phase is a fool."[45]

"The day the case comes in, you start preparing for the penalty phase. By the time you pick a jury, you should have a good idea what your penalty phase case will be."[46]

Mr. Limas did not adequately prepare for the sentencing phase. He testified as follows:

Q.    Regarding the punishment, Mr. Colella was assessed the death penalty, is that correct?

A.    That's correct.

Q.    Were you aware that he had a history of psychiatric care?

A.    *Yes, I was.*

Q.    Was any evidence introduced regarding this psychiatric history?

A.    *Very little.*

Q.    Was there potential to introduce more but you didn't do it, or what happened in that regard?

A.    This was one of his – well, the only, the only person that came on to testify was by the State. And that's what – that's who I cross-examined. I believe he was a witness that had dealings with Paul when Paul was, I believe, 12 years-old, somewhere in there, 11 years-old. But that's the only witness.

Q.    But you were aware that he had other potential witnesses regarding his psychiatric history?

A.    Yes.

---

[45] David E. Rovella, *Preparing for the Penalty Phase*, NAT'L L.J., May 12, 1997, at A1, A14 (quoting experienced capital litigator and Yale Law School Professor Stephen Bright).

[46] *Id.* (quoting Natman Schaye, co-chair of NACDL's Death Penalty Defense Committee).

Q.     And none of that was introduced?

A.     No.

App. I, Exh. 9 (Evidentiary Hearing) at 9-10 (emphasis added).  Counsel later almost confessed to inadequacy in this regard:

Q.     [Don't you think it would be the best practice to obtain all psychiatric records that are possible for Mr. Colella  and then let the Court sort it out?

A.     Well, at least for the punishment phase.

Q.     That's all I am talking about, punishment.   For punishment, psychiatric evidence is important and obtaining all his records were important; is that correct?

A.     I agree with that.

Q.     And that wasn't done, was it?

A.     No.

*Id.* at 26-27 (emphasis added).  Trial counsel also failed to perform other essential tasks such as (1) interviewing the defendant's family members concerning the family's background or the defendant's mental problems (App. III, Exh. 39 (Curtis Aff.) at ¶¶28, 33); (2) contacting any witnesses from Indiana, where Mr. Colella had lived until shortly before the crime; (c) investigating the circumstances of his client's juvenile arrests, which the State used in aggravation; and (d) requesting an evaluation of his client by a mental health expert.  Trial counsel failed to even request the appointment of a mental health expert, despite his admission during the state habeas hearing that he knew his client had a history of mental illness and emotional problems.

360.     Trial counsel presented three witnesses at the punishment phase.  The two non-family witnesses were David Coffee, Mr. Colella's former boss at a South Padre Island real estate firm for whom Mr. Colella worked for a few months in 1991, and Joe Palermo, a neighbor at Mrs. Curtis' trailer park who got to know Mr. Colella for a few weeks when Mr. Colella was living with his

mother. S.F. Vol. XXI: 126-181. The same pattern present in the guilt phase continued in the punishment phase: instead of trial counsel locating these witnesses by diligent investigation, Mrs. Curtis located them only after she realized that trial counsel was not going to put forth any real investigative efforts to try to locate and present mitigating evidence to save her son's life. *See* App. VI, Exh. 56 (Supplemental Affidavit of Mary Curtis), at ¶¶3-4. Mrs. Curtis located them after Mr. Colella was convicted, and told Mr. Limas about them "on the first or second day of the punishment phase trial itself." *Id.* at ¶4. The only preparation they received of which Mrs. Curtis was aware was possibly a brief conversation in the hallway immediately before they testified.

361.    The witnesses' lack of preparation was evident: the prosecution effectively cross-examined them because they had only known Mr. Colella for a few months and were unaware of many aspects of his life. *See* S.F. Vol. XXI: 159-168, 177. Indeed, the prosecution exploited the defense's utter lack of preparation by barraging Mr. Coffee, Mr. Colella's former supervisor, with allegations (some misleading) concerning Mr. Colella's former convictions. *Id.* at 163-64. Mr. Coffee obviously had not been furnished with this information by the defense, and in fact stated he would not have hired Mr. Colella had he known about it. Trial counsel permitted Mr. Coffee to be neutralized as a defense witness and, in fact, turned into a prosecution witness.

362.    Mr. Colella's mother, Mary Curtis, was the last witness. She testified that Mr. Colella suffered psychiatric problems which began early in his life. Mrs. Curtis' direct examination occupies seven printed pages of the record. Mrs. Curtis received no preparation for her testimony:

> Mr. Limas told me I would be a witness the same day of my testimony. He just said "I'm gonna put you on the witness stand." That was the extent of his preparing me as a witness. He did not tell me specific questions he intended to ask. As a lay person, I had no idea what to expect and what to say to the jurors. I did not know what would help my son and had no guidance from Mr. Limas.

App. III, Exh. 39 (Curtis Aff.) at ¶31. The lack of preparation is evident:

> Q.      [by trial counsel] And can you tell this jury when Paul first started having problems?

197

A.      When he first started having problems?

Q.      When he started being involved with the law.

A.      If it please the Court, I would like to go back farther than when he was involved with the law.

Q.      Okay, I'll ask you that.

A.      At the age of four-years-old Paul was diagnosed as hyperkenic.

Q.      I'm sorry?

A.      He was diagnosed as a hyperkenic.

Q.      Hyperkenic?

A.      Hyperactive.

Q.      Hyper?

A.      Yes.

Q.      Okay.  And that was through a doctor?

A.      Yes, it was.

Q.      And that's the information you got?

A.      Yes.

Q.      Okay.  And did you put him into a regular school?

A.      At one point he was in a regular school.  He started into kindergarten.

Q.      Okay.

A.      *The facts I am telling you are documented in Chicago, Illinois and Terre Haute, Indiana about Paul.*

Q.      Okay . . .

S.F. Vol. XXI: 127-28 (emphasis added).  This testimony was undermined by the lack of basic

198

witness preparation, which forced Mrs. Curtis to repeatedly ask for clarifications of trial counsel's questions. Mrs. Curtis actually asked the Court for permission to describe Paul's background. When it dawned on her that counsel had not read any of the records, and in fact knew nothing about Paul's early life, Mrs. Curtis seemed to actually scold him from the witness stand. Later, the following exchange occurs:

> Q.   Now, you know that the State is asking for a sentence of death on Paul?
>
> A.   Yes, I do.
>
> Q.   And do you have any pleas for the jurors?
>
> A.   Do I have any pleas for the jury?
>
> Q.   Would you like to tell them something about your son?
>
> A.   I want to say the right thing. I can't find the right words. I love my son very much. I understand the hurt the families of the deceased are feeling. I have lost a child. I feel like in this situation I am losing another child, even though he may be given a life sentence instead of a death sentence. I am asking for the jury's and I am pleading for my son's life.

*Id.* at 132. As Mrs. Curtis recalls: "When [trial counsel] asked me whether I had any 'pleas' for the jury, I didn't understand his question, and didn't know what I was supposed to say. I had not been told that I would be expected to, or allowed to, 'plead' for my son's life, or what I would be allowed to say." App. III, Exh. 39 (Curtis Aff.) at ¶32.

363.    Counsel's failure to prepare *any* of the defense's punishment phase witnesses is painfully apparent. Witness preparation is essential to competent advocacy:

> [W]itnesses, especially clients, are entitled to the lawyer's help in ensuring that their testimony is presented accurately and persuasively. The justification is compelling. A witness, left to her own devices, might be forgetful, inarticulate, or unaware of the significance of the facts she relates or omits. People come to lawyers precisely because they want, and are entitled to, assistance in presenting their claims and defenses. It *smacks of abandonment* to submit a client to examination without first reviewing the potential testimony.

Lubet, *supra*, at 79 (emphasis added).

364.    With Mary Curtis' testimony, the defense case was over. Counsel's performance was totally inadequate.  He presented two character witnesses whom he did not even locate himself, and obviously failed to prepare.  As a result, their testimony was weak, and Mr. Coffee's testimony damaged Mr. Colella due to lack of preparation for cross-examination.  Mr. Colella's mother was hurried to the witness stand at the last minute without any preparation, as was painfully apparent from her testimony.  All the jury learned about the childhood and mental problems of the young man they sentenced to death were a few isolated facts, consisting of seven pages of the record, from his mother.  As trial counsel admitted, he told the jury "very little" about this.  Superficial punishment phase testimony which comes from the defendant's family members may be discounted if not adequately corroborated. *Mann v. Scott*, 41 F.3d 968, 984 n.11 (5th Cir. 1994); *Johnson v. Collins*, 964 F.2d 1527, 1532 (5th Cir. 1992).  Trial counsel overlooked sources of compelling, credible mitigation, and certainly failed to effectively use the wealth of additional information (much of it corroborated by independent experts) that Mrs. Curtis possessed.  The mitigation case was a shadow of what it could have been, and deprived Mr. Colella's sentencing jury of the thorough presentation to which it was entitled, and which it required to perform its awesome task.

> **c.      Counsel failed to adequately investigate and present to the jury neutral, credible evidence of Petitioner's chaotic, poverty-stricken, traumatic upbringing, and his extensive, well-documented history of hyperactivity, suicide attempts, depression, and brain damage.**

365.    Paul Colella was born on October 27, 1968, in Louisiana.  His mother drank heavily during his pregnancy:

> At that time of my life, I was a heavy drinker.  While I was pregnant with Paul, I drank alcohol.  Back then, people were not as aware of the risks of drinking while pregnant.  While I was pregnant with Paul, I would drink two or three times a week. My drinks of choice were vodka and wine.  I would drink until I passed out.

*See* App. III, Exh. 39 (Curtis Aff.) at ¶7.  Mrs. Curtis has since completely stopped drinking. *Id.*

200

Her heavy alcohol intake may have caused Paul's organic brain damage. *See* App. III, Exh. 40 (Affidavit of Cecil Reynolds, Ph.D.) ("Reynolds Aff.") at ¶4.[47]

366.    Paul's natural father, Paul Watts, and his mother were itinerant carnival workers. Paul's natural father was "uneducated, a drug addict, an alcoholic, and extremely abusive to Mrs. [Curtis] and all the children except Paul."[48] *See* App. III, Ex. 44 at 2  (Treatment Records, Loyola Guidance Center) ("Loyola Records").   While Paul was very young, one of his sisters died from leukemia. *Id.* For five months, his sister slowly died, and his mother was often out of the house for extended periods caring for her when she was in the hospital. *Id.*; *see also* App. III, Exh. 39 (Curtis Aff.) at  ¶9.

367.    Paul Watts was illiterate, and came from an impoverished family marked by mental illness, alcohol and drug abuse, and physical abuse. *Id.* at ¶8 (observing that Watts' father had mental problems, and that there was mental retardation in the family).  Paul Watts subjected the young Paul Colella's family to years of nightmarish physical, sexual, and emotional abuse when Paul Colella was growing up.  Mrs. Curtis remembers several incidents:

> I remember several specific incidents of Paul Watts' violence and abuse.  In 1972, when we were living in Chicago, I was outside the apartment building, and I refused to go back into my apartment because I was afraid.  Paul Watts took my son Steven, who was then a toddler, and hung Steven out the window by his shirt.  He did this to try to get me to come back in.  While this happened, I was watching outside the apartment complex, and my son Paul, who was about 4 years old, was standing right beside me, witnessing the whole thing.

---

[47] Dr. Cecil Reynolds, a neuropsychologist with extensive forensic experience, has analyzed Mr. Colella.  His Affidavit is included in the Appedicies as Exhibit 40.  Dr. Reynolds reviewed Paul Colella's psychiatric records and evaluated him in person as of March of 1999.

[48] The names of individuals are redacted in the records from this facility.  When obvious from the context, the name of the person being referred to will be inserted in brackets.

> In 1971, when I was pregnant with my daughter Susan, Paul Watts shoved me down a flight of stairs, and I had to be hospitalized for three weeks. On another occasion, Paul Watts doused me with lighter fluid and threatened to burn me up. My son Paul and several of my other children witnessed much of this behavior.
>
> When we were staying in North Carolina with the carnival, Paul Watts abandoned me for two days. I had no food or diapers and no money to buy either for my children. I borrowed five dollars from a neighbor, packed one bag, and left on foot with three children, including my son Paul. We hitchhiked for two days, then someone with a big heart bought us bus fare to Indiana. We stayed with my parents for a few days, then moved to Chicago. This was 1972 when Paul was about four years old.
>
> Paul Watts constantly physically abused me. The abuse seemed to get worse as the years went by. I often had to go to the emergency room because of the severity of Paul Watts' beatings. Once, he beat me with a motorcycle chain. My son Paul witnessed most of these attacks.

App. III, Exh. 39 (Curtis Aff.) at ¶¶12-15. In 1972, when Mrs. Curtis was in the hospital recovering from blood clots in her lungs, Paul Watts' brother, who Mrs. Curtis reports is now serving time for sexually abusing children, kidnapped three of Mrs. Curtis' children-including Paul-and took them to Indiana. *Id.* at ¶17. They remained there for three months while Mrs. Curtis received intensive medical treatment. *Id.* at ¶18. When she picked them up, they were dirty and malnourished, and needed medical attention. *Id.* Later that year, Paul Watts was arrested for raping one of his own stepdaughters, one of Mr. Colella's stepsisters. *Id.* at ¶ 6. Mrs. Curtis became so afraid of him that she took her children, including Paul Colella, to the Salvation Army shelter rather than live with Paul Watts. *Id.*

368.    The death of her fifteen-year-old daughter in 1970, as well as her troubled home and her serious medical problems, severely affected Mrs. Curtis during Paul Colella's formative years. Mrs. Curtis is extremely candid about her problems:

> After Marie died, I went into a very deep depression. I began drinking all the time and found it extremely difficult to care for myself and my children. I once tried to jump out of a car on the way to a therapist's office. I was diagnosed with depression

202

by the therapist and was prescribed medication. I continued to drink while I took the medication, which further reduced my ability to function. I felt overwhelmed with grief and sadness, and felt guilty that my mental illness was interfering with my ability to care for my children. I also had many serious medical problems in the early 1970s which required me to stay in the hospital for long periods of time.

App. III, Exh. 39 (Curtis Aff.) at ¶10; *see also* App. III, Exh. 44 (Loyola Records) at 2 (October 2, 1975 report describing Mrs. Curtis' physical problems)

369.     Mr. Colella began to display psychiatric problems requiring professional intervention at the age of seven, when he was referred to the Loyola Guidance Clinic in Chicago, Illinois. He was referred by the Field School, where he was attending elementary school, and by his pediatrician. *See* App. III, Exh. 44 (Loyola Records) at 1. Counselors at the Loyola Clinic observed that Paul was "'overactive' and has a visual-motor learning disability." *Id.* The referral came because in the late summer of 1975, Paul's brother was badly burned as he and Paul played with lighter fluid. *Id.* The boys had watched Paul's father, during his divorce from Paul's mother, douse her with lighter fluid and "threaten[] to burn her up with a match." *Id.* The counselors suspected that the boys may have been trying to re-enact this incident. The counselor observed that Paul's mother's life was "stormy and chaotic." *Id.* at 2. His mother had been separated from him for long stretches for treatment of serious illnesses such as "kidney and bladder difficulties" and "pulmonary embolisms [sic] in her leg and lungs." *Id.* Paul's stepfather was a "fair" surrogate father for Paul, but did not know how to control Paul's increasingly disturbed behavior. *Id.* Paul's mother admitted to "emotional disturbance" requiring medication. The Loyola Child Guidance Clinic agreed to try to treat Paul for a weekly fee of $1.00, since the family was on Public Assistance. *Id.* Many of the treatment sessions were missed because of the ill health of Paul's mother. *Id.* at 3.

370.     Paul was evaluated on March 23, 1978, when he was nine years old, by a team of psychiatrists at the Guidance Clinic. They found him to be disturbed, and concluded that some of his problems may have been caused by organic brain damage. First, the team noted Paul's poor performance in school, which might have been explained by learning disabilities and "anxiety." *Id.*

CMPDF - www.texio.com

at 4. The evaluation noted Paul's "poor academic progress" and reported "possible difficulties in verbal mediation." The doctors observed that "[a] question of neurological and/or visual impairment is raised on the basis of the following test material[.]" *Id.* The doctors then described three separate test results that made them suspect neurological damage. *Id.* "In light of the mother's report of a recent abnormal EEG, birth complications and epilepsy of Paul's sister, . . . the hypothesis of organic impairment should be investigated further." *Id.*

371.    The psychiatrists also reported clear signs of depression and impulsive behavior. The doctors noted a "lack of integration between his thoughts and feelings with an ensuing inability to judge before acting." *Id.* at 5. Commenting on the thematic apperception test (TAT), which asks subjects to create stories to explain drawings of people in different situations, the doctors observed: "Depression is a common theme throughout Paul's TAT stories and one suicide story and several deaths were given." *Id.* The doctors again noted Paul's impaired ability to "judge before acting." *Id.* The doctors continued "Although suicidal impulses are present, the probability of Paul's consciously acting upon them is low. It is important to note, however, that because hostile and depressive feelings are salient for Paul now, in combination with his impulsive tendencies, he may be inclined toward 'accident-proneness.'" *Id.* at 6. They conclude that "[f]urther investigation of neurological and visual impairment is also recommended." *Id.* However, as Dr. Cecil Reynolds noted, "the records do not indicate that any such evaluation was ever performed on Paul. Thus, it appears that Paul was never properly evaluated and diagnosed, and that the treatment interventions he received may thus have been ineffective." App. III, Exh. 40 (Reynolds Aff.) at ¶7.

372.    During a subsequent examination by L. Marks, Paul was administered several different psychological tests. He seemed bored and easily distracted: "He would count the [Rorschach] cards and persistently attend to the stop watch asking questions about how it operated." App. III, Exh. 44 (Loyola Records) at 7. "Paul's attention to the stop watch, among other distracting behaviors, heightened . . . his activity level had increased considerably (e.g. fidgeting in his chair,

fingering materials on the desk, looking out the window, and repeated attempts to look at the manual). Paul was not observed to be a quiet, obedient boy but one who was impulsive, impish, and curious." *Id.* The "examiner was left with the impression that Paul is tightly controlling his thoughts and feelings and has a need to shut out inquiry into those from the outside world." *Id.* at 8.

373.    Two therapists described weekly sessions with Paul.  The first therapist is Joe Yount, whose August 1, 1978 summary of his treatment appears on pages 9-10.  Mr. Yount had approximately 35 sessions in the ten months he treated Paul, although he notes that "[s]everal sessions have been cancelled because of vacations or illness [and] family difficulties with regard to providing transportation." *Id.* at 9.  Yount observed that Paul seemed to have more fun "'rough-housing'" than playing with toys or games.  *Id.*  Yount continues, stressing that Paul's acting-out behavior can be controlled by sympathetic limit-setting:

> This physical play soon became quite exhausting for me.  Paul was extremely active, and seemed to get quickly out of control.  This was manifested in almost total disregard for his own (and my) physical safety.  When playing catch, he would throw a ball with all his might at me. He would also climb on the furniture and "fall down." My goal at this time became one of limit setting. However, he seemed unresponsive to simple "Don't" commands. This was quite frustrating for both of us until I began offering simple reasons for the limits I was setting.  Of special importance were my statements concerning physical danger.  When I told Paul we couldn't do a certain thing because it could hurt him or me, he calmed down considerably. He seemed to respond best when I implied that I could control him and that I cared about his well being.
>
> From my own observations and from psychological testing results, it seems that Paul has great difficulty understanding the behavior of adults. One of my main goals has been to provide a model of adequate adult behavior for Paul to identify with. In my judgment, this identification process has been helped considerably by my offering simple and concrete explanations for my behavior and asking Paul to repeat them. This process began in the context of limit setting. More recently, I have generalized this approach to other things we do, with an increasing emphasis on positive behaviors. For example, I might tell Paul that I like to go to the park with him because it feels good to get exercise and it's fun to play with a friend.
>
> I have also attempted to use this strategy to help Paul understand his own feelings and behaviors as well as those of other adults. This has met with some success.

> However, Paul still seems reluctant to deal with negative feelings such as anger or sadness. He responds to these issues by trying to change the subject or withdrawing.

> Another goal in my intervention with Paul has been to ameliorate his school problems. In January, I met with his school principal. It was my impression that Paul's teacher was quite harried and overwhelmed from having to handle children with behavior problems. Paul was subsequently transferred to a classroom with a different teacher. Since that time, he reportedly has behaved much more appropriately and even tells me that he enjoys his school experience.

*Id.* (emphasis in original) The therapist then observes that further treatment should focus on helping Paul "understand the behavior of adults," and that a male therapist should be preferred because Paul's "relationships with adult males have been transitory and confusing in the past." *Id.* at 10.

374. Paul continued treatment with another therapist, Paul Perz. In a summary of sessions held in October of 1978, Mr. Perz noted Paul's continuing problems with impulsiveness: "Paul played aggressively and limits had to be set as he soon began throwing stones, climbing fences, and crawling underneath parked cars." *Id.* at 11.

> Similar behavior was evident in our second session. Paul could not decide what game he should bring into the room so he suggested that we wrestle and that I give him "horsey rides." Paul's play became so aggressive that I imposed strong limits as to what we could/not do. Paul appeared to accept the explanation of my fear that one or both of us may get hurt.

*Id.* In an effort to contain Paul's impulsive and dangerous behavior, his doctor recommended "an increase of Paul's dosage of Mellaril from 1 tablet, 25 mg. to 2 tablets daily." *Id.* As Dr. Reynolds notes, Mellaril is "a powerful tranquilizer and an antipsychotic medication typically used with only severe psychiatric disturbances, especially at the age he received this medication." App. III, Exh. 40 (Reynolds Aff.) at ¶ 14.

375. In November of 1978, the therapist noted that Paul's aggressive behavior was continuing, but that he "seemed to be gradually responding to limits set by the therapist." *Id.* at 13. In December, following some "window breaking" incidents, Paul's mother was informed of his conduct: "Paul's immediate reaction was withdrawal and for the entire session he did not actively

<center>206</center>

participate, he sat quietly in the chair with his head buried in his arms." *Id.* at 14. Mrs. Curtis later called the clinic and revealed that "Paul has been depressed, withdrawn, and has had crying spells during the past two weeks." *Id.* She also revealed that the family physician had doubled Paul's dosage of Mellaril, as had earlier been contemplated. *Id.* When the therapist spoke to Paul about this conversation, he became "lethargic" and "guarded" and stated that "'you probably think I'm crazy.'" *Id.*

376. Paul was committed for inpatient treatment to the Chicago Read Mental Health Center on April 15, 1977. *See* App. III, Exh. 42 (Chicago Read) at 1-2. Paul, then eight years old, had "verbalized [wanting] to die by jumping out the window," had tried to hang himself with a belt twice, and had threatened to stab himself in the abdomen with a fork. *Id.* at 2 Paul had also engaged in violent behavior toward his siblings. *Id.* Dr. Hakimi, a Mental Health Center doctor, evaluated Paul and described his demeanor as "depressed and anxious," observed that he had a "frightened tense and sad facial expression," "very badly expressed his wish to go home and be with his family" and that he "was talking very slowly & always while crying." *Id.* at 3. Dr. Hakimi concluded that Paul was displaying "objective and subjective signs of depression and deprivation syndrome." *Id.* Although Dr. Hakimi apparently felt it necessary to "evaluate possible organicity," he or she was unable to do so. However, there is a handwritten note "IQ Normal/'soft neurological' & 'clumsiness'?" *Compare* App. III, Exh. 39 (Curtis Aff.) at ¶19 (after concussion from fall when Paul was three years old, Paul "seemed more clumsy and less coordinated than he was before"). Dr. Hakimi observed that Paul's early childhood had been marked by repeated traumatic events:

> At age 2 ½, his sister died of cancer
> At age 3, he had a concussion from falling
> At age 3 ½  his father left
> At ages 3 ½ & 4 & 6, his mother was hospitalized
> At age 7 he wanted to see his sister's grave

*Id.* at 2, 5-6 (underline in original).

377. A follow-up interview with a social worker noted that Paul had repeatedly fought

with his teachers to the point of "kicking and biting," and that "[o]nce he was in such a frenzy that he did not recognize his own mother." *Id.* at 4 (assessment by social worker Diane Kopan). The social worker observed that the attempt to treat Paul's hyperactivity with medication was "unsuccessful," and that his suicidal and aggressive behavior became so acute that he was referred to a pediatric neurologist, who certified him as "suicidal." *Id.*

378.    The social worker described Paul as "extremely quiet, tense, guarded defensive child . . .who is so withholding or repressed (it is unclear which) that projective testing obtained no responses except one in which he demonstrated a clearly suicidal idea." *Id.* at 5. A Basic Child Study "revealed a slow normal child intellectually, who had visual motor problems . . . anxiety indicators and an extremely unstable family life." *Id.* Paul's mother revealed that she had been "so nervous" during her divorce from her abusive first husband that she "didn't learn she was pregnant [with Paul] til [the] 5th month." *Id.* During this time, Mrs. Curtis drank heavily. *See* App. III, Exh. 39 (Curtis Aff.) at ¶ 7. The social worker observed "many traumas" in Paul's early life: "at age 2 ½ Paul's sister, then age 16 ½, died of cancer, at age 3 [Paul suffered] a concussion from falling, age 3 ½ Paul's father, Mr. Watts, left, as did his sister (she ran away[)]. Mr. Watts abused drugs and alcohol, was violent toward Mrs. Watts and children, but permissive toward Paul and encouraged Paul to act out." App. III, Exh. 42 (Chicago Reed) at 5- 6. The social worker observed that Paul had been separated from his mother during his early development because his mother required prolonged treatment for serious illnesses such as "bladder repair, kidney stones, and pulmonary embolisms." *Id.* at 6.

379.    Many of Paul's siblings also suffered from the chaotic and abusive conditions at home. One sibling was "hospitalized 6 times (5 for pneumonia) up to a year ago" and "was started by Evanston Hospital on phenobarbital for a seizure problem (after tantrums, vomiting, severe head pain) and referred to Loyola Child Guidance." *Id.* Another sibling, with whom Paul was "very identified," ran away from home and had three children by the time she was 19. *Id.* When Paul was

seven, this sibling, in front of Paul, threatened to commit suicide by overdosing. She had an extensive history of treatment for "emotional problems." *Id.* Paul's mother herself had been medicated with antidepressants and antianxiety drugs since Paul was five. *Id.*

380. On June 13, 1977, a psychologist at the Henry Horner Children's Center evaluated Paul. *See* App. III, Exh. 41 (Henry Horner) at 1. During the testing, Paul was "withdrawn" and "very guarded," and responded "I don't know" to many questions. *Id.* Paul's "emotional problems may have interfered with his ability to attend to school work and he could already be showing a deficit in some school related skills." *Id.* at 2. The psychologist further observed that "Paul gets punished psychologically and/or physically by his parents when he gets into a conflict or argument with his younger sister or brother." *Id.* Once again, the clinician perceived a suicidal component in Paul's thinking:

> Paul views himself as a small boy without very much social or psychological support in a threatening world. He tries to present a happy carefree image which is in marked contrast with the sad feelings that occasionally slip out. Paul's longest test story on the TAT was in response to a card that shows a lady burying her head in her arm and sitting on the floor with a gun at her feet. Paul said, "It looks like a lady and that's a gun. She shot herself. She's mad." (Examiner: "Why is she mad?") "Don't know. Maybe she had a fight." (E: "What happened next?") "Buried." (E: "What will her parents think?") "They'll be upset and probably kill themselves." Given Paul's general level of nonresponsiveness, this story with several suicides shows that despite his strong attempts at control and repression of conflicts his suicidal thoughts do come out. Considering his withdrawn behavior, depression, and previous suicidal gestures, his suicidal potential must be regarded at least as moderate and a definite possible action if he is not given the opportunity to discharge some of his angry and sad feelings.

> Diagnosis:

> Withdrawing Reaction of Childhood (DSM-II 308.I) with moderate suicidal potential.

*Id.*

381. Paul was nine years old at this evaluation. As Dr. Reynolds observes: "It is unusual to see such serious suicidal gestures in children that young. When such seriously disturbed behavior

209

is present in young children, it indicates severe mood disorders that generally require intensive therapy or medication to overcome." App. III, Exh. 40 (Reynolds Aff.) at ¶17.

### d. Trial counsel's failure to secure a psychiatric assessment of his client despite ample notice that his client had a long history of mental health and behavior problems constituted deficient performance.

382.   Trial counsel never obtained any of the records excerpted above.  They were not difficult to locate: undersigned obtained them merely by sending a request and release to the relevant institutions.  Trial counsel admitted during the state habeas evidentiary hearing that he knew before trial that his client had a history of mental illness and behavioral problems.  Aside from putting Paul's mother on the stand (with no preparation), trial counsel did nothing to investigate this history of mental problems, and thus remained ignorant of his client's family and mental health history.

383.   Given his knowledge of the defendant's history of mental illness, counsel was obliged to investigate further.  The failure to proffer mitigating evidence "is not per se ineffective assistance," but only if that "omission is based on well informed, strategic decisions." *Rector v. Johnson*, 120 F.3d 551, 564 (5th Cir. 1997) (*citing King v. Puckett*, 1 F.3d 280, 289 (5th Cir. 1993) and *Wilkerson v. Collins* 950 F.2d 1054, 1065 (5th Cir. 1992), *cert. denied*, 113 S. Ct. 3035 (1993)).  The key question is thus whether counsel fulfilled his duty to "make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. Lawyers who remain ignorant of readily available mitigating evidence relevant to the punishment phase of a capital murder trial cannot make reasoned strategic decisions and render effective assistance to their clients. *Emerson v. Gramley*, 91 F.3d 898, 905-06 (7th Cir. 1996), *cert. denied,* 117 S. Ct. 1260 (1997) (counsel unable to make reasoned strategic judgment regarding whether to proffer mitigation when his inadequate preparation had left him ignorant of what evidence could have been offered).

384.   The deficiency is clearer when the defense lawyer reasonably should know the existence of certain mitigating evidence. *See, e.g., Cook v. Lynaugh*, 821 F.2d 1072, 1078-79 (5th

Cir. 1987) (holding decision not to investigate validity of prior conviction deficient because lawyer had "objective indicia" indicating its unreliability); *Hendricks v. Calderon*, 70 F.3d 1032, 1043 (9th Cir. 1996) (where counsel knows client has history of mental illness, "counsel's failure to investigate his client's mental condition as a mitigating factor in a penalty phase hearing, without a supporting strategic reason, constitutes deficient performance") (citation omitted), *cert. denied*, 517 U.S. 1111 (1996); *Jones v. Thigpen*, 788 F.2d 1101, 1103 (5th Cir. 1986) (reversing death sentence when counsel "either neglected or ignored critical matters of mitigation at the point when the jury was to decide whether to sentence [his client] to death."), *cert. denied*, 479 U.S. 1087 (1987).

385.    An expert witness was necessary to present fully Mr. Colella's adequate defense. *Elledge v. Dugger*, 823 F.2d 1439, 1445 (11th Cir. 1987), in reversing a death sentence on ineffectiveness ground, is illuminating:

> An attorney has a duty to undertake reasonable investigation or "to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. Elledge made his counsel aware of his unhappy and abused past; yet counsel did not even interrogate Elledge's family members to ascertain the veracity of the account or their willingness to testify. He also did not seek out potentially helpful expert witnesses.

*Id.* Elledge's trial counsel raised his mental state as a defense solely by presenting Elledge's own "'free-form' testimony about his background and mental impairments." *Id.* In *Collier v. Turpin*, 155 F.3d 1277 (11th Cir. 1998), trial counsel had failed to obtain expert input and had overlooked other relevant mitigation, and instead had relied solely on brief testimony from relatives:

> [C]ounsel presented ten separate witnesses, including Collier's wife, whose relevant testimony consisted almost entirely of one or two word answers to inquiries as to Collier's general reputation in the community, his reputation for truth or veracity, his reputation for hard work, and his reputation as a man who supports his family. . . . Had counsel presented the wealth of mitigating evidence that they gathered in preparation for the sentencing phase of the trial, we believe there is a reasonable probability that consideration of these factors would have led the jury to a different result.

155 F.3d at 1296; *see also Antwine v. Delo*, 54 F.3d 1357, 1367-68 (8th Cir. 1995) (counsel

ineffective in capital sentencing phase when he knew of defendant's strange behavior, but failed to obtain expert input which would have revealed defendant's bipolar disorder), *cert. denied*, 116 S.Ct. 753 (1996); *Clabourne v. Lewis*, 64 F.3d 1373, 1384-1387 (9th Cir. 1995) (counsel ineffective for failing to adequately prepare testifying trial expert with recent mental health records which would have changed defense expert's diagnosis, as well as state expert's diagnoses, to schizophrenia instead of antisocial personality disorder); *Blanco v. Singletary*, 943 F.2d 1477, 1501-05 (11th Cir. 1991) (counsel never spoke to potential witnesses and thus failed to present evidence of childhood poverty, seizures, family history of psychosis, organic brain damage, borderline retardation, epileptic disorders and paranoid and depressive behaviors; counsel also asked for continuance to procure psychiatric exam and then never had one conducted), *cert. denied*, 504 U.S. 946 (1992).

386.    Trial counsel admitted that it was "important" and the "best practice" to obtain records concerning psychological treatment.  The prosecution, in its cross-examination of Mr. Limas, propounded a series of hypothetical leading questions asking Mr. Limas whether some juries may distrust psychiatric evidence, or whether such evidence could hypothetically backfire.  *See* App. I, Exh. 9 (Evidentiary Hearing) at 21-22, 29-30.  In response, counsel agreed that in certain cases, psychiatric evidence might not sway the jury.  However, he carefully refrained from stating that he had not presented that evidence in *Mr. Colella's* case for any of those reasons.  In fact, he never clearly endorsed a reason for not discovering the evidence, and admitted that he had not done something that was "important" and "the best practice."  One question is particularly revealing:

> Q.     [by counsel for the State] Did you come across any case whatsoever
>        that you can inform this Court or the Court of Criminal Appeals later
>        on that you came across in researching that issue that you were able
>        to say, "oops, I had evidence here that this case said was admissible
>        concerning his psychiatric treatment?"  Did you see any case that you
>        would have used in the admission of that evidence?
>
> A.     I don't recall any.

*Id.* at 21.  Many cases conclusively establish that a capital murder defendant may (and, as the cases

discussed above establish, sometimes must) present evidence of psychiatric treatment and assessment in the sentencing phase of a death penalty case. Such evidence is often the linchpin.

387. The context of this case is crucial. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. Such is not the case here. Trial counsel did not assemble the information concerning his client's background and treatment, have his client assessed by a mental health expert, and then, with knowledge of the strengths and weaknesses of the potential case, make a conscious strategic decision. Instead, counsel remained ignorant of the evidence. He therefore could not have made a reasonable strategic decision about whether or not to present it. *Moore v. Johnson*, 194 F.3d 586, 604 (5th Cir. 1999).

388. Dr. Cecil Reynolds, Ph.D., is an experienced psychologist who specializes in forensic neuropsychology, has been recognized for his expertise, and has consulted with both the state and the defense in many death penalty trials. *See* App. III, Exh. 40 (Reynolds Aff.) at ¶1. Dr. Reynolds read the entire punishment phase of Mr. Colella's trial, the state habeas evidentiary hearing, and the psychiatric records excerpted above. *Id.* at ¶ 2. Dr. Reynolds also conducted a 5 and ½ hour in-person examination of Mr. Colella, and administered many psychological tests. *Id.* at ¶¶ 11-12.

389. Dr. Reynolds, after the examination and review of the records, concluded that Mr. Colella suffers organic brain damage.

> On certain key aspects of the neuropsychological examination, Mr. Colella scored in a range generally considered to reflect organic impairment to the brain. This impairment may be of a developmental or of a traumatic nature. Mr. Colella's history of closed head injury, maternal alcohol use, and early testing results are consistent with the results of my neuropsychological examination. He shows a central dysarthria, which is an imperfect articulation of speech due to disturbances of muscular control resulting from damage to the central nervous system; attentional deficits; impulsivity; organizational deficits; constructional dyspraxia, which is the partial loss of the ability to perform coordinated acts; memory and attentional deficits; and low average levels of intelligence and academic skill. The results thus indicate frontal and temporal lobe dysfunction, which, among other things, impairs a person's ability to benefit from feedback and alter behavior.

213

*Id.* at ¶ 13. Dr. Reynolds further observed that this information would have been clear to a competent mental health professional had one been retained prior to Mr. Colella's punishment phase trial in 1992: "[M]ultiple, overlapping indicators . . . would have led a neuropsychologist or similar specialist, when presented with th[e information in the files], to suspect that Mr. Colella may suffer from organic brain damage or dysfunction." *Id.* at ¶3. "If a reasonably competent mental health professional had been retained by trial counsel and given access to the available information about Mr. Colella and his upbringing, he or she would have recognized the need for a neuropsychological evaluation of Mr. Colella, and that evaluation would have confirmed Mr. Colella's organic brain problems as had been suspected in his many diagnostic examinations during childhood." *Id.* at ¶30.

390.    As Dr. Reynolds observed, clear warning signs of organic impairment were observed when Mr. Colella was a young child. *Id.* at ¶¶5-7. As he observes, and as the above records indicate, several different clinicians, evaluating Paul at different times, independently concluded that aspects of Paul's behavior and motor coordination, as well as the results of early psychological testing, raised a question of organic impairment. *Id.* Thus, Mr. Colella's impairments were not suddenly "discovered" on the eve of trial:

> The records I have reviewed establish that Paul Colella has displayed symptoms strongly suggestive of organic brain damage from a very early age. The records from Paul's childhood gain considerable credibility from the fact that they were created as the result of contemporaneous testing and evaluation of Paul by impartial, qualified professionals long before he had any contacts with the criminal justice system.

*Id.* at ¶8.

391.    The organic brain damage Mr. Colella sustained typically damages motor coordination and results in behavior patterns reflecting impaired judgment:

> He shows a central dysarthria, which is an imperfect articulation of speech due to disturbances of muscular control resulting from damage to the central nervous system; attentional deficits; impulsivity; organizational deficits; constructional dyspraxia, which is the partial loss of the ability to perform coordinated acts; memory and attentional deficits; and low average levels of intelligence and academic skill.

214

> The results thus indicate frontal and temporal lobe dysfunction, which, among other things, impairs a person's ability to benefit from feedback and alter behavior.

*Id.* at ¶ 13. Once again, Dr. Reynolds observes that these behavior problems, and problems with motor coordination, have been noted by experts starting as early as Paul's seventh year of life:

> These behavior patterns are documented in the records I have reviewed, which establish that, from a very young age, Paul Colella consistently displayed learning problems; distractibility; impulsive behavior, often to the extent that he endangered his own or others' physical safety; mood disturbances; and a reduced ability to perceive the consequences of his actions and guide his behavior by them.

*Id.* at ¶ 14. Dr. Reynolds further notes that Paul's behavior was so disturbed that he was medicated with Mellaril, a powerful antipsychotic not commonly administered to young children in such doses. *Id.* The records indicate that at one point, Paul Colella was receiving 25 mg. of Mellaril twice daily. The Physicians' Desk Reference advises that, in children, a dose that large should be reserved only for patients who are "hospitalized, severely disturbed, or psychotic." PHYSICIAN'S DESK REFERENCE 2108 (1993).

392.    Dr. Reynolds observed that the behavior problems created by Paul's brain damage were aggravated by his home environment:

> Paul's impaired ability to control his behavior was not improved, and likely aggravated, by the chaotic, harmful influences he was exposed to in the home environment.  Children who suffer from organic brain damage often require intensive, responsible limit setting and a stable environment with established expectations in order to help them control their behavior.  It appears extremely unlikely that any adult in Paul's household, or the elder siblings in whose care Paul was often placed, were in any position to provide this kind of structure and discipline.  In fact, they appear to have often engaged in disturbed, impulsive, or irresponsible behavior in front of Paul.  For instance, the Chicago Read records indicate that Paul's father, Paul Watts, abused drugs and alcohol, and "encouraged Paul to act out." One of Paul's sisters, with whom he was described as "very identified," threatened to commit suicide by overdosing in front of Paul.  The records reflect that Paul often adapted better in structured institutional settings such as the special-education classes he was sometimes placed in.

App. III, Exh. 40 (Reynolds Aff.) at ¶ 16.  Paul's behavior was difficult to control, but it was capable

215

of being modified with intensive, responsible limit setting.

393.    This environment was not provided at home.  Mr. Curtis drank and did not get along with Paul, and did not know how to approach his behavior problems.  *See* App. III, Exh. 39 (Curtis Aff.) at ¶23; App. III, Exh. 44 (Loyola Records) at 2 (observing strained relationship with stepfather).  Mrs. Curtis was often absent from the family with serious medical problems, was still drinking, and was, by her own admission, emotionally disturbed and depressed for many periods during Paul's childhood.  App. III, Exh. 39 (Curtis Aff.) at ¶10; App. III, Exh. 44 (Loyola Records) at 2 (noting that Mrs. Curtis admits to requiring medication for mental problems).  Many of Paul's female siblings, who were responsible for his discipline when his parents were absent or incapacitated, had mental and physical problems of their own.

394.    Had trial counsel requested the appointment of a qualified mental health professional, the jury would have learned that the Applicant is organically impaired, and that he never received the consistent, highly structured discipline he required in order to help him control the behavior problems caused by his neurological impairments.  This information was essential to a fair assessment of Mr. Colella's personal moral culpability, and would have convinced the sentencing-phase jury that Mr. Colella's personal culpability was so lessened by the unusual circumstances of the offense and his organic brain damage that he should have received a sentence of life imprisonment rather than the death penalty.

### e. Counsel failed to prevent the prosecution from improperly and prejudicially referring to an alleged 1982 battery adjudication as "sexual assault" or "child molestation."

395.    On August 6, 1992, the State filed a Motion "State's Notice of Extraneous Offenses." Tr. Vol. I at 80-81.  The first alleged offense is listed as "7-10-82/Battery."  *Id.* at 80.  However, the State attempted to show, using *only inadmissible hearsay*, that the "Battery" charge was originally a charge of "Child Molesting."  S.F. Vol. XXI: 98.  Trial counsel objected, but both objections were irrelevant because they were based on TEX. CODE CRIM. PROC. art. 37.07, which does not apply to

216

CMsPDF - www.fasoo.com

capital sentencing proceedings. *See infra* Section VI.C.2.h (counsel incompetent for failing to appreciate important legal distinction between capital and non-capital sentencing proceedings). The objection was thus overruled. The trial court asked the prosecution whether there was going to be a "conviction" on this matter. *Id.* at 99. The prosecution replied "Yes, Your Honor," but did not advise the trial court that there was no "conviction" for the serious felony of "Child Molesting" but rather an informal juvenile disposition for the misdemeanor of "Battery." On the basis of the defense's ineffectual objection, and the prosecution's omission, the trial court permitted a witness to recite hearsay about the incident.

396.    It became clear through later examination of the witness that Mr. Colella had never been convicted of "Child Molesting," because the State of Indiana had never proven that offense. *Id.* at 99-100. The testimony about the abandoned "Child Molesting" allegation was hearsay, and would have been excluded upon timely objection. The State could have permissibly offered the testimony of the alleged victim to establish the offense by means of a witness with direct personal knowledge, but never did so. The defense objected on the basis of a law which did not even apply to the proceedings. Compounding the error, defense counsel permitted the prosecutor to repeatedly insinuate that the defendant was a rapist and child molester. *See, e.g., id.* at 123 (trial counsel objects successfully, but not before prosecutor asks witness about a "report" he read that indicated the crime was "more than a battery"); *id.* at 196 (during closing, prosecution refers to a "sexual assault that was reduced to a battery" without objection). Mr. Colella has never been convicted of any sex offense, but the jury was clearly left with the impression that he had. In fact, a journalist who watched the trial reported that Mr. Colella had been "convict[ed] . . . [of] rape." App. VI, Exh. 59 (Tony Vindell, "Jurors Give Colella Death Penalty," *The Brownsville Herald*, Sept. 5, 1992). Zealous, well-prepared defense counsel could have protected his client from the prosecutor's improper tactics and excluded all of these extremely prejudicial references with an adequate pretrial investigation and a timely and sufficient motion in limine.

CVisPDF - www.fweiss.com

**f.  Counsel failed to rebut the false and misleading closing argument concerning the circumstances of Applicant's 1985 burglary conviction.**

397.    The prosecution mischaracterized evidence – once again without proper objection from the defense – when it discussed Mr. Colella's 1985 burglary conviction.  During closing arguments, the State asserted that Mr. Colella, in 1985, had "burglarized a home of an old lady, *an 83-year-old lady at knifepoint.*" *Id.* at 196.  In fact, Mr. Colella had used a knife only to cut a screen, and dropped it in the house after cutting the screen.  *See* App. V, Exh. 51 (Transcript of Juvenile Waiver Hearing), at 13-15.  The resident, Mabel Gregg, saw Mr. Colella in the doorway to her bedroom.  When he noticed that she had seen him, he took a step toward her, and then ran out of the house.  *Id.*  Mr. Colella *never touched* Ms. Gregg, never threatened her, and never displayed the knife to her.  *Id.*  These allegations apparently stemmed from comments Ms. Gregg, who was understandably upset, had made about what she was *afraid* the burglar *might* have done to her.  *Id.* at 14.  Brad Kesler, a probation officer who testified at the 1985 waiver hearing, stated that there was *no* evidence that Mr. Colella "offered to use the knife or held the knife . . . as if to use it on the victim." *Id.* at 15.

398.    Again, courtroom observers in Mr. Colella's capital trial were left with a highly prejudicial false impression: one reporter asserted that the State had proven that Mr. Colella "broke into the home of an 83-year-old neighbor woman, *threatened her at knifepoint, tied her up and robbed her.*" App. VI, Exh. 58 (Allen Essex, *Jury Orders Lethal Injection for Colella*, VALLEY MORNING STAR, Sept. 5, 1992) (emphasis added).

**g.  Counsel failed to mitigate the impact of the prosecution's aggravating evidence by using readily available mitigating evidence to link the Petitioner's previous wrongdoing to his psychological problems and chaotic family environment.**

399.    The only prior offense the State proved with admissible evidence was Mr. Colella's 1985 conviction for burglary.  On June 7, 1985, when Paul Colella was sixteen years old, a hearing was held pursuant to an allegation that he burglarized Ms. Gregg's home.  *See* App. V, Exh. 51

218

(Transcript of June 7, 1985 Vigo County Waiver Hearing). The hearing considered whether juvenile jurisdiction should be waived over Mr. Colella so that he could be prosecuted as an adult. During the hearing, two probation officers who had supervised Paul, Brad Kesler and Monte Tosser testified. Brad Kesler was questioned about Paul's history of mental health problems by Paul's appointed counsel, Terre Haute attorney Christopher Gambill:

Q:      And in fact he began counseling or psychological counseling beginning at the age of six, is that correct? Is that –

A:      Yes.

Q:      – what your records indicate?

A:      Yes sir.

Q:      That he had severe emotional problems from a very early age. In fact, on several occasions he had, had attempted to commit suicide, is that correct?

A:      Yes sir. I believe he was nine when that first happened.

Q:      And that the only actual treatment through the juvenile system to date has been Gibault School and probation, both formal and informal. Is that correct?

A:      True.

Q:      He has never been committed to the State Boys School, other than for the two week diagnostic tests?

A:      He, he was committed but the sentence was suspended.

Q:      Correct. So he's never done time at the Indiana Boys School.

A:      No, outside of the two weeks.

Q:      Now, if I, now turning in reference to the various reports on that that you had received, hasn't it been the finding of all of those who have examined him that he needs a very struc [sic], that he needs a significant amount of counseling and psychiatric treatment?

219

A:      Yes sir.

Q:      Okay. And in fact, there are treatment facilities for juveniles such that it, such as at Evansville State Hospital, correct?

A:      Correct.

Q:      And that is available for juvenile offenders, correct?

A:      Yes.

Q:      And that has not been used in Paul's case, is that correct?

A:      No sir.

Q:      Now he did undergo some psychological counseling while at Gibault, is that correct?

A:      True.

Q.      And in fact, didn't the reports from Gibault indicate that that had done some good while there and in the structured environment?

A:      Yes.

Q:      Okay. And that the prognosis when he was released was that it would, that the chances were poor without that counseling and structure, that he would have problems, correct?

A:      Yes.

Q.      Which is in fact what happen, has happened if the allegations are true.

A.      Yes sir.

*Id.* at 17-19.

400.    As the examination continued, it became clear that Mr. Kesler believed that Paul needed intensive psychiatric counseling, and that such intensive inpatient treatment had positive effects on Paul's behavior in the past:

220

Q:     Then, if there are such programs such as Evansville, there are such programs such as at Evansville or in fact in Gibault, correct, for this intense psychological counseling?

A:     Yes sir.

Q:     And it is your opinion that this is what's necessary to, that this does have some affect [sic] on Paul during these periods that he receives this treatment.

A:     Yes sir.

Q:     And in fact, do you have any opinion as, as to, can, is counseling available at the Indiana State Boys School?

A:     Yes sir.

Q:     And ?

A:     Basically the same type of counseling at Boys School as Gibault.

Q:     Right, okay. A little tighter security perhaps?

A:     That's the difference.

* * *

Q:     Now there are also other facilities available such as LaRue Carter, correct?

A:     True.

Q:     Okay. And in fact, a program like that you think would be very helpful with Paul, as the program at Gibault was helpful to Paul.

A:     Those programs, both at Evansville and LaRue Carter would be helpful. The only difference between the juvenile and the adult, again is a matter of security.

Q:     Okay, now, but, but this is a program that would be helpful to Paul you believe in his rehabilitative process.

A:     If Paul would stay there, yes I believe it would be.

221

> Q:    And, in, the way that you're framing your answers to my question, you have an opinion that Paul could in fact be helped. I mean, he's not beyond help, would that be a fair statement?
>
> A:    Paul could be helped, yes.

*Id.* at 23-26. Later, Mr. Kesler stated that imprisoning Paul in an adult penal facility would "protect the community," but that "[t]here are other alternatives besides that." *Id.* at 25-26. The judge then examined Mr. Kesler extensively on Paul's mental health history. *Id.* at 32-35. The judge then denied Paul's motion for a directed verdict that he should not be waived to the adult system. *Id.* at 42-44.

401.    After Mr. Kesler, Steven Rolnick, a psychology graduate student who had treated Paul in Terre Haute, Indiana, testified. Mr. Rolnick confirmed that Paul had been referred to the Katherine Hamilton Center in Terre Haute, after problems with his behavior in school. *Id.* at 46-47. Mr. Rolnick observed that Paul had been treated with "Meloril" (Mellaril), a "major tranquilizer" and "anti-psychotic drug." *Id.* at 50. Mr. Rolnick noted that Paul had been brought in as an inpatient in the Hamilton Center on March 6, 1982 because he had been "evaluated in the emergency room by the unit nurse and was felt to be depressed and . . . maybe suicidal." *Id.* at 53. A preliminary evaluation had found that the fourteen-year-old Paul had a "substance abuse problem." *Id.* at 55-56. Both of his parents were drinking at this time. *See* App. III, Exh. 39 (Curtis Aff.) at ¶23.

402.    At that time, Paul was being treated with Mellaril, Ritalin for hyperactivity, and Imipramine, which Mr. Rolnick described as "an anti-anxiety medication and it has some anti-depressive features as well." App. V, Exh. 51 (Transcript of June 7, 1985 Vigo County Waiver Hearing) at 58. The examination continued:

> Q:    Now with your discussions with Paul, did you find that there had been periods in which he had in fact been suicidal?
>
> A:    Yes.

*Id.* at 58.

> Q:     Did there seem to be any common feature of those periods of time
>        when these suicidal tendencies emerged?
>
> A:     I can only speak for the attempts in, in 1982, in March and August
>        and those, both of those times he had been drinking alcohol in great
>        quantity.

*Id.* at 61. Paul suffered from "conduct disorder," according to Mr. Rolnick. Mr. Rolnick also

observed that his behavior was often "upset, agitated, angry and depressed and drunk of course." *Id.*

When asked what played a role in the development of this disorder, Mr. Rolnick stated:

> I would suggest that he has had a difficult family life. His natural father died
> according to my records. His natural father had an alcoholism problem. According
> to my records, within the family too has been chronic conflict with the stepfather.
> To the knowledge, also according to my record and my interviews with Paul's
> mother, that the stepfather also is a recovering alcoholic and that would contribute
> to, certainly an environment of upset.

*Id.* at 62. Mr. Rolnick also observed that Paul's delinquent acts seemed to occur when he was under

the influence of alcohol and marijuana. *Id.* at 63. Mr. Rolnick observed that the only time in Paul's

life when he had received thorough treatment in a structured environment was when he was in the

Gibault School for Boys in Terre Haute, Indiana, and that "some improvement" in his conduct

occurred there. *Id.* at 65.

403.    Paul was "not at this point" beyond hope of any rehabilitation, Mr. Rolnick stated.

*Id.* at 66. Mr. Rolnick observed that Paul needed alcohol and drug treatment, and "there would also

be the necessity for some very intensive individual therapy and/or confrontative group therapy." *Id.*

at 67. Mr. Rolnick then observed that there were several inpatient hospitalization programs that

could provide appropriate therapy for Paul, including the Evansville State Hospital, although Mr.

Rolnick conceded that it "would not be the first choice in terms of services." *Id.* at 68-69. When

asked whether it would be appropriate to place Paul in an adult prison, Mr. Rolnick expressed

"serious concerns":

> My feeling is, and also my knowledge of his behavior under stress is that he will
> resort to self-injury and, and it would be my opinion that placed in the adult setting,
> that it is not a therapeutic one but a highly punitive one, that would cause him enough
> stress to likely act out in a self-injurious, possibly suicidal way.

*Id.* at 70. Mr. Rolnick believed Paul's best interests would be served "out of the community for some period of time but I do not believe that the resources available for juveniles have been exhausted at this point." *Id.* at 71. Mr. Rolnick then introduced a psychological evaluation which noted Paul's increasing problems with alcohol and drugs, that he had significant "conflicts" with his stepfather, described as a Vietnam veteran who was then an "unemployed bartender," that he had a "long history of school discipline problems and has been in classes for the seriously emotionally handicapped." *Id.* at 76-77. The Indiana court then examined Mr. Rolnick at length concerning Paul's psychiatric diagnoses, the treatment facilities he had been in, and the medications he had been prescribed. *Id.* at 83-103.

404.    Paul's lawyer then called Monte Tosser, the same person who testified against Paul at the punishment phase of his capital murder trial. Mr. Tosser described his contacts with Paul, both as a probation officer and as a staff member at the Gibault School. *Id.* at 104-108. Mr. Tosser stated that Paul had made some progress at the Gibault School, but that he had displayed some behavior problems toward the end of his stay there and that his prognosis was not good. *Id.* at 109-110. However, Mr. Tosser stated that Paul was not beyond rehabilitation. *Id.* at 110. Under cross-examination by counsel for the State, Mr. Tosser stated that, although he did not believe placement at the Indiana Boys' School would do Paul much good, he still believed that Paul was not beyond rehabilitation in the juvenile setting. *Id.* at 112. Mr. Tosser continued:

> There are various other institutions or placement facilities in the State of Indiana.
> Numerous types of placement facilities that are basically similar to Gibault. Some
> have different philosophies, philosophies of treatment. I believe that Paul if [he] is
> wanting to change would benefit from a possibility of a facility like that.

*Id.* at 114.

224

405.    After consideration, the Indiana judge waived juvenile jurisdiction over Paul, and transferred him to the adult court. However, the subsequent hearings establish that the judge, the prosecutor, and the defense all believed that Paul needed psychiatric help, and they tried to obtain counseling for him. On June 17, 1985, the judge arraigned and admonished Paul. *See* App. V, Exh. 50 (June 17, 1985 hearing). On November 5, 1985, Paul pled guilty to burglary. *Id.* at 22 (Nov. 5, 1985 hearing). The State asserted that Paul had attempted to gag the resident during the burglary, but once again his counsel pointed out that there was no evidence whatsoever in the record to support that assertion. *Id.* at 24-25. The guilty plea proceeding concluded. *Id.* at 31-32.

406.    On December 6, 1985, Paul was sentenced. *See* App. V, Exh. 50 (Dec. 6, 1985). His attorney advised the court that after consultation with Paul's probation officers, he wished to invoke a provision of Indiana law that provided that offenders who had drug and alcohol abuse problems and "were likely to be rehabilitated through a treatment program" to be diverted to a community drug and alcohol treatment program rather than prison. *Id.* at 35-35. He asked the court to commit Paul to Evansville State Hospital for evaluation in their drug and alcohol abuse program. *Id.* at 33-34. The court asked the prosecutor: "Does the State of Indiana concur with those statements just made?" to which the prosecutor responded: "Yes your Honor." *Id.* at 35. In accordance, the court ruled that:

> [H]aving been advised by the State of Indiana and Defendant's counsel that further evaluation be required of the Defendant, so as to determine a proper sentence in this cause, and the Court also being of the mind that further evaluation should be made of the Defendant so as to more properly determine a proper sentence herein, the Court now continues this matter as to sentencing and now directs the Sheriff of Vigo County to transport Defendant to Evansville State Hospital, Evansville, Indiana, for further evaluation.

*Id.* at 36. The court continued informally, addressing Paul himself:

> I think everybody's got your best interests at heart in this matter, including myself. In other words, we're not only trying to mete out a punishment or I'm not only trying, but I want to see that you get some help . . . In other words, I could just sit here and mete out a prison sentence and forget you, and, and, but you know, that's not only the purpose of the law. We're trying to help you and trying to see if you can be rehabilitated and if so, that's what we want to do.

*Id.* at 38-39. "We're trying to find the best and proper sentence to help you," the court continued.

407.    Unfortunately, all parties at the hearing had misinterpreted the law.  On December 13, 1985, there was a further hearing.  *See* App. V, Exh. 50 (December 13, 1985 Hearing Transcript). Paul's attorney, Christopher Gambill, advised the court that because Paul had pled guilty to a Class B Felony, the treatment diversion program was not available.  *Id.* at 42.  To keep open the possibility of mental health treatment for Paul, the defense and prosecution agreed to permit Paul to withdraw his plea of guilty and instead enter a plea of Guilty but Mentally Ill.  *Id.* at 42-43.  The court admitted that it was "unaware of the exact law . . . with respect to getting you help, treatment, [and] did something that the law does not allow me to do."  *Id.* at 44.  The State did not object to Paul's tendering a plea of Guilty but Mentally Ill.  *Id.* at 45.  The court re-admonished Paul.  *Id.* at 50-57. Paul admitted that he had broken into the house, that the resident awoke and started screaming, that he "started toward her and then figured I was going the wrong way and turned around, dove out the back window."  *Id.* at 58.  Paul's lawyer then observed that the judge was required to find that Paul was mentally ill to properly adjudicate him as guilty but mentally ill.  *Id.* at 60.  After briefly describing Paul's history of mental illness, the judge recognized the history of mental illness "heretofore entered in the waiver hearing of the Defendant." *Id.* at 62.

408.    Paul's lawyer observed that all of Paul's prior brushes with the law were "alcohol and drug related offenses," to which the court responded "Yeah, I see that." *Id.* at 68.  Paul's lawyer observed that all the parties at the juvenile hearing, both testifying for the state and the defense, had agreed that Paul needed long-term counseling.  *Id.* at 69.  The prosecutor did not object to this characterization.  *Id.*  The judge sentenced Paul to eight years, specifically cutting two years off the presumptive ten-year sentence because of "mitigating circumstances," and did not impose fine.  *Id.* at 70-71.  The court further recommended that Paul "be further evaluated by the Department of Mental Health after transfer to the Department of Corrections pursuant to Indiana Code 11-10-4." *Id.* at 71. The court granted Paul time off his sentence for time served and told him: "I want you to

226

get your life straightened out." *Id.* at 72. The court then wished Paul "good luck." *Id.* at 74.

409.    This evidence should have gone before Mr. Colella's jury in his capital case.  The jury only heard brief testimony about the facts of the crime from the arresting officers, and the fact that Paul had been tried as an adult.  Had trial counsel obtained this vital information, he could have lessened the impact of the burglary conviction as aggravating evidence.  The jury could have learned that (1) Paul committed the Indiana offense under the influence of drugs and alcohol, and that both of his parents were heavy drinkers at the time; (2) Paul never touched or threatened the resident, and in fact panicked and fled when the resident awoke; (3) every probation officer and mental health professional who testified agreed that, although Paul should be separated from society for a time, Paul had serious mental health problems and that further intensive, highly structured counseling could help him; (4) the judge, the prosecutor, and the defense attorney agreed to try to divert Paul from adult incarceration so that he could get treatment and get away from his unstable, alcohol-abuse ridden home environment; and that (5) when this initial plan fell through, the judge, the prosecuting attorney, and the defense all agreed to permit Paul to plead guilty but mentally ill so that he could get help for his problems and, in the judge's own words, "straighten his life out."

410.    The jury never learned that this burglary, as well as the other juvenile offenses they heard hearsay testimony about, were committed by a brain-damaged teenager, both of whose parents drank, and who had a childhood marked by many traumas.  As Dr. Reynolds observed, the behavior problems associated with brain damage often intensify in adolescence:

> I am also aware from reading the punishment phase of the trial that Mr. Colella apparently compiled a record of juvenile offenses involving burglary, theft, trespassing, and unauthorized possession of liquor.  It would not be unusual to see this kind of behavior in an adolescent with organic brain damage.  It is generally accepted that the behavioral symptoms associated with organic brain damage are, for developmental reasons, likely to intensify in adolescence.  Of course, Mr. Colella's mood disorders and turbulent home environment also likely played a role in these acts of delinquency.

App. III, Exh. 40 (Reynolds Aff.) at ¶24.  Even had Mr. Colella's family been a model of sobriety,

stability, and psychological health-which it unquestionably was not-the longstanding behavior problems tied to Mr. Colella's organic impairments could have been expected to increase in adolescence.

### h. Counsel's citation to irrelevant statutes demonstrated ignorance of the law governing death penalty sentencing proceedings which harmed Petitioner.

411. Because of inadequate preparation and his lack of any prior death penalty experience, trial counsel entered the punishment phase ignorant of a crucial rule governing the death penalty sentencing process, and this ignorance led to critical tactical errors that permitted the admission of much damaging, clearly inadmissible testimony.

412. Repeatedly, as the prosecution attempted to inject inflammatory hearsay about Mr. Colella's juvenile adjudications and psychiatric treatment, trial counsel objected on the basis of the then-existing provisions of TEX. CODE CRIM. PROC. art. 37.07. *See, e.g.*, S.F. Vol. XXI:75 (objecting to hearsay testimony concerning burglary on the basis of 37.07(a)(1), which prevents admission of certain juvenile adjudications of delinquency provided the adjudication was more than five years old); *id.* at 85 (relying on article "3707 Section 3," which at the time of Mr. Colella's trial excluded evidence of certain extraneous offenses, to prevent hearsay about burglary); *id.* at 99 (again relying on article 37.07(a)(1)). Counsel sometimes tried to rely on the well-established rule that, "[i]n proving prior convictions for enhancement purposes as authorized by [the older version of] TEX. CODE CRIM. PROC. art. 37.07, the State may not show the details of the offenses leading to such convictions and may not show extraneous offenses other than final convictions." *Lopez v. State*, 574 S.W.2d 563, 566 (Tex. Crim. App. 1978) (citations omitted).

413. However, when Mr. Colella was tried *it had been well-settled Texas law for over a decade that the provisions of Article 37.07 do not apply to the sentencing phase of capital murder trials in which the State seeks the death penalty. See, e.g., Cantu v. State*, 939 S.W.2d 627, 648 (Tex. Crim. App. 1997) (Court of Criminal Appeals' "prior holdings [establish] that Article 37.07 does not apply to capital cases and that the admission of unadjudicated extraneous offenses at the

sentencing phase of a capital trial does not offend the Eighth and Fourteenth Amendments" (citing cases)); *see also Gentry v. State*, 770 S.W.2d 780, 792-93 (Tex. Crim. App. 1988). The prosecutor actually pointed this out to the Court: "Your Honor, the applicable section is 3737.071 [sic] in capital murder. And that section [that defense counsel cited] is not applicable because that is any general case. And in a capital murder case the rules are different and applies different as to what the State can bring in at the punishment phase." S.F. Vol. XXI: 85.

414.    It is obvious that counsel prepared to limit the State's presentation of aggravating evidence by comparing the prior convictions the State planned to introduce to the provisions of art. 37.07, and judicial interpretations of those provisions. Given his lack of any prior capital-case experience, this must have seemed appropriate. At trial, none of his planned objections was sustained, because he was not acquainted with an unquestioned, decade-old line of authority that rendered his objections irrelevant. Counsel did not have a backup strategy, as he generally failed to articulate any other plausible basis for the exclusion of the evidence once his art. 37.07 objection was overruled. The prohibition against hearsay does apply to the punishment phase of capital murder trials. *See supra* Part II.C.2.j (discussing counsel's inexcusable failure to prevent state from attempting to prove aggravating offenses solely through inadmissible hearsay).

415.    When the record reflects that counsel clearly was ignorant of or mistaken about the law relevant to an important facet of a trial, deficient performance is clear. *See, e.g., Burley v. Cabana*, 818 F.2d 414, 417 (5th Cir. 1987) (granting punishment phase relief when counsel didn't know of, and failed to inform judge of, relevant sentencing option, quoting the magistrate judge's findings that "'[t]o be considered effective, counsel has a duty to make at least a minimum investigation of the law, especially on such an important issue as sentencing mitigation . . . .'"). It is especially easy to find Sixth Amendment violations when counsel displays ignorance of relevant law because such ignorance is an "identifiable lapse in constitutionally adequate representation" for which there can be no conceivable strategic justification. *Trass v. Maggio*, 731 F.2d 288, 293 (5th

CitiPDF - www.texte.com

Cir. 1984); *see also Kennedy v. Maggio*, 725 F.2d 269, 272-73 (5th Cir. 1984) (obligation to research "the current state of the law in relation to the facts of a given case" is an essential obligation of counsel; ineffectiveness of counsel who displays "patently erroneous" understanding of law is "elementary"). Because his preparation was focused on art. 37.07, trial counsel failed to note that most of the evidence to which he was objecting was clearly inadmissible hearsay, and would have been excluded on that basis upon timely and proper objection. This crude tactical blunder was caused solely by counsel's ignorance of the law, and prejudiced his client by permitting inadmissible evidence to go before the jury.

### h. Trial counsel failed to object to improper prosecution argument at the punishment phase.

416.    The Petitioner hereby incorporates the briefing concerning the duty of counsel to object to improper prosecution closing argument set out in *supra* Section VI.C.2.m (dealing with ineffectiveness for failure to object to guilt-phase closing). Trial counsel's errors were repeated at the punishment phase.

417.    First, as in the guilt phase, counsel's prior errors–failing to object to inadmissible hearsay statements and failure to understand the applicable law–permitted the prosecution to remind the jury of many key points of damaging hearsay during its closing. For instance, the prosecution described a conversation she claimed to have had with her husband about the case. She said: "We were discussing the death penalty and he asked me, 'Migdalia,' he says 'Does this guy have a prior record?'" S.F. Vol. XXI: 196. The prosecutor then listed all of the offenses proven, suggested, or hinted at during the punishment phase, misleading the jury in an attempt to prejudice the defendant by mentioning a "sexual assault that was reduced to a battery," a burglary of an 83-year-old lady "at knifepoint," and even bomb threats. *Id.* The majority of the offenses the prosecutor described were, of course, proven *only by inadmissible hearsay.*

418.    The prosecution then injected her husband's hypothetical opinion. She said her husband asked her "[d]o you think if he goes to the penitentiary again he will learn?" to which she

replied no, so her husband says "Then there's really no choice [but to sentence him to death]. There's really no choice." *Id.* at 197. The prosecutor cannot inject her own personal opinion into closing argument. *See, e.g. Martinez v. State*, 822 S.W.2d 276, 282 (Tex. App.–Corpus Christi 1991); *United States v. Herberman*, 583 F.2d 222, 229 (5th Cir. 1978) ("'[A]n attorney may not express his personal opinion concerning the merits of the case.'" (citations omitted)). Thus, the prosecution cannot inject the personal opinion of his or her *spouse*, either: "The prosecutor may not relate his version of the testimony a witness not called might give." *McKenzie v. State*, 617 S.W.2d 211, 220-21 (Tex. Crim. App. 1981) (prosecutor's speculation about what certain members of the community might say concerning proper punishment of defendant constituted "manifestly improper, harmful and prejudicial" error warranting reversal); *see also Fisher v. State*, 511 S.W.2d 506, 507 (Tex. Crim. App. 1974) (drawing distinction between permissible comment on defendant's failure to call a witness who could have given relevant evidence and impermissible tactic of "relat[ing] his version of the witness' testimony").[49] The harm is especially clear when the argument, as here (1) describes a clearly irrelevant extra-record conversation; (2) contained misleading characterizations of the evidence; and (3) delivers a personal opinion about the ultimate issue from someone who *never heard the evidence. Cf., e.g., Young v. State*, 752 S.W.2d 137, 145 (Tex. App. – Dallas 1998) (reversing conviction when prosecution "tr[ied] appellant for a fictitious attempted offense against police officers which only occurred in the vivid imagination of the prosecutor" and observing that matters "found in the vivid imagination of the prosecutor with no support in the record are outside the scope of proper jury argument"). This argument improperly invited the jury to believe that death was the only "choice" afforded a reasonable person given the evidence. Counsel's failure to object to this obviously improper and misleading extra-record hearsay argument fell far below the standard of competency required by the Sixth Amendment.

---

[49] In *Fisher*, a defendant failed to call his wife, who witnessed the crime and apparently could have given material testimony. 511 S.W.2d at 508. The court observed that in such circumstances, the State may invite the jury to conclude that the witness was not called because her testimony would have been "both material and damaging." *Id.* at 507. Here,

231

419.    The prosecution also invited the jury to compare the relative worth of the victims' and the defendant's life: "[The victims' relatives will] come and tell you about their lives, about what kind of people these two victims were, *compared to this guy here.* Hardworkers, worked seven, nine hours a day." S.F. Vol. XX:7 (emphasis added). The prosecution subtly reinforced this theme by inducing Mr. Lavesphere's mother to describe them as hardworking. *Id.* at 14. This argument is improper. *Mosley v. State,* 983 S.W.2d 249, 262 (Tex. Crim. App. 1998) (admission of victim-impact evidence not intended to foster improper comparisons between worth of victim's life and that of "other members of society"); *State v. Storey,* 901 S.W.2d 886, 902 (Mo. 1995) (reversing death sentence for, inter alia, improper comparison of relative worth of defendant's and victim's lives).

420.    Trial counsel's failure to object to these improper, harmful arguments fell below a reasonable standard of competency. Especially when placed in the context of counsel's myriad other errors at sentencing, the failure to object was prejudicial. Mr. Colella's Sixth Amendment rights were violated, and his conviction and death sentence must be overturned.

### j.  Counsel failed to object when the prosecution "proved" his participation in alleged extraneous offenses by inadmissible evidence.

421.    The State linked Mr. Colella to several juvenile offenses. Without objection, the State proved many, if not all, of these offenses solely through inadmissible hearsay testimony. Prohibitions against the introduction of hearsay apply at the punishment phase. *Lewis v. State,* 815 S.W.2d 560, 567-68 (Tex. Crim. App. 1991) (disallowing capital murder defendant's grandmother's descriptions of his remorseful statements), *cert. denied,* 503 U.S. 920 (1992); *see also McGinnis v. Johnson,* 181 F.3d 686, 693 (5th Cir. 1999) (trial court properly excluded defense witness' proffered testimony during death penalty sentencing hearing on hearsay grounds). Trial counsel, apparently unaware of this elementary legal principle, inexplicably permitted the prosecution to offer literally dozens of inadmissible hearsay statements from its punishment-phase witnesses.

---

obviously, the prosecutor's husband had no connection to the case.

232

422.    Terre Haute Police Department Sergeant Gregory Tyler, for instance, declared that he learned that Mr. Colella was at the Vigo County Juvenile Center because he "read the case [file]" and determined from that file that "he had been caught coming out of the Vigo County School Administration Building the same night by one of our patrol officers." S.F. Vol. XI: 59. Tyler then recounts hearsay statements from the defendant's mother, *id.* at 59; hearsay statements about the contents of another police report Sgt. Tyler claims to have read, *id.* at 60; hearsay statements from the defendant and two of his friends, *id.* at 645-65. The prosecution asked Tyler whether Paul Colella was the one who broke into the Vigo County School Administration Building, and Tyler answers "yes," even though he had no personal knowledge of that incident and knew about it only from reading a report. *Id.* at 68. Almost the whole of Sgt. Tyler's testimony was obvious hearsay. However, the defense did not object on hearsay grounds to any of this testimony.

423.    Next, the State offered Douglas Brentzinger, another Terre Haute police department employee. Brentzinger testified that he had "heard" that Mr. Colella had minor scrapes with the law, *id.* at 72; testified to hearsay statements from the defendant's mother, *id.* at 78; hearsay statements about the disposition of the 1985 burglary charge against Paul Colella and the amount of time Paul served, and his date of parole (all hearsay, all unaccompanied by any documentation) *Id.* at 79-80; hearsay statements about purported past offenses of Mr. Colella; and improper quasi-"expert" testimony concerning the officer's opinions about Mr. Colella's future dangerousness, *id.* at 82. Once again, counsel lodged no hearsay objections to any of this testimony. Counsel objected, on "speculation" grounds, to the improper opinion testimony offered by a non-expert and which clearly invaded the province of the jury, but was overruled.

424.    Next, the State called Detective Joseph Newport. Detective Newport offered hearsay testimony about a waiver hearing following the burglary conviction; *id.* at 89; hearsay concerning that offense's disposition; *id.* at 90; hearsay concerning how long Mr. Colella served in prison, *id.*; hearsay concerning the weapon allegedly used in the 1985 burglary, *id.* at 91; a narrative containing

233

inadmissible and inflammatory hearsay statements from the defendant, *id.* at 92 (defense objects without stating a legal basis for the objection, request to strike testimony from the record and request for a mistrial therefore denied); and more improper opinion testimony concerning the defendant's future dangerousness, *id.* at 93. Although trial counsel lodged a successful hearsay objection on page 91, he failed to object to many other obvious hearsay statements.

425.    The prosecution then offered the testimony of Monte Tosser, a juvenile probation officer who supervised Mr. Colella for a time in the 1980s. Mr. Tosser offered hearsay about a battery charge the defendant purportedly pled guilty to in the 1980s, *id.* at 100; about the alleged burglary of the school corporation, *id.* at 101; about a "false information" or "bomb scare" at a junior high school, *id.* at 101-02; a hearsay recital of alleged charges against Mr. Colella that required his placement in a juvenile psychiatric treatment facility, *id.* at 106; probable hearsay about behavior problems at the facility, *id.* at 110; an outrageously unfair hearsay insinuation that Mr. Colella had made some comments about "Charles Manson," *id.* at 112; and, finally, more improper opinion testimony concerning Mr. Colella's future dangerousness. *Id.* at 114. Trial counsel objected to the comment about "Charles Manson," and the objection was sustained, but trial counsel did not seek a limiting instruction or a mistrial. All other hearsay came in without hearsay objections.

426.    The above summarized the prosecution's case at the punishment phase. The jury heard about several different juvenile offenses, including alleged child molestation (which was never proven), theft, burglary, and minor in possession of alcohol. Almost none of these offenses was proven by admissible evidence. The prosecution did not introduce certified copies of any adjudications and authenticate them by fingerprints; offer the testimony of any of the alleged victims of the crimes; or offer any testimony from police officers who actually witnessed the criminal activity. This evidence should have been objected to. Had it been objected to, the prosecution would have been limited solely to fair methods of proof. Because the prosecution was unable to offer admissible first-person testimony about these offenses, or admissible records of conviction or

adjudication concerning them, many of the offenses should not have come before the jury.

### k. Counsel's deficient performance undermined confidence in the outcome of the punishment phase of Mr. Colella's trial.

427.    In Mr. Colella's capital murder trial, the jury had to unanimously answer the following question "no" to sentence Mr. Colella to death:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

TEX. CODE CRIM. PROC. ANN. art. 37.071 §2(e); *id.* § 2(f)(2) (unanimity requirement). The jury was instructed that it "shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness." *Id.* § 2(f)(4). If the jury could not agree on punishment, the defendant would automatically be sentenced to life imprisonment. *Id.* § 2(g). Even without considering the many other punishment-phase errors described in this Application, the omission of the powerful mitigation and psychiatric evidence detailed above is sufficient to "undermine confidence" in the outcome of Mr. Colella's sentencing-phase trial.

428.    A consistent pattern marked Paul Colella's behavior since his earliest childhood: a reduced ability to control his impulses, a reduced ability to appropriately channel or control anger, and self-destructive and suicidal urges. These longstanding personality traits, born of organic brain damage and severe emotional trauma during childhood, had compelling mitigating relevance to the punishment phase of his trial.

429.    Analysis of the prejudice flowing from deficient performance must include a consideration of the record as a whole. *See Strickland,* 466 U.S. at 695. This is not a case in which the defendant, for instance, selected the victims at random, robbed them, and casually murdered them to eliminate witnesses. *See, e.g., Dobbs v. Turpin,* 142 F.3d 1383, 1390 (11th Cir. 1998) (although defendant's crime "deplorable," prejudice was found because case was not one of the

"many death penalty cases [which] involve murders that are carefully planned, or accompanied by torture, rape or kidnapping" and in which horrifically aggravated nature of killing swamps mitigating evidence). It bears repeating, that even the State admits the defendant shot the victims solely because he genuinely believed they had just abducted and gang-raped his wife.[50]

430.    All witnesses agree that Mr. Colella saw his wife scratched and bruised, sobbing and hysterical, dressed in torn, wet, sandy clothing, claiming to have been raped by the men in the white pickup truck. All witnesses confirm that Mr. Colella then became utterly, completely enraged. *See, e.g.*, S.F. Vol. XVI: 1001 (Vikki Larsen describes demeanor as "deranged" and "out of control"). According to the State's theory, Mr. Colella then unexpectedly happened upon the white pickup just hours later, and his wife, in person, confirmed that the men in that truck were the ones who had held her down and forcibly violated her hours earlier.

431.    Any married man in such a position would likely feel outraged, and would likely feel a strong desire to harm and punish the men who had violated his wife. These feelings do not justify or excuse revenge. However, they do tie into a powerful and recognized mitigation theme which has been a part of Anglo-American jurisprudence for centuries. *See, e.g., Flannery v. State*, 676 S.W.2d 369, 370 (Tex. Crim. App. 1984) (defendant convicted of voluntary manslaughter rather than murder when evidence is "uncontroverted" that his daughter had just told defendant that the victim had raped her). Evidence which establishes an incomplete defense to criminal liability at the guilt phase is relevant mitigating evidence at the punishment phase. *McKoy v. North Carolina*, 494 U.S. 433, 441 (1990). As Dr. Reynolds observed:

> [P]erceiving one's wife physically injured, in a state of shock and hysteria, claiming
> to have been forcibly gang-raped; then unexpectedly encountering the three men who
> had committed that offense - would have subjected even a psychologically normal

---

[50] Again, Mr. Colella maintains his innocence. Nevertheless, because there was a punishment phase in this proceeding, the undersigned counsel must demonstrate the harm flowing from counsel's errors. Any statement made in this Petition which is consistent with Mr. Colella's guilt is made solely for rhetorical purposes *only*.

married male to extreme psychological stress, and could easily have sparked intense rage at the perpetrators of the crime.

App. III, Exh. 40 (Reynolds Aff.) at ¶22. Mr. Colella's history of brain damage and mental illness made him uniquely susceptible to this "extreme psychological stress."

> Mr. Colella, however, was unusually susceptible to the stress and trauma that this incident provoked. As the testing I have performed and the information I have reviewed establishes, Mr. Colella's organic brain damage has, throughout his life, significantly reduced his ability to control his impulses and evaluate the consequences of his actions. Thus, when Mr. Colella learned what had happened to his wife, and then, according to the state's theory, unexpectedly came across the persons whom he believed had committed the act, he was significantly less able to control his feelings of rage and humiliation, and behavior based on those feelings, than a person who does not have organic brain damage.

*Id.* at ¶23.

432.    Courts have long recognized the unique mitigating power of evidence of organic brain damage. *Moore*, 194 F.3d at 613-15 (affirming grant of new sentencing hearing in light of trial counsel's failure to develop and present mitigating evidence about brain damage and childhood abuse. *Glenn v. Tate*, 71 F.3d 1204 (6th Cir. 1995), *cert. denied*, 510 U.S. 910 (1996) (noting unusual significance of organic brain damage as mitigating evidence, reversing punishment phase for ineffective defense presentation of such evidence); *Brewer v. Aiken*, 935 F.2d 850, 861-62 (7th Cir. 1991) (observing that juror studies establish significance of brain damage as mitigation (citing Lawrence White, *Juror Decision Making in the Capital Penalty Trial: An Analysis of Crimes and Defense Strategies*, 11 L. & HUMAN BEHAV, 113, 122-25 (1987) & *Standardless Sentencing*, 21 STAN. L. REV. 1297, 1361-63 (1969)). Dr. Reynolds observes that: "I have in fact testified in the punishment phase of capital murder cases in which juries have found a defendant's history of mental illness and history of organic brain dysfunction mitigating." App. III, Exh. 40 (Reynolds Aff.) at ¶31.

433.    The argument is simple. Mr. Colella's brain is damaged, due possibly to his mother's

drinking or an early head injury. The evidence of neurological impairment has been noted since his early childhood. Throughout his life, this condition–for which he is not responsible–has affected his behavior, making him impulsive and less able to control his behavior than a person whose brain is intact. When in a situation in which almost anyone would feel outrage and a strong desire for revenge, Mr. Colella's impaired judgment came to the fore, and he could not control his urge to harm the men whom he believed had raped his wife. Trial counsel, owing to his inexcusable neglect, failed to discover the credible, neutral information revealing his client's brain damage, even though he knew the evidence was available. Had the jury heard this evidence, and had its mitigating impact been adequately presented by an expert, at least one juror would have found the evidence sufficiently mitigating to warrant a sentence of life imprisonment rather than the death penalty. This Court need not speculate as to whether this evidence would have made a difference to the jury. Juror Linda Ann Jordan, who actually served on Mr. Colella's trial, declares:

> At the punishment stage of the case, I would have been very interested to learn that Mr. Colella had a history of mental health problems. There was no evidence along these lines at the trial. I have been informed that Mr. Colella did have a history of mental health problems dating back to his childhood. This information would have been very important to me in the punishment decision. I think everyone has a family member or friend who has been affected by mental illness. I believe that people who have mental health problems should be punished when they do wrong, but I believe that their mental problems should be taken into account.
>
> If I had been told that Mr. Colella had a history of mental illness, I would have been convinced that the death penalty was not appropriate in his case, and I would have held out against a death sentence.

App. VI, Exh. 64 (Affidavit of Juror Linda Ann Jordan), at ¶¶4-5. Juror Juan Esparza echoes these sentiments:

> I don't remember any real testimony about Paul's background at the punishment phase of the trial. Paul's lawyer didn't seem to give us very much evidence about Paul's background and mental problems. I remember that the other jurors kept going back to how much trouble Paul caused when he was a teenager, and all the times he had gotten in trouble with the law. I have been told that Paul does have a history of mental illness, including brain damage. If I had known that, it would have made it

238

easier for me and the other jurors to understand why Paul had behavior problems. I know that if I had heard about Paul's background and mental state at the punishment phase, I would not have voted to sentence Paul to death.

App. VI, Exh. 63 (Affidavit of Juan Esparza), at ¶5. At least two of the jurors who decided Mr. Colella's fate were looking for trial counsel to give them some reason–any plausible reason–not to sentence him to death. Trial counsel's utter lack of preparation denied to them readily available evidence of many mitigating characteristics of the defendant, and disserved not only the client but also the jury and the criminal justice system. The failure to prepare and present mitigating evidence about Mr. Colella's background and mental illness–not to mention counsel's other sentencing phase errors–undermines confidence in the outcome of the trial. *Strickland*, 668 U.S. at 694; *Moore*, 194 F.3d at 616 (trial counsel's awareness of his clients troubled background "should have triggered some sort of inquiry into Moore's background").

### 3.      Ineffective Assistance of Counsel – Direct Appeal.

434.      The Sixth Amendment guarantees a criminal defendant the right to effective assistance of counsel on direct appeal from a state conviction. *Evitts v. Lucey*, 469 U.S. 387 (1985). To prevail on a claim of ineffective assistance of appellate counsel, an applicant must demonstrate deficient performance on the part of his appointed appellate counsel, and prejudice resulting from the deficient performance. *Goodwin v. Johnson*, 132 F.2d 162, 176 n.10 (5th Cir. 1997).

#### a.   The appointment of trial counsel as the sole appellate attorney in Mr. Colella's case created a foreseeable and preventable conflict of interest that adversely affected Mr. Colella's rights.

435.      Because many of Mr. Colella's most promising claims involve record-based ineffectiveness allegations, it was impossible for trial counsel to fully protect Mr. Colella's appellate rights. Trial counsel notes that he asked the trial court not to appoint him as Mr. Colella's attorney on direct appeal:

I did not feel comfortable handling Mr. Colella's direct appeal after the finding of guilt and his death sentence was handed down. I had never handled a capital murder

239

appeal before. I knew that capital appeals are very complex, and I thought only someone who had a great deal of experience with them should handle such cases. I also knew that in all likelihood an ineffective assistance of counsel claim should have been raised, but I would not have been able to do that. However, Judge Valdez ordered me to handle the appeal even though I told him, for the reasons noted above, that I did not want to be appointed.

App. VI, Exh. 62 (Affidavit of Abel Limas) at ¶6.

436.    The obvious practical and ethical problems associated with appointed counsel attacking his trial representation on appeal make it impossible for appellate counsel to attack his own effectiveness in appellate proceedings. *See, e.g., Robinson v. Norris*, 60 F.3d 457, 459-60 (8th Cir. 1995) (applicant entitled to different counsel for new trial motion because "counsel should not be expected to attack his own competence"), *cert. denied*, 517 U.S. 1115 (1996); *Ciak v. United States*, 59 F.3d 296, 303 (2d. Cir. 1995) ("[P]etitioner's counsel on direct appeal also represented him at trial [and] . . . it is the rare attorney who can be expected to contend on appeal that his representation was so poor that he deprived his client of a fair trial.").

437.    Appointment of trial counsel as sole appellate counsel thus created an immediate and crippling conflict of interest. Because counsel's independent judgment was hampered by a conflict of interest between his interests and zealous advocacy on his client's behalf, his claims must be reviewed under the prejudice standard of *Cuyler v. Sullivan*, 446 U.S. 335 (1980). Under *Cuyler*, a conflict of interest which results in ineffective assistance is subject to a lower standard of prejudice than a conventional ineffective assistance of counsel claim. To prevail under *Cuyler*, a defendant need only demonstrate that an actual (as opposed to potential or inchoate) conflict of interest adversely affected the representation of his client. *Id.* at 348-50.

438.    An "actual conflict" of interests exists under *Cuyler* if the defense attorney "'was required to make a choice advancing his own interests to the detriment of his client's interests.'" *Stoia v. United States*, 22 F.3d 766, 771 (7th Cir. 1994) (quoting *United States v. Ziegenhagen*, 890 F.2d 937, 939 (7th Cir. 1989) (quoting *United States v. Horton*, 845 F.2d 1414, 1419 (7th Cir. 1988)).

240

Mr. Colella's and trial counsel's interests were adverse.

439.    As this Petition demonstrates, Mr. Colella had many viable record-based claims of ineffective assistance of counsel. To raise these claims, counsel would have had to repeatedly attack his own performance, which no lawyer can reasonably be expected to do. Appellant's Brief filed by trial counsel did not contain any claims attacking appellate counsel's own trial representation. Trial counsel's failure to raise these claims before the Court of Criminal Appeals stemmed solely from a conflict between Mr. Colella's interest in full review of the fairness of his trial and trial counsel's reluctance to attack his own competence in a publicly-filed brief.

"'[T]o establish an adverse effect on the basis of what an attorney failed to do, a defendant must demonstrate that some plausible alternative defense strategy or tactic - 'a viable alternative' - might have been pursued.'" *Perillo v. Johnson*, 79 F.3d 441, 449 (5th Cir. 1996) (collecting federal circuit court cases endorsing identical test) (quoting *Beets v. Scott*, 65 F.3d 1258, 1288 (5th Cir. 1995) (King, J., dissenting), *cert. denied*, 517 U.S. 1157 (1996)). The Court emphasized in *Cuyler* that the standard it announced did not require a traditional showing of prejudice. *Cuyler*, 446 U.S. at 349-350. In practice, this distinction means that, so long as a Applicant establishes that a "plausible" or "viable" strategy was "likely" left unpursued because of a conflict, it is completely irrelevant whether the strategy would have changed the outcome of the case. *See, e.g., Perillo*, 79 F.3d at 449; *Winkler v. Keane*, 7 F.3d 304, 309 (2d Cir. 1993) ("Even if it is *likely to be unsuccessful*, the negotiation of a plea bargain in a case in which the evidence is strongly against a defendant is a viable alternative."), *cert. denied*, 511 U.S. 1022 (1994)(emphasis added); *McConico v. Alabama*, 919 F.2d at 1543, 1548 (11th Cir. 1990) (applicant "need not show that the result of the trial would have been different without the conflict of interest"); *United States v. Mett*, 65 F.3d 1531, 1535 (9th Cir. 1995), *cert. denied*, 519 U.S. 870 (1996) ("The strength of the prosecution's case is not relevant to whether counsel's performance was adversely affected."); *Lopez v. Scully*, 58 F.3d 38, 42 (2d Cir. 1995) (conflict which prevented counsel from requesting lower sentence for defendant had adverse

CExPDF - www.foxes.com

effect even though judge had earlier declared he would not lower sentence even if "Jesus Christ came and did a break dance on this desk").

440.     The evidence of adverse effect is clear.  Raising the many record-based ineffective assistance of counsel claims was at least a plausible appellate strategy, and in fact would have been a very powerful strategy.  *See, e.g., Ramirez v. State*, 987 S.W.2d 938, 946 (Tex. App. – Austin 1999) (reversing defendant's conviction for ineffective failure to object to hearsay).  Trial counsel's representation was marked by dozens of deficiencies which resulted in prejudice to his client.  Mr. Colella hereby adopts all briefing and argument from the sections cited above regarding failure to object to inadmissible evidence and failure to demonstrate adequate familiarity with governing legal doctrines.  Each of counsel's errors, and the cumulative impact of all of the errors taken as a whole, would have established prejudicial ineffective assistance of counsel which would have won a reversal of the defendant's conviction on direct appeal.

> **b.  Trial counsel rendered ineffective assistance of counsel on appeal by failing to brief and argue a claim that Mr. Colella was deprived of due process by the prosecution's pervasive misconduct during his trial.**

441.     Counsel also rendered ineffective assistance of counsel on appeal by failing to raise the many powerful claims of prosecutorial misconduct.  Although counsel had forfeited many such claims by his incompetent failure to object to many instances of prosecutorial misconduct at trial, counsel could nonetheless have raised a prosecutorial misconduct claim.  The Court of Criminal Appeals has recognized that although "there must usually be a timely, proper, and specific objection" to a prosecutor is improper jury argument, "an exception to the general rule is that improper argument may present a Fourteenth Amendment due process claim if the prosecutor's argument so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Miller v. State*, 741 S.W.2d 382, 391 (Tex. Crim. App. 1987) (citations omitted); *see also Miller v. Johnson*, 200 F.3d 274, 283 (5th Cir. 2000), *cert. denied*, __ U.S. __, 121 S. Ct. 1222 (2000) ("[P]rosecutorial misconduct that rises to the level of a due process violation does not require an

CVisPDF - www.fenrir.com

objection to be preserved for appeal under Texas law").

442.    Trial counsel should have protected his client's rights by raising such a claim. Even if he might not have been able to successfully raise each distinct act of prosecutorial misconduct on its own (owing to his previous unprofessional failure to object to them), he could have ensured at least some scrutiny of the prosecution's tactics by raising a cumulative-misconduct Due Process claim, which does not require a timely objection to be preserved for review. As fully set out in Section A *supra*, the prosecutorial misconduct in this case was extraordinary severe and pervasive. It began during voir dire, and continued to the punishment-phase summation. The prosecution knowingly sponsored perjured testimony, improperly introduced prejudicial hearsay, improperly introduced questionable evidence of inflammatory extraneous offenses, make misstatements of fact during closing argument, improperly impeached the defendant, mischaracterized evidence, make inflammatory appeals to the jury's emotions, inserted the prosecutor's personal opinion into argument, and improperly attacked the defendant over the shoulders of his counsel. No conceivable reason exists for counsel not to have briefed a cumulative-misconduct claim during direct appeal; indeed, this claim is easily as strong as or stronger than many claims which were briefed by trial/direct appeal counsel. Counsel's conduct therefore falls below a standard of reasonable professional competence, and the performance prong of *Strickland* is therefore satisfied. *See, e.g.*, *United States v. Williamson*, 183 F.3d 458, 462-63 (5th Cir. 1999) (although attorney need not brief every possible claim to satisfy *Strickland* standard on direct appeal, attorney should "research relevant facts and law" and see to it that all "[s]olid, meritorious arguments based on directly controlling precedent [are] discovered and brought to the court's attention"). Given his inexplicable failure to object to dozens of instances of misconduct, it is reasonable to assume that trial counsel was so unfamiliar with Due Process jurisprudence that he *simply did not know* that many of the things the prosecutor was doing were unlawful. *See Trass v. Maggio*, 731 F.2d 288, 293 (5th Cir.1984) (holding that ignorance of relevant law constitutes an "identifiable lapse in constitutionally

243

adequate representation").

443.    Had trial counsel adequately briefed a cumulative-misconduct claim, his client would have been entitled to review of the claim on the merits and, given the pervasiveness of the misconduct, would have been granted a new trial by the State. *See, e.g. Cook v. State*, 940 S.W.2d 623, 627 (Tex. Crim. App. 1996) (reversing defendant's conviction upon proof that "[p]olice and prosecutorial has misconduct tainted this entire matter from the outset"). The prejudice prong of *Strickland* is also met. Mr. Colella was denied his Sixth Amendment right to effective assistance of counsel on direct appeal.

### c.    Trial counsel rendered ineffective assistance of counsel by failing to designate the complete record of the proceedings for inclusion in the appellate record.

444.    On September 11, 1992, trial counsel wrote the court reporters of the 357th District Court to request a copy of the statement of facts from the trial. *See* App. V, Exh. 53 (Letter to Court Reporters). The letter, in full, reads: "Please be advised that we request the Statement of Facts in the above-mentioned case from the Voir Dire Examination of the Jurors to the Punishment Phase. Should you have any questions regarding this matter please call our office." *Id.* Trial counsel did not request that any pretrial hearings be made a part of the appellate record.

445.    The trial court held a hearing on the defendant's change of venue motion on June 26, 1992. Tr. Vol. I at 3 (Criminal Docket). The trial court denied the motion. *Id.* Because of trial counsel's deficient request to the court reporters, the hearing on the motion for change of venue was never transcribed and made a part of the record for appellate review. The Criminal Docket describes a hearing held on May 12, 1992, regarding "Discovery & other motions." Tr. Vol. I at 2. This hearing was not transcribed and made a part of the record either. *See* S.F. Vol. II: 1 ("Master Chronological Index") (describing pretrial hearings). Other pretrial hearings may not have been transcribed. The undersigned counsel, through an appointed investigator, requested a transcript of these hearings last year, and had checked back frequently to attempt to expedite the creation of the transcripts. However, because of severe delays experienced by the Court Reporter, post-conviction

244

counsel have not yet been able to secure transcripts of these hearings as of the time of filing. When the transcripts are produced, copies will be immediately forwarded to the Court and to counsel for the Respondent.

446.   Counsel did not have a transcript of these proceedings before him as he drafted Mr. Colella's appeal. No claims were raised based on the trial court's refusal to change venue, or based on the unknown rulings that occurred during the May 12, 1992 hearing on "Discovery & other motions". "The Rules of Appellate Procedure provide that it is counsel's affirmative duty to see that a sufficient record is presented to the appellate court to show error requiring reversal." *Ex Parte Coy*, 909 S.W.2d 927, 928 (Tex. Crim. App. 1995) (citing TEX. R. APP. P. 50(d)). The effect of an attorney's failure to arrange for the transcription of important trial events is to "place appellant in the position of having no appeal at all." *Vicknair v. State*, 702 S.W.2d 304, 306 (Tex. App. - Houston [1st Dist.], no pet.).

447.   A habeas applicant alleging an ineffective assistance of counsel claims based on counsel's failure to provide the Court of Criminal Appeals with a complete transcript of the proceedings against him must demonstrate resulting prejudice. *Goodwin v. Johnson*, 132 F.2d 162, 176 (5th Cir. 1997) (no harm occurred to defendant from failure to transcribe bench conferences because reviewing court's ultimate decision could not possibly have been changed by facts contained in untranscribed hearing). Mr. Colella can do so. As discussed *infra* in Section VI.F., Applicant's trial was fundamentally tainted by copious prejudicial publicity of Brenda Colella's trial, in which Applicant's substantive guilt of shooting the two victims in this case was *assumed*. Most press reports from Brenda's trial recited that Mr. Colella had indeed shot the victims. *Id.* Local television news broadcasts covered Mr. and Mrs. Colella's arrival in South Padre Island from Indiana, and their arraignment. *Id.* There was almost certainly additional television coverage of Brenda Colella's trial, but the undersigned counsel have been unable to procure videotapes of this coverage owing to the television stations' policy of refusing to provide such copies without a valid court order. *Id.* Many

of the potential jurors summoned for examination had heard of the case, and several had to be released because they had already formed a fixed opinion of Mr. Colella's guilt. *Id.*

448.    Mr. Colella was unable to argue to the Court of Criminal Appeals that the trial court's denial of his motion to change venue was improper.  Texas law provides that a change of venue due to widespread prejudicial pretrial publicity is proper when the publicity raises a doubt as to whether voir dire will be sufficient to erase unconscious biases on the part of jurors.  *Henley v. State*, 576 S.W.2d 66, 71 (Tex. Crim. App. 1978) (citing cases).  As explained *infra* in Section VI.F, Mr. Colella was denied due process by refusal to change venue.  Because there is a reasonable likelihood that the Court of Criminal Appeals would have reversed his conviction because of this violation had this claim been properly raised on direct appeal, Mr. Colella has suffered harm as the result of counsel's ineffective performance.

449.    Mr. Colella has secured the transcript of one pretrial hearing and attached it to this Application. Mr. Colella intends to request a court order permitting him access to videotapes of the local television news coverage relating to his case.  Mr. Colella specifically reserves the right to amend this Application to supplement this claim when the transcripts of the missing pretrial hearings and the videotapes are furnished.

E.    **Cumulative error claims.**

1. **Cumulative ineffective assistance of counsel.**

450.    The errors set forth *supra* in Sections VI.C.1 & C.2, considered in their entirety, constituted ineffective assistance of counsel, in violation of Applicant's rights under the Sixth Amendment.

451.    Trial counsel failed to perform adequate pretrial investigation needed to set out his client's available, convincing alibi defense in a convincing fashion.  He permitted the State to introduce inflammatory and irrelevant hearsay testimony and extraneous offense allegations which tainted the jury against his client.  He failed to object to improper prosecution voir dire and closing

246

argument at both phases of the trial. His cross-examinations of key State witnesses were meandering, unfocussed, and failed to capitalize on inconsistencies which could have further eroded the witnesses' credibility.

452.    Trial counsel did not adequately investigate his client's childhood and family background. Because of trial counsel's inadequate preparation, the jury never learned that Mr. Colella grew up in an itinerant carnival family marked by extraordinary adversity: brutal physical abuse, sexual and emotional abuse, drug use, alcoholism, depression, inadequate parenting, grinding poverty, serious illness and death, abandonment, and parental kidnapping, most of which Mr. Colella was either directly victimized by or watched during the formative years of his childhood, and which left Mr. Colella, and several of his siblings, with lasting psychological problems. Because of counsel's inadequate preparation, the jury never learned of Mr. Colella's organic brain damage and history of juvenile suicide attempts, depression, self-destructive behavior, and mood disturbances severe enough to require medication with powerful antipsychotic drugs. Nor did it hear testimony from treating physicians and counselors whose names appear in the records and who could have provided mitigating testimony.

453.    Counsel did not secure his client's psychiatric records or have his client examined by a mental health professional, even though, before trial, he knew of his client's extensive history of mental illness and emotional disturbance. Because of trial counsel's inadequate preparation, the jury never learned mitigating circumstances of his client's 1985 burglary conviction – such as that the judge and prosecutor agreed with the defense that the crime was partly attributable to Mr. Colella's deprived background, poor home life, and mental illnesses, and that the judge and prosecutor cooperated with the defense in repeated, sustained attempts to ensure that Mr. Colella received mental health treatment. Counsel did not adequately interview any of his client's family members, despite their willingness-at the time of trial-to discuss these subjects and Mrs. Curtis' willingness-at the time of trial-to discuss sensitive or unflattering information to prevent her son's punishment by

247

lethal injection. Counsel put his key punishment phase witness (Mrs. Curtis) on the stand without any preparation. He did not tell her what evidence would be relevant to the jury's determination, what she would be allowed to say, or what kind of cross-examination she would face. The tenor of his questions and her answers indicates counsel's unfamiliarity with the basic facts of his client's background and Mrs. Curtis' lack of preparation. Had Mrs. Curtis not performed her own investigation, her testimony would have been the only evidence, as Mr. Limas did not attempt to secure any additional character witnesses. The two additional defense witnesses, whom *Mrs. Curtis*, not trial counsel, located, were unprepared, and were thus cross-examined with devastating results.

454. Counsel permitted the introduction, without objection, of inadmissible hearsay testimony, often containing inflammatory, damaging assertions. He failed to recognize the difference in the rules governing non-capital and capital sentencing proceedings, ensuring that his planned objections would all be dismissed as irrelevant, and that the evidence they were intended to exclude would come in.

455. These many errors, taken together, fundamentally altered the presentation to the jury. When a State's law, like Texas's, provides that a capital murder defendant will be sentenced to life in prison if the jury cannot reach a unanimous verdict at the punishment phase of the trial, a capital defendant need demonstrate only that one juror would have declined to vote for death had he or she been presented with the mitigating evidence withheld from the jury by ineffective counsel. *See Williams v. Taylor*, 529 U.S. 362, __, 120 Ct. 1495, 1513-14 (2000) (rejecting argument that defendant who shows prejudice by demonstrating likelihood of "hung jury" life sentence seeks illegitimate "windfall" from court); *see also Kirkpatrick v. Whitley*, 992 F.2d 491, 497 (5th Cir. 1993). Had counsel performed effectively, there is a "reasonable probability" – a probability "sufficient to undermine confidence in the outcome" – that the jury would not have unanimously agreed to answer the punishment phase special issues to ensure the death penalty. *Strickland*, 466 U.S. at 694. Had counsel performed effectively, the jury would have been presented with a "moving

248

narrative" or defendant's "bleak, so deprived, [and] harrowing" upbringing sufficient on its own to evoke mercy. *Emerson v. Gramley*, 91 F.3d 898, 906 (7th Cir. 1996) (granting punishment phase relief). The jury would also have known that the defendant is brain damaged, and that the effects of the brain damage have been clearly noted since his early childhood. The jury would further have known that his brain damage – a permanent condition inflicted on the defendant through no fault of his own-resulted in behavioral effects which reduced his personal moral culpability. Even with the limited information they had, the jurors found their sentencing task difficult – several were crying when they returned to the courtroom after deliberating. *See* Essex, *supra*. When placed in the context of the crime for which Mr. Colella was convicted – which even the State admits would never have occurred but for Mr. Colella's belief that the victims had, just hours before, gang-raped his wife – the mitigating effect of the evidence is clear.

> ## 2. Mr. Colella's trial was tainted by pervasive prosecutorial misconduct which rendered the entire proceedings fundamentally unfair and denied Petitioner due process of law.

456.    The American Bar Association's Standards for Criminal Justice: Prosecution Function (3rd ed. 1993) ("Prosecution Guidelines") describe the ethical duties of prosecutors:

Standard 3-5.6  Presentation of Evidence

A prosecutor should not knowingly offer false evidence, whether by documents, tangible evidence, or the testimony of witnesses, or fail to seek withdrawal thereof upon discovery of its falsity.
A prosecutor should not knowingly and for the purpose of bringing inadmissible matter to the attention of the judge or jury offer inadmissible evidence, ask legally objectionable questions, or make other impermissible comments or arguments in the presence of the judge or jury.

Standard 3-5.7  Examination of Witnesses

A prosecutor should not ask a question which implies the existence of a factual predicate for which a good faith belief is lacking.

Standard 3-5.8  Argument to the Jury

In closing argument to the jury . . . [t]he prosecutor should not intentionally misstate the evidence or mislead the jury as to the inferences it may draw.

The prosecutor should not express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.

The prosecutor should not make arguments calculated to appeal to the prejudice of the jury.

The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence.

457.    Prosecutorial misconduct violates due process when it is severe and pervasive, and renders a defendant's trial fundamentally unfair.  See *Donnelley v. DeChristoforo*, 416 U.S. 637 (1974).  This is such a case.  In every phase of Mr. Colella's trial, the prosecution engaged in misconduct and overreaching.  Trial counsel inexcusably failed to object to many of these incidents.  Most of these incidents of misconduct have been described elsewhere in this Application.  These incidents, taken together, establish a pattern of wrongdoing that independently violated Mr. Colella's Fourteenth Amendment right to due process of law.  Mr. Colella will briefly restate these incidents in light of the requirements of this Claim:

**       Voir dire**

458.    The prosecution improperly attempted to bind prospective jurors to a given outcome based on a hypothetical; injected its opinion of the proper punishment (against a finding of voluntary manslaughter); improperly invoked the prestige of its office (and improperly vouched for the accomplice witness' testimony) by suggesting that it knew it had cut a deal with the "least culpable" accomplice and stating that without the deal, no one would have been punished.  The prosecution also deprived Mr. Colella of the presumption of innocence.  *See supra* Section VI.C.1(h), (i) (alleging ineffective assistance of counsel for failing to object to these improper tactics).

CVisPDF - www.tesisi.com

**\*\*    Guilt-phase opening**

459.    The prosecution referred to Mr. Colella's alleged wife-beating, even though it had no admissible evidence that Mr. Colella abused his wife.

**\*\*    Guilt-phase trial on the merits.**

460.    The prosecution improperly bolstered the credibility of its star witness, Red Wilson, by (1) having Sgt. Luis Martinez introduce it; and (2) misrepresenting the true scope of the immunity agreement executed with Mr. Wilson, and improperly using the immunity agreement to bolster Red's credibility.  *See supra* Section VI.A.3.  The prosecution also knowingly sponsored perjured or misleading testimony from Sgt. Martinez concerning the tire tracks found at the dump scene, the time of death of the victims and the caliber of the murder weapon.  *See supra* Section VI.A.1(b)-(e).

The prosecution tainted Mr. Colella with prejudicial, irrelevant extraneous allegations of spousal abuse, which was "proven" only by inadmissible hearsay.  *See supra* Section VI.A.4  The prosecution also accused Mr. Colella of obstruction or retaliation directed at a witness (a third-degree felony as defined by TEX. PEN. CODE § 36.06), which was "proven" only by inadmissible *double* hearsay, and robbery of money from the victims' bodies, which was irrelevant to Mr. Colella's guilt, and which was suggested only by suspect, contested accomplice-witness testimony.

461.    The prosecution failed to indict Red Wilson for capital murder, perjury or aggravated perjury (TEX. PEN. CODE § 37.03), even though he lied about material events, such as his involvement in dumping the bodies.  The prosecution intentionally introduced inadmissible double hearsay testimony from Red Wilson describing alleged statements made by Steven Watts to Red, which in turn described alleged statements Mr. Colella made to Steven Watts.  The prosecution also improperly impeached the defendant with testifying questions about irrelevant points (*E.g.*: "And you hit her, you continued to beat [your wife] when she was up there [in Terre Haute, Indiana], right?" S.F. Vol. XVIII: 1453) and an outrageous *anonymous hearsay* allegation that "someone" said

they were afraid Mr. Colella *had killed* Brenda. *Id.* The prosecution also attempted to improperly impeach Mr. Colella with inadmissible testimony concerning alleged statements Brenda Colella had given to investigators outside Mr. Colella's presence, and alleged the existence of statements he himself had made to investigators which had never been introduced into evidence. *Id.* at 1464-67.

462. The prosecution, both in cross-examination and in closing argument, implied that Mr. Colella used his constitutionally guaranteed right to be present in the courtroom to "tailor" his testimony. *Id.* at 1456; *see also supra* Section VI.C.1(m) (describing prosecution's unfounded insinuation in its guilt-phase closing that Mr. Colella had been forced to "switch" defenses because he realized during trial that his voluntary manslaughter defense could not prevail). Such comments go outside the record and unfairly attacked the defendant's credibility merely because he chose to exercise his constitutional rights to be present at trial and to testify.

### ** Guilt-phase closing

463. The prosecution argued outside the evidence, attacked defense counsel for his proper advocacy on his client's behalf (telling the jury repeatedly that defense counsel's job was to "use" them), made improper appeals to the prejudices and emotions of the jurors by repeatedly referring to the victims' families and declaring that the victims' spirits could not be put to rest unless Mr. Colella were convicted; improperly vouched for Red Wilson's credibility by implying falsely that he had no motive to lie, improperly attacked Mr. Colella's credibility, insulting him by calling him a "user" and a "liar," mischaracterized the evidence concerning the victims' times of death and the inconsistencies in its own witnesses' testimony (implying that the defense was fabricating these inconsistencies when the prosecutor knew that the inconsistencies were genuine); mischaracterized the defendant's testimony by asserting that he didn't "remember" committing the crime when his sole claim was that he did not commit the crime; unconstitutionally altered the burden of proof by implying that the fact that large portions of Mr. Colella's testimony were corroborated only went to show what a clever liar he was; and improperly put her own experience and integrity at issue by

CMxPDF - www.texla.com

asking jury to take into her account her own personal knowledge and experience in evaluating the strength of the State's case.

464.    Simply put, a majority of the State's remarks during closing were either similar to or indistinguishable from arguments that courts have repeatedly denounced as unfair and improper.

## ** Punishment phase trial on the merits

465.    The prosecution alleged several prior acts of wrongdoing on Mr. Colella's part *solely* through inadmissible hearsay testimony from police officers and probation officials.    The prosecution also attempted to inject inflammatory, irrelevant hearsay and double hearsay into the trial (such as Mr. Colella's alleged comments about "Charles Manson" and a shadowy allegation that Mr. Colella had made some comment about robbing vending machines).    The prosecution was rebuked by the trial judge three separate times during the punishment phase for attempting to introduce "improper" evidence to "inflame the minds of the jury." *See* S.F. Vol. XXI: 113, 125, 159.

466.    The prosecution also unfairly attacked Mr. Colella by intentionally mischaracterizing evidence concerning Mr. Colella's 1982 juvenile adjudication for battery and his 1985 conviction for burglary.  The State, *solely through inadmissible hearsay*, suggested that the battery conviction actually involved a sexual assault or rape, even though it knew that Mr. Colella had never been convicted of a sex offense in this case or any other.  The prosecution also insinuated that Mr. Colella had tied up, gagged, and threatened the victim of the 1985 burglary even though the evidence did not support this.    Both of these mischaracterizations were repeated during the prosecution's punishment-phase closing.  Prejudice is demonstrated by the fact that reporters present in the gallery were misled into believing that Mr. Colella had been convicted of "rape" and that he had tied up, gagged, and bound the victim of the 1985 burglary. *See* Prosecution Guidelines, Commentary to Guideline 3-5.6 ("The mere offer of known inadmissible evidence of asking a known improper question may be sufficient to communicate to the trier of fact the very material the rules of evidence are designed to keep from the fact finder.").

**\*\* Punishment phase closing argument**

467.    The centerpiece of the prosecution's closing argument was a detailed account of a purported private conversation with her husband in which she recounts a misleading litany of Mr. Colella's alleged previous wrongdoing, most of which was "proven" only by hearsay.  After telling her husband and the jury about all the things Mr. Colella had allegedly done, the prosecutor informs the jury that her husband, given that account, believed that Mr. Colella was beyond redemption and should be punished by lethal injection.  This tactic improperly injected the opinion of the prosecutor's *husband* into the trial and further reinforced the misleading characterizations of the evidence to the jury immediately before they retired to deliberate Mr. Colella's sentence.  The prosecution also improperly invited the jurors to sentence Mr. Colella to death based on a comparison of the "worth" of his life with the worth of the victims'.

468.    The prosecution's misconduct and improper closing argument is especially likely to render a defendant's trial fundamentally unfair when the prosecutor "manipulate[s] or misstate[s] the evidence [or] implicates specific rights of the accused such as the right to counsel or the right to remain silent."  *Darden v. Wainwright*, 477 U.S. 168, 181-82 (1986) (holding aggressive and improper prosecution argument harmless because it did not fit the above description); *see also United States v. Corona*, 551 F.2d 1386 (5th Cir. 1977) (finding improper prosecutor's remarks in closing statement that bolstered the testimony of Government witnesses and injected the prosecutor's personal opinions, and citing ABA standards in support of holding).

469.    The prosecution's guilt-phase closing "manipulate[d] and misstate[d]" evidence on the central issue of the victims' times of death and the inconsistencies in its own witnesses' testimony.  The prosecution's unfounded and repeated assertions that Mr. Colella used his presence in court and his opportunity to testify to "tailor" his testimony directly attacked his Sixth Amendment right to be present in the courtroom and his Fifth Amendment right to testify.  The prosecution's argument that defense counsel's only duty was to "get his guy off" and that it was improper for

254

defense counsel to attack the quality of the State's investigation burdened Mr. Colella's Sixth Amendment right to effective representation by counsel.

470.   This case is one of "those rare cases where the improper comments [by the prosecutor] were so numerous and, in combination, so prejudicial that a new trial is required." *Floyd v. Meachum*, 907 F.2d 347, 348 (2d Cir. 1990) (reversing habeas applicant's conviction based on due process violations caused by improper argument at guilt-phase summation).   To buttress its finding of prejudice, the *Floyd* court observed that the prosecutor's misconduct "[did] not involve one, or a few isolated, brief episodes; rather, it involve[d] repeated and escalating prosecutorial misconduct from initial to closing summation." *Id.* at 353.   The court condemned the prosecutor's "studied pattern" of unfair remarks, and observed:

> In sum, we conclude that the cumulative effects of the prosecutor's remarks, which included both inflammatory comments and erroneous statements of law, and which implicated [the defendant's] specific constitutional right to remain silent, diverted the jury from the charges on which Floyd was being tried, and from the fundamental principles by which a jury must discharge its duty.

*Id.* at 354, 356-57 (citations omitted).   The *Floyd* court found the error prejudicial, noting that there was no physical evidence against Floyd and that the state's primary witness had unusually severe credibility problems. *Id.* at 356.   The analogy to his case is obvious.   Here, however, the prejudice is even clearer than in *Floyd*, as the misconduct in *Floyd* was limited to summation remarks, while here it permeated every phase of the trial. *See also United States v. Herberman*, 583 F.2d 222 (5th Cir. 1978) (reversing defendant's conviction on Due Process grounds because prosecutor "made too many improper suggestions, introduced too much improper evidence, and [falsely] denied the existence of evidence on too many occasions," and the "sum of all these errors prevented appellant from obtaining a fair and impartial trial").   Severe prosecutorial misconduct deprived Mr. Colella of due process, and his conviction and death sentence must be reversed.

**F.     The trial court's refusal to grant Petitioner's request for a change of venue and alleviate the effects of extensive and prejudicial pretrial publicity, which assumed applicant's guilt, deprived Petitioner a fair trial in violation of the Sixth and Fourteenth**

255

**amendments to the United States Constitution.**

### 1.     Pretrial publicity prejudiced Mr. Colella's jurors.

471.    During the voir dire it became apparent that news and other media coverage of the Brenda Colella capital murder trial had not escaped members of Mr. Colella's venire panel.  Further, even members who ultimately served as jurors were aware of the pretrial publicity.  One of the jurors, in fact, testified that the publicity had caused her to have thoughts which indicate that she had prejudged the case.

### 2.     Jurors who served on Mr. Colella's trial were aware of pretrial publicity.

#### a.     Juror No. 4, Refugia G. Leal

472.    Ms. Leal was curious about the nature of Mr. Colella's case so she turned on the TV (S.F. Vol. VI: 289) and heard on television that Brenda Colella had received a life sentence for the murders of the same victims in Mr. Colella's case.  *Id.*  When asked whether Brenda Colella's life sentence would have affected her, she said: "Well I thought about it.  Well, if she's already serving life, you know, what keeps him from, you know, serving life, too."  *Id.*  The prosecutor then said "Well, the trial, everyone deserves his day in court." to which Mrs. Leal said: "I understand that, but that crossed my mind, if she's already found guilty, you know, what –."  *Id.*  The prosecutor then interrupted Mrs. Leal and asked a very leading question:  "Can you set this aside for us because you are – ," to which Mrs. Leal said "I can.  I am a fair person."  *Id.*  The prosecutor then asked another leading and conclusory question:  "The fact that she is serving life right now, you can still be fair and impartial to the defense attorney and listen to all the evidence and so forth?", to which Mrs. Leal said:  "Uh-huh."  *Id.*  Shortly thereafter, on examination by Mr. Colella's attorney, Mrs. Leal admitted again that "because my first impression was well, she's already there, he will probably more than likely – he will end up the same way.  If everyone gets together to make the same decision, that, you know, to take – to give him life rather than the death penalty because they are up together."  *Id.* at 290-91.  But in nearly the same breath she then testified that she was not biased and had not

256

formed an opinion. *Id.* at 291. Neither side objected to Mrs. Leal.

### b.   Juror No. 3, Herlinda Soto

473.   Ms. Soto read in the newspaper that Brenda Colella had received a life sentence in her capital murder trial for the deaths of the victims in Mr. Colella's case and saw on television that Mr. Colella's trial was "coming up." *Id.* at 198. The prosecutor then asked: "Would that in any way affect your deliberating in this case, sitting here in the trial – wife got life?" to which Ms. Soto said "No." *Id.* The prosecution then asked another leading question: "You will sit there and listen to all the evidence and make a good and fair decision at the end of all the evidence?" to which Ms. Soto said: "Yes, sir." *Id.* Defense counsel did not voir dire Ms. Soto on pretrial publicity. *Id.* at 201-09.

### c.   Juror No. 8, Jose Gerardo Garcia

474.   Mr. Garcia had heard of the case through the television. S.F. Vol. IX: 892. In an obvious attempt to coach Mr. Garcia, the prosecutor then explained that the media "tells us some things, doesn't tell us other things, emphasizes some things. " *Id.* at 892-93. The prosecutor further asked : "[N]ow you're in a position as the juror to really make a decision because you've heard all the evidence completely. So could you be fair and impartial, in spite of what you've read in the –?" to which Mr. Garcia responded, "Yes." *Id.*

### d.   Juror No. 10, James Schaefer

475.   Mr. Schaefer had heard of the case through the newspapers "a little bit, just what happened in the news media." *Id.* at 1006. The prosecutor then responded: "Now, you know, the newspaper is not always accurate. It doesn't tell you everything that happened. It just goes on something real small. Would anything in that media that you have seen or you may have read, would that affect you in making a decision?" to which Mr. Schaefer responded "No, it wouldn't." *Id.*

.

257

### 2. The statements of other members of the venire panel demonstrated the pervasive and prejudicial nature of the publicity surrounding Brenda's trial.

#### a. Jimmy E. Payne

476.   Mr. Payne heard about the case on the television (S.F. Vol. XIII: 865); had formed an opinion that Mr. Colella is guilty based on what he saw on television (*id.* at 866); and said that Mr. Colella would need to change his mind that he is not guilty (*id.* at 867).  Defendant used peremptory challenge after trial court rejected the challenge for cause. *Id.* at 869-70.

#### b. Kathleen Crum

477.   Ms. Crum heard radio coverage (S.F. Vol. X: 1162); said that newspaper coverage was very biased (*id.* at 1163); and said Mr. Colella was guilty and wanted him to prove his innocence (*id.* at 1165-66).   Struck for cause as a result of her opinions and because she would have requested evidence of innocence.  (*id.* at 1169).

#### c. Clara Aguilar

478.   Ms. Aguilar said she heard "so much of this case ' (*id.* at 1223); and thinks Mr. Colella is guilty (*id.* at 1226).  Both sides agreed she should be dismissed because of her feelings and what she had heard and read. *Id.*

#### d. Julia Garcia

479.   Ms. Garcia heard something about the case from the newspaper (S.F. Vol. VIII: 793); admitted having read about the case (*id.* at 811); and admitted being familiar with the case (*id.* at 812).  Defendant used peremptory challenge to strike. *Id.* at. 813.

### 3. Under the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment, Petitioner was entitled to a trial free of the adverse effects of comprehensive pretrial publicity which assumed Petitioner's guilt.

#### a. The applicable principles.

258

480.     The Sixth and Fourteenth Amendments guarantee a criminal defendant the right to a fair trial. *Holbrook v. Flynn*, 475 U.S. 560, 567 (1986); *Estelle v. Williams*, 425 U.S. 501, 503 (1976). The basic principle is that a criminal defendant is entitled to a verdict based only upon the evidence introduced at trial. *Holbrook*, 475 U.S. at 567; *Taylor v. Kentucky*, 436 U.S. 478, 485 (1978); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (holding that the verdict must be based upon the evidence developed at trial "regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies"). Further, a defendant has the right to be tried by "a panel of impartial, 'indifferent' jurors." *Irvin*, 366 U.S. at 722. Accordingly, courts must guard against "factors that may undermine the fairness of the fact-finding process." *Williams*, 425 U.S. at 503; *see Cox v. Louisiana*, 379 U.S. 559, 562 (1965) (noting that a state should "adopt safeguards necessary and appropriate to assure that the administration of justice at all stages is free from outside control and influence").

481.     To prevail on his fair trial claim, Mr. Colella must show either actual or inherent prejudice. *Flynn*, 475 U.S. at 572. Mr. Colella can show each.

482.     Some of the publicity concerning the Brenda Colella trial was in the print media. The stories that the undersigned have located contain detailed accounts of the testimony of the witnesses who only a few months later testified for the State at Mr. Colella's trial. The following are examples of some of the stories:

> *Trial Begins in Case of Double Homicide*, BROWNSVILLE HERALD, May 27, 1992, at 3A: in her opening statement, Assistant District Attorney Migdalia Lopez "said that [Brenda] Colella's version of the incident is that *her husband shot the two men with a stolen gun* after Brenda Colella told him the men had raped her earlier that day." *See* App. II, Exh. 20 (emphasis added).

> *Capital Murder Trial of Indiana Woman Begins*, VALLEY MORNING STAR, May 28, 1992: describes that Brenda Colella is accused of causing her husband to shoot to death two men on South Padre Island and gives more information about Mr. Colella's alleged involvement in the murders. *See* App. II, Exh. 21.

> *Shooting Described for Jurors*, BROWNSVILLE HERALD, May 28, 1992, at 3A:

259

discusses Mr. Colella's alleged involvement in the shooting.  *See* App. II, Exh. 22. Notes that "Brenda Bowling Colella . . . is charged with causing her husband, Paul Colella, to shoot to death two men . . ." *Id.*

*Witness Testifies Suspect Was Involved in a Shooting Before Double Murder*, BROWNSVILLE HERALD, May 29, 1992, at A3: describes the testimony of Vikki Larson (who also testified at Mr. Colella's trial).  The story reports (a) Ms. Larson *"said Paul Colella wanted to go find them 'and kill the men'"*; (b) Ms. Larson said that she and others tried to discourage Mr. Colella from going to find the men but he pulled a gun; and (c) that shortly after this incident, while Ms. Larson was inside a trailer, she heard five shots fired.  *See* App. II, Exh. 23 (emphasis added).

*Woman Testifies in Colella Murder Trial*, VALLEY MORNING STAR, May 29, 1992, at A9: describing that victims were "[a]llegedly shot to death by Paul Colella . . ." Also, noting Brenda Colella's statement that Paul "wanted to go find the son-of-a-bitches and kill them."  Further notes that "Wilson said he and Brenda Colella remained inside his Bronco *while Paul Colella shot the two men."* *See* App. II, Exh. 24 (emphasis added).

*Witness Cut Deal for Testimony*, BROWNSVILLE HERALD, May 31, 1992: repeated the State's claim that Brenda Colella was charged with capital murder because *"she caused her husband* to shoot to death Michael Levesphere [sic] and David Ray Taylor on Sept. 12 by telling him that they had raped her."  Also describes some of the testimony of Red Wilson (who also testified at Mr. Colella's trial) and it described the immunity deal he had reached with the State.  Further, gave an account of the testimony of another witness for the prosecution, Sherie Wilson (who also testified at Mr. Colella's trial), who purportedly said that she did not believe Brenda Colella when she said she had been raped because she did not have bruises on her body. *See* App. II, Exh. 25 (emphasis added).

*Witness says He Tried to Talk Shooter Out of Double Homicide*, BROWNSVILLE HERALD, June 2, 1992, at A3:  noting that Red Wilson "said he tried to persuade Paul Colella not to shoot the men."  Also states that Wilson said Paul Colella "ran up to the truck, *he fired into the truck"* and "He fired and killed the guys.  He shot in there." *See* App. II, Exh. 26  (emphasis added).

*Chilling Testimony Given in Colella Murder Trial*, PORT ISABEL PRESS, June 4, 1992: the first sentence states: "The night of Sept. 12, 1991, *Paul Colella shot and killed two oilfield workers* while they slept in a pickup truck on the South Padre Island beach, according to eye witness testimony."  Recounts Red Wilson's testimony that Mr. Colella fired the shots.  Has more details from trial testimony about the entire incident.  *See* App. II, Exh. 27 (emphasis added).

260

*Witness Describes Slayings of Oil Field Workers on Island* VALLEY MORNING STAR, June 2, 1992, at A2: summarizes testimony of Red Wilson, including testimony that Mr. Colella shot the two victims. *See* App. II, Exh. 28. For example, notes Wilson testimony that Paul Colella "walked to the rear of the truck and fired shots into the bed of the truck." *Id.*

*Defense Presents No Witnesses in Island Murder Trial*, BROWNSVILLE HERALD, June 3, 1992, at 3A: notes that trial court denied directed verdict in Brenda Colella Trial, "Wilson testified that he saw Paul Colella shoot the two men while they slept in the truck." *See* App. II, Exh. 29.

*Survivor testifies about SPI killings*, VALLEY MORNING STAR, June 3, 1992, at A6: noting that "Brenda Bowling Colella is accused of causing her husband, Paul Colella, to shoot to death two oil field workers." *See* App. II, Exh. 30.

*Indiana Woman Convicted of Island Murders, Sentenced to Life*, BROWNSVILLE HERALD, June 4, 1992, at A11: noting that "Prosecutors said Brenda Colella caused her husband to shoot the two men by telling him they had raped her . . ." *See* App. II, Exh. 31.

*Indiana Woman Found Guilty of Capital Murder*, VALLEY MORNING STAR *News*, June 4, 1992, at A2: describes that the jury found Brenda Colella guilty of capital murder for "causing her husband, Paul Colella, of Indianapolis *to shoot to death two oil field workers* on the beach at South Padre Island." States that Mr. Colella "will go on trial for capital murder June 29 in Valdez's court." Further mentions that in closing arguments the prosecutor argued that Paul Colella and Brenda Colella had fled town after the incident. Also recounted prosecutor's closing argument "*that just before Colella went to shoot the men*, he once more asked his wife, 'did they do it (rape her).' " *See* App. II, Exh. 32 (emphasis added).

*Colella Found Guilty in Capital Murder Trial*, PORT ISABEL PRESS, June 7, 1992: discusses evidence about the rape and Red Wilson's testimony about the alleged conversation before the shootings between Brenda Colella and Paul Colella. *See* App. II, Exh. 33.

*Brenda Colella, 21, Given Life in Prison*, PORT ISABEL PRESS, July 3, 1992: states that Brenda Colella was "formally sentenced to life in prison by Judge Roy Valdez for her role in the Sept. 12 South Padre Island shooting deaths of two oil workers." *See* App. II, Exh. 34.

### b.      Pretrial publicity caused actual juror prejudice.

483.    Actual prejudice occurs when the jurors had such fixed opinions that they could not

judge the case impartially. *Patton v. Yount*, 467 U.S. 1025, 1035 (1983). In Mr. Colella's case one of the jurors, Mrs. Leal, admitted to a disqualifying prejudice. Her ability to be impartial was impaired, as she readily admitted that (1) she was curious about the case in which she had been summoned to serve on the venire panel; (2) she learned from television that two persons had been killed; (3) she learned that Brenda Colella was already serving life for these murders; (4) and if Brenda Colella is serving life "what keeps him from, you know, serving life, too". S.F. Vol. VI: 289. She stated that the publicity "closed my mind." *Id.*

484.    Admittedly, through leading and conclusory questions the State attempted to rehabilitate Mrs. Leal, and she in fact later admitted she could be impartial.  These follow-up statements should be given little credence, as the questions that were asked (both by the prosecutor and defense counsel) did not properly measure the extent to which the exposure had affected Mrs. Leal.  *See Coleman v. Kemp*, 778 F.2d 1487, 1542-43 (4th Cir. 1985) (noting that while jurors professed objectivity, their protestations were ineffectual because of superficial voir dire consisting of "leading questions and conclusory answers").  While the Fifth Circuit has suggested that pretrial publicity does not necessarily vitiate impartiality, *United States v. Parker*, 877 F.2d 327, 330-331 (5th Cir. 1989), *cert. denied*, 493 U.S. 871 (1990), and that a juror expressing an opinion based upon pre-trial publicity does not necessarily warrant a strike for cause, *see Bell v. Lynaugh*, 828 F.2d 1085, 1093 (5th Cir.), *cert. denied*, 484 U.S. 933 (1987),[51] such is not the case here. Mrs. Leal was clearly prejudiced and  by exposure to the pretrial publicity and was only "rehabilitated" through extremely leading questions.  *See supra*.  In *Bell*, however, the prosecutor merely asked whether the juror "believed that based upon what you have heard, . . . whether that would, or could, affect some of your deliberations?" 828 F.2d at 1085. The prosecutors in *Bell* made no effort to coach the juror by asking leading and conclusory questions as the State did in this case.

485.    The same analysis can be applied to three other jurors, Ms. Soto, Ms. Garcia, and Mr. Schaefer.  No meaningful voir dire examination was conducted that was "calculated to elicit the disclosure of the existence of actual prejudice." *Coleman*, 778 F.2d at 1542.  Instead, these jurors, like other members of the panel, were simply asked conclusory and leading questions.  Indeed, the prosecutors prefaced all questions to the jurors with commentary calculated to prompt the desired response.  This evidence establishes actual prejudice.

---

[51] *In Bell*, the juror's opinion that "I guess [defendant] was more guilty, if I had to choose" was based upon pre-trial newspaper articles, and was held not to warrant removal for cause where juror stated that she could be fair and impartial).

### c. Pretrial publicity caused inherent juror prejudice.

486.    In some situations, "a procedure employed by the State involves such a probability that prejudice will result that it is deemed inherently lacking in due process." *Estes v. Texas*, 381 U.S. 532, 542-43 (1965). The standard for determining when a particular occurrence is inherently prejudicial is whether "an unacceptable risk is presented of impermissible factors coming into play." *Flynn*, 475 U.S. at 570-71; *Williams*, 425 U.S. at 505. A risk becomes unacceptable when the probability of deleterious effects exists. *Id.* at 504. Courts should examine inherently prejudicial occurrences with close judicial scrutiny, because "the actual impact of a particular practice on the judgment of jurors cannot always be fully determined." *Williams*, 425 U.S. at 504; *see Flynn*, 475 U.S. at 568. Courts must evaluate the probability of deleterious effects based on reason, principle, and common human experience. *Williams*, 425 U.S. at 504. *United States v. Chagra*, 669 F.2d 241, 250 (5th Cir.), *cert denied*, 459 U.S. 846 (1982) (noting that "[a defendant] can demonstrate that prejudicial, inflammatory publicity about his case so saturated the community from which his jury was drawn as to render it virtually impossible to obtain an impartial jury. . . .") .

487.    The Supreme Court first announced the concept of inherent prejudice in *Rideau v. Louisiana*, 373 U.S. 723 (1963). In *Rideau*, the defendant contended that the trial court's denial of his motion for change of venue violated his right to a fair trial under the Due Process Clause of the Fourteenth Amendment. The basis for his change of venue motion involved a local television station's broadcast of the defendant's jailhouse confession to a substantial portion of the community before the trial. Without requiring the defendant to show the actual effect that the televised confession had on the fairness of the trial, the Court found the airing of the confession inherently prejudicial. *Id.* at 727; *id.* at 729, 733 (Clark, J., dissenting). The Court noted that the televised confession "*was* Rideau's trial, and any subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality." *Id.* at 726.

488.    Since *Rideau*, the Court has developed a well-defined jurisprudence concerning

264

inherent prejudice. For example, in *Turner v. Louisiana*, 379 U.S. 466 (1965), two deputy sheriffs gave critical testimony for the prosecution and also performed extensive official duties in sequestering the jurors during the course of the defendant's three-day trial for capital murder. The Court determined that the practice was inherently suspect and, therefore, did not require the defendant to make a showing of actual prejudice:

489.   In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel. What happened in this case operated to subvert these basic guarantees of trial by jury.

> [E]ven if it could be assumed that the deputies never did discuss the case directly with members of the jury, it would be blinking reality not to recognize the extreme prejudice inherent in this continual association throughout the trial between the jurors and these two key witnesses for the prosecution.

*Id.* at 473 (internal quotation marks omitted)[52].

490.   Other Supreme Court rulings have broadened the application of the inherent prejudice test. *See Estes v. Texas*, 381 U.S. 532, 542-44 (1965) (finding that the totality of the circumstances surrounding the defendant's televised trial demanded a finding of inherent prejudice to his due process rights under the Fourteenth Amendment) (plurality opinion of Clark, J.); *id.* at 552, 578-80 (Warren, C.J., concurring) (finding that the presence of television in the criminal courtroom was inherently unfair); *id.* at 593 (Harlan, J., concurring) (concluding that, "when the trial practices in question are instinct with dangers to constitutional guarantees," no showing of specific prejudice is

---

[52] *See Gonzales v. Beto*, 405 U.S. 1052 (1972) (citing *Turner* for the proposition that allowing the county sheriff, a key prosecution witness, to retain his duties as a bailiff responsible for the care of the jurors was inherently prejudicial); *Parker v. Gladden*, 385 U.S. 363 (1966) (finding inherently prejudicial a bailiff's remarks to several jurors that the defendant was guilty).

ChMPDF - www.texto.com

required); *Sheppard v. Maxwell*, 384 U.S. 333, 358 n.11, 363 (1966) (finding that the totality of the circumstances surrounding the defendant's notorious murder trial showed that the trial judge's failure to insulate the proceedings from inherently prejudicial publicity and to control disruptive influences deprived the defendant of his Fourteenth Amendment right to a fair trial.)

491.    In sum, the Supreme Court's inherent prejudice jurisprudence emphasizes that "[d]ue process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Smith v. Phillips*, 455 U.S. 209, 217 (1982); *see Chandler v. Florida*, 449 U.S. 560, 574 (1981) (holding that "[t]rial courts must be especially vigilant to guard against any impairment of the defendant's right to a verdict based solely upon the evidence and the relevant law"). Accordingly, cases involving preventable intrusions on the trial proceedings present greater justification for presuming prejudice than do cases in which the trial court took appropriate steps to ensure the integrity and dignity of the trial. *See United States v. Haldeman*, 559 F.2d 31, 61 n.32 (D.C. Cir. 1976); *see, e.g., Nebraska Press Ass'n v. Stuart*, 427 U.S. 539 (1976) (noting that the trial court's failure to control the proceedings in *Estes* constituted one of the factors resulting in an inherent deprivation of the defendant's due process rights); *United States v. Herring*, 568 F.2d 1099 (5th Cir. 1978) (finding inherent prejudice, because the district court refused to conduct a voir dire examination of the jury to determine whether any juror had read a suggestive newspaper article about the case); *Norris v. Risley*, 918 F.2d 828 (11th Cir. 1990) (noting the relative ease with which the trial judge could have alleviated the risk of inherent prejudice caused by spectators wearing "Women Against Rape" buttons during rape trial)[53].

---

[53]  Extraneous influences which exert pressure on jurors undermine public confidence in the fairness and reliability of the criminal justice system. Accordingly, courts must guard against the possibility of a conclusion by the public that a jury's verdict "was in part a product of intimidation and did not flow from the fair and orderly working of the judicial process." *Cox v. Louisiana*, 379 U.S. 559, 565 (1965).

266

### d.   The totality of the circumstances caused inherent prejudice to Mr. Colella's right to a fair trial.

492.   The highly unfair and inflammatory publicity which surrounded Mr. Colella's trial, publicity which went right to the heart of the issue in Mr. Colella's case, was inherently prejudicial. It created an unacceptable risk that the jury would base its verdict at both phases of the trial on impermissible factors. Throughout Mr. Colella's trial, his jury was given subtle reminders not only of his wife's recent trial but also of the publicity it had generated. The publicity posed a serious and unacceptable threat to the fairness of the fact-finding process in Mr. Colella's trial and undermined the Sixth and Fourteenth Amendment guarantees that a jury shall base its verdict "only on the evidence subjected to the crucible of the adversarial process." *Woods v. Dugger*, 923 F.2d 1454, 1460 (11th Cir.), *cert. denied sub nom. Singletary v. Woods*, 502 U.S.953 (1991).

493.   The inherently prejudicial impact of the pretrial publicity surrounding Mr. Colella's case is exemplified by news accounts, published two months before his trial, which reported "facts" that went to the ultimate issue in Mr. Colella's case, namely, whether Paul Colella shot the victims. Story after story reported that Brenda Colella's culpability hinged on Mr. Colella's conduct, and numerous stories in reporting the verdict concluded that Mr. Colella had shot the victims. Headlines, such as "Colella Found Guilty in Capital Murder Trial" and "Chilling Testimony Given in Colella Murder Trial" engendered a deep prejudice as to Mr. Colella's guilt. As in *Rideau*, the detailed, high profile accounts at the Brenda Colella trial "was [Paul Colella's] trial."

494.   It is no surprise then that members of Mr. Colella's venire panel had been so persuaded of his guilt based on these new stories and other media coverage that they could not have been seated. One of the panel members who was seated had the impression from the coverage that if Brenda Colella had gotten life Mr. Colella would probably get the same.

495.   Further, the news stories reported "facts" that clearly would have been inadmissible at trial. For example, stories from statements about the immunity granted to Red Wilson improperly described the agreement and wrongly implied that Wilson had established his innocence of the

charges brought against him. *See, e.g.,* App. II, Exh. 29 (*Chilling Testimony Given in Colella Murder Trial,* PORT ISABEL PRESS, June 4, 1992). Accordingly, the sanctity of the courtroom was invaded by pretrial publicity before the trial ever began.

496. Finally, an essential element of the right to a fair trial involves the trial court's duty to insulate the jury, as best as possible, from every source of pressure or prejudice. The Supreme Court has recognized that, "Given the pervasiveness of modern communications and the *difficulty of effacing prejudice from the minds of the jurors,* the trial courts must take strong measures to ensure that the balance is never weighed against the accused." *Sheppard v. Maxwell,* 384 U.S. 333, 362, (1966) (emphasis added). A trial court can therefore use its power to grant a change of venue to a community untouched by the crime. The trial judge did not employ this protective measure at Mr. Colella's trial. Under the circumstances, the trial judge's failure to grant a change of venue to a community where the publicity could not have had the same effect deprived Mr. Colella of his right to a fair trial.

### e.   Conclusion

497. "Mr. Holmes stated no more than a truism when he observed that 'Any judge who has sat with juries knows that in spite of forms they are extremely likely to be impregnated by the environing atmosphere.'" *Turner v. Louisiana,* 379 U.S. 466, 472 (1965) (quoting *Frank v. Magnum,* 237 U.S. 309, 349 (1915) (dissenting opinion)). The extensive and prejudicial publicity surrounding the trial tainted the community and had an inherently prejudicial effect on Mr. Colella's right to a fair trial. Further, as the voir dire proceedings reveal, it created an actual prejudice in certain members of the panel. The pretrial publicity created an unacceptable risk that the jury based its decisions at the guilt and punishment phases of the trial on impermissible factors.

498. Under these circumstances, it is inconceivable to think that Mr. Colella received an impartial assessment of his guilt or innocence on the basis of the evidence, and the detached examination of the special issues which the Texas death penalty system contemplates. It is too much

Case 1:01-cv-00166   Document 1   Filed in TXSD on 09/27/2001   Page 269 of 280

to assume that the men and women seated on Mr. Colella's jury rendered disinterested verdicts based exclusively on the evidence admitted in the courtroom. The totality of the circumstances leaves no doubt that at least one member of the jury was affected by the community's expressions that Mr. Colella had committed the offense. "With his life at stake, it is not requiring too much that applicant be tried in an atmosphere undisturbed by so huge a wave of public passion." *Irvin v. Dowd*, 366 U.S. 717, 728 (1961).

**G.      The evidence of Petitioner's guilt of capital murder is factually insufficient under *Clewis v. State* because the Petitioner's capital murder conviction was contrary to the great weight of the evidence.**

499.    The evidence of Mr. Colella's guilt is factually insufficient under *Clewis v. State*, 922 S.W.2d 126 (Tex. Crim. App. 1996). To perform *Clewis* factual-sufficiency review, a court must view "all the evidence equally, including the testimony of defense witnesses, and the existence of alternative hypotheses." *Angelo v. State*, 977 S.W.2d 169, 174 (Tex. App. – Austin 1998, pet. ref'd) (op. on reh'g). However, the court must be appropriately deferential to the jury verdict, so as to avoid substituting its judgment for that of the fact finder. *See Clewis*, 922 S.W.2d at 133. The appellate court should set aside the verdict if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See id.* at 135; *Stone v. State*, 823 S.W.2d 375, 381 (Tex. App. – Austin 1992, pet. ref'd, untimely filed).

500.    Applying *Clewis* to the facts of this case requires a finding of factual insufficiency. The State had no physical evidence linking Mr. Colella to the crime. The State's main proof came from an accomplice witness who had an obvious motive to lie, whose testimony was riddled with inconsistencies, and who lied to the jury at least once during his testimony (concerning the provenance of the tire tracks found near the bodies). Further, *Clewis* review requires consideration of the defense's evidence. Mr. Colella's alibi testimony was convincing, and in fact was corroborated by a neutral third party. The only testimony from the state which contested the alibi evidence – Sgt. Martinez's estimate of the time of death of the victims – was actually *revised by the*

*prosecution*, perhaps in an attempt to nullify the alibi. The strength of the defense (even in the weakened form as it was presented by trial defense counsel, was strong enough to induce two Judges of the state's highest court to endorse the "alternate hypothesis" that Red Wilson committed the murders – a hypothesis which is even more consistent with the physical evidence that the one supporting Mr. Colella's guilt.

**H.   The cumulative effect of the errors in applicant's trial denied Mr. Colella his fundamental Due Process rights under the Fourteenth Amendment to the United States Constitution.**

501.   Petitioner has documented serious errors, each of which on its own gives rise to a violation of Applicant's rights under the United States Constitution. The errors, considered in their entirety, violated Applicant's due process rights under the Fourteenth Amendment and require a new trial. *Derden v. McNeel*, 938 F.2d 605, 609 (5th Cir. 1991).

**I.   Mr. Colella's Eighth Amendment right to meaningful appellate review of his death sentence was denied by the Court of Criminal Appeals' refusal to review his properly presented challenge to the sufficiency of the evidence supporting the jury's rejection of the mitigation special issue.**

502.   Mr. Colella, pointing to the evidence of his emotional problems adduced at the punishment phase of his trial, challenged the sufficiency of the jury's "no" answer to the second punishment phase special issue, which inquired whether sufficient mitigating circumstances existed to warrant a sentence of life imprisonment rather than the death penalty. The Court of Criminal Appeals refused to consider this claim:

> Because the weighing of "mitigating evidence" is a subjective determination undertaken by each individual juror, we decline to review the evidence for sufficiency. We defer to the jury's conclusion that the evidence was not sufficient to warrant a sentence of life imprisonment.

*Colella v. State*, 915 S.W.2d 834, 845 (Tex. Crim. App. 1995). The CCA's abdication of its responsibility to adjudicate this fairly-presented claim violated Mr. Colella's Eighth Amendment right to meaningful appellate review of his death sentence.

503.    Two separate decisions are involved in any death sentence: the eligibility decision and the selection decision. *See Tuilaepa v. California*, 512 U.S. 967, 971 (1994). To be eligible for the death penalty, the defendant must be convicted of a crime for which the death penalty is a proportionate punishment. *See Coker v. Georgia*, 433 U.S. 584 (1977). In Texas, only those convicted of an offense under TEX. PENAL CODE § 19.03 are eligible for capital punishment. The second decision, the selection decision, relates to the sentencer's determination whether a death eligible defendant should, in fact, receive the death penalty. The selection decision requires individualized sentencing and must be expansive enough to accommodate all relevant mitigating evidence so as to assure an assessment of the defendant's culpability. *Tuilaepa*, 512 U.S. at 973. In Texas, the selection decision is determined by the jury's answers to the statutory punishment issues of TEX. CODE CRIM. PROC. ANN. art. 37.071.

504.    The State must ensure that the process is neutral and principled so as to guard against bias or caprice. *Tuilaepa*, 512 U.S. at 973; *see also Gregg v. Georgia*, 428 U.S. 153, 189 (1976) (procedures must "minimize the risk of wholly arbitrary and capricious action"). To ensure this neutral and principled process, both decisions must be subject to appellate review. *Furman v. Georgia*, 408 U.S. 238 (1972) (decided in conjunction with *Branch v. Texas*, 408 U.S. 238 (1972); *Parker v. Dugger*, 498 U.S. 308, 321 (1991). This is so because meaningful appellate review of death sentences promotes reliability and consistency. *Clemons v. Mississippi*, 494 U.S. 738 (1990).

505.    In Texas, the selection decision encompasses two principal punishment issues. First is the issue of "future dangerousness." Second is the *Penry* issue which asks whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

506.    In *Clemons*, the Supreme Court spoke at length about the necessity of meaningful

271

appellate review.  The Court noted that the process of appellate courts' reweighing of evidence was consistent with *pursuit* of the Eighth Amendment's twin objectives of measured, consistent application of the death penalty and fairness to the accused.  *Id.* at 748 (citing *Eddings* and *Lockett*, *supra*).  The Court stated:

> We see no reason to believe that careful appellate weighing of aggravating against mitigating circumstances in cases such as this would not produce "measured consistent application" of the death penalty or in any way be unfair to the defendant. It is a routine task of appellate courts to decide whether the evidence supports a jury verdict and in capital cases in "weighing" States, to consider whether the evidence is such that the sentencer could have arrived at the death sentence that was imposed. And, as the opinion below indicates, a similar process of weighing aggravating and mitigating evidence is involved in an appellate court's proportionality review. Furthermore, this Court has repeatedly emphasized that meaningful appellate review of death sentences promotes reliability and consistency. It is also important to note that state supreme courts in States authorizing the death penalty may well review many death sentences and that typical jurors, in contrast, will serve on only one such case during their lifetimes.

> \*   \*   \*

> We accordingly see nothing in appellate weighing or reweighing of the aggravating and mitigating circumstances that is at odds with contemporary standards of fairness or that is inherently unreliable and likely to result in arbitrary imposition of the death sentence.

*Clemons*, 494 U.S. at 748-750.

507.    The *Clemons* Court pointedly noted that failure to perform meaningful appellate review would result in an automatic rule of affirmance that would be invalid under *Lockett, supra,* and *Eddings, supra,* "for it would not give defendants the individualized treatment that would result from actual reweighing of the mix of mitigating and aggravating circumstances." *Clemons*, 494 U.S. at 752. *See also Parker v. Dugger*, 498 U.S. 308, 321-322 (1991) (appellate review of mitigating evidence by the Florida Supreme Court was so deficient as to be arbitrary.).

508.    Meaningful appellate review has been a requirement of the Eighth Amendment since the States began re-enacting capital sentencing schemes following *Furman*.  For example, in

272

upholding the constitutionality of the Georgia scheme the Supreme Court held:

> As an important additional safeguard against arbitrariness and caprice, the Georgia statutory scheme provides for automatic appeal of all death sentences to the State's Supreme Court. That court is required by statute to review each sentence of death and determine whether it was imposed under the influence of passion or prejudice, whether the evidence supports the jury's finding of a statutory aggravating circumstance, and whether the sentence is disproportionate compared to those sentences imposed in similar cases.

*Gregg v. Georgia*, 428 U.S. 153, 198 (1976).

> In *Proffitt v. Florida, supra*, the Supreme Court stated:
> The statute provides for automatic review by the Supreme Court of Florida of all cases in which a death sentence has been imposed. . . . Since, however, the trial judge must justify the imposition of a death sentence with written findings, meaningful appellate review of each such sentence is made possible and the Supreme Court of Florida, like its Georgia counterpart, considers its function to be to [guarantee] that the [aggravating and mitigating] reasons present in one case will reach a similar result to that reached under similar circumstances in another case. . . . . If a defendant is sentenced to die, this Court can review that case in light of the other decisions and determine whether or not the punishment is too great.

*Proffitt*, 428 U.S. at 250-252 (internal quotes omitted.)

509.    In holding Texas' post-*Furman* capital sentencing scheme constitutional, the Supreme Court noted that by providing for "prompt judicial review of the jury's decision in a court with statewide jurisdiction, Texas has provided a means to promote the evenhanded, rational, and consistent imposition of death sentences under law." *Jurek*, 428 U.S. at 276.

510.    These cases make it clear that meaningful appellate review is an absolute requirement of the Eighth Amendment. The jury's negative answer to the mitigation special issue is subject to meaningful appellate review. The fact that other jurisdictions perform review of such "normative" judgments is done in other jurisdictions demonstrates this. *Clemons*, 494 U.S. at 748. In *Collins v. State*, 548 S.W.2d 106 (1977), the Arkansas Supreme Court stated:

> There is a meaningful appellate review by this court of the appropriateness of the death penalty in a particular case, considering both the punishment and any errors on points raised in the trial court, including the sufficiency of the evidence to support

> any part of the jury verdict. This appellate review includes . . . whether the evidence supports the jury's findings on the question whether mitigating circumstances outweigh aggravating ones . . . [and] whether the sentence is excessive.

548 S.W.2d at 120; *see also State v. Breton*, 663 A.2d 1026, 1039 (Conn. 1995) (Connecticut Supreme Court holds the defendant's right to appellate review of the death sentence included appellate consideration of certain aspects of mitigating evidence); *State v. Richardson*, 462 S.E.2d 492, 503 (1995) (North Carolina Supreme Court considers whether evidence demonstrated a mitigating factor); *Sheridan v. State*, 852 S.W.2d 772, 781 (Ark. 1993) (Arkansas Supreme Court reviews the jury's findings on mitigation.); *State v. Hernandez*, 562 N.E.2d 219 (2 Dist.1990); *Lowery v. State*, 547 N.E.2d 1046 (Ind. 1989) (Indiana Supreme Court reviews mitigating evidence to determine whether death sentence was erroneous); *Fisher v. State*, 736 P.2d 1003, 1011 (Ok. Crim. App. 1987) (Oklahoma Court of Criminal Appeals approves appellate reweighing of mitigating and aggravating circumstances to determine whether there was sufficient evidence from which a rational juror could find that balance warranted death sentence). The Court of Criminal Appeals' belief that the mitigation special issue is somehow "unreviewable" is belied by the experience of the majority of other American jurisdictions, in which such review is routine and logical.

511. Meaningful appellate review plays the crucial role of ensuring that the death penalty is not imposed arbitrarily or irrationally. *Parker*, 498 U.S. at 321. This review must consider the "individual circumstances" of each defendant before death may be assessed:

> It cannot be gainsaid that meaningful appellate review requires that the appellate court consider the defendant's actual record. "What is important . . . is an individualized determination on the basis of the character of the individual and the circumstances of the crime." *Zant v. Stephens*, (1983); *see also Clemons, supra*, 494 U.S. at 752; *Barclay v. Florida*, 463 U.S. 939, 958 (1983) (plurality opinion).

*Parker*, 498 U.S. at 321. This individualized determination requires a review of the mitigating circumstances. The *Parker* Court noted that "the Florida Supreme Court affirmed Parker's death

274

CitiPDF - www.fevita.com

sentence without considering the mitigating circumstances" and that "[t]his affirmance was invalid because it deprived Parker of the individualized treatment to which he is entitled under our Constitution. *Parker*, 498 U.S. at 322. Thus, this individualized treatment must take into consideration both aggravating and mitigating factors. *Id.*

512. Because the Court of Criminal Appeals failed in this duty, Mr. Colella's death sentence must be vacated.

## J. Granting the State's challenge for cause against venireman William Bristol violated Mr. Colella's rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

513. When asked by the State whether he had reservations about imposing the death sentence, venireman Bristol said "yes." S.F. Vol. VI: 91. He elaborated, however, in an ambiguous manner:

> Q:  Do you feel that all the evidence may show but that you could not kill them?
>
> A.  I wouldn't be – give it, kill another human being.

*Id.* at 92. On cross-examination, Mr. Bristol stated that he could consider the facts in light of the special issues that may be submitted to him during the sentencing phase. *Id.* at 100-02. Thus, the majority in *Colella v. State* observed that "during his voir dire as a whole Bristol seemed to state that he could follow the statutory scheme." 915 S.W.2d at 842.

514. The trial court struck Mr. Bristol for cause, stating "based on the totality of the examination by both parties, I find that juror – this juror is not acceptable." S.F. Vol. VI:104

515. Mr. Bristol did not state that he would automatically vote against the death penalty. The trial court's assumed conclusion that Mr. Bristol would automatically find mitigating circumstances to justify avoiding the death sentence was an abuse of discretion. In fact, as pointed out in the dissent by Judge Clinton in *Colella v. State*, venire person Bristol did not even come close to stating anything about an automatic vote against the death penalty. 915 S.W.2d at 845.

275

516.    A venireman must be told what the law requires of him before it can be said that he cannot follow it.  *Cuevas State*, 742 S.W.2d 331, 343 n.12 (Tex. Crim. App. 1987).  Also, the proponent of a challenge must establish that her challenge was proper.  This was not done here.  As Judge Clinton observed, the burden is not met until the proponent "has shown that the venireman understood the requirement of the law and could not overcome his prejudice well enough to follow it."  *See Colella*, 915 S.W.2d at 846.

517.    In *Wainwright v. Witt*, 469 U.S. 412 (1985), the Supreme Court addressed the issue of what standard governed review of a trial judge's determination that *Witherspoon* did not prevent a prospective juror from being excused for cause because of reluctance to assess the death penalty.  *See id.* at 415-17 (setting out relevant portions of voir dire).  The Court determined that the trial judge's determination should be treated as a finding of fact and thus presumed correct.  Id. at 433.  The record shows Mr. Bristol to be precisely the kind of juror the Supreme Court has repeatedly held cannot be challenged for cause in death penalty jury selection.  He was completely capable of setting aside his personal feelings and answering the two punishment questions fairly.  The trial court's contrary characterization of his testimony was clearly erroneous, and its decision to sustain the State's challenge for cause thus violated Mr. Colella's rights under the Sixth, Fourteenth and Eighth Amendments to the United States Constitution.

# PRAYER FOR RELIEF

WHEREFORE Mr. Colella prays that this Court:

1.  Issue a writ of habeas corpus to have him brought before the Court, to the end that he may be discharged from his unconstitutional confinement and restraint and/or relieved of his unconstitutional sentence of guilt and his unconstitutional sentence of death;

2.  Grant full and complete discovery, including the right to take depositions and to subpoena witnesses and documents necessary to the resolution of his claims;

3.  Order an evidentiary hearing, permitting the full and fair development and presentation of Mr. Colella's claims, and allow Mr. Colella a reasonable time period after any hearing for him to brief the issues of fact and law raised by this Petition or such hearing;

4.  Grant Petitioner, through the undersigned counsel, a reasonable period of time, not less than fifty days, to prepare and file such amendments to this Petition as may be necessary to raise all available constitutional challenges to Mr. Colella's conviction and death sentence and/or to address the deficiencies of the order entered by the trial court that dismissed Petitioner's state habeas application;

5.  Find that Mr. Colella's unconstitutional conviction and sentence of death were imposed in violation of the United States Constitution and laws of the United States and must be reversed;

6.  Direct that under Habeas Corpus Rule 7 the record in this case be expanded to include the "additional materials relevant to the determination of the merits of the petition" which are found in the volumes of exhibits filed with this Petition; and

7.  Grant such other relief as law and justice require.

Respectfully submitted,

Michael V. Powell
Southern District No. 5429
State Bar No. 16204400
Locke Liddell & Sapp, LLP
2200 Ross Ave., Suite 2200
Dallas, Texas 75201
Ph: (214) 740-8520
F: (214) 740-8800

Mandy Welch
Attorney-in Charge
Southern District No. 15543
Texas Bar No. 21125380
Burr & Welch
412 Main Street, Suite 1100
Houston, Texas 77002
Tel. (713) 227-0200
Fax (713) 227-0215

Susan L. Karamanian
Southern District No. 10787
Texas Bar No. 11097600
2000 H. Street NW
Washington, D.C.
Ph: (202) 994-1210
F: (202) 994-9446

COUNSEL FOR PETITIONER

# VERIFICATION

STATE OF TEXAS   )
                 )
COUNTY OF POLK )

## AFFIDAVIT OF PAUL RICHARD COLELLA

I, Paul Richard Colella, declare under penalty of perjury that I reside in the State of Texas, I have read the foregoing Petition for Writ of Habeas Corpus; I am familiar with its contents; and that the foregoing is true and correct.

Executed on this September 2_ 2001.

_____
Paul Richard Colella

Subscribed and sworn to before me this 2_ day of Sept , 2001.

_____
Notary Public

My commission expires:

5-14-2002

> RONALD M. BUSH
> NOTARY PUBLIC
> STATE OF TEXAS
> My Commission Expires 05-14-2002

## CERTIFICATE OF SERVICE

I hereby certify that I have caused the foregoing pleading to be served on Respondent by mailing, via the U.S. Postal Service, postage prepaid a copy of the pleading to counsel for Respondent, Capital Litigation Division, Office of the Attorney General, P.O. Box 12548, Capitol Station, Austin, Texas 78711, this 25th day of September, 2001.

Michael V. Powell