.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

FEB 2 8 2002

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| PAUL RICHARD COLELLA, | § | |
| Petitioner, | § | |
| | § | |
| V. | § | NO. 1.01cv166 |
| | § | |
| JANIE COCKRELL, DIRECTOR, | § | |
| TEXAS DEPARTMENT OF | § | |
| CRIMINAL JUSTICE, | § | |
| INSTITUTIONAL DIVISION, | § | |
| Respondent. | § | |

## RESPONDENT COCKRELL'S MOTION FOR SUMMARY JUDGMENT
## WITH BRIEF IN SUPPORT

Petitioner Paul Richard Colella was convicted of capital murder and sentenced to death in

Texas state court for the murders of Michael Lavesphere and David Ray Taylor on South Padre

Island in 1991. In addition to the eyewitness testimony of accomplice Anthony "Red" Wilson, the

State adduced other compelling evidence that pointed to Colella. The previous evening, he had gone

into a rage after his wife claimed that the victims had raped her, and he was seen brandishing a pistol

and stating that he was going to kill them. He left the island shortly after the murders and fled to

Indiana, evading the law until he was arrested five months later.

The Texas Court of Criminal Appeals affirmed Colella's conviction and sentence and

subsequently denied his state post-conviction petition. He now seeks habeas corpus relief in this

Court pursuant to 28 U.S.C. § 2254. The writ should be denied because all his claims are either

procedurally barred, unsupported by the record, or meritless as a matter of federal constitutional law.

The Director denies all of Colella's assertions of fact except those supported by the record or

specifically admitted herein.

### PETITIONER'S ALLEGATIONS

Colella alleges (1) prosecutorial misconduct, Petition 28-73; (2) denial of adequate resources

to conduct a defense, id. at 73-95; (3) ineffective assistance of counsel, id. at 95-246; (4) cumulative

error, *id.* at 246-55, 270; (5) denial of a change of venue due to prejudicial pretrial publicity, *id.* at 255-69; (6) factual insufficiency of the evidence, *id.* at 269-70; (7) denial of adequate appellate review, *id.* at 270-75; and (8) improper exclusion of a potential juror. *Id.* at 275-76. Because Colella presented all of these claims to the Texas state courts in his state habeas petition, he has exhausted his state remedies as required by 28 U.S.C. § 2254(b). Given the factual findings and legal conclusions of the state courts, which are supported by the record, he is unable to make out a claim for federal habeas relief.

## STATEMENT OF THE CASE

Colella was convicted of capital murder and sentenced to death in September, 1992, in cause number 92-CR-173-E, in the 357th District Court of Cameron County, Texas. I Tr 139, 144-45.[1] The Texas Court of Criminal Appeals affirmed on October 11, 1995, *Colella v. State,* 915 S.W.2d 834 (Tex. Crim. App. 1995), and dismissed his state habeas petition as untimely on July 15, 1998. *Ex parte Colella,* No. 37,418-01. Colella then filed a habeas corpus petition in this Court, which dismissed it for failure to exhaust state remedies on March 14, 2000. *Colella v. Johnson,* No. B-98-121. He returned to state court to file a second state writ application; the Court of Criminal Appeals denied it with written order on September 19, 2001. *Ex parte Colella,* No. 37,418-02. Colella filed his federal petition in this case on September 27, 2001.

A copy of the records of Colella's direct appeal and state writ application has been forwarded to the Court. A copy of the record of Brenda Colella's trial is available and will be forwarded to the Court.

---

[1] The transcript of papers filed in state court is referred to as "Tr," and the statement of facts (record of trial testimony) as "SF." The statement of facts of the trial of Colella's co-defendant, Brenda Bowling Colella, is referred to as "BBC." Volume numbers precede and page numbers follow all record citations.

2

## STATEMENT OF THE FACTS

### I.     The Players

The murder victims were visiting South Padre Island for recreational purposes.  Colella had lived on the island for about two months, and most of the fact witnesses were semipermanent residents of the island who lived in trailers, tents, and temporary campsites and whose principal activities were to "[d]rink and pull people out of the sand." XIII SF 350.  They included the following:

**Red Wilson.**  A 30-year-old native of the nearby town of Edinburg, Red had stayed on the island "on occasions" previously and had lived there permanently since February or March of 1991.  XIII SF 444, 455, 459.  A petty criminal with a record for non-violent offenses, Red had worked as a mechanic and oil field roughneck and survived on the island by towing cars stuck in the sand.  XIII SF 446-55, 460, 464.  He never had been seen with a gun or known to own one.  XIII SF 368.

**Sid Wilson.**  Sid (no relation to Red) had lived with his wife, Sherrie, in a bus on the island for six years.  XIII SF 379, 383.  They had known Red for two to three years and Colella for only a few months.  XIII SF 348-49, 381-82.

**Sherie Wilson.**  Sherie was Sid's wife of thirteen years.  XIII SF 349.  She did not believe Brenda Colella's claim that she had been raped.  XIII SF 351-53.

**Albin J. "Jack" Dunn, Jr.**  Dunn, 63, had lived for six years in a trailer located near Sid's and Sherie's bus.  XII SF 284, XIII SF 293-94, 383.  It had a shower and restroom that he made freely available to the "ladies" in his circle of acquaintances, and there was "always cold beer and food at my place."  XIII SF 296-97, 331.  He had known Red for about two years and Colella for a month to six weeks.  XII SF 286, XIII SF 293, 328-29.

**Vikki Larsen.**  Larsen, 37, and her young child lived with Dunn in his trailer at the time of the murders.  XVI SF 967.  She had known Red for five or six years and Colella for a month or two.  XVI SF 968-70.  She, Red, and the others present attempted to dissuade Colella from seeking out and exacting revenge on Brenda's alleged assailants.  XVI SF 980.

3

**Brenda Bowling Colella.** Brenda married Colella ten days before the murders. XVII 1343-44. She was known to ride around with other guys when Colella was at work and had been seen going with other men to the bay side of the island, where the only reason for going would be "[t]o get laid." XIII SF 394-95, 405, 415-16. Her acquaintances on the island had seen her with black eyes and bruises inflicted by Colella, as well as hair pulled from her head. XIII 334, 350, 416, 417, 419. She told Sid that Colella was responsible for her injuries on more than one occasion, and she told Red that Colella had beaten her on several occasions when he was drinking. XIII SF 416, 419, 506-07. Sherie Wilson advised Brenda that she shouldn't put up with such abuse and should leave Colella. XIII SF 350. Colella admitted only that he had "slapped" Brenda twice. XVIII SF 1462-63.

**Paul Richard Colella.** Colella was released on parole on September 6, 1990, after serving five years of an eight-year sentence for burglary in the State of Indiana. XVIII SF 1391, State's Exhibit ("SX") 37. He arrived in Texas on September 20, 1990, and began living on South Padre Island in July of 1991. VII SF 1278-79. According to Colella, the island was a place where time "ain't really a big deal" and "[w]e never run out of beer." XVII SF 1298-99, 1307. Colella previously had held jobs there, but was unemployed at the time of the murders. XVII SF 1281-82. His only source of income was money that Red paid him for helping tow cars -- from $5 to $15 per tow. XIII SF 350, 389, XVIII SF 1405. He testified that the normal routine on the island was to buy a case of beer in the morning and start drinking as early as 9 a.m., although they sometimes waited until noon before imbibing. XVII SF 1294, XVIII SF 1404. Colella was not supposed to use drugs because he was on parole, but he nonetheless smoked marijuana. XIII SF 384, XVII SF 1283, XVIII SF 1404. When Brenda cried rape, Colella went into a rage and became "extremely agitated" and "almost halfway insane." XIII SF 317, XVI SF 978. Colella was the only person present who had a firearm. XVI 978-79. He asked Red to take him to find Brenda's alleged assailants, but Red refused because Colella was carrying a gun. XIII SF 337.

4

## II.     Facts of the Crime

The facts of the crime are summarized in the opinion of the Texas Court of Criminal

Appeals.

Viewed in the light most favorable to the verdict, the evidence at trial established the following: Rick Taylor, David Taylor, and Michael Lavesphere arrived at South Padre Island in a white pick-up truck on the afternoon of September 12, 1991. While driving on the beach, they encountered a vehicle stuck in the sand. The three attempted unsuccessfully to help the occupants of the vehicle free the car.

Shortly thereafter, [Colella], his wife, Brenda Bowling, his sister, Lori, and Red [Wilson] drove up in Red's Ford Bronco. Red, being experienced at towing cars out of the sand, offered to free the car for a fee. Rick, David, and Michael remained to watch the action. After Red successfully freed the car, Rick, David, and Michael asked Red, [Colella], Brenda, and Lori if they would like to "party" together. The group declined, but Red testified that he told the men where they would probably be later if they would like to join them. Red, [Colella] and Lori then went to drop Brenda off so she could get ready to go to work.

Between 5:00 and 6:00 that evening, Rick, David, and Michael met up with [Colella] and Red on the beach. The group drank alcohol and smoked marijuana. Brenda arrived later, having apparently been laid off from work, and joined in the "partying." Red and Rick played Frisbee by the water while the others remained by the vehicles. At one point, either David or Michael began throwing sand on Brenda. She asked him to stop and chased after him. [Colella] told him, "Hey, that's my old lady. Why don't you leave her alone." He apologized to [Colella] saying that he did not know Brenda was married.

Brenda eventually left the party after arguing with [Colella] about his drinking. Red testified that she had asked him to stop [Colella] from drinking any whiskey because "[he] beats [her] whenever he gets mad or drunk." However, Red refused to intervene. Shortly thereafter, the party broke up. [Colella] and Red went to "look for a tow." Rick, David, and Michael left to dine in town.

On their way to dinner at about 8:00 p.m., Rick, David, and Michael happened upon Brenda who was hitchhiking along the side of the highway. They offered her a ride and she accepted. Rick testified that after about five or ten minutes Brenda became hysterical for some unknown reason and attempted to jump from their truck. Rick restrained her until the truck slowed down enough for her to get out without being injured. Rick denied that they raped Brenda. He further testified that she appeared uninjured when she left and that her clothes were not torn. The trio then drove on into town.

5

Sometime between 8:30 and 10:00 p.m., Brenda arrived at the trailer of Albin "Jack" Dunn. She was screaming hysterically and her clothes were wet and torn. She claimed that she had been raped by the guys in the white pick-up truck, but did not want to call the police because there was a warrant out for her arrest in Indiana. Victoria "Vikki" Larsen, who was living with Jack, got in her van and went to look for [Colella].

Meanwhile, after driving around and stopping at a convenience store, [Colella] and Red decided to stop and bathe at some public showers along the beach. Afterwards, one or both of them stole a blue bag and a brown leather case from a boat at a nearby dock. The case contained a revolver and ammunition. Red and [Colella] then decided to go target shooting farther down the beach. After shooting for awhile, they got back into Red's truck and began driving back up the road.

After locating Red and [Colella] out on the highway, Vikki informed them that Brenda had been raped. Red and [Colella] immediately left for Jack's trailer. [Colella] put the revolver in the waistband of his pants.

Upon arrival at Jack's trailer, [Colella] was visibly upset. Vikki testified that [Colella] was "extremely agitated, like going crazy." [Colella] testified that when he saw Brenda he said "something to the effect that [he] wanted to go catch the sons-of-a-bitches and kill them." Sherie Wilson, Jack's neighbor, came over to the trailer.

Sherie, in an intoxicated state, began harassing Brenda. She said things like, "You can't rape the willing." A fight then broke out between Sherie, Brenda, and [Colella]. Sherie slapped [Colella] and Brenda went after her. Red finally got Sherie to get back into her truck, but she got out again. [Colella] testified that "she started to come back at me. So I grabbed her and threw her on the ground," Sherie then went to get her husband, Sid.

Sid testified that his intention upon arriving at the trailer was to hit [Colella] because [Colella] had hit his wife. However, [Colella] pulled the revolver on Sid before Sid could strike him. [Colella] then began to run away and Sid chased him. [Colella] fired two shots. He testified that he did not aim at Sid and that he fired just to scare him. Sid continued to chase him. When [Colella] fell in the sand, Sid rushed at him and [Colella] fired again. This time Sid backed off and [Colella] ran into the dunes. Red and Brenda eventually picked [Colella] up and they went back to their campsite.

After a near discovery by Sid at the campsite, [Colella], Brenda, and Red decided to leave. Brenda and [Colella] packed up their belongings and placed them in Red's Bronco. As they traveled north along the beach, they came across the white truck with the men that allegedly raped Brenda. They drove past the truck; then

6

[Colella] told Red to turn around and go back. Red testified that [Colella] said, "Well, I'm going to get the son a bitches. I can't let them get away with this."

[Colella] asked Brenda one more time if these were the men who raped her. She said yes. Red testified that [Colella] then jumped out of the Bronco, went over to the truck, shot one victim in the back of the truck, and then ran around to the driver's side to shoot the other victim who was in the truck's cab. [Colella], Red, and Brenda left, but [Colella] told Red that they needed to go back to move the truck so that it would not be found. Red complied.

[Colella] got into the truck with the victims and drove north down the highway. Red and Brenda followed. [Colella] eventually put the truck in the water on the bay side of the island and returned to Red's Bronco. At some point, [Colella] threw the gun in the ocean. Red then drove [Colella] and Brenda to [Colella's] mother's home in Port Isabel. Red testified that when he left them, [Colella] had a billfold containing several dollar bills of unknown denominations. Red had never seen [Colella] with a billfold before.

[Colella] borrowed money from his parents for bus tickets and they drove him and Brenda to the bus station in Victoria, Texas. They purchased their tickets at 6 a.m. on September 13th and boarded the bus for Terre Haute, Indiana.

The bodies of David Taylor and Michael Lavesphere and the partially submerged white truck were discovered the morning of the 13th. Luis Martinez, Cameron County Sheriff's Office Criminal Investigator, estimated that the pair was killed at approximately 2 a.m. that morning and that the type of bullet used could have been fired from a revolver. Dr. Lawrence Dahm, a pathologist, testified that both victims had been shot at close range. Taylor had been shot once in the head and Lavesphere had been shot twice, once in the face and once in the neck. The murder weapon was never recovered.

Rick Taylor testified that he, David, and Lavesphere parked on the beach and settled down to sleep at approximately midnight. David took the cab of the truck and Lavesphere took the bed of the truck. Because there was no room for Rick, he went to sleep in the dunes so that he would not be run over by any passing vehicles. That was the last he saw of his brother and Lavesphere. He further testified both David and Lavesphere had substantial amounts of money in their possession prior to their deaths. Little money was found on the victims upon their discovery.

*Colella v. State*, 915 S.W.2d at 836-38 (footnotes omitted).

7

## III.    Facts Relating to Punishment

The opinion of the Court of Criminal Appeals also summarizes the punishment-phase evidence.

> At the punishment phase of trial, the State introduced the following evidence: (1) in the summer of 1982, [Colella] was charged with child molestation which was later reduced to battery; (2) in December 1982, [Colella] confessed to burglary of a building, but he was not charged as part of a plea bargain; (3) in 1984, [Colella] was charged with false information for creating a false bomb scare; (4) [Colella] was then placed in the Jabalt School for Boys, an Indiana institution for delinquent minors, but was released because "he was not taking advantage" of the programs the school offered; (5) Monte Tosser, a Jabalt School counselor, testified that [Colella] had behavioral problems at the school including "physical altercations with peers;" (6) in December 1985 at the age of sixteen, [Colella] was convicted for burglarizing the residence of an 83-year-old woman; (7) knives from [Colella's] home were found at the scene of the burglary; (8) [Colella] was sentenced as an adult to eight years for the burglary, but was paroled in 1990; (9) during his arraignment for the instant crime, [Colella] acted hostile toward a camera man and had to be restrained; (10) Officers Douglas Brentzinger and Joseph Newport of the Terre Haute Police Department each gave his opinion that he believed [Colella] would be a continuing threat to society because [Colella] was a "career criminal" and his crimes had gotten progressively worse; and (11) Monte Tosser also testified that he believed [Colella] would be a continuing threat to society.

> *            *            *            *            *            *

> [Colella's] mitigating circumstances included: (1) [Colella] was diagnosed as hyperactive at the age of four; (2) he attended special classes for the "emotionally disturbed"; (3) he attempted to hang himself when he was eight-years old and was admitted to a mental hospital for one month; (4) he was in therapy for a period of time; (5) his former employer, David Coffee, testified that [Colella] was a good employee; (6) [Colella] told Coffee a few weeks before the murders that he was going to move "back North;" and (7) David Taylor's mother didn't hate [Colella] for killing her son.

*Id.* at 844 & n.14 (footnotes omitted).

## IV.    Facts Established in Brenda Colella's Trial

Colella cites to the record of the trial of his co-defendant, Brenda Colella, to support his various theories of prosecutorial misconduct. Consideration of the record of that trial is important for another reason, however, that being that it severely undercuts the factual premise underlying

Colella's legal claims -- that he is innocent and that "Red did it." Among the evidence presented at Brenda's trial were several inculpatory statements that she made, statements that were highly damning to Colella as well as to her. After Brenda was arrested and advised of her constitutional rights, she told Martinez "that she felt that she was not guilty of capital murder because she had not witnessed the killing, that all she had done, if you would call it participate, was she said she stayed in the Bronco with Red when *Paul did the killing*." 4 BBC 197 (added emphasis). Subsequently, when she and Colella were arraigned, Colella became agitated because a television cameraman was present, and "[s]he goes and says, 'Paul, cool it; fuck this motherfucker. We fucked up and there's nothing we can do about it.'" 4 BBC 199.[2]

## MOTION FOR SUMMARY JUDGMENT

### Standard of Review

A party moving for summary judgment bears the burden of informing the court of the basis for its motion and identifying pleadings and other record evidence that demonstrate the absence of any genuine issues of material fact. *Howell Hydrocarbons, Inc. v. Adams*, 897 F.2d 183, 191 (5th Cir. 1990) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986)). Once the moving party makes that showing, the burden shifts to the nonmoving party to show that summary judgment is not appropriate. *Fields v. City of South Houston*, 922 F.2d 1183, 1187 (5th Cir. 1991).

Moreover, under the 1996 amendments to the federal habeas corpus statute embodied in the Antiterrorism and Effective Death Penalty Act of 1996 ("the AEDPA"), a state prisoner may not obtain relief

> with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

---

[2]     The defense succeeded in having Brenda's statements excluded at Colella's trial. XVIII SF 1468-73.

9

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (West 1996).

Thus, the Supreme Court has held that federal courts may not grant the writ merely on a finding of error by a state court, but instead only if a state court "arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *(Terry) Williams v. Taylor,* 529 U.S. 362, 413, 120 S. Ct. 1495, 1523 (2000), *quoted in Montoya v. Johnson,* 226 F.3d 399, 404 (5th Cir. 2000), *cert. denied,* 121 S. Ct. 2220 (2001).

Absent a direct conflict with Supreme Court authority, habeas relief is available only if the state-court decision is factually or legally unreasonable. *Montoya v. Johnson,* 226 F.3d at 404. "[A]n *unreasonable* application of federal law is different from an *incorrect* or *erroneous* application of federal law." *Williams v. Taylor,* 529 U.S. at 412, 120 S. Ct. at 1523 (original emphasis). "Under § 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 1522, 120 S. Ct. at 411. An "unreasonable application" occurs "if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 1523, 120 S. Ct. at 413.

In review of a state prisoner's federal habeas petition, "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption by clear and convincing evidence." § 2254(e)(1); *Jackson v. Johnson,* 150 F.3d 520, 524 (5th Cir. 1998). Moreover, where the petitioner

10

has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that

> (A) the claim relies on

>> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

>> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."

28 U.S.C. § 2254(e) (2); *Murphy v. Johnson,* 205 F.3d 809, 815 (5th Cir.), *cert. denied,* 121 S. Ct. 380 (2000). Thus, in the state courts a petitioner "must be diligent in developing the record and presenting, if possible, all claims of constitutional error. If the prisoner fails to do so, himself or herself contributing to the absence of a full and fair adjudication in state court, § 2254(e) prohibits an evidentiary hearing to develop the relevant claims in federal court, unless the statute's other stringent requirements are met." *(Michael) Williams v. Taylor,* 529 U.S. 420, 437, 120 S. Ct. 1479, 1491 (2000).

Finally, pre-AEDPA precedent forecloses habeas relief if a claim (1) is procedurally barred as a consequence of a failure to comply with state procedural rules, *Coleman v. Thompson,* 501 U.S. 722, 111 S. Ct. 2546 (1991); (2) seeks retroactive application of a new rule of law to a conviction that was final before the rule was announced, *Teague v. Lane,* 489 U.S. 288, 109 S. Ct. 1060 (1989); or (3) asserts trial error that, although of constitutional magnitude, did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S. Ct. 1710, 1722 (1993) (citation omitted).

## I.    Most of Colella's Claims Are Procedurally Barred.

All of Colella's federal claims were raised in his second state writ application. When the trial court entered findings of fact and conclusions of law and recommended that relief be denied, it also found that Colella had procedurally defaulted his claims for relief by "his failure to preserved [sic] them for appellate review with a sufficient trial objection; his failure to have raised them on direct appeal or in his first Application; or through their unfavorable disposition on direct appeal." *Ex parte Colella* at 326.   Under Texas law, failure to raise a claim on direct appeal constitutes a procedural bar that precludes federal habeas review. *Finley v. Johnson,* 243 F.3d 215, 218 (5th Cir. 2001).

Federal habeas review of a claim is barred if the state courts refused to consider the merits of the claim due to a failure to comply with state procedural rules. *Coleman v. Thompson,* 501 U.S. at 748, 111 S. Ct. at 2565.  "In order for a state procedural bar to be prevent federal habeas review, it must be 'independent' of the merits of the federal claim and 'adequate' in the sense of not being unconstitutional, or arbitrary, or pretextual." *Young v. Herring,* 938 F.2d 543, 548 n.5 (5th Cir. 1991) (citing *Wainwright v. Sykes,* 433 U.S. 72, 87, 97 S. Ct. 2497, 2506 (1977)).

If the state court explicitly invokes a procedural bar and alternatively reaches the merits of a defendant's claims, a federal court is bound by the state procedural default. *Harris v. Reed,* 489 U.S. 255, 264 n.10, 109 S. Ct. 1038, 1044 n.10 (1989).  Moreover, when the last state court to render judgment does not disclose the basis for its opinion, a federal court will presume that the unexplained order follows the same reasoning as a prior state judgment, unless the petitioner adduces strong evidence to rebut the presumption. *Ylst v. Nunnemaker,* 501 U.S. 797, 803, 111 S. Ct. 2590, 2595 (1991); *Goodwin v. Collins,* 910 F.2d 185, 187 (5th Cir. 1990).

Finally, where a state court has explicitly relied on a procedural bar, a state prisoner may not obtain federal habeas relief absent a showing of cause for the default and actual prejudice attributable to the default or that the federal court's failure to consider the claim will result in a  miscarriage of justice. *Coleman v. Thompson,* 501 U.S. at 730, 111 S. Ct. at 2552; *Murray v. Carrier,* 477 U.S. 478,

12

485, 106 S. Ct. 2639, 2644 (1986). A miscarriage of justice in this context means that the petitioner is actually innocent of the crime of which he was convicted. *Sawyer v. Whitley,* 505 U.S. 333, 339-40, 112 S. Ct. 2514, 2519 (1992).

Here, the only one of his federal claims that Colella raised on direct appeal was that venire member Bristol was improperly excluded from the jury. *Colella v. State,* 915 S.W.2d at 840-42. Thus, the remainder of his claims, with the exception of those raising ineffective assistance of counsel,[3] are procedurally defaulted for federal habeas review. Because Colella fails to show that he is actually innocent of capital murder, these bars prevent this Court from considering the majority of his claims on the merits.

## II.    Colella's Claims of Prosecutorial Misconduct Do Not Warrant Habeas Relief.

Alternatively, Colella's claims fail on the merits. He first alleges that he was denied a fair trial due to various forms of prosecutorial misconduct. Petition at 73-95. These claims do not state a basis for relief because they are based on a series of factual assumptions that are plainly incorrect: (1) the State changed its theory of the case between Brenda's trial and his; (2) the time of death could be accurately determined by the stage of rigor mortis the victims's bodies were in when found; (3) his presence at the Victoria bus station the following morning provides an ironclad alibi; (4) tire tracks at the scene showed another vehicle had pushed the victims's truck into the bay; (5) the gun he was seen with could not have been the murder weapon; and (6) Red's immunity agreement somehow induced him to lie.

---

[3]     The Director does not believe that Colella has procedurally defaulted all of his claims of ineffective assistance of counsel on this basis, because under Texas law, claims of ineffectiveness that require factual development outside the record normally cannot be considered on appeal and instead are properly raised on state habeas corpus. *Ex parte Torres,* 943 S.W.2d 469, 475 (Tex. Crim. App. 1997). Colella's Sixth Amendment claims that involve only matters of record--such as counsel's acts and omissions during the course of trial, including cross-examining witnesses and making objections--are procedurally defaulted, however, because they were not raised on appeal.

13

While Colella does not make a free-standing legal claim that he is innocent, he does maintain his innocence. Petition at 193. It is important to note, however, that "in the eyes of the law, [Colella] does not come before the Court as one who is 'innocent,' but, on the contrary, as one who has been convicted by due process of law of two brutal murders." *Herrera v. Collins,* 506 U.S. 390, 393-400, 113 S. Ct. 853, 860 (1993). Colella's attempt to circumvent the jury's finding of guilt beyond a reasonable doubt and retry the entire case on guilt-innocence thus involves an undertaking far beyond the scope of the federal habeas corpus statute. "The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited. Federal courts are not forums in which to litigate state trials." *Barefoot v. Estelle,* 463 U.S. 880, 887, 103 S. Ct. 3383, 3392 (1983).

Colella cannot show innocence based on conflicts in the trial evidence because his jury was fully apprised of these inconsistencies. In our adversarial system of justice, it is the fact-finder's responsibility to weigh, and reconcile, such conflicts. "The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, and the jury is free to choose among reasonable constructions of the evidence." *United States v. Salazar,* 66 F.3d 723, 728 (5th Cir. 1995). Further, Colella was able to present his defensive theory of alibi at trial. "Thus, the jury had the opportunity to take into account both versions of the murders and determine which was more credible." *Dowthitt v. Johnson,* 230 F.3d 733, 742-43 (5th Cir. 2000), *cert. denied,* 121 S. Ct. 1250 (2001). The jury, as evidenced by its verdict, rejected the defense's theory. The mere fact that there were conflicts in the State's evidence at Colella's trial, or that the evidence was susceptible of more than one interpretation, is probative of nothing.

Similarly, it is settled that a petitioner normally cannot establish his innocence by impeachment evidence, which "is a step removed from evidence pertaining to the crime itself." *Calderon v. Thompson,* 523 U.S. 538, 118 S. Ct. 1489, 1504 (1998). For instance, evidence that a State's witness "had entered into a cooperation agreement despite the state's alleged assertion at trial that no such agreement existed" was found to be "only impeachment, rather than evidence of actual

14

innocence." *Stafford v. Saffle,* 34 F.3d 1557, 1561, 1562 (10th Cir. 1994). *See also Whitlock v. Godinez,* 51 F.3d 59, 63-64 (7th Cir. 1995) (new impeachment evidence "was insufficient to establish actual innocence because it "[did] not seriously call into doubt the core of the state's case"); *United States v. Zuno-Arce,* 25 F. Supp.2d. 1087, 1110 (C. D. Cal. 1998) (finding no "satisfactory showing of actual innocence" where new evidence "serves only to impeach the credibility of [two State's witnesses]"). Consequently, accepting *arguendo* Colella's premise that but for trial counsel's acts and omissions, reasonable doubt would have been created, Petition at 110, such impeachment would fall far short of showing that Colella did not commit the crime of which he was convicted.

### A. The Prosecution Did Not Present Perjured Testimony.

According to Colella, the prosecution presented false testimony regarding "the estimated time of death, the date when the bodies were first discovered, the source of tire tracks at the crime scene, and the terms of Red's Immunity Agreement." Petition at 31. To prevail on these claims, Colella must show that false testimony was given, that the falsity was material in that it would have affected the jury's verdict, and that the prosecution used the testimony knowing it was false. *Giglio v. United States,* 405 U.S. 150, 154, 92 S. Ct. 763, 766 (1972);*Creel v. Johnson,* 162 F.3d 385, 391 (5th Cir. 1998). Contradictory or inconsistent testimony, as well as conflicts between reports, written statements and the trial testimony of prosecution witnesses do not, standing alone, establish perjury. *Kutzner v. Johnson,* 242 F.3d 605, 609 (5th Cir. 2001). *See, e.g., Koch v. Puckett,* 907 F.2d 524, 531 (5th Cir. 1990) (contradictory testimony from witnesses or inconsistencies in a witness's testimony at trial are to be resolved by the trier of fact and do not suffice to establish that certain testimony was perjured); *United States v. Viera,* 819 F.2d 498, 502 (5th Cir. 1987) (inconsistencies between pre-trial and in-trial testimony do not, without more, establish perjury or put the prosecution on notice of possible perjury).

Moreover, perjured testimony is material only when "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs,* 427 U.S. 97, 103, 96 S. Ct. 2392, 2397 (1976) (footnote omitted), *quoted in Creel v. Johnson,* 162 F.3d at 391.

15

Colella misstates the materiality standard as being whether the false testimony "may have had an effect on the outcome of the trial." Petition at 44. Citing *Moody v. Johnson,* 139 F.3d 477, 484 (5th Cir. 1998), he contends that "[t]his standard is 'considerably less onerous than the *Brady* standard, which requires an applicant to prove that there is a reasonable likelihood that the outcome of the trial would have been different.' *Id.* In fact, however, *Moody* quite clearly states just the opposite, *i.e.,* that "if false evidence is presented by the prosecution at trial, a new trial is warranted only if the false testimony could have, *in any reasonable likelihood,* affected the jury's determination." *Id.* at 484 (emphasis added) (citing *Giglio v. United States,* 405 U.S. at 154, 92 S. Ct. at 765).

Colella's assertion that the prosecution engaged in a "pattern" of presenting false testimony, Petition at 29, is based on a mischaracterization of the record, and his assertion that the prosecutor "sponsored two inconsistent theories of how the crime happened," *id.* at 41, is factually incorrect. The State's theory of the case at Colella's trial was identical to that at the prior trial of his co-defendant, his jury was aware of any inconsistencies in the testimony, and the inconsistencies to which he points are neither perjurious nor, in any event, material.

Colella first alleges that Martinez gave false testimony about the time of death. Petition at 32-41. This submission must fail because it is founded on two false premises: (1) that Martinez was able to accurately determine when the victims died, and (2) that "clearly beyond ten hours the body is no longer subject to rigor mortis but instead is in post-mortem." Petition at 36. As for the first issue, Martinez testified that he was not qualified to determine time of death, that "we have very limited training as far as the time of death. And that is one of the problems that we have here in the Valley that we don't have a coroner. And we can't establish time of death." XVII SF 1246-47. Thus, his conclusions regarding the time of death were merely an estimate. XVII SF 1247. Because Martinez was not a qualified medical expert, the worst that can be said of his testimony is that it was inconsistent -- not that one of his estimates regarding time of death was "false" and the other "true." That his testimony was inconsistent does not establish perjury, as Colella does not show that his

16

"later, rather than earlier, testimony was false." *Hays v. Alabama,* 85 F.3d 1492, 1499 (11th Cir. 1996).

Moreover, even accepting *arguendo* Colella's contention that Martinez testified untruthfully at his trial, he nonetheless fails to show materiality. Colella's jury could not have been misled because it was fully apprised of Martinez's previous testimony. XVII SF 1241-45. *See Shasteen v. Saver,* 252 F.3d 929, 933 (7th Cir. 2001) ("when a defendant alleges that the prosecution used perjured testimony, we must inquire into whether the defendant had adequate opportunity to expose the alleged perjury on cross-examination"). For instance, Colella argues that Martinez's subsequent testimony was false because at Brenda's trial he "dismissed the possibility that the bodies could have been there for ten hours: 'Ten would be a big number.'" Petition at 34 (citing 5 BBC 247). At Colella's trial, however, defense counsel specifically questioned Martinez about this line of testimony. XVII SF 1243. Similarly, the jury was aware that Martinez and Judge Hunsaker gave conflicting testimony as to whether Martinez and Boyd had estimated that the victims had been dead for six hours. XVII SF 1240. Far from supporting Colella's claim of perjury, the record discloses that any inconsistencies in Martinez's testimony were before the trier of fact to weigh in assessing his credibility. *See Creel v. Johnson,* 162 F.3d at 392 (perjured testimony not material where, *inter alia,* "the jury had the opportunity to observe [the witnesses] while they were cross-examined extensively").

Even more remarkable is Colella's assertion that rigor mortis dissipates after ten hours, a proposition that is flatly contradicted both by the trial record and by medical science. Dr. Dahm, the only medical expert to testify at trial, testified that rigor mortis would remain for up to twelve to fourteen hours, then begin to slowly dissipate over the next six to eight hours, XVIII SF 1479-80, a point the prosecutor reminded the jury of during closing argument. XIX SF 1552-53. Dr. Dahm was unable to determine the time of death, as Colella notes. Petition at 38 n.17 (citing XVIII SF 1477-86).

17

Dr. Dahm's testimony is consistent with generally accepted medical knowledge, which recognizes that the progression of rigor mortis is an unreliable means to determine time of death because it "may be substantially modified by a variety of factors which affect the underlying chemical process." Spitz, Werner U., Medicolegal Investigation of Death: Guidelines for the Application of Pathology to Crime Investigation 27 (Charles C. Thomas 3rd ed. 1993). Thus, "the variability of postmortem rigor makes its use as a postmortem clock rather tenuous, to be considered only in conjunction with other timing indices." *Id.* at 28.

> Rigor mortis is one of the poorest gauges to estimate the time of death due to the large number of variables -- activity at time of death, temperature of the environment and weight of the deceased. Extremely obese people may never develop rigor mortis, while skinny people develop it rapidly. Heat speeds up the process, cold restrains it.

Wilson, Keith D., Cause of Death, 66 (Writer's Digest Books ed. 1992).

Nonetheless, the authorities agree that rigor mortis normally lasts far more than ten hours. "Rigor mortis usually appears 2-4 h after death, and fully develops in 6-12 h. This can vary greatly. . . . Rigor mortis is lost due to decomposition. In temperate climates, rigor mortis disappears in 36 h, but may be present up to 6 days." DiMaio, Dominick J., and DiMaio, Vincent J. M., Forensic Pathology, 26-27, (CRC Press ed. 1993). "In temperate climates, under average conditions, rigor becomes apparent within half an hour to an hour, increases progressively to a maximum within twelve hours, remains for about twelve hours and then progressively disappears within the following twelve hours." Spitz, *op. cit.* at 26.[4] "Within a fairly wide range of variations, rigor is usually well established throughout the body within twelve hours after death and resolved after thirty hours." Wilson, *op. cit.* at 66. Because rigor mortis is not an accurate gauge of the time of death, Martinez's testimony simply was not probative on that point and, therefore, not material.

---

[4]    One authority opines that "[i]n a hot environment, . . . rigor mortis may disappear in only nine to twelve hours," Spitz, *op. cit.* at 27, while others believe that "[i]n hot climates, such as in Texas, a body can be in a moderately advanced to advanced state of decomposition in 24 h, in which case, there will not be any rigor mortis present." DiMaio, *op. cit.* at 27.

Moreover, while Colella insists that the time of death was significant because he established his presence in Victoria at 6:00 a.m. on September 13th, Petition at 38-39, his alibi was less than persuasive. Colella's alibi defense relied heavily on the testimony of bus station ticket agent Amy Pflaum, who estimated a travel time of four and one-half hours to Victoria, XVII SF 1210-12, for an average of less than sixty miles per hour. It is obvious, however, that the wide open spaces of Willacy, Kenedy, Kleberg, and Nueces counties allow for considerably more speed -- particularly for one fleeing from criminal apprehension in the dead of night, with little traffic or law enforcement personnel present and powerful motivation to not dawdle[5] -- a point the prosecutor made to the jury during closing argument. XIX SF 1555. Curiously, Colella did not call the persons who were best situated to bolster his alibi -- his mother and stepfather, who drove him to Victoria. Colella does not explain this failure of proof other than to allege that trial counsel erred in not calling them, because "they both were willing" to corroborate his alibi defense. Petition at 109. He fails to show as much, however, as he offers no affidavit from the stepfather, and the mother avers only that she told trial counsel of the alibi and urged him to contact bus station personnel to support it, not that she advised counsel that she was prepared to testify on point. See Petitioner's Exhibit 39 at 5. Indeed, Colella's related ground of ineffective assistance of counsel based on presentation of a "superficial" alibi defense only mentions in passing the defense's failure to call these important potential witnesses. Petition at 109, 158.

In sum, Colella fails to show that the State presented false testimony about the time of death because (1) he fails to show that Martinez's inconsistent testimony in fact was false; (2) his jury heard Martinez's testimony from Brenda's trial and was able to compare it to his testimony at

---

[5]     Colella gave self-serving testimony at trial that the trip "was about five hours because there was a storm that night." XVIII SF 1397. In fact, there was no storm, and only scattered "light showers" fell in the area. See affidavit of Texas State Climatologist John W. Nielsen-Gammon, attached hereto as an exhibit. Similarly, Colella testified at trial that they arrived at the Victoria bus station between 5:00 and 5:30 a.m., XIII SF 1384-85, whereas the affidavit of his mother that he proffers to this Court avers that "we arrived shortly before 6:00 A.M. . . . ." Petitioner's Exhibit 39 at 5.

Colella's trial in assessing his credibility and resolving any inconsistencies; and (3) Martinez's speculation about the time of death based on rigor mortis was not probative because it is contradicted by expert testimony at Colella's trial and by the overwhelming weight of medical science, which has established that rigor mortis lasts far longer than the ten hours to which Martinez testified.

Colella's next submission, that the State misled the jury about the dates on which the offense and the events leading up to it took place, Petition at 42-45, is so insubstantial as to merit no discussion. The record is replete with references to the correct dates, about which there never has been a dispute, and any slips of the prosecutor's tongue could not have confused the jury. Indeed, it is inconceivable that a prosecutor, or any trial attorney, would seek to gain an advantage by occasionally misstating uncontradicted facts. This claim is frivolous.

Colella also alleges that the State sponsored false testimony regarding the second set of tire tracks near where the victims's pickup was found. Petition at 45-57. He correctly observes that at Brenda's trial, Martinez testified that State's Exhibit 40, a photograph of a tire track found at the crime scene, showed tracks from a tire belonging to Red's Bronco. Petition at 47 (citing 4 BBC 96, 101), whereas as Colella's trial, he testified that the tire track shown in the photo was not from Red's Bronco. XII SF 148-49. It is unclear why Martinez testified as he did at Brenda's trial and equally unclear what advantage the State might have gained from that testimony because at both trials, the prosecution's theory was that Colella drove the victims's pickup truck into the water. In the prosecutor's opening statement at Brenda's trial, she said that the State would prove, among other things, that after the murders, "Colella gets into the deceased's pickup," and after finding one of the victims's wallets, "then he goes and he ditches the pickup on the other side, somewhere on the gulf [sic] side. And he goes to the bay side and he puts the truck into the water." 4 BBC 20. Martinez testified that initially the investigating officers thought that the presence of other tire tracks at the scene indicated that the victims's pickup may have been pushed into the water by another vehicle. 4 BBC 96-97, 103. He was not able to substantiate the theory, however. "I conducted a personal investigation of the white truck and I could not find any damaging parts to the rear end of the pickup

20

truck that would indicate that the vehicle had been pushed into the water." 4 BBC 103. "We were never able to prove that the vehicle had been towed or pushed from the actual campsite to where, to the killing site to where it finally rested in the water." 4 BBC 149. The record thus refutes Colella's assertion that Martinez's testimony about the tire tracks "was rather an important component of the State's case against Brenda Colella . . . ." Petition at 54.

In any event, to determine whether Martinez's testimony denied Colella a fair trial, it is necessary to determine which version of his testimony was "false." Here, the record conclusively demonstrates that Martinez's testimony at Colella's trial was truthful and accurate. After Martinez testified that the tire tracks at the scene were not from Red's Bronco, he was cross-examined about the notation he had put on the back of State's Exhibit 40, "Red's Bronco." XII SF 148. When Martinez was pressed by defense counsel as to whether the tire tracks in Exhibit 40 matched the known tire tracks from Red's Bronco depicted in Exhibits 33 and 34, the following exchange took place:

> Q.   [D]id 34, 33 and 40 match in any way?
>
> A.   No, sir.
>
> Q.   That's because you know whose truck they belonged to, right?
>
> A.   No, sir. You got to be blind to not see the three treads in the middle and the border on the outside of the campsite tire track, where this one shows one, two, three, four tire impressions, with no border on the outside. This one shows the same, but a thinner line, with no border on the outside, which makes it impossible for it to be the same tire as this one, since it's got a border on the side and only three treads in the middle.
>
> Q.   Okay. so you are saying that they are different then?
>
> A.   That's why we weren't able to prove that theory.

XII SF 151-52.

The exhibits, which are contained in the state court records that have been forwarded to the Court, bear out Martinez's observations about the differences in the tire tracks. The State did not present perjured testimony, and Colella's self-serving speculation about a "helpful motorist" assisting in pushing the pickup truck into the water, Petition at 55, is irrelevant because it assumes that another vehicle was involved. The State's theory of the case, as the prosecutor advised the jury in her opening statement and as Red testified at trial, was that Colella acted alone in driving the victims's pickup truck into the bay. XI SF 27-28, XIX SF 1483-99. Because the physical evidence shows beyond peradventure that Martinez testified truthfully at Colella's trial that the tire tracks were not the same, Colella's claim of perjured testimony fails for lack of a factual basis.

Colella next alleges that Martinez gave perjured testimony about the weapon used in the offense. Petition at 57-59. This claim is wholly frivolous. The prosecution never attempted to argue that the bullets that killed the victims were not nine millimeter, and Gordon Batsell testified for the State that the bullets in fact were nine millimeter. XIII SF 421-22. Moreover, both Batsell and defense witness Al Petrarca testified about the statistical improbability of a nine millimeter bullet being fired from a revolver. XIII SF 425-26, XVII 1127-53. Colella does not explain why, if the State was relying on Martinez's "perjured" testimony about the caliber of the bullet, it introduced directly contradictory testimony. Given the extensive evidence before it, his jury could not have been misled on this point.[6]

Moreover, Colella's theory of the case is not helped by the fact that it was statistically improbable that the gun he was carrying the night of the murders was the murder weapon. Red never had been seen with a gun or known to own one, and Colella testified that he gave the gun he had to

---

[6]     Colella asserts that he has found an expert who "has concluded that the ammunition recovered from the victims's bodies could not have been fired from the 'revolver' seen in Mr. Colella's possession." Petition at 59 n.25 (citing Petitioner's Exhibit 66, affidavit of Max Courtney). In fact, however, the portion of Courtney's affidavit that Colella quotes states only that it "would be very unlikely," *id.,* and thus his opinion is consistent with those offered at trial by Batsell and Petrarca.

Red. XIII SF 368, XVIII SF 1361-62, 1374. Thus, the clear import of the defense's theory was that Red used that gun to kill Taylor and Lavesphere. This being so, Colella's statistical arguments regarding the gun are as exculpatory of Red as of him and offer no support for his protestations of innocence.

**B.      Colella's "Inconsistent Theories"Claim Is *Teague*-barred and Meritless.**

Colella contends that he was denied due process because the State pursued a different theory of the case and offered materially different evidence at his trial than it had at Brenda's trial. Petition at 59-61. Even if this allegation were supported by the record--which, as shown above, it is not--it provides no basis for relief. First, it is barred from federal merits review because Colella seeks a new rule of constitutional law in violation of *Teague v. Lane, supra*.

> In *Teague,* the Court held that federal courts may not create new constitutional rules of criminal procedure on habeas review. A new rule is one which was not dictated by precedent existing at the time the petitioner's conviction became final. A new rule is created if the rule is, in light of [the Supreme] Court's precedent, susceptible to debate among reasonable minds. Accordingly, we must examine existing precedent and decide whether, under that precedent, relief is required. If reasonable minds could differ on whether current law requires relief, we may not grant relief without creating a new rule barred by *Teague.*

*Vega v. Johnson,* 149 F.3d 354, 357 (5th Cir. 1998) (internal citations and quotation marks omitted).

Colella argues that he was denied due process because "the prosecution switched several material facts between the trials of Mr. Colella and his wife." Petition at 60. He thus relies on the doctrine of judicial estoppel, *i.e.,* "that the state was barred . . . from taking a position in his trial inconsistent with that it had taken" at his co-defendant's trial. *Nichols v. Scott,* 69 F.3d 1255, 1272 (5th Cir. 1995). The *Nichols* court noted that the doctrine of judicial estoppel is "obscure," that there is no constitutional authority for such a rule, and that "it has apparently never been applied against the government in a criminal case." 69 F.3d at 1272. "Relief on any such basis is barred by *Teague.*" *Id.* at 1274. *See also Jacobs v. Scott,* 31 F.3d 1319, 1326 (5th Cir. 1994) (although State took inconsistent positions, at separate trials of Jacobs and his coconspirator, as to who was the

triggerman, claim was *Teague*-barred because "we have found no authority . . . that the state's contradictory statements amount to federal constitutional error"). Because it is the law of this circuit that existing precedent does not dictate the rule that Colella seeks, *Teague* bars federal merits review of this allegation.

Alternatively, this submission fails as a matter of law because "there is no indication in the authorities that [the doctrine of judicial estoppel] is constitutionally mandated." *Nichols v. Scott*, 69 F.3d 1272.[7] Thus, Colella presents no federal constitutional issue cognizable on habeas corpus review, which "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S. Ct. 475, 479 (1991).

Colella's reliance on *Smith v. Groose*, 205 F.3d 1045 (8th Cir.), *cert. denied sub nom. Gammon v. Smih*, 531 U.S. 985, 121 S. Ct. 441 (2000), is misplaced for several reasons, the first being that *Nichols*, not it, is the law of the Fifth Circuit, which is not bound by decisions of other courts of appeals. *Doleac v. Michalson*, 264 F.3d 470, 488 (5th Cir. 2001). In *Nichols*, the State took inconsistent positions as to whether Nichols or his co-defendant, Willie Ray Williams, had been the triggerman in a capital murder. At Williams's trial, the State relied on his admission that he had fired the fatal shot. 69 F.3d at 1260 & n.2. Thereafter, at Nichols's trial, the State primarily argued that Nichols had been the triggerman. *Id.* at 1262. On federal habeas review, the district court

---

[7]     Although the Supreme Court recently applied the doctrine of judicial estoppel against a government entity in *State of New Hampshire v. State of Maine*, 121 S. Ct. 1808 (2001), it took pains to point out its limited application, noting that the case before it was not one

> where estoppel would compromise a governmental interest in enforcing the law. When the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined. It is for this reason that it is well settled that the Government may not be estopped on the same terms as any other litigant.

*Id.* at 1817, *quoting United States v. Owens*, 54 F.3d 271, 275 (6th Cir. 1995) (quotation marks and internal citations omitted).

granted the writ "on the basis of its conclusion that the prosecutor violated principles of estoppel and due process by arguing for and obtaining a conviction and death sentence against two men for firing a single bullet." *Id.* at 1268. The Fifth Circuit reversed, noting that while the evidence showed that both Nichols and Williams fired at the victim, and that one of those shots was fatal, "it was *not* clearly established which." *Id.* at 1271 (original emphasis). Colella's claim fails as a matter of law under *Nichols.*

Even if *Smith v. Groose* were controlling, Colella could not make out a valid claim. There, "what the State claimed to be true in Smith's case it rejected in Cunningham's case, and vice versa." 205 F.3d at 1050. Here, by contrast, the State's theory of the case was the same at both trials -- that Colella, not Red, shot the victims himself and then drove their pickup truck into the bay where it was found the next day. Thus, there was no due process violation even under *Smith v. Groose* because the State's evidence and theory of the case did not rest on "diametrically opposed testimony." *Id.* at 1052. *See United States v. Dickerson,* 248 F.3d 1036, 1044 (11th Cir. 2001) (denying relief "where any alleged inconsistency in the Government's conspiracy theory had no impact on the likelihood of Dickerson being convicted"); *United States v. Paul,* 217 F.3d 989, 998-99 (8th Cir. 2000) (distinguishing *Smith v. Groose* and denying relief on basis of *Nichols* because state's theories were not factually irreconcilable).

## C.    Colella's Challenge to Red's Immunity Agreement Is Meritless.

Colella next contends that the immunity agreement that the prosecution struck with Red Wilson was constitutionally flawed. Petition at 61-67. This claim is both *Teague*-barred and unsupported by the record.

Colella does not, because he cannot, cite any Supreme Court precedent prohibiting the use of immunity agreements. He instead relies on authority of the Arizona Supreme Court condemning "conditional" immunity agreements. Petition at 63-64. Other courts, however, have reached an opposite conclusion. *See, e.g., People v. Jones,* 600 N.W.2d 652, 657-58 (Mich. App. 1999) (upholding agreements that "provided some incentive for the witnesses to conform their trial

testimony to their prior accounts of the incident" because "the prosecution also expressly conditioned its grants of immunity on the witnesses providing *truthful* testimony") (original emphasis) (citing *Sheriff v. Acuna*, 819 P.2d 197 (Nev. 1991); *State v. Bolden*, 979 S.W.2d 587, 590 (Tenn. 1998); and *State v Clark*, 743 P.2d 922 (1987)).  Because Colella does not identify any Supreme Court precedent underlying this submission, he seeks a new rule of law that is barred from federal habeas review by the rule of *Teague v. Lane.*

Even under the authorities cited by Colella, however, his claim fails because the State's agreement with Red was not conditional within the meaning of *State v. Fisher*, 859 P.2d 179 (Ariz. 1993).  There, the state Supreme Court held that plea agreements must "properly be conditioned upon truthful and complete testimony," and that "consistency provisions," which require that testimony at trial "will not vary substantially in relevant areas to the statements previously given to investigative officers," are invalid.  *Id.* at 183.  Here, by contrast, the State's agreement with Red contained no consistency provision and provided only that he "be granted immunity for his truthful testimony . . . ."  Petitioner's Exhibit 5 at 1.  The Director cannot comprehend Colella's assertion that an agreement calling for truthful testimony somehow "gave Red incentives to perjure himself . . . ."  Petition at 64.

Colella is unable to point to any portion of the agreement requiring Red's testimony to be consistent with prior statements he had made or with other trial evidence.  Indeed, within this very ground for relief, Colella complains that Red gave testimony that was inconsistent with his testimony at Brenda's trial.  Petition at 66.  He thus makes contradictory arguments that his trial was rendered unfair because (1) Red was required to give consistent testimony, and (2) Red's testimony was inconsistent.  That Red's testimony was marked with inconsistencies demonstrates that his immunity agreement was not "conditional."

Finally, Colella's assertion that Red lied to his jury, Petition at 64-67, is meritless, representing nothing more than another baseless attempt to transform trial testimony unfavorable to his position into "perjured testimony."  For instance, Colella insists that Red lied when he testified

26

that the tire track found at the crime scene was not from his vehicle. Petition at 65 (citing XV SF 758). In so doing, he wholly ignores not only the testimony of Martinez that "[y]ou got to be blind to not see" the differences between Red's tire tracks and those found at the crime scene, XII SF 151-52, but also the physical evidence that conclusively demonstrates the correctness of Martinez's conclusion and the truthfulness of Red's testimony. State's Exhibits 33, 34, 40.

### D.     The State Did Not Create a False Impression of the Evidence.

Colella asserts that the State misled the jury about the significance of evidence of his criminal history that it offered at the punishment phase of trial. Petition at 67-69. He is mistaken.

Colella first alleges that the prosecutor misrepresented to the jury that he had been convicted of a sexual assault. Petition at 67-68. In fact, however, the prosecutor made no such representation, and instead correctly stated what the evidence reflected -- that Colella had been *charged* in the State of Indiana with the offense of child molestation, and that the offense subsequently was reduced to a battery. XXI SF 196. Moreover, the prosecutor's description of the offense as a "sexual assault" was an accurate statement of Indiana law, which defines the offense of child molestation as being committed when a person, with an underage child, "performs or submits to sexual intercourse or deviate sexual intercourse . . . ." IC 35-42-4-3(a), *cited in Mullins v. State,* 486 N.E.2d 623, 624 (Ind. App. 1985). Colella's jury was not misled about this matter.

Equally untenable is Colella's contention that the prosecutor misstated the facts surrounding his 1985 conviction for burglary in Indiana. Petition at 68-69. According to Colella, although he broke into the home of an eighty-three-year-old woman at night while carrying a knife, he intended her no harm. In fact, however, Probation Officer Brad Kesler testified that Colella's victim "woke up, saw a white male standing by the foot of her bed, screamed. She claims that the suspect came towards her and then fled, leaving one pocket knife, or uh, leaving the pocket knife. A steak knife and a butter knife were found outside the home." Petitioner's Exhibit 51 at 6. Kesler testified that the victim "claims that Paul tried to place a gag in her mouth." *Id.* at 7. In a written statement she gave, the woman averred that Colella "started toward me and he had a white cloth in his hand, and

27

I thought he was going for my throat." *Id.* at 14. Kesler testified that she "was definitely afraid and feared for her safety." *Id.* at 31. Thus, the Indiana trial court found that there was "probable cause to believe that he jeopardized an elderly woman's health by his conduct." *Id.* at 120. "And a pocket knife can be used, I suppose for one thing only and that's to cut something, whether that's a screen or whether it's somebody's throat, I don't know." *Id.* at 120-21. Colella's jury was not misled about the facts giving rise to his burglary conviction.

Finally, to the extent that the fact-finder was given an incorrect impression of the evidence, any error surely was harmless. On federal habeas corpus review, error is deemed harmless unless the petitioner can show that it "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S. Ct. 1710, 1722 (1993); *Pyles v. Johnson,* 136 F.3d 986, 993 (5th Cir. 1998). To determine whether a particular error is harmless, it must "'be quantitatively assessed in the context of the other evidence presented in order to determine [the effect it had on the trial].'" *Brecht v. Abrahamson,* 507 U.S. at 629, 113 S. Ct. at 1717 (quoting *Ariziona v. Fulminante,* 499 U.S. 279, 307-08, 111 S. Ct. 1246, 1263-64 (1991)). Here, Colella's jury was aware of the facts of the capital murder--that he shot two men dead in cold blood--as well as his well documented inability to conform to the requirements of the law.[8] Moreover, four different representatives of the Indiana criminal justice testified to their belief that Colella would be a continuing threat to society. XXI SF 53-125. On this record, any error surely was harmless.

**E.      The State Did Not Suppress Exculpatory Evidence.**

In two related claims, Colella alleges that the State suppressed exculpatory evidence in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S. Ct. 1194 (1963). Petition at 69-73. These claims are not supported by the record.

---

[8]      At Colella's juvenile court hearing in Indiana some ten years earlier, the trial court had noted that the evidence showed "a continual chain of events here that indicates that [Colella] is quite anti-social." Petitioner's Exhibit 51 at 120.

The *Brady* Court held that "the suppression by the prosecution of evidence favorable to an accused after a request violates due process where the evidence is material either to guilt or punishment, irrespective of the good or bad faith of the prosecution." *Id.* at 87, 83 S. Ct. at 1196-97.

> The *Brady* rule is based on the requirement of due process. Its purpose is not to replace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur. Thus, the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial.

*United States v. Bagley,* 473 U.S. 667, 675, 105 S. Ct. 3375, 3379-80 (1985).

> In general, a petitioner seeking habeas relief who asserts that the State violated its duty to disclose material evidence must demonstrate that (1) the prosecution withheld evidence, (2) that the evidence was favorable to the petitioner, and (3) the evidence was material. [E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. As the Supreme Court has noted, the question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.

*Hill v. Johnson,* 210 F.3d 481, 485 (5th Cir. 2000) (internal citations and quotation marks omitted) (quoting *United States v. Bagley,* 437 U.S. at 682, and *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S. Ct. 1555 (1995)), *cert. denied,* 121 S. Ct. 2001 (2001).

It is the defendant's burden to establish materiality, and when he fails to do so, a federal habeas court does "not need to consider whether [he] established the other *Brady* components." *United States v. Hughes,* 230 F.3d 815, 819 (5th Cir. 2000) (citing *Strickler v. Greene,* 527 U.S. 263, 291, 119 S. Ct. 1953 (1999)). In conducting the materiality inquiry, a court must examine the suppressed evidence collectively rather than individually. *Little v. Johnson,* 162 F.3d 855, 862 (5th Cir. 1998) (citing *Kyles v. Whitley,* 514 U.S. at 436, 115 S. Ct. at 1567). Withheld impeachment evidence that "is merely cumulative of other evidence" is immaterial, *Spence v. Johnson,* 80 F.3d 989, 995 (5th Cir. 1996), as is evidence that "no reasonable jury would have believed," *id.* at 996,

or that does not "offer support for any of [the defendant's] exculpatory theories." *Little v. Johnson,* 162 F.3d at 862.

Colella has not made out a valid *Brady* claim because he has utterly failed to show that any exculpatory evidence was suppressed by the prosecution. Instead, he merely engages in self-serving speculation about what Red or Martinez *may* have told investigators or the grand jury. Petition at 69-71. Having failed to demonstrate that any evidence in fact was suppressed by the State, Colella "has no idea" whether such evidence might have been useful to the defense. *Hughes v. Johnson,* 191 F.3d 607, 630 (5th Cir. 1999). His *Brady* claim thus fails as "purely speculative." *Id. See also United States v. Taylor,* 253 F.3d 1115, 1117 (8th Cir. 2001) ("Taylor has shown no prejudice from the Government's failure to produce non-existent evidence").

### III.    Colella Was Not Denied Adequate Funding To Conduct a Defense.

Colella raises five claims in which asserts that his defense was hampered because trial counsel was not sufficiently compensated and the trial court refused to appoint co-counsel or an investigator. Petition at 73-95. These claims are meritless for several reasons, the first being that they are unsupported by the record, which shows trial counsel never requested the appointment of co-counsel, and that he in fact hired an investigator to assist him. *Ex parte Colella,* statement of facts of evidentiary hearing held on April 6, 1998 ("SEH"), 5.

These allegations also fail as a matter of law. Colella does not, because he cannot, cite any authority for the proposition that a defendant is denied a fair trial simply because his appointed counsel has not tried a capital case before or because his compensation is low. *See, e.g., Cone v. Bell,* 243 F.3d 961, 975 (6th Cir.) (that trial counsel was handling first capital case did not *per se* show ineffective assistance of counsel), *cert. granted on other grounds,* 122 S. Ct. 663 (2001). He thus is asking for the creation of a new rule of constitutional law that is barred by *Teague v. Lane.* Further, while the Sixth Amendment guarantees a criminal defendant the right to counsel, it does not

30

entitle him to multiple attorneys or to investigative assistance.[9]  Consequently, that Colella was represented by a single lawyer at trial raises no federal constitutional issue that might warrant habeas relief.  Because Colella cites no authority to the contrary, this claim also is *Teague*-barred.  And because he has no such right, this claim fails as a matter of law regardless of the *Teague* bar.

Colella's complaint of inadequate funding is not helped by the various legal theories that he attaches to it, as it is nothing more than "a straight ineffective assistance of counsel claim." *Yohey v. Collins,* 985 F.2d 222, 227 (5th Cir. 1993).  Thus, he can establish a Sixth Amendment violation only by making the two-prong showing of deficient performance and resulting prejudice under *Strickland v. Washington,* 466 U.S. 668, 104 S. Ct. 2052 (1984),  which he is unable to do, as discussed below.

Further, given Limas's active representation of Colella at trial, there is no substance to his assertion that he was constructively denied counsel under *United States v. Cronic,* 466 U.S. 648, 104 S. Ct. 2039 (1984).  Petition at 83.  The Fifth Circuit has limited *Cronic* to "cases involving the absence of counsel from the courtroom, conflicts of interest between defense counsel and the defendant, and official interference with the defense." *Jackson v. Johnson,* 150 F.3d 520, 525 (5th Cir. 1998) (citing *Chiildress v. Johnson,* 103 F.3d 1221, 1228 (5th Cir. 1997)).  Colella's claims obviously do not fit into the first two categories, and his assertion that his trial was rendered unfair by "crippling state-imposed handicaps" Petition at 83, fails because, as discussed above, it finds no support in Supreme Court authority.

---

[9]        In federal capital cases, a defendant has a *statutory* right to two defense attorneys at trial under 18 U.S.C. § 3005.  *See United States v. Boone,* 245 F.3d 352, 358-59 (4th Cir.), *cert. denied,* 121 S. Ct. 1983 (2001).  Likewise, Article 26.052 of the Texas Code of Criminal Procedure has been amended since Colella's trial to provide for the appointment of two lawyers, as he notes. Petition at 80.  That Congress and the Texas legislature saw fit to enact these provisions further demonstrates that there is no *constitutional* entitlement to more than one lawyer.

Colella likewise argues in vain that inadequate funding denied him reliable sentencing. Petition at 84-89. Again, the lack of authority for this submission dooms it both under the rule of *Teague* and as a matter of law.

Finally, there is no merit to Colella's reliance on *Ake v. Oklahoma,* 470 U.S. 68, 105 S. Ct. 1087 (1985). Petition at 89-95. *Ake* provides that an indigent criminal defendant must have

> access to the raw materials integral to the building of an effective defense. Thus, while the Court has not held that a State must purchase for the indigent defendant all the assistance that his wealthier counterpart might buy, it has often reaffirmed that fundamental fairness entitles indigent defendants to an adequate opportunity to present their claims fairly within the adversary system.

*Id.* at 77, 105 S. Ct. at 1087 (internal citations and quotation marks omitted). The Fifth Circuit has construed *Ake* to require non-psychiatric experts "only if the evidence is both critical to the conviction and subject to varying expert opinion." *Yohey,* 985 F.2d at 227 (quoting *Scott v. Louisiana,* 934 F.2d 631, 633 (5th Cir. 1991)), *quoted in Moore v. Johnson,* 225 F.3d 495, 502 (5th Cir. 2000), *cert. denied,* 121 S. Ct. 1420 (2001).[10]

While Colella attempts to bootstrap his *Ake* claim by reference to his allegations of prosecutorial misconduct and ineffective assistance of counsel, he fails to demonstrate that the appointment of either co-counsel or the assistance of an investigator was critical to the defense. Instead, his argument is that without additional resources, trial counsel was so handicapped that his representation amounted to ineffectiveness. Petition at 92-95. He is unable to make this showing because (1) as discussed above, his theory of the case is factually flawed, and (2) as discussed below, trial counsel's challenged acts and omissions do not show ineffective assistance of counsel as defined by *Strickland.*

## IV.    Trial Counsel Provided Constitutionally Adequate Representation.

---

[10]    At least one circuit applies an even more stringent test, *i.e.,* to obtain relief, the petitioner must demonstrate that his expert testimony would have shown "that he could not have committed the crime." *Johnson v. Gibson,* 169 F.3d 1239, 1247 (10th Cir. 1999).

Colella makes numerous allegations of ineffective assistance of counsel. Petition at 95-246. Viewed individually or collectively, these claims do not amount to a Sixth Amendment violation.

## A.     Guilt-Innocence Phase

Claims of ineffective assistance of counsel are judged under the two-prong test of *Strickland v. Washington*.

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687, 104 S. Ct. at 2064, *quoted in Williams v. Taylor*, 529 U.S. at 390, 120 S. Ct. at 1511 (quotation marks omitted).

> To establish ineffectiveness, a defendant must show that counsel's representation fell below an objective an objective standard of reasonableness. To establish prejudice he must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Williams v. Taylor*, 529 U.S. at 390-91, 120 S. Ct. at 1511-12 (quoting *Strickland*, 466 U.S. at 688, 694, 104 S. Ct. at 2064, 2068) (quotation marks omitted).

In determining the merits of an alleged Sixth Amendment violation, courts "must be highly deferential," and every effort must be made to eliminate the "distorting effect of hindsight." *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065. A reviewing court is required to presume that counsel's "conduct fell within the wide range of reasonable professional assistance." *Id.*, quoted in *Dupuy v. Cain*, 201 F.3d 582, 590 (5th Cir. 2000). Moreover, the deficiency prong need not be considered if the petitioner has failed to demonstrate prejudice. *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2070; *Martin v. Cain*, 206 F.3d 450, 457 (5th Cir. 2000). To meet this burden, he must do

33

more than simply allege prejudice, and instead must "affirmatively prove" it. *Strickland,* 466 U.S. at 693, 104 S. Ct. at 2067; *Hill v. Lockhart*, 474 U.S. 52, 58, 106 S. Ct. 366, 370-71 (1985).

Colella first faults trial counsel for not conducting a more thorough investigation and devotes much of his argument on this point to discussing that the same attorney had been found ineffective in an unrelated non-capital case. Petition at 97-107. That finding has no relevance to his ineffectiveness claims in this case, however, which must be judged according to the two-part standard of deficient performance and resulting prejudice. "Both prongs of the *Strickland* test . . . require examination of the specific conduct and decisions made by counsel in the particular case; [Colella] cannot establish that the representation he received was constitutionally inadequate merely from evidence about [Limas's] reputation or conduct in other cases." *Anderson v. Collins,* 18 F.3d 1208, 1215 (5th Cir. 1994).

Colella first alleges that trial counsel did not sufficiently communicate with him, failed to investigate his alibi defense, and failed to call his mother and stepfather to support that defense. Petition at 107-09. To prevail on this claim, he must show what such investigation would have uncovered and how his defense would have thereby benefited. *Nelson v. Hargett,* 989 F.2d 847, 850 (5th Cir. 1993); *Lockhart v. McCotter,* 782 F.2d 1275, 1282 (5th Cir. 1986). Colella does not make this showing, as he offers nothing to prove that witnesses existed who could have corroborated Amy Pflaum's testimony that he was present at the Victoria bus station. Moreover, as discussed above, he has not demonstrated that either his mother or stepfather was available to give alibi testimony, and the record suggests that they were not. Obviously, their testimony could have been far more useful to the defense than that of Pflaum, because it would have covered a time frame starting several hours earlier. Moreover, and of even greater significance, only they could have provided corroboration for Colella's assertion that his motivation for fleeing the island was to evade Sid

34

Wilson. Nonetheless, according to Colella, his mother's efforts were devoted to trying to locate bus station personnel, not insisting to counsel that she should testify.[11]

Colella has proffered two affidavits from his mother that contain a total of eight pages. Petitioner's Exhibits 39, 61. The only mention of counsel's alleged failure to call her and her husband is a single paragraph averring that she told defense counsel that they drove Colella to Victoria, that they arrived just before 6:00 a.m., and that "I specifically asked Mr. Limas to contact the people at the bus station in Victoria, because they might remember having seen Paul at that time." Petitioner's Exhibit 39 at 5.29. This portion of the affidavit is revealing, for several reasons. First, and most glaringly, it does not represent that she in fact was prepared to give trial testimony on this point. While the affidavit describes her efforts to prod counsel into investigating at the bus station, nowhere does it state that she in fact told counsel that *she* wanted to testify and that he refused or ignored her. Second, the affidavit omits a critical detail -- the time Colella came to her house that night, a time that obviously would have been far more useful to his claim of alibi than the time he arrived in Victoria. And finally, it finds no corroboration from the stepfather, who has not furnished an affidavit, an important omission for which Colella provides no explanation.[12] In short, Colella fails to show that his mother and stepfather were prepared to testify favorably for him.

---

[11] This point was touched on at the state evidentiary hearing. There, trial counsel agreed with the prosecutor that "there was really no serious question . . . that these people were over at the bus station in Victoria, Texas buying a bus ticket to go back to Indiana. That was not a serious question." SEH 16. Instead, "the big issue was the time that it was as to when the murders occurred . . . ." *Id.*

[12] At the state evidentiary hearing, trial counsel testified that he did not call the parents as witnesses due to trial strategy. *Ex parte Colella*, SEH 29. This point was not further developed, and thus the basis for counsel's strategy was not disclosed. Perhaps counsel was mindful of his obligation to not present false testimony, *Nix v. Whiteside*, 475 U.S. 157, 106 S. Ct. 988 (1986), or perhaps his decision to not call them "suggests a realistic appraisal of [their] alibi theory rather than deficient performance." *Knox v. Johnson*, 224 F.3d 470, 479 (5th Cir. 2000).

Further, Colella could not have suffered *Strickland* prejudice because his defense of alibi in fact was presented through the testimony of bus station agent Amy Pflaum. Trial counsel testified at the state evidentiary hearing that other witnesses from the bus station would have been merely cumulative, SEH 18. Counsel cannot be held ineffective for failing to present evidence that is cumulative of other evidence that has been admitted. *Burton v. United States,* 237 F.3d 490, 494 (5th Cir. 2000).

Colella next complains that counsel did not sufficiently utilize the record from Brenda Colella's trial for impeachment purposes. Petition at 110-11. The record shows, however, that defense counsel in fact used that record during his cross-examination of Martinez. XVII SF 1241-45. Given the deference mandated by *Strickland,* Colella fails to show deficient performance. "[O]ur scrutiny of counsel's performance is highly deferential. We must be particularly wary of 'argument[s] that essentially come[] down to a matter of degrees. Did counsel investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second-guessing.'" *Dowthitt v. Johnson,* 230 F.3d 733, 743 (5th Cir. 2000) (quoting *Kitchens v. Johnson,* 190 F.3d 698, 703 (5th Cir. 1999)), *cert. denied,* 532 U.S. 915, 121 S. Ct. 1250 (2001).

For the same reasons, Colella cannot prevail on the litany of complaints that he advances about defense counsel's trial performance, including that counsel changed his theory of the case during the trial, Petition at 111-14; did not object to improper bolstering, *id.* at 114-26; did not object to hearsay, *id.* at 126-38; did not have Judge Hunsaker's inquest report admitted in evidence, *id.* at 138-39; did not conduct adequate cross-examination, *id.* at 139-47; did not prevent improper impeachment of Colella, *id.* at 147-53; did not object to evidence of extraneous offenses, *id.* at 153-57; and did not object to improper argument. *Id.* at 159-71. Perhaps it is now possible, via hindsight, to gainsay the wisdom of counsel's chosen course of action and give him a failing grade, as Colella has done. What is not possible, under *Strickland,* is to find counsel constitutionally

36

ineffective for choosing among plausible options. "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland,* 466 U.S. at 690, 104 S. Ct. at 2052. Colella's trial attorney was hardly asleep during the trial, and the record reflects that he cross-examined the State's witnesses; made numerous objections, many of which were sustained; and presented evidence and argument in support of Colella's alibi defense. Thus, Colella's claims that counsel should have done more-- cross-examined more thoroughly, objected more frequently, etc.--cannot succeed because they "come[] down to a matter of degrees." *Dowthitt v. Johnson,* 230 F.3d at 743.

Colella argues that trial counsel erred because he "switched defensive themes midway through the guilt phase," Petition at 111, pursuing an alibi defense after having conducted voir dire of the jury panel on a provocation theory that might have supported a conviction for the lesser included offense of voluntary manslaughter. *Id.* at 11-14. This claim is meritless.

An "attorney's actions during voir dire are considered to be a matter of trial strategy." *Teague v. Scott,* 60 F.3d 1167, 1172 (5th Cir. 1995). Thus, they "cannot be the basis for a claim of ineffective assistance of counsel unless counsel's tactics are shown to be 'so ill chosen that it permeates the entire trial with obvious unfairness.'" *Id.* (quoting *Garland v. Maggio,* 717 F.2d 199, 206 (5th Cir. 1983)). Habeas relief is warranted only where it is shown that counsel's actions "tainted the petit jury actually impaneled." *Clark v. Collins,* 19 F.3d 959, 965 (5th Cir. 1994). While Colella speculates that a different approach might have been more efficacious to the defense, he does not establish "a reasonable probability that, but for his attorney's failure . . ., his trial would have reached a different result." *Id.* This is so because, as discussed at length above, Colella's alibi defense was, at best, insubstantial. When the strength of Colella's alibi is evaluated in light of the other trial evidence, the possibility of an acquittal was remote, regardless what questions defense counsel propounded at voir dire.

37

Moreover, the voir dire that trial counsel did conduct was of benefit to the defense. By exploring various factual scenarios, including those involving provocation, counsel was able to identify venire members who were conviction-prone, thus enabling him to intelligently exercise the defense's challenges for cause and peremptory strikes. Colella fails to show that he was denied a fair trial.

Many of Colella's allegations of ineffectiveness are either unsupported by the record or facially inadequate to make out a claim for habeas relief. For instance, Colella's complaint that the inquest report should have been admitted fails because the report would have been merely cumulative of Judge Hunsaker's testimony, which already was before the jury. *Burton v. United States,* 237 F.3d at 494. Moreover, as Colella acknowledges, counsel in fact attempted to have the report admitted, and it was excluded on the prosecutor's objection that it was not "the best evidence." Petition at 138-39 (citing XVII s 1174). Although Colella argues that the trial court erred in sustaining the State's objection, he does not show what counsel might have done to overcome this objection and obtain a different ruling from the trial court.

Similarly, his allegations that counsel erred in not objecting to bolstering are unfounded. Having complained at length that the State offered inconsistent testimony, Colella now reverses field and complains that Martinez gave consistent testimony that bolstered that of Red Wilson. In any event, given the deference mandated by *Strickland,* Colella cannot show deficient performance. His trial attorney "may have concluded that the dangers inherent in objecting--losing the objection or appearing obstructionist to the jury--outweighed the marginal benefit in preventing the bolstering. Such a calculation was surely the defense counsel's to make." *Knox v. Johnson,* 224 F.3d at 480.

Further, Colella's own pleadings make clear that he could not have suffered *Strickland* prejudice from the absence of a bolstering objection. He asserts that defense counsel at Brenda's trial did a much more effective job of excluding similarly objectionable testimony. Petition at 118-19. This is hardly a ringing endorsement, however, given that Brenda's jury convicted her of capital

38

murder even though, on appeal, the state court of appeals found the evidence to constitutionally insufficient and ordered a judgment of acquittal.

The same considerations attend counsel's decisions on whether to object to the other evidence and argument to which Colella points. At every instance, counsel had to weigh the possible pros and cons of lodging an objection. The mere decision to not object cannot, standing alone, show deficient performance. Moreover, much of the evidence of which Colella complains was not objectionable. For instance, he faults trial counsel for not objecting that testimony that he and his co-defendants wished to make a deal was inadmissible under Rule 410 of the Texas Rules of Criminal Evidence. Petition at 127. There was no valid basis for such an objection, however, as that rule prohibits statements "made in the course of plea discussions *with an attorney for the prosecuting attorney . . . .*" Because the statements at issue here were made to law enforcement officers rather than to an assistant district attorney, a Rule 410 objection would have been futile. Counsel is not required to file frivolous motions or make frivolous objections. *Green v. Johnson,* 160 F.3d 1029, 1037 (5th Cir. 1998); *McCoy v. Lynaugh,* 874 F.2d 954, 963 (5th Cir. 1989).

Other of Colella's allegations simply are not supported by the record. He charges that state's witness Ricky Taylor was allowed to assert "that he had 'personal knowledge" that Mr. Colella shot the victims . . . ." Petition at 137-38. In fact, however, Ricky Taylor's testimony was just the opposite -- that he did not see the shootings and instead had only a *belief* that Colella was the perpetrator. XVI SF 1037-38. Colella acknowledges as much in making the contradictory claim that Ricky Taylor was impermissibly allowed to express his unsubstantiated opinion that Colella was the killer. Petition at 131-32.

**B.      Punishment Phase**

Colella also alleges attorney ineffectiveness at the punishment phase. Petition at 191-239. Specifically, he faults trial counsel for (1) not presenting evidence of a troubled childhood and organic brain damage, Petition at 200-10; (2) not seeking to have his client examined by a psychiatric

39

expert, Petition at 210-16; (3) not challenging the State's evidence of Colella's prior convictions, Petition at 216-18; (4) not challenging the State's punishment-phase evidence, Petition at 218-28; (5) displaying ignorance of the law, Petition at 228-30; (6) failing to object to improper argument, Petition at 230-32; and (7) failing to object to the prosecution's proving extraneous offenses by hearsay evidence. Petition at 232-39. These claims are meritless.

In deciding a claim that defense counsel failed to investigate and present mitigating evidence at the punishment phase of trial, the question is "not what is prudent or appropriate, but only what is constitutionally compelled." *Burger v. Kemp*, 483 U.S. 776, 794, 107 S. Ct. 3114, 3126 (1987). The Fifth Circuit consistently "has upheld decisions of counsel not to put on evidence in mitigation of culpability when the decision results from a strategic choice." *Williams v. Johnson,* 16 F.3d 626, 632 (5th Cir. 1994). "A court might even disagree with such a decision, viewing the case in hindsight, and still determine that the decision was not so seriously inept as to have been professionally unreasonable." *Id.* For instance, in *Crane v. Johnson,* 178 F.3d 309 (5th Cir. 1999), the court found no deficient performance in counsel's decision to not pursue an insanity defense because "they made a tactical decision not to raise this defense due to the lack of sufficient evidence and their concern about drawing damaging rebuttal psychiatric testimony from the State." *Id.* at 313-14.

Similarly, in *Rector v. Johnson,* 120 F.3d 551 (5th Cir. 1997), a death row inmate complained of counsel's failure to present mitigating evidence of child abuse, family instability and low IQ at the punishment phase of trial. In affirming the district court's denial of relief, the Fifth Circuit noted counsel's explanation "that they chose not to present such evidence because the jury might very well consider that evidence aggravating, rather than mitigating. Under these facts, Rector has failed to show deficient performance . . . . " *Id.* at 564.

Likewise, in *Carter v. Johnson,* 131 F.3d 452 (5th Cir. 1997), the court found that trial counsel did not perform deficiently in foregoing an incompetency claim and the presentation of

expert testimony on their client's mental status. Because counsel averred "that they had no reason to believe that Carter was mentally incompetent at the time of trial" and because the state trial court specifically found Carter to be competent, the failure to investigate the alleged incompetency did not render counsel's performance deficient. *Id.* at 463-64.

The soundness of this body of precedent is not called into question by the Supreme Court's decision in *Williams v. Taylor*. There, the Supreme Court noted that trial counsel did not begin preparations for the punishment phase until a week before the trial. 529 U.S. at 395, 120 S. Ct. at 1514. Further, "[t]hey failed to conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood, *not because of any strategic calculation* but because they incorrectly thought that state law barred access to such records." *Id.* (emphasis added). In addition, counsel failed to offer evidence of Williams' borderline mental retardation, his commendations for helping uncover a prison drug ring and returning a guard's wallet and testimony from guards that Williams was unlikely to behave violently in prison. *Id.* Counsel even failed to return a telephone call from an accountant who had visited Williams as part of a prison ministry and was willing to testify that Williams seemed to thrive in a regimented atmosphere. *Id.* The Supreme Court further noted that counsel's failure to present evidence that was purely favorable with no negative aspects was not justified by a strategic decision to focus solely on Williams's voluntary confession. *Id.* Based on a straightforward application of *Strickland v. Washington*, the Supreme Court concluded that counsel performed deficiently in failing to conduct a thorough background investigation. *Id.*

Here, in contrast to *Williams*, Colella's trial counsel was aware of Colella's deprived childhood and psychiatric problems. SEH 9. Although Colella was granted a state-court evidentiary hearing at which he established that trial counsel did not present extensive evidence on these points, counsel never was asked why he did not do so. SEH 26-27. On this record, the *Strickland* presumption of strategy is controlling. *Moawad v. Anderson,* 143 F.3d 942, 948 (5th Cir. 1998).

41

A federal habeas court "need not conclude that [trial counsel] actually made his strategic decisions for these reasons. Instead, we are required to presume that the challenged actions were within the wide range of professional conduct if, under the circumstances, it might have been trial strategy. It [is the petitioner's] burden to overcome that presumption." *Bullock v. Whitley,* 93 F.3d 697, 701 (5th Cir. 1995). Because Colella failed to develop the factual basis for this point in the state courts, and § 2254(e) prohibits an evidentiary hearing in this court. *Williams v. Taylor,* 529 U.S. at 437, 120 S. Ct. at 1491.

Further, the record provides an established basis for foregoing the presentation of mitigating evidence at Colella's trial -- that it was two-edged. This is demonstrated by the very records on which Colella relies, which show that even as a child, he "displayed learning problems; distractibility; impulsive behavior, often to the extent that he endangered his own or others' physical safety; mood disturbances; and a reduced ability to perceive the consequences of his actions and guide his behavior by them." Petitioner's Exhibit 40 at 4.14. He had "a history of violent behavior toward his 6 year old brother (attempted to stabbing with a pencil) and school peers (attempted cutting child with glass)." Petitioner's Exhibit 42 at 4. "Twice recently he fought with teachers, kicking and biting. Once he was in such a frenzy he didn't recognize his mother." The Indiana trial court that sentenced him to prison observed that the evidence showed "a continual chain of events here that indicates that [Colella] is quite anti-social." Petitioner's Exhibit 51 at 120. Clearly, Colella's "violence and drug use . . . had the potential to turn the jury against" him. *Cockrum v. Johnson,* 119 F.3d 297, 304 (5th Cir. 1997). Counsel cannot be deemed ineffective for not presenting potential mitigating evidence such as this, that could also have worked to the defendant's disadvantage. *Ransom v. Johnson,* 151 F.3d 716, 724 (5th Cir. 1997);

Further, while the evidence that Colella now proffers may have been mitigating to some extent, it was not without problems. First, much of it was remote in time, involving events from his childhood that occurred years before, which led trial counsel to believe that it would not be

42

persuasive. SEH 21-22. Other of Colella's proffered evidence is of questionable value. For instance, he relies heavily on the testimony at his juvenile hearing in Indiana of a psychology graduate student, Stephen Rolnick. Petition at 222-23. The Indiana court that hear Rolnik testify stated that "I really cannot place very much credibility on his testimony because his opinions were based on information other than what, you know, a lot of it he didn't even know where it came from except he'd read it in a report or someplace but he didn't know where the people that wrote the reports got theirs." Petitioner's Exhibit 51 at 118.

Likewise, Colella's affidavit from psychologist Cecil Reynolds does not prove the point for which Colella offers it -- that he "suffers organic brain damage." Petition at 213 (citing Petitioner's Exhibit 40). Reynolds was incapable of making such a diagnosis because he merely interviewed Colella and administered psychiatric tests, *id.* at 3.12, and did not conduct the more extensive tests he himself stated were necessary:

> In order to assess whether someone has suffered brain damage, a full neuropsychological and neurologic workup should be done. This would include evaluation by a neurologist or a board-certified clinical neuropsychologist to determine whether brain damage exists, followed by diagnostic medical testing to try and determine the location and extent of the brain damage. The diagnostic medical tests at least an EEG and in some cases a BEAM, and possibly a PET scan, an MRI, or a CAT scan, although these diagnostic tests do not always show brain damage.

Petitioner's Exhibit 40 at 3.10. Thus, Reynolds's diagnosis of brain damage is, by his own admission, flawed because he did not conduct the tests that were necessary to reach such a conclusion.

With regard to prejudice, the Supreme Court has held that mitigating evidence unrelated to dangerousness might influence the jury to return a sentence less than death. *Williams*, 529 U.S. at 398, 120 S. Ct. at 1516. Here, there is no reasonable probability that the evidence Colella asserts trial counsel should have presented would have influenced the jury to respond differently to the special issues. It is true, as Colella asserts, that the apparent motivation for the murders was Brenda

43

Colella's rape accusation.   It is also true, however, that a group of Colella's friends attempted to dissuade him from seeking revenge and that hours passed between the alleged rape and the murders, but he nonetheless sought out his victims and killed them.  Moreover, while Colella "did not lay [sic] in wait and ambush the victims," Petition at 193, his actions were even more heinous in that he killed them as they slept.  Further, in discounting the punishment-phase evidence that the defense did offer, Colella "fails . . . to credit the force of a mother's simple plea for her son's life."  *Cockrum v. Johnson,* 119 F.3d at 304.  On this record, Colella cannot establish that he was prejudiced by counsel's decision to not pursue a mitigation strategy based on a deprived childhood and mental problems.

As discussed above, in connection with Colella's claim that the State misrepresented his criminal history, the prosecutor did not misrepresent the facts.  Thus, Colella's related claim that counsel erred in not objecting on this basis must fail.  And Colella's claims relating to counsel's failure to object to the prosecutor's jury argument cannot succeed because, like his claims faulting counsel for not objecting during the guilt-innocence phase, they involve strategic decisions, made in the heat of trial, that cannot support a finding of ineffective assistance of counsel.

### C.   Appeal

Equally meritless are Colella's allegations of ineffective counsel on appeal.  Petition at 239-46.  To prevail on this claim, he must meet the two-prong *Strickland* test:  deficient performance and resulting prejudice.  *Smith v. Robbins,* 528 U.S. 259, 285, 120 S. Ct. 746, 764 (2000).  To establish the former, he must show that "counsel unreasonably failed to discover [and raise] nonfrivolous issues."  *Id.*  Appellate counsel "need not (and should not) raise every nonfrivolous claim, but rather may select among them in order to maximize the likelihood of success on appeal."  *Id.* at 288, 120 S. Ct. at 765 (citing *Jones v. Barnes,* 463 U.S. 745, 103 S. Ct. 3308 (1983)).  Thus, it is possible that an ineffectiveness claim may be "based on counsel's failure to raise a particular claim, but it is difficult to demonstrate that counsel was incompetent."  *Id.* (citing *Gray v. Greer,* 800 F.2d 644, 646

44

(7th Cir. 1986)). To establish prejudice, the petitioner "must show a reasonable probability that, [but for counsel's error], he would have prevailed on appeal." *Id.* at 285, 120 S. Ct. at 764 (citing *Strickland,* 466 U.S. at 694, 104 S. Ct. at 2068).

Colella cannot make this showing. First, he offers no Supreme Court authority for the proposition that a constitutionally impermissible conflict of interest exists when trial counsel also is appointed to represent the defendant on appeal. Petition at 242. In federal criminal prosecutions, when a defendant complains that the trial transcript is incomplete, "and *the defendant is represented by the same attorney at trial and on appeal*, reversal is required only if the defendant can show that failure to record and preserve the specific portion of the trial proceedings visits a hardship on him and prejudices his appeal." *United States v. Neal,* 27 F.3d 1035, 1044 (5th Cir. 1994) (emphasis added, internal quotation marks and citation omitted). Implicit in this rule is that it is entirely proper for a defendant's trial attorney to also represent him on appeal.

Because Colella's allegation of a conflict of interest is not mandated as a matter of federal constitutional law, this allegation is barred from review by the non-retroactivity rule of *Teague v. Lane.* Colella can make out a claim of ineffective assistance of counsel on appeal only by satisfying the dual prongs of *Strickland* as explicated in *Smith v. Robbins.* Even accepting *arguendo* his argument that appellate counsel erred in not attacking his own trial performance, there was no prejudice because, as discussed above, trial counsel provided constitutionally adequate representation. Appellate counsel does not perform deficiently, and no prejudice results, when he refrains from raising a non-meritorious issue. *Beazley v. Johnson,* 242 F.3d at 257; *Williams v. Johnson,* 16 F.3d at 634.

For the same reason, Colella cannot show ineffective assistance of appellate counsel for failing to raise the prosecutorial-misconduct claims he has presented in this forum. Petition at 242-44. Because, as shown above, he could not have prevailed on appeal on those issues, it follows that neither prong of *Strickland* is met.

45

Finally, there is no merit to Colella's contention that appellate counsel performed deficiently in not insuring that the record was complete. Petition at 244-46. A habeas petitioner who complains of an incomplete record is entitled to relief only if he can show that he was prejudiced by the omission. *Green v. Johnson,* 160 F.3d 1029, 1042 (5th Cir. 1998). Colella cannot make this showing because (1) the record in question was presented to the Court of Criminal Appeals on state habeas review, and (2) his claim that pretrial publicity denied him a fair trial is meritless, as discussed below.

## V.      Colella Fails To Show Error, Much Less Cumulative Error.

Colella next asserts that, considered cumulatively, his various claims of ineffective assistance of counsel and prosecutorial misconduct justify issuance of the Great Writ. Petition at 246-55. He also contends that all of his submissions of constitutional error cumulated to deny him a fair trial. Petition at 270. Because, as demonstrated above, none of Colella's claims merits federal habeas relief, it necessarily follows that the aggregate of them likewise did not deny him a fair trial. *United States v. Williams,* 264 F.3d 561, 572 (5th Cir. 2001); *Miller v. Johnson,* 200 F.3d 274, 285 n.6 (5th Cir.), *cert. denied,* 531 U.S. 849, 121 S. Ct. 722 (2000).

## VI.     Colella Was Not Denied a Fair Trial by Pretrial Publicity.

Colella asserts that he was denied a fair trial because the trial court denied his motion for change of venue based on prejudicial pretrial publicity. Petition at 255-69. This claim fails as a matter of law.

"As a general rule, a state defendant who seeks habeas relief as a result of pretrial publicity must demonstrate an actual, identifiable prejudice on the part of members of the jury that is attributable to that publicity." *Willie v. Maggio,* 737 F.2d 1372, 1386 (5th Cir. 1984), *quoted in Moore v. Johnson,* 225 F.3d at 504. In determining whether bias exists, "the trial court retains great latitude in deciding what questions should be asked on voir dire." *Mu'Min v. Virginia,* 500 U.S. 415, 424, 111 S. Ct. 1899, 1904 (1991).

Despite its importance, the adequacy of voir dire is not easily subject to appellate review. The trial judge's function in this part of the trial is not unlike that of jurors later on in the trial. Both must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and of responses to questions."

*Rosales-Lopez v. United States,* 451 U.S. 182, 188, 101 S. Ct. 1629, 1634 (1981), *quoted in Mu'Min, id.*

Regardless of the extent of voir dire, however, the trial court "must make the same decision at the end of the questioning: is the juror to be believed when he says he has not formed an opinion about the case?" *Mu'Min,* 500 U.S. at 425, 111 S. Ct. at 1905. Because the inquiry whether a venire member is biased is one of historical fact, a state trial judge's finding of bias *vel non* must be presumed correct on federal habeas review. *Patton v. Yount,* 467 U.S. 1025, 1036, 104 S. Ct. 2885, 2891 (1984); *Beazley v. Johnson,* 242 F.3d 248, 262 (5th Cir.), *cert. denied,* 121 S. Ct. 329 (2001). This is because

caselaw does not look to precise words alone. We assay the trial judge's apprisal of the potential juror's beliefs. None of us reading this one part of the transcript today was present to personally observe [the venire member] as he answered these questions . . . years ago. The trial judge was. He saw [the venire member] when he spoke. That observation was made in the context of all that had gone on in the prior exchanges between counsel and other prospective jurors.

*Russell v. Lynaugh,* 892 F.2d 1205, 1217 (5th Cir. 1989) (Clark, C. J., specially concurring). "Just because a juror once expressed pretrial conceptions of guilt does not preclude a fact finding, to which federal habeas courts must defer, that the juror was in fact impartial." *Hogue v. Johnson,* 131 F.3d 466, 505 (5th Cir. 1997) (citing *Patton v. Yoiunt,* 467 U.S. at 1035-40, 104 S. Ct. at 2891-93).

Here, Colella's contentions are facially inadequate to make out a finding of bias. Following a full-blown hearing at which both Colella and the State introduced evidence, the trial court found

"that the defendant can get a fair and impartial trial in this county." Petitioner's Exhibit 54 at 78.[13] Colella does not assert that the hearing was procedurally flawed or unfair in any other way and likewise does not point to any error in the trial court's decision to credit the State's witnesses rather than his in denying a change of venue. He thus fails to prove unreasonableness as required to make out a claim under the AEDPA.

Moreover, of the four jurors who Colella claims were exposed to pretrial publicity, Petition at 256-57, he identifies only one, Refugia G. Leal, as having "admitted to a disqualifying prejudice." Petition at 262. Even as to Leal, however, Colella concedes that "she in fact later admitted she could be impartial." Petition at 263. Thus, given the presumption of correctness accorded the trial court's findings of impartiality and attendant credibility choices, Colella in effect admits that he cannot prove actual prejudice on the part of any of his jurors. *See Patton v. Yount,* 467 U.S. at 1040, 104 S. Ct. at 2893 (in the case of an ambiguous juror "only the trial judge could tell which of these answers was said with the greatest comprehension and certainty. . . . [and] the ambiguity in the testimony of the cited jurors who were challenged for cause is insufficient to overcome the presumption of correctness owed to the trial court's findings").

Further, Colella's assertion that the prosecutor improperly rehabilitated Leal is a *non sequitur* in light of the "great latitude" afforded the trial court in conducting voir dire and, in any event, hardly constitutes the "clear and convincing evidence" required to overcome the statutory presumption. 28 U.S.C. § 2254(e)(1). Colella does not, because he cannot, cite any authority for the proposition that federal constitutional error can result solely from the asking of leading questions during voir dire. Thus, his complaint that the prosecutor asked leading questions seeks a new rule of law that is barred by *Teague v. Lane.*

---

[13]    The record of the venue hearing was not transcribed and made part of the state-court record on appeal. Colella has proffered it to this Court as an exhibit. Petitioner's Exhibit 54. Curiously, this record reflects that the hearing was held on June 26, 1995, almost three years after Colella's trial. The Director assumes that this date is a typographical error.

48

Finally, there is no merit to Colella's claim of inherent juror prejudice under *Rideau v. Louisiana,* 373 U.S. 723, 83 S. Ct. 1417 (1963). Petition at 264-69. As he notes, *Rideau* "involved a local television station's broadcast of the defendant's jailhouse confession to a substantial portion of the community before the trial." Petition at 264. Here, by contrast, Colella never has confessed, and the newspaper articles he proffers are not nearly so damning. The fact that some members of the juror panel were aware of Brenda's previous trial is simply insufficient, standing alone, to establish inherent prejudice, as "[t]he Constitution does not require that jurors be completely unaware of the facts and issues to be tried . . . ." *Black v. Collins,* 962 F.2d 394, 409 (5th Cir. 1992). Colella has not sustained "his burden of showing that the trial atmosphere was 'utterly corrupted by press coverage' . . . ." *Id.* (quoting *Dobbert v. Florida,* 432, U.S. 282, 303, 97 S. Ct. 2290, 2303 (1977)).

**VII.    Colella's Factual Insufficiency Submission Does Not State a Claim for Relief.**

Colella contends that the evidence is "factually insufficient" under the Court of Criminal Appeals's decision in *Clewis v. State,* 922 S.W.2d 126 (Tex. Crim. App. 1996). Petition at 269-70. Factual insufficiency is a creation of Texas law that allows an appellate court to examine the fact-finder's weighing of the evidence. *Clewis v. State,* 922 S.W.2d at 133. Being strictly a state-law rule, it plays no part in a federal habeas court's evaluation of evidentiary sufficiency. *Pemberton v. Collins,* 991 F.2d 1218 (5th Cir1993); *Brown v. Collins,* 937 F.2d 175, 181 (5th Cir. 1991); *Schrader v. Whitley,* 904 F.2d 282, 284 (5th Cir. 1990); *Thompson v. Lynaugh,* 821 F.2d 1054, 1062 (5th Cir. 1987). Colella's challenge to the factual sufficiency of the evidence does not state a claim for relief.

49

## VIII.   Colella Was Not Denied Adequate Appellate Review.

Colella argues that the Court of Criminal Appeals did not afford him constitutionally adequate appellate review because it refused to judge the sufficiency of the trial evidence that mitigated against the death penalty. Petition at 270-75. "Implicit in this suggestion is the notion that the death penalty *would* be a proportionate sentence for *other* Texas capital defendants. The claim is barred . . . as the state appellate court is *not* required to conduct such a proportionality review." *Hughes v. Johnson,* 191 F.3d at 622 (original emphasis) (citing *Pulley* v. *Harris,* 465 U.S. 37, 104 S. Ct. 871 (1984)). Put another way,"regardless of whether the Texas court reviews the jury verdict under the mitigation special issue or the future dangerousness special issue, 'meaningful appellate review' has been afforded." *Beazley v. Johnson,* 242 F.3d at 261. This claim is frivolous.

## IX.   The Trial Court Properly Sustained the State's Challenge for Cause.

Finally, Colella alleges that the trial court erred when it sustained the State's challenge for cause against venire member William Bristol. Petition at 275-76.   Again, his claim is foreclosed by the factual findings made by the state courts.

"[T]he proper standard for determining when a prospective juror may be excluded for cause because of his or her own views on capital punishment . . . is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S. Ct. 844, 852 (1985), *quoted in McFadden v. Johnson,* 166 F.3d 757, 760 (5th Cir. 1999).   As discussed above, under *Patton v. Yount, supra,* the trial judge's resolution of this question constitutes a fact finding that must be presumed correct by a federal habeas court.  Moreover, the judge's ruling sustaining the State's challenge for cause constitutes a factual finding within the meaning of the federal habeas statute, and he is not required "to write out in a separate memorandum his specific findings on each juror excused" or "to announce for the record his conclusion that [the venire member] was biased or his reasoning." *Wainwright v. Witt,* 469 U.S. at 430, 105 S. Ct. at 855.

When Colella raised this claim on direct appeal, the Court of Criminal Appeals noted that Bristol "emphasized his disagreement with the death penalty" and "his answers were . . . sufficient to support a rational conclusion that he would automatically find mitigating circumstances to justify avoiding assessment of a death sentence, regardless of the evidence adduced at trial." *Colella v. State,* 915 S.W.2d at 842. Here, as with Colella's claim that pretrial publicity tainted his jury, the state courts's finding of bias must be presumed correct under the statute and is controlling. While Colella naturally emphasizes that Bristol's testimony was ambiguous, he does not offer the clear and convincing evidence required to overcome the statutory presumption that must be accorded the state courts's finding that Bristol was so biased against the death penalty as to be disqualified to sit as a juror. "One of the purposes of § 2254(d) was to prevent precisely this kind of parsing of trial court transcripts to create problems on collateral review where none were seen at trial." *Wainwright v. Witt,* 469 U.S. at 435, 105 S. Ct. at 858, *quoted in Cantu v. Collins,* 967 F.2d 1006, 1015 (5th Cir. 1992). Colella fails to show any unreasonableness in the exclusion of venire member Bristol and thus fails to make out a claim for relief under the AEDPA.

## CONCLUSION

For the above reasons, the Director respectfully requests that summary judgment be entered in her behalf and that Colella's petition for writ of habeas corpus be denied.

Respectfully submitted,

JOHN CORNYN
Attorney General of Texas

HOWARD G. BALDWIN, JR.
First Assistant Attorney General

MICHAEL T. McCAUL
Deputy Attorney General for
Criminal Justice

GENA BUNN
Assistant Attorney General
Chief, Capital Litigation Division

51

CHARLES A. PALMER
Assistant Attorney General
State Bar No. 15426500
Admission ID No. 1523
Attorney in Charge

P. O. Box 12548, Capitol Station
Austin, Texas   78711
(512) 936-1600
Facsimile No. (512) 320-8132

ATTORNEYS FOR RESPONDENT

## CERTIFICATE OF SERVICE

I, Charles A. Palmer, Assistant Attorney General of Texas, do hereby certify that a true and correct copy of the above and foregoing Respondent Cockrell's Motion for Summary Judgment With Brief in Support has been served by placing same in the United States Mail, postage prepaid, on this the 27th day of February, 2002, addressed to the following:

Mike V. Powell                    Mandy Welch
LOCKE LIDDELL & SAPP              BURR & WELCH
2200 Ross Avenue, Suite 2200      1630 Castle Court, Suite A
Dallas, Texas 75201               Houston, Texas 77002.

CHARLES A. PALMER
Assistant Attorney General

52

EXHIBIT

# AFFIDAVIT

My name is John W. Nielsen-Gammon and I am the Texas State Climatologist and Professor of Meteorology, Department of Atmospheric Sciences, Texas A&M University. I have reviewed the weather records for the five-hour period between 1:00 a.m. and 6:00 a.m., September 13, 1991, for the area between Brownsville, Texas, and Victoria, Texas, and the reflect the following:

Brownsville reported some light showers at 1:00 a.m. and 3:00 a.m. with a total of one hundredth of an inch of rain.

Sarita reported no precipitation of 0.10 or more.

Kingsville did not report any rain, but reported fog at 3:00 a.m., and haze at 4:00 a.m.

Corpus Christi reported light showers at 2:00 a.m., 3:00 a.m., and 4:00 a.m., with rainfall totals of three hundredths, fourteen hundredths, and two hundredths, respectively.

Victoria did not report any bad weather or precipitation during the five-hour period mentioned above.

Many cooperative stations in the area reported only 24-hour precipitation totals. Most such stations reported less than 0.25 inches for the 24-hour period including 1:00 a.m. to 6:00 a.m. The exceptions are Raymodnville (0.36), Port Isabel (0.32), Alice (0.70), and Welder Wildlife Foundation (0.55). The weather records do not reflect how much, if any, of this precipitation fell between 1:00 a.m. and 6:00 a.m. September 13, 1991.

I have read the above and declare under penalty of perjury that it is true and correct.


_____
JOHN W. NIELSEN-GAMMON


SWORN and SUBSCRIBED to before me on this the 25th day of January, 2002.


_____
NOTARY PUBLIC
In and For the State of Texas

JANICE Y. MILLS
Notary Public, State of Texas
My Commission Expires
OCTOBER 18, 2003

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

PAUL RICHARD COLELLA,           §
        Petitioner,           §
                   §
V.           §           NO. 1.01cv166
                   §
JANIE COCKRELL, DIRECTOR,           §
TEXAS DEPARTMENT OF           §
CRIMINAL JUSTICE,           §
INSTITUTIONAL DIVISION,           §
        Respondent.           §

**O R D E R**

Came on to be heard **Respondent's Motion for Summary Judgment**, and the Court

after considering the pleadings of the parties filed herein, is of the opinion that the following order

should issue:

It is hereby ORDERED, ADJUDGED and DECREED that said motion be, and it is hereby

GRANTED.

SIGNED on this the _____ day of _____, 2002, at _____, Texas.


_____
JUDGE PRESIDING