*16*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JUN 1 7 2002

Michael N. Milby
Clerk of Court

|  |  |  |
|---|---|---|
| PAUL RICHARD COLELLA, | § | |
| | § | |
| PETITIONER, | § | |
| | § | |
| V. | § | NO. 1:01CV166 |
| | § | |
| | § | |
| JANIE COCKRELL, DIRECTOR | § | |
| TEXAS DEPARTMENT OF CRIMINAL | § | |
| JUSTICE, INSTITUTIONAL DIVISION, | § | |
| | § | |
| RESPONDENT. | § | |

---

**PETITIONER'S RESPONSE TO RESPONDENT'S
MOTION FOR SUMMARY JUDGMENT**

Mandy Welch
Southern District No. 15543
State Bar No. 21125380
BURR & WELCH
Houston, Texas 77006
Phone:  (713) 523-2299
Fax:     (713) 523-3833

**LEAD COUNSEL FOR PETITIONER**

**OF COUNSEL:**

Michael V. Powell
Southern Dist. No. 5429
State Bar No. 16204400
2200 Ross Ave., Suite 2200
Dallas, Texas 75201
Phone:  (214) 740-8520
Fax:     (214) 740-8800

Susan L. Karamanian
Southern Dist. No. 10787
State Bar No. 11097600
2000 H Street, NW
Washington, DC 20052
Phone:  (202) 994-1210
Fax:     (202) 994-2831

## Table of Contents

                                                                   **Page**

I.     Introduction ........................................................................................... 1

II.    Bases for the Response ........................................................................ 2

III.   Statement of the Case ........................................................................... 3

      A.  Trial and Direct Appeal ................................................................ 3

      B.  First State Habeas Proceedings .................................................... 4

      C.  First Federal Habeas Proceedings ............................................... 5

      D.  State Habeas Under Tex. Code Crim. Proc. Art. 11.071 § 4A(f) ................. 6

IV.   Summary Judgment Facts ................................................................... 8

      A.  Introduction .................................................................................. 8

      B.  Facts from the Petition ................................................................. 9

      C.  Response to Respondent's "Facts" as Set Forth in the Motion ...................... 9

            1.  Red Wilson had been seen with a gun ................................. 9
            2.  Other persons had been seen with a gun .............................. 10
            2a. Petitioner fled because Sid Wilson posed an "armed threat" ...... 11
            3.  Sgt. Martinez gave false testimony about the tire tracks ............. 12
            4.  Detective Boyd established additional tire tracks at the scene ...... 15
            5.  Sgt. Martinez presented false testimony to Petitioner's jury about
                Exhibit 40 ...................................................................... 17
            6.  Petitioner's jury was misled about the photographs ................ 20
            7.  The evidence established another motorist was involved ........... 20
            8.  Sgt. Martinez presented false testimony about the estimated time of death ........ 21
            9.  Respondent does not address Petitioner's evidence as to the "estimated"
                time of death .................................................................. 23
          10. Petitioner's jury was not told that Sgt. Martinez had testified previously
                that 5:00 a.m. was the estimated time of death ...................... 23
          11. The State capitalized on Sgt. Martinez's inconsistent testimony ........ 24
          12. Sgt. Martinez testified in Brenda's trial that the victims could not have
                been killed ten hours before they were found (due to rigormortis),
                but in Petitioner's trial he testified they were killed twelve hours
                before they were found.  This inconsistency was not disclosed to
                Petitioner's jury ............................................................. 25

i

13. Petitioner was in Victoria, Texas at 6:00 a.m. on or about September 13, 1991................................................................................26
14. Red gave false testimony ....................................................................27
   a. Tire tracks at the scene............................................................28
   b. Red's whereabouts....................................................................28
   c. The time of the murders ..........................................................29
   d. Theft of a wallet.......................................................................29
   e. Letters written by Red Wilson ................................................29
   f. The shooting ............................................................................30
   g. The gun ...................................................................................30
   h. Visit to campsite .....................................................................30
15. Sgt. Martinez gave false testimony about the bullet ...........................30
16. Critical inconsistencies marred the testimony in Brenda's trial and Petitioner's trial. The State failed to note any of the inconsistencies, correct the testimony; and/or proffer any explanation for it..........................31
17. The State elicited false testimony about the Immunity Agreement....................32
18. Petitioner's guilt hinged on Red Wilson, who was not credible.........................32
19. Trial witnesses testified inconsistently ...............................................34
20. The State told Petitioner's jury that Petitioner had been charged and/or convicted of child molestation...................................................................39
21. The State falsely claimed that Petitioner had burglarized an elderly lady at knifepoint ..........................................................................................40
22. The Grand Jury indicted Red Wilson for capital murder but Red Wilson was given complete immunity without any explanation...............................41
23. Petitioner was denied adequate defense resources.............................42
24. Limas rendered ineffective assistance of counsel in Petitioner's trial (guilt-innocence phase and voir dire) ............................................47
25. Limas rendered ineffective assistance of counsel in the sentencing phase .....................................................................................................77
   a. Limas knew Petitioner had psychiatric problems but failed to get Petitioner's medical records..............................................78
   b. Trial counsel failed to perform other essential tasks .................79
   c. Effective representation would have disclosed substantial Mitigating Facts about Petitioner...........................................82
   d. Trial counsel engaged in other errors in the sentencing phase ................82
26. Ineffective Assistance of Counsel on Direct Appeal ...........................82
27. Cumulative Error Claims .....................................................................83
V.   There are Questions of Material Fact and Respondent is Not Entitled to Judgment as a Matter of Law .....................................................................................87

Prayer for Relief.............................................................................................87

960000:10028 : DALLAS : 1050885.1

## I.     Introduction

Petitioner's conviction and death sentence violate the United States Constitution. Petitioner's well-documented, substantial Petition for Writ of Habeas Corpus (Petition) sets forth claims of prosecutorial misconduct, deprivation of essential defense resources, and ineffective assistance of counsel, in addition to other claims. Each claim justifies the issuance of a writ of habeas corpus.

Respondent urges summary dismissal without affording Petitioner discovery or an evidentiary hearing. As a matter of law, any summary review at this time would be premature. The Petition sets forth specific allegations to show reason to believe that the Petitioner may be entitled to relief if the facts are fully developed. Petitioner is entitled to discovery and an evidentiary hearing on certain of the claims before this Court considers the Motion.[1]

No court has analyzed the Petition's claims as required by law. Respondent never answered Petitioner's habeas corpus application filed in the Texas courts. The Texas trial court never determined the need for an evidentiary hearing. Petitioner was not allowed to submit proposed findings of fact and conclusions of law before Texas dismissed his case. Instead of answering the application as required by law, Respondent crafted a dismissal order (Order). Two days after the Order was filed, Judge Euresti of the Texas court signed the proposed order as submitted.[2] That single act, along with the Texas Court of Criminal Appeals's short order denying relief, was the sum and substance of Texas's review of Petitioner's habeas application.

Respondent's Motion is silent about this travesty of justice. Instead, Respondent uses the Order as a sword to bar any court from properly considering Petitioner's claims. According to

---

[1] Petitioner is submitting the Affidavit of Counsel under Federal Rule of Civil Procedure 56(f), requesting a continuance on a ruling of Respondent's Motion for Summary Judgment until he has had the chance to take discovery. In addition, Petitioner is filing a Motion for Discovery. This Response and Petitioner's Brief in Opposition to the Motion for Summary Judgment are filed subject to and without waiving Petitioner's Rule 56(f) Motion and request for discovery. Petitioner also respectfully reserves the right to request an evidentiary hearing.

[2] "Remarkably" because the Order indicates that the Texas state court judge "reviewed" many (but not all) of the relevant pleadings and trial transcripts before signing the Order. *See* App. VIII, Exh. 68 (Order) at 1 (all citations to the appendices and Petitioner's trial record are as in the Petition). Petitioner respectfully request this Court to take judicial notice that Judge Euresti, who signed the Order, did not preside over Petitioner's 1992 capital murder trial and that Petitioner's trial record alone consists of twenty-one (21) volumes and Petitioner's habeas application exceeds 200 pages with eight (8) volumes of appendices.

Respondent, Petitioner should be executed without a federal court reviewing the merits of Petitioner's habeas claims solely because the Order contains certain language, even though the process by which the Order was entered did not even *purport* to comply with Texas Code of Criminal Procedure Art. 11.071 (Vernon Supp. 2002) and violated the federal constitutional requirement of Due Process of Law.

Respondent is not entitled to summary relief. The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) does not bar this Court from adjudicating the factual issues. The Texas court did not follow Texas law in "adjudicating" any of Petitioner's claims, let alone did it make findings on all of the Petition's many, detailed factual issues. Alternatively, any resolution of issues by the Texas court was based on an unreasonable application of federal law or resulted in a decision based on an unreasonable factual determination. The Order is vaguely worded and, at times, unintelligible, making it difficult, if not impossible, to determine what it is doing. What is certain, however, is that the Order did not make findings on all of the Petition's numerous factual issues, the bases of which Petitioner fully developed in his application filed in the Texas courts. This Court is not obligated to accept the correctness of any finding in the Order, or at least clear and convincing evidence establishes that any determination is incorrect. Further, none of the pre-AEDPA defenses, *e.g.*, procedural bar, retroactivity, or no effect on the jury, applies.

Once this Court overcomes these procedural matters, it will become clear as set forth in this Response and the accompanying Petitioner's Brief in Opposition to Respondent's Motion for Summary Judgment (Brief) that Respondent has failed to meet her summary judgment burden. The Motion misstates the "facts". It also ignores nearly all of the relevant facts. Application of the correct legal principles to the facts establishes, at a minimum, that genuine issues of material fact exist and Respondent is not entitled to judgment as a matter of law.

This case cries out for at least one court to consider its merits. That can only be done by the denial of the Motion and the prompt ordering of discovery and an evidentiary hearing.

## II.    Bases for the Response

The Motion is not a "no evidence" motion under Federal Rule of Civil Procedure 56.

2

Instead, it uses the Statement of Facts from Petitioner's trial, the Statement of Facts from Brenda Colella's trial, and a single affidavit to establish the "summary judgment facts." The Response cites to the following pleadings or exhibits, which are adopted and incorporated herein for all purposes: (1) Petitioner's Petition for Writ of Habeas Corpus (verified) filed in this Court; (2) Appendices Volumes I-VIII filed with the Petition; and (3) Statement of Facts and Trial Record from Petitioner's trial in the 357th Judicial District Court of Cameron County, Texas. In addition to this Response, Petitioner is filing a Brief which sets out the legal grounds in light of the facts. Petitioner's Response and Brief establish that there are numerous genuine issues of material fact and that Respondent's Motion should be denied.

## III.    Statement of the Case

Respondent's "statement of the case" omits relevant proceedings and omits critical facts in its characterization of the disposition of the proceedings. The following sets forth in detail and accurately the proceedings. Because the procedural history of Petitioner's case supports denial of summary judgment, the facts set forth below are established in the record before this Court and are, therefore, proper summary judgment facts.

### A.    Trial and Direct Appeal

Petitioner, his wife Brenda Bowling Colella ("Brenda") and Anthony Randall "Red" Wilson were indicted for the capital murder of Michael Lavesphere and David Ray Taylor. *See* Appendix I, Exhibit 2 (Indictment). The 357th District Court of Cameron County, Texas (Convicting Court) appointed Abel C. Limas of Brownsville the sole counsel to represent Petitioner. *See* App. I, Exh. 3 (Order Appointing Attorney). On May 26, 1992, "Red" Wilson entered into an immunity agreement with the State. *See* App. I, Exh. 5 (Agreement for Immunity from Prosecution for Testimony, hereinafter "Immunity Agreement"). Based on the Immunity Agreement, the capital murder charge against Wilson was dismissed.

In late May and early June of 1992, Brenda was tried in Cameron County and convicted of capital murder. (BBC) Vol. IX: 989. Her conviction was later reversed on the grounds that a rational trier of fact could not have found essential elements of the crime (promoting or assisting

3

the commitment of an offense by Petitioner) beyond a reasonable doubt. Brenda was set free. *See Colella v. State*, 860 S.W.2d 618 (Tex. App. – Corpus Christi 1993).

On September 3, 1992, a jury in the Convicting Court found Petitioner guilty of capital murder. S.F. Vol. XIX: 1560-62; *see also* App. I, Exh. 7 (Verdict on Guilt Including Charge). On September 4, 1992, the jury answered "yes" to Special Issue No. 1 and "no" to Special Issue No. 2 submitted under Texas Code of Criminal Procedure Art. 37.071 § 2(b)(1) & (e). *Id.*; *see also* App. I, Exh. 8 (Verdict on Punishment Including Charge). The jury's answers resulted in a mandatory death sentence. By judgment entered September 11, 1992, Judge Valdez of the Convicting Court, who presided at Petitioner's trial, sentenced Petitioner to death.

On October 11, 1995, the Texas Court of Criminal Appeals ("CCA") affirmed the judgment of conviction and sentence of death over two dissenting opinions. *Colella v. State*, 915 S.W.2d 834, 845 (Tex. Crim. App. 1995). The dissenting opinion of Judge Baird, joined by Judge Overstreet, analyzed the evidence and urged that the Convicting Court's judgment be reversed and that acquittal be ordered. *Id.* at 859. According to Judge Baird, "Red" Wilson, not Petitioner, was responsible for the murders, and Petitioner is innocent. *Id.* The CCA denied rehearing. Petitioner's counsel, Mr. Limas, filed no petition for a writ of certiorari to the United States Supreme Court.

### B.    First State Habeas Proceedings

On November 26, 1996, the CCA appointed another Brownsville lawyer to represent Petitioner in state post-conviction proceedings. Petitioner's state habeas corpus application was due May 21, 1996. *See* TEX. CODE CRIM. PROC. art. 11.071 § 4(a). State habeas counsel obtained an extension to September 22, 1997, based on the State's agreement and the Convicting Court's order. *See* App. I, Exh. 10 (Motion for Extension of Time); App. II, Exh. 11 (Agreed Order Extending Time). State habeas counsel filed the Application for a Writ of Habeas Corpus (the "Untimely Application") on September 25, three days past the September 22 extended date. *See* App. II, Exh. 12 (Untimely Application). On April 8, 1998, the Convicting Court conducted a brief evidentiary hearing on one claim in the Untimely Application. *See* App. I, Exh. 9

4

(Transcript of Evidentiary Hearing).   On July 15, 1998, the CCA dismissed the Untimely Application as an abuse of the writ.  *See* Ex. 13 (Order, *Ex Parte Colella*, No. 37,418-01), at 1. The CCA majority held that the Untimely Application was "untimely" and that its claims did not satisfy art. 11.071 § 5(a).  *Id.*[3]  Petitioner filed a petition for a writ of certiorari to the U.S. Supreme Court, which was denied.

### C.    First Federal Habeas Proceedings

Petitioner filed a Preliminary Petition for a Writ of Habeas Corpus in this Court on September 9, 1998, and an Amended Petition on March 23, 1999.  On September 1, 1999, TEX. CODE CRIM. PROC. Art. 11.071, § 4A(f), took effect, which permits habeas applicants whose appointed counsel before September 1, 1999, "filed an untimely application or failed to file an application before [the relevant due date]," to appointment of new counsel and an opportunity to file an additional habeas application.  Petitioner's initial state habeas application was filed late, and he was thus entitled to the benefit of § 4A(f).

Both Petitioner and Respondent acknowledged that Petitioner should have been allowed to return to the Texas courts to exhaust his remedies, but they differed as to how he should proceed.  Magistrate Judge Black urged the parties to agree on a procedure to allow Petitioner to exhaust his state remedies without jeopardizing his right to return to federal court.  Based on the parties' discussion, on February 29, 2000, Judge Black filed a Report and Recommendation recommending that Petitioner's pending federal petition be dismissed without prejudice to allow him to return to state court and exhaust his remedies under § 4A(f).  *See* App. VI, Exh. 55 (Report and Recommendation).  Petitioner was entitled to the benefit of § 4A(f).  *Id.* at ¶ 8. Judge Black also held that if Petitioner files a federal habeas petition after exhausting his state remedies, "that petition will not be deemed 'second or successive' under the AEDPA" and it

---

[3] This provision bars consideration of an untimely application unless it "contains sufficient specific facts establishing that: (1) the current claims and issues have not been and could not have been presented previously...;[or] (2) [that] by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt; or (3) by clear and convincing evidence, but for a violation of the United States Constitution no rational juror [could have sentenced the defendant to death]."  Art. 11.071 § 5 (a).

would be "considered as an initial, timely federal habeas petition." *Id.* at ¶ 17. U.S. District Judge Hilda G. Tagle adopted Judge Black's Report and Recommendation. *See* App. VI, Exh. 56 (Court Order). Respondent did not appeal.

### D.    State Habeas Under TEX. CODE CRIM. PROC. art. 11.071 § 4A(f)

Consistent with the Report and Recommendation, Petitioner returned to the Texas courts. The CCA ordered Petitioner to file his Original Application in the Convicting Court on or before August 18, 2000 (*see* App. VI, Exh. 57 (CCA Order)), and Petitioner complied. On October 16, 2000, the CCA granted Petitioner leave to file an amended application by January 15, 2001, and Petitioner again complied.

Under Code of Criminal Procedure Art. 11.071 § 7(a), the State's answer to Petitioner's First Amended Application was due May 16, 2001. No answer was filed. On May 17th, the State's Attorney, Cameron County Assistant District Attorney John Olson, informed the trial court by letter that he intended to submit a "proposed order" but had not done so because his grandmother passed away on May 16, 2001, and he had been preoccupied with her illness in the days preceding her death. Olson also requested until May 21, 2001 to submit a "proposed order." *Id.*

On May 21, 2001, the State submitted two proposed orders to the Honorable Benjamin Euresti, Jr., Judge of the 107th District Court, Cameron County, Texas, presiding by assignment.

The lengthier of the State's proposed order contained rulings denying relief on the basis of so-called procedural defaults and other defenses and affirmative defenses that the State had never pleaded in any answer as required by Section 7(a). Counsel for Petitioner received the State's proposed orders May 22, 2001. On May 23, 2001, without notice to Petitioner or his counsel, Judge Euresti signed the lengthier proposed order (the Order) without a single change. *See* App. VIII, Exh. 68 (Order, signed May 23, 2001, filed May 24, 2001). The first paragraph of the Order states as follows:

> Today, after having reviewed Applicant's amended Application for a Writ of Habeas Corpus (the "**Application**"); its Appendices; his trial file and

6

trial record; his direct appeal. **Colella v. State**, 915 S.W.2d 834 (Tex. Crim. App. 1995); his first Application (untimely filed) and the record of an evidentiary hearing thereon. **Ex Parte Colella**, No. 92-CR-173-E; and the State's proposed order, this Court finds and concludes that the instant Application cannot be favored on this grounds: ...

*Id.* at 1.

On May 25, 2001, not knowing that the State's proposed order had been signed, Petitioner's counsel placed in the mail, addressed to the District Clerk, Applicant's Objection to State's Failure to File an Answer and Motion to Preclude Defenses (Objection). *See* App. VIII, Exh. 69 (Objection). The Objection was based on the State's failure to file an answer as required by section 7(a) of article 11.071. Petitioner objected to the Court's entry of *any* order sustaining any un-pleaded procedural defense, procedural default, or other supposed defenses or affirmative defenses to the application. Petitioner further objected to the State's failure to comply with sections 7, 8 and 9 of Article 11.071.

Upon learning that Judge Euresti had signed the State's Order, Petitioner filed a pleading objecting to the Order, asking the district court to reconsider and vacate the order and renewing his previous request for discovery and an evidentiary hearing.[4] Thereafter, Petitioner's counsel learned that the transcript of the article 11.071 proceedings had been forwarded to the CCA and was informed, through the District Clerk's office, that Judge Euresti would not reconsider the Order. Petitioner submitted a proposed order denying the objections, motion to reconsider and vacate, and renewed motions for evidentiary hearing and discovery which also directs the court clerk's office to prepare a supplemental transcript of the proceedings and forward it to the CCA. Also, Petitioner filed in the CCA his Applicant's Objections to District Court's Order and Motion to Vacate and Remand. *See* App. VIII, Exh. 71.

On September 19, 2001, the CCA issued a brief order (without opinion) denying all relief

---

[4] The pleading is titled: Applicant's Objections to the Trial Court's Order of May 23, 2001 and all Procedures Contrary to Article 11.071; Motion to Reconsider and Vacate Entry of Order of May 23, 2001, Denying Applicant's First Amended Application for Writ of Habeas Corpus; and Renewed Motion for Evidentiary Hearing and Discovery. *See* App. VIII, Exh. 70.

7

to Petitioner. *See* App. VIII, Exh. 72 (Sept. 19, 2001 Order). The CCA stated that Petitioner had not been afforded a hearing by the Texas courts. *Id.* The CCA's Sept. 19, 2001 Order makes no reference to Petitioner's application as being a "second" or "successor" application. *Id.*

## IV.   Summary Judgment Facts

### A.   Introduction

The summary judgment facts set forth below are based on evidence adduced at Petitioner's trial and Brenda's trial. Subpart B restates the Petition's facts to make sure they are included in the summary judgment record. Subpart C responds to the specific statements in the Respondent's Motion and the Order. Subpart C establishes that Respondent's rendition of the "facts" contains multiple inconsistencies, which alone precludes entry of summary judgment. Subpart C also shows that Respondent has omitted many material facts, which again precludes entry of summary judgment. Subpart C is lengthy because Respondent's Motion fails to address nearly all of the facts set forth in the Petition.

Judge Euresti did not preside over Petitioner's trial or Brenda's trial. In the Order (drafted and submitted by the State), Judge Euresti stated that he "will not acknowledge Brenda's record references/Exhibits." App. VIII, Exh. 68 (Order), at ¶6. Thus, Judge Euresti did not consider any aspect of Brenda's trial. In the Motion in this federal Court, nevertheless, Respondent cites repeatedly to Brenda's trial record as establishing relevant summary judgment facts. *See* Motion at 2 (indicating that a copy of the record of Brenda's trial would be forwarded to this Court); 8-9 (setting forth the "Facts Established in Brenda Colella's Trial").

Respondent can not have it both ways. Respondent's Motion should be denied because it relies on facts that the State habeas court are irrelevant and refused to consider (although Petitioner certainly agrees with Respondent's position here that the State habeas court was wrong and that the Statement of Facts from Brenda's trial is highly relevant to this proceeding). Or, this conflict between the State's positions about Brenda's trial here and in the state habeas proceedings establishes that the State habeas court did not adjudicate any of the facts set forth in the Petition. In particular, a critical claim in the Petition concerns prosecutorial misconduct,

8

which stems from the conflict between the facts the State used in Brenda's case *versus* those it sponsored in Petitioner's case. Petition at ¶¶ 71-150; 456-57. As confirmed in the Order, the State habeas court did not even consider the transcript of Brenda's trial—the factual basis of Petitioner's prosecutorial misconduct/cumulative error claim. For this reason alone, this federal Court should make, at a minimum, independent findings as to all claims that cite or relate to Brenda's trial.

**B.     Facts from the Petition**

Petitioner adopts and incorporates herein the factual statement from the Petition at ¶¶25-70.

**C.     Response to Respondent's "Facts" as Set Forth in the Motion**

Many of the facts set forth in the Motion are incorrect or are sharply disputed. Also, the Motion contains factual admissions that undermine summary judgment. Finally, the Motion fails to address most of the facts presented by the Petition. This section of this Response addresses factual problems that plague Respondent's Motion. Given the Motion's factual inaccuracies and its failure even to address most of the detailed facts that the Petition went to great lengths to document, it should be apparent to the Court that the Motion should be denied based on the facts alone. In addition, this section of the Response establishes that the Order failed to make specific findings as to many of the facts raised in the Petition. Most of the Petition's facts are undisputed and are established by clear and convincing evidence.

**1.     Red Wilson had been seen with a gun.**

Respondent asserts that "Red" Wilson had never been seen with a gun. *See* Motion at 3, 22. This claim is false. Respondent quotes portions of the CCA's opinion on Petitioner's direct appeal. *See, e.g., id.* at 5-8. In the quoted portion, the CCA stated as follows:

> Meanwhile, after driving around and stopping at a convenience store, [Colella] and Red decided to stop and bathe at some public showers along the beach. Afterwards, one or both of them stole a blue bag and a brown leather case from a boat at a nearby dock. The case contained a revolver and ammunition. *Red and [Colella] then decided to go*

> target shooting father down the beach. After shooting for awhile, they
> got back into Red's truck and began driving back up the road.

*Id.* at 6 (quoting *Colella*, 915 S.W.2d at 837) (emphasis added).

"Red" Wilson even *admitted* to firing the weapon earlier in the day. SF XIV at 534–35.
Later the same day, Red again possessed the gun. After the chase with Sid Wilson, Red
"demanded the gun back" from Petitioner because he said Petitioner "didn't have the guts" to use
it. S.F. XVIII at 1439; *see also Colella*, 915 S.W.2d at 855 (Baird, J., dissenting (Petitioner gave
the revolver to Red)). Based on the CCA opinion and "Red" Wilson's trial testimony, clear and
convincing evidence rebuts the Order's statement that "no one, either before or after the victims
were found, saw Red with a pistol." *See* Order at ¶ 13.

Red's link to the gun is highly material. It clearly and convincingly ties Red to the
murder weapon, which runs afoul of his innocence. According to the CCA, mere possession of a
gun was a factor corroborating Petitioner's guilt. *See Colella*, 908 S.W.2d at 437. Also, it
undermines the validity of Red's Immunity Agreement, in which he was given immunity if he
did not lie or voluntarily participate in the killings. App. I, Exh. 5 (Immunity Agreement).
Finally, it establishes that the Order's statement in paragraph 13, that no one had seen Red with a
pistol, is wrong and unreasonable given the evidence before the State habeas court.

### 2.    Other persons had also been seen with a gun.

Respondent also asserts that "Colella was the only person present who had a firearm."
*See* Motion at 4. This statement is also false. As noted above, "Red" Wilson fired the revolver
and was handed the revolver after Petitioner had finished his chase with Sid Wilson.

Also, while hiding among the dunes, "Red" Wilson heard another gun being fired and
testified that he believed Sid Wilson, the husband of Sherie Wilson, had a rifle and was firing it.

(BBC) S.F. Vol. VII: 645 (testimony of "Red" Wilson).  Red later learned that Sid Wilson had been firing his rifle.  *Id.*; *see also* S.F. Vol. XV: 699-701 ("Red" Wilson testified how he determined that Sid had been firing shots).  Sid Wilson used his rifle to poke around Petitioner's tent to try to locate Petitioner.  (BBC) S.F. Vol. VII: 653; *see also* S.F. Vol. XVIII: 1366-68 (Petitioner testified that "Red" Wilson said that Sid Wilson was coming with his rifle).

Sid Wilson's possession and use of a rifle is also material.  Clear and convincing evidence establishes that Petitioner did not intend to search for the three men and kill them; instead, Petitioner was fleeing Sid Wilson who was brandishing and firing a gun. This fact raises serious doubt as to Petitioner's guilt.  When coupled with the State's admission that "there was no evidence to corroborate Red's testimony that Paul asked Appellant [Brenda] whether 'they' were the ones who 'did it,' or that she answers 'Yes,' (App. II., Exh. 18 (State's Appellate Brief) at 20).

**2a.    Petitioner fled because Sid Wilson posed an "armed threat."**

Sid Wilson posed an "armed threat," which was why Petitioner left Red's camp.  The State conceded this fact.  *See* App. II, Exh. 18 (State's Appellate Brief) at 20 ("In fact, there was evidence that the trio's decision to leave Red's camp had nothing to do with a search for the men, and everything to do with a late-night search for a new camp to avoid Sid's armed threat."). Again, the State's claim that only Petitioner had a gun is belied by the State's own words.  The State's claim that Petitioner had a motive to flee South Padre Island allegedly because of the murders is also belied by the State's own words.  Petitioner fled because of Sid Wilson's threats, and the Motion does not refute this fact.  Based on the State's admission and the trial testimony, clear and convincing evidence establishes that Petitioner did not intend to search for the three men and kill them.  This fact is important for reasons stated in the preceding subparagraph 2.

11

3.    **Sgt. Martinez gave false testimony about the tire tracks.**

Respondent admits, as she must, the critical fact that in Brenda's trial, Detective Sgt. Martinez testified that State's Exhibit 40 and other photographs showed tire tracks from Red's Bronco leading up to the white pickup truck in the bay where the victims were found.  *See* Motion at 20; (BCC) S.F. Vol. IV: 96, 98-101 (establishing that Exh. 40 and Exh. 33 are photographs of Red's tire tracks at the dump scene).  Respondent also admits, as she must, that Martinez testified in Petitioner's trial that the *same* tire tracks in Exhibit 40 were *not* from Red's Bronco.  *Id. See* S.F. Vol. XII: 149-50.  The two statements are diametrically opposite and cannot be reconciled.  Notably, the Order is absolutely silent as to this material conflict in Martinez's testimony, which is established by clear and convincing evidence.

Respondent tries to downplay the conflict by claiming Martinez equivocated in Brenda's trial.  Motion at 20.  But in Brenda's trial, Martinez testified:

Q.    Were there other tire tracks other than the tire tracks from the pickup that you saw submerged there?

A.    Yes.

Q.    Were you able to determine whose tire tracks those were?

A.    *Yes.*

Q.    *Could you tell us who you were able to determine they were from?*

A.    *A Bronco that belonged to another co-defendant.*

Q.    *And is that co-defendant Anthony Wilson?*

A.    *Yes.*

Q.    *Also known as Red?*

A.    *Yes.*

12

(BBC) S.F. Vol. IV: 96 (emphasis added).

According to Respondent, the alleged "equivocation" occurred when Martinez was asked whether he was able to "determine whether anybody pushed that pickup into the water" and he first said "[w]e were not able to determine." *Id.* at 96-97. Yet in the very next sentence, Martinez testified: "We were able to *establish* a theory that indicates that the truck was pushed into the water." *Id.* at 97 (emphasis added). Immediately after this statement, Martinez testified:

> Q.     Could these tire tracks be caused by something else other than
>        another truck pushing the pickup truck or another vehicle into the
>        water?
>
> A.     No.
>
> Q.     Could that same truck, that pickup, get stuck in the water? I'm
>        sorry, in the sand and because of it getting stuck create more tire
>        tracks?
>
> A.     The truck, itself?
>
> Q.     No, ma'am.

*Id.* at 97.

Thus, in Martinez's own words, (1) a second set of tire tracks was present at the dump scene; and (2) the second set of tire tracks could not have been caused by the white pick-up. Clearly, another vehicle had been at the scene. Shortly after this testimony, Martinez reaffirmed the other vehicle was Red's Bronco:

> Q.     State's Exhibit No. 33, tell me what this is.
>
> A.     No. 33 is the tire impression of the tire print that I took that depicts
>        where the second vehicle stopped before reaching the water.
>
> Q.     Do you know whose vehicle that is?
>
> A.     No. At the time I took the picture? No.
>
> Q.     Yes.
>
> A.     No.

13

> Q.    Later were you able to determine whose tire prints that was?
>
> A.    Yes.
>
> Q.    And who was that?
>
> A.    The Bronco, Red.
>
> Q.    Red's Bronco, is that correct?
>
> A.    That's correct.
>
> Q.    Okay.   Why don't you put on the back of it, 'Red's Bronco,' please?
>
> A.    (Witness complies)

*Id.* at 98-99.

Shortly after this exchange, Martinez for a third time under oath and on direct examination reaffirmed the presence of Red's Bronco at the dump scene:

> Q.    How about State's Exhibit 40?
>
> A.    That is a tire impression of the wet sand that depicts the tire track of the suspected vehicle that moved or pushed the white truck into the water.
>
> Q.    *Is that Red's tire track, his Bronco?*
>
> A..   *Yes.*

*Id.* at 101 (emphasis added).

After lunch, Martinez stated that he could not substantiate the theory that "somebody pushed the pickup truck into the water." *Id.* at 103. But Martinez did not withdraw his testimony that the tire tracks at the dump scene, leading up to the white pick-up, were from Red's Bronco. This was undisputed in Brenda's trial.  Further, in the direct appeal of Brenda's case, the State admitted that "Deputy Martinez concluded that Red's truck had pushed the victims' truck into the bay because tire tracks near their truck matched Red's." App. II, Exh. 18 (State's Appellate Brief) at 21 n.3.    Nowhere in the Motion does Respondent repudiate, let alone address, this

critical judicial admission.

Respondent finally gives up trying to reconcile the conflicts. Instead, she claims "it is necessary to determine which version of his [Sgt. Martinez's] testimony was 'false.'" Motion at 21. Respondent now asserts that Martinez was truthful in Petitioner's trial (necessarily implying that he testified falsely in Brenda's trial). Specifically, the Motion claims that Martinez testified that Exhibits 33 and 34 do not match Exhibit 40. *Id.* at 21-22. Actually, if this is the case then the false testimony is even worse. Martinez testified in Brenda's trial that Exhibit 33 is from Red's truck at the crime scene. (BBC) S.F. Vol. IV: 98-99 ("No. 33 is the tire impression of the tire print that I took that depicts where the second vehicle stopped before reaching the water"; after testifying that he could tell whose tire tracks they were, Sgt. Martinez said "The Bronco, Red" and then put on the back of the photo "Red's bronco.").

These facts are critically important because they show that the State's prosecutor elicited false testimony from Martinez about the tire tracks and critical crime scene evidence tying "Red" Wilson to the disposing of the victims, and did so knowingly.

**4.    Detective Boyd established additional tire tracks at the scene.**

Detective Boyd was the first officer at the scene. Her Supplement Report, not admitted into evidence in Petitioner's trial, is attached as Exhibit 16 to the Petition. Boyd testified in Brenda's trial, based on her observations and training, that "it appeared to us that maybe another vehicle had pushed or been offset from the pickup vehicle that was in the water." (BBC) S.F. Vol. IV: 65. In testifying about the scene to Petitioner's jury, Boyd testified that "[t]his shows the tire tracks that were made in the area where the truck went into the water." S.F. Vol. XI: 48. Boyd then testified:

Q.    Were those tire tracks made by that pickup?

A.    One set was determined to be from that pickup, and the other set appeared to be another vehicle that was there at that time.

*Id.* at 48-49.

15

Boyd never identified whose truck was responsible for the tire tracks. *Id.* at 32-85. In the Supplement Report, Boyd stated another vehicle "had been used to push the truck into the water as there were off-setting tire tracks and there was [sic] markings in the sand indicating the braking of the second vehicle or push vehicle where the brakes had been applied just before the water line pushing the sand to a small mound." *See* App. II, Exh. 16.

Nowhere in the Motion does Respondent even address Boyd's testimony or Boyd's Supplement Report (both clear and convincing) that another vehicle was involved, which is consistent with the testimony Martinez gave in Brenda's trial. Boyd's testimony defies Respondent's statement that no other vehicle was involved. *See* Motion at 22. At a minimum, it raises a question of material fact as to whether another vehicle and person were at the dump scene, which is relevant to the issue of whether the State put on false testimony by having Sgt. Martinez testify that Red's Bronco was not at the dump scene.

The Order does not address the factual conflicts between (i) the Boyd Supplement Report and Boyd's testimony (establishing another vehicle was used to push at the scene) and (ii) Martinez's testimony in Petitioner's trial (denying that another vehicle was involved). *See* Order. Instead, the Order merely states that "whether there were one or a dozen sets of tire tracks where the victims' truck was found, this Court finds that the issue before the jury was the corroboration of the only eye-witness [Red Wilson] against Applicant." *Id.* at ¶ 12. That statement is totally false. A critical issue in Petitioner's trial, about which the jury was specifically instructed, was whether the accomplice, "Red" Wilson, was truthful. *See* App. I, Exh. 7 (Jury Instruction on Guilt/Innocence) ("You cannot convict the defendant upon [Red Wilson's] testimony unless you first believe that his testimony is true"). The presence of Red Wilson's Bronco tracks at the scene of the crime establishes that Red was not truthful. Also, this evidence raises serious questions about the validity of the Immunity Agreement, which required that Red to testify truthfully and that he not have participated in the killings. *See* App. I, Exh. 5 (Immunity Agreement). Finally, the presence of Red's tire tracks establishes Red's presence at the crime scene and tends to show that he was responsible for the murders.

5.    **Sgt. Martinez presented false testimony to Petitioner's jury about Exhibit 40.**

Assistant District Attorney Migdalia Lopez's direct examination of Detective Martinez allowed Martinez to misrepresent to Petitioner's jury the events giving rise to the description written on State's Exhibit 40. *See* Petition at ¶¶ 97-108. Exhibit 40 was introduced in Brenda's trial through Martinez. In front of Brenda's jury, Sgt. Martinez marked Exhibit 40 as "tire track at crime scene belonging to Red." *Id.* at 46-47 (citing (BBC) S.F. Vol. IV: 101-03)).[5]

In testifying about the same photos in Petitioner's trial, however, Martinez never mentioned that he first marked up the photos in Brenda's case. Instead, he testified:

Q.    It says "Red's Bronco."

A.    Right.

Q.    They are not from Red's Bronco?

A.    No, sir.

Q.    Why did you write that?

A.    That's a theory which we established prior to when we got to –
When we got to the crime scene, we took photographs, and as we
developed a theory, we had theorized the tire impressions that were
found were from Red's Bronco. That's why we took these other
photographs of the campsite tires.

We could never establish the theory because, as you can see on the
photograph, the tire impressions are not of good quality because of
the moisture in the sand; and the tire impressions on the tracks, as
the ones from the campsite, do not make it the same tire.

Q.    So you made a mistake here when you put "Red's Bronco."

A.    No. That's a theory we had when we developed this film.

Q.    All right. Explain to the jury what you mean by "theory," a theory
of what?

A.    When we first got to the scene, we developed a theory that the

_____

[5] Sgt. Martinez did the same identification for Exhibit 33. *See* (BBC) Vol. IV: 98-99.

victims' truck had been pushed into the water by another vehicle. When we interviewed the witnesses there and we established that there was an alleged sexual assault that had been committed and a red Bronco had been involved, we theorized the red Bronco had been used to push the vehicle in the water.

Q.    So after you took this picture, you showed it to Red, right?

A.    No, sir.

Q.    Then how would you know to put "Red's Bronco"?  How would you know that?

A.    That was a theory that we had established.

Q.    When did you take this photograph?

A.    This is at the crime scene.

Q.    When did you take the photograph?

A.    The day we discovered the bodies.

Q.    So you discover the bodies, you take photographs, and after you interview Red, you put "Red's Bronco"?

A.    No, sir.  When we got the film back from the developers, we started to identify the impressions, and one of the theories that we had was that the red Bronco had been used.  So that's why I put down there "Red's Bronco."

Q.    And you found this out the very next day?

A.    I believe it was Monday.  The next day was Saturday, and I was not present on Saturday.

Q.    That's when you found out that Red's Bronco had been used?

A.    On Monday, yes, sir.

Q.    Now, this one, Exhibit 40, says "tire track at crime scene belonging to Red."

A.    That's the same theory I mentioned earlier, the theory that was established.

18

Q.    Did you show these to Red?

A.    No, sir.

Q.    Did you compare these to Red's Bronco?

A.    Yes.

Q.    And Exhibit No. 34 shows "tire track at Red's campsite."

A.    That is correct.

Q.    Did you verify that this is Red's Bronco?

A.    Yes.

Q.    And did Exhibit 34, 33 and 40 match in any way?

A.    No, sir.

S.F. Vol. XII: 149-50.

Martinez testified in Petitioner's trial that when securing the crime scene, his staff took the photographs marked State's Exhibits 33 and 40. S.F. Vol. XII: 149-150. Shortly after the photographs were developed he formulated a theory that the tire tracks in the photos were caused by Red's Bronco. *Id.* Based on this theory, "that's why [he] put down 'Red's Bronco.'" *Id.* It is undisputed that Martinez wrote the phrase "tire track at crime scene belonging to Red" on Exhibit 40 in front of Brenda's jury and not when the photo was developed a day after he had found the bodies. The same is true about Exhibit 33. This fact is clear and convincing. The Motion and Order are silent about Petitioner's claim that Martinez's testimony in Petitioner's trial was false or misleading. By falsely testifying that his marking "Red's Bronco" reflected merely an early theory that could not be proven, Martinez avoided explaining to Petitioner's jury why he testified under oath to Brenda's jury that the photo established Red's Bronco tracks at the crime scene. All of these facts are material because they show that the State knowingly elicited false testimony from Martinez about critical crime scene evidence, knew it was false, and never

19

corrected it.

### 6.    Petitioner's jury was misled about the photographs.

Martinez clearly changed his testimony regarding Exhibit 40 from Brenda's trial to Petitioner's trial. *See* Petition at ¶¶ 97-114. Respondent argues that Petitioner's "jury was fully apprised of these inconsistencies." Motion at 14; *see also id.* at 16 ("his jury was aware of any inconsistencies in the testimony"). This statement is false. Martinez's testimony in Petitioner's trial is contained in Volume 12, pp. 88-274. Nowhere in nearly 200 pages of testimony does Martinez say that he had told Brenda's jury, a few months earlier, that the tire tracks in Exhibit 40 came from Red's Bronco but that was changing that testimony in Petitioner's trial. Nowhere does Martinez tell Petitioner's jury that he wrote the phrase "tire track at crime scene belonging to Red" on Exhibit 40 in front of Brenda's jury after identifying the photo as such in an open court. The Order, as well, makes no findings as to this fact. *See* Order. This fact is material because it shows that the State knowingly used false testimony without correcting it.

### 7.    The evidence established another motorist was involved.

Petitioner observed that if "Red" and his Bronco weren't involved in disposing of the victims, as the State now claims, then someone else must have been involved. *See* Petition at ¶¶ 110-111. The presence of another person is material. It challenges the State's claim that Petitioner acted alone. Also, it raises fundamental doubt whether Petitioner was responsible for the killings.

Respondent claims that Petitioner's reference to another person is "self-serving" and "speculation." *See* Motion at 22. But Detectives Boyd and Martinez, the State's witnesses, testified that another vehicle was at the scene. *See supra* at Section IV(C) ¶¶ 3-4 (pp. 12-17). In Brenda's trial, Martinez tied "Red" Wilson to this vehicle. *See* (BBC) S.F. Vol. IV: 96, 101-03. Claiming that he wasn't at the scene, the State's witness, "Red," then testified in Petitioner's trial

that another man, the so-called "Tiger Van Man," could have been involved:

    Q.    So you think this [set of tire tracks] belongs to the white truck, correct?

    A.    Yes.

    Q.    And this one [the other set of tire tracks] belongs to the van, you are saying?

    A.    Yes.

    Q.    You are positive?

    A.    No, I can't say I am positive, but that's what I believe.

    Q.    But we know that's not your tire track, right?

    A.    Right.

    Q.    And this one is yours?

    A.    Yes.

    ***

    Q.    Mr. Wilson, Red, you told Sgt. Martinez that tire track belonged to that van because you were sure, right?

    A.    No. I was pretty positive, because I know the van was in that area and I knew the guy. He used to camp out right there where he had tooken [sic] that picture from. The guy that owned the van used to camp out in that area ....

S.F. XV at 762-63.

    Thus, Petitioner's statement about another person is based on the State's principal investigative witnesses, Detectives Boyd and Martinez, who testified that another vehicle *was* at the scene, and it is also based on the State's key witness, "Red", who testified that the "Tiger Van Man" was in the vicinity. It is false for Respondent now to claim that Petitioner has fabricated facts showing that another person was at the dump scene. The Order makes no fact findings as to the clear and convincing evidence, as set forth in the Petition, which established the presence of another person at the crime scene.

    **8.    Sgt. Martinez presented false testimony about the estimated time of death.**

    Respondent now argues that the State's investigator and witness, Martinez, was not

qualified to testify about the time of death; thus the variance in his testimony about the estimated time of death between Brenda's trial and Petitioner's trial was, in Respondent's view, a mere "inconsisten[cy]." Motion at 16. Qualifications aside, it is undisputed that in both cases, the State's prosecutor presented Martinez to testify about the time of the victims' deaths. Martinez's testimony on the time of death was relied on by the CCA majority in its opinion affirming Petitioner's conviction. *Colella v. State*, 915 S.W.2d at 838 (*see* Baird, J., dissenting at p. 851: "Because the pathologist did not approximate a time of death, the majority looks to a police offer to supply this important testimony").

As with the tire tracks, Respondent concedes that Martinez gave starkly conflicting testimony about the time of the murders. Motion at 16 ("[t]hat his testimony was inconsistent does not establish perjury"). In Brenda's trial, Martinez testified that the "bodies had been dead for about six to eight hours" when he had found them between 11:30 a.m to noon and that the killing had occurred *at 5:00 a.m. "more or less"*. Petition at ¶ 75; (BBC) S.F. Vol. V: 306-07. Martinez rejected any suggestion in Brenda's trial that the murders occurred "sometime between 12 and 2 o'clock." (BBC) S.F. Vol. V: 247. In Petitioner's trial, it was established that Petitioner was more than 240 miles from the crime scene before 6:00 a.m. S.F. Vol XVII: 1204-10. Thus, in Petitioner's trial, Martinez changed his testimony and said that the victims had been killed before 3:00 a.m. Petition at ¶ 76; S.F. Vol. XII: 205. Indeed, Martinez also testified to Petitioner's jury that that the bodies had been there for about "twelve hours," meaning that the victims had been killed near midnight, a concept he expressly rejected in Brenda's trial. Petition at ¶ 77; S.F. Vol. XII: 271.

Respondent does not refute the conflicts (again, established by clear and convincing evidence), but blames Petitioner. According to Respondent, Petitioner must establish that

22

Martinez's testimony in *Petitioner's* case was false and that his testimony in Brenda's case was truthful before Petitioner is entitled to relief. Motion at 16-17. In other words, according to Respondent, it is perfectly fine for the State to use false testimony in one of two trials and leave it to the defendants to catch which time the State's witness is lying! Here, Martinez's *changed* testimony was in Petitioner's case, and the strong inference is that Petitioner changed his testimony to undercut Petitioner's bus station clerk alibi witness, who did not appear in Brenda's case.[6]

The Order makes no findings of fact as to whether Martinez gave false testimony. The State elicited false testimony from Martinez about the crucial fact of the time of death.

**9.    Respondent does not address Petitioner's evidence as to the "estimated" time of death.**

Respondent attempts to explain Martinez's conflicting testimony claiming his testimony was only "estimates" of the time of the deaths. Motion at 16. As the Petition establishes, the conflicts in Martinez's trial testimony were between two versions of what his official investigation determined was the "estimated" time of death. Petition at ¶¶ 75-77.

**10.   Petitioner's jury was not told that Sgt. Martinez had testified previously that 5:00 a.m. was the estimated time of death.**

Respondent falsely claims that Petitioner's jury was told about Martinez's conflicting testimony in Brenda's trial. Motion at 17. While Petitioner's jury heard that Martinez testified in Brenda's trial that "ten hours" would be a big number because the bodies would have become loose, it did not hear that Martinez had testified earlier that *the estimated time of death was 5:00*

---

[6] Equally disturbing about timing is that the State repeatedly elicited false testimony about the date the victims were found, emphasizing that the victims were found on September 12th instead of September 13th. *See* Petition at ¶¶ 90-96. The Motion does not deny this fact; instead, it claims, without identifying the specifics, that "the record is replete with references to the correct dates." Motion at 20.

*a.m.* That fact is clear and convincing.

Further, Respondent incorrectly cites to page 1240 of volume 17 to support the proposition that "the jury was aware that Martinez and Judge Hunsaker gave conflicting testimony as to whether Martinez and Boyd had estimated that the victims had been dead for six hours." Motion at 17.   In the referenced testimony, Martinez was asked whether he had told Hunsaker that the bodies had been dead about 6 hours (and he said "no") and he was also asked whether he had heard Detective Boyd tell Hunsaker that the bodies had been dead about 6 hours (and again, he said "no"). *See* S.F. XVII: 1240.

**11.    The State capitalized on Sgt. Martinez's inconsistent testimony.**

The State improperly capitalized on Martinez's sinister change in testimony on the estimated time of death. Petition at ¶ 83. Ms. Lopez, the prosecutor who tried both Brenda and Petitioner, argued in closing of the guilt phase of Petitioner's trial: "And [defense counsel is] telling you that this occurred at 5 in the morning. Where does Mr. Limas get that from? Where? What evidence have we heard that it happened at 5 o'clock in the morning? Where did that evidence come from?" S.F. Vol. XIX: 1552. However, Ms. Lopez knew that Martinez *had* testified at Brenda's trial that the victims had died around 5:00 a.m. She also knew that Petitioner's counsel had tried to read this testimony at Petitioner's trial but that the Judge had *sua sponte* cut-off Petitioner's counsel and precluded the testimony. *See* Petition at ¶ 81;   S.F. XVII: 1245.

The Motion is silent about the prosecutor's improper capitalization on Martinez's switch in testimony.  Not a single fact refutes the prosecutor's improper use of Martinez's failure to testify in Petitioner's trial that the estimated time of death was 5:00 a.m., as he had testified in Brenda's case. The undisputed, clear and convincing evidence is that the prosecutor suggested that Petitioner's counsel had fabricated the 5:00 a.m. evidence, yet the prosecutor knew that the evidence was true.  The Order provides no findings on this matter.

24

**12.    Sgt. Martinez testified in Brenda's trial that the victims could not have been killed ten hours before they were found (due to rigormortis) but in Petitioner's trial he testified they were killed twelve hours before they were found. This inconsistency was not disclosed to Petitioner's jury.**

Petitioner has established that the State used false testimony from Martinez about the estimated time of death.  *See* Petition at ¶¶ 75-89; *supra* at Section IV (C)  ¶¶ 8-10 (pp. 22-24). The falsity is based on the irreconcilable conflict between Martinez's testimony in Brenda's case and his testimony in Petitioner's case, a conflict Respondent concedes.

The Petition has raised the issue of rigormortis because Martinez clearly raised it.  In Brenda's trial, Martinez used rigormortis to justify his conclusion that the victims were killed around 5:00 a.m.  When Martinez first observed the bodies, they were stiff, "rigormortis had already set in", which is consistent with someone who had been dead for six hours.  Petition at ¶¶ 75-89 (BBC) S.F. Vol. 5:  Martinez expressly rejected that the killings could have occurred ten (10) hours before 11:30 a.m. to noon (when he first witnessed the bodies) because at ten hours, rigormortis would have dissipated.  Petition at ¶ 75; (BBC) S.F. Vol. V: 247.   In fact, Martinez rejected that the killings occurred "sometime between 12 and 2 o'clock in the morning or 1 o'clock in the morning." *Id.* Respondent does not refute that Martinez testified in Brenda's trial that rigormortis would have dissipated within ten (10) hours.  In Petitioner's trial, however, Martinez allegedly relied on his personal observation of the bodies and rigormortis to reach his opposite conclusion that the bodies had been there for twelve (12) hours.  Petition at ¶ 77; S.F. Vol. XII: 271.  The fact of this testimony is undisputed, clear and convincing.

What Petitioner's Motion then does is try to set up a strawman.  It spends considerable ink trying to establish that Martinez testified falsely in *Brenda's* trial because, allegedly, rigormortis supposedly does not dissipate by the tenth hour.  *See* Motion at 17-18 (citing Dr.

Dahm's trial testimony and books on the subject). Dr. Dahm testified that rigormortis could last from "8 to 12 to 14 hours." S.F. Vol. XVIII: 1479. Dr. Dahm never testified that rigormortis was an improper means of estimating time of death. The books, which were not admitted at trial, say that some bodies do not experience rigormortis (a fact which Dr. Dahm disputes). In any event, the books establish that the Respondent agrees this federal court should consider evidence that was not before the State habeas court or Petitioner's jury.

Respondent's exercise is an attempt to establish that Martinez's testimony on the estimated time of death was not "material." Motion at 18 ("[b]ecause rigor mortis is not an accurate gauge of the time of death, Martinez's testimony simply was not probative on that point, and therefore, not material"). But neither Brenda's nor Petitioner's jury were told that rigormortis is not a reliable way of determining when a person died. To the contrary, in both cases, the prosecutor used Martinez's testimony about rigormortis to establish the material fact of the estimated time of death. As the dissenting CCA opinion noted on Petitioner's direct appeal, the only evidence of an approximate time of death, "this important testimony," came from Sgt. Martinez. *Colella v. State*, 915 S.W.2d at 857 (Baird J., dissenting). The Order makes no findings of fact on Martinez's change in his testimony on the time of death. *See* Order. These facts show that the State used false testimony knowingly on the material issue of the estimated time of death.

### 13. Petitioner was in Victoria, Texas, before 6:00 a.m. on September 13, 1991.

It is undisputed that at 6 a.m. on a Friday near the middle of the month of September, 1991, Amy Pflaum, a ticket agent for a bus line, sold tickets to Brenda and Petitioner to travel from Victoria, Texas to Indianapolis, Indiana. S.F. Vol. XVII: 1204-10. It is also undisputed that Martinez testified in Brenda's trial that the victims were killed on South Padre Island about

5:00 a.m., and that he changed his testimony in Petitioner's trial to state that the killings occurred around midnight. *See supra* at Section IV (C) ¶¶ 8-12 (pp. 22-27). Respondent provides no facts to refute these points. Respondent also provides no facts to refute Ms. Pflaum's testimony that it takes about four and one-half hours to drive from Brownsville to Victoria. S.F. Vol. XVII: 1210. Instead, Respondent merely speculates that Petitioner might have made the trip faster if his mother and Mr. Curtis, who drove Petitioner and Brenda, had been speeding, which was not established at trial or by any summary judgment evidence. No evidence of this was ever introduced in the Texas courts.

Petitioner's Motion attaches the Affidavit of John W. Nielsen-Gammon, a professor of climatology and meteorology, who reported about some unidentified "weather records" for the morning of September 13th. This affidavit was not introduced in the Texas state courts. Furthermore, it establishes that the highways from Brownsville to Victoria on that early morning were likely wet and slick (with enough rain to stir up, but not wash off, the dust) and that there were patches of fog. The Affidavit fails to show that Petitioner could have speeded to Victoria.

Finally, the Order makes no specific findings of fact as to Petitioner's whereabouts before or at 6:00 a.m. on September 13, 1991.

### 14. Red gave false testimony.

Red gave false testimony. The Motion does not refute this. The Petition's evidence is clear and convincing. The State had to be careful that "Red" an accomplice witness, whose testimony the State had purchased, testified truthfully. *See* Tr. Vol. I at 134. Under "Red's" Immunity Agreement, Red was obligated to testify truthfully, and the State was obligated to "police" that Agreement. App. I, Exh. 5 (Immunity Agreement). The following testimony of "Red" Wilson was demonstrably false:

27

**a.    Tire tracks at the scene.**   Red testified that the tire tracks identified in State's Exhibit 40 (the photograph marked by Sgt. Martinez as "tire track at crime scene belonging to Red") were not those of his Bronco:

> Q.    [Mr. Limas]: This is State's Exhibit No. 40.  Sgt. Martinez has written "tire track at crime scene belonging to Red."  Is that your tire track?
>
> A.    [Red Wilson]: No.

S.F. Vol. XV: 758.  Red then testified about a man who drove a "Tiger Van" and attributed some tire tracks to this man's van.  *Id.* at 760-66.  Martinez testified in Brenda's trial that the tire tracks in Exhibit 40 (Exhibit 40 is the same in both cases) were those from "Red" Wilson's Bronco. (BBC) S.F. IV: 101.   Hence, based on Martinez's testimony in Brenda's trial, which the State never withdrew or corrected, "Red's" testimony about his truck being at the crime scene was false.  The Order makes no fact findings on this matter.

Respondent now claims that *no* other person was present at the scene, having labeled Petitioner's testimony on this issue as self-serving and speculative.  Motion at 22.   Red's testimony about the Tiger Van Man at the dump scene is false, or Respondent's statement in her Motion is false.

**b.    Red's whereabouts.**  Red testified that on September 13th he went with Paul's brother, Steve, to the scene "and we noticed there was a white vehicle into the water.  That was pretty well easily seen from the side of the road.  It wasn't really obstructed too much.  There was a little dune in front–From the road, by the water, there was a little, small dune.  And we stopped there for a minute, and then we took off and went back to the campsite."  S.F. Vol. XIV: 614-15.  In cross-examination in Petitioner's trial, however, Red denied going to the scene until months later:

> Q.    [Mr. Limas]: Now, were you ever at this scene [the scene where the truck with the victims was found in the water]?
>
> A.    [Mr. Wilson]: No, I was not.

28

Q.   [Mr. Limas]: You never drove over there or you never went over
     there.

A.   [Mr. Wilson]: Maybe months later I drove by or something.  I go
     up and down the beach a lot.

S.F. Vol. XV: 759.   Thus, in Petitioner's trial, Red Wilson gave two opposite accounts of
whether he ever went to the crime scene.  The Motion does not deny the inconsistency.  The
Order makes no findings of fact on this matter.  The clear and convincing evidence is that "Red"
Wilson gave false testimony, about which the prosecution knew.  Further, Red's denial about
going to the dump scene on the morning of the 13th, given his prior testimony that he was there,
raises a question of material fact as to his responsibility for the killings.

     **c.**     **The time of the murders.**  "Red" told Petitioner's jury that he did not know the
time of the murders.  S.F. Vol. XIV: 692.  But he testified to Brenda's jury that he estimated it
"at around 10:00, 10:30, 9:30, 10:30, 11:30, I guess."  (BBC) S.F. Vol. VII: 710.  When
confronted with this inconsistency, Red said "I am wrong about the time.  I never knew what
time it was."  S.F. Vol. XV: 741.  The Motion does not address this inconsistency, nor does the
Order make any findings as to the inconsistency.

     **d.**     **Theft of a wallet.**  "Red" testified that Petitioner stole a wallet from one of the
victims; and that Petitioner looked at an ID in the wallet and stated that it belonged to Ricky
Taylor, the "hippie" guy who earlier had played Frisbee with "Red" (BBC) S.F. Vol. VII: 706;
S.F. Vol. XIV: 603-04.  Ricky Taylor, however, never mentioned having had his wallet stolen on
the      night      of      the      crime,      and      instead      testified      that      the      stolen
money was missing from his *brother's* billfold and from a loose roll of cash Mr. Lavesphere
(who did not have a billfold) carried in his front pocket.  (BBC) S.F. Vol. VIII: 884; S.F. Vol.
XVI: 1042-44.  No mention of this fact is made in the Order.  "Red's" false testimony about the
money raises yet another question as to Red's involvement in the killings as he falsely attributed
to Petitioner a crime that did not happen.

     **e.**     **Letters written by Red Wilson.**  "Red" admitted that, while in jail, he had

written letters describing where the murder weapon was buried to Pam "Bubbles" Smith, his
then-girlfriend. (BBC) S.F. Vol. VIII: 813-14, 846 (affirming that he told Pam Smith "where the
gun was at"). Martinez contradicted Red by testifying that he visited Pam Smith, inspected the
letters sent to her by "Red," and determined that "Red" never mentioned the murder weapon in
any of them. (BBC) S.F. Vol. V: 235-36 (letters said "[n]othing about the gun"). None of these
facts is addressed in the Order, let alone does the Order make any findings as to them. *See*
Order. The Petition's evidence, based on trial testimony, is clear and convincing that "Red" lied
about what he said in his letters to Bubbles Smith (or Martinez lied about what the letters said).

      **f.**    **The shooting.** Red testified that Petitioner first ran to the *back* of the pickup and
shot one of the men. S.F. Vol. XIV: 649, and then he ran to the *driver's side* and shot into the
truck. *Id.* at 651. Dr. Dahm testified that the victims' injuries established that they were shot
from the *passenger* side of the pickup. S.F. Vol. XVI: 906-07.

      **g.**    **The gun.** Red testified during Brenda's trial he encouraged Petitioner to bury the
gun so that Red could later locate it when he went to the police. (BBC) S.F. Vol. VIII: 821.
Red testified to Petitioner's jury that Paul threw the gun into the Gulf of Mexico. S.F. Vol. XII:
242.

      **h.**    **Visit to campsite.** Martinez testified that "Red" took him to his campsite. S.F.
Vol. XII: 169-71. "Red" denied ever taking Martinez to the campsite. S.F. Vol. XIV: 657-58.

      **15.**    **Sgt. Martinez gave false testimony about the bullet.**

      Sgt. Martinez changed his testimony between Brenda's trial and Petitioner's trial as to
whether he examined the bullet removed from Michael Lavesphere's body to determine the type
of bullet used. Petition at ¶¶ 116-17. In Brenda's trial, Martinez qualified as a firearm's expert
and opined that the bullets used to kill the victims were nine millimeter, based on his review of
the bullet extracted from Lavesphere. *Id.*; (BBC) S.F. Vol. IV: 114-18. In Petitioner's trial,
Martinez denied that he earlier testified that he knew the bullet was a nine millimeter based on

30

his inspection, and he totally denied inspecting the bullet. Petition at ¶ 117; S.F. Vol. XII: 198-99. The Motion is silent about this conflict, which the Petition documented in clear and convincing terms. The Order makes no fact findings about this inconsistency. Again, this fact is material because it shows that the State knowingly elicited false testimony.

Petitioner has offered an explanation for Sgt. Martinez's change in testimony. Petition at ¶¶ 118-19. As established at Petitioner's trial, the weapon that Petitioner and "Red" had stolen earlier in the day was a revolver. *Id.* at ¶ 118 (citing S.F. Vol. XIII: 304, 316). It is rare for a nine millimeter bullet, like that extracted from Lavesphere's body, to be fired from a revolver. *Id.* (citing S.F. Vol. XIII: 426). Thus, Martinez changed his testimony about the bullet to avoid having to explain the unexplainable. Again, the Motion does not address this fact because it ignores Petitioner's fundamental constitutional claim that the State allowed Martinez to testify falsely.

Instead, the Motion focuses on the testimony of a witness, Gordon Batsell, who the State called in Petitioner's trial to establish that some revolvers that fired nine millimeter bullets were in circulation. Also, the Motion cites to the testimony of Al Petrarca, but he was not testifying as a ballistics expert. S.F. XVII: 1129. Petrarca had no knowledge as to the weapon that was used. *Id.* at 1158.

**16.    Critical conflicts marred the testimony in Brenda's trial and Petitioner's trial. The State failed to note any of the inconsistencies, correct the testimony; and/or proffer any explanation for it.**

The Petition documents conflicting testimony that the State's witnesses offered in the two trials. The inconsistencies involve the following:  (1) Martinez's testimony about the tire tracks at the dump scene; (2) the circumstances giving rise to the description placed on Exhibit 40; (3) the estimated time of death; and (4) Martinez's testimony about whether he had examined the

bullet from a victim. The Motion does not establish that these conflicts of material issues of fact were made known to Petitioner's jury. Petitioner's jury was not made aware of the conflicting testimony as the clear and convincing evidence establishes. Also, as to each conflict, the prosecutor made no effort to correct the testimony or proffer an explanation for the conflicts, which the Motion does not rebut. *See* Statement of Facts. The Order makes no findings on these matters.

**17.    The State elicited false testimony about the Immunity Agreement.**

Under the Immunity Agreement, "Red" Wilson was bound to tell the truth before both Petitioner's and Brenda's jury. *See* App. I, Exh. 5 (Immunity Agreement). The Motion does not dispute the clear and convincing evidence that "Red" gave false testimony in Petitioner's trial (or in Brenda's trial). *See supra* at Section IV (C) ¶ 14 (pp. 27-31).

Further, the Petition established that the State allowed Red to misrepresent to Petitioner's jury that under the Immunity Agreement, Red was immune from prosecution so long as the State did not discover that Red lied about his not being the "shooter". Petition at ¶¶ 136-37; S.F. Vol. XV: 832-33. The Motion and Order are silent about Red's false testimony. These facts are all important because they show that the State knowingly elicited false testimony from Red.

**18.    Petitioner's guilt hinged on Red Wilson, who was not credible.**

No physical evidence—no ballistics evidence, fingerprints, DNA, or hair or fiber comparison—linked Petitioner to the crime. Sgt. Martinez, the lead investigating officer, failed to collect vital information. Although Martinez claimed to have participated in "hundreds" of murder investigations, S.F. Vol. XII: 164, he failed to collect a pair of boots at the crime scene which had obvious potential as evidence, failed to preserve the critical second set of tire tracks found at the crime scene, failed to preserve blood evidence which could have yielded clues to the

identity of a suspect or witness, and failed to review a videotape of the crime scene. *See* Petition at ¶ 49 (citing S.F. Vol. XII: 156, 159, 163-64; 201-02; 244); *see also id.* at ¶ 50.

The only physical evidence preserved by the State from the dump scene pointed to Red Wilson. Aside from Red, no eyewitness testimony linked Petitioner to the actual shooting. Aside from Red's testimony, no evidence tended to show that Petitioner robbed the victims. Aside from Red's testimony, no evidence linked Petitioner to "dumping" of the bodies. *See* Statement of Facts from Petitioner's Trial.

Red was not credible. As an alleged accomplice, his testimony is corrupt and legally inherently suspect. *See* Art. 38.14 of the Texas Code of Criminal Procedure.; Tr. Vol. I at 134. The State has admitted Red was not credible. The Cameron County District Attorney's Office, in an Appellate Brief filed in Brenda's case, *itself* conceded that Red had given an account of the crime to police which was "not altogether true." App. II, Exh. 18 (State's Appellate Brief), at 15. Further, the same State's brief admits that many key points of Red's testimony were completely uncorroborated:

> "[T]here was no evidence to corroborate Red's testimony that Paul asked Appellant [Brenda Colella] whether 'they' were the ones who 'did it,' or that she answered 'Yes,' or evidence to corroborate [Red's] testimony that she was concerned he not leave Paul and even helped push his truck after it broke down pulling the victims' truck."

*Id.* at 20-21; *see also id.* at 15 ("Where was the evidence to corroborate Red's testimony that [Brenda] said 'yes' when Paul asked her 'Did they rape you?'"). The Motion does not address these stark admissions by the State, which have been established by clear and convincing evidence (namely, the State's own admissions!).

Without Red's testimony, the evidence would only establish that Petitioner threatened the victims' lives, possessed a weapon before the crime, and left the State on the morning of the offense. Petitioner's own testimony established a credible, independent reason for leaving the State, *i.e.*, Sid Wilson's repeated drunken threats to kill Petitioner *and* Brenda. Even the State

33

does not dispute that the Colellas were genuinely afraid of "Sid's armed threat." App. II, Exh. 18 (State's Appellate Brief) at 20. There is a genuine question whether the weapon seen in Mr. Colella's possession on the day before the crime could even have been the murder weapon. Thus, if Red's testimony were disregarded, the only undisputed evidence linking Mr. Colella to the crime would have been his threats to harm the men who had just raped his wife. Unquestionably, this would not have been enough to prove beyond a reasonable doubt that Mr. Colella shot the victims.

The only evidence the State was able to proffer that *robbery* of the hundreds of dollars in cash the victims were openly displaying was *not* the motive for the victims' deaths were Mr. Colella's threats and Red's testimony. Red admitted during Petitioner's trial that he had bought a used car for $200 shortly after the crime. S.F. Vol. XV: 840. Red, who lived out of his pickup, testified that he paid for the car using money he had saved from mechanic work and towing. *Id.* During Brenda's trial, Red maintained that he kept "around $300 or so" in his glove compartment, and that "[e]verybody was aware of it." However, no other trial witness at Brenda's or Petitioner's trial confirmed Red's account of his glove-compartment savings account. Red also testified that his Bronco's windshield had been shattered in a towing accident some time ago, and that this made it illegal to drive the Bronco. (BBC) S.F. Vol. VI: 568-69. Red's fear of being ticketed or arrested for driving in a vehicle without a windshield significantly hampered his mobility, restricting him from driving in town. Nevertheless, apparently for months, Red did not use his glovebox "savings"–which he says was kept in the Bronco itself–to repair its windshield. However, after the two victims were found dead, with hundreds of dollars missing from their pockets, Red promptly bought another vehicle.

### 19.   Trial witnesses testified inconsistently.

Sgt. Martinez repeatedly contradicted himself in Petitioner's trial. He testified under direct examination that the weapon used in the offense came from the "general area of the trailer park [on the south side of the Sea Ranch]," described that area, and even introduced photographs

34

of it. S.F. Vol. 12: 129-130. Yet, under cross-examination, Martinez declared that no one ever told him the weapon came from a trailer park, and that he had never gone to the trailer park to look for the weapon. *Id*. at 173-74. The Order and Respondent's Motion are silent as to this conflicting testimony, which was established clearly and convincingly.

Martinez testified that he had no knowledge that the pathologist's office had ever turned any bullets recovered from the victims' bodies over to the Sheriff's Office evidence custodian, Jerry Ramirez. *Id*. at 140. Shortly afterward, however, Martinez was asked whether any bullets were found in the victims' bodies, and replied "Yes, sir." *Id*. at 199. He went on:

Q.   And do you know, sir, who came into possession of that bullet?

A.   Jerry Ramirez, the evidence custodian.

Q.   And do you know who provided that bullet to Jerry Ramirez?

A.   The pathologist from the Valley Baptist Medical Center in Harlingen where the autopsies were conducted.

*Id*. In attempting to explain his decision not to make plaster impressions of tire tracks found at the campsite of Red Wilson and the Colellas, Martinez first declared he didn't make casts because it would have been *impossible* to make casts from tire tracks in wet sand. S.F. Vol. XII: 159 ("The conditions of the tire impressions or the soil itself there made it of virtually no use with the plaster of Paris."). However, after being confronted with the fact that it is indeed possible to make such casts, Martinez changed his story: "Q. So you're testifying that you did have the means how to lift the tire track print, but you just did not feel a need for it? / A. Yes, sir." S.F. Vol. XVII: 1260.

During Brenda's trial, Martinez affirmed that Red, while being questioned on February 20, 1992, had told him where the murder weapon was *buried* on South Padre Island:

Q:   . . . You see in your report where you state that Red said he knew where the murder weapon was buried on the island?

35

> A:    That he basically knew where the murder weapon was at, buried on the island.
>
> Q:    In your own words, "That he knew where murder weapon was buried on the Island."
>
> A:    That he basically knew where the murder weapon was at, buried on the Island.[7]

(BBC) S.F. Vol. V: 261. Later in Brenda's trial, under cross-examination concerning the level of his involvement with the crime, Red caused a problem for the prosecution by lying about his admission to Martinez:

> Q:    Red, did you tell Officer Martinez that you knew where the murder weapon was buried on the island?
>
> A:    No.

(BBC) S.F. Vol. VIII: 813. Red likely testified this way because, just one week before, he had changed his story about what had happened to the murder weapon and told police that Petitioner had thrown the gun into the Gulf of Mexico.

At Petitioner's trial, Martinez no doubt realized that Red's false testimony at Brenda's trial and his changed stories regarding the location of the murder weapon would harm the State's case. So Martinez gave false and misleading testimony concerning Red's statements:

> Q.    The detection of a weapon in the Gulf of Mexico, Mr. Martinez, was a hope of finding a weapon to this crime, right?
>
> A.    Yes, sir.
>
> Q.    And your direction to the Gulf of Mexico was because of Red Wilson's statement to you, right?

---

[7] Indeed, Red testified during Brenda's trial that he had actually encouraged Mr. Colella to bury the gun, so that Red could later locate it when he went to the police. (BBC) S.F. Vol. VIII: 821. Red also admitted at Brenda's trial that he had written letters to his then-girlfriend from jail in which he told his girlfriend that he knew where the murder weapon was. (BBC) S.F. Vol VIII :813-14, 846. Especially when coupled with the anonymous tip from the person who saw Red burying the gun, the incriminating statements in the letters to Pam Smith further undermine Red's credibility, and case grave doubt on the truth of his later account of having seen Mr. Colella throw the murder weapon into the Gulf of Mexico. Mr. Colella's trial counsel, who did not obtain a complete transcript of the testimony in the Brenda Colella trial, does not seem to have realized the value of this admission to impeachment of Mr. Wilson.

A.    The interview, yes.

Q.    And you are saying that he *never* told you that there was a gun buried anywhere else, right?

A.    *That's correct.*

S.F. Vol. XII: 242.

Q.    Now, the weapon was never found, is that right?

A.    That is correct.

Q.    And *no one*, other than the tip [from an anonymous informant who claimed to have seen Red burying the murder weapon] told you that a weapon was buried somewhere, right?

A.    *That is correct.*

Q.    And you still hold to that story?

A.    Yes, sir.

S.F. Vol. XII: 248 (emphasis added).  Shortly after this testimony, Martinez was confronted with his earlier report, stating that Red had told him where the murder weapon was "buried on the Island."  *Id.*  Martinez then asserted that the word "bury" meant to throw in the water.  *See* S.F. Vol. XII: 265 ("Q.  When you were saying 'buried,' were you saying buried under the water? / A.  Yes.").[8]

Martinez and Red could not get their stories straight at other points as well.  For instance, they differed on whether Red took Martinez over to his campsite during his May "oral" statement (which is incorrectly assumed to have occurred in April in the excerpts below):

Q:    Now, when [Red] took you over there in April, he took you to the campsite, right?

A:    *Yes.*

---

[8] Webster's Encyclopedic Unabridged Dictionary defines the verb "bury" as meaning "[t]o put in the ground and cover with earth."

37

\* \* \*

Q:    And then seven months [after the crime] you go back to the campsite with Red Wilson, is that right?

A:    *That's correct.*

\* \* \*

Q:    Was he under arrest at that time?

A:    He was in custody at the county jail.

Q:    For this murder, right?

A:    Yes, sir.

S.F. Vol. XII: 169-71 (emphasis added).

Red, however, denied ever taking Martinez to any campsite during the May statement:

Q:    And you took [Sgt. Martinez] to whose campsite?

A:    I took him to no one's.

\* \* \*

Q:    So if Sgt. Martinez testified to that fact, that you took him to a campsite, would he be lying?

A:    If he testified that I took him to a campsite –

Q:    Let's simplify it. You never took him to your campsite?

A:    To my campsite?

Q:    Right.

A:    No.

\* \* \*

Q:    You never took them to Paul's campsite, did you?

A:    Not on that day [when he was being interviewed for his second, "oral" statement], no.

S.F. Vol. XIV: 657-58. Red says the only time he escorted Martinez to any campsite was when

he took Martinez to Paul and Brenda's campsite in *mid-September*.   Red adamantly denied accompanying Martinez to any campsite during the second statement.

In addition, Red gave false testimony. *See supra* at Section IV (C) ¶ 14 (pp. 27-31). Again, these inconsistencies are established by clear and convincing evidence (the face of the trial transcripts tells the story), and the Order does not make findings of fact as to each of them. They further show that the State prosecuted Petitioner using perjured testimony, in violation of Petitioner's due process rights.

### 20.   The State told Petitioner's jury that Petitioner had been charged and/or convicted of child molestation.

The State's witness, Monte Tosser, testified in the sentencing phase that Petitioner had been charged with "child molestation". S.F. Vol. XXI: 98 ("the first contact I had with him [Petitioner] was on a child molestation charge"). Defense counsel objected based on a lack of a predicate for the testimony. *Id.* at 98-99. Prosecutor Lopez then told the Convicting Court she would establish a predicate, "a conviction", in fact, but she never established a charge or conviction. *Id.* (the Convicting Court asks Ms. Lopez if there is going to be a predicate, to which Ms. Lopez says "yes"; the Convicting Court then asks "A conviction?" to which Ms. Lopez says "Yes.") The Motion does not refute the clear and convincing evidence that Ms. Lopez told the Convicting Court and Petitioner's jury that she would establish a conviction for child molestation. Motion at 27. Also, the Motion (like the trial testimony) offers no evidence that Petitioner had been charged with, let alone convicted of, child molestation. *Id.* The Motion does not deny that testimony about the charge of "child molestation" was hearsay and that the State could only have permissibly offered the testimony of the alleged victim to establish the offense by means of a witness with direct personal knowledge. Petition at ¶ 396. The Order makes no specific findings of fact on this matter.

39

Based on the alleged charge of child molestation, in closing argument, Prosecutor Lopez argued that Petitioner "had a sexual assault that was reduced to a battery." S.F. Vol. XXI: 196. The Motion does not deny that Lopez made this statement. Instead, the Motion asks the Court to rewrite the statement to make it into something that was not said: "that Colella had been *charged* in the State of Indiana with the offense of child molestation, and that the offense subsequently was reduced to battery." Motion at 27 (emphasis in original). Lopez never stated that Petitioner had been charged with sexual assault. Instead, Lopez told Petitioner's jury that there was a "conviction" and that Petitioner "had a sexual assault."

The Motion does not refute that Petitioner has never been convicted of any sex offense, but the jury was left with the clear impression that he had. As the Petition established, a journalist who watched the trial reported that Petitioner had been "convict[ed] . . . [of] rape." Petition at ¶ 396; *see also* App. VI, Exh. 59 (Tony Vindell, "Jurors Give Colella Death Penalty," *The Brownsville Herald*, Sept. 5, 1992), again a fact the Motion does not challenge and about which the Order makes no fact findings.

These facts are material because they establish that the State gave a false impression of the evidence, it did so knowingly, it never corrected the false impression, and the false impression was material.

### 21. The State falsely claimed that Petitioner had burglarized an elderly lady at knifepoint.

In closing argument, the State asserted that Petitioner had burglarized a home of *an 83-year-old lady at knifepoint*. S.F. Vol. XXI: 196. The fact that the State made this statement is undisputed. The State's evidence at trial does not support this statement. The statements in the Motion at 27-28 do not support the claim that Ms. Gregg was held at knifepoint. Petitioner had used a knife only to cut a screen, and dropped it in the house after cutting the screen. *See* App.

40

V, Exh. 51 (Transcript of Juvenile Waiver Hearing), at 13-15.  The Motion does not establish
that the knife was used for anything else.  Brad Kesler, a probation officer who testified at the
1985 waiver hearing, stated that there was *no* evidence that Mr. Colella offered to use the knife
or held the knife . . . as if to use it on the victim.  *Id.* at 15.  The Motion provides no facts to
refute Kesler's testimony.

Ms. Gregg saw Petitioner in the doorway to her bedroom.  When he noticed that she had
seen him, he took a step toward her, and then ran out of the house.  *Id.*  Mr. Colella *never
touched* Ms. Gregg, never threatened her, and never displayed the knife to her.  *Id.*  The evidence
in the Motion stem from comments Ms. Gregg, who was understandably upset, made about what
she was *afraid* the burglar *might* have done to her.  *Id.* at 14.  Courtroom observers were left with
a highly prejudicial false impression: one reporter asserted that the State had proven that
Petitioner "broke into the home of an 83-year-old neighbor woman, *threatened her at knifepoint,
tied her up and robbed her.*"  App. VI, Exh. 58 (Allen Essex, *Jury Orders Lethal Injection for
Colella*, VALLEY MORNING STAR, Sept. 5, 1992) (emphasis added).  The Motion does not refute
these facts.  The Order makes no specific fact findings as to them.

These facts are material because they establish that the State gave a false impression of
the evidence, it did so knowingly, it never corrected the false impression, and the false
impression was material.

### 22. The Grand Jury indicted Red Wilson for capital murder but Red Wilson was given complete immunity without any explanation.

On February 26, 1992, a Cameron County Grand Jury indicted Red Wilson for capital
murder.  *See* App. I, Exh. 2.  Beginning May 19, 1992, Red met with representatives of the
Cameron County Sheriff's and District Attorney's office, but at Red's counsel's request, Red's
statement was not reduced to writing.  Petition at ¶ 58; (BBC) S.F. Vol. V: 222; S.F. Vol. XII:
211-12.  On May 26, 1992, Wilson was given complete immunity conditioned on his truthful
testimony and on the fact that State did not gain evidence that Red had "voluntarily participated

in the actual killing." *Id.* at Exh. 5.

It is undisputed that Petitioner's defense counsel requested all material under *Brady v. Maryland*. Tr. Vol. I at 24, 25. The Petition claims that "Sgt. Martinez possibly gave sworn grand jury testimony during which he identified the tire tracks as having come from Red Wilson's Bronco" or that he "may also have given sworn testimony as to the time of the victims' death which was inconsistent with his account at Mr. Colella's trial." Petition at ¶ 146. These statements are based on Martinez's actual testimony in Brenda's trial. The Motion does not refute or deny Petitioner's charge. *See* Motion at 28-30. Also, the Motion offers no explanation for the abrupt dismissal of any charges against Red after the grand jury had indicted him. *See id.* Instead, the Motion merely points Petitioner's catch-22, *i.e.*, if Petitioner wants to prove a violation of *Brady*, he first must have the evidence that was not presented to Petitioner's defense counsel, and that evidence is now under the exclusive control of the State. *Id.* Again, the Order makes no specific findings of fact on this matter.

**23.    Petitioner was denied adequate defense resources.**

The Motion does not refute the following facts, all set forth in the Petition, establishing in clear and convincing terms that Petitioner was denied adequate defense resources. Further, the Order makes no findings as to these following facts:

   a.    Petitioner's court-appointed defense counsel, Abel Limas, was trying his first capital murder case when he represented Petitioner. App. VI, Exh. 62 (Affidavit of Abel Limas) (Limas Aff.) at ¶ 3. Limas had been licensed just over five years when he was appointed. App. I, Exh. 9 (Evidentiary Hearing) at 4 (Limas testified that as of April 1998 he was licensed for 11.5 years, which means that he was licensed in November 1986); App. I, Exh. 3 (Order of Appointment) (appointing Limas to represent Petitioner; dated April 2, 1992).

   b.    Limas tried the case alone. *See* Appearances Section of any volume of the Statement of Facts. The State had three prosecutors at trial – Ms. Migdalia

Lopez, Ms. Sandra Zamora, and Mr. Joe Valle. *Id.*

c.  Limas's request to the Convicting Court for co-counsel was denied. App. VI, Exh. 62 (Limas Aff.) at ¶ 4. The Motion only notes that there is no reference in the "record" to Limas seeking co-counsel. Motion at 30.

d.  Limas explained to the Convicting Court that (i) Petitioner's case was too complex for one attorney to handle alone; (ii) he "would not be able to provide Mr. Colella with the defense he deserved without the help of another lawyer"; and (iii) he had not tried a capital case before. App. VI, Exh. 62 (Limas Aff.) at ¶ 4. The expectation that a single appointed counsel could adequately represent a death-charged inmate in a case as complex as this was unreasonable. App. I, Exh. 9 (State Habeas Evidentiary Hearing) at 6. Limas is not board certified in criminal law. *Id.*

e.  Limas testified that a co-counsel would have helped him. *Id.*; *see also* App. VI, Exh. 62 (Limas Aff.) at ¶ 4. In Limas's opinion, it should have been a requirement that two attorneys be appointed in capital murder cases. App. I, Exh. 9 (State Habeas Evidentiary Hearing) at 6. Thus, the probable value of co-counsel was great. *Id.*

f.  Limas was paid only $9000 for the services he provided in Petitioner's case. App. V, Exh. 52 (Cameron County Auditor's Report).

g.  The $9000 allocated based on the work Limas indicated performing breaks down to $22.93 per hour, at best. Petition at ¶ 153.

h.  Limas paid an investigator out of his own pocket, which means that his already inadequate fee is further reduced. App. V, Exh. 62 (Limas Aff.) at ¶ 5.

i.  The Convicting Court refused to compensate Limas for the services of an investigator, which Limas felt limited the amount of investigation the investigator could perform. *Id.* The probable value of a fully-funded investigator was great. *Id.*

j.  Limas was not compensated until May 26, 1994, nearly two years after his representation was finished. App. V, Exh. 52 (Cameron County's Auditor's Report).

k.  Limas advised the Convicting Court regarding his concern about lack of resources "to assist me in investigating almost all or all the facts in this case." Limas observed that the District Attorney's Office has multiple prosecutors and investigators. App. VI, Exh. 54 (Hearing on Change of Venue) at 3.

43

l.   Cases and legal experts have established that $9000 in compensation for a capital murder trial and appeal is inadequate. Petition at ¶¶ 154-55. *See also* App. VII, Exh. 67 (Appleseed Report) at 97-99.

m.   Appointing a single lawyer to represent an inmate charged with capital murder is unusual and disfavored. Tex. Code Crim. P. Ann. art. 26.0259 (requiring that two attorneys be appointed in capital felony cases unless reasons against so are stated in the record); ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES Guideline 2.1 (1989) ("In cases where the death penalty is being sought, two qualified trial attorneys should be assigned to represent the defendant. In cases where the death penalty has been imposed, two qualified appellate attorneys should be assigned to represent the defendant.").

n.   Texas did not provide funding for indigent defense representation in capital cases and instead relied on each county to handle the funding.

o.   Until 1995, the State exercised no oversight of the counties' administration of indigent defense. *See* Tex. Code Crim. P. art. 26.052.

p.   Until 1995, the State provided no guidelines or standards to guide the countries' system for appointment and compensation of counsel. *Id.*

q.   A 1993 report prepared for the State Bar of Texas established that Texas has "a lack of uniformity and a lack of control over the quality of representation provided throughout the state." The Spangenberg Group, *A Study of Representation of Capital Cases in Texas* (March 1993) at vi. One common feature among all of the counties, however, was the lack of funding and adequate defense resources; the report found that "in almost every county, the rate of compensation provided to court-appointed attorneys in capital cases is absurdly low and does not cover the cost of providing representation." *Id.* The study found that a "significant number of attorneys and judges" reported that the quality of representation in capital cases in Texas was "adversely affected" by general inadequacy of funding and compensation provided by the counties. *Id.*

r.   Spangenberg's findings have been reiterated by a recent report issued by Texas Appleseed, a non-profit legal advocacy organization, which undertook a comprehensive study of appointment and compensation of counsel in Texas capital cases. *See* App. VII, Exh. 67 (capital representation chapter of Appleseed Report). The study found systemic underfunding and a lack of oversight, uniformity, and guidance characterizes Texas' system of providing counsel for indigent capital defendants. *Id.*

s.  These problems are manifest in Cameron County capital cases, including, but not limited to, Petitioner's case. The compensation data made available by the Cameron County Auditor's office and in the Cameron County District Clerk's office indicates that Cameron County makes grossly inadequate financial resources available to defense counsel in capital cases, even relative to other Texas counties that are also chronically underfunding indigent defense. Texas's failure to monitor county administration of indigent capital defense and to assure minimally adequate levels of compensation and funding for investigation and experts is resulting in an arbitrary and capricious administration of the death penalty.

t.  Petitioner's strong interest caused by the denial of co-counsel and investigators strongly outweighs any governmental interest adversely affected by the provision of co-counsel and other resources.

u.  Petitioner's case was too complex to be handled competently by one attorney. ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, Guideline 2.1 comment at 42 (February 1989) ("[b]ecause many of the duties of defense counsel in capital cases are definably different from those performed by counsel in criminal cases generally, because there are many rapid developments in the complex body of law affecting death penalty cases, and especially because of the harsh and irrevocable nature of the potential penalty, the responsibilities of trial counsel are sufficiently onerous to require the appointment of two attorneys as trial counsel"); *Summary of Action Taken by the House of Delegates of the A.B.A.*, A.B.A. Sec. Crim. J. 109 at 5-6 (1985) (citing in part the fact that death penalty trials are bifurcated as basis for recommending appointment of co-counsel in these cases); Herron, *Defending Life in Tennessee Death Penalty Cases*, 51 TENN. L. REV. 681, 682 (1984) ("[a] defense team, including at least two defense attorneys, should be involved [in capital cases]"); Bazelon, *The Defective Assistance of Counsel*, 42 CRIM. L. REV. 1, 33 n.16 (1973) (describing the deficiencies in representation resulting from burdens on a single attorney handling a capital case).

v.  Limas was solely responsible for:

• factual investigation, legal research, writing and argument of pre-trial motions;

• background investigation and examination of venire persons during individual voir dire;

• factual investigation, legal research, preparation of case for guilt/innocence phase, devising a theory of defense at guilt/innocence;

45

- factual investigation, legal research, and development of a mitigation theory for the punishment phase;

- trying the case; and

- all aspects of Petitioner's appeal. App. VI, Exh. 62 (Limas Aff.).

w.  Limas was overwhelmed and out-manned. App. VI, Exh. 53 (Change of Venue Hearing) at 3. He had to conduct, alone, two separate jury trials: the guilt phase and the punishment phase. *See* Statement of Facts from Petitioner's Trial. He had to handle the appeal alone, even though he had asked the trial court to have another attorney handle the appeal because he had never handled a capital murder appeal before, he knew the appeal was complex, and he knew in all likelihood that an ineffective assistance of counsel claim should have been raised to protect Petitioner's rights. App. VI, Exh. 62 (Limas Aff.) at ¶ 6.

x.  Limas did not engage a trained mitigation expert or any mental health expert for the punishment phase of the trial even though he knew Petitioner had a history of mental health treatment. *See* Trial Transcript (no request for appointment); Trial Record (no testimony from such an expert).

y.  Petitioner's case was legally and factually complex. *See* Petitioner's Statement of Facts. One attorney could not adequately perform all the tasks required. App. I, Exh. 9 at 6.

z.  Because Limas was overwhelmed by his vast responsibilities, he failed to develop a defense theory in time, leading him to articulate two separate theories during voir dire and during the trial itself. This apparent "switch" needlessly crippled the credibility of Mr. Colella's alibi defense. The errors, described below, flow directly from the refusal of the trial court to appoint co-counsel. *See infra* at Section IV (C), ¶ 24 (p. 47).

aa. The evidence that would have saved Mr. Colella from a death sentence was readily available to a defense team with the appropriate legal and professional mental health assistance. *See infra* at Section IV (C), ¶ 25 (p. 77). With co-counsel, the defense could have developed Mr. Colella's life history and presented it as the basis for a sentence less than death. Focusing on the mitigating aspects of Mr. Colella's character and background, co-counsel could have identified appropriate experts to test and evaluate the client, and work to further sharpen a punishment phase strategy. *See id.*

bb. Full investigation of the State's prior offenses would have revealed that the State's characterization of them was inaccurate and would have revealed that

the prosecutor and judge who dealt with one of those previous offenses regarded it as being linked to Petitioner's troubled background and mental illness, and in fact cooperated with defense counsel to try to assure that Petitioner received counseling and help for his problems in addition to punishment. *See id.*

cc.  Mr. Limas presented no mental health expert, only a minuscule portion of the mitigating evidence that was available, and no theory as to why the jury should spare Petitioner's life. *See id.*

dd.  Limas's closing argument at the punishment phase – which is less than five pages – was an entirely ineffectual plea for mercy. S.F. Vol. XXI: 190-95.

**24.  Limas rendered ineffective assistance of counsel in Petitioner's trial (guilt-innocence phase and voir dire).**

The Motion makes no attempt to challenge any of the facts set forth in the Petition that document Limas's constitutionally inadequate performance as appointed counsel during the guilt-innocence phase of Petitioner's trial. These facts, which are established in clear and convincing terms but not addressed by the Order, are as follows:

a.  Well before trial, Petitioner's mother, Mary Curtis, approached Limas about potential alibi witnesses and Petitioner's extensive psychiatric history. *See* App. III, Exh. 39 (Curtis Aff.) at ¶¶ 26, 29; App. I, Exh. 9 (State Habeas Hearing) at 46 (affirming she told Limas about Petitioner's psychiatric history but he never followed up on it); *see also* App. I, Exh. 9 (Evidentiary Hearing) at 31-34 (defendant affirms that his pretrial meetings with Limas were too infrequent, that he never spoke to Mr. Limas' investigator, that he was not informed of decisions to hire experts, that he told Mr. Limas all the names of the people who treated him for mental illness and that Mr. Limas never contacted them and never explained why).

b.  Mary Curtis attended every day of Brenda Colella's trial, and took notes. App. III, Exh. 39 (Curtis Aff.) at ¶ 27. Limas only appeared briefly at Brenda's trial, for periods of 15 minutes or less. *Id.* Ms. Curtis was not aware of any representative from Limas's office sitting through the entire trial. *Id.* ("If there was another person from Mr. Limas' office at the trial, I was not aware of that."). Limas never asked to see Ms. Curtis's notes or asked about what happened in Brenda's trial. *Id.*

c.  Although Limas agreed that obtaining all prior psychiatric records was "important" for the punishment phase, he admitted he did not obtain the

records. App. I, Exh. 9 (Evidentiary Hearing) at 26-27 (Limas admits not obtaining any psychiatric records, not having Mr. Colella analyzed, and presenting only the unprepared testimony of Mrs. Curtis' mother). Although Limas admitted that the time of death was a "big issue", Limas never contacted any witnesses to establish Petitioner's alibi. App. III, Exh. 39 (Curtis Aff.) at ¶ 30 (Mrs. Curtis, not Limas, contacted witness who independently corroborated alibi); S.F. Vol. XVII: 1214 (bus station witness confirms being contacted by Petitioner's mother on the first day of trial).

d.    Limas left trial and investigative decisions to the beginning of the trial, and in fact made little to no investigative effort himself. App. III, Exh. 39 (Curtis Aff.) at ¶ 30 (because Limas failed to investigate the bus station witness until trial, and showed no intention of ever doing so, Mrs. Curtis performed the investigation and informed Mr. Limas of the witness' availability on the day of trial); S.F. Vol. XVII: 1214 (bus station witness confirms she was contacted by *defendant's mother* on the first day of the trial). Limas's conduct in terms of leaving preparation for the last minute is consistent with his habit and pattern of conduct as identified in the Alifonzo Lopez case, a case he tried in 1990 (two years before trying Petitioner's case) in which he was found to have rendered ineffective assistance of counsel. *See* App. IV, Exh. 46 (Transcript of Hearing) at 49-56; App. IV, Exh. 47 (Magistrate Judge's Report and Recommendation) at 6-10. Limas's conduct in not contacting Petitioner and failing to prepare the case is consistent with his conduct in the Lopez case. *See* App. IV, Exh. 47 (Magistrate Judge's Report and Recommendation) at 8-9 ("[t]he lack of preparation, the failure to understand the theory of defense, the failure to present the necessary evidence for an alibi defense …").

e.    Limas appeared confident of victory, which is consistent with his conduct in the Lopez case. App. III, Exh. 39 (Curtis Aff.) at ¶ 26.

f.    Mrs. Curtis heard Sgt. Luis Martinez testify in Brenda's trial that (1) the two victims died at about 5:00 a.m. and (2) they could not have died before 3:00 a.m. She informed Limas that "if the victims were killed when Detective Martinez said they were during Brenda's trial, that there was not way that Paul could have done it, because Paul was on his way to Victoria at that time. I told Mr. Limas that I and Lester had driven Paul and Brenda to the bus station on the early morning of the 13th, that we arrived shortly before 6:00 A.M." App. III, Exh. 39 (Curtis Aff.) at ¶ 29. She asked Limas to contact the personnel at the bus station in Victoria, advising trial counsel that they would be able to corroborate that Paul and Brenda had arrived in Victoria before the bus station had opened at 6:00 a.m. on September 13, 1991. *Id.* Trial counsel advised Mrs. Curtis that he would "look into" the possibility of corroborating the alibi with witnesses at the bus station, but he appears never to have done so. *Id.*

48

Mrs. Curtis, finally becoming aware that *trial counsel was not going to pursue this vital line of inquiry*, went to the bus station. *Id.* at ¶ 30. Mrs. Curtis located Amy Pflaum, who confirmed Paul and Brenda Colella were at the Victoria bus station before 6:00 a.m. on or about Friday, September 13, 1991 – nearly the same time the victims were killed, according to (1) their official Cameron County death certificates; (2) the testimony of Sgt. Martinez at Brenda Colella's trial; and (3) the report of Municipal Court Judge Brian Hunsaker. *See* S.F. Vol. XVII: 1204-15. Victoria, Texas is 232 miles from South Padre Island, Texas. S.F. Vol. XVII: 1210. Ms. Pflaum independently confirmed Mrs. Curtis' account, noting that she had been contacted by Mrs. Curtis approximately two weeks before her testimony, near the beginning of the trial. *Id.* at 1214.

Limas conceded that the alibi, which related to the time of death of the victims, was the "crucial issue", the "main issue." App. I, Exh. 9 (Evidentiary Hearing) at 26. Nevertheless, the task of investigating supporting evidence for the alibi fell to *the client's mother* – a former itinerant carnival worker who had had a drinking problem and suffered serious medical problems. App. III, Exh. 39 (Curtis Aff.) at ¶¶ 6, 7, 17-18, 30. Ms. Curtis never met Limas's investigator, Robert de la Paz. *Id.* at ¶ 26.

g.  Limas failed to proffer the testimony of Mary and Lester Curtis, who drove Petitioner to the bus station in Victoria, Texas and who helped to pay his bus fare. S.F. Vol. XVIII: 1384-85. Mr. and Mrs.Curtis figured prominently in Mr. Colella's account, *see id.*, and the jury no doubt wondered why their testimony was not presented. Both of them were willing to testify. App. III, Exh. 39 (Curtis Aff.) at ¶¶ 29, 33 ("I was willing to discuss ..."). Limas called the decision not to proffer their testimony strategic, but failed to explain the nature of the strategy. App. I, Exh. 9 at 28-29.

h.  Limas failed to introduce the death certificates **listing the State's official position that the victims died at 6:00 a.m. on September 13, 1991.** App. I, Exh. 9 at 8-9; App. II, Exh. 38 (Death Certificates). Limas tried to secure the admission of the Inquest Report (App. II, Exh. 17) **which shows that the victims had been dead "approximately 6 hrs." from 12.50 p.m. (making the estimated time of death around 7:00 a.m.),** but the State objected on best evidence grounds. S.F. Vol. XVII: 1171-74. Limas failed to clearly lay the foundation for the report's admission as either a business record (TEX. R. EVID. 803(6)) or a public record or document (TEX. EVID. 803(8)(B)), both of which were possible. From the face of the document and the testimony, it is apparent that Judge Hunsaker created the document based on information collected at or near the time of the incident pursuant to a duty imposed by law. *See* App. II, Exh. 17; S.F. Vol. XVII: 1171-74. Trial counsel never requested another opportunity to lay the foundation for the document's admission, and

did not contest the prosecutor's misstatement of the "best evidence" doctrine. S.F. Vol. XVII: 1174-76.

i.  The State's arguments and tactics concerning the time of death during Mr. Colella's trial resemble the ones advanced by the State in Mr. Lopez's trial. In Mr. Lopez's case, the State indicted him for a crime committed in 1988, and, when presented with the possibility of a solid alibi, attempted to obfuscate the issue and undermine the alibi by muddying the issue of whether the offense occurred in 1988 or 1989. *See, e.g.,* App. IV, Exh. 48 (Respondent's Objections to Magistrate Judge's Report) at 8-10 (observing that "upon [] discovery" of the alibi, "the prosecution, caught in a quandary, was *forced to change its strategy*," and reprinting excerpt of state's closing attempting to muddy the timing issue) (emphasis supplied).

j.  The major witnesses for the State in Petitioner's trial had testified about the same events in Brenda's trial. *Compare* App. I, Exh. 4 (excerpts from Brenda's trial) with Petitioner's Statement of Facts. Limas never got or read a complete transcription of the testimony in Brenda's trial. App. VI, Exh. 62 (Limas Aff.) at ¶ 7.

k.  The District Clerk's file contains trial counsel's motion requesting a transcript of the testimony of Red Wilson from Brenda's trial but it provides no indication whether this motion was ever granted, and any transcript, if obtained, was not in trial counsel's file presented to the undersigned. *See* Trial Transcript.

l.  Limas seemed aware of some of the testimony of Martinez and Red Wilson from Mrs. Colella's trial, but he could not accurately recall it. *See, e.g.,* S.F. Vol. XVII: 1242-45; S.F. Vol. XV: 741.

m.  Limas failed to demonstrate to the jury how witnesses changed their testimony pertaining to material facts in Mr. Colella's trial, and how they gave irreconcilably inconsistent testimony in Brenda Colella's trial. *See supra* at Section IV (C), ¶¶ 3-17 (p. 12).

n.  Limas appeared largely unaware of Ricky Taylor's prior testimony and his first, inconsistent statement. *See* S.F. Vol. XVI: 1066. Had he read Ricky Taylor's testimony from Mrs. Colella's trial, he would have discovered much invaluable impeachment material that could have parried the State's attempts to portray Brenda Colella's rape allegation as a lie.

o.  Limas voir-dired jurors solely on a potential defense of provocation, and sometimes damagingly implied, either by stating it or by focusing almost exclusively on punishment-phase issue, that punishment was the most important issue. For instance, Mr. Limas advised one potential juror that the

thrust of the defense would be that

> even though I killed two people and you know I did because they told you I did, because the indictment is telling you I killed those two people, but then I show you through the evidence, through witnesses, right, as to what happened. And then you're going to . . . say "Well, although it's murder, although it's capital murder, because the law says that, I'm going to find this man, that he had a reason to. And I'm going to lower that charge from voluntary manslaughter [sic] to voluntary manslaughter. Would you do that?

S.F. Vol. IX: 1096 (voir dire of Virginia Aguirre).

p.   This excerpt represents the approach Mr. Limas used with all jurors – an approach which conceded Petitioner's guilt in killing the two men. *See, e.g.*, S.F. Vol. VI: 121-123 (seated juror Joseph Ronald Briseno; same lines of questioning); S.F. Vol. VII: 339-41 (examines seated juror Virginia McConnell on whether she would take into account the "rage" caused by provocation and emphasizes to her that the jury is sole judge as to whether "ten minutes" or "three hours" is sufficient "cool reflection" to dissipate sudden passion arising from adequate provocation); S.F. Vol. VII: 407-409 (seated juror Linda Ann Jordan questioned about "sudden passion" and "rage" as reason for a double homicide).

q.   Limas examined prospective jurors on their attitude toward a non-testifying defendant, and also consistently advised them that the defense will almost certainly be presenting little or no evidence. *See, e.g.*, S.F. Vol. VI: 100 ("Mr. Colella will not be testifying"); S.F. Vol. VII: 342-43 (voir dire about nontestifying defendant; seated juror McConnell); *id.* at 365 (nontestifying defendant); *id.* at 453 (nontestifying defendant); *id.* at 488 (prepares juror Rodriguez for no evidence from defense; juror seated); S.F. Vol. VIII: 602-03 (asks what he's think if state presented 30 witnesses but defense presents none; informs juror that "a defense attorney, proceeds in a case like this by [merely] asking questions from those people that the State brought in"); *id.* at 800 (nontestifying defendant); S.F. Vol. IX: 898-99 (no evidence from defense; juror seated); *id.* at 1024 (no evidence from defense; juror is seated and becomes foreperson); S.F. Vol. X: 1166 (nontestifying defendant). Trial counsel no doubt compounded the jury's confusion by neglecting to give an opening statement. S.F. Vol. XI: 31 (defers right to open with State); S.F. Vol. XVII: 1082-86 (waives right to opening statement at beginning of defense case).

r.   During voir dire, Limas never mentioned Petitioner's alibi defense. *See* S.F. Vols. VI-X.

51

s.  Limas's failure to voir dire the panel on the alibi defense was not a conscious tactical decision; rather, it was the product of trial counsel's failure to investigate.  App. III, Exh. 39 (Curtis Aff.) at ¶ 30.

t.  Trial counsel had five months to prepare a defense.  *See* App. I, Exh. 3 (Appointment Order dated April 2, 1992); Petitioner's Statement of Facts (establishing Petitioner's the trial dates as August 27, 1992- September 4, 1992).  At least as soon as Brenda's trial was complete in late May of 1992 (and possibly sooner), Limas knew that the timing of the events would be crucial.  *See* App. II, Exh. 39 (Curtis Aff.) at ¶¶ 28-29 (Mrs. Curtis advises Limas of inconsistencies as to time of death).

u.  As of August 24, 1992 (the last day of jury selection), Limas prepared to proceed with, and prepared seated jurors to hear, a case in which (1) the defendant did not testify; (2) the defense would put on almost no evidence; (3) the focus of the defense at the guilt phase would be provocation and/or voluntary manslaughter – *i.e.*, that Mr. Colella had killed the victims in state of sudden passion following upon adequate cause; and (4) the punishment phase would be the most important phase of the trial.  See S.F. Vols VI-X.  The trial on the merits started *the very same day*: August 24, 1992, at 2:45 P.M.  *See* S.F. Vol. XI: 2.

v.  By September 1, 1992 – one week later – the defense had changed radically.  Petitioner did testify, he presented an alibi defense, not solely a voluntary manslaughter defense, and seven defense witnesses testified, not counting the recall of Red Wilson and Martinez, who originally testified for the State.  *See* S.F. Vol. II (Master Index).

w.  The prosecution effectively attacked Limas's switch in defense strategy in closing:

> All this stuff during voir dire about voluntary manslaughter, where is that coming from?  If he was going to take the witness stand all along and say "I wasn't even there," which is what he did at the end, then what are we doing going into voluntary manslaughter?  What is the purpose of voluntary manslaughter, if all along he's coming and saying, "I was not there, ladies and gentlemen.  I want you to believe that."

> S.F. Vol. XIX: 1546.

> And he [the defendant] sat there throughout all this time and he heard all the evidence.  And he knew, he knew what his chances were on voluntary manslaughter.  He knew that the State had already showed how much time had gone by, what had happened,

52

those intervening pieces that we had talked about on voir dire. He already knew. So he had to change his story. So his story could not be voluntary manslaughter anymore. His story now was, "I wasn't there. I wasn't there." And how is the State going to get him out of that "I wasn't there"? How? And that's when he changed his story, ladies and gentlemen, because all along it was voluntary manslaughter until now.

*Id.* at 1554.

x.   Petitioner and his mother prodded trial counsel to investigate the alibi defense at least as early as the completion of Brenda's trial, and likely even before that. App. I, Exh. 9 (Evidentiary Hearing) at 30-36 (Testimony of Mr. Colella); App. III, Exh. 39 (Curtis Aff.) at ¶¶ 29, 30. Trial counsel failed to do so, and Mrs. Curtis eventually performed the investigation herself "because it didn't seem as if [Mr. Limas] ever would" follow up on the leads his client and Mrs. Curtis had given him consistently. App. III, Exh. 39 (Curtis Aff.) at ¶ 30.

y.   The prosecution had Martinez recite Red's testimony and then tell the jury that he had been able to "confirm" or "verify" it. *See, e.g.,* S.F. Vol. XII: 116-17, 123, 132-35. When Martinez did this, Red *had not even yet testified*, and his credibility had not been impeached. See S.F. Vol. II (Master Index). The following examples from Martinez's direct examination are representative:

Q.   Were you able to determine later whether what [Red] told you [in his second, oral statement] was the truth?

A.   Yes.

Q.   And you told us that was based on what he himself later told you.

A.   Yes.

Q.   Were you able to go back and check his story?

MR. LIMAS:        Your Honor, objection. She continues to lead the witness, your Honor.

MRS. LOPEZ:       Your Honor, that's 'were you able' to do that. That's not —

THE COURT:        I will let him answer the question. Go ahead. Overruled.

53

THE WITNESS:    Yes.

Q.    And how were you able to go back and determine whether he was telling you the truth or not?

A.    He took me.

Q.    Where did he take you?

A.    To South Padre Island to the alleged crime scene and to where the actual murder was committed.

S.F. Vol. XII: 116-17.

Q.    In [Red Wilson's] first statement did you find out that what he had told you was accurate up to a point?

A.    Yes, ma'am, it was very accurate.

Q.    How were you able to determine the accuracy of the first statement?

A.    By the statements of the other witnesses that I had interviewed.

Q.    So did you corroborate his first statement?

A.    Yes, I did.

Q.    When we use the word "corroboration," what exactly does that mean?

A.    I am able to determine if a person or persons are saying an accurate report, because I am comparing it with the same reports that are given by other individuals that say the same thing.    That is corroboration.

Q.    Is that supporting evidence?

A.    Yes, it is.

*Id.* at 123.

54

> Q. Were you also able to verify the first statement that he gave?
>
> A. Yes.
>
> Q. And how did you go about verifying his first statement? You already told us about the second statement and how you verified that. Now how about the first statement? How did you verify what he told you?
>
> A. By talking to the other witnesses that were present.
>
> Q. And again was his first statement consistent with information you have received from other people?
>
> A. Very consistent, yes.

*Id.* at 132.

The prosecution then had Martinez recite, in narrative form, the most vital portion of Red's testimony – a recitation which consisted *solely* of single- and double-level hearsay:

> Q. In [Red's] oral statement, what did [Red] put into that statement that he hadn't put into his first statement?
>
> A. The fact that he had been in the vehicle. He had left the campsite with the defendant and Brenda Bowling to calm them down. They had gone down the gulf side, on the beach side, toward the third exit when they came upon the victims' truck that was parked, where the defendant had once again called out to Brenda and had asked her if they had done it to her and where she verified or replied, "Yes."
>
>    He [the defendant] had gotten off the truck and had ordered Red to turn on the lights of the truck after Red told him, "Hey, let's go and call the police. We know where they are at. Let's call the police." The defendant had yelled out, "Fuck the cops," and he had gotten off, where he went to the bed of the truck and fired at the individuals.

55

*Id.* at 134.

z.   Limas made only a "leading" objection to the above testimony. *Id.* at 116-17, 123, 134.

aa.  The State asked Martinez "Now, based on the information that you received, *who was the shooter*?," to which Martinez replied "The defendant." *Id.* at 143. (emphasis added). Limas made no objection. *Id.*

bb.  Limas failed to make proper objections to, or preserve error to, any of this testimony by Martinez. The closest trial counsel came was when he interrupted Martinez's bolstering narrative: "They have this witness [Red] that is going to testify as to the statements that he gave, your Honor. That would be the proper witness. It's all hearsay, and I'm going to object to that at this point." *See* S.F. Vol. XII: 135. Before a ruling, the prosecutor promised to "withdraw the question," and the defense lawyer never followed up the objection. *Id.* But the objection was not pursued to a definitive adverse ruling. *Id.*

cc.  Martinez "vouched" that Red spoke the truth because he claimed Red took him to the spot on South Padre Island where the alleged murders occurred. S.F. Vol. XII: 117. In fact, as Martinez admitted later, the police never located any casings showing that the murder had occurred there. S.F. Vol. XII: 266-67. In his cross-examination of Martinez, Brenda's trial counsel, faced with Martinez's attempts to bolster Red, forced the Detective to admit that he had no evidence to corroborate Red's multiple stories about disposal of the murder weapon, Red's account of the gun burglary, Red's assertion that Mr. Colella stole the victims' wallet, or Red's account of the manner and location of the shooting. *See* (BBC) S.F. Vol. V: 257-58, 266-68. The failure to object to Martinez's bolstering testimony was harmful. Red had not yet testified; however, the jury knew he would and further knew that his testimony would be essential to the State's case. *See, e.g.,* S.F. Vol. XI: 25-28 (prosecution opening heavily stresses Red's testimony).

dd.  Limas failed to properly object to the State's grossly unfair questioning of Red Wilson about alleged threats made to Red Wilson that led to the following inadmissible testimony:

Q.   Have you been harassed and threatened because of coming to testify in court?

A.   Well, I don't know what you would consider that.

Q.   Did you tell me that somebody had been

56

putting little signs saying you were – I will use the Spanish word because that's the word you used – "el dedo," the finger?

A.    Yes, there were two different occasions. One put one there and it said "Red, the big, fat rat," and the other one said "Wilson, the finger" in my section, on my tank, while I was out. When I would come back, it would be there hanging above my door.

\* \* \*

Q.    Is there an inmate that has been talking to you about different things that this defendant has been saying?

A.    Yes.

Q.    And has been getting messages back to you?

A.    I don't know if you would say he was telling me or he was – if the defendant over here was sending – telling him to tell me this. I don't know for a fact he was actually doing this, but I heard conversations of such.

Q.    Were you afraid for your safety?

A.    Yes, I was. At one point a guard had come and told me that there was some writing on a wall and to watch out and to be careful and there's a guy in the tank on the other side that is supposedly writing the other co-defendant letters. It's just hearsay, but he says that —

MR. LIMAS:  Your Honor, I will object to hearsay at this time.

Q.    (By Ms. Lopez:) But does that concern you?

THE COURT: Sustain the objection.

Q.    (By Ms. Lopez:)  Does that worry you?

57

A.    Yes.

Q.    Does that worry you for your safety?

A.    Yes, it does. I have gang members from the alleged bomber group in my tank and other people from different organizations that I feel I can fear from them that I am being called names. So they might take it upon themselves to come forth and do something. I don't know. I don't know what the outcome would be. I don't know if they might come up and just beat me up. I don't know what the outcome would be of it. So I am very scared, yes.

S.F. Vol. XIII: 455-57.

ee.    The State's case against Petitioner consisted of extensive hearsay testimony to which Limas did not object. During the State's direct examination of Martinez, the following occurred:

Q.    Now, this defendant also wanted to speak with the DA's office, is that correct?

MR. LIMAS: I will object to any statements that this defendant made to Mr. Martinez in any form.

THE COURT: I will sustain the objection at this time until the proper predicate has been laid.

Q.    Did the other two defendants want to work out a deal with the DA's office as well?

A.    Yes.

S.F. Vol. XII: 218.

ff.    Limas did not seek a motion in limine concerning any such conversations or negotiations, to prevent any mention of alleged deal negotiations before the jury. *See* Trial Transcript. Limas did not assure that the prosecutor was prevented from soliciting testimony on this subject, or that the jury was instructed to disregard any such testimony. *See* S.F. Vol. XII: 218.

58

gg. The testimony about plea discussions was not introduced for impeachment, or for any other reason other than to unfairly prejudice Mr. Colella. Counsel should have immediately objected not only on hearsay grounds, but also on the ground of then-existing TEX. R. CRIM. EVID. 410(3), which provided that "evidence of the following is not admissible against the defendant who made the plea or was a participant in the plea discussions . . . (3) any statement made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty . . . ." Counsel did not object on hearsay, Rule 410(3), or any other relevant basis. *See* S.F. Vol. XII: 218. Trial counsel did not recognize the prejudicial nature of this testimony and object on relevant grounds, request a limiting instruction, and ask for a mistrial. *Id.*

hh. Martinez testified about a statement allegedly given by Brenda to a police officer named Green in Indianapolis. S.F. Vol. XII: 259-60. Counsel objected once on leading grounds but *never* on hearsay grounds. *Id.* at 260. The testimony insinuated that Brenda had given an inconsistent account of the rape and hinted that she was selective in what she wished to discuss. *Id.* at 259-60. Neither Brenda (who was under conviction for capital murder at the time) nor "Investigator Green" testified at Mr. Colella's trial. *See* S.F. Vol. II (Master Index). The prosecution never entered Brenda's "statement" into the record. *Id.*

ii. In response to the prosecutor's leading questions, Sherie Wilson testified that she had "heard" that the defendant's sister had checked on Red shortly after the crime because the defendant's sister "thought this defendant had done something to Red" because the defendant had a "big roll of money and thought that maybe he had robbed Red." S.F. Vol. XIII: 377-78. Counsel lodged three ineffectual objections (two on the basis of leading questions, the other with no legal basis stated). *Id.* Thus, what Sherie Wilson "heard" from some unnamed source (likely a self-serving statement from Red) was admitted. *Id.* The State did not put the defendant's sister on the witness stand. *See* S.F. Vol. II (Master Index). Sherie Wilson admitted that she had not seen any of this happen, and only heard about it. S.F. Vol. XIII: 377. Sherie Wilson was an alcoholic who disliked the Colellas. Petition at ¶¶ 35-36.

jj. The State solicited hearsay from Red Wilson that Brenda didn't want Mr. Colella to drink because he would beat her. S.F. Vol. XIII: 506. Limas did not object. *Id.*

kk. Red testified, without objection, that Mr. Colella had a teardrop tattoo on his face, which signified that he had "been in prison." S.F. Vol. XIV: 530-31. The prosecutor intentionally solicited this remark. *Id.* The prosecution first established that Mr. Colella had tattoos – the only component of Red's

testimony which might have been relevant (for identification purposes). It then asked Red whether the defendant had a tattoo on his face (yes), where on his face (near the eye), of what (a teardrop) and what that meant (that he had been to prison). *Id.* Limas never objected. *Id.*

ll. Red testified that the defendant's brother, Steven Watts, came to "check up on him" the day after the crime because, according to Mr. Watts, "Paul had showed up with a bunch of money . . . and they were worried that maybe he had tooken [sic] the money from me and I might have been dead." S.F. Vol. XIV: 612. Limas failed to object. He later objected on hearsay grounds when the prosecution asked "what else did the defendant's brother tell you?" (*id.* at 612) but by then the damage had been done. Once again, the prosecution did not put Mr. Watts on the witness stand. *See* S.F. Vol. II (Master Index). The reason emerges later: Steven Watts was called by the defense and called Red's story a fabrication. S.F. Vol. XVII: 1192-94.

mm. The prosecution offered *double* hearsay from Red Wilson in this same context to which Limas did not object:

> Q.    From what Steve *told* you that this defendant *told* his family, was it the truth or not?
>
> A.    No, it wasn't.
>
> Q.    Did he [the defendant] make up a story?
>
> A.    Yes, he did.
>
> Q.    That had nothing to do with what even occurred?
>
> A.    That is correct.
>
> Q.    It had to do with *some drug transaction that went bad* according to him?
>
> A.    Yes.
>
> S.F. Vol. XIV: 613-14 (emphasis added).

Steven Watts never made these comments to Red. S.F. Vol. XVII: 1192-94.

nn. Limas actually permitted Red to restate and elaborate on these statements.

60

S.F. Vol. XV: 780-81.   As a result, the jury heard false and inadmissible accusations that Petitioner had dealt drugs and lied to his family. *Id.*

oo. More hearsay is admitted on S.F. Vol. XV: 855-56, this time concerning statements Petitioner and Brenda allegedly made about Sid Wilson, and a statement allegedly made by Brenda to the effect that she had seen Petitioner and Red while she was in the truck with the three men.   Once again, no objection. *Id.* A few pages later, Red described a conversation he said he had in jail with Petitioner, in which Red alleges – in a narrative that continues for a full printed page without any questioning, and which consists exclusively of single and double hearsay – that Petitioner told him Brenda once scared someone in Indiana by saying that they should watch out because her husband had "already killed some guys over here in Texas." *Id.* at 858-60.[9]  Counsel permitted the accomplice witness to present the jury with a lengthy hearsay narrative of the defendant's purported statements which contain a *double hearsay* statement from Brenda declaring Petitioner's guilt of the crime!

pp. Ricky Taylor admitted that, although he was *riding in the truck with Brenda Colella,* he had no reason to believe that Brenda had seen the defendant and Red pass by in a vehicle while riding with her in the pickup, but testified "I've been told since" that she did.   S.F. Vol. XVI: 1024.   Limas failed to object to hearsay. *Id.*  Later, Limas permitted the victim's brother to declare, based apparently on what he's *heard* about the crime, that he believes the defendant killed the victims:

> Q.   Do you know who shot your brother and Michael Lavesphere to death?
>
> A.   Is that a personal opinion, or what?
>
> Q.   No, your personal knowledge, from personal knowledge.
>
> A.   *I believe Paul Colella shot them.*
>
> Q.   But did you see the shooting?
>
> A.   No, I didn't see any shooting.
>
> S.F. Vol. XVI: 1037-38 (emphasis added).   Limas lodged no objection. *Id.*

---

[9] The context of Red's statement makes it clear that another man threatened to fight Petitioner over Brenda, and that Brenda made the statement to try to avoid a fight by intimidating the other man.   Therefore, Brenda had a motive to make Petitioner seem threatening. *Id.*

qq. Brenda's trial gave Limas a road map to the State's case and the testimony would try to introduce in Petitioner's trial but Limas had not read Brenda's trial testimony.    App. VI, Exh. 62 (Limas Aff.) at ¶ 7.  Limas could have prepared a motion in limine requiring the prosecutor to approach the bench before introducing any of these statements and, by doing so, kept many harmful insinuations from the jury.  *See* Trial Transcript (no such motion in limine).

rr. The State neither produced, nor demonstrated the unavailability of, a single non-accomplice witness who (1) *saw* the defendant with a large amount of money after the crime, (2) corroborated Red's account of the robbery, (3) *saw* the defendant commit spousal abuse, (4) directly heard the defendant lie to his family, or (5) heard his wife accuse him of committing the killings or took Brenda Colella's "statement" to this effect.  *See* Petitioner's Statement of Facts.  In fact, other trial witnesses denied many of these assertions.  *See, e.g.* S.F. Vol. XVII: 1192-94 (Steven Watts denied making statements to Red); S.F. Vol. VI: 506 (Vikki Larsen rejected suggestion that Mr. Colella beat his wife).  Further, Red's story of the alleged "robbery" – the only such evidence before the jury – was suspect.  Ricky Taylor did not confirm Red's story of whose wallet was stolen. S.F. XVI: 1042-44.

ss. Limas's cross-examination of Ricky Taylor was meandering and purposeless.  First, he examined Mr. Taylor at length concerning the hotel arrangements the three men had made, a topic with no perceptible relevance.  S.F. Vol. XVI: 1047-51.  Limas then examined Mr. Taylor concerning the trio's repeated stops at a Circle K on the Island, and a "scuffle" there.  *Id.* at 1051-53.  Limas then essentially walked Ricky Taylor through his direct testimony, allowing him to repeat it largely without challenge.  *Id.* at 1053-63. Limas questioned his brother's sleeping position and Red's reaction to seeing Mr. Taylor the day after the murders.  *Id.* at 1065-66.

tt. Limas failed effectively to cross-examine Martinez.  First, Limas failed to adequately impeach Martinez with his prior testimony from the Brenda Colella trial as to the estimated time of death.  This testimony related to perhaps the crucial issue at Petitioner's trial – the time of the victims' deaths.  Trial counsel had Martinez read the preliminary portion of his testimony from Brenda's trial, which would have begun to signal to the jury the inconsistencies in his testimony.  However, when Limas attempted to impeach Martinez with his specific time estimate, the trial court cut him off, even though there was no objection from the State.  Trial counsel simply gave up, and moved on.  Partly because of this failure, Martinez was able to deceptively tell the jury that his testimony about the time of the victims' deaths in Brenda's trial was not inconsistent with that in Mr. Colella's trial.  *See* S.F. Vol. XVII: 1242-45.

uu. Trial counsel's ineffective cross-examination allowed Martinez to argue falsely that his conclusion that Red's tire tracks were present at the dump scene was merely a preliminary, initial hypothesis formed in the early days of the investigation, and then discarded. The truth, which Sgt. Martinez successfully concealed from the jury, is that Red's tire tracks were present at the crime scene was an established fact of the State's case which had remained unchanged in the eight months following discovery of the bodies, and which *Martinez attested to under oath in an open courtroom during a capital murder trial only two months before Mr. Colella was tried.* Review of Martinez's testimony from Brenda's trial would have alerted a reasonably prepared lawyer to this fact, and would have permitted a devastating cross-examination of Martinez which would have significantly undermined the credibility not only of Martinez but of Red himself. *See supra* at Section IV (C) at ¶¶ 3-6 (pp. 12-20). Juror Juan Esparza recalls that he felt there was barely enough evidence against Mr. Colella, and that Mr. Limas' cross-examination of these witnesses was unclear and did not clearly highlight the inconsistencies in their testimony. Juror Esparza declares:

> I don't feel that Paul's lawyer ever made it real clear that the sheriff's investigator who testified at Paul's trial had said different things during Brenda's trial about the tire tracks and the time of death. If I had known these things, I would not have voted to convict Paul, because I thought the evidence that he was the shooter was so weak.

App. VI, Exh. 63 (Affidavit of Juror Juan Esparza), at ¶ 4.

vv. Counsel's cross-examination of Red Wilson was equally haphazard. First, Limas made the same mistake he had made in earlier cross-examinations: he merely retraced the steps of the direct. In fact, trial counsel elicited *forty-one consecutive* pages of testimony from Red minutely detailing the events of September 12, 1991. *See* S.F. Vol. XV: 697-738. This tactic allowed Red to deliver his account of Paul shooting the victims again, in minute detail. *Id.* at 733-78. Counsel apparently intended to trip Red up, but the points he made were generally trivial and confusing. *See, e.g., id.* at 731-32, 735 (defense counsel disputes Red's account of which way he was facing during certain events, and how Red knew that Mr. Colella had jumped back into his truck after the shooting).

ww. Limas requested a transcript of Red's testimony from Brenda's trial, and there is some suggestion that he had it in court when cross-examining Red. *See* S.F. Vol. XV: 816. But Limas did not confront Red Wilson with his previous incriminating admission that he had written letters to Pam "Bubbles" Smith in which he admitted that he knew where the murder

63

weapon was located. *See* S.F. Vols. XII-XIV. Limas did attempt to point out to the jury that Red Wilson was romantically interested in Brenda Colella, but his inaccurate recall of Red's testimony at Brenda's trial allowed Red to escape largely undamaged. At Brenda's trial, Red testified as follows:

> Q:    Now Red, did you tell Miss Lopez that you at one time had wanted Brenda to leave Paul?
>
> A:    Yes.
>
> * * *
>
> Q:    Isn't it true that you liked Brenda so much you tried to convince her to leave Paul for you?
>
> A:    That wasn't the reason.
>
> Q:    What was the reason?
>
> A:    That she was getting beat up , and *I did like her and I did want her*, but that wasn't the reason.
>
> Q:    But that was part of the reason; you wanted her for yourself?
>
> A:    In the beginning.
>
> (BBC) S.F. Vol. VII: 749-50.
>
> A:    I liked Brenda and I wanted to get together with her.  . . . I made a statement that I would trade my truck for her, give Paul my truck for her.
>
> (BBC) S.F. Vol. VIII: 824.

This testimony was important to the jury's assessment of Red's credibility because it indicated that Red may have had precisely the same motive to kill the victims as Mr. Colella did–to avenge the violent victimization of the object of his affections. Trial counsel obviously felt the importance of making this point, as he did bring up the subject in cross-examination. However, his attempt fell flat:

Q:    You love Brenda, don't you?

A:    No.

Q:    You have never told anyone you loved Brenda?

A:    That I love her?  No.

* * *

Q:    Did you ever tell Brenda that you wanted to go away with her?  Did you ever tell her that?

A:    Your question, no.

Q:    You never told her?

A:    That I wanted to go away with her, no.

S.F. Vol. XV: 849.

Trial counsel did not use the precise language Red had used earlier during his sworn testimony in Brenda's trial.

xx.    Counsel's cross-examination affirmatively hurt the defense.  The prosecution offered the testimony of local sporting goods store owner Gordon Batsell, who tested the bullets recovered from the victims' bodies and declared that they were nine-millimeter bullets.  S.F. Vol. XIII: 422.  The prosecution insisted that Mr. Batsell repeatedly state that there were some such guns in circulation in 1991, and that he had sold some in the past (albeit "very few").  *See* S.F. Vol. XIII: 421.  At this point, the defense should have realized three things: (1) the State's witnesses had definitely stated that the gun stolen by Red or Paul from the boat on the 12th of September, 1991 was the gun used in the crime; (2) State's witness Batsell had identified the bullets fired into the victims as nine-millimeter rounds; and (3) nine-millimeter revolvers are rare.  These three facts, taken together, created a serious gap in the State's case–one the State was obviously concerned about because the vast majority of revolvers are *not* nine-millimeter and are in fact .357 or .38 revolvers.  The State's case can only hold together under the assumption that the gun stolen at random from the boat in the marina happened, by sheer coincidence, to be a very rare handgun.  Limas should have pointed out that if the bullets found in the victims were actually fired from a nine-millimeter semiautomatic (a much more likely proposition than the State's theory), then Red

65

Wilson was lying about the very centerpiece of his testimony, and Paul Colella did not kill the victims. Similarly, if the weapon stolen from the boats was a .357 or .38 revolver (once again, a much more likely proposition than the State's theory), then Red Wilson was lying about the centerpiece of his testimony, and Paul Colella did not kill the victims. By far the most powerful and convincing strategy for the defense would be to *highlight* the identification of the bullets as nine-millimeter, and to highlight the rarity of nine-millimeter revolvers. And indeed, trial counsel seems to have adopted this strategy during certain parts of his cross-examination of Gordon Batsell. *See* S.F. Vol. XIII: 426 (witness testifies under cross that "it is very unusual to find a revolver that shoots a nine-millimeter cartridge). However, at other points of his cross-examination of Mr. Batsell, counsel actually undermines his position by calling into question Mr. Batsell's identification of the spent round as a nine-millimeter round:

> Q.    . . . You are not saying that [the bullet recovered from the victims] is a nine-millimeter], are you?
>
> A.    We have no way without further testing to tell one hundred percent that it's a nine-millimeter.
>
> Q.    So then it is possible then that it could be a .38, a .357 -- a .380 would be too small, would it not?
> A.    A .380 and a nine-millimeter are the same diameter.
>
> Q.    Okay, sir.  So then basically it's *very difficult to say that is a nine-millimeter or that is a .357, that is a .380 or .38?  It's difficult without that further test as you say?*
>
> *A.    Without any further testing, no.*
>
> *Q.    And you didn't do any further testing, did you?*
>
> *A.    No.*

S.F. Vol. XIII: 424.

Later, defense counsel again suggests that "it's very difficult to tell what that bullet really is." *Id.* at 428. The State's expert's assertion that the bullets were nine-millimeter was actually helpful to the defense, and that undermining or attacking that assessment would have been totally counterproductive. Yet, that is precisely what counsel did. Counsel's questioning indicates that he had not done the necessary research and investigation to accurately assess the strengths and weaknesses of the State's ballistics evidence, and his failure to adequately prepare led him to cross-examine Mr. Batsell in a way that was affirmatively harmful to

66

his client. Counsel also failed by not requesting that the court appoint his own ballistics expert to consult with him about this testimony, and to perform any further testing necessary. *See* Trial Transcript (no request for the appointment of expert witnesses).

yy.   Petitioner testified at the guilt phase. S.F. Vol. XVII: 1275-1345, XVIII: 1347-1474 His testimony is far longer than that of any other defense witness. *See* S.F. Vol. II (Master Index). It is readily apparent that Limas did not prepare Petitioner as he had to repeat questions asking for basic information and/or wrongly suggested answers that were incorrect. *See, e.g.,* S.F. Vol. XVII: 1276 (Q: " ... you're what, 20?" A.23") (Q: "You were born in 60 what?" A: '68"); 1277 (A: "We road the bus from Terre Haute, Indiana to here." Q: "Terre what?" A: Terre Haute."); 1281 (after Petitioner testified that he worked at the Sand Dollar, Limas asks him if that is a motel; it is not, as the Sand Dollar is a realty company); 1289-90 (Limas unable to locate Jack Dunn's trailer site on the map); 1293 (Limas wrongly suggesting that Colella did not go to town until noon); 1294 (Limas wrongly suggesting that Petitioner, *et al.* got to the beach after noon); 1297 (Limas indicates that he doesn't know the name of Paul's nephew). Also, even the Judge admonished Limas not to open the door into Petitioner's prior crimes. S.F. Vol. XVIII: 1402.

zz.   Prosecutor Migdalia Lopez cross-examined Mr. Colella for approximately 80 pages. *See* S.F. Vol. XVIII: 1403-87. The prosecutor induced Mr. Colella to deliver a legal conclusion as to whether he was entitled to a "voluntary manslaughter" defense. After half a page of Ms. Lopez badgering Mr. Colella to "give up" his manslaughter defense ("you're not claiming . . . voluntary manslaughter at all, are you?"), trial counsel belatedly steps in and successfully objects to this tactic because the question asked for a legal conclusion. *Id.* at 1449-50. However, trial counsel did not pursue the objection any further: he did not ask for a mistrial, or for an instruction for the jury to disregard the testimony, or to remind the jury that they are the ultimate judges of whether Mr. Colella was guilty of a lesser-included offense. *Id.* Limas failed to preserve this error for review by not pursuing the objection to adverse ruling. *Id.* The jury could well have concluded that they were under no obligation to consider the voluntary-manslaughter defense because Mr. Colella had (improperly) been forced to disclaim it on the witness stand. There can be no doubt that the prosecutor knew that posing questions which require legal conclusions to lay witnesses was improper, because she herself successfully objected on such a basis earlier in the trial. S.F. Vol. XII: 238 (prosecution successfully objects when defense asks Sgt. Martinez what he knows about "lesser included offenses" because the witness is "not an attorney" and cannot be asked to "speculate on the law").

aaa.   The prosecutor was repeatedly admonished by the Court to "lay predicates" before injecting harmful information and to avoid "fishing expeditions, unless you can lay the predicate under the rules." *Id.* at 1456-57, 1459, 1464-65.

67

bbb.   Ms. Lopez insinuated that Brenda had been declared an "unfit" mother and had essentially abandoned her four-year old child, (*id.* at 1451), that Mr. Colella continued to "hit" and "beat" his wife when they relocated to Indiana (*id.* at 1453); that "somebody came and said that you had beaten her up before . . . and they were afraid you had *killed* Brenda?" (*id.* at 1454, emphasis added, defense counsel objects on same page but fails to pursue to a ruling); again insinuating that Mr. Colella "hit [his] wife" (*id.* at 1462, twice on one page); that Mr. Colella had told Martinez and Deputy Perez, when they arrested the Colellas in Indiana, that "Brenda and Red had stayed in the pickup when the killing had occurred." *Id.* at 1466. The prosecutor never offered any evidence to support her assertions that Brenda had been declared an unfit mother. *See* Petitioner's Statement of Facts. Limas did not object to these questions except for once (along with other questions concerning Brenda's flirting habits, *see id.* at 1431-32), which besmirched Brenda's character by portraying her as an irresponsible parent and a woman of loose morals and were irrelevant.

ccc.   The prosecution never offered any admissible evidence that Mr. Colella had physically abused his wife, much less a conviction for such conduct. Its "proof" consisted of *nothing but dubious hearsay and rumors*. Nevertheless, the defense, after failing to pursue its motion in limine on these matters and inexplicably permitting the rumors to be repeatedly mentioned in front of the jury, did not intervene while the prosecution badgered Mr. Colella with these baseless allegations. *Id.* at 1462-63. The prosecutor incalculably compounded the prejudice by injecting an inflammatory *anonymous* hearsay allegation that "somebody" thought Mr. Colella had killed his wife. *Id.* at 1453. The prosecution never supported this accusation with any evidence – no police report, no 911 transcript, no eyewitness testimony, nothing. *See* Petitioner's Statement of Facts. Nevertheless, the jury heard it, and the defense failed to have it withdrawn. *Id.*

ddd.   The prosecutor gave a fabricated assertion that *Mr. Colella* had told the police that "Brenda and Red had stayed in the pickup" when the victims were shot. *Id.* at 1466. No witness ever offered any testimony showing that Mr. Colella had made this alleged prior inconsistent statement. *See* Petitioner's Statement of Facts. The prosecutor appears to have invented this statement, which attacks the heart of the defense's case by insinuating that Mr. Colella, out of his own mouth, had earlier contradicted the story he had just told the jury. On the very next page, the prosecutor questions Mr. Colella concerning statements allegedly made by Brenda to Sgt. Martinez and Abel Perez. The defense, caught unaware, hastily invoked Mr. Colella's "Fifth Amendment right of not [sic] to incriminate themselves." *Id.* at 1467. The prosecution's unfair surprise[10] (coupled with the defense's lack of preparation) forced trial counsel to invoke Mr. Colella's "right not to incriminate"

---

[10] As trial counsel pointed out, the prosecution raised this issue despite the defense's previous request for discovery of all "oral statements" of the defendants which the prosecutor intended to use. *Id.*

68

himself before the jury.

eee.   The prosecution alleged that Mr. Colella assaulted his wife Brenda, pulling her hair out and inflicting bruises and black eyes. No admissible testimony was offered to prove these allegations. The only testimony was hearsay, sometimes double hearsay. *See, e.g.*, S.F. Vol. XIII: 333-34 (Albin 'Jack' Dunn states that he once saw Brenda Colella with a black eye that he "believes" was inflicted by the defendant, but that he has never seen the defendant hit the victim); *id.* at 416, 419 (Sid Wilson declares that Brenda "said" Paul beat her, "[Brenda] *said* Paul [pulled her hair out once]. She *told* me and my wife that Paul did." (emphasis added)); *id.* at 506 (Red Wilson says Brenda "said" Paul would "beat her up," but admits "I have never been an eyewitness to none of it"). Trial counsel never objected to this evidence.

The prosecution tried to elicit the same damaging hearsay from Vikki Larsen, but she refused:

Q.   Now, the defendant used to hit her, didn't he?

A.   I don't know.

Q.   Didn't she tell you that he used to hit her?

A.   *No, she did not.*

Q.   You never saw her with bruises before that time?

A.   *Not that I recollect. I've heard rumors, but that was all.*

Q.   And the rumor was that he did beat her?

A.   *Yeah, but I don't believe rumors on the beach.*

* * *

Q.   Did you know that [Brenda] had left the party because she was upset with this defendant because he had been drinking and that he beats her after she drinks?

A.   I don't know what the fight was about. I just know that they were arguing and that

69

she left.

Q.    And that she didn't want to be with him because when he drinks he beats her up, right?

A.    I don't know.

Q.    She didn't tell you that part?

A.    No.

Q.    Okay.

A.    *I had never seen him lay a hand on her.*

S.F. Vol. XVI: 988-90 (emphasis added).

fff.    This inadmissible hearsay also improperly attempted to besmirch Mr. Colella's reputation before the jury. It was re-emphasized in the prosecution's closing– *without so much as an attempt to tie it to a relevant trial issue:*

> [The defendant]'s an alcoholic. He is telling you he's gone to AA. He drinks a lot and he wants you to believe that he never beat her when everybody else on the Island knew that he beat her, but he wants you to believe that he didn't do that at all. That's what he wants you to believe.

S.F. Vol. XIX: 1556.

Adequate trial counsel would have objected to this testimony. Trial counsel, on August 4, 1992, filed a motion in limine to exclude hearsay allegations of spousal abuse. Tr. Vol. I at 73-74. The proposed Order granting the motion is blank. *Id.* at 76. In a pretrial hearing held on August 17, 1992, trial counsel, in an apparent reference to this motion, stated: "The only thing that might be coming up would be a motion in lemine [sic] during the trial as the evidence goes, your Honor. That's the only thing that — " S.F. Vol. IV: 3. That is the sole discussion of the issue that appears in the record.[11] As the record stands now, trial counsel never

---

[11] Trial counsel failed to order the transcription of any pretrial hearings. Petition at ¶¶ 441-42. Although some transcripts of pretrial proceedings were included in the record provided to Petitioner by the Cameron County District Clerk's Office, others were not, including the crucial pretrial change of venue hearing, and apparently, at least one other volume of pretrial motions. The undersigned counsel requested transcripts of these proceedings from the court reporter. On or about April 13, 1999, they received a copy of a transcript of a hearing held on June 26, 1992, which addressed defendant's (1) motion for continuance; (2) motion for discovery and inspection; (3) motion for excluding material; and (4) motion for change of venue. Thus, if there was an adjudication of the Motion in Limine concerning the spousal abuse hearsay, it is not present in the record as it stands now, and is not present solely due to the ineffectiveness of appellate counsel.

followed up on his initial motion, and never requested a determination of the admissibility of the inadmissible hearsay spousal-abuse "evidence."

Had Limas followed up on his stated intent to object to this testimony, he would have succeeded, because the evidence was irrelevant and prejudicial. The prosecution repeatedly insinuated weakly, again *solely through hearsay*, that Brenda Colella fabricated the allegation of rape when she noticed that Paul Colella had seen her riding in the pickup with the three men. *See, e.g.*, S.F. Vol. XVI: 1024, 1059 (Ricky Taylor says he's been "told since" that Brenda noticed the defendant, who was driving the opposite direction with Red, noticed her in the cab of the pickup with the three men, but later affirms that he doesn't remember ever having passed a vehicle while driving); S.F. Vol. XVI:989 (Vikki Larsen asked "Did Brenda also happen to mention that she saw Paul and Red heading in the opposite direction [while in the cab of the white pickup with the three men]?" to which Larsen answered "No."). The prosecution's theory was apparently that the alleged spousal abuse was relevant because it provided Brenda with a motive to invent the rape allegation to defuse Paul's anger at seeing her riding with three strange men.

ggg.    Brenda arrived at Jack Dunn's trailer hysterical, with her clothing torn and scratches and bruises on her body, and told everyone who saw her that night that she had been raped. Several people besides Mr. Colella were convinced that Brenda had been raped. S.F. Vol. XVI: 1001 (Vikki Larsen); S.F. Vol. XIII: 342 (Jack Dunn believes Brenda was raped, she could not have been putting on a show). Thus, the only relevant question is whether the defendant, Mr. Colella, *actually believed* her. As to this point, the evidence is uncontroverted: Mr. Colella certainly believed his wife. *See, e.g.*, S.F. Vol. XVI: 1001 (Vikki Larsen declares that Paul believed Brenda had been raped). Even the State admits that this is so. *See* App. II, Exh. 19 (State's Substitute Appellate Brief) at 15 (State declares that Brenda's allegation was the sole cause of Mr. Colella's action in killing the victims).

hhh.    Linda Ann Jordan, a juror in Petitioner's trial declared that "the testimony about Paul's violent behavior towards Brenda was important in our decision about guilt, because it made it seem more likely that he was a hotheaded type of person who could have killed the guys because they messed with his woman." App. VI, Exh. 64 (Affidavit of Linda Ann Jordan) at ¶ 3.

iii.    Limas's unexplained switch in tactics allowed the prosecutor to argue that the defense was "defense-shopping." Its scornful attack on Petitioner's "new-found" alibi defense was one of the *main prosecution themes* at closing argument: it was referred to at least three separate times. S.F. Vol. XIX: 1546, 1554, 1555.

jjj.    Limas's failure to object to repeated inadmissible hearsay allowed the evidence to

71

be introduced without limitation, thus allowing the prosecution to repeatedly refer to the rumors, and hearsay statements that constituted such a prominent part of its case and was the primary basis for the prosecution's consistent closing theme that the defendant was a "user" who lied to and manipulated his own family and now wanted to "use" the criminal justice system to get off. S.F. Vol. XIX: 1549-50, 1559. It also permitted the prosecutor to argue, in its guilt-phase closing, minutes before the jury began deliberations, that "everybody else on the Island knew that [the defendant] beat" his wife, although the prosecution had never introduced admissible testimony to this effect. *Id*. at 1556.

kkk.    The prosecution urged the jury to disbelieve Mr. Colella's denial of the charge that he beat his wife (a subject which should never have been broached but for counsel's inexplicable failure to object) not because others had seen him do so, or because he had ever been convicted of (or even arrested for) such conduct, but rather merely because there were inadmissible rumors and gossip to that effect. S.F. Vol. XIX: 1556. The prosecution could have had no other reason to mention this evidence than to draw the jury's attention to the spousal abuse rumors directly before they retired to consider his guilt. Trial counsel, having failed to exclude mention of the spousal-abuse gossip, was obliged at least to ensure that the State did not illegitimately capitalize on the earlier admission of this evidence during closing.

lll.    During its guilt-phase closing, the prosecution referred to seated jurors by name. S.F. Vol. XIX: 1519 (addresses foreman by name); *id*. at 1522 (addresses *every single juror* by name). No objection was made.

mmm.    The prosecution improperly referred to the victims and the victims' family members and declared that the victims' families (who were likely in the courtroom) "appreciate" your jury service. S.F. Vol. XIX: 1518. The prosecution urged the jury, when they were deliberating, to "consider the Constitutional rights of David Ray Taylor and Michael Lavesphere, the Constitutional right that was taken away from them, the Constitutional right that we all have of life, liberty and the pursuit of happiness." *Id*. at 1520-21. The prosecution also asserted that the victims were asleep when they were murdered, *see id*. at 1523 ("David Ray Taylor and Michael Lavesphere never had a chance to explain themselves, never given an opportunity. The cattle when they are brought into a slaughtering pin have more of a fighting chance. At least they get to see their execution. David Ray Taylor and Michael Lavesphere never had that chance."), but at other points argued precisely the opposite: that the victims were awake and attempting to shield themselves with their hands when it suited other purposes. *See* S.F. Vol. XV: 898 (pathologist testifies that powder stippling on hands indicates victim trying to defend self when shot). Immediately before the jury retired, the prosecution said: "I cannot do anything to bring back Michael Lavesphere and David Taylor. There's nothing I can do. As much as I would like to do that, I can't. All I can do is make sure that this defendant pays for what he did and

*hopefully their spirit will be put to rest.*" *Id.* at 1559 (emphasis added).  Limas made no objection to any of these arguments.

nnn.  During closing, Prosecutor Lopez stated:

Anybody can come and criticize me for the way I conducted myself in the courtroom or who I called on the witness stand and didn't call on the witness stand.

* * *

Yes, anybody can come and criticize.  Anybody can come and criticize me for the way I conducted this trial, but I did it based on my experience.  I did it based on my knowledge of the case, based on having tried another case, all that I brought into this courtroom with me in making decisions, just like the Sheriff's office does.

* * *

[Anybody can second-guess decisions law enforcement officers may make in the heat of an investigation,] [b]ut when you're there and you are under pressure, and you have to make decisions, then you have to use your experience.  You have to do the best job you feel you can do.  That's what happened.

And that's what these officers have to do and they do it every single day.  Not only in this case, in many cases they have to come and do that.  But every time [they testify] the defense attorneys, I don't care what case, will attack them.  And they know that.  They know they cannot win.

They are damned if they do and they're damned if they don't, because a defense attorney will come and attack them every single time, ladies and gentlemen.

*Id.* at 1548-50 (emphasis added).   Limas made no objection.

ooo.  The prosecution also cited to facts not in evidence and improperly hinted that her experience as the prosecutor in Brenda Colella's trial helped her bolster her case.[12]  *Id.*  Limas made no objection. *Id*

ppp.  The prosecution improperly vouched for the credibility of its law enforcement witnesses by painting them as reluctant but worthy individuals who routinely demonstrated courage by testifying even though they knew they "cannot win" and that they will be "attack[ed]" by defense counsel. S.F. Vol. XIX: 1548-50.  Limas

---

[12] This argument was especially misleading, as the prosecutor, Ms. Lopez, significantly changed the case she presented to Brenda's jury in presenting it to Mr. Colella's jury.

made no objection.

qqq.   The prosecution immediately compounded the error through a series of arguments that attacked and insulted defense counsel:

> You got [sic] to remember what Mr. Limas said.  He has a duty, and that is correct.  He has a duty, and his duty is *to get his guy off*.  That's his duty.  That's his job.
>
> And he will come in here and he will tell you *whatever he feels he can* because he has to try to use you.  He has to try to use you to believe his way, just like his client.

> S.F. Vol. XIX: 1550 (emphasis added).  Limas did not object.  *Id.*

rrr.   The prosecution compounded this error by suggesting that Mr. Colella's testimony was coached.  S.F. Vol. XIX: 1546 (repeating twice phrase "He [Mr. Colella] was ready for m[y cross-examination].").  Limas did not object.

sss.   The prosecution argued outside the record.  The prosecution implied that the defense had "changed its story" from a voluntary manslaughter defense to alibi midway through trial, when the defendant suddenly "knew what his chances were on voluntary manslaughter . . . [and realized] he had to change his story.  So his story could not be voluntary manslaughter anymore."  *Id.* at 1554.  The prosecution, obviously, had no insight into the defense's private strategic thinking, and thus had no basis for asserting that the defense changed the story *because* the defendant suddenly realized the voluntary manslaughter defense "wouldn't fly."  This argument telegraphed to the jury that there was some deceitful, improper motive for the apparent change in defensive strategy – something the prosecution had no proof of, and which was in fact not true. As demonstrated herein, Petitioner notified his counsel of his alibi *months before trial*.  *See* App. III, Exh. 39 (Curtis Aff.) at ¶¶ 29.

ttt.   The prosecution argued that the "blame-shifting" strategy had been "thought up" by the defendant as a desperate last-minute ploy by a defendant who was confronted with an unusually strong prosecution case.  S.F. Vol. XIX: 1554.

uuu.   The prosecution's "defense-switch" comments were repeated three times in the closing, and constituted a major theme.  *Id.* at 1546; 1554; 1555.

vvv.   The prosecution also implied that the defendant "learn[ed] a lot of things at the penitentiary," S.F. Vol. XIX: 1553-54, without explaining what those things were or what relevance they had to his guilt.  The prosecution asserted that Mr. Colella had suspiciously become unable to "remember" certain facts when, in reality, Mr. Colella clearly remembered and testified in detail to the events of September 12-

74

13, 1991. *See id.* at 1558-59 ("Then where [the defendant's story] deviates and where it stops is that he is taken to Port Isabel and he is stopped there. And when Red goes on with his story as to what happened, as to how he killed these two people, that he *does not remember* and that did not happen."). Limas did not object.

www. The prosecution insulted Petitioner and improperly asserted their opinions concerning his character. First, the prosecution repeatedly referred to Mr. Colella as a "user." S.F. Vol. XIX: 1545, 1550, 1555-57. The prosecution accused the defendant of "using" his own sister, his mother, his stepfather, his wife, and Red, and then insinuated that the defendant now wanted to "use" the jury to get off. S.F. Vol. XIX: 1545. The prosecution also referred to the defendant as a "liar." S.F. Vol. XIX: 1553, 1554, 1555, 1557 (calls defendant "good liar"; defendant had motive to "come here and lie"; defendant took stand knowing he was "going to lie"). However, the prosecution could point to no element of Mr. Colella's testimony that was contradicted by non-accomplice evidence, and even admitted that most of Mr. Colella's testimony was corroborated. *Id.* at 1553 ("If you're going to be a good liar, stick to the truth as much as possible."); *id.* at 1558 ("He deviates just a little [from the known facts], just *enough for you to believe him.* He just deviates a little."). Limas did not object.

xxx. The prosecution's insulting references to Mr. Colella as a "user" were the prosecutor's own personal opinion. *See* S.F. Vol. XIX: 1545 ("And *I've* been here and *I've* looked at the defendant. And you know what the word that comes to *my* mind to describe this person? He is a user.") (emphasis added). The only apparent basis in the evidence for this insult was Mr. Colella's occasional dependence on others for transportation and lodging.[13] Limas did not object.

yyy. The prosecution misled the jury concerning its witnesses statements. First, the prosecution referred to defense counsel's cross-examination of Red Wilson in which defense counsel pointed out that Red's recollection of the time the shootings occurred had suspiciously become more precise between Brenda's trial and Paul's trial. S.F. Vol. XIV: 693. The prosecution implied that defense counsel had no basis for asserting that Red had once given an extremely wide range of possible times for the shooting – as early as 9:30 or as late as 11:30: "He's telling you he brought Red here and Red put all these times here. Who put those times there? Red didn't, Mr. Limas did. Mr. Limas was the one that put the times. Red told you the last time he testified he had said it was about midnight,

---

[13] For instance, the prosecution stressed that Mr. Colella lived in a house in Indiana which was owned by his mother, and that his sister occasionally helped him out with food stamps. S.F. Vol. XIX: 1556. Mr. Colella did not trick, manipulate, or threaten his family into helping him–their help was the kind of routine favors family members and friends often perform for one another. Thus, in addition to improperly urging the jury to convict the defendant based on irrelevant character traits, the prosecution's characterization of Mr. Colella as a "user" had no basis in the evidence.

but he couldn't be certain." S.F. Vol. XIX: 1547. In fact, Red did *not* testify at the previous trial that the shootings occurred at "12:00," he testified that they were *long over* by that time. (BBC) S.F. Vol. VII: 708-10 (defendant had already shot victims, disposed of bodies, and thrown gun in the water by 12:00 midnight). When asked by the prosecution in Brenda's trial when the shootings happened, Red said "I estimate at around 10:00, 10:30; 9:30, 10:30, 11:30." *Id.* at 710. Red is the source of that range of times (all of which before 10:30 are impossible, since the victims placed a phone call at 10:34). The defense failed to object to this inaccurate characterization of the record – which was refuted by sworn testimony given in the previous trial.

zzz.  The prosecution misleadingly suggested that defense counsel had no evidence suggesting that the victims had been shot at 5:00 a.m. S.F. Vol. XIX: 1552. The prosecution's statement that there was no evidence for (and that the defense had no basis for) stating that the crime may have occurred at 5 o'clock a.m. was false. *See* (BBC) S.F. Vol. IV: 307. Limas failed to object.

aaaa.  In voir dire, the prosecution repeatedly described aspects of a hypothetical crime similar to the one it intended to prove and asked jurors how these facts would affect their verdict. *See, e.g.*, S.F. Vol. VI: 258, 281-83; S.F. Vol. VII: 325-27, 374-81, 396-98, 540. Limas did not object. Mr. Colella was harmed because a juror who has promised to render a certain verdict based on a particular set of facts will not have an open mind, and may be reluctant to violate a "perceived" promise to a party by not voting the way he or she said she promised in voir dire.

bbbb.  The prosecution repeatedly attempted to bias jurors against the imposition of a voluntary manslaughter conviction for the killing of two people because the maximum penalty for voluntary manslaughter, 20 years, was "too cheap" a price for two human lives. *See, e.g.*, S.F. Vol. VI: 275 (taints seated juror with suggestion that 20 years sentence will always be too light for someone who killed people); S.F. Vol. VII: 403 (same); S.F. Vol. VIII: 611, 665, 710 (same, non-seated juror); S.F. Vol. IX: 913 (tells seated juror that 20 year sentence for voluntary manslaughter of two victims would mean victims' lives were "coming awfully cheap."). Besides tainting the jury against a voluntary manslaughter verdict, this questioning improperly invited the jurors to consider the punishment as they debated what crime the Petitioner might be guilty of, and also, from the leading, suggestive form of the question, clearly injected the prosecutor's personal opinion of the proper verdict into voir dire proceedings. Limas did not object.

cccc.  Limas permitted the State to improperly bolster its case by advising many jurors that the only reason the State offered immunity to Red Wilson was because if it did not do so, "all three [codefendants] would walk." *See, e.g.*, S.F. Vol. VII: 432-33; S.F. Vol. VIII: 637 (implies that deal was cut only so that victims' families could receive justice); *id.* at 639 (trial counsel objects here, but is overruled); *id.* at 717 (asserts that they picked least culpable codefendant to cut

deal with); *id.* at 826 (if we didn't cut deal, all defendants would walk); *id.* at 855-56 (we owe it to victims' families to cut deals so people who kill their loved ones will be punished; objection overruled); *id.* at 922 (seated juror; how would victims' families feel if we didn't cut deal?). In fact, the prosecution declared in voir dire: "We didn't go and kill [the victims]. This person did, okay?" S.F. Vol. VIII: 588 (emphasis added). Limas did not object.

dddd.   The comments about seeking "justice" for the victims' families (*e.g.*, S.F. Vol. VII: 855-56) warned the jury that they would be disappointing bereaved relatives if they disagreed with the prosecution's assessment that Mr. Colella was the most guilty codefendant and that Red Wilson was the least. The defense occasionally objected to this practice, *see* S.F. Vol. IX: 978-81, demonstrating that defense counsel knew it was improper. However, trial counsel allowed the vast majority of such comments to pass without objection.

eeee.   When and how the gun was disposed of was unclear. A citizen told authorities that he or she had seen *Red* burying the murder weapon shortly after the crime. S.F. Vol. XI: 74, App. II, Exh. 16 (Detective Sandra Boyd's Supplement Report) at 3. Sgt. Martinez testified that he had attempted to locate the weapon, but had not been able to do so. Red initially told Sgt. Martinez that he had seen Mr. Colella "bury" the weapon. (BBC) S.F. Vol. V: 261. Red then denied he told Sgt. Martinez that he knew where the murder weapon was buried. (BBC) S.F. Vol. VIII: 813. Instead, Red testified that Petitioner had thrown the weapon into the Gulf of Mexico. S.F. Vol. XII: 242.

**25.   Limas rendered ineffective assistance of counsel in the sentencing phase.**

Respondent has not challenged any of the facts set forth in the Petition that Limas rendered ineffective assistance of counsel in the sentencing phase of Petitioner's trial. The lengthy factual basis for this claim is set forth in the Petition at ¶¶ 354-433, which is adopted and incorporated herein for all purposes.

It is undisputed that the State did not think that the circumstances of *this* crime warranted punishment by death: originally it chose not to seek the death penalty, and only chose to do so after it found that Petitioner had a criminal record. S.F. Vol. II: 5. The State has maintained that Brenda Colella's allegation of rape was the sole cause of Petitioner's actions. *See* App. II, Exh. 19 (State's Substitute Appellate Brief) at 17-18 (asserting that "Paul would not have killed the men but for [Brenda's alleged] lie that they had raped her" and that "Appellant knew that but for her lie Paul would not have killed the men").

77

       **a.**       **Limas knew Petitioner had psychiatric problems but failed to get Petitioner's medical records.**

           Mr. Limas did not adequately prepare for the sentencing phase.  He testified as follows:

Q.      Regarding the punishment, Mr. Colella was assessed the death penalty, is that correct?

A.      That's correct.

Q.      Were you aware that he had a history of psychiatric care?

A.      *Yes, I was.*

Q.      Was any evidence introduced regarding this psychiatric history?

A.      *Very little.*

Q.      Was there potential to introduce more but you didn't do it, or what happened in that regard?

A.      This was one of his - - well, the only, the only person that came on to testify was by the State.  And that's what - - that's who I cross-examined.  I believe he was a witness that had dealings with Paul when Paul was, I believe, 12 years-old, somewhere in there, 11 years-old.  But that's the only witness.

Q.      But you were aware that he had other potential witnesses regarding his psychiatric history?

A.      Yes.

Q.      And none of that was introduced?

A.      No.

App. I, Exh. 9 (Evidentiary Hearing) at 9-10 (emphasis added).  Counsel later almost confessed to inadequacy in this regard:

Q.      [Don't you think it would be the best practice to obtain all psychiatric records that are possible for Mr. Colella  and then let the Court sort it out?

A.      Well, at least for the punishment phase.

Q.      That's all I am talking about, punishment.  For punishment,
        psychiatric evidence is important and obtaining all his records
        were important; is that correct?

A.      I agree with that.

Q.      And that wasn't done, was it?

A.      No.

*Id.* at 26-27 (emphasis added).

   **b.   Limas failed to perform other essential tasks**.

   Limas did not (1) interview the defendant's family members concerning the family's background or the defendant's mental problems (App. III, Exh. 39 (Curtis Aff.) at ¶¶ 28, 33); (2) contact any witnesses from Indiana, where Mr. Colella had lived until shortly before the crime (*id.* at ¶ 33); (c) investigate the circumstances of his client's juvenile arrests, which the State used in aggravation (App. VI, Exh. 61 (Supplemental Affidavit of Mary Curtis) at ¶¶ 6-10); or (d) request an evaluation of his client by a mental health expert (*See* Trial Transcript (no request for appointment of expert witnesses)).  Limas failed to request the appointment of a mental health expert, despite his knowing that Petitioner had a history of mental illness and emotional problems.  *See* Trial Transcript (no request for appointment of mental health expert).

   Trial counsel presented three witnesses at the punishment phase.  The two non-family witnesses were David Coffee, Mr. Colella's former boss at a South Padre Island real estate firm for whom Mr. Colella worked for a few months in 1991, and Joe Palermo, a neighbor at Mrs. Curtis's trailer park who got to know Mr. Colella for a few weeks when Mr. Colella was living with his mother.  S.F. Vol. XXI: 126-181.  As in the guilt phase, Mrs. Curtis located these witnesses only after she realized that Limas was not going to try to locate and present mitigating evidence to save her son's life.  *See* App. VI, Exh. 61 (Supplemental Affidavit of Mary Curtis), at ¶¶ 3-4.  Mrs. Curtis located them after Petitioner was convicted, and told Mr. Limas about

79

them on the first or second day of the punishment phase trial itself. *Id.* at ¶ 4. The only preparation they received, of which Mrs. Curtis was aware, was possibly a brief conversation in the hallway immediately before they testified. *Id.*

The witnesses' lack of preparation was evident: the prosecution effectively cross-examined them because they had only known Mr. Colella for a few months and were unaware of many aspects of his life. *See* S.F. Vol. XXI: 159-168, 177. Indeed, the prosecution exploited the defense's utter lack of preparation by barraging Mr. Coffee, Mr. Colella's former supervisor, with allegations (some misleading) concerning Mr. Colella's former convictions. *Id.* at 163-64. Mr. Coffee obviously had not been furnished with this information by the defense, and in fact stated he would not have hired Mr. Colella had he known about it. *Id.* Trial counsel permitted Mr. Coffee to be neutralized as a defense witness and, in fact, turned into a prosecution witness.

Mr. Colella's mother, Mary Curtis, was the last witness. She testified that Mr. Colella suffered psychiatric problems which began early in his life. Mrs. Curtis's direct examination occupies seven printed pages of the record. *See* S.F. XXI: 126-33. Mrs. Curtis received no preparation for her testimony:

> Mr. Limas told me I would be a witness the same day of my testimony. He just said "I'm gonna put you on the witness stand." That was the extent of his preparing me as a witness. He did not tell me specific questions he intended to ask. As a lay person, I had no idea what to expect and what to say to the jurors. I did not know what would help my son and had no guidance from Mr. Limas.

App. III, Exh. 39 (Curtis Aff.) at ¶ 31. The lack of preparation is evident:

> Q.  [by Limas] And can you tell this jury when Paul first started having problems?
>
> A.  When he first started having problems?
>
> Q.  When he started being involved with the law.
>
> A.  If it please the Court, I would like to go back farther than when he was involved with the law.
>
> Q.  Okay, I'll ask you that.

A.    At the age of four-years-old Paul was diagnosed as hyperkenic.

Q.    I'm sorry?

A.    He was diagnosed as a hyperkenic.

Q.    Hyperkenic?

A.    Hyperactive.

Q.    Hyper?

A.    Yes.

Q.    Okay. And that was through a doctor?

A.    Yes, it was.

Q.    And that/s the information you got?

A.    Yes.

Q.    Okay. And did you put him into a regular school?

A.    At one point he was in a regular school. He started into kindergarten.

Q.    Okay.

A.    *The facts I am telling you are documented in Chicago, Illinois and Terre Haute, Indiana about Paul.*

Q.    Okay . . .

S.F. Vol. XXI: 127-28 (emphasis added). This testimony was undermined by the lack of basic witness preparation, which forced Mrs. Curtis to ask repeatedly for clarifications of trial counsel's questions. Mrs. Curtis actually asked the Court for permission to describe Paul's background. *Id.* at 128. When it dawned on her that counsel had not read any of the records, and in fact knew nothing about Paul's early life, Mrs. Curtis seemed to actually scold him from the witness stand. Later, the following exchange occurs:

81

Q.    Now, you know that the State is asking for a sentence of death on Paul?

A.    Yes, I do.

Q.    And do you have any pleas for the jurors?

A.    Do I have any pleas for the jury?

Q.    Would you like to tell them something about your son?

A.    I want to say the right thing.  I can't find the right words.  I love my son very much.  I understand the hurt the families of the deceased are feeling.  I have lost a child.  I feel like in this situation I am losing another child, even though he may be given a life sentence instead of a death sentence.  I am asking for the jury's and I am pleading for my son's life.

*Id.* at 132.  As Mrs. Curtis recalls: "When [trial counsel] asked me whether I had any 'pleas' for the jury, I didn't understand his question, and didn't know what I was supposed to say.  I had not been told that I would be expected to, or allowed to, 'plead' for my son's life, or what I would be allowed to say."  App. III, Exh. 39 (Curtis Aff.) at ¶ 32.  With Mary Curtis' testimony, the defense case was over.

### c.    Effective representation would have disclosed substantial mitigating facts about Petitioner.

Paragraphs 365-381 of the Petition document the substantial mitigating facts that would have been disclosed if trial counsel had investigated his case, including the lengthy history of Petitioner's treatment for psychiatric problems and a doctor's assessment of Petitioner and his history.  Petitioner incorporates those facts from the Petition by reference.

### d.    Trial counsel engaged in other errors in the sentencing phase

Paragraphs 382-432 of the Petition set forth the many other instances of ineffectiveness rendered by trial counsel during the sentencing phase.

### 26.    Ineffective Assistance of Counsel on Direct Appeal.

Mr. Limas asked the Convicting Court not to appoint him as Mr. Colella's attorney on direct appeal:

I did not feel comfortable handling Mr. Colella's direct appeal after the finding of guilt and his death sentence was handed down. I had never handled a capital murder appeal before. I knew that capital appeals are very complex, and I thought only someone who had a great deal of experience with them should handle such cases. I also knew that in all likelihood an ineffective assistance of counsel claim should have been raised, but I would not have been able to do that. However, Judge Valdez ordered me to handle the appeal even though I told him, for the reasons noted above, that I did not want to be appointed.

App. VI, Exh. 62 (Limas Aff.) at ¶ 6.

On September 11, 1992, Limas wrote the court reporters of the 357th District Court to request a copy of the statement of facts from the trial. *See* App. V, Exh. 53 (Letter to Court Reporters). The letter, in full, reads: "Please be advised that we request the Statement of Facts in the above-mentioned case from the Voir Dire Examination of the Jurors to the Punishment Phase. Should you have any questions regarding this matter please call our office." *Id.* Trial counsel did not request that any pretrial hearings be made a part of the appellate record.

### 27.    Cumulative error claims.

The Motion does not challenge the facts supporting all aspects of Petitioner's claim of ineffective assistance of counsel. It is these facts which also support Petitioner's cumulative error claim as to ineffective assistance.

Also, the Motion does not refute the factual bases for Petitioner's claim that Petitioner's trial was tainted by pervasive prosecutorial misconduct which rendered the proceeding fundamentally unfair and denied Petitioner due process of law. The facts supporting this claim are set out in the Petition and in this Motion. They are summarized as follows:

### Voir dire.

The prosecution improperly attempted to bind prospective jurors to a given outcome based on a hypothetical (*see supra* at Section IV (C), ¶ 24 (aaaa) (p. 76)); injected its opinion of the proper punishment (against a finding of voluntary manslaughter) (*see id.* at (bbbb) (p. 76)); improperly invoked the prestige of its office (and improperly vouched for the accomplice witness' testimony) by suggesting that it knew it had cut a deal with the "least culpable"

83

accomplice and stating that without the deal, no one would have been punished (*see id.* at (cccc) (pp. 76-77)). The prosecution also deprived Mr. Colella of the presumption of innocence. *Id.*

### Guilt-phase opening.

The prosecution referred to Mr. Colella's alleged wife-beating, even though it had no admissible evidence that Mr. Colella abused his wife. S.F. Vol. XI: 14-15.

### Guilt-phase trial on the merits.

The prosecution improperly "bolstered" the credibility of its immunized witness, Red Wilson, by (1) having Martinez preview Red's testimony and "vouch" for Red's credibility before Red was even called to the stand; and (2) misrepresenting the true scope of the immunity agreement executed with Red, and improperly using the immunity agreement to bolster Red's credibility. *See supra* Section IV (C) ¶ 24 (y) p. 53; Section IV (C) ¶ 17, p. 32. The prosecution also knowingly sponsored perjured or misleading testimony from Martinez concerning the tire tracks found at the dump scene, the time of death of the victims and the murder weapon. *See supra* Section IV (C) ¶¶ 3-12, pp. 12-25. The prosecution tainted Petitioner with prejudicial, irrelevant extraneous allegations of spousal abuse, which was "proven" only by inadmissible hearsay. *See supra* Section IV (C) ¶ 24 (bbb)-(hhh), p. 68. The prosecution also accused Petitioner of obstruction or retaliation directed at a witness (a third-degree felony as defined by TEX. PEN. CODE SEC. 36.06), which was "proven" only by inadmissible *double* hearsay (*id.* at (dd), and robbery of money from the victims' bodies, suggested only by suspect, contested accomplice-witness testimony (*see* p. 29, *infra*)..

The prosecution failed to indict Red Wilson for capital murder, perjury or aggravated perjury (TEX. PEN. CODE sec. 37.03), even though he lied about material events, such as his involvement in dumping the bodies. The prosecution intentionally introduced inadmissible double hearsay testimony from Red Wilson describing alleged statements made by Steven Watts to Red, which in turn described alleged statements Mr. Colella made to Steven Watts. The prosecution also improperly impeached the defendant with testifying questions about irrelevant points (*E.g.*: "And you hit her, you continued to beat [your wife] when she was up there [in

84

Terre Haute, Indiana], right?"  S.F. Vol. XVIII: 1453) and an outrageous *anonymous hearsay* allegation that "someone" said they were afraid Mr. Colella *had killed* Brenda.  *Id*.  The prosecution also attempted to improperly impeach Mr. Colella with inadmissible testimony concerning alleged statements Brenda Colella had given to investigators outside Mr. Colella's presence, and alleged the existence of statements he himself had made to investigators which had never been introduced into evidence. *Id*. at 1464-67.

The prosecution, both in cross-examination and in closing argument, implied that Mr. Colella used his constitutionally guaranteed right to be present in the courtroom to "tailor" his testimony. *Id*. at 1456; *see also supra* Section IV (C) ¶ 24 (sss)-(vvv) (pp. 74-75)  (describing prosecution's unfounded insinuation in its guilt-phase closing that Mr. Colella had been forced to "switch" defenses because he realized during trial that his voluntary manslaughter defense could not prevail).

### Guilt-phase closing.

The prosecution argued outside the evidence, attacked defense counsel for his proper advocacy on his client's behalf (telling the jury repeatedly that defense counsel's job was to "use" them), made improper appeals to the prejudices and emotions of the jurors by repeatedly referring to the victims' families and declaring that the victims' spirits could not be put to rest unless Mr. Colella were convicted; improperly vouched for Red Wilson's credibility by implying falsely that he had no motive to lie, improperly attacked Mr. Colella's credibility, insulting him by calling him a "user" and a "liar," mischaracterized the evidence concerning the victims' times of death and the inconsistencies in its own witnesses' testimony (implying that the defense was fabricating these inconsistencies when the prosecutor knew that the inconsistencies were genuine); mischaracterized the defendant's testimony by asserting that he didn't "remember" committing the crime when his sole claim was that he did not commit the crime; unconstitutionally altered the burden of proof by implying that the fact that large portions of Mr. Colella's testimony were corroborated only went to show what a clever liar he was; and improperly put her own experience and integrity at issue by asking jury to take into her account

her own personal knowledge and experience in evaluating the strength of the State's case. *See supra* at Section IV (C) ¶ 24 (mmm)-(xxx) (pp. 72-75).

**Punishment phase trial on the merits.**

The prosecution alleged several prior acts of wrongdoing on Mr. Colella's part *solely* through inadmissible hearsay testimony from police officers and probation officials. *See supra* at Section IV (C) ¶¶ 20-22, pp. 39-41); *see also supra* at Section IV (C) ¶ 25). The prosecution also attempted to inject inflammatory, irrelevant hearsay and double hearsay into the trial (such as Mr. Colella's alleged comments about "Charles Manson" and a shadowy allegation that Mr. Colella had made some comment about robbing vending machines). Petition at ¶ 425. The prosecution was rebuked by the trial judge three separate times during the punishment phase for attempting to introduce "improper" evidence to "inflame the minds of the jury." *See* S.F. Vol. XXI: 113, 125, 159.

The prosecution also unfairly attacked Mr. Colella by intentionally mischaracterizing evidence concerning Mr. Colella's 1982 juvenile adjudication for battery and his 1985 conviction for burglary. The State, *solely through inadmissible hearsay*, suggested that the battery conviction actually involved a sexual assault or rape, even though it knew that Mr. Colella had never been convicted of a sex offense in this case or any other. The prosecution also insinuated that Mr. Colella had tied up, gagged, and threatened the victim of the 1985 burglary even though the evidence did not support this. *See supra* at Section IV (C) ¶ 21 (pp. 40-41). Both of these mischaracterizations were repeated during the prosecution's punishment-phase closing. *Id.* Prejudice is demonstrated by the fact that reporters present in the gallery were misled into believing that Mr. Colella had been convicted of "rape" and that he had tied up, gagged, and bound the victim of the 1985 burglary.

**Punishment phase closing argument**

The centerpiece of the prosecution's closing argument was a detailed account of a purported private conversation with her husband in which she recounts a misleading litany of Mr. Colella's alleged previous wrongdoing, most of which was "proven" only by hearsay. After

86

telling her husband and the jury about all the things Mr. Colella had allegedly done, the prosecutor informs the jury that her husband, given that account, believed that Mr. Colella was beyond redemption and should be punished by lethal injection. S.F. XXI: 196-97. The prosecution had also improperly invited the jurors to sentence Mr. Colella to death based on a comparison of the "worth" of his life with the worth of the victims. S.F. XX: 7, 14.

## V.  There are Questions of Material Fact and Respondent is Not Entitled to Judgment as a Matter of Law

The Motion fails to rebut nearly all of the facts set forth in the Petition. In addition, this Response has shown that the Motion is based on incorrect assumptions about the facts. Many of the "facts" that the Motion has presented are simply wrong.

In the Brief, Petitioner applies the facts to the law (as to some of the other claims, the Brief includes a factual development). The Response and the Brief establish that the Motion should be denied because there are questions of material fact and Respondent cannot establish that she is entitled to judgment as a matter of law.

WHEREFORE Petitioner prays that Respondent's Motion for Summary Judgment will be denied, that the Court will schedule an evidentiary hearing and allow essential discovery, and for such other relief to which he may entitled.

Respectfully submitted,

Mandy Welch
Attorney-in-Charge
Southern District No. 15543
Texas Bar No. 21125380
Burr & Welch
412 Main Street, Suite 1100
Houston, Texas  77002
Tel. (713) 227-0200

87

Fax (713) 227-0215

Susan L. Karamanian
Southern District No. 10787
State Bar No. 11097600
2000 H. Street NW
Washington, D.C.
Phone: (202) 994-1210
Facsimile: (202) 994-2831

Michael V. Powell
Southern District No. 5429
State Bar No. 16204400
2200 Ross Ave., Suite 2200
Dallas, Texas 75201
Phone: (214) 740-8520
Facsimile: (214) 740-8800

ATTORNEYS FOR PETITIONER

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have caused the foregoing pleading to be served on Respondent by mailing, via the U.S. Postal Service, postage prepaid a copy of the pleading to Mr. Charles Palmer, Capital Litigation Division, Office of the Attorney General, P.O. Box 12548, Capitol Station, Austin, Texas 78711, this 17th day of June 2002.

Michael V. Powell

88