United States District Court
Southern District of Texas
FILED

JUN 1 8 2002

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

|  |  |  |
|---|---|---|
| PAUL RICHARD COLELLA, | § | |
| | § | |
| PETITIONER, | § | |
| | § | |
| V. | § | |
| | § | NO.1:01CV166 |
| | § | |
| JANIE COCKRELL, DIRECTOR | § | |
| TEXAS DEPARTMENT OF CRIMINAL | § | |
| JUSTICE, INSTITUTIONAL DIVISION, | § | |
| | § | |
| RESPONDENT. | § | |
| | § | |

---

**PETITIONER'S BRIEF IN OPPOSITION TO RESPONDENT'S
MOTION FOR SUMMARY JUDGMENT**

Mandy Welch
Southern District No. 21125380
State Bar No. 21125380
BURR & WELCH
Houston, Texas 77006
Phone:  (713) 523-2299
Fax:      (713) 523-3833

**ATTORNEY-IN-CHARGE FOR PETITIONER**

**OF COUNSEL:**

Michael V. Powell
State Bar No. 16204400
Southern Dist. No.  5429
2200 Ross Ave., Suite 2200
Dallas, Texas 75201
Phone:  (214) 740-8520
Fax:      (214) 740-8800

Susan L. Karamanian
State Bar No. 11097600
Southern Dist. No. 10787
2000 H Street, NW
Washington, DC 20052
Phone:  (202) 994-1210
Fax:      (202) 994-2831

# TABLE OF CONTENTS

Page

I.  Introduction ................................................................................................1

II. Argument and Authorities ..........................................................................3

    A.  Respondent Has Not Met Her Summary Judgment Burden ...................3

        1.  AEDPA Defenses are Inapplicable ...............................................4

        2.  Petitioner's claims are not procedurally barred ...........................18

    B.  Summary Judgment Would be Improper as to Each of Petitioner's Claims ........21

        1.  The State Presented False Testimony in Clear Violation of the Fourteenth Amendment ...............................................................21

        2.  The State Violated Petitioner's Fourteenth Amendment Right to Due Process of Law By Shifting Theories Between Brenda's and Petitioner's Trials ....................................................................25

        3.  The State Violated Petitioner's Fourteenth Amendment Right to Due Process of Law with Respect to Red Wilson's Immunity Agreement ..............................................................................28

        4.  The State Violated the Fourteenth Amendment by Presenting a False and Misleading Impression of the Evidence ...................30

        5.  The State Violated *Brady v. Maryland*, 373 U.S. 83 (1963) .....................33

        6.  The State Violated *Brady v. Maryland* and *Kyles v. Whitley* by Concealing Material the Defense Could Have Used to Impeach the Quality and Integrity of the Police Investigation .......................35

        7.  The Trial Court's Refusal to Provide Reasonable Compensation, Investigative Assistance, and Co-Counsel Effectively Denied Petitioner the *Assistance* of Trial Counsel under *United States v. Cronic*, 466 U.S. 648 (1984) ......................................................36

        8.  Trial Counsel's Unreasonably Low Compensation and the Trial Court's Refusal to Appoint Co-Counsel or to Compensate Trial Counsel for Investigative Services Denied Petitioner the Effective Assistance of Counsel under *Strickland v. Washington*, 466 U.S. 668 (1984) ..............................................................................39

9.    Trial Counsel's Unreasonably Low Compensation and the Trial Court's Refusal to Appoint Co-Counsel or to Compensate Trial Counsel for Investigative Services Denied Petitioner's Right to Reliable Sentencing Procedures under the Eighth Amendment ...............39

10.   The Trial Court's Refusal to Appoint Co-Counsel or to Compensate Trial Counsel for Investigative Assistance to Assist Trial Counsel in the Enormous Task of Preparing For and Presenting this Complex Capital Case Denied Petitioner the Basic Tools Essential to his Defense in Violation *of Ake v. Oklahoma*, 470 U.S. 68 (1985)...................................................................................42

11.   Limas Provided Ineffective Assistance of Counsel in the Guilt/Innocence Phase and Voir Dire .......................................................43

12.   Trial Counsel Provided Ineffective Assistance of Counsel in the Sentencing Phase .......................................................................................49

      a.    Failure to Investigate and Present Mitigating Evidence ................49

      b.    Failure to Prevent the Prosecution from Misrepresenting Evidence to Give False Impressions about Future Dangerousness ...........................................................................55

      c.    Failure to Counter the Prosecution's Aggravating Evidence.........56

      d.    Other errors .................................................................................57

13.   Limas Provided Ineffective Assistance of Counsel on Appeal...................57

14.   Counsel's Errors and Deficiencies, Considered in their Entirety, Constitute Constitutionally Ineffective Assistance of Counsel .................58

15.   Petitioner's Trial was Tainted by Pervasive Prosecutorial Misconduct Which Rendered the Entire Proceedings Fundamentally Unfair and Denied Petitioner Due Process of Law...........59

16.   The Evidence of Petitioner's Guilt is Factually Insufficient under *Clewis v. State* ............................................................................................59

17.   The Cumulative Effect of the Errors Denied Petitioner his Fundamental Due Process Rights under the Fourteenth Amendment.............................................................................................60

18.   The CCA Denied Petitioner a Meaningful Appellate Review of His Death Sentence.......................................................................................61

19. Granting the State's Challenge for Cause Against Venireman William Bristol Violated Petitioner's Rights under the Sixth, Eighth and Fourteenth Amendments ..........................................................63

CONCLUSION..................................................................................................................65

CERTIFICATE OF SERVICE ........................................................................................67

## I.    Introduction

Petitioner's well-documented Petition for Writ of Habeas Corpus (the "Petition") establishes that Petitioner's conviction and death sentence violate the United States Constitution. Respondent's motion for summary judgment, filed before Petitioner has been allowed discovery or an evidentiary hearing and after *no* meaningful review of Petitioner's habeas claims by the Texas courts, should be denied and an evidentiary hearing ordered.[1]

The Petition raises, at a minimum, material questions about errors that occurred throughout Petitioner's trial that no doubt "undermine confidence in the fundamental fairness of the state adjudication" and require issuance of a federal writ. *Williams v. Taylor*, 529 U.S. 362, 375 (2000) (citing *Teague v. Lane*, 489 U.S. 288, 311-14 (1989)). Respondent manifestly has failed to show that she is entitled to summary judgment under the record already before this Court.

The State repeatedly and knowingly elicited false testimony on material facts about whether the State's principal witness, "Red" Wilson, was at the crime scene, the estimated time of the shootings, the alleged murder weapon, *etc.*, and then unconstitutionally convicted Petitioner on that false testimony. It did the same when it convinced the jury to assess the death sentence. The Prosecutor gave the jury false impressions about Petitioner's prior criminal history and wrongfully capitalized on those false impressions in her arguments.

While the State prosecuted Petitioner with a team of prosecutors, police investigators, and expert witnesses, it did not afford to Petitioner even the basic essentials to mount a constitutionally-adequate defense. Petitioner's appointed attorney, Mr. Limas, told the trial judge he could not provide Petitioner the defense to which he was entitled without the help of co-counsel. Because of his woeful unpreparedness for trial, Mr. Limas was incapable of "acting in the role of advocate," as clearly required by *United States v. Cronic*, 466 U.S. 648 (1984).

---

[1] With this Brief, Petitioner is submitting Petitioner's Motion under Federal Rule of Civil Procedure 56(f), requesting a continuance of Respondent's Motion for Summary Judgment until Petitioner has had the chance to take discovery. In addition, Petitioner is filing a Motion for Discovery. This Brief is filed without waiving Petitioner's rights under Rule 56(f) and his right to discovery and an evidentiary hearing.

Petitioner's appointed trial attorney lacked access to basic resources, including co-counsel, a State-funded investigator, a mental health professional, or even reasonable compensation. The facts establish that Petitioner was constructively denied counsel. They also establish that Petitioner was denied "the right" to "require the prosecution's case to survive the crucible of meaningful adversarial testing" as *Cronic* demands.

In addition, the undisputed facts establish that appointed trial counsel repeatedly made errors that fall below any objective standard of reasonableness. His performance violated *Strickland v. Washington*, 466 U.S. 668 (1984). Mr. Limas's documented errors do not depend on "second-guessing well-informed strategy decisions" by use of hindsight. Trial counsel did not perform the basics. Well before trial, Mr. Limas was informed that Petitioner had a strong alibi—third party witnesses had seen him in Victoria, Texas, within an hour after the alleged killings on South Padre Island—but counsel did *nothing* to investigate, develop a defensive theme around, or prepare to prove, that alibi. If Limas had investigated the alibi, he would *not* have stood before Petitioner's venire panel and talked about "manslaughter" or justification for the killings because Petitioner was "provoked" to kill by victims' rape of Petitioner's wife. He would not have been forced to shift his defensive theories in the middle of trial, a devastating event that became obvious to all.

Further, even though Limas knew Petitioner's wife, Brenda Colella, had already been tried for the same murders by the same Cameron County law enforcement and prosecution team, he did not obtain, let alone study, the transcript of the testimony from Brenda's trial, and he did not attend Brenda's trial. That neglect is inexcusable, and the State does not even pretend to offer any excuse. If Limas had studied the transcript of Brenda's trial, and had it in hand during Petitioner's trial, he would have had a clear record of the critical changed testimony by State witnesses Detective Martinez and "Red" Wilson. He could have demonstrated to Petitioner's jury that the State's witnesses were giving false testimony in Petitioner's case on extremely critical facts.

Also before trial, appointed counsel knew about Petitioner's psychiatric history. Yet, he did absolutely nothing to investigate Petitioner's past (the record shows that trial counsel did

nothing—no factual investigation, no interviews, no review of readily-available hospital documents—to prepare for Petitioner's sentencing hearing). Limas did not even hire a mental health expert for consultation or trial. The Petition has established the abundance of information available about Petitioner's childhood and psychiatric problems and why, under *Williams v. Taylor*, counsel's failure to investigate or present mitigating evidence mandates a federal writ.

The record contains example upon example of Limas's failure to make the most rudimentary and obvious objections to highly-prejudicial inadmissible testimony, his failure to object to the State's improper mischaracterization of testimony, and his failure to object to the Prosecution's repeated use of grossly unfair trial tactics. Counsel in this proceeding are mindful that in the heat of a trial, counsel must make decisions that with hindsight may always be questioned. That is not the case here. The number of mistakes here is overwhelming. The mistakes reflect trial counsel's lack of preparation and knowledge for defending a capital murder case. None of this is a surprise. Mr. Limas told the Convicting Court before Petitioner's trial that he could not, by himself, defend Petitioner's capital murder case.

Similarly, trial counsel told the Convicting Court that he was not qualified to represent Petitioner on his direct appeal. Nevertheless, the Court ordered him to proceed, Mr. Limas handled the appeal, and his performance prejudiced Petitioner.

All of these errors, and others addressed, below establish that Petitioner's Motion should be denied in its entirety and an evidentiary hearing, with reasonable discovery, ordered.

## II.    Argument and Authorities

### A.    Respondent Has Not Met Her Summary Judgment Burden

Respondent bears the burden of pleading and proving the absence of any genuine issue of material fact, and that as a matter of law, she is entitled to judgment as to each and every claim Petitioner has asserted. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Even though this is a habeas case, the Respondent must satisfy the requirements of Rule 56(c), and she concedes this point. *See* Motion at 9. Further, all evidence must be viewed

in the light most favorable to Petitioner, the non-movant. *Teague v. Scott*, 60 F.3d 1167, 1171 (5th Cir. 1995).

Respondent cannot cite to any pleading she filed raising affirmative defenses because she did not answer Petitioner's Petition. As set forth in Petitioner's Response to Respondent's Motion for Summary Judgment (the "Response"), filed June 17, 2002, and incorporated herein for all purposes, Respondent has failed to establish that undisputed facts support entry of summary judgment in her favor. Many of Respondent's "facts" are simply incorrect. Her Motion ignores most of the facts described in the Petition on material points.

**1.    AEDPA Defenses are Inapplicable**

Respondent seeks to avoid her Motion's obvious shortcomings by telling this Court not even to concern itself with the merits of Petitioner's federal constitutional claims. She claims that Petitioner's claims were "adjudicated on the merits" in Texas habeas proceedings within the meaning of 28 U.S.C. § 2254(d). That statute provides that this Court can and must review the claims at least to determine whether any alleged state "adjudication"

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The Petition has documented the failure of the Texas habeas court even to attempt to comply with Texas law as it "processed" Petitioner's state habeas petition. *See* Petition at ¶¶ 15-23. The Response further elaborates the absolute travesty of justice that Respondent wants to pass off as an "adjudication" of Petitioner's claims by the Texas courts. Response at 1, 6-8. In simple terms, the State of Texas never answered Petitioner's state habeas petition, as expressly

4

required by Texas law. The State's attorney submitted a proposed form of order that Judge Euresti (who did not preside over Petitioner's trial) signed promptly after he received it from the State. *See* App. VIII, Exh. 68 (the "Order"). No notice was given, and no hearing was held. The Texas Court of Criminal Appeals (CCA) summarily denied relief. *See* Petition at ¶¶ 15-23.

Petitioner is familiar with the standards under section 2254(d), and if there was any "adjudication" by the Texas courts, which Petitioner steadfastly denies, his Petition in this Court meets the 2254(d) standards for relief. The phrases "contrary to" and "unreasonable application" within 2254(d) establish "two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court." *See Williams v. Taylor*, 529 U.S. 362, 404 (2000). A state court decision is "contrary to . . . clearly established Federal law as determined by the Supreme Court" if: (1) "the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or (2) "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Id.* at 405-06.

A state court decision is "an unreasonable application of clearly established" Supreme Court precedent if the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts." *Id.* at 407-08. The Court established two guidelines for ascertaining when an application of federal law is "unreasonable." First, the inquiry into unreasonableness is an objective one. *See id.* at 409-10. Second, "unreasonable" does not mean only "incorrect." An application of clearly established Supreme Court precedent must be both incorrect and unreasonable to warrant federal habeas relief. *See id.* at 410-12. As set forth in the discussion of below, as to each claim, either subsection (1) or (2) of section 2254(d), or both, applies—if this

5

Court believes that Petitioner's claims were "adjudicated" in the Texas courts (which they were not if any reasonable meaning is given to the word "adjudicated").

Petitioner's claims were not "adjudicated on the merits" in the Texas courts as required by section 2254(d). In *Nobles v. Johnson*, the Fifth Circuit was asked to determine whether the petitioner's *Giglio* claim had been "adjudicated on the merits" in the Texas courts. 127 F.3d 409, 416 (5th Cir. 1997). The Fifth Circuit expressed reservation "about applying the more stringent AEDPA standards" of section 2254(d) "because we are not convinced that the state habeas court sufficiently addressed Nobles's *Giglio* claim" as the "state habeas court did not address the 'materiality' prong of *Gigilo* but simply ruled, without evidentiary hearing, that 'applicant's allegations do not suggest … the presentation of false evidence by the state.'" *Id.* *Nobles* is consistent with *Morris v. Cain*, which recognized that "[a] full and fair adjudication of petitioner's claims is a prerequisite for application of AEDPA's review provisions." 186 F.3d 581, 584 (5th Cir. 1999).

In Petitioner's case, as described below, the Order does not specifically address *any* of the factual elements of Petitioner's federal constitutional claims. Under *Nobles*, this Court should find that Petitioner's claims were not "adjudicated" on the merits in the State habeas proceedings.

Further, as in *Nobles*, Petitioner was not granted any hearing, or any discovery from the State, in the Texas courts. Petitioner's situation is actually much worse than the inmate in *Nobles*, because in Petitioner's case the prescribed Texas habeas procedure, painstakingly crafted in Texas Code of Criminal Procedure Article 11.071, was completely ignored. *See* Petition at ¶¶ 15-23. Under *Morris*, this Court need not invoke AEDPA's review provisions due to the absence of any "adjudication" of Petitioner's habeas claims by the Texas courts.

6

Respondent attempts to avoid the travesty that occurred below by asserting that this Court should presume that the Texas court's determinations of any factual issue is correct unless the Petitioner rebuts the presumption by clear and convincing evidence. *See* Motion at 10 (citing 28 U.S.C. § 2254(e)(1)).    Section 2254(e)(1)'s presumption does not apply to the Order entered below because:

      1.     The Order did not make findings on the factual issues.    First, as to all factual issues, the State habeas court excluded consideration of all record references and exhibits from Brenda's trial. *See* App. VIII, Exh. 68 (Order) at ¶ 6 ("this Court will not acknowledge Brenda's record references/Exhibits"); *id.* at ¶ 7 (refusing to consider Sgt. Martinez's testimony from Brenda's trial that Red Wilson's tire tracks were at the dump scene ("Applicant again mainly references Brenda's trial record, a device this Court will not favor")); *id.* at ¶ 8 (refusing to consider Sgt. Martinez's testimony in Brenda's case about the weapon).    Many of the Petition's federal constitutional claims (false testimony, shifting theories, Red Wilson immunity agreement, *Brady* claim, *Kyles* claim, ineffective assistance of counsel (guilt-innocence and voir dire), cumulative error, pervasive prosecutorial misconduct, change of venue, and *Clewis* claim) cite and depend on facts established by the record of Brenda's trial.    Now, in her Motion before this Court, Respondent concedes the fundamental importance of the record of Brenda's trial by citing facts from Brenda's trial as she seeks summary judgment, even though the State habeas court, to which she wants this Court to deter, expressly refused to consider the testimony of the State's witnesses in Brenda's trial.    There is no way the State habeas court could have adjudicated Petitioner's federal constitutional claims that arise from the direct and material conflicts between what the State's witnesses testified to, under oath, in Brenda's trial, and what they later testified to, also under oath, in Petitioner's trial.    The State habeas judge refused even

to "acknowledge" the transcript of the State's witnesses' testimony from Brenda's trial.

Second, the Order is silent as to material issues of fact raised by the Petition.  Because Judge Euresti refused to consider the record of the State's witnesses' testimony in Brenda's trial, the Order did not address any of the following factual issues.  As to some of Petitioner's claims, the Order, in unthinking, mantra-like fashion, identifies one of Petitioner's habeas claims and then recites that "he did not prove its [their] theory of reversible error by a preponderance of the evidence," yet it fails to define "its" or "their" or "theory of reversible error."  This formulaic statement is not only unintelligible; it simply fails to state a factual finding about any of the following material matters:

(1)     given Sgt. Martinez's testimony in Brenda's case, did Sgt. Martinez give false testimony in Petitioner's case about (a) the tire tracks at the dump scene; (b) origins of Exhibit 40; (c) estimated time of death; (d) his observations of rigormortis; (e) the presence of another motorist at the dump scene; (f) his examination of the bullet extracted from Michael Lavesphere's body; (g) the location of the murder weapon; or (h) what Red Wilson told Martinez about the location of the murder weapon?

(2)     as to each of (a)-(h) in the preceding subparagraph (1), was Petitioner's jury told of Martinez's fatally inconsistent testimony a few months earlier in Brenda's trial?

(3)     as to each of (a)-(h) in subparagraph (1), did the State know Martinez's testimony was false?

(4)     As to each of (a)-(h) in subparagraph (1) was there any reasonable likelihood that Martinez's false testimony could have affected the judgment of the jury?

(5)     did the prosecutor correct Martinez's false testimony when it first appeared?

(6)     was Sid Wilson actually an "armed threat" to Petitioner and Brenda, as the State *admitted* in Brenda's case?

(7)     was another motorist at the dump scene and if so, was that motorist "Red" Wilson?

(8)     was Petitioner's jury told that Sgt. Martinez testified in Brenda's trial, without equivocation, that his investigation concluded that the estimated time of the

victims' deaths was 5:00 a.m.?

(9)     did the State improperly capitalize on Sgt. Martinez's inconsistent testimony?

(10)    given Red Wilson's testimony in Brenda's case, did Red give false testimony regarding (a) the tire tracks at the dump scene; (b) the time of the murders; (c) the theft of Ricky Taylor's wallet; (d) letters he wrote to Pam "Bubbles" Smith describing where the murder weapon was buried; or (e) the location of the gun?

(11)    as to each of (a)-(e) in subparagraph (10), was Petitioner's jury advised of Red Wilson's prior inconsistent testimony?

(12)    as to each of (a)-(e) in subparagraph (10), did the State know the evidence was false when Red testified in Petitioner's trial?

(13)    as to any of (a)-(e) in subparagraph (10), was there any reasonable likelihood that Red's false testimony could have affected the judgment of the jury?

(14)    as to Red's false testimony, did the prosecutor correct it when the false evidence first appeared?

(15)    did Petitioner, Brenda and Red leave Red's camp *not* because they were searching for the Taylor brothers and Lavesphere, but because they feared Sid Wilson's "armed threat" as the State *admitted* in Brenda's case?

(16)    was Petitioner's trial counsel ineffective for not making objections Brenda's trial counsel lodged, and that were sustained in Brenda's trial?

(17)    did Red Wilson steal money from one of the victims?

(18)    was Red simply not credible based on the State's admission in Brenda's case that Red was a "convicted felon and a liar to boot"?

In addition, the Order fails to make findings as to many other factual issues directly raised by the Petition (which are the same factual issues that Petitioner raised in his state habeas proceedings). Examples are as follows:

(1)     are the tire tracks in Exhibit 40 from Red Wilson's Bronco, as Martinez first testified?

(2)     were Red Wilson and his Bronco at the crime scene?

(3)     if the tire tracks clearly showing a second vehicle at the crime scene are not from Red's Bronco, whose vehicle made them?

(4)     what was the time of death and what is the basis for that estimation?

(5)     did Red Wilson give false testimony about (a) the Immunity Agreement; (b) his visit to the dump scene; (c) the circumstances of the shooting; and (d) whether he took Martinez to his campsite?

(6)     as to any of the false statements identified in subparagraph (5) above, was the testimony known by the State to be false?

(7)     as to any of the false statement identified in subparagraph (5) above, did the State correct the testimony, as it was obligated to do?

(8)     as to any of the false statements identified in subparagraph (5) above, is there any reasonable likelihood that the false testimony could have affected the judgment of the jury?

(9)     did the State create a false impression as to the child molestation charge against Petitioner and, if so, is there any reasonable likelihood that impression could have affected the judgment of the jury?

(10)    did the State create a false impression as to the 1985 burglary conviction, and, if so, is there any reasonable likelihood that impression could have affected the judgment of the jury?

(11)    did the State fail to disclose to the defense *Brady* material (*e.g.,* State's notes of Red Wilson's meetings with sheriff's deputies or prosecutors or Martinez's grand jury testimony) which could have been used by the defense to impeach the testimony of the State's witnesses or to exculpate Petitioner?

(12)    was Petitioner denied a constitutionally adequate defense because his appointed trial and appellate counsel, Mr. Limas, was compensated at an unreasonably low rate and because he was not paid until almost two years after the trial?

(13)    was Petitioner denied a constitutionally adequate defense due to the failure of the Convicting Court to appoint co-counsel?

(14)    was Petitioner denied a constitutionally adequate defense because the trial court did not authorize the appointment of an investigator?

(15)    was Petitioner effectively denied counsel at sentencing, a critical stage of the proceedings against him?

(16)    was Petitioner's lawyer subjected to crippling State-imposed handicaps so that he was effectively unable to act as counsel on Petitioner's behalf?

10

(17)    did appointed counsel (a) fail to communicate sufficiently with Petitioner about the facts, potential witnesses and/or experts; (b) fail to follow-up on information given about an alibi; (c) leave crucial strategy decisions until after jury selection; (d) failed to call witnesses who would have supported Petitioner's alibi; (e) fail to obtain critical evidence (*e.g.,* the victims' death certificates); (f) fail to secure the admission of critical evidence (*e.g.,* Judge Hunsaker's report); (g) fail to adopt the defense of alibi as a unified, consistent defensive theme throughout voir dire and the guilt phase; (h) fail to obtain and read the complete transcript of Brenda Colella's trial; (i) change his theory of the defense after trial had already started; (j) fail to object when the prosecution improperly bolstered Red Wilson's credibility through Martinez's testimony; (k) fail to object to inadmissible, inflammatory, bolstering testimony concerning alleged threats made to Red Wilson; (l) fail to object to inflammatory, inadmissible hearsay; (m) fail to adequately cross-examine the State's witnesses; (m) fail to prevent the State's improper impeachment of Petitioner; (n) fail to object to testimony concerning irrelevant, inflammatory alleged extraneous offenses; (o) fail to properly present Petitioner's alibi defense; (p) fail to object to improper, inflammatory and misleading elements of the prosecution's guilt-phase closing argument; and/or (q) fail to object as the prosecution unlawfully tainted the entire jury against Petitioner and his case during voir dire?

(18)    as to any of the acts identified in the preceding subparagraph (17), if found to have occurred, is there a reasonable probability that the outcome of Petitioner's trial would have been different had the error not occurred?

(19)    as to any combination of the acts identified in subparagraph (17), if found to have occurred, is there a reasonable probability that the outcome of Petitioner's trial would have been different had the errors not occurred?

(20)    did trial counsel (a) not obtain or review any records about Petitioner's psychiatric history even though he knew that Petitioner had an extensive psychiatric history; (b) not interview Petitioner's family members concerning the family's background or Petitioner's mental problems; (c) fail to contact any witnesses from Indiana, where Petitioner had lived until shortly before the crime; (d) fail to investigate the circumstances of Petitioner's juvenile arrests; (e) fail to request an evaluation of his client by a mental health expert; (f) fail to request the appointment of a mental health expert knowing that Petitioner had a history of mental illness and emotional problems; (g) rely on Petitioner's mother to identify all mitigating witnesses literally at the last minute; (h) fail to prepare any witness who testified on Petitioner's behalf in the sentencing phase; (i) fail to investigate and present to the jury neutral, credible evidence of Petitioner's chaotic, poverty-stricken, traumatic upbringing, and his extensive, well-documented history of hyperactivity, suicide attempts, depression, and brain damage; (j) fail to prevent the prosecution from improperly and prejudicially referring to an alleged 1982 battery adjudication as a "sexual assault" or "child molestation"; (k) fail to rebut the false and misleading closing argument concerning the circumstances of

Petitioner's 1985 burglary conviction; (l) fail to mitigate the impact of the prosecution's aggravating evidence by using readily available mitigating evidence to link the Petitioner's previous wrongdoing to his psychological problems and chaotic family environment; (m) cite to irrelevant statutes; (n) fail to object to improper prosecution argument at the punishment phase; and/or (o) fail to object when the prosecution "proved" Petitioner's participation in alleged extraneous offenses by inadmissible evidence?

(21)    as to any of the acts identified in the preceding subparagraph (20), if found to have occurred, is there a reasonable probability that Petitioner's sentence would have been different had the error not occurred?

(22)    as to any combination of the acts identified in subparagraph (20), if found to have occurred, is there a reasonable probability that Petitioner's sentence would have been different had the errors not occurred?

(23)    was Limas subject to a conflict of interest in handling Petitioner's appeal, and if so, did the conflict of interest adversely affect his representation of Petitioner?

(24)    did Limas (a) fail to brief and argue his own ineffectiveness on direct appeal and (b) fail to present a prosectorial misconduct claim on direct appeal, and if so, was Petitioner prejudiced by his constitutionally-inadequate performance on appeal?

(25)    Did Limas fail to designate the complete record of the proceedings for inclusion in the appellate record, and if so, did this result in actual prejudice to Petitioner?

(26)    Did the errors of Petitioner's State-appointed counsel, considered in their entirety, constitute ineffective assistance of counsel under well-established Supreme Court precedent.

(27)    In any of the following stages:  voir dire, guilt phase opening, guilt-phase trial, guilt-phase closing, punishment phase trial, punishment phase closing, did the prosecution engage in such severe and pervasive misconduct to render Petitioner's trial fundamentally unfair?

(28)    Did the cumulative effect of all of the errors identified in the Petition violate Petitioner's federal constitutional right to Due Process of Law?

2.    As stated above, the Order did not make factual findings on many fact issues raised by the Petition.  In addition, the Order is vague, ambiguous, and at times unintelligible. The Order does disclose the legal standards it purports to apply, or it discloses that it applied clearly erroneous legal standards.  For example, instead of saying why the State has pleaded and

proved that Petitioner's claims were procedurally barred, the Order refers to Petitioner's alleged "failure to show this Court why he is *not* procedurally-barred from raising them," thereby *reversing* the State's burden to plead and prove a procedural bar. *See* Order at ¶¶ 8, 11-15, 34, 36, 41.

As to certain of Petitioner's claims, the Order merely cross-references to other paragraphs in the Order without explanation. For example, paragraph 16 states that Petitioner's false impression claims "are overruled on the same bases as No. 15." Paragraph No. 15 has nothing to do with a false impression claim and instead concerns Red Wilson's immunity agreement. The problems are compounded when another paragraph, *e.g.*, Paragraph No. 20, purports to cross reference to "No. 17," which in turn purports to cross reference to No. 15. For another example, consider paragraphs 26 and 27, which respectively address Petitioner's claims that Limas failed to prevent the prosecution from improperly referring to a battery charge as "sexual assault" or "child molestation" and failed to rebut false and misleading argument about a 1985 burglary. Each of these paragraphs states that the claim "is overruled on the same bases as No. 25." Paragraph No. 25, in turn, deals with another situation in which the Court held that Petitioner failed "to show that his trial court committed an abuse of discretion by **sustaining** his objection" and by not "showing such evidence was **admissible** at that point in time." In other words, Paragraph No. 25 dealt with Limas's failure to get evidence admitted, while paragraph nos. 26 and 27 addressed claims that Limas failed to exclude certain evidence or argument.

In addition, the Order contains phrases that have no meaning because no context is provided. For example, the phrase "Red's extrajudicial inculpation" in paragraph 13 is not explained. The following sentence from paragraph 24 is nonsensical: "If an applicant forever denies that he committed a crime, and no one else adduced evidence of his 'history of mental

13

illness, including brain damages,' such evidence would not be relevant."

The Order places the burden on Petitioner to produce new evidence—"[t]his Court, therefore, insists that Applicant, having raised a claim of factual innocence, produce newly-discovered evidence which, if true creates a doubt as to the efficacy of the verdict sufficient to undermine confidence in his verdict, and that it is probable that the verdict would be different if he were retried." Order at ¶ 41. Yet, instead of giving Petitioner notice that the State habeas judge was about to sign a proposed order presented by the prosecutor, an opportunity to conduct reasonable discovery, or an opportunity to address the court or present evidence at a hearing, the Texas habeas courts summarily denied Plaintiff's petition for relief.

3.    The Order cannot be a federally-recognizable state "adjudication" because of the manner in which the Order was entered. The State courts completely disregarded the procedure the Texas Legislature enacted to bring the State's capital punishment habeas procedures into compliance with *Townsend v. Sain*, 372 U.S. 293 (1963), and otherwise to bring due process to Texas death penalty habeas procedures on a statewide basis. Texas Code of Criminal Procedure Art. 11.071 (Vernon Supp. 2002). After Petitioner filed his timely application, the State did not file an answer as required by 11.071 § 7(a) ("[t]he state shall file an answer to the application for writ of habeas corpus not later than the 120th day after the date the state receives notice of issuance of the writ"). A State writ issued by operation of law upon Petitioner's filing of a timely application for writ of habeas corpus. *Id.* at § 6(a).

The State's answer is obviously an important pleading, intended, at a minimum, to provide notice to the Petitioner of any procedural defenses on which the State intends to rely and what facts the State contends are contested. Within twenty (20) days of the filing of an answer, the convicting court is supposed to ascertain whether there exist unresolved fact issues and then

issue a written order stating that determination. *Id.* at § 8(a).  If the court determines that fact

issues exist, it is supposed to designate the factual issues to be decided and the manner in which

they shall be resolved, including giving Petitioner's counsel notice whether he or she should

prepare for an evidentiary hearing. *Id.* at § 9(a).  If the court determines that no unresolved fact

issues exist, it is required so to advise the parties, and within thirty (30) days of the issuance of

such an order, the parties "shall file proposed findings of fact and conclusions of law." *Id.* at §

8(b).  Thereafter (not before), the court is empowered to make the appropriate findings of fact

and conclusions of law, and it may hear argument of counsel. *Id.* at § 8(c). After the convicting

court has followed these procedures, the district clerk is supposed to transmit to the CCA a copy

of the pleadings, including the State's answer and both parties' proposed findings of fact and

conclusions of law. *Id.* at § 8(d).

In Petitioner's state habeas proceedings, the process painstakingly prescribed in Article

11.071 was completely ignored, over Petitioner's repeated objections, and it was ignored by

those who are supposed to assure compliance with Texas law, the District Attorney's Office of

Cameron County, the Convicting Court, and the Texas Court of Criminal Appeals.  These State

officers clearly knew that (1) the State was obligated to file an answer; (2) the Convicting Court

was duty bound to determine whether any issues of fact were in dispute, and if no fact issues

existed, to call for submission by both parties of proposed findings of fact and conclusions of

law; and that (3) the Texas scheme contemplated hearings, including an evidentiary hearing.

The State is charged with the responsibility for upholding the rule of law in all regards to assure

that justice is done. *United States v. Murrah*, 888 F.2d 24, 27 (5th Cir. 1989).  Article 11.071 sets

forth the "exclusive procedures" that the Texas courts and the parties must follow in post-

conviction proceedings. *Ex parte Davis*, 946 S.W.2d 216, 224 (Tex. Crim. App. 1996)

(McCormick, P.J., concurring). In other words, no other procedures are acceptable, and the State does not represent that any other procedure constitutes an "adjudication" or complies with due process. It is undisputed that the State's Article 11.071 process was utterly disregarded in Petitioner's State habeas proceedings, despite Petitioner's written objections filed immediately upon his learning that the Cameron County District Attorney and Convicting Court were not following the law. Although Respondent's Motion touts the Order, the Motion is strangely silent about the State's refusal to comply with its own required procedures in the entry of that Order.

More disturbing is that Judge Euresti signed the Order literally within hours after it was presented to him by the State's prosecutor, without notice to Petitioner's counsel. The Order recites that the Judge reviewed many of the relevant, voluminous pleadings, exhibits, and trial transcripts, but that could not be true. The record is too voluminous, and the time was too short.

All of these facts establish that the Order was entered in violation of federal due process and the State's procedures designed to afford due process, and cannot be used by the State for establishing facts or legal rulings against Petitioner. The Petition sets forth in detail the manifest procedural noncompliance by the Texas system. *See* Petition at ¶¶ 15-23. The Motion does not address any of these manifest flaws and instead, falsely asserts that this Court must defer to the Order. If this Court agrees, a travesty will be complete. The Cameron County District Attorney's Office, whose very actions were at issue, got to draft the State's "Order" exonerating its own actions without even having first to answer Petitioner's application for writ of habeas corpus. The "Order" sustains procedural defenses that were never pleaded, and to which Petitioner was given no opportunity to respond. The "Order" was signed, without a single change, by a state judge (not the judge who presided over the Petitioner's trial) without notice or

16

a hearing, and without Petitioner's counsel being allowed even the time allowed by statute to submit cross-findings and conclusions for the habeas court's consideration. The CCA, without allowing briefing or holding a hearing, then summarily denied relief in a two page conclusory order, even though Petitioner had objected at every step of the way to the State's complete failure to follow its own statutory procedures, which were enacted to provide due process of law. Here, a man's life is at stake. Neither the state nor federal courts would permit such a travesty of justice in a civil case with even $100,000 at issue.

      4.      Finally, the Order was entered without any hearing, let alone a full and adequate hearing. Under *Townsend v. Sain*, if the procedure employed by the state habeas court "appears to be seriously inadequate for the ascertainment of the truth, it is the federal judge's duty to disregard the state findings and take evidence anew." 372 U.S. 293, 316 (1963). That test undoubtedly is met here. *See also Singleton v. Johnson*, 178 F.3d 381, 385 (5th Cir. 1999) (citing authority holding that a petitioner is entitled to an evidentiary hearing in federal court because the state did not afford him a full and fair evidentiary hearing on a disputed factual issue). *Valdez v. Cockrell*, 274 F.3d 941 (5th Cir. 2001), does not compel this Court's deference to the Order. In *Valdez*, the petitioner at least had an evidentiary hearing in the Texas court where his counsel was allowed to address the State judge. *Id.* at 943. Here, as the CCA authoritatively wrote, "*no* evidentiary hearing was held." App. VIII, Exh. 72 (CCA Order) at 1 (emphasis added).

      In any event, as set forth below and in the Response, Petitioner has presented clear and convincing evidence to support each of his claims, and any "findings" in the Order are contrary to clear and convincing evidence that was before the State court (even though the State court expressly refused to consider much of it, *i.e.*, the record of Brenda's trial).

## 2.    Petitioner's claims are not procedurally barred

Respondent's second attack in an effort to prevent consideration of the merits of Petitioner's federal constitutional claims is to argue that they were procedurally barred because Petitioner's State-appointed counsel did not make sufficient objections at trial, or raise the points on direct appeal, or in his first habeas application. Motion at 12-13.

Respondent has waived her right to assert any procedural bar. Procedural bar "'is normally a defense that the State is 'obligated to raise' and 'preserv[e]' if it is not to 'lose the right to assert the defense thereafter.'" *Trest v. Cain*, 522 U.S. 87, 89 (1997) (quoting *Gray v. Netherland*, 518 U.S. (1996)). The Fifth Circuit has held that procedural default is an affirmative defense that is waived if the state fails to raise the defense in pleadings. *Cupit v. Whitley*, 28 F.3d 532, 535-36 (5th Cir. 1994); *Mayo v. Lynaugh*, 893 F.2d 683, 686 (5th Cir. 1990).

It is undisputed that the State's attorneys did not affirmatively plead any defense of procedural bar in the Texas courts. When the State's attorney indicated his refusal to file an answer as required by section 7(a) of Texas Code of Criminal Procedure Art. 11.071, Petitioner immediately moved "to preclude the State from asserting or relying on unpleaded supposed procedural defenses, supposed procedural defaults, or other supposed defenses or affirmative defenses." *See* App. VIII, Exh. 69 (Applicant's Objection to State's Failure to File an Answer and Motion to Preclude Defenses). Petitioner's objections were renewed in another pleading filed immediately after the Order was entered. *See* App. VIII, Exh. 70 (Applicant's Objections to the Order of May 23, 2001 and All Procedures Contrary to Article 11.071, etc.). The Texas courts refused to rule on Petitioner's objections and motions.

Given that the State never has pleaded the affirmative defense of procedural bar and that, at every stage, Petitioner objected to entry of the Order based on the absence of any notice of any affirmative defense, this Court should not honor any "procedural bar."

Second, Respondent's Motion correctly concedes that procedural bar does not apply to Petitioner's claims of ineffective assistance of counsel. *See* Motion at 13. Respondent tries to impose a novel limitation on her concession by claiming that ineffectiveness based on "record

18

matters," *e.g.*, appointed counsel's failures during trial, is procedurally defaulted. *Id.* at 13 n.3. Respondent cites no authority for so limiting the rule that procedural bar does not apply to ineffectiveness claims. Respondent's rationale is that Petitioner might have raised these claims on direct appeal.   But Petitioner has alleged that counsel was unconstitutionally ineffective on direct appeal by not asserting his own ineffectiveness at trial. *See* Petition at ¶¶ 441-443. The CCA recognizes that it is not realistic to expect counsel to raise his own ineffectiveness. *See Robinson v. State*, 16 S.W.3d 808, 811-12 (Tex. Crim. App. 2000) (citing favorably a decision of the Supreme Court of Mississippi (*Read v. State*, 430 So.2d 832, 837 (Miss. 1983)) which held that "the procedural bar rule has no application to the issue of ineffective assistance of counsel"). Also, the Sixth Amendment right to counsel is not forfeitable and can only be waived "by the conscious and intelligent decision of the person who holds the right." *Id.* (citations omitted).

Third, the procedural bar can be forfeited if there was a cause and prejudice for the failure to raise the issue. Record-based ineffectiveness claims were not raised on direct appeal because Limas was also Petitioner's appointed appellate counsel. This no doubt prejudiced Petitioner. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986). Indeed, as to each and every claim that the Petition raises, there was cause and prejudice for the failure to raise the issue.

Fourth, the Motion assumes that the Order "found" that each of Petitioner's claims of is procedurally barred.  For the procedural bar to even come into play, the state court must have "explicitly relied on a procedural bar." *Tucker v. Johnson*, 242 F.3d 617, 627 (5th Cir. 2001). The Order, drafted by the State, contains a general statement that Petitioner did not show why all of his claims and their sub-issues are not procedurally barred (thereby illegally making "no procedural bar" into an element of the Petitioner's case, rather than an affirmative defense to be pleaded and demonstrated by the State), but the Order never states explicitly that each and every claim is procedurally barred or why. *See* Order at ¶ 5 (general statement).  Also, as to most of the claims, the Order merely states that Petitioner "fail[ed] to show this why he is not procedurally-barred from raising them" and does not assert that the claims are in fact procedurally barred. *See id.* at ¶¶ 8, 11-15, 32-34, 36. At paragraph 16, the Order begins its attempt to cross-reference, but as noted above, it is not clear even what all the cross-references

19

are to.  Sometimes a cross-reference is to a paragraph that does not even mention a procedural bar.  *See id.* at ¶¶ 26-30 (all purporting to cross-reference to Paragraph No. 25, which does not mention any procedural bar),  Paragraphs 31, 39, 40, 42, and 43 make no mention of any procedural bar.

Fifth, the Motion and the Order suggest that to the extent Petitioner did not raise a claim in his first untimely state court habeas proceeding filed on September 9, 1998 (which the CCA dismissed due to its untimely filing), he is procedurally barred from raising it now.  Neither the Motion nor the Order cites any law whatsoever to support this argument.  First, this contention is shown to be incorrect by Tex. Code Crim. Proc. Art. 11.071 § 4A(f), which was enacted to allow Petitioner, and others like him whose habeas counsel failed to file timely petitions, to file habeas petitions in the Texas courts.  Section 4A(f) does not confine the petition that Petitioner could file to the one that his earlier counsel filed out-of-time.  Indeed, it provides that "[n]*otwithstanding any other provision of this article*, the court of criminal appeals shall appoint counsel and establish a new filing date for application . . . for each applicant who before September 1, 1999, filed an untimely application or failed to file an application before the date required by Section 4(a) or (b)."  Tex. Code Crim. Proc. Art. 11.071 § 4A(f) (Vernon Supp. 2002) (emphasis added).   The article does not say, and surely cannot mean, that the newly-appointed counsel may refile only the same habeas application that the earlier counsel, who missed the filing deadline, filed.  *Any* attorney appointed under section 4A must investigate "the factual and legal grounds for" the application as required by Tex. Code Crim. Proc. Art. 11.071 § 3.  Give this specific responsibility and counsel's general duty zealously to represent his or her client, no attorney could simply re-cycle an earlier application if he or she found it wanting.  Second, Respondent is estopped from asserting this argument, or has waived it.  Magistrate Judge Black's Report and Recommendation expressly recognized that if "Petitioner files a federal habeas petition following exhaustion of his state remedies, that petition will not be deemed 'second or successive' under the AEDPA" and "the petition will be considered as an initial, timely federal habeas petition."  App. VI, Exh. 55 (Magistrate Judge's Order) at ¶ 17.  Judge Black's Report and Recommendation, which Respondent reviewed before it was

submitted to the Court, effectively precludes any argument that this Court may not consider Petitioner's claims in the Petition unless they were also raised in his 1998 State application, which the CCA dismissed as untimely.

As to some of Petitioner's claims, Respondent also alleges that (1) Petitioner seeks retroactive application of a new rule of law or (2) that Petitioner has not proven that the claims resulted in a substantial and injurious effect or influence in determining the jury's verdict. Petitioner will address these defenses below in connection with his individual claims.

**B.    Summary Judgment Would be Improper as to Each of Petitioner's Claim**

**1.    The State Presented False Testimony in Clear Violation of the Fourteenth Amendment**

Petitioner's federal due process rights were violated when the State knowingly offered false testimony to obtain his conviction, or failed to correct false testimony presented by its witnesses. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). Relief is warranted if (1) the statements in question are shown to be false; (2) the prosecution knew that they were false; and (3) the statements were material. *Thompson v. Cain*, 161 F.3d 802, 808 (5th Cir. 1998). These principles of federal constitutional law were well-established at the time of Petitioner's trial.

Respondent agrees with Petitioner's characterization of the *Napue* standard. The one apparent issue, although really not in dispute, concerns materiality. *See* Motion at 15-16. Under Supreme Court authority, false testimony is material "if there is any reasonable likelihood that [it] could have affected the judgment of the jury." *See Napue*, 360 U.S. at 271.[2]

The following testimony presented at Petitioner's trial is false, or at least there is a question of material fact as to whether it is false: (1) Sgt. Martinez's testimony that the tire

---

[2]    There is some confusion, prompted by the Petition's statement at p. 44, that the standard under *Napue* "is considerably less onerous than the *Brady* standard, which requires an applicant to prove that there is a reasonable likelihood that the outcome of the trial would have been different." As Respondent points out, this statement is incorrect as *Moody v. Johnson*, 139 F.3d 477, 484 (5th Cir. 1998) did not eliminate the "reasonable likelihood" standard. What Petitioner should have said, and as he did say earlier in the Petition, is that the *Napue* standard is "considerably less onerous" than the "reasonable probability" standard under *Brady v. Maryland*. *See* Petition at n13 (citing *Kirkpatrick v. Whitley*, 992 F.2d 491, 497 n.30 (5th Cir. 1993) (distinguishing between the requirement of *Brady* that there be a "reasonable probability," "a probability sufficient to undermine confidence in the outcome" versus a "reasonable likelihood that the false testimony *could have affected* the jury's verdict") (emphasis added).

tracks in certain trial photos are not from Red Wilson's truck (Martinez testified in Brenda's trial that the tire tracks in the photos were from Red Wilson's truck; the State admitted in its appellate brief filed in Brenda's case that the tire tracks came from Red's truck); (2) Martinez's testimony that tire tracks at the dump scene are not from Red Wilson's truck (Martinez testified in Brenda's trial that the tire tracks were from Red Wilson's truck; the State admitted in its appellate brief filed in Brenda's case that the tire tracks were from Red's truck); (3) Martinez's testimony that the phrase "tire track at crime scene belonging to Red" on Exhibit 40 reflects a theory he had when he first developed the film the day after the victims were found (in front of Brenda's jury, Martinez wrote the phrase shortly after Exhibit 40 was admitted into evidence in that trial); (4) Martinez, who arrived on the scene between 11:30 a.m. and noon, testified the bodies had been there for about twelve hours (he testified in Brenda's trial that the "bodies had been dead for about six to eight hours"); (5) Martinez used his observations and professional experience about rigormortis to establish that the bodies had been there for twelve hours (in Brenda's trial, Martinez testified that rigormortis would not extend beyond ten hours and used this fact to estimate the victims' deaths at around 5:00 a.m.); and (6) Martinez testified that he had not earlier testified that he knew the bullet was a nine millimeter based on his inspection and he denied inspecting the bullet (in Brenda's trial, Martinez opined that the bullets used to kill the victims were nine millimeter based on his review of the bullet taken from Michael Lavesphere). *See* Petition at ¶¶ 71-122.

The State knew that Martinez's testimony in Petitioner's trial was false. The same State prosecutors had sponsored Martinez's very different testimony in Brenda's trial. *See* Statement of Facts from Brenda's Trial. This fact is undisputed. The State made no effort to correct any of Martinez's false statements. Instead, as to the false testimony about the estimated time of death, the State improperly capitalized on it in closing argument. Petition at ¶ 83. The State's conduct runs afoul of *United States v. Sanfilippo*, 564 F.2d 176, 178 (5th Cir. 1977) (a prosecutor has a duty to correct the false testimony when the false evidence first appears) and *United States v. O'Keefe*, 128 F.3d 885, 896-98 (5th Cir. 1997), *cert. denied*, 523 U.S. 1078 (1998) ("a deprivation of due process may result when the information has been provided to the defense but

22

the government reinforces the falsehood by capitalizing on it in its closing argument"). Notably, Respondent's Motion is silent as to these critical points of federal constitutional law.

The Motion attempts to dismiss Martinez's false testimony as immaterial. But there can be no doubt that it was reasonably likely that the false testimony of the State's lead police investigator affected the decision of Petitioner's jury, or at least there is a question of material fact as to this matter. The tire tracks testimony presented in Brenda's trial through Martinez established that Red was at the dump scene, a fact that Red denied in Petitioner's trial. Red's presence at the dump scene established that Red lied. Petitioner's jury was specifically instructed that it must find that Red, an accomplice, testified truthfully. Tr. Vol. I at 134. Sgt. Martinez avoided conflicting with Red's testimony, and thereby casting doubt on Red's testimony in Petitioner's trial, by changing his testimony in Petitioner's trial to remove Red from the dump scene. Further, Red's false testimony that he was not at the dump scene, when Martinez had earlier testified he was, at least raised a question of material fact as to whether Red was, in fact, responsible for the killings. Contrary to Respondent's claim, Petitioner's jury was not advised of the numerous inconsistencies between the two trials on the issue of the tire tracks. Response at 20.

Sgt. Martinez's false testimony about the estimated time of death (5:00 a.m. at Brenda's trial; 12 midnight at Petitioner's trial) was absolutely and critically material. If Sgt. Martinez, the State's lead police investigator, testified to the same result from his investigation that he did in Brenda's trial, his testimony would have been that the estimated time of death was 5:00 a.m. The jury would then have had little choice but to accept Petitioner's alibi because a highly credible, third party witness placed Petitioner 242 miles away from South Padre Island before 6:00 a.m. that same morning. Also, Prosecutor Lopez could not have argued in closing that Petitioner's counsel fabricated his statement that the deaths occurred about 5:00 a.m. If in front of Petitioner's jury, Sgt. Martinez expressly rejected the notion that the killings had occurred between 12 and 2 o'clock or 1 o'clock in the morning, as he had done testifying to Brenda's jury, it is reasonably likely that the jury could have found in favor of Petitioner. The State did not disclose Martinez's prior conflicting testimony on the time of death to Petitioner's jury. *See*

23

Response at 21-26.

The Motion does not even address that Martinez also gave false testimony in Petitioner's trial, saying: (1) that he did not review the bullet extracted from Michael Lavesphere's body, and (2) he had not earlier testified that he knew the bullet was a nine millimeter based on his inspection. *See* Petition at ¶¶ 115-119. In Brenda's trial, Martinez testified that he was an expert in firearms, that he reviewed the bullet extracted from Lavesphere's body, and he determined it was a nine millimeter. *Id.* at ¶ 116.[3] The Motion does not challenge the Petition's lengthy explanation about the materiality of this false testimony. *See* Petition at ¶¶ 117-119.

Finally, Respondent cites certain cases for the proposition that "contradictory" or "inconsistent" testimony is not always testimony. *See* Motion at 15. In none of the cited cases, however, had the State presented the testimony of a witness in one trial and then called that very same witness to give directly opposite testimony during the second trial at issue. *See Kutzner v. Johnson*, 242 F.3d 605, 609 (5th Cir. 2001) (testimony that a certain company's cable wiring was not common is not false merely because another person testified in an affidavit that the cable wiring was available; also, the falsity was not established by a facsimile from the company showing that it sold 41,000 feet of wire on a monthly basis);[4] *Koch v. Puckett*, 907 F.2d 524, 531 (5th Cir. 1990) (defendant merely disagreed with the testimony of a sheriff and investigators as to events relating to a shooting; no claim that the prosecution knew the testimony was false); *United States v. Viera*, 819 F.2d 498, 502 (5th Cir. 1987) (prosecutor had no duty to intervene and correct his witness' statements because he had no reason to believe that the witness was lying).

Here, the State's prosecutor knew that Martinez's testimony was false in Petitioner's trial because she had also presented him for his sworn testimony in Brenda's trial only months earlier.

---

[3] *See also* App. II, Exh. 18 (State's Appellate Brief) at 3 ("[t]hat round would later be found to match the size of the wounds Martinez observed in the victims' bodies and slugs recovered from their autopsies") (citing Sgt. Martinez's testimony from Brenda's trial).

[4] The Fifth Circuit in *Kutzner* had before it a specific finding from the state habeas court that the witness did not commit perjury. 242 F.3d at 609. In contrast, in Petitioner's case, there is no such specific finding as to any of the facts giving rise to Petitioner's claim as to false testimony. *See* Order.

24

The State called Martinez and knew at the time he was giving false testimony without correcting him, and the State's Prosecutor even capitalized on the false testimony in her closing argument. The materiality of Martinez's false testimony is unquestionable. The testimony involves critical issues of crime scene evidence, the estimated time of death, and the weapon used in the offense. The State's conduct was a clear violation of the Fourteenth Amendment.

The Order does not identify any legal principle supporting its ruling denying Petitioner's claim. In any event, the failure to grant habeas corpus relief as to this claim was contrary to *Napue* and involved an unreasonable application of the *Napue* standard to Petitioner's case. Given the record in the Texas courts, the denial of this claim unreasonably ignored the facts.[5]

### 2.    The State Violated Petitioner's Fourteenth Amendment Right to Due Process of Law By Shifting Theories Between Brenda's and Petitioner's Trials.

Respondent provides no facts to refute Petitioner's showing that the State called certain witnesses to testify in Brenda's trial to certain facts and used those witnesses to convict Brenda, but then in Petitioner's trial, elicited different conflicting facts about the same crime from the very same witnesses, and used those conflicting facts to convict Petitioner. The Prosecutor never corrected its witnesses' testimony and one cannot help but believe that the prosecution team encouraged their witnesses to mold their testimony to undercut Petitioner's alibi and to avoid impeaching "Red's" credibility. The false testimony in Petitioner's trial pertained to critical events, such as whether Red's Bronco made the tire tracks at the crime scene, the time of the victims' deaths, and the type of weapon used in the offenses. Much of the false testimony came from Detective Martinez, an experienced Cameron County law enforcement officer, whose appearance and testimony no doubt impressed the jury, as the State wanted it to do.

Respondent does not refute that the State's prosecutors, as "quasi-judicial officers," owe

---

[5] Petitioner steadfastly maintains that the claims in his State habeas application were not "adjudicated on the merits" as contemplated by AEDPA and that the Order did not make the required findings.

a duty to assure that justice is done. *E.g., Strickler v. Greene*, 119 S.Ct. 1936, 1948-49 (1999).

Instead, Respondent tries to suggest that the Prosecutor's presentation of inconsistent fact

testimony from the same witnesses about the same crime was somehow proper. Motion at 23-24

(citing *Nichols v. Scott*, 69 F.3d 1255, 1272 (5ᵗʰ Cir. 1995)). *Nichols* is clearly distinguishable.

In *Nichols*, defendant Williams pleaded guilty to capital murder of a shop clerk. 69 F.3d at 1260.

Nichols, one of three other persons named in the indictment, was tried and also convicted of

capital murder of the same clerk. *Id.* at 1260-63. Nichols' jury was instructed under the Texas

"law of parties," in which Nichols could have been found guilty of capital murder either for

firing the fatal shot, or even if Williams fired the fatal shot if done in furtherance of a conspiracy

of which Nichols was a member. *Id.* at 1262. Both Nichols and Williams fired at the clerk. *Id.*

at 1265 n.17. The federal district court in *Nichols* held that Williams's guilty plea established

Williams as the person who fired the fatal shot. *Id.* at 1269. According to the district court,

based on Williams' guilty plea, the State's evidence at Nichols' trial that Nichols was, in fact, the

triggerman thus was false. *Id.* The Fifth Circuit held that the district court erred by holding that

Williams had fired the fatal shot, as Williams had merely pleaded guilty. *Id.* at 1270-71.

Further, in *Nichols*, the two claims were not factually inconsistent. "Nichols was properly

eligible for the death penalty whether or not the shot he fired at Shaffer – as opposed to that fired

by his co-actor Williams – was the cause of Shaffer's death." *Id.* at 1273. Finally, Nichols's

defense lawyers knew of what happened in Williams's case, so "the reliability or fairness of the

fact finding process" in Nichols' trial was not affected. *Id.* at 1269.

In Petitioner's case, Limas was not aware of what had happened in Brenda's trial because

he had not attended that trial or read the transcript. Regardless, Petitioner's case is vastly

different from *Nichols*. Petitioner's case involves the Prosecution's active involvement in

Martinez's change of his testimony on specific facts between the two trials, which did not occur in *Nichols*. The result of Martinez' changed testimony was that the State was able to "lie around" fatal flaws in its case against Petitioner, of which it learned after its witnesses had already given their sworn testimony in Brenda's trial.

The Motion claims that the State's evidence and theory in Petitioner's case did not rest on diametrically opposite testimony.   Nevertheless, the State has not offered any explanation for Martinez's opposite testimony about the tire tracks, estimated time of death, and the bullet, all of which is extremely well-documented. *See* Response at 11-26.   With Martinez's change in his testimony about his findings on the time of the crime, the Prosecution in Petitioner's trial was able to undercut the significance of the powerful fact that Petitioner was 240 miles away from the crime scene shortly before 6 a.m. on the morning of September 13th.   In Brenda's trial, 6 a.m. was only one hour after the time that Martinez testified the victims were killed.   With Martinez's abrupt change in his testimony about Red's tire tracks, the Prosecution in Petitioner's trial was able to eliminate the "problem" of Red's presence at the crime scene.   With Sgt. Martinez's change in testimony about the fatal bullet, the Prosecution in Petitioner's trial was able to avoid cross-examination of Martinez, a self-professed firearms expert in Brenda's trial, about how a 9 mm bullet could have been fired from a revolver.

Finally, Respondent argues that Petitioner's claim is *Teague*-barred.   Petitioner is not asking for the application of any new rule of law.  Since 1935, *Berger v. United States* has been the law, and it recognized that the prosecutor's duty is to assure that justice is done.  When the accused is treated unfairly, the U.S. system of justice suffers. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963).  *See also Strickler v. Greene*, 119 S.Ct. at 1948 n.19, citing other Supreme Court opinions as far back as 1935.  As the Eighth Circuit held in *Smith v. Groose* acknowledged, a

27

holding that the State's use of factually-contradictory theories violates due process is not a new rule of constitutional law. It is as old as *Berger*. 205 F.3d 1045, 1053 (8th Cir. 2000), *cert. denied*, __ U.S. __, 121 S.Ct. 441 (2000).

*Nichols* establishes that if *Teague* were to apply, which Petitioner denies, Petitioner's claim would be subject to a *Teague* exception. Holding the State to factually consistent theories and evidence is necessary to assure an accurate conviction. Unlike in *Nichols*, what the Prosecutor did in Brenda's case is related to the accuracy of the determinations made in Petitioner's case. *Compare Nichols*, 69 F.3d at 1273. Petitioner could not have been found guilty if the State had presented the same facts that it presented to convict Brenda in her trial.

The Order does not identify any legal principles supporting its ruling on this claim. In any event, the failure to grant habeas corpus relief on this claim was contrary to *Berger* and involved an unreasonable application of the *Berger* standard to Petitioner's case. Given the record in the Texas courts, the denial of this claim unreasonably ignored the facts.

### 3. The State Violated Petitioner's Fourteenth Amendment Right to Due Process of Law with Respect to Red Wilson's Immunity Agreement

Red Wilson gave false testimony in Petitioner's trial about (1) his tire tracks at the scene of the crime; and (2) the time of the murders. This false testimony, and other false testimony, is documented throughout the Petition and is summarized in the Response at pages 27-30. As set forth therein, the State knew Red's testimony was false because it had presented conflicting testimony from Red or Detective Martinez in Brenda's case.

The Motion claims that Red's tire tracks testimony was truthful. *See* Motion at 25-27 (Respondent claims that the tire tracks in Exhibit 40 are not from Red Wilson's truck). But Martinez testified in Brenda's case that the tire tracks in Exhibit 40 were from Red Wilson's truck, and he so noted that fact directly on the Exhibit at Prosecutor Lopez's request in open

Court. No effort was made in Brenda's case to correct Martinez's testimony or to suggest that he was mistaken about his "experienced" identification of the tire tracks. *See* Response at pp. 27-30. In fact, the State cited Martinez's testimony in Brenda's appeal to establish that Red's truck had pushed the victims' truck into the Bay.. App. II, Exh. 18 (State's Appellate Brief) at 21 n.3.

In any event, all of Red's false testimony was material, which the Motion does not challenge, and the fact that Red testified falsely is independently material because of the Convicting Court's instruction to Petitioner's jury that it must first find Red's testimony truthful before that testimony could be considered as a basis for conviction.

Red gave other false testimony in Petitioner's trial, *e.g.*, he testified that on September 13th he went to the crime scene, but then in cross-examination denied he had gone there until months later. Petition at ¶¶ 133-34. The significance of this testimony is that it should have triggered a breach of the Immunity Agreement because Red's testimony in these two instances cannot be reconciled. Also, this fact, like the tire tracks, ties Red to the crime scene, which raises questions about his own responsibility for the murders. Notably, the Motion does not address any of Red's false testimony. Instead, Respondent claims, rather surprisingly, that Red's obligation to testify *truthfully* does not mean that he had to testify *consistently*! Motion at 26. But if Red told the truth when he said he went to the dump scene on September 13th, then he had to have lied when he testified that he did not go to the dump scene until months later. If Red told the truth when he testified that he did not go to the dump scene until months later, then he lied when he said he went to the dump scene on September 13th.

The State was obligated to hold Red to his promise to testify truthfully, as he agreed under the Immunity Agreement. Instead, the Prosecutor encouraged Red to tell the jury that his immunity remained in effect *unless he was the shooter*. Petition at ¶¶ 136-37. Notably, the

Motion provides no facts to refute Petitioner's claim that the State caused Red to mischaracterize his own Immunity Agreement in violation of *Napue*.

The prosecutor has the ethical and legal duty not merely to "win" a conviction but to assure that "justice shall be done." *Berger*, 295 U.S. at 88. As a result, the prosecutor is prevented from presenting false evidence, and a reversal of a conviction is required where the prosecutor knew or should have known that false evidence was presented, especially by an indicted alleged accomplice from whom the State has purchased testimony in exchange for a highly conditional grant of immunity. *Miller v. Pate*, 386 U.S. 1, 7 (1967). The State *no doubt* used false testimony from Red to convict Petitioner, in violation of Petitioner's long-established due process rights.

The Order does not identify the legal principles supporting its ruling on this claim. In any event, the failure to grant habeas corpus relief on this claim was contrary to *Napue* and involved an unreasonable application of the *Napue* standard to Petitioner's case. Given the record in the Texas courts, the denial of this claim unreasonably ignored the facts.[6]

### 4. The State Violated the Fourteenth Amendment by Presenting a False and Misleading Impression of the Evidence

The State's prosecutors knowingly gave the jury misrepresented impressions that Petitioner had been convicted of child molestation and burglarized an elderly lady at knifepoint.

---

[6] The Motion claims that Petitioner's constitutional challenge to Red's "conditional" Immunity Agreement is *Teague*-barred. Petitioner's counsel have not found United States Supreme Court authority that would have struck down the Immunity Agreement due to its conditionality. It is well established, however, that plea-bargains and inducements create powerful motivation to lie. *Hoffa v. United States*, 385 U.S. 293, 311 (1966); *United States v. Cervantes-Pacheco*, 826 F.2d 310, 315 (5th Cir. 1987) ("It is difficult to imagine a greater motivation to lie than the inducement of a reduced sentence ..."). In the usual case, established safeguards, nevertheless, allow for testing the "compensated" witness's veracity. *Hoffa*, 385 U.S. at 311. One of the important safeguards is the Prosecutor's duty not to present false testimony or to let false testimony go uncorrected, and that duty has long been well established in Supreme Court cases. *E.g.*, *Strickler v. Greene*, 119 S.Ct. 1936 at 1948-49. In Petitioner's case, that important safeguard failed, and Red's testimony was not subject to meaningful adversarial testing due to the State's misconduct.

Petition at ¶¶ 138-141; Response at 39-41. As to the child molestation, the State capitalized on the false impression by suggesting in closing argument that Petitioner had been convicted of sexual assault. *Id.* Respondent's Motion does not refute any of these facts. Her Motion's factual response fails to rebut that there is a reasonable likelihood that the false impression affected the jury's judgment.

The Motion claims that Petitioner must show that the error had a substantial and injurious effect or influence in determining the jury's verdict. Motion at 28 (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). The false impression claim arises under *Napue* and *Alcorta v. Texas*, 355 U.S. 28, 31 (1957). *See United States v. Anderson*, 574 F.2d 1347, 1355 (5th Cir. 1978). The "considerably less onerous standard" applies to the false impression claim, which would require the setting aside of a verdict if there is any reasonable likelihood that the false impression could have affected the jury's judgment. *Id. See also Kirkpatrick v. Whitley*, 992 F.2d 491, 497 (5th Cir. 1993) (merely applying the "reasonable likelihood" test and not mentioning the "substantial and injurious effect or influence" test of *Brecht*). The Fifth Circuit has expressly refused to decide whether the *Brecht* test applies to a claim using the "any reasonable likelihood" standard of materiality in the habeas context. *Barrientes v. Johnson*, 221 F.3d 741, 756-57 (5th Cir. 2000), *cert. dismissed*, 531 U.S. 1134 (2001). The Fifth Circuit does not require application of the *Brecht* test to Petitioner's false impression claim.

Even were the harmless error test to apply, at a minimum there is a factual issue as to whether the State's false impressions had a substantial and injurious effect in determining the jury's verdict on guilt or on punishment of death. A reporter sitting in the audience, hearing what the jury heard, wrote that Petitioner had been convicted of rape (untrue), and another reporter, hearing what the jury heard, wrote that Petitioner had threatened an elderly lady at

knifepoint, tied her up and robbed her (none of which occurred). Response at 40, 41. In other words, the reporters sitting in the courtroom, listening to the same presentations by the prosecution as the jury, believed the State's terribly damaging false impressions.

Respondent suggests that the false impressions might not seem so bad if they are put into the following context: first, Respondent says Petitioner's jury was aware of the facts of the capital murders with which Respondent was charged and second, four representatives from Indiana law enforcement had prophesied that Petitioner would be a continuing threat to society. Motion at 28 (the Motion cites to 75 pages of testimony to support the latter claim without giving any specific references). If Respondent's first point were to prevail, then every person found guilty of capital murder is necessarily a "continuing threat to society" because the jury has already found them guilty of a horrible, intentional, crime of violence. As to the second point, the Motion is simply incorrect. Sgt. Tyler testified about a one involvement he had with Petitioner, which occurred in 1982, nearly ten years before Petitioner's capital murder trial; and he never testified that Petitioner would be a continuing threat to society. *See* Vol. XXI: 53-70. Mr. Tosser's testimony actually involved the 1982 charge of molestation, which the State used to set up the Prosecutor's misleading claims that Petitioner was convicted of child molestation. *See id.* at 98-99. Tosser had not dealt with Petitioner since 1984, so his testimony about future dangerousness should have been considered in that light. *Id.* at 113. The problem is that Tosser's testimony was grossly distorted when the Prosecutor claimed in closing that Petitioner "had a sexual assault." Messrs. Breitzinger and Newport had dealings with Petitioner as to the 1985 burglary offense. *Id.* at 80-81, 84. Breitzinger had not had any involvement with Petitioner since then. *Id.* at 81. Newport had not indicated when he last had contact with Petitioner. Both answered "yes" when asked if in their "opinion" Petitioner posed future danger, with little

explanation of how they could be qualified to predict such a matter or the bases, if any, for their "opinions." *Id.* at 81-82; 93.

Petitioner asks this Court to put the false impressions in their proper context as the principal aggravating "facts" the Prosecution argued to convince the jury to sentence Petitioner to death. *See* S.F. XXI: 54-121. The impressions were highly prejudicial. The Prosecutor undoubtedly knew they would be. That is why she went to such great lengths to leave the false impressions, unsupported by the known facts, with the jury.

The Order does not identify the legal principles supporting its ruling on this claim. In any event, the failure to grant habeas corpus relief on this claim was contrary to *Napue* and *Alcorta* and involved an unreasonable application of theses cases to Petitioner's case. Given the record in the Texas courts, the denial of this claim unreasonably ignored the facts.

### 5.    The State Violated *Brady v. Maryland*, 373 U.S. 83 (1963)

It is undisputed that shortly after the victims were found, the Cameron County Sheriff's Office interrogated Red Wilson. Red gave a sworn written statement denying any involvement in the killings, a statement that everyone later learned contained material lies and omissions. Petition at ¶ 54.

It is also undisputed that a little over five months after the victims were found, on February 26, 1992, a Cameron County grand jury indicted three people for the capital murder of David Taylor and Michael Lavesphere: Red Wilson, Paul Colella and Brenda Colella. App. I, Exh. 2 (Indictment). The Cameron County District Attorney's Office presented the capital murder case against the Colellas *and* Red Wilson to the grand jury. S.F. Vol. XII: 184. Shortly before Brenda's trial in late May 1992, Red Wilson met with Detective Martinez and representatives of the Cameron County District Attorney's office for an allegedly "off-the-record" two-day interview. Petition at ¶ 58. Thereafter, Red was given complete immunity conditioned on his truthful testimony and also conditioned on no evidence coming to the District

Attorney's attention that Red had actually participated in the killings. *Id.*; App. I, Exh. 5 (Immunity Agreement).

It is further undisputed that immediately after the Immunity Agreement was made, Detective Martinez testified in Brenda's trial that his investigation concluded that Red's Bronco was at the crime scene. (BBC) S.F. Vol. IV: 96 -101. In Petitioner's trial, however, a few months later Detective Martinez changed his testimony and denied that his same investigation had concluded that Red Bronco's was at the crime scene. S.F. Vol. XII: 149-50.

In addition, it is undisputed that Petitioner's trial counsel asked for all *Brady* material, including access to any inconsistent statements and any grand jury witness testimony that is inconsistent with any statement known to the State. Tr. Vol. I at 24-25.

The Motion does not refute that, under *Brady*, Petitioner had the legal right to inconsistent grand jury testimony or any inconsistent statements made by witnesses to state officers. *See* Motion at 28-30. Instead, it merely claims that at this stage the Petitioner bears the burden of showing that the State suppressed material exculpatory evidence, and that Petitioner has not identified any specific *Brady* evidence. *Id.* at 29-30.

The cases that Respondent cites are distinguishable. In *United States v. Hughes*, 230 F.3d 815, 819 (5th Cir. 2000), the court held an evidentiary hearing on the *Brady* claim. In *Little v. Johnson*, 162 F.3d 855, 862 (5th Cir. 1998), the federal district court conducted testing on the *Brady* evidence and held an evidentiary hearing on other issues. Here, Respondent seeks dismissal of the *Brady* claim without discovery or an evidentiary hearing, and apparently without even an in camera inspection by this Court. *Hughes v. Johnson*, 191 F.3d 607, 630 (5th Cir. 1999), is distinguishable in that the *Brady* claim was based on the failure to produce an internal investigation report, yet it was apparent that the petitioner did not know whether such an investigation had even occurred. Instead, the petitioner had merely asserted conclusory allegations. *Id.* Finally in *United States v. Taylor,* 253 F.3d 1115, 1117 (8th Cir. 2001), the surveillance tape evidence alleged to have been *Brady* evidence did not exist.

Petitioner has given detailed pleadings setting forth Sgt. Martinez's numerous instances of providing false testimony. Response at 12-26, 30-31. That Red Wilson gave untruthful and

inconsistent testimony also stands unrefuted.  Id. at 27-30; 32-39.  Petitioner is entitled to discovery of testimony given by Detective Martinez before the Grand Jury that supported the capital murder charge against Red Wilson, any evidence that would have supposedly supported dropping those charges, and any other statements or evidence affecting the credibility of any witness or concerning Red Wilson's involvement in the murders.  Petitioner has filed a motion for limited discovery under Rule 6 of the Rules Governing Section 2254 Proceedings.  Until Respondent produces this information, it would be premature for the Court to rule on Petitioner's *Brady* claim.

The Order does not identify the legal principles supporting its ruling on this claim.  In any event, the failure to grant habeas corpus relief on this claim was contrary to *Brady* and involved an unreasonable application of *Brady* to Petitioner's case.  Given the record in the Texas courts, the denial of this claim unreasonably ignored the facts.

   **6.    The State Violated *Brady v. Maryland* and *Kyles v. Whitley* by Concealing Material the Defense Could Have Used to Impeach the Quality and Integrity of the Police Investigation**

The State does not challenge that Petitioner was entitled under *Brady* and *Kyles v. Whitley*, 514 U.S. 419, 449 n.19 (1995), to material information that Petitioner could have used to impeach the State's witnesses against him (in particular Martinez and Red Wilson) and to assist him in proving that the Cameron County Sheriff's Office investigation, and the process by which the State's agents gathered evidence against him, should not be trusted by the jury.  *See* Motion at 28-30.  Instead, Respondent again asserts her Catch-22:  Petitioner must now establish the materiality of the missing evidence, but Petitioner cannot do so because he does not have the evidence.  (Respondent's counsel has confirmed that the State will continue to oppose in this Court Petitioner's very limited motion for discovery of Martinez's grand jury testimony and the State's agents' records of their two-day interrogation of "Red" Wilson.)

The Order does not identify the legal principles supporting its ruling on this claim.  In

any event, the failure to grant habeas corpus relief on this claim was contrary to *Brady* and *Kyles* and involved an unreasonable application of theses cases to Petitioner's case. Given the record in the Texas courts, the denial of this claim unreasonably ignored the facts.

### 7. The Trial Court's Refusal to Provide Reasonable Compensation, Investigative Assistance, and Co-Counsel Effectively Denied Petitioner the Assistance of Trial Counsel under *United States v. Cronic*, 466 U.S. 648 (1984)

The Motion does not refute that Petitioner's appointed counsel, Mr. Limas, who was defending his first capital murder case after having been licensed for just over five years, received an unreasonable compensation for his services. *See* Motion at 30-32. It also does not refute that counsel was not compensated for investigative services; counsel, in fact, paid an investigator out of his own pocket. *Id.* Further, it is undisputed that Limas was sole appointed counsel and the State had at least three attorneys at Petitioner's trial. Petitioner's trial counsel made a request to the Convicting Court for appointment of co-counsel. *See* App. VI, Exh. 62 (Limas Aff. ) at ¶ 4 (Limas describes asking Judge Valdez for co-counsel). Limas has testified that he did not qualified to defend Petitioner's case alone, and he told the trial judge that "I would not be able to provide Mr. Colella with the defense he deserved without the help of another lawyer, and that I had never tried a capital murder case before." *Id.* Again, these facts are all undisputed.[7] The Order makes no factual findings about this claim.

Petitioner claims that the denial of resources constructively deprived him of an adequate trial counsel, and that trial counsel was prevented from subjecting the case to the "crucible of meaningful adversarial testing." A defendant "requires the guiding hand of counsel at every step in the proceedings against him." *Powell v. Alabama*, 287 U.S. 45, 69 (1932). This rule is designed "to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding." *United States v. Cronic*, 466 U.S. 648, 658 (1984). As the

36

Supreme Court stated in *Cronic*: "The right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial." *Id.* at 658. These principles were well-established when Petitioner's verdict and death sentence became final in 1996.

*Cronic* recognizes that an attorney must be capable of subjecting the case to the "crucible of meaningful adversarial testing" to fulfill his role within the system. *Id.* at 656. Under *Cronic*, reversal is required without a showing of prejudice whenever the accused demonstrates that his lawyer was "prevented from assisting the accused during a critical stage of the proceeding." *Id.* at 659 & n.25. The State has conceded that "*Cronic* calls for the presumption of prejudice when, during a critical stage of trial, counsel is either (1) totally absent, or (2) present but prevented from providing effective assistance." *Burdine v. Johnson*, 262 F.3d 336, 345 (5th Cir. 2001) (*en banc*), *cert. denied*, 70 U.S.L.W. 3742 (U.S., June 3, 2002).

Limas has admitted that he alone could not provide effective assistance because he lacked the skill and experience to represent a person facing a capital murder charge with the prospects of a death sentence. Limas was present, but was simply unable to provide effective assistance because he was not qualified, as he had so advised the trial court, and lacked the required investigative and financial resources.

Respondent claims that *Cronic* is limited to three defined situations. Motion at 31 (citing *Jackson v. Johnson*, 150 F.3d 520, 525 (5th Cir. 1998)). This is incorrect. First, *Jackson* does not so hold. Instead, *Jackson* recognized that in *Childress v. Johnson*, 103 F.3d 1221 (5th Cir. 1997) "constructive denial of counsel had been found in cases involving counsel's absence from the courtroom, conflicts of interest between defense counsel and the defendant, and official interference with the defense." *Id.* Contrary to Respondent's statement, this wording does not

---

[7] Respondent notes that trial counsel did not file a motion for the appointment of co-counsel. Motion at 30.

limit constructive denial of counsel to these three instances. Second, in *Jackson*, the Fifth Circuit stated "[w]e have indicated that constructive denial will also be found 'when counsel fails to 'subject the prosecution's case to meaningful adversarial testing.'" *Id.* Respondent states that Petitioner's "claims obviously do not fit into the first two categories" of *Jackson*. Motion at 31. Limas has given a sworn affidavit stating that he advised the Convicting Court that he would be unable to provide Petitioner with the defense to which he was constitutionally entitled without a co-counsel, and the record demonstrates he was correct. App. VI, Exh. 62 (Limas Aff.) at ¶ 4. Limas never moved to withdraw even though he had determined that he could not fulfill his professional duty to represent Petitioner absent co-counsel. *See* Texas Disciplinary Rules of Professional Conduct Rule 1.01(a) (lawyer shall not accept employment in a legal matter "which the lawyer knows or should know is beyond the lawyer's competence"). On Petitioner's direct appeal, Limas was suffering under a conflict because his personal interest diverged from the interest of Petitioner, and this actually affected his performance. *See Cuyler v. Sullivan*, 446 U.S. 335, 356 n3 (1980).

Respondent has also stated that Petitioner's "assertion that his trial was rendered unfair by 'crippling state-imposed handicaps' . . . fails because, as discussed above, it finds no support in Supreme Court authority." Motion at 31. The only authority cited dealt with whether the inexperience of counsel gave rise *per se* to ineffective assistance of trial counsel. *See* Motion at 30. Petitioner's claim is that the State's failure to appoint co-counsel, given that trial counsel admitted he could not adequately defend Petitioner alone, and its failure to provide investigative resources, effectively denied him a counsel or prevented him a counsel who was truly acting as his advocate. *Cronic*, 466 U.S. at 655-56.

The Order does not identify the legal principles supporting its ruling on this claim. In

any event, the failure to grant habeas corpus relief on this claim was contrary to *Cronic* and/or

involved an unreasonable application of *Cronic* to Petitioner's case. Given the record in the

Texas courts, the denial of this claim unreasonably ignored the facts.

**8. Trial Counsel's Unreasonably Low Compensation and the Trial Court's Refusal to Appoint Co-Counsel or to Compensate Trial Counsel for Investigative Services Denied Petitioner the Effective Assistance of Counsel under *Strickland v. Washington*, 466 U.S. 668 (1984)**

Respondent says that *Strickland v. Washington*, 466 U.S. 668 (1984), sets forth the

governing standard for Petitioner's claim that the denial of resources violated his Sixth

Amendment rights. Motion at 31. As set forth below, State-appointed counsel's performance

was constitutionally deficient, and Petitioner was actually prejudiced by that counsel's deficient

performance.

The Order does not identify the legal principles supporting its ruling on this claim. In

any event, the failure to grant habeas corpus relief on this claim was contrary to *Strickland* and

involved an unreasonable application of *Strickland* to Petitioner's case. Given the record in the

Texas courts, the denial of this claim unreasonably ignored the facts.

**9. Trial Counsel's Unreasonably Low Compensation and the Trial Court's Refusal to Appoint Co-Counsel or to Compensate Trial Counsel for Investigative Services Denied Petitioner's Right to Reliable Sentencing Procedures under the Eighth Amendment**

Respondent devotes only two sentences to Petitioner's claim that his Eighth Amendment

right to procedural fairness in sentencing was violated. *See* Motion at 32 (after introducing the

issue, Respondent states in a single sentence that Petitioner's claim lacks authority and is barred

by *Teague*).

The factual basis for Petitioner's Eighth Amendment claim is undisputed. Texas's

underfunded indigent capital defense system, which required each county to fund the

representation of counsel, including investigators and experts, and left the appointment process to the counties, resulted in arbitrary and capricious administration of the death penalty and arbitrary and capricious imposition of death sentences. The problems created by Texas's decentralized process for the appointment and compensation of counsel in death penalty cases have been documented and are legendary. They have prompted legislative reforms beginning in 1995, after Petitioner's trial, with establishment of guidelines and standards for the appointment and compensation of counsel. When trial counsel was appointed, there were no guidelines in effect as to his competency and compensation. *See* Response at 42-47. Given the low compensation afforded Texas counsel in representing those accused of a death-eligible crime, it is no wonder that the Fifth Circuit has affirmed federal writs of habeas corpus when compensation was low, and in doing so has pointed to problems in the Texas system. *Cockrum v. Johnson*, 119 F.3d 297, 298 (5th Cir. 1997) (decrying appointed counsel's low compensation as part of a "perverse allocation of government resources"); *Martinez-Macias v. Collins*, 979 F.2d 1067 (5th Cir. 1992) ("The state paid defense counsel $11.84 per hour. Unfortunately, the justice system got what it paid for.").

Second, the Supreme Court has long recognized the "need for reliability in the determination that death is the appropriate punishment in a specific case." *Zant v. Stephens*, 462 U.S. 862, 884 (1982) (quoting *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976)). In scrutinizing death penalty procedures under the Eighth Amendment, the Supreme Court has emphasized the "twin objectives" of "measured consistent application and fairness to the accused." *Clemons v. Mississippi*, 494 U.S. 738, 748 (1990) (citing *Eddings v. Oklahoma*, 455 U.S. 104, 110-111 (1982) and *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (emphasizing the importance of reliability). The death penalty cannot be meted out "arbitrarily or capriciously."

*Caldwell v. Mississippi*, 472 U.S. 320, 343 (1985) (O'Connor, J., concurring in part). The Supreme Court has demanded special protections in death penalty cases, recognizing that "death is a different kind of punishment from any other which may be imposed in this country." *Gardner v. Florida*, 403 U.S. 349, 357 (1977).

Respondent has elected to ignore long-established Supreme Court authority that the Eighth Amendment requires reliability and fairness in the determination of his death sentence. The State of Texas was duty bound to assure that Petitioner was free from arbitrary and capricious punishment. That was clearly the legal landscape in 1992, when he was tried, and in 1996, when his conviction became final. Texas's underfunding and lack of oversight, uniformity and guidance combined to assure that Petitioner was not provided constitutionally-adequate legal representation in a capital case. Those factors resulted in Petitioner not being provided an attorney with access to basic resources to adequately prepare for Petitioner's guilt or sentencing trials.

For purposes of *Teague*, the Fifth Circuit *en banc* decision in *Burdine* emphasized that a rule is *not* new if it represents a specific application of a general constitutional principle espoused and enforced in the Supreme Court's earlier cases. *Burdine*, 262 F.3d at 343 . Requiring the State of Texas to assure that adequate resources are provided to lawyers appointed represent those accused of capital offenses and facing the most serious penalty, death, is consistent with the Supreme Court's Eighth Amendment jurisprudence as set forth above.

The Order does not identify the legal principles supporting its ruling on this claim. In any event, the failure to grant habeas corpus relief on this claim was contrary to *Zant, Woodson, Clemons, Caldwell, Lockett, etc.* and involved an unreasonable application of these cases to Petitioner's case. Given the record in the Texas courts, the denial of this claim unreasonably

ignored the facts.

> **10. The Trial Court's Refusal to Appoint Co-Counsel or to Compensate Trial Counsel for Investigative Assistance to Assist Trial Counsel in the Enormous Task of Preparing For and Presenting this Complex Capital Case Denied Petitioner the Basic Tools Essential to his Defense in Violation of *Ake v. Oklahoma*, 470 U.S. 68 (1985)**

Respondent's Motion provides no facts to refute the Petition's facts supporting Petitioner's *Ake* claim. The Petition set forth at length and in detail the lack of access Petitioner had to "the raw materials integral to the building of an effective defense." *Ake v. Oklahoma*, 470 U.S. 68, 77 (1985).

Trial counsel told the Convicting Court that he was not qualified to defend Petitioner and later told the Convicting Court that he was overwhelmed. He has provided his opinion that two attorneys should have been appointed to defend Petitioner's capital murder case. Another missing element of Petitioner's defense material was an investigator compensated by the State As the record establishes, the Convicting Court declined to compensate trial counsel for the services of an investigator, which limited the investigation that was done. Indeed, no serious investigative work or background studies were done on Petitioner's behalf. Adequate legal counsel, assisted by an investigator, is required for a constitutionally-adequate defense of someone accused of capital murder and facing the death penalty, as the Petition established (*see* Petition at ¶¶ 175-188). Respondent has not refuted these facts.

Respondent makes only one argument in response: *Ake* is inapplicable (says Respondent) because Petitioner had a constitutional right to non-psychiatric experts "only if the evidence is both critical to the conviction and subject to varying expert opinion." Motion at 32 (citing *Yohey v. Collins*, 985 F.2d 227 (5th Cir. 1993)). Petitioner has established the essential role of counsel as necessary to assure the integrity of the adversarial process and prevent the harm that resulted

from the lack of constitutionally-adequate counsel. Petition at ¶¶ 179-188. In *Moore v. Johnson*, 225 F.3d 495, 503 (5th Cir. 2000), *cert. denied*, 532 U.S. 949 (2001), the Fifth Circuit squarely included the lawyer as part of the "raw materials" under *Ake* – "[m]ost of those raw materials come to the defendant in the form of his court-appointed lawyer – in his expert knowledge about how to negotiate the rules of court, how to mount an effective defense, and so forth." Here, it is undisputed that this basic "raw material" under *Ake*, an adequate lawyer, with adequate investigative resources, was missing. In addition, the Petition establishes the critical information that could have been uncovered relating to Petitioner's innocence, if appointed trial counsel had an adequately-funded investigator.

The Order does not identify the legal principles supporting its ruling on this claim. In any event, the failure to grant habeas corpus relief on this claim was contrary to *Ake* and involved an unreasonable application of *Ake* to Petitioner's case. Given the record in the Texas courts, the denial of this claim unreasonably ignored the facts.

### 11.    Limas Provided Ineffective Assistance of Counsel in the Guilt/Innocence Phase and Voir Dire

Respondent agrees that under *Strickland v. Washington*, 466 U.S. 668 (1984), ineffective assistance of counsel occurs when (1) counsel's performance was deficient, falling below an "objective standard of reasonableness"; and (2) the deficient performance prejudiced the defense. 466 U.S. at 687. This Court must be "highly deferential" to counsel's decisions, but deference is given only to informed strategic choices after counsel has fulfilled his duty to make a "reasonable investigation." *Id.* at 690-91.

Respondent does not challenge the Petition's facts that trial counsel did not engage in a reasonable investigation. Trial counsel has admitted, and it stands unrefuted on this record, that Mr. Limas was not qualified to defend Petitioner, alone, in this prosecution.

Respondent attacks Petitioner's reference to the *Alifonso Lopez* case, in which Mr. Limas was found to have rendered ineffective assistance of counsel due to his lack of preparation, failure to understand the theory of the defense, and failure to present the necessary evidence to develop an alibi. Also, in the *Lopez* case, the court found trial counsel not to be credible. As Petitioner clearly indicated, *Lopez* was cited as further evidence of counsel's habits and course of conduct as a lawyer, particularly in a case involving an alibi. Petitioner understands that he must establish that Mr. Limas was also constitutionally ineffective in Petitioner's case (Petition at ¶¶ 192, 207), so his Petition has developed extensive facts as to Mr. Limas's ineffectiveness in Petitioner's case.

Respondent does not challenge that trial counsel's investigation/preparation was deficient. Motion at 34 (not attempting to establish that counsel was not deficient but instead emphasizing that Petitioner must show what an investigation would have uncovered and how the defense would have benefited). Respondent does not rebut the extensive evidence that trial counsel did not communicate with Petitioner or potential witnesses about critical aspects of the case. *See* Petition at ¶ 208 (trial counsel failed to follow-up with potential alibi witnesses and those who had treated Petitioner for psychiatric problems; trial counsel failed to meet with Petitioner to adequately prepare; Petitioner never met with trial counsel's investigator; Petitioner never advised about decisions to hire experts (actually, no decisions were made as no experts consulted with Limas or testified at Petitioner's trial)). Trial counsel "never approached" any of Petitioner's family members to interview them about the case even though they were at the trial. App. III, Exh. 39 (Mary Curtis Aff.) at ¶ 28.   Petitioner was never asked to review the evidence that his attorney intended to put on during trial.   App. I, Exh. 9 (Evidentiary Hearing) at 32. Trial counsel never told Petitioner whom he had interviewed for the case. *Id.* at 31-34.

Also, Respondent does not deny that trial counsel left most, if not all, of his trial and investigative decisions to the beginning of trial. Petition at ¶ 209. She does not rebut that due to Mr. Limas's unpreparedness, he did not have gather facts to support Petitioner's alibi defense until the beginning of trial, when Petitioner's mother took it upon herself to go to Victoria and find Amy Pflaum, or that thereafter Mr. Limas changed the theory of Petitioner's defense from manslaughter to alibi. Petitioner's mother, however, had prodded trial counsel to investigate the alibi defense at least as early as the end of Brenda's trial, and likely even before that. App. I, Exh. 9 (Evidentiary Hearing) at 30-36 (Testimony of Petitioner); App. III, Exh. 39 (Curtis Aff.) at ¶¶ 29, 30.

Respondent does not refute trial counsel's sworn statement that he did not obtain or read the transcript of Brenda's trial before Petitioner's trial. App. VI, Exh. 62 at ¶ 7. While it appears that trial counsel was aware of some parts of Martinez's testimony, as the Petition acknowledged, the evidence is undisputed that Limas did not attend Brenda's trial or make a reasonable investigation of what happened in Brenda's trial. This is not a question of "degrees" as the Motion claims, but of appointed counsel's failure to perform a fundamental aspect of trial preparation—familiarization with the State's case against his client from the record of the prosecution of another defendant by the same prosecutors for the same crime.

As a result, the undisputed evidence is that during voir dire, trial counsel suggested that Petitioner was guilty of killing the two men, but did so based on provocation or voluntary manslaughter. Limas also told the jury that Petitioner would not testify. Petition at ¶¶ 215-220. During trial, however, Petitioner maintained his innocence, and did so by taking the stand in his own defense during the guilt phase. *Id.* at ¶ 218. Also, Respondent does not deny that the State picked up on Limas's switch in defense theory and gored him with it in closing arguments,

arguing that "this stuff during voir dire about voluntary manslaughter" cannot be reconciled with Petitioner's taking the stand and saying "'I wasn't even there.'" SF.Vol. XIX: 1546. Of course, this "stuff . . . about voluntary manslaughter" would have never been said to Petitioner's jury if trial counsel had investigated the case.

Respondent's only attempt to challenge the ineffectiveness facts as to preparation is to claim that Petitioner has not shown that Petitioner's mother (Mrs. Curtis) or stepfather were prepared to give alibi testimony.[8] This observation misses the point. Mrs. Curtis has given sworn testimony that trial counsel never interviewed the family. Trial counsel did not call any of the family members as witnesses. He claimed this was strategy but he had not even interviewed the witnesses so as to make an informed decision. Mrs. Curtis has given sworn testimony that, after having heard Detective Martinez testify in Brenda's trial about the estimated time of death, and before Petitioner's trial began, she told trial counsel that she and her husband had driven Paul and Brenda to the bus station in Victoria, Texas on the morning of the 13th and that they arrived shortly before 6:00 a.m. App. III, Exh. 39 at ¶ 29. Limas said he would look into this fact but he never did. *Id.* Trial counsel did not have the transcript from Brenda's trial, in which Martinez had established the time of death as approximately 5:00 a.m., so he was unable fully to appreciate the significance of Mrs. Curtis's information. Or, trial counsel may simply have neglected to do *anything* about Mrs. Curtis information until it was too late. Had trial counsel investigated Mrs. Curtis's claim about the alibi, which he has now agreed was a "big issue" and "crucial," he never would have mentioned "voluntary manslaughter" in front of Petitioner's jury and instead would have developed a consistent defense focused on the alibi. It was after Mrs. Curtis brought Ms. Pflaum to the courthouse that trial counsel shifted his theory of the case to the

---

[8] There is no evidence that Mrs. Curtis refused to testify. Instead, in her affidavit, she stated that she wanted to tell the jury more about her son. App. III, Exh. 39 at ¶¶ 29, 33.

alibi defense. *See* Response at 47-53.

Respondent says, as she must, that there was no serious question about the time Petitioner purchased the bus ticket in Victoria—6:00 a.m. on September 13. Motion at 35 n.11.[9]  But this admission, while welcome, overlooks the crucial point.  The State's evidence in Brenda's trial clearly established that the victims were killed around 5:00 a.m., not before 3:00 a.m.  Once Amy Pflaum established Petitioner's whereabouts in Victoria at 6:00 a.m., it was absolutely imperative for Mr. Limas to demonstrate that the victims were killed around 5:00 a.m., as the State had theretofore consistently said.  As Limas has conceded, the time of the shootings became critically important. App. I, Exh. 9 (Evidentiary Hearing) at 34.  Limas could have done this by properly using Martinez's sworn testimony from Brenda's trial.  Counsel appears not to have the printed copy of that testimony so that he could properly control Martinez.  Second, as trial counsel has admitted, he did not obtain the victims' death certificates.  *Id.*  The death certificates established that Cameron County officially recorded that two victims died at approximately 6:00 a.m.  App. II, Exh. 38.  Trial counsel made no "strategic decision" about the death certificates because he had made no effort to obtain them from the Cameron County offices.  Third, he could have secured admission of the Municipal Judge's official report, which again officially concluded that the victims had died at approximately 6:00 a.m.  Contrary to the Motion, the Petition has established that the Hunsaker report could have been admitted as a business record (Tex. R. Evid. 803(6)) or a public record or report (Tex. R. Crim. Evid. 803(8)(B)).  Petition at ¶¶ 262-263.

The Motion argues that only Mrs. Curtis and her husband could corroborate Petitioner's assertion that Petitioner fled the island to avoid Sid Wilson.  Motion at 34-35.  But as the Petition

---

[9] This is due to Mrs. Curtis, not Mr. Limas.  Mrs. Curtis found and brought Ms. Pflaum to the courthouse.

establishes, the State *conceded* in Brenda's appeal that the evidence established that Petitioner was fleeing to avoid Sid's armed threat. Response at 11.

Petitioner's Petition and Response have documented at length trial counsel's failure to engage in the minimally-adequate performance that the constitution requires of appointed counsel at a murder trial. There are not just "a few" instances of conduct falling below the *Strickland* standard. Mr. Limas's failures permeate the record. Respondent claims that it was trial counsel's decision to object to evidence or not, and this Court should not consider whether trial counsel's conduct was deficient. Motion at 38 (citing *Knox v. Johnson*, 224 F.3d 470, 480 (5th Cir. 2000)). *Knox* dealt only with a situation involving bolstering, in which the State asked each of its four main witnesses if they were testifying as they had before. 224 F.3d at 480. In Petitioner's case, Red Wilson's credibility was pivotal, which Respondent does not dispute, and the State's use of Martinez's to bolster and "corroborate" Red's testimony did not occur only once, but repeatedly. The record belies Respondent's hopeful suggestion that perhaps trial counsel was concerned about the effect on the jury if he were to object. Motion at 38. During this testimony, trial counsel did object on grounds of leading, and from time to time to hearsay.

Respondent's Motion does not address in detail the Petition's other well-documented instances of ineffectiveness. To the extent that Respondent relies on the argument that defense counsel made calculated decisions not to object based on a concern about losing the objection or appearing obstructionist, this Court need only review the record, as set forth in the Petition. Trial counsel was not shy about making objections, but he failed to make the important ones to preclude the admission of highly prejudicial and inadmissible evidence.

Respondent's Motion attempts to challenge some of the Petition's statements. First, it claims that Petitioner did not show how the Hunsaker report could have been admitted    This

statement is false. *See* Petition at ¶¶ 262-63. Second, the Motion claims that the Petition erred by arguing that trial counsel failed to prevent the admission of testimony about Petitioner's wanting to "work out a deal" with the State. Motion at 39 (noting that Rule 410 of the Texas Rules of Criminal Evidence only applies to discussions with an attorney for the prosecuting attorney). First, the statements *did* concern possible conversations between Petitioner and the prosecuting attorneys. Petition at ¶ 240. Second, the Motion does not dispute that the statement could have been excluded on hearsay grounds, as the Petition also urged. *Id.* at ¶¶ 240-42.

The Order does not state the basis for its decision on this claim. In any event, the failure to grant habeas corpus relief on this claim was contrary to *Strickland* and involved an unreasonable application of *Strickland* to Petitioner's case. Given the record in the Texas courts, the failure to grant relief unreasonably ignored the facts.

### 12. Trial Counsel Provided Ineffective Assistance of Counsel in the Sentencing Phase

The *Strickland* test also applies to the sentencing phase of Petitioner's trial, as Respondent must agree. *Williams v. Taylor*, 529 U.S. 362 (2000). Trial counsel's ineffectiveness in the sentencing phase is obvious, to put it mildly.

#### a. Failure to Investigate and Present Mitigating Evidence

Respondent has failed to address Mr. Limas's critical admission that he knew Petitioner had a history of psychiatric care, yet he failed to obtain *any* records regarding Petitioner's past psychiatric care. Petition at ¶ 359. Respondent does not dispute that trial counsel failed to investigate many aspects of Petitioner's background. Limas failed to perform essential tasks including: (1) interviewing the defendant's family members concerning the family's background and the defendant's mental problems; (2) contacting witnesses from Indiana, where Petitioner grew up and lived shortly before coming to Texas; (3) investigating Petitioner's juvenile arrests;

and (4) requesting that a mental health expert evaluate Petitioner. *Id.*; Response at 79-82. As the record shows, Mr. Limas did *nothing* to prepare for the sentencing hearing. The only witnesses he called were lay witnesses identified as available at the last minute by Petitioner's mother. He failed to prepare any of those witnesses for their testimony or cross-examination. The Petition describes the problems that occurred at the sentencing hearing, when it became apparent that trial counsel had not even conferred with the witnesses before they gave their testimony. *See* Petition at ¶¶ 360-364.

The Motion claims that the Fifth Circuit allows counsel not to *put on* mitigation evidence when that decision results from a strategic choice. Motion at 40. There is not a shred of evidence, however, that Petitioner's trial counsel made *any* strategic choice. Unlike in *Williams v. Johnson*, 16 F.3d 626, 632 (5th Cir. 1994) (cited in the Motion), in which counsel *reviewed* the mitigating evidence and elected not to introduce it, Petitioner's trial counsel was unaware of what Petitioner's psychiatric and juvenile records established because he did not obtain or review them. He did not discuss any of these matters with Petitioner or his family. Two of the three cases that Respondent cites can be distinguished on this ground. *See Crane v. Johnson*, 178 F.3d 309, 313 (5th Cir. 1999) (trial counsel investigated the possibility of an insanity defense, but relied on expert reports, as well as the experts' observations in making a tactical decision not to raise this defense due to the lack of sufficient evidence and their concern about drawing damaging rebuttal psychiatric testimony from the State); *Rector v. Johnson*, 120 F.3d 551, 564 (5th Cir. 1997), *cert. denied*, 522 U.S. 1120 (1998) ("Rector admits that trial counsel investigated his background and obtained information" and based on the investigation, trial counsel elected not to put on the evidence). The third case, *Carter v. Johnson*, 131 F.3d 452 (5th Cir. 1997), is readily distinguishable, as counsel averred they had no reason to believe that the inmate was

incompetent while here Limas knew Petitioner had a psychiatric history and juvenile arrests.

The Motion's citation to *Williams v. Taylor*, 529 U.S. 362 (2000) (a habeas case in which trial counsel was found to have rendered ineffective assistance of counsel in the sentencing phase), actually supports Petitioner's prayer for relief. In *Williams*, trial counsel did not begin to prepare for the punishment phase until a week before trial. 529 U.S. at 395. In Petitioner's case, trial counsel did no preparation until *the day* the punishment phase began. In *Williams*, trial counsel did not conduct an investigation that would have uncovered extensive information and documents about his client's past, which is *precisely* what occurred in Petitioner's case. *Id.* As in *Williams*, Petitioner's trial counsel has admitted that information about Petitioner's past would have been important in mitigation, but he simply did not pursue it. As in *Williams*, Petitioner's trial counsel ignored leads provided to him by others about mitigating information from Petitioner's past. *Id.*

As in *Williams*, "not all of the additional evidence was favorable to [the convicted]." *Id.* at 396. In addition to convictions of armed robbery, burglary, and grand larceny, the petitioner in *Williams* previously assaulted an elderly woman, who remained in a vegetative state, and had been involved in two auto thefts and another violent assault on an elderly woman. *Id.* at 368. Williams' juvenile records, which were not offered at trial, revealed that Williams had thrice been committed to the juvenile system for aiding and abetting larceny, pulling a false alarm, and breaking and entering. Nevertheless, the Supreme Court held: "The failure to introduce the comparatively voluminous amount of evidence that did speak in Williams' favor was not justified by a tactical to decision to focus on Williams' voluntary confession." *Id.* Indeed, in *Williams*, the state argued that trial counsel had engaged in a tactical decision to favor a confession and to ignore mitigating evidence. *Id.* at 373-74. The federal district court dismissed

51

this argument - "tactics as a matter of reasonable performance could not justify the omissions." *Id.*

The Motion's only response is that in *Williams* trial counsel lacked any knowledge of his client's past (and therefore could not have made a strategic decision), while Petitioner's trial counsel was told about Petitioner's past, but then ignored the facts regarding it. Motion at 41. Which is worse?  In other words, Petitioner's trial counsel's alleged "strategic decision," according to Respondent, was to remain ignorant of mitigating evidence, or what it might be. As the federal district court ruled in *Williams*, no "tactic" could justify trial counsel's failure to *gather* and examine basic documents and evidence about his client's past, which is what happened here.  Remaining ignorant of what evidence might exist is not a reasonable or constitutionally-adequate "trial strategy."

*Moawad v. Anderson*, 143 F.3d 942, 948 (5th Cir. 1998), *cert. denied*, 525 U.S. 952 (1998), which Respondent cites, clearly does not warrant a different result.  In *Moawad*, trial counsel failed to investigate possible gunpowder burns on the victim, which the petitioner claimed would have established that the shooting was an accident or was done in self-defense. 143 F.3d at 948.  The petitioner had not pointed to any record evidence supporting his claim that there were gunpowder burns.  Also, trial counsel may have decided not to conduct the test to avoid learning about any negative result, in which case he would have been hard-pressed to allow his client to testify that the victim fired a gun.  *Id.*  In contrast, Petitioner claims that his trial counsel failed to investigate *any aspect* of available mitigating evidence, which is the heart of any sentencing trial in a death penalty case.  As in *Williams*, "trial counsel did not fulfill [his] obligation to conduct a thorough investigation of the defendant's background."  529 U.S. at 396; *see also* Petition at ¶¶ 354-357, 383-387 (citing numerous cases that trial counsel's failure to

investigate mitigating evidence gives rise to ineffectiveness).[10]

The Motion claims that the mitigating evidence that habeas counsel located is "two-edged," *i.e.*, some of it could have been construed negatively against the Petitioner. Motion at 42. Again, in *Williams*, the negative aspect of some of the mitigating evidence was serious, as the Court conceded. The Supreme Court held, nevertheless, that the evidence established prejudice, *i.e.*, a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" with a reasonable probability being "a probability sufficient to undermine confidence in the outcome." *Williams*, 529 U.S. at 391. The decision was based on "the entire postconviction record, viewed as a whole and cumulative of mitigation evidence presented originally." *Id.* at 399.

As in *Williams*, Petitioner's trial counsel failed to discover the deplorable conditions in which Petitioner was raised and the pervasiveness of alcoholism in his family of origin. *Compare Williams*, 529 U.S. at 397 (describing the filthy living conditions and the presence of alcohol) *with* Petition at ¶¶ 365-368 (Petitioner is the child of an alcoholic mother; father engaged in physical, sexual and emotional abuse; Petitioner was kidnapped by father's brother and then abandoned; children found dirty and malnourished and in need of medical treatment). Petitioner's trial counsel also failed to discover evidence of mental problems. *Compare Williams*, 529 U.S. at 396 ("[c]ounsel failed to introduce available evidence that Williams was 'borderline mentally retarded' and did not advance beyond sixth grade in school") *with* Petition at ¶ 369 (at the age of seven, Petitioner displays psychiatric problems requiring intervention); ¶ 370 (at the age of nine, Petitioner evaluated by a team of psychiatrists who found him to be

---

[10] *Bullock v. Whitley*, 53 F.3d 697 (5th Cir. 1995), cited by Respondent, involved trial counsel's failure to present certain testimony to establish petitioner's insanity. The Fifth Circuit found a reasonable trial strategy for the decision. 53 F.3d at 701. Contrary to Respondent's claim, the court in *Bullock* found it irrelevant that trial counsel, who had since died, had not testified about his strategy. *Id.*

disturbed; based on three tests, the team made them suspect neurological damage); ¶ 371 (psychiatrists report that Petitioner has clear signs of depression and impulsive behavior with suicidal impulses present; ¶ 374 (Petitioner prescribed Mellaril, powerful tranquilizer and an antipsychotic medication); ¶ 376 (at the age of eight, Petitioner is committed for inpatient treatment at Chicago Read Mental Health Center after he had indicated suicidal tendencies); ¶ 380 (at the age of nine, Petitioner has more suicidal gestures which cause him to be treated at the Henry Homer Children's Center). As in *Williams*, some of the mitigating evidence concerning Petitioner dealt with events that occurred many years ago.

The Petition presents extensive detail about Petitioner's lengthy treatment as a child for serious mental problems. Petitioner was under the care of psychiatrists and other medical professionals; he was committed to *three* special institutions for disturbed children. None of the details of Petitioner's background was known to Mr. Limas, let alone to Petitioner's jury during sentencing, just like none of this type of evidence was known to Williams's trial counsel or jury.

In addition, Petitioner's trial counsel failed to engage an expert on mental health, and then armed with knowledge based on such an expert's examination of Petitioner and review of the relevant records, failed to make any decision (let alone a "strategic decision") about what evidence to present. Dr. Cecil Reynolds has now done such a review, and his findings are included in the Petition at paragraphs 388-394 and in other parts of the Petition. Notably, the Motion does not address Petitioner's argument that trial counsel's failure to engage a mental health expert, particularly given Mr. Limas's concession that he knew Petitioner had a history of psychiatric problems, constitutes constitutional ineffectiveness.

Dr. Reynolds's testimony as set forth in the Petition further supports prejudice, *i.e.*, a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different." *Williams*, 529 U.S. at 391.  The Motion's sole response to all of the work that Dr. Reynolds performed is to claim that the Petition's conclusion that Petitioner "suffers organic brain damage" was not established by the Reynolds Affidavit.   Motion at 43 (noting that a full test would not to be done to establish brain damage).   Nevertheless, Dr. Reynolds reviewed the voluminous medical reports on Petitioner which gave "clear warning signs of organic impairment" (Petition at ¶ 390), and he conducted a test in which he concluded that "Mr. Colella scored in a range generally considered to reflect organic impairment to the brain." Petition at ¶ 213.

The Motion does not refute any of these facts or other facts in Dr. Reynolds' Affidavit. Respondent makes a half-hearted attempt to claim that the information is too "remote in time," as some of it deals with Petitioner's childhood, and therefore, trial counsel might have decided it was not persuasive. First, this observation misses the point. Trial counsel gathered *nothing* about Petitioner's history and treatment, so he had *no idea* of the information or the relevant dates. Second, the evidence addresses serious medical problems that have plagued Petitioner during his childhood, and continue to plague him now, as Dr. Reynolds testified. Third, it is odd that the State would claim that events relating to Petitioner's childhood are remote in time, yet the principal evidence that the State put on as to Petitioner's alleged future dangerousness came from Indiana corrections personnel who had last dealt with Petitioner when he was a juvenile.

**b.     Failure to Prevent the Prosecution from Misrepresenting Evidence to Give False Impressions about Future Dangerousness.**

The State's Prosecutor gave the materially false impressions to Petitioner's jury that Petitioner had been convicted of sexual assault and child molestation and that Petitioner had robbed an elderly lady at knife-point.  Response at 39-41.  The Motion's only response as to the ineffectiveness claim arising from the false impressions, which trial counsel was unable to

counter because he did not obtain the underlying documents regarding Petitioner's juvenile history, is to claim that Petitioner's rendition of the facts is incorrect. Motion at 44. Respondent is wrong, as Petitioner's Response demonstrates.

It should be undisputed that a constitutionally-adequate attorney, preparing to defend his client in a death penalty trial, would investigate the State's alleged "prior offenses" to assure that the State does not present an exaggerated account of those offenses to the sentencing jury. Respondent does not claim to the contrary. As the Petition and this Response establish, Petitioner was prejudiced as a result of counsel's complete failure to investigate the facts and circumstances of Petitioner's prior offenses.

### c.    Failure to Counter the Prosecution's Aggravating Evidence

The Petition sets forth factual details from the available records of various hearings involving Petitioner's 1985 juvenile conviction for burglary. Petition at ¶¶ 399-410. The details, about which trial counsel was unaware since he did not obtain these records, would have served to blunt the Prosecution's misleading descriptions of Petitioner's crimes, which the State used, quite effectively, as aggravating evidence. In addition, these records provide more information about Petitioner's psychological problems and his lengthy history of treatments.

One of Petitioner's Indiana probation officers, Officer Kesler, reported that Petitioner had "done some good while there [in Gibault School] and in the structured environment". Petition at ¶ 399. Petitioner needed counseling, which the officer indicated "would be helpful." *Id.* at ¶ 400. Monte Tosser, who testified for the State in Petitioner's punishment phase, had testified in the 1985 Indiana proceeding, stating that Petitioner had a potential for benefiting from help. *Id.* at ¶ 404. The Indiana judge, based on state officials' recommendations, agreed that Petitioner needed help and long-term counseling. *Id.* at ¶¶ 406-08.

Respondent's Motion does not challenge any aspect of what happened in Indiana except to say that the Indiana court gave little weight to the testimony of psychology graduate student Rolnik. Motion at 43. Respondent tries to minimize all of the mitigating evidence by claiming that only mitigating evidence "unrelated to dangerousness" might influence the jury to return a sentence less than death. *Id.* (citing *Williams*, 529 U.S. at 398). *Williams* did not so hold. The Supreme Court in *Williams* merely noted that "[m]itigating evidence unrelated to dangerousness (e.g., evidence as to the home conditions) may alter the jury's selection of penalty." 529 U.S. at 398. In other words, *Williams* recognized that evidence of a deprived childhood filled with abuse and privation and of the petitioner's mental problems could have influenced the jury's appraisal of his moral culpability. It is this type of evidence that Petitioner's jury did not hear, because Mr. Limas did not investigate, prepare, or present any such evidence.

### d.   Other errors.

Respondent's Motion ignores nearly of the other detailed evidence that Petitioner has presented. The evidence is set forth in the Petition and Response and it establishes that trial counsel's errors prejudiced Petitioner.

The Order does not state the basis for its decision on this claim. In any event, the failure to grant habeas corpus relief on this claim was contrary to *Strickland* and involved an unreasonable application of *Strickland* to Petitioner's case. Given the record in the Texas courts, the failure to grant relief unreasonably ignored the facts.

### 13.   Limas Provided Ineffective Assistance of Counsel on Appeal

The Motion does not dispute that (1) Mr. Limas asked the Convicting Court not to require him to represent Petitioner on direct appeal; (2) Mr. Limas advised the court that he was not qualified to handle a complex capital appeal; and (3) Mr. Limas knew that in all likelihood, an

ineffective assistance of counsel claim should have been raised but he was unable to raise the claim. Petition at ¶ 435; Appendix at Tab 62. Further, the Motion does not deny that Mr. Limas did not raise any ineffectiveness claims on appeal. The Petition also establishes that these claims have strong, constitutional merit.

Given trial counsel's statement that his own ineffectiveness should have been presented on direct appeal, Petitioner has demonstrated an actual conflict under *Cuyler v. Sullivan*, 446 U.S. 335 (1980). Petitioner has established that Limas advised the Convicting Court that he would not be able to make viable appellate points about his own inadequacy. Petition ¶¶ 435-36. Remarkably, the Motion does not address Petitioner's argument as to *Cuyler*, which establishes ineffectiveness if Petitioner has established that a plausible or viable strategy was left unpursued because appointed counsel had a conflict of interest.

The failure to grant habeas corpus relief on this claim was contrary to *Cuyler* and/or involved an unreasonable application of *Cuyler* to Petitioner's case. Given the record in the Texas courts, the denial of this claim unreasonably ignored the facts.

### 14. Counsel's Errors and Deficiencies, Considered in their Entirety, Constitute Constitutionally Ineffective Assistance of Counsel

The Motion devotes a short paragraph to Petitioner's claim that Limas's errors, in their entirety, constitute ineffective assistance of counsel. Motion at 46. Respondent simply denies that Limas rendered ineffective assistance of counsel.

The Petition has established that Limas committed errors that prejudiced Petitioner and that there is a reasonable probability that the jury's verdict or sentence would have been different. The Petition has summarized these errors in its "cumulative error" claim and given the legal basis for the cumulative error claim, the latter of which the Motion does not refute. Petition at ¶¶ 450-455. The failure to grant habeas corpus relief on this claim violated well-established law and involved an unreasonable application of the law. Given the record in the

58

Texas courts, the denial of this claim unreasonably ignored the facts.

### 15. Petitioner's Trial was Tainted by Pervasive Prosecutorial Misconduct Which Rendered the Entire Proceedings Fundamentally Unfair and Denied Petitioner Due Process of Law

The Petition documented at length the Prosecution's use of improper tactics to secure a conviction against Petitioner and sentence him to death. *See* Petition at ¶¶ 456-470; *see also id.* at ¶¶ 71-150. The Response focuses many of the same facts, with more detailed cross-references. *See* Response at 83-87. Respondent's Motion merely claims that Respondent has previously shown that each claim lacks merit, and therefore in the aggregate, the acts cannot give rise to a cumulative error claim. Motion at 46.

But nowhere in the Motion does Respondent establish that the Prosecution's tactics in Petitioner's trial—in improperly conducting voir dire, using improper opening and closing argument, sponsoring false testimony, failing to correct perjury, falsely insinuating highly prejudicial matters about Petitioner, and the list goes on—either (a) did not occur; or (b) do not give rise to a federal due process violation. The misconduct was severe and pervasive, which the Motion does not refute. Petitioner's trial was fundamentally unfair. *Donnelly v. DeChristoforo,* 416 U.S. 637 (1974).

The failure to grant habeas corpus relief on this claim was contrary to *Donnelly* and involved an unreasonable application of *Donnelly* to Petitioner's case. Given the record in the Texas courts, the denial of this claim unreasonably ignored the facts.

### 16. The Evidence of Petitioner's Guilt is Factually Insufficient under Clewis v. State

Respondent is correct that this Court cannot review Petitioner's factually insufficient claim under *Clewis v. State,* 922 S.W.2d 126, 133 (Tex. Crim. App. 1996). As with all of Petitioner's claims, the Order made no findings on this issue and Petitioner was never allowed to

fully develop it in the Texas courts due to the State's failure to follow its own Code of Criminal Procedure.

At least one federal court, when faced with a factual insufficiency challenge has recognized that *Clewis* is inapplicable, and the relevant inquiry in a federal habeas proceeding is whether "[a] rational trier of fact could have found proof of guilt beyond a reasonable doubt." *See Shaw v. Crockrell*, No. 3-01-CV-1000-M, 2002 U.S. Dist. LEXIS 1086 (N.D. Tex. Jan. 23, 2002) (citing *Schrader v. Whitley*, 904 F.2d 282, 284 (5th Cir.), *cert. denied*, 498 U.S. 903 (1990) (quoting *Jackson v. Virginia*, 443 U.S. 307 (1979))).  This standard of review controls even if state law would impose a more demanding standard of proof. *Schrader*, 904 F.2d at 284. *See also Brown v. Collins*, 937 F.2d 175, 181 (5th Cir. 1991).  In *Shaw*, it appears, but it is not clear, that the petitioner asserted a general challenge to the factual sufficiency of the evidence.

Petitioner acknowledges that his claim was filed under *Clewis*.  In any event, the Motion fails to present any facts to show that a rational trier of fact could have found proof of guilt and imposition of the death sentence beyond a reasonable doubt (if the narrow federal standard applies to Petitioner's claim).  The Petition establishes such a reasonable doubt, both as to the conviction and the death sentence.

The failure to grant habeas corpus relief on this claim violated well-established law and involved an unreasonable application of the law.  Given the record in the Texas courts, the denial of this claim unreasonably ignored the facts.

### 17.  The Cumulative Effect of the Errors Denied Petitioner his Fundamental Due Process Rights under the Fourteenth Amendment

Respondent claims that none of Petitioner's claims merits federal habeas relief and therefore, she is entitled to summary judgment on the Petition's claim that the cumulative effect of each and every error alleged in the Petition constitutes a violation of Petitioner's due process rights under the Fourteenth Amendment.  In this Response, Petitioner has established that

summary judgment is improper as each of his claims. Under *Derden v. McNeel*, 938 F.2d 605, 609 (5th Cir. 1991), a new trial is warranted. The failure to grant habeas corpus relief on this claim violated well-established law and/or involved an unreasonable application of the law. Given the record in the Texas courts, the denial of this claim unreasonably ignored the facts.

### 18.    The CCA Denied Petitioner a Meaningful Appellate Review of His Death Sentence

The Motion does not rebut that the CCA refused to consider the evidence presented at Petitioner's trial for purposes of determining whether it was sufficient to warrant the death penalty. Motion at 50. It also does not rebut the well-established United States Supreme Court authority that both the death-eligibility decision (is the death penalty appropriate for the crime?) and the selection decision (should a particular death-eligible defendant receive the death penalty in this case?) require appellate review to ensure that the process is neutral and principled. *Parker v. Dugger*, 498 U.S. 308, 321 (1991) ("[w]e have emphasized repeatedly the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally"). Meaningful appellate review of death sentences promotes reliability and consistency. *Clemons v. Mississippi*, 494 U.S. 738, 749 (1990). Absent meaningful appellate review, there would be an automatic affirmance of every death sentence, which would be invalid under *Lockett v. Ohio*, 438 U.S. 586, 605 (1978) ("an individualized sentence is essential in capital cases") and *Eddings v. Oklahoma,* 455 U.S. 104, 112 (1982) (capital punishment must "be imposed fairly and with reasonable consistency or not at all"). *See also Parker*, 498 U.S. at 321-22 (appellate review of mitigating evidence by the Florida Supreme Court was so deficient to be arbitrary).

Instead, Respondent shifts the focus from Petitioner's claim that he is entitled to a meaningful appellate review to the Fifth Circuit's holding that the CCA is not required to conduct a "proportionality" review of death sentence. Motion at 50 (citing *Hughes v. Johnson,*

191 F.3d 607, 622 (5th Cir. 1999)).  In *Hughes*, relying on *Pulley v. Harris*, 465 U.S. 37 (1984), the inmate claimed that the death sentence was disproportionate in the circumstances of his case because mitigating circumstances should have rendered him ineligible for the death penalty.  The Fifth Circuit held that under *Harris*, the state appellate court was not obligated to make this determination, because it was not required to compare the inmate's sentence with other the sentences of other capital defendants.  *Id.*

Petitioner has not relied on *Pulley v. Harris*.  Instead, he has cited Supreme Court authority which requires that the death sentence be given "individualized treatment" under the Constitution and requires the State to assure that death sentences are imposed evenhandedly, rationally and consistently.  Here, the CCA gave Petitioner's death sentence "no treatment," which Respondent does not challenge.  In upholding the Texas capital-sentencing procedures, the United States Supreme Court took comfort from Texas's reported system of "prompt judicial review of the jury's decision in a court with statewide jurisdiction" which is a means "to promote the evenhanded, rational, and consistent imposition of death sentences under law." *Jurek v. Texas*, 428 U.S. 262, 276 (1976).  As one experienced Texas jurist has written:  "*Colella* runs afoul of *Clemons* because it creates an automatic rule of affirmance that is invalid under *Lockett*, *supra*, and *Eddings*, *supra*, because *Colella* does not provide defendants with the individualized treatment that results from a reweighing of the mitigating and aggravating circumstances." *Morris v. State*, 940 S.W.2d 610, 620 (Tex. Crim. App. 1996) (Baird, J., dissenting).  The CCA's failure to review Petitioner's sentence runs afoul of *Clemons*, is inconsistent with the Court's observation in *Jurek*, and violates the Eighth Amendment.

Respondent also cites *Beazley v. Johnson*, 242 F.3d 248 (5th Cir. 2001).  In *Beazley*, the petitioner challenged the CCA's interpretation of Texas Code of Criminal Procedure Art.

44.251(a), which requires the CCA to reform a death sentence if the evidence is insufficient to support the jury's answers to questions under articles 37.0071 and 37.0711. The petitioner in *Beazley* also challenged the CCA's decision to review the sufficiency of mitigating evidence under the "future dangerousness" special issue, rather than the "mitigation" special issue. *Id.* at 261. The Fifth Circuit deferred to the CCA's interpretation of state law; it also held there was meaningful appellate review when the Texas court reviewed the jury verdict under the mitigation special issue or the future dangerousness issue. *Id.* Unlike in *Beazley*, Petitioner does not seek review of the CCA's interpretation of the Texas Code of Criminal Procedure. The Fifth Circuit in *Beazley* acknowledged that the Texas courts had engaged in *some* review of Beazley's death sentence. *Id.* In *Colella*, the CCA elected not to conduct *any* review.[11]

The Order stated that this claim was "overruled through his failure to cite authority showing that this Court [the Texas trial court] has the authority to review and rule adversely to a ruling of an appellate court." Order at ¶ 43. Without citing any legal principles, the Order also stated that the claim was without merit. *Id.* The failure to grant habeas corpus relief on this claim was contrary to *Parker, Clemons, Edding, Lockett, Jurek* and the many other U.S. Supreme Court decisions that recognize the need for meaningful appellate review of the death sentence and/or it involved an unreasonable application of *Parker, Clemons, Edding, Lockett, Jurek, et al.* to Petitioner's case. Given the record in the Texas courts, the denial of this claim unreasonably ignored the facts.

> **19.    Granting the State's Challenge for Cause Against Venireman William Bristol Violated Petitioner's Rights under the Sixth, Eighth and Fourteenth Amendments .**

Venireman William Bristol testified that he could answer the special issues in the

---

[11]Respondent's Motion does not reference *Moore v. Johnson*, 225 F.3d 495 (5th Cir. 2000), *cert. denied*, 532 U.S. 949 (2001) on this issue. In *Moore*, the court held that appellate review of the mitigating factors is not required, as all that is needed is for the jury to consider the mitigating evidence in determining whether the death sentence should be given. 225 F.3d at 506-07. Petitioner contends for the reasons stated in this Response that appellate courts are duty bound to review a death sentence to determine its propriety and non-arbitrariness in light of the evidence. The CCA expressly refused to provide this constitutionally-mandated review.

sentencing phase with regard to the evidence and as instructed. S.F. Vol. VI: 100-02. His clear commitment to follow the rules came after he had earlier given ambiguous testimony on whether he could impose the death sentence. *Id.* at 92. Judge Clinton of the CCA read the *Colella* transcript and observed:

> None of these answers remotely establishes that he [Bristol] would automatically answer the § 2(e) special issue affirmatively. The prosecutor did not even explain the operation of the special issues to him, much less inquire whether his apparent inability personally to impose a death penalty would cause him consciously to distort his response to one of them.

*Id.* at 846 (Clinton, J., dissenting).

As the CCA's majority opinion stated: "[D]uring his voir dire as a whole Bristol seemed to state that he could follow the statutory scheme." *Colella*, 915 S.W.2d at 842. Nevertheless, the trial judge said based on the totality of the examination, the juror was not acceptable, S.F. Vol. VI: 104, and the CCA found the trial judge's decision to strike Bristol was a rational conclusion. *Colella*, 915 S.W.2d. at 842.

Petitioner's Motion urges this Court to defer to the Texas court findings, which Respondent claims must be presumed correct. But the Texas habeas court made no finding on this point. According to Respondent, the Convicting Court made a finding at trial when it stated "this juror is not acceptable." Motion at 50.

This "finding," even if subject to a presumption of correctness, is still rebuttable if clear and convincing evidence refutes it. Motion at 51. First, the finding is based on the application of an incorrect legal standard. The Motion does not dispute that the State bore the burden of showing that Bristol understood the requirement of the law and that he could not overcome his prejudice. This showing was not made, as the Motion does not dispute. *Colella*, 915 S.W.2d at 846. Second, clear and convincing evidence disputes the conclusion. This Court can read the transcript and determine, as did Judge Clinton, that Bristol's views would not prevent or substantially impair the performance of his duties as a juror. Indeed, Bristol clearly agreed he could impose the death penalty, and he never said that he could not.

64

Petitioner is not asking this Court to "parse" the trial court transcript to raise problems on collateral review where none were seen at trial. Instead, it is asking this Court to review the transcript in light of the relevant legal standards, and to determine whether it was clearly and convincingly established that Bristol should not have been struck for cause. The Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution afford Petitioner relief because Bristol clearly stated he could follow the Texas sentencing scheme. The failure to grant habeas corpus relief on this claim violated well-established law and involved an unreasonable application of the law. Given the record in the Texas courts, the denial of this claim unreasonably ignored the facts.

## CONCLUSION

Petitioner's counsel apologize for the length of their papers, but this is a deadly serious matter. At trial and on direct appeal, Petitioner was represented only by Mr. Limas. Petitioner did not have a constitutionally-adequate defense at trial or on direct appeal. The State habeas courts, to put it bluntly, gave Petitioner's Petition (the same one he has filed here) the backs of their hands.

Petitioner maintains his innocence of these crimes. He was convicted on the extremely flimsly testimony of Red Wilson, whose testimony the State purchased for a grant of immunity. There can be no question that the State's principal police investigator, Detective Martinez, gave false testimony at Petitioner's trial, molded after Brenda's trial to defeat Petitioner's alibi based on the testimony of an unimpeachable third party witness, the Victoria bus station clerk, and also changed so as not to destroy the appearance that Red Wilson was testifying truthfully, which the State had to give.

Absolutely no physical evidence tied Petitioner to these crimes. Indeed, there is no physical evidence (that Petitioner or his counsel know of) that could exonerate him either, because none was gathered or preserved by the Cameron County Sheriff's Office. In other words, this is not a case in which Petitioner can ask the Court for DNA testing to save his life, or anything such as that.

65

All Petitioner has is this Petition, and this Petition is all that now stands between him and the executioner's table. His Petition is meritorious. He earnestly requests this Court to deny Respondent's Motion for Summary Judgment, authorize him reasonable discovery, and set this matter down for an evidentiary hearing. Our Constitution requires no less.

Respectfully submitted,

Mandy Welch
Attorney-in-Charge
Southern District No. 15543
Texas Bar No. 21125380
Burr & Welch
412 Main Street, Suite 1100
Houston, Texas 77002
Telephone: (713) 227-0200
Fax: (713) 227-0215

Susan L. Karamanian
Southern District No. 10787
State Bar No. 11097600
2000 H. Street NW
Washington, D.C.
Telephone: (202) 994-1210
Fax: (202) 994-2831

Michael V. Powell
Southern District No. 5429
State Bar No. 16204400
2200 Ross Ave., Suite 2200
Dallas, Texas 75201
Telephone: (214) 740-8520
Fax: (214) 740-8800

COUNSEL FOR PETITIONER

## CERTIFICATE OF SERVICE

I hereby certify that I have caused the foregoing pleading to be served on Respondent by overnight delivery a copy of the foregoing brief to Mr. Charles Palmer, Assistant Attorney General of Texas, counsel for Respondent, Capital Litigation Division, Office of the Attorney General, P.O. Box 12548, Capitol Station, Austin, Texas 78711, this 17th day of June 2002.

_____
Michael V. Powell